## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, on behalf of themselves and all others similarly situated, | Civil Action No. |
| -and- | |
| The Professional Tennis Players Association, | **COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |
| ATP Tour, Inc., WTA Tour, Inc., International Tennis Federation Ltd., and International Tennis Integrity Agency Ltd., | |
| Defendants. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    PARTIES ............................................................................. 10

    A.    Plaintiffs ................................................................. 10

    B.    Defendants ............................................................. 12

        1.    The ATP ........................................................ 12

        2.    The WTA ...................................................... 13

        3.    The ITF ........................................................ 13

        4.    The ITIA ...................................................... 14

III.   JURISDICTION .................................................................. 14

IV.   VENUE ................................................................................ 16

V.    BACKGROUND ................................................................... 17

    A.    The ITF, ATP, WTA, and ITIA .............................. 18

        1.    The ITF ........................................................ 18

        2.    The ATP ........................................................ 21

        3.    The WTA ...................................................... 26

        4.    The Conspirators' Revenue Streams .......................... 31

        5.    The ITIA ...................................................... 31

    B.    The PTPA............................................................... 32

    C.    The History of Organized Sports' Hostility to Player Rights ............... 35

VI.   FACTUAL ALLEGATIONS................................................... 39

    A.    The Governing Body Defendants Conspire to Fix Player Earnings ................................................................ 40

        1.    The Tours and Their Co-Conspirators Agree to Restrict Prize Money. .............................................. 40

2.      Defendants Take Players' Name, Image, and Likeness Rights Without Compensation. ................................... 49

3.      The Governing Body Defendants Restrict Players' Ability To Earn Off-Court Income ........................... 50

B.      The Governing Body Defendants and Their Co-Conspirators Lock Up the Market by Agreeing to Only Recognize the Ranking Points from Each Others' Tournaments and Controlling the Professional Tennis Schedule ................ 54

1.      The Governing Body Defendants and Their Co-Conspirators Utilize Ranking Points to Manipulate the Market for Players' Services. ........................ 55

2.      The Governing Body Defendants and Their Co-Conspirators Set A Demanding, Year-Long Schedule With Restrictive Play Requirements. ................. 59

3.      Ranking Points and Compulsory Schedules Force Players to Sell Their Labor on Restrictive Terms. ................ 72

C.      The Tours Prevent New Tournaments From Entering The Market and Require Member Tournaments to Agree to Anticompetitive Non-Competes. .......................... 73

1.      Closed Tournament Structure .................... 74

2.      Non-Compete Agreements.......................... 77

D.      Defendants Abuse Their Dominance Through The Sham and Arbitrary Investigative Processes of the ITIA. ................ 82

E.      The ATP Abuses Its Monopsony Power By Unfairly Collecting and Using Players' Data ........................ 89

F.      The Governing Body Defendants Protect Their Cartel By Compelling Their Players to Sign Illegal and Unenforceable Arbitration Provisions and Waivers. ...................... 91

VII.    RELEVANT MARKETS, MARKET POWER, AND HARM TO COMPETITION ................................................ 94

A.      The Market for the Services of Men's Professional Tennis Players ................................................ 94

B.      The Market for the Services of Women's Professional Tennis Players ........................................................................... 98

C.      Defendants' Individual and Concerted Misconduct Have Harmed the Relevant Markets.......................................................... 102

    1.      Harm To the Market for the Services of Men's Professional Tennis Players. ................................. 102

    2.      Harm To the Market for the Services of Women's Professional Tennis Players. ........................... 104

VIII.   CLASS ALLEGATIONS ........................................................... 106

A.      Classes ................................................................... 106

B.      Numerosity ............................................................... 107

C.      Commonality ............................................................. 107

D.      Typicality ............................................................... 109

E.      Adequacy of Representation .............................................. 110

F.      Superiority .............................................................. 110

IX.     ANTITRUST INJURY ............................................................ 111

X.      INTERSTATE TRADE, COMMERCE, AND CONDUCT ............................ 116

CLAIMS FOR RELIEF ................................................................... 117

PRAYER FOR RELIEF .................................................................. 157

DEMAND FOR JURY TRIAL ............................................................ 158

Plaintiffs, by and through their undersigned attorneys, allege as follows:

## I. INTRODUCTION

1. Professional tennis players are stuck in a rigged game. Not on the court, where fierce competition between players delights millions of fans worldwide, but off of it, where players are forced to endure grueling schedules, capped earnings, abusive and invasive investigations and discipline, and have limited control over their own careers and brands. This is because a cartel of tour organizers and tournament operators have conspired to avoid competition amongst themselves and to shut out outside tournaments, affording them complete control over the players' pay and working conditions. These horizontal and vertical agreements are textbook violations of state and federal law. They immunize professional tennis from ordinary market forces and deny professional tennis players and other industry participants their right to fair competition. This lawsuit seeks to remedy these harms.

2. Plaintiffs are a diverse group of twelve professional tennis players—men and women, established superstars, journeymen, and relative newcomers from around the world, who seek to represent a class of similarly situated professional tennis players—and the Professional Tennis Players Association, which advocates for the rights of all players. These players have dedicated their lives to the sport they love and they embody the ideals of intense competition coupled with respect for the rules that tennis stands for.

3. Unfortunately, the same cannot be said of the Defendants, four major organizations that dominate and control professional tennis: (i) the International Tennis Federation, which regulates and oversees professional tennis tournaments,

including the four "Grand Slams" (the U.S. Open, Australian Open, French Open, and Wimbledon), among others; (ii) the ATP Tour and (iii) the WTA Tour, which regulate and oversee the men's and women's professional tennis tours, respectively; and (iv) the International Tennis Integrity Agency, an arm of the other three Defendants charged with the authority to investigate and discipline players for anti-doping and anti-corruption violations. Far from empowering players to play their best tennis and promoting fair competition, these organizations—in concert with dozens of co-conspirators who operate the tournaments on the tours—instead have rigged and manipulated the competitive marketplace in order to exploit players for their own gain. The Defendants' scheme is expansive, but its aims are straightforward: the Defendants and their co-conspirators have formed a cartel, acquired monopsony power in the market for the services of professional tennis players, erected barriers to entry to lock out competitors and preserve their own artificial market position, and abused their power to the harm of players, the sport, fans, and competition.

4.     The cartel has locked up the market for players' services by implementing a number of draconian, interlocking anticompetitive restraints. These include price-fixing arrangements and other restrictions that limit players' pay, restrictive scheduling and ranking mandates that lock players in to their closed system of tournaments, and restrictive non-competes and other agreements to exclude competition from other professional tennis events. These illegal restraints enable the cartel to pay artificially low compensation to professional tennis players, eliminate competition amongst themselves, and prevent any potential competitors

from entering the market. The cartel then exploits its market power by subjecting the players to abusive investigations and arbitrary discipline to keep them in line. Individually and together, these restraints reduce players' earnings and their ability to negotiate for better working conditions, exclude competitors, and impede the growth of the sport.

5.     **Price fixing and other restrictions on players' earnings:** First, and most straightforwardly, Defendants and their co-conspirators engage in *per se* illegal conduct by fixing the compensation professional tennis players may earn. Defendants do so by agreeing with each other and with the individual tournament co-conspirators to cap the prize money tournaments award and limit players' ability to earn money off the court. Rather than being determined by market forces, players' earnings are instead subject to artificial limitations agreed upon by the Defendants and their co-conspirators.

6.     Specifically, Defendants and their co-conspirators have instituted strict caps on the prize money players may receive, and have the power to veto any tournament's effort to increase those amounts. For example, when billionaire Larry Ellison, the owner of the BNP Paribas Open at Indian Wells, tried to increase the total prize pool offered to players above the fixed amounts Defendants permit, his proposal was rejected. The ATP explained that its own rulebook prohibited the increased prize money, and the WTA followed suit. As a result, players received artificially depressed pay when they competed at the event that year. Put another way, Defendants denied players compensation the market was ready and willing to

provide. Moreover, they ensured that no tournament on the Defendants' tours pays out a higher prize pot than the Grand Slams do. This price-fixing conspiracy not only reduces the compensation professional tennis players receive for their labor, but prevents individual tournaments from competing to draw better players and bigger audiences through larger prize money pools.

7.    Not content to restrict players' on-court earnings from tournaments, Defendants and their co-conspirators also leverage their power to restrict players' freedom to contract for sponsorship and endorsement deals. Players must sign over certain name, image, and likeness ("NIL") rights as a condition of competing, often without any compensation in return. Defendants similarly prevent players from entering into sponsorship agreements with certain categories of businesses— including businesses that Defendants partner with themselves—as a condition of competing. These restrictions allow Defendants and their co-conspirators to preserve the value of endorsement deals for themselves, free from competition with individual players. Together, these restrictions—especially when coupled with the prize money caps—artificially restrain players' earnings to the Defendants' benefit.

8.    **Restrictions to lock in players:** Players are sold a dream of tennis stardom as children and adolescents, with some getting lured to go pro as early as 13 or 14 without being told that they are committing themselves to a profession that operates under a rigged economic system that Defendants dominate. Defendants and their co-conspirators maintain their dominance through a number of aggressive measures designed to ensure players are locked in to Defendants' tours and cannot

participate in other tournaments. Most directly, Defendants fine players who compete in alternative tournaments and suspend those who withdraw from events produced by Defendants and their co-conspirators. Indeed, in a particularly callous exercise of their power over players, Defendants will penalize players even when an absence results from an injury, the birth of a child, or the death of a loved one. And the grueling 45-week-per-year schedule that Defendants and their co-conspirators impose—comprising dozens of tournaments spread across six continents—all but ensures that players lack any practical ability to play elsewhere.

9.      Defendants further restrict players' mobility through a draconian system of "Ranking Points," the anticompetitive currency used by Defendants to dictate which tournaments players can compete in, how much compensation they earn, and whether they receive certain sponsorship opportunities. Defendants award Ranking Points to players only if they play in the tournaments on Defendants' tours. Because players must obtain the Defendants' Ranking Points to qualify for the Grand Slams and other premier tournaments, this system funnels players away from alternative events and forces them to compete only on the Defendants' tours from the moment the players first step onto a professional tennis court.

10.     Together, Defendants' compulsory attendance rules and manipulative Ranking Points system not only require professional tennis players to work on restrictive terms but also serve to further entrench Defendants' monopsony power. Defendants' restrictions have simply left no time or capacity for players to sell their services to any buyer other than Defendants, harming competition and raising entry

barriers by excluding rival tournaments or circuits from entering or expanding in the market for the players' services.

11.    **Restraints on competition among tournaments:** As part and parcel of their scheme to dominate the market for the services of professional tennis players, Defendants also have entered into various agreements and arrangements designed to avoid competition from tournaments that, in a competitive market, could provide players with competing earning opportunities.

12.    Each tennis tournament is an independently owned business. In a fair market, there would be competition among tournament operators, allowing independent operators to follow their own economic self-interest and optimize their respective tournaments by scheduling them at dates and times most attractive to players, fans, and other business partners. But Defendants do not abide by such competition, which could threaten their dominance.

13.    Instead, Defendants hand-pick who may create, host, and operate professional tournaments and grant the lucky few a sanction to do so. Defendants allocate specific calendar weeks and geographic regions to their tournament operator co-conspirators, insulating tournaments from having to compete with one another for players or fans. The Defendants' own bylaws, in fact, require tournament operators to enter into non-compete agreements with one another. These non-competes often have lengthy terms—sometimes lasting for years after the end of the contract itself—which make it virtually impossible for tournaments to leave the conspiracy and create

independent tournaments to compete with the events that are members of Defendants' cartel.

14.    **Abusive investigations and discipline imposed on players:** Defendants exploit their exclusive control over the services of professional tennis players by abusing corrupt anti-doping and anti-corruption programs managed by Defendant ITIA, to which all professional tennis players are subject. The ITIA's aggressive, unrelenting, and, at times, illegal investigative processes subject players to dozens of drug tests (both blood and urine), invasive searches of their personal cell phones, hours-long interrogations without counsel, and harassment by unaccountable and ill-trained investigators. Defendants, moreover, have improperly collected and used player data and forced players to sign illegal waiver and arbitration agreements that seek to deprive players of their right to hold Defendants to account in court. Defendants are able to impose these arbitrary and unfair abuses only because their agreements to restrain competition have left them free of any worry that players will play elsewhere.

15.    Individually and together, Defendants' unlawful actions have destroyed fair competition, with devastating effects. Defendants' scheme has resulted in a marketplace bereft of rivals competing for the players' services. Because of the anticompetitive restraints that entrench their market power and bar new market entrants, Defendants and their co-conspirators operate insulated from competition and can freely pay players less and provide worse working conditions as a result. Defendants and their co-conspirators are able to divide the cartel's profits while

players and fans suffer. Because of Defendants' actions, tournaments have no need (and no ability) to compete with one another to attract players with better pay or higher quality tournaments, alternative events are excluded from competing for the players' labor, and players have lost the freedom to play where, when, and on what terms they want.

16.     The consequences of Defendants' scheme for Plaintiffs and other players are stark. As if it were not already bad enough that Defendants are denying players the wages players are entitled to, Defendants also force players to play in dangerous conditions. Players have been forced to play outside in excessive heat—like when the temperatures in Melbourne exceeded 120 degrees during the Australian Open, putting players at risk of heat stroke and other harms. Players have been forced to play late into the night—like the post-midnight matches at the U.S. Open. And players are forced to compete under subpar and sub-competitive playing conditions that collectively harm players' physical and mental well-being, including the heavier tennis balls unilaterally imposed by Defendants that shorten (already short) careers by injuring players' wrists, elbows, and shoulders. The harm to players' mental health and well-being are particularly severe because most players cannot afford to bring their training and coaching staffs or their families to the grueling schedule of tournaments Defendants mandate.

17.     Defendants' monopsony power and their anticompetitive rules and regulations also leave tennis fans worse off and impede the sport's growth. Competition among tournaments would lead to a better product and experience for

fans, increasing attendance, ticket sales, sponsorships, and television revenues. But instead of new tournaments emerging in different cities where tennis's popularity may be surging, Defendants close the door to new entrants to enrich themselves and their co-conspirators at the expense of the sport and its fans.

18.     In short, Defendants' dominant and restrictive control of every aspect of the sport allows them to serve as gatekeepers to the world of professional tennis, to the harm of players and fans alike. These actions harm players, the public, and competition itself, and are in blatant violation of federal and state law. Plaintiffs' challenge to this unlawful scheme seeks not only to rectify the harm they and other players have suffered and ensure that they can obtain the fair value of their labor, but to improve and grow the sport to which they have dedicated their lives by ensuring a free market for professional tennis that is responsive to the forces of supply and demand rather than controlled by the whim of Defendants and their co-conspirators.

19.     This case is the next step in a long line of cases initiated by athletes, stretching back over half a century, to lift anticompetitive restraints imposed upon them by owners, leagues, and cartels, like Defendants, who insisted that preventing athletes from accessing a competitive marketplace and obtaining the true value of their labor was absolutely necessary to avert the destruction of the sport. But as previous successful challenges to other sports leagues illustrate, the leagues' assertions underpinning the unlawful and anticompetitive restraints placed on athletes are not merely hyperbolic and self-serving, but actively hinder the growth of

sport. This lawsuit will reveal no different; Plaintiffs' challenge to the cartels and monopsonies under which they currently must work seeks not only to rectify the harm they have suffered, but to improve and grow the sport to which they have dedicated their lives.

## II. PARTIES

### A. Plaintiffs

20.    Plaintiff Vasek Pospisil is a Canadian male professional tennis player on the ATP Tour. Pospisil is currently ranked 830th on the ATP Tour. Pospisil has a career-high singles ranking of 25th and doubles ranking of 4th on the ATP Tour.

21.    Plaintiff Nicholas Kyrgios is an Australian male professional tennis player on the ATP Tour. He is currently ranked 1099th on the ATP Tour. Kyrgios has a career-high singles ranking of 13th and doubles ranking of 11th on the ATP Tour.

22.    Plaintiff Anastasia Rodionova is a retired Russian-Australian female professional tennis player who formerly played on the WTA Tour. Rodionova has a career-high ranking of 62nd in singles and 15th in doubles on the WTA Tour. She is a resident of the state of Florida.

23.    Plaintiff Nicole Melichar-Martinez is an American female professional tennis player on the WTA Tour. She is currently ranked 18th in doubles on the WTA Tour. Melichar-Martinez has a career-high ranking of 6th in doubles and 400th in singles on the WTA Tour.

24.    Plaintiff Saisai Zheng is a Chinese female professional tennis player on the WTA Tour. She is currently ranked 55th in doubles and 585th in singles on the

WTA Tour. Zheng has a career-high ranking of 15th in doubles and 34th in singles on the WTA Tour.

25.     Plaintiff Sorana Cîrstea is a Romanian female professional tennis player on the WTA Tour. She is currently ranked 101st in singles and 800th in doubles on the WTA Tour. Cîrstea has a career-high ranking of 21st in singles and 35th in doubles on the WTA Tour.

26.     Plaintiff John-Patrick ("JP") Smith is an Australian male professional tennis player on the ATP Tour. He is currently ranked 66th in doubles on the ATP Tour. Smith has a career-high ranking of 52nd in doubles and 108th in singles on the ATP Tour.

27.     Plaintiff Noah Rubin is a retired American male professional tennis player who formerly played on the ATP Tour. Rubin has a career-high ranking of 125th in singles and 245th in doubles on the ATP Tour. He is a resident of the state of New York.

28.     Plaintiff Aldila Sutjiadi is an Indonesian female professional tennis player on the WTA Tour. She is currently ranked 42nd in doubles on the WTA Tour. Sutjiadi has a career-high ranking of 26th in doubles and 344th in singles on the WTA Tour.

29.     Plaintiff Varvara Gracheva is a French-Russian female professional tennis player on the WTA Tour. She is currently ranked 914th in doubles and 65th in singles on the WTA Tour. Gracheva has a career-high ranking of 135th in doubles and 39th in singles on the WTA Tour.

30.     Plaintiff Tennys Sandgren is a retired American male professional tennis player who formerly played on the ATP Tour. Sandgren has a career-high ranking of 41st in singles and 115th in doubles on the ATP Tour.

31.     Plaintiff Reilly Opelka is an American male professional tennis player on the ATP Tour. He is currently ranked 114th on the ATP Tour. Opelka has a career-high ranking of 89th in doubles and 17th in singles on the ATP Tour.

32.     Plaintiffs Pospisil, Kyrgios, Rodionova, Melichar-Martinez, Zheng, Cîrstea, Smith, Rubin, Sutjiadi, Gracheva, Sandgren, and Opelka comprise the "Player Plaintiffs."

33.     Plaintiff The Professional Tennis Players Association ("PTPA") is a 501(c)(6) non-profit corporation incorporated in Washington, D.C., with its principal place of business located in McLean, Virginia. The PTPA is an association of men and women professional tennis players founded to advocate for all players. The PTPA is the leading advocate for professional tennis players worldwide and works to support, protect, and advance players' well-being. The PTPA's executive committee consists of current professional players Vasek Pospisil, Saisai Zheng, Novak Djokovic, Ons Jabeur, Bethanie Mattek-Sands, Taylor Townsend, and Hubert Hurkacz. The former members of the PTPA's executive committee include current professional player Paula Badosa and retired players John Isner and Diego Schwartzman.

### B. Defendants

#### 1. The ATP

34.     Defendant ATP Tour Inc. ("ATP") is a not-for-profit corporation organized under the laws of Delaware. The ATP's principal place of business is

located at 201 ATP Tour Boulevard, Ponte Vedra Beach, Florida 32082. ATP controls the ATP Tour, which includes the ATP Tour Finals, the United Cup, the ATP Tour Masters 1000, ATP Tour 500, and ATP 250, and is the only top-tier tennis tour for men. Additionally, the ATP controls a secondary tennis tour called the ATP Challenger Tour.

### 2. The WTA

35.    Defendant WTA Tour Inc. ("WTA," and collectively with the ATP, the "Tours," and each, a "Tour") is a not-for-profit corporation organized under the laws of New York. WTA's principal place of business is located at 100 2nd Avenue South, Suite 1100-S, St. Petersburg, Florida 33701. Defendant WTA controls the WTA Tour, which includes the WTA Tour Finals, the WTA Tour 1000, WTA Tour 500, and WTA 250, and is the only worldwide top-tier tennis tour for women. Additionally, the WTA also controls a secondary tennis tour called the WTA 125, or sometimes called the WTA Challenger Tour.

### 3. The ITF

36.    Defendant International Tennis Federation Ltd. ("ITF") is a corporation registered in the Bahamas, with its principal place of business located at Bank Lane, Roehampton London SW15 5XZ, United Kingdom. The ITF organizes the "Official Tennis Championships of the International Tennis Federation," the four most prominent and prestigious annual professional tennis tournaments more commonly known as the "Grand Slam" events: the Australian Open, the French Open, Wimbledon, and the U.S. Open. The ITF calls itself the world's "governing body of the

game of tennis," whose responsibilities include "protecting the integrity of the game through determination of the Rules of Tennis."[1]

### 4. The ITIA

37.     Defendant International Tennis Integrity Agency Ltd. ("ITIA") is a not-for-profit corporation registered in the United Kingdom with its principal place of business located at Bank Lane, Roehampton London SW15 5XZ, United Kingdom—the same office at which the ITF is headquartered. The ITIA was formed in 2021 by Defendants ATP, WTA, ITF, and the Grand Slams, tasked with working on behalf of, and at the direction of, these organizations to enforce anti-doping and anti-corruption measures in professional tennis.

## III.    JURISDICTION

38.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs' claims arise under laws of the United States that regulate commerce and protect commerce against restraints and monopolies: Section 4 of the Clayton Act (15 U.S.C. § 15), Section 4 of the Sherman Act (15 U.S.C. § 4), Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 2 of the Sherman Act (15 U.S.C. § 2).

39.     The Court has personal jurisdiction over Defendants because they transact substantial business in the State of New York, including in this District; engage in antitrust violations throughout the United States, including, in substantial part, in the State of New York and in this District; knowingly engage in and commit

---

[1] Int'l Tennis Fed'n, *ITF Rules of Tennis* 1 (2025) ("ITF Rulebook").

overt acts in furtherance of an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in the United States, including in the State of New York and in this District; knowingly conspire with other entities which take overt acts in furtherance of the conspiracy in the State of New York, including in this District; and have substantial aggregate contacts with the United States as a whole, including in the State of New York and in this District.

40.     In particular, upon information and belief, Defendants ATP, WTA, and ITF and its co-conspirators have regularly met during the relevant period in the State of New York and in this District to agree to the illegal and anticompetitive restraints in furtherance of the conspiracies alleged herein. Defendants' overt acts in furtherance of their antitrust conspiracy have had an anticompetitive effect on Plaintiff Noah Rubin, who resides in the State of New York and in this District. In addition, Defendants' co-conspirator United States Tennis Association ("USTA"), the owner and operator of the U.S. Open Grand Slam event, resides, is found, transacts substantial business, and knowingly takes substantial overt actions in furtherance of its conspiracy with Defendants in the State of New York and in this District.

41.     In addition, this Court has personal jurisdiction over Defendant WTA because it is a New York corporation that resides and is found in the State of New York, including in this District.

42.    Furthermore, this Court has personal jurisdiction over Defendants ATP, WTA, and ITF because they have consented to personal jurisdiction in this District through the WTA Bylaws.[2]

43.    This Court also has personal jurisdiction over Defendant ITIA because the ITIA is comprised of members, including the USTA, that reside, are found, or transact business in the State of New York and in this District. In furtherance of the conspiracy alleged herein, Defendant ITIA has taken investigatory and enforcement actions against those under its jurisdiction in the State of New York, including within this District, such as: conducting drug tests and investigations, confiscating the personal devices of members of the Classes, and holding events and workshops to discuss its investigatory and enforcement tactics.

44.    The Court has supplemental jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. § 1367.

**IV. VENUE**

45.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b)–(d), because during the relevant class period all Defendants resided, transacted business, or were found in this District; all Defendants knowingly took part in a conspiracy in which co-conspirators took overt acts in furtherance of the conspiracy in this District; a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and Plaintiffs have and will

---

[2] All references to the WTA Bylaws in this Complaint refer to the Bylaws dated July 29, 2024.

continue to suffer harm in this District as a result of the Defendants' conspiracy averred herein.

46.     Upon information and belief, Defendants agree with its co-conspirators to several of the illegal restraints alleged herein at meetings in this District. In addition, Defendants ATP, WTA, and ITF have consented to claims being heard exclusively in this District through the WTA Bylaws.

## V. BACKGROUND

47.     Professional tennis has undergone a troubling evolution. Once a niche sport whose adherents were dedicated to advancing the interests of players and the game, professional tennis is now a multibillion-dollar global business whose fruits the Defendants and their co-conspirators keep for themselves, to the exclusion of the players.

48.     Tennis is now one of the most popular sports in the world. Driven by players who now spend 11 months of the year competing against each other across several continents, the Grand Slams draw a combined annual viewership of almost 2 billion people, while both the ATP Tour and the WTA Tour draw cumulative annual audiences of roughly 1 billion viewers.

49.     Those eyeballs generate eye-popping sums of money. For example, through their media rights and sponsorship deals, Defendants ATP and WTA now regularly earn annual revenue greater than $200 million and $100 million, each more than triple what the Tours took in a decade ago. And those numbers do not even include the many millions of dollars individual tournaments earn each season. The BNP Paribas Open and Cincinnati Open, two tournaments on both Tours, reported

record retail sales in 2024 that surpassed their previous highwater marks by more than 30%. That same year, it was reported that the U.S. Open generated more revenue from the sale of one specialty cocktail ($12.8 million) than it paid to the men's and women's champions combined (approximately $9 million).

50.     Despite these lucrative revenue streams, the Tours and the ITF (together, the "Governing Body Defendants"), act in concert with tournament operators on the Tours (the "Tournament Co-Conspirators"), and with the owners and operators of the Grand Slams (the "Grand Slam Co-Conspirators") to suppress player compensation, eliminate competition for the players' services, lock out potential rivals, and reduce the output of tournaments.

51.     Each of the Tournament Co-Conspirators and the Grand Slam Co-Conspirators is an independent economic entity that operates separately from the Defendants. In a competitive market, each Tournament and Grand Slam Co-Conspirator would compete for players' services with other tournament operators both inside and outside the Tours, follow its own economic self-interest, and optimize its own operations. Instead, they have conspired with the Governing Body Defendants and forsaken competition in order to enrich themselves at the players' expense, to the detriment of fans and the game.

### A. The ITF, ATP, WTA, and ITIA

#### 1. The ITF

##### a. The History of the ITF

52.     As tennis exploded in the second half of the Nineteenth Century from a summer lawn sport for the English elite to a game played in countries across the

Western world, national tennis associations began forming in each country to provide rules and structure to govern the game within each nation.

53.     Among these early associations were the forerunners of the four national governing bodies for amateur and professional tennis that constitute Defendants' Grand Slam Co-Conspirators: Tennis Australia, which owns and operates the Australian Open; the All England Lawn Tennis Club ("AELTC"), which owns and operates the Wimbledon Championships; Fédération Française de Tennis ("FFT"), which owns and operates Roland Garros, also known as the "French Open"; and the USTA, which owns and operates the U.S. Open.

54.     In 1913, to unite under a single governing body, these organizations and 11 other national associations agreed to form the International Lawn Tennis Federation to coordinate and govern tennis globally. That organization would later become known as the ITF.

55.     In the first few years following its founding, the ITF came to oversee and enforce the critical aspects of the sport. In 1924, the constituent national associations gave the organization the authority to determine and implement playing rules of tennis that would be uniform across the globe. That same year, it organized and recognized for the first time the four Grand Slam events—then, reserved only for amateur competitors—and became a member of the "Grand Slam Committee."

56.     The ITF has held a firm grip on tennis and the Grand Slams ever since. Although each Grand Slam is independently owned, it is the ITF that dictates critical aspects of these tournaments.

57.     For decades, the ITF limited the Grand Slams to amateurs, kept professional players out of the Grand Slams and other prestigious tournaments, and prevented the Grand Slams from awarding prize money. But in 1968, the ITF permitted professional players to compete in the Grand Slams for the first time. That decision was accompanied by a move to organize, for the first time in the organization's history, professional tournaments in which players could compete for prize money.

### b. The ITF's Current Role and Governance Structure

58.     Today, the ITF is comprised of 200 member National Associations, which are the national tennis federations of nearly every country in the world. The ITF, along with the ATP and the WTA, works to determine the scheduling, rules, and promotion of professional tennis globally.

59.     The ITF Constitution is the document agreed to by the ITF's constituent federations that prescribes the organization's operations. Most pertinently, the ITF Constitution vests the ITF's 16-member board of directors with authority to amend the international playing rules of tennis, which tournaments around the world must then institute and enforce.

60.     The ITF sits as a voting member on the Grand Slam Board—the governing committee overseeing the Grand Slams—whose other seats are occupied by the executives of the Grand Slam tournaments. The ITF regulates and organizes the Grand Slams by directing rule changes, structural changes, administrative services, officiating, and media services for the events.

61.     The ITF also organizes and oversees the Davis Cup, a prestigious annual tournament for men's players, as well as the men's and women's tennis tournaments at the Olympics. In addition, the ITF organizes the ITF World Tennis Tours, two lower-level circuits of professional tennis events that serve as a potential entry point into professional tennis tournaments for juniors and lower-ranked players hoping to ascend to the Challenger Tours and then, eventually, the ATP Tour or the WTA Tour. The ITF's board of directors appoints separate committees that oversee and promulgate rules and regulations for the Davis Cup and the World Tennis Tours, respectively.

## 2. The ATP

### a. <u>History of the ATP</u>

62.     The late 1960s saw the ITF and the broader world of tennis accept that attracting the sport's top talent to the most prestigious tournaments, such as the Grand Slams, required permitting professionals to compete for prize money. As the tennis world transformed from one that elevated amateurism to one that promoted professionalism and profit, Jack Kramer, Donald Dell, and Cliff Drysdale formed the ATP in 1972 to provide their fellow players protection in the burgeoning world of professional tennis. The trio intended that the ATP would be a trade association of the players and for the players to counter the power held by the Men's Tennis Council ("MTC")—then the governing body that operated the circuit of professional tournaments—and the organizers of the Grand Slams, neither of which took much, if any, input from the players themselves.

63.     The Tournament Co-Conspirators have since co-opted and subverted the ATP Tour by seizing a voting majority on the Tour's board which, in turn, has allowed them to impose an extensive set of restrictive and anticompetitive rules on players. Because Defendant ATP and its Tournament Co-Conspirators condition a player's ability to compete professionally on his adherence to these rules, the organization has lost its original identity as an advocacy group for players.

64.     The subversion of the ATP is compounded by the fact that the tournaments on the Tours are now owned largely by billionaires, private equity funds, and foreign sovereign wealth funds who seek only to line their pockets at the expense of the players. Far from the association that men's tennis players formed to give themselves a voice in their profession, the ATP now consists of a several dozen Tournament Co-Conspirators and ATP executives who disregard the players' interests by capping their compensation and burdening their bodies with an ever-expanding, unreasonable schedule of tournaments.

### b.  The ATP's Governance Structure

65.     The ATP is nominally organized as a collaboration between different constituencies in men's tennis: the men's professional tennis players themselves and the owners of tournaments in which players compete—both individuals and entities—which receive a sanction from the ATP to stage their tournaments on the Tour. The ATP recognizes two so-called "membership classes": men's professional tennis players ("Player Class Members") and organizers of men's professional tennis tournaments ("ATP Tournament Class Members").

66.     A web of agreements exists among the ATP and its Tournament Co-Conspirators: the ATP Bylaws, the ATP Rulebook, player consent forms, and other written and, upon information and belief, non-written agreements. Through this web of agreements, the ATP and its Tournament Co-Conspirators determine and promulgate the rules by which male professional tennis players on the Tour are bound.[3]

67.     Organizational and policy decisions are made by the nine voting directors of the ATP Board. Pursuant to the ATP Bylaws,[4] the ATP Board includes four voting directors from the Player Class Members ("Player Class Representatives"), four voting directors from the Tournament Class Members ("Tournament Class Representatives"), and the Board Chairman, currently Andrea Gaudenzi. Although the ATP Bylaws purport to give Player Class Representatives as many votes as their Tournament Class counterparts, the Board Chairman votes with the Tournament Class Representatives because the ATP depends on the revenue from the sponsorship deals and ticket sales generated at the Tournament Class Representatives' events.

---

[3] For instance, the ATP Rulebook both contains the agreement to fix prize money and specifies the formulas according to which each Tournament Co-Conspirator's prize money pools will be calculated and made available to players. *See* Ass'n of Tennis Pros., *The 2025 ATP Official Rulebook* § 3.09 (2025) ("ATP Rulebook") ("Each ATP Tour and ATP Challenger Tour tournament is required to offer and pay as part of its financial commitment the on-site prize money shown in 'Exhibit J' plus hotel accommodations, unless otherwise determined by ATP. . . . ATP must approve any changes in prize money, including from year to year.")

[4] All references to the ATP Bylaws in this Complaint refer to the ATP Bylaws dated January 1, 2023.

68.     Since the four Player Class Representatives are in a minority, they can never independently effect change within the ATP. They can only advance their rights or negotiate contract terms if one of the other ATP Board representatives votes for the players' interests, and against his own economic interest.

69.     As just one example, the ATP Board has placed marquee Tour events in locations that are favorable to the Tour and its business partners, but are not in the players' best interests. The ATP recently announced that the Nitto ATP Finals, which is mandatory for certain players, will remain in Italy until 2030. Upon information and belief, the ATP decided to keep the tournament in Italy—the home of the ATP's Chairman and CEO—without seriously entertaining offers from bidders that could have offered better accommodations or playing conditions for players. While in a free market the ATP could solicit bids to host the event, it instead unilaterally decided to place it in a location convenient for its chief executive.

70.     To maintain the guise of player empowerment, the ATP established a Player Advisory Council.[5] Although the ATP Player Advisory Council possesses authority to elect Player Class Representatives to the ATP Board, such authority is diluted by the fact that even those it elects cannot overcome the alignment among the ATP Board Chairman and the Tournament Class Representatives—none of whom have any interest to sacrifice their monopsony or the economic restraints they have

---

[5] The Player Advisory Council consists of ten members, including active players, an alumni member, and a coach member. The ten player members are comprised of a mixture of singles and doubles players, represent different ranking categories (*i.e.*, 1-50 singles, 51-100 singles, 1-25 doubles, etc.), and different regions of the world.

imposed on the players. There is no other mechanism through which the ATP Player Advisory Council can advocate for players or negotiate the terms of their earnings.

71.    Even when the ATP Board solicits the Player Advisory Council's input on certain matters, it ignores the players' concerns out of hand. Player Plaintiff Vasek Pospisil observed the ATP Board repeatedly refuse to engage with players when he served on the Council between 2018 and 2020. When Pospisil and his fellow Council members requested access to the Tour's audits, balance sheets, and other financial statements when they were asked to vote on prize money changes, the ATP Board denied their request.

### c.  ATP Tour Structure

72.    The ATP Tour schedules an annual slate of over 60 tournaments in which male players play. Each of these tournaments is owned and operated by one of the ATP's Tournament Class Members, each of whom is a Tournament Co-Conspirator. As a condition of a tournament's membership in the ATP, each Tournament Co-Conspirator agrees to be bound by the ATP Bylaws and ATP Rulebook, the documents that contain the rules and regulations that govern the ATP Tour and regulate the male Player Plaintiffs and ATP Class members.

73.    To enter into an ATP tournament, players must be ATP members and must pay ATP membership dues. As part of their membership, most players sign a "Consent and Agreement Form," a contract which purports to bind players to the ATP's rules, bylaws, resolutions, and regulations, and purports to subject them to the

oversight of the ITIA.[6] Once a player retires, he is no longer bound by the ATP's Consent and Agreement Form.

74.    The ATP categorizes the events in separate "tiers" of tournaments on the Tour. The top tier, the ATP World Tour Masters 1000, has nine events for which participation is mandatory for the top 30 players on the Tour. The middle tier, the ATP World Tour 500, has 16 events. The lowest tier, the ATP World Tour 250, has 30 events. Male players will play in multiple events within each tier in a single season.

75.    The ATP Challenger Tour is a separate tour from the ATP Tour that features lower-ranked male players and serves as a pipeline to the ATP Tour. Most players first compete in the ATP Challenger Tour before they compete in the ATP Tour. Likewise, most players first compete in the ITF Men's World Tennis Tour before competing in the ATP Challenger Tour. Although separate circuits of tournaments, players can move between all three tours during the same season.

### 3. The WTA

#### a. History of the WTA

76.    The WTA has followed an arc similar to the ATP. The first professional tour of women-only tennis tournaments, the Virginia Slims Circuit, began in 1970 with nine original participating players, including the legendary Billie Jean King. In 1973, when the United States Lawn Tennis Association, the forerunner of the USTA, threatened to boycott players on the newly formed circuit, King founded the WTA to unite all women players into a single association to assert and protect their rights.

---

[6] Upon information and belief, a small minority of players have continued to play at ATP events without signing the Consent and Agreement Form.

77.     But like the ATP, the WTA strayed from its original structure and function over time. In 1995, the WTA merged with the Women's Tennis Council—the incumbent governing body overseeing the circuit of professional women's tournaments—to form the WTA Tour. As a result, the WTA has shed its original identity as an association of women players, for women players, to become another governing body that its Tournament Co-Conspirators have co-opted and subverted to serve their own interests.

78.     Like the ATP, the tournaments on the WTA Tour are now owned largely by billionaires, private equity funds, or foreign sovereign wealth funds who seek only to line their own pockets through their majority position on the WTA Board at the expense of the players' capacity to negotiate for higher earnings and safer working conditions. Far from the association of women tennis players formed to give themselves a voice in their profession, the WTA now consists of a few dozen Tournament Co-Conspirator owners, Tour executives, and the ITF who give the players nominal formal representation in the organization but disregard the players' interests by capping their compensation and burdening their bodies with an ever-expanding schedule of tournaments as a condition of participation in their profession.

### b.  The WTA's Governance Structure

79.     Like the ATP, the WTA is nominally organized as an organization composed of the different constituencies of women's professional tennis. Pursuant to the WTA Bylaws, the WTA is divided into four classes of members: (i) the Player Class, (ii) the Tournament Class, (iii) the Federation Class, and (iv) the Special Class membership. WTA Tournament Class members ("WTA Tournament Class Members,"

and together with ATP Tournament Class Members, "Tournament Class Members") include professional tournament owners authorized by the WTA to stage professional tournaments on the WTA Tour. The sole member of the Federation Class is the ITF, which represents its member national tennis associations. The sole member of the Special Class is the WTA Board Chairman, who is appointed by the WTA Board. The current WTA Board Chairman is Steve Simon.

80.    A web of agreements exists among the WTA and its Tournament Co-Conspirators: the WTA Bylaws, the WTA Rulebook, player consent forms, and other written and, upon information and belief, non-written agreements. Through this web of agreements, the WTA and its Tournament Co-Conspirators determine and promulgate the rules by which female professional tennis players on the Tour are bound.

81.    Organizational and policy decisions are made by the eight voting members of the WTA Board: three Player Class Representatives, three Tournament Class Representatives, one ITF representative, and the WTA Board Chairman; the non-voting Director is the WTA CEO.

82.    Through its voting structure, the WTA Chair, the ITF representative, and the three tournament representatives retain a majority on the WTA Board that can impose numerous conditions on the ability of Player Plaintiffs and other players to play professional tennis even though the Player Class Representatives generally vote unanimously. The WTA Chair and ITF representative typically vote with the Tournament Class Representatives, whose tournaments generate revenue from

sponsorships and ticket sales that the WTA and the ITF depend on. Thus, women's professional players can only advance their rights or negotiate contract terms if one of the other WTA Board representatives votes against his or her economic interest.

83.    To maintain the guise that the women's players have authority and bargaining power, the WTA has a seven-member Players' Council, whose sole power under the WTA Bylaws is to elect the Player Class Representatives to the WTA Board. But the WTA Players' Council members have no meaningful power to seek redress for the WTA's various violations of the antitrust laws, bargain for the players' economic interests, negotiate contracts, or improve conditions.

### c.  WTA Tour Structure

84.    The WTA Tour schedules an annual slate of over 50 tournaments in which the female Player Plaintiffs and the members of the WTA Class play. Each of these tournaments is owned and operated by one of the WTA's Tournament Co-Conspirators, each of whom is a WTA Tournament Class Member. Many of the tournaments on the WTA Tour are the same events in which the men's professional tennis players compete on the ATP Tour, and are thus owned and operated by the same individuals or entities that own and operate the ATP Tournament Co-Conspirators.

85.    Like the ATP, each WTA Tournament Co-Conspirator has agreed to be bound by the WTA Bylaws and WTA Rulebook,[7] which contain the rules and regulations that govern the WTA Tour, as a condition of membership in the WTA.

---

[7] Women's Tennis Ass'n, *2025 WTA Rulebook* § VIII.5 (2025) ("WTA Rulebook").

Thus, the WTA Bylaws and WTA Rulebook contain the written agreements that the WTA's Tournament Co-Conspirators form with the WTA and with each other, and that the WTA enforces, restricting competition in the market for the services of female professional tennis players.

86. Most players sign the WTA Annual Player Form, which purports to bind players to the WTA Rulebook and the WTA Bylaws, in order to play in WTA events.[8] Once a player retires, her purported commitments under the Annual Player Form end.

87. The WTA limits the number of events in each of the three "tiers" of tournaments on the WTA Tour. The top tier, the WTA 1000 tournaments, has ten events, each of which is mandatory for every member of the WTA Class, to the extent the player qualifies. The middle tier, the WTA 500 tournaments, has 18 events. The WTA 250 tier, has 20 events.

88. The WTA 125 Tour, sometimes referred to as the WTA Challenger Tour, is a separate tour from the WTA Tour that serves as a prelude to the WTA Tour. Most players first compete in the WTA Challenger Tour before they compete in the WTA Tour. In turn, most players first compete in the ITF Women's World Tennis Tour before competing in the WTA Challenger Tour. Like the men's tour structure, many female players move between and compete in tournaments on all three tours during the same season.

---

[8] Upon information and belief, a small minority of players have continued to play at WTA events without signing the Annual Player Form issued in a given season.

#### 4.  The Conspirators' Revenue Streams

89.     The Tours' primary revenue streams are money derived from the Tournament Co-Conspirators' events, and each Tour's own revenue from sponsorship and media rights agreements. Tournaments themselves, including the Grand Slams, primarily generate revenues from ticket sales, sponsorships, event-day sales, and media endeavors (broadcast and streaming), among other revenue streams. Upon information and belief, the Grand Slam Co-Conspirators generated over $1.5 billion collectively in 2024, while only paying between 10-20% of revenue to players.

90.     The ATP and WTA also earn money directly from revenues derived from their own assets, such as: selling the sponsorship rights to the Ranking Points to Saudi Arabia's Public Investment Fund (PIF); generating ticket and broadcast revenues from the ATP Finals, which the ATP owns; and generating revenue from the Tours' agreements to share players' biometric data with fitness companies, *see infra* ¶¶ 260-67. In 2023, approximately 35% of the Tours' total revenues came from Tournament Co-Conspirators' ticket sales, and roughly 20% from media revenues.

#### 5.  The ITIA

91.     In 2008, the WTA, the ATP, the ITF, and the Grand Slam Co-Conspirators formed the Tennis Integrity Unit ("TIU"), an organization given carte blanche to investigate match-fixing and other gambling activity under its Tennis Anti-Corruption Program ("TACP"), and punish players found to have violated TACP rules. For thirteen years, the TIU operated at the direction of the ITF. However, due in part to the public outcry that resulted from the ITF's inability to manage the organization effectively, as well as the TIU's failure to address allegations of match-

fixing, in 2021, the Governing Body Defendants and their Grand Slam Co-Conspirators subsumed the TIU within a new organization they formed: the ITIA. Many of the former employees of the TIU continue to work for the ITIA.

92.     In 2022, the ITIA assumed jurisdiction over the Tennis Anti-Doping Program ("TADP"), the program charged with investigating anti-doping allegations in professional tennis and levying punishments for any infractions it discovered. The ITIA now possesses authority to investigate and discipline players for doping and corruption-related offenses.

93.     Today, the nine-member board of the ITIA consists of the executive director of the Grand Slam Board, the chair of the WTA, the chief legal officer of the ATP, the president of the ITF, and five attorneys and business executives. The Governing Body Defendants and the Grand Slam Board also fund the ITIA, which operates under the control of those entities. As a result, the Governing Body Defendants and the Grand Slam Co-Conspirators capitalize on the ITIA's singular authority to police doping and gambling to harass players and invade their privacy in the name of investigation—with no due process or other player protections to ensure the ITIA acts within the confines of the law.

### B. The PTPA

94.     The PTPA started as a grassroots movement helmed by Novak Djokovic and Player Plaintiff Vasek Pospisil 2019 because the tennis organizations originally founded to protect the interests of professional tennis players had descended into anti-competitive organizations eroding players' rights.

95.     The PTPA provides protection and support for players and advocates for their best interests both within the tennis organizations' governing bodies and outside of those governing bodies.

96.     Several of the Player Plaintiffs, including Vasek Pospisil and Saisai Zheng, have served on the PTPA's executive committee to help advocate for themselves and their peers.

97.     The PTPA's goals include: taking action and advocating on behalf of tennis players globally, including the right of freedom of association; ensuring that players receive equitable compensation, pensions, and travel and accommodation reimbursements; optimizing and rigorously protecting tennis players' data privacy and freedom of movement rights; safeguarding tennis players' welfare and protecting players from procedural abuse and harassment during purported anti-corruption and anti-doping investigations; and advocating for, and contributing to, the best vision and structure of tennis globally.

98.     In addition to being an advocacy body for players, the PTPA offers a wide range of services, resources, and benefits for players including health, medical, and legal support. The PTPA also serves as an informational and educational body for players and advises players on decisions affecting their careers. The PTPA additionally helps players generate incremental off-court revenue opportunities through the PTPA's various licensing and marketing programs.

99.    The PTPA has worked not only to achieve these goals for current professional tennis players but for up-and-coming and future professional athletes in the sport.

100.    In furtherance of those goals, the PTPA has become a member organization of the World Players Association, a global collective of unions and associations that represent professional athletes in dozens of different sports. As the exclusive tennis player representatives in the World Players Association, the PTPA works alongside unions like the Major League Baseball Players Association, the National Basketball Players Association, and the National Football League Players Association to protect and advance the rights of professional athletes across sports.

101.    The PTPA has repeatedly tried to negotiate and facilitate change directly with the Defendants in order to resolve the issues present in this lawsuit. However, the Defendants have repeatedly strung along and then rebuffed the PTPA, leaving them with no choice but to bring this lawsuit to achieve the change that the players deserve.

102.    Defendants' hostility toward the PTPA and its mission was no more apparent than when Defendant ATP recently amended the ATP Rulebook and its Bylaws to punish male professional tennis players who join or affiliate with the PTPA or other organizations deemed adverse to the ATP. Specifically, Defendant ATP amended the ATP Rulebook to permit the Tour to strip players who affiliate with the PTPA or other adverse organizations of their eligibility to vote on ATP governance issues or enjoy the Tour's limited pension program and bonus pool and added a new

Section 9.2(c) to its Bylaws to provide that any player on the Player Advisory Council who affiliates with the PTPA or another adverse organization will be automatically removed from the Player Advisory Council and lose any eligibility to sit on it again.

### C. The History of Organized Sports' Hostility to Player Rights

103.    Plaintiffs' challenge here is not without precedent, and in fact follows in the footsteps of many athletes challenging unjust, illegal, and monopolistic sports leagues and governing bodies. Historically, athletes' legal challenges to the leagues in which they play have been a central way to bring about not only fairer pay and more equitable playing conditions for players, but an explosion of popularity and revenue for the leagues—despite those leagues' predictions of disaster.

104.    *Baseball.* For nearly the first century of professional baseball, the owners of MLB franchises restricted players' ability to sign a contract with a new team and negotiate on the open market by agreeing with each other to include in every player's contract a series of provisions known as the "reserve clause" that bound the player to play only for his team until the conclusion of his career. The owners proclaimed that the reserve clause was "absolutely necessary" to the maintenance of professional baseball because without it, teams would be forced into "disastrous" competition with each other to pay players.[9]  They argued further that "if the reserve clause was eliminated, the World Series would not be possible."

---

[9] Christopher R. Deubert, *"Baseball Would Certainly Fail": A History of Sports Leagues' Hyperbolic Predictions in the 20th Century's Biggest Cases and the Largely Successful Evolution of Their Arguments*, 14 Harv. J. Sports & Ent. L. 211, 220 (2023).

105.     In 1975, MLB players Dave McNally and Andy Messersmith sued to overturn the reserve clause system, and an arbitration panel ruled that the two players were not bound by the reserve clause in their contracts,[10] a decision now considered the death knell of the reserve clause and dawn of player free agency.[11]

106.     The competition for players wrought by the demise of the reserve clause brought no disaster for MLB, only unprecedented popularity for the sport. The October after the McNally and Messersmith decision, nearly 35 million Americans watched the World Series between the New York Yankees and Cincinnati Reds, a number that would be matched or eclipsed in each of the next six seasons.[12] In 2023, MLB took in $11.6 billion in revenue, hardly a "disastrous" figure and one that MLB reported only months before superstar baseball player Juan Soto signed a record $765 million contract. In short, the league's finances continue to thrive even as its players land previously unheard-of salaries.

107.     *Football*. When professional football players sued the NFL in 1975 to overturn the league's "Rozelle Rule," which gave the commissioner unilateral authority to force a team to compensate a player's former team when the player departed via free agency, the NFL argued at trial that without the limitations on player mobility and compensation that resulted from the Rozelle Rule, there would

---

[10] *See Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n*, 532 F.2d 615 (8th Cir. 1976).

[11] *See* Roger Abrams, *Arbitrator Seitz Sets the Players Free*, Baseball Rsch. J., Fall 2009.

[12] *World Series Television Ratings (1968-2024)*, Baseball Almanac (last visited March 17, 2025) https://www.baseball-almanac.com/ws/wstv.shtml

be little competitive balance between teams, fans would lose interest in the league, and franchises would be left in financial ruin. After a jury in the District of Minnesota returned a verdict for the players, the Eighth Circuit affirmed that the Rozelle Rule violated the Rule of Reason.

108.     Then in 1992, when NFL players went to trial again to challenge a rule permitting each NFL team to restrict over 75% of its roster from signing with another team,[13] the lead attorney for the NFL argued in his closing argument that removing the rule "would be the destruction of the National Football League that we know today."[14]  The jury was unmoved, returning a verdict for the players.

109.     As a result of their forebearers' challenges, today's NFL players regularly change employers and break records for contract values. In 2023, quarterback Lamar Jackson became the first NFL player to sign a contract worth $52 million per year.[15] Yet Jackson's and other players' ability to choose their employers and negotiate higher salaries was met with neither "destruction" nor a decline in fan interest. That very same season, the NFL took home a record $20.47 billion in revenue, the average franchise was valued at $6.5 billion,[16] and nearly 125 million

---

[13] *See* Deubert, *supra* note 9, at 281.

[14] Thomas George, *N.F.L.'s Free-Agency System is Found Unfair by U.S. Jury*, N.Y. Times, (Sept. 11, 1992), https://www.nytimes.com/1992/09/11/sports/football-nfl-s-free-agency-system-is-found-unfair-by-us-jury.html.

[15] Kevin Patra, *Lamar Jackson, Ravens agree to terms on five-year, $260 million contract*, NFL (Apr. 27, 2023 4:28 PM), https://www.nfl.com/news/lamar-jackson-ravens-agree-to-terms-on-new-contract.

[16] Michael Ozanian, *Rising NFL valuations mean massive returns for owners. Here's how good the investment is*, CNBC (Sept. 5, 2024 7:08 PM), https://www.cnbc.com/2024/09/05/rising-nfl-valuations-massive-returns-for-owners.html.

viewers watched Super Bowl LVIII in February 2024. The NFL owners' predictions of doom and disaster could not have been more inaccurate.

110.     *NCAA.* More recently, when current and former college athletes challenged the NCAA's restrictions on the compensation that athletes could receive while playing for their respective college teams, the NCAA argued that such restrictions (*i.e.*, not paying the players at all) were necessary to keep consumer interest, which would implode and cause significant losses for universities if uprooted, because college sports fans valued the concept of amateurism so greatly.[17]

111.     After the NCAA subsequently adjusted its rules to permit college athletes to receive compensation for marketing and profiting from their name, image, and likeness, its assertions about how the collapse of interest would follow the collapse in amateurism proved to be false. In fact, women's college athletics, in particular, have exploded in popularity since 2021. The 2024 NCAA Division I Women's Basketball championship game set a record with 18.7 million average viewers on television, outdrawing the men's championship that same week as well as every other televised sporting event since 2019—outside of football games and the Olympics. Men's college football has similarly seen increased popularity; in 2023, ESPN reported its highest college football viewership in five years, and total viewing of college football was up 12% in 2023, and up 28% over the period spanning 2018-2023.

---

[17] *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1070 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

112.    The compensation now paid to student-athletes has led neither to declining interest in collegiate athletics nor financial difficulty for the universities for which these athletes play. In 2022, the Big Ten Conference signed a media rights deal worth over $7 billion, while in 2024 the Southeastern Conference began reaping the reward of its $3 billion television deal with ESPN.

113.    The leagues have cried wolf far too many times. Like clockwork, they profess panic about the competitive balance within, consumer interest in, and viability of their sports if athletes are given the rights the law affords them. Yet every time, their predictions of an apocalyptic future without supposedly "procompetitive" restrictions on players' rights prove inaccurate. In fact, each time athletes have earned their rights to fair treatment and economic power, their leagues have surpassed prior success by nearly every objective measure. Plaintiffs expect the same outcome here.

## VI. FACTUAL ALLEGATIONS

114.    The Defendants have engaged in a concerted and interlocking scheme to dominate the market for the services of professional tennis players. They have done so by locking in players to play in the tournaments hosted by their Tournament and Grand Slam Co-Conspirators and fixing the earnings players may receive. Defendants and their co-conspirators have further entered agreements designed to prevent new tournaments from entering the market and competing for players.

115.    Knowing they have insulated themselves from competitive pressure from other tournaments and tennis circuits, Defendants abuse their market power by subjecting players to harassing and invasive investigations and unfair and

unconsented data collection. Defendants' scheme serves no purpose other than to enrich themselves and their co-conspirators at the players' expense in violation of the federal antitrust laws.

### A. The Governing Body Defendants Conspire to Fix Player Earnings

116.    Notwithstanding the unprecedented recent growth in professional tennis's revenue and popularity, the Governing Body Defendants and their co-conspirators engage in horizontal price-fixing by agreeing amongst themselves and with their Tournament and Grand Slam Co-Conspirators to fix the compensation that professional tennis players may earn in prize money and in endorsement deals. Confirming as much, compensation for professional tennis players lags far behind what professional athletes earn in comparable leagues. Unlike other professional sports leagues, such as MLB, the NBA, and the NHL, each of which splits approximately 50% of gross revenue with its players, the Tours split less than 20% of their revenue with players, and further prevent players from accessing other sources of earnings.

117.    Because these agreements are naked restraints to suppress player earnings with no possible procompetitive benefit for the sport or the business of tennis, they constitute *per se* violations of Section 1 of the Sherman Act.

### 1. The Tours and Their Co-Conspirators Agree to Restrict Prize Money.

118.    The Governing Body Defendants have engineered and entered into agreements with and among their Tournament Co-Conspirators to fix the amount of prize money that each Tournament Co-Conspirator can offer to professional tennis players and delegate authority to Defendants ATP and WTA to police and enforce

their agreements. Those agreements include, but are not limited to, those codified in the ATP and WTA Rulebooks, which specify the amount and distribution of prize money pools each Tournament Co-Conspirator distributes to players at each tournament.

### a. The Cartels Agree on Specific Prize Money Awards

119.    The ATP Rulebook explicitly regulates how much money any individual Tournament Co-Conspirator may pay to men's players who compete at its event. Section 3.08(B)(1)(a) of the ATP Rulebook states that each ATP Tournament Co-Conspirator must pay the specific prize money as established and promulgated by the ATP, and the ATP publishes a corresponding schedule with the precise amount that each Tournament Co-Conspirator must pay.

120.    Upon information and belief, the ATP's prize money agreements permit Tournament Co-Conspirators to raise their prize money pots only at the same specified annual rate. The agreements eliminate competition among tournaments on the basis of prize money by prohibiting any individual Tournament Co-Conspirator from raising its prize money awards at a rate greater than what the ATP and the Tournament Co-Conspirators have agreed to.

121.    To ensure each of their fellow Tournament Co-Conspirators fall in line with their price-fixing conspiracy, the Tournament Co-Conspirators agree with each other and with the ATP to vest the ATP with the authority to police the agreements. Any departure from the prize money regulations dictated by the ATP Rulebook requires the ATP's consent and approval. Because the ATP acts through the ATP Board, each Tournament Co-Conspirator on the board has the ability to vote against

a co-conspirator's request to increase prize money beyond what is expressly permitted by the cartel's agreed-upon schedule, notwithstanding the fact that the Tournament Co-Conspirators are independent entities that compete with one another for the services of male professional tennis players. In practice, this gives one tournament a say in whether its direct competitors should pay higher wages.

122.    By agreeing to vest the ATP and Tournament Co-Conspirators on the ATP's Board with unfettered veto authority over other Tournament Co-Conspirators' prize money decisions, Defendant ATP and its Tournament Co-Conspirators have committed a *per se* violation of the antitrust laws.

123.    Defendant ATP and its Tournament Co-Conspirators have also agreed to limit the amount of prize money offered at each level of the Tour to prevent tournaments of lower tiers from competing with higher-tier tournaments. Under the schedule of prize money pools, the ATP and its Tournament Co-Conspirators agree that no Tournament Co-Conspirator that owns a 250-level tournament may award prize money that exceeds the lowest prize money award offered by any 500-level tournament, and no Tournament Co-Conspirator that owns a 500-level tournament may award prize money that exceeds the lowest prize money offered by any Masters 1000-level tournament.

124.    The WTA has entered into a similar agreement with its Tournament Co-Conspirators, through the WTA Rulebook, to restrict how much money any individual

Tournament Co-Conspirator may pay to women's players who compete at its events.[18] Section IX.E and Section XII.D of the WTA Rulebook specify that each Tournament Co-Conspirator must pay the specific prize money established by the WTA's prize money "breakdowns" published on the WTA's website. These "breakdowns" set forth the amount each Tournament Co-Conspirator must pay to each player who competes at its event relative to the player's success at the tournament.

125.    Like the ATP, the WTA's Tournament Co-Conspirators agree with each other and with the WTA to vest the WTA with the authority to police their agreements. To ensure each Tournament Co-Conspirator limits its prize money awards, any change to a prize money pool is subject to the WTA's consent and approval.

126.    The WTA's prize money agreements permit Tournament Co-Conspirators to raise their prize money pots only at the same specified annual rate. Specifically, WTA Rulebook Section XIV prescribes the specific formula that each Tournament Co-Conspirator must use to determine the prize money allotted to players. The provision states that any Tournament Co-Conspirator must raise its prize money pot by only 3% in any year and that the WTA must "approve[]" any effort a Tournament Co-Conspirator makes "to pay player compensation in excess of" the amounts dictated by the WTA Rulebook. Because the WTA acts through the WTA Board, each Tournament Co-Conspirator on the board has the ability to vote against

---

[18] As a co-owner of the United Cup—a Tournament Co-Conspirator on the WTA Tour—Defendant ATP is a member of the WTA and agrees to each of the WTA's price-fixing schemes alleged herein.

a co-conspirator's request to increase prize money beyond what is expressly permitted by the cartel's agreed-upon schedule, notwithstanding the fact that the Tournament Co-Conspirators are independent entities that compete with one another for the services of female professional tennis players.

127.    By agreeing to vest the WTA and the Tournament Co-Conspirators on the WTA's Board with unfettered veto authority over prize money, Defendants WTA and its Co-Conspirators have committed a *per se* violation of the antitrust laws.

128.    Defendant WTA and its Tournament Co-Conspirators have also agreed to limit the amount of prize money offered at each level of the Tour to prevent tournaments from lower tiers from competing with higher-tier tournaments. Specifically, Section XIV of the WTA Rulebook contains provisions that fix the amount of prize money each Tournament Co-Conspirator may award to players depending on whether it hosts a 250-, 500-, or 1000-level tournament. Pursuant to this rule, no Tournament Co-Conspirator that owns a 250-level tournament may award prize money that exceeds the prize money offered by any 500-level tournament, and no Tournament Co-Conspirator that owns a 500-level tournament may offer prize money that exceeds the prize money offered by any 1000-level tournament.

129.    The Governing Body Defendants' agreement with their Tournament Co-Conspirators to fix prize money awarded to players have been well documented and publicized. Take, for example, the BNP Paribas Open at Indian Wells, a tournament on both the ATP Tour and the WTA Tour. In 2012, billionaire Larry Ellison, who owns

the BNP Paribas Open, sought approval from the ATP and WTA to increase the total prize pool awarded to players at his event by $1.6 million, $800,000 each for the ATP and WTA. As an independent economic actor, paying players more prize money was likely to attract better players, draw more television partners, and increase ticket sales and sponsorship revenues relative to its competitors. Nevertheless, the ATP denied the requested increase because it would pressure other Tournament Co-Conspirators to raise prize money above the annual rate the cartel had agreed to. Ellison acquiesced to the Tour's directive and continued to suppress prize money according to the ATP's schedule.

130.    In a quote to USA Today, an ATP official confirmed that the ATP Board had rejected the proposal due to the collusive restraints codified in the ATP Rulebook: "We welcome tournaments increasing prize money, however, in this case, a tournament is proposing a distribution that is not in line with the ATP rules that players and tournaments themselves have agreed, and which every other tournament on tour follows. . . . We would be happy to approve a prize money increase, if it complies with ATP rules on distribution."

131.    The WTA followed suit, rejecting the proposal to raise prize money pools for the female professional tennis players at the BNP Paribas Open because doing so would have violated the price-fixing agreement the event had made with the WTA and its fellow Tournament Co-Conspirators.

132.    And while prize money does generally increase year over year, the rate of increase is nowhere near proportionate to what a competitive market would

otherwise pay. In short, the ATP, WTA, and their respective Tournament Co-Conspirator's agree to fix the price of labor for professional tennis players' services at the expense of the players and the sport itself.

### b. Governing Body Defendants Agree to Stratify Prize Money

133.    In addition to regulating prize money payouts *within* each of their respective Tours, upon information and belief, Defendants ATP and WTA have agreed with each other, their Grand Slam Co-Conspirators, and Defendant ITF to limit prize money for their respective tournaments.

134.    Upon information and belief, the Governing Body Defendants, along with each Tour's Tournament Co-Conspirators, have agreed with each Grand Slam Co-Conspirator that no Tournament Co-Conspirator will raise the prize money above the prize money amounts awarded at the Grand Slams. In other words, Defendants ATP, WTA, and the ITF have agreed with their Grand Slam Co-Conspirators to stratify the prize awards such that no Tournament Co-Conspirator will pay players more money than their Grand Slam counterparts.

135.    Upon information and belief, Defendants ATP and WTA agree to ensure that their Tournament Co-Conspirators keep their prize money awards at an artificially low rate to refrain from threatening the Grand Slams' status as the most prestigious, highest payout tournaments for players.

136.    Upon information and belief, Defendant ITF agrees with Defendants ATP and WTA that tournaments on the ITF's men's and women's World Tennis Tours will abide by similar restrictions on the prize money they award. The ITF's World Tennis Tour is the entryway into a professional tennis career. It is the lowest-paying

level of competition for both men and women aspiring to compete on the ATP and WTA Challenger Tours and eventually on the ATP and WTA Tours. To ensure that the ATP and the WTA maintain their own tours' respective supremacy, the Governing Body Defendants collectively agree that no tournament on the ITF World Tennis Tours will pay more than the ATP's and WTA's Tournament Co-Conspirators. In return, the ATP and the WTA include results from World Tennis Tour tournaments in their calculations of Ranking Points (albeit at a lower point value than Challenger tournaments), giving the ITF an advantage in drawing young players to its events when they begin their professional careers.

137.    The ATP's and the WTA's decision to reject the BNP Paribas Open's effort to raise prize money in 2012 is further evidence of the agreements between the Tours and their Grand Slam Co-Conspirators to stratify the prize money awards. By rejecting Larry Ellison's proposal, the ATP and WTA guaranteed that the BNP Paribas Open could not offer prize money commensurate with the Grand Slams that year and affirmed Indian Wells's place below each of the Grand Slams in the global pecking order.

### c.  Players Suffer Under The Prize Money Agreements

138.    The Governing Body Defendants' agreement to restrict prize money not only depresses competition for the services of professional tennis players, it leads to stark pay disparities between the top- and lower-ranked players. The press has documented the plight of bottom-ranked ATP players, who struggle to get by on their meager earnings and are sometimes forced to live out of their cars and take non-tennis jobs to supplemental their artificially depressed income.

139.    Indeed, players who do not advance to the quarterfinals of a tournament typically face a net financial loss from their participation because the prize money awarded to players eliminated in earlier rounds does not cover the expenses they incur to participate in the tournament, which can include travel costs not just for themselves but for their coaches, physical therapists, and other health and wellness staff, all of whom are essential to the players' success.

140.    Compensation for professional tennis players also lags far behind what professional athletes earn in comparable leagues. Unlike other professional sports leagues, such as MLB, the NBA, and the NHL, each of which splits approximately 50% of *gross revenue* with its players, upon information and belief, the Tours split less than 20% of their gross revenue with players.

141.    There is no procompetitive justification for the naked price-fixing restraints agreed to by the Governing Body Defendants, their Tournament Co-Conspirators, and their Grand Slam Co-Conspirators. In a free market, the Tournament and Grand Slam Co-Conspirators should be competing for players by raising their prize money pools to attract the best talent and give fans a better experience. Instead, the Governing Body Defendants and their co-conspirators have agreed to create a system that insulates themselves from competitive pressures and restricts players' earnings so that Defendants and their co-conspirators can keep a greater percentage of the sport's revenue for themselves.

## 2. Defendants Take Players' Name, Image, and Likeness Rights Without Compensation.

142.     In addition to restricting on-court prize money, the Governing Body Defendants orchestrated and entered into agreements with and among their Tournament Co-Conspirators to require every player to assign their NIL rights to the Tours and the Tournament Co-Conspirators for use in media, advertisements, and promotion in exchange for $0.[19]

143.     This agreement, which is codified in the ATP and WTA Rulebooks, restricts every professional tennis player from monetizing and controlling his or her NIL rights.

144.     Upon information and belief, Defendants ATP and WTA further agree with one another to maintain and enforce this anticompetitive NIL assignment. This way, the ATP ensures that no female player on the WTA Tour can market herself freely to sponsors and advertisers and put pressure on the ATP to permit the male players to do the same, and the WTA reciprocates to ensure that no male player on the ATP Tour can market himself freely to pressure the WTA to relinquish its stranglehold on NIL rights.

145.     This naked restraint is *per se* anticompetitive because it forecloses players from negotiating with the Tours and its Tournament Co-Conspirators for their NIL rights, and forecloses them from otherwise selling those NIL rights to sponsors and advertisers in a competitive, free market. That the Tours and their

---

[19] *See* ATP Rulebook § 1.12(A); Ass'n Tennis Pros., *Second Amended And Restated Bylaws Of ATP Tour, Inc.*, Art. III, § 3.2(e) (Jan. 1, 2023) ("ATP Bylaws"); WTA Rulebook § VII.B.7.

Tournament Co-Conspirators have valued those NIL rights at $0—as opposed to any reasonably calculated market value—only serves to underscore the impropriety of their agreement.

146. This restraint lacks any procompetitive justification. There is simply no procompetitive business purpose for the Governing Body Defendants and the Tournament Co-Conspirators to force players to assign their NIL rights and to fix the price of those rights at $0. The capital and infrastructure necessary to stage their tournaments would be available absent this agreement. The Governing Body Defendants and their Tournament Co-Conspirators agree to and enforce this restraint only to divert advertising and sponsorship money away from professional players into their own coffers, which they are able to do only because of their monopsony power and cartel activity.

### 3. The Governing Body Defendants Restrict Players' Ability To Earn Off-Court Income

147. The Governing Body Defendants, their Tournament Co-Conspirators, and their Grand Slam Co-conspirators further limit player earnings by restricting players' partnership and sponsorship opportunities.

148. Under the ATP and WTA Rulebooks, players may sign sponsorship deals only with select companies for their tennis rackets, bags, and apparel. Specifically, Section 8.04(L) of the ATP Rulebook and Section VII.C.3.h of the WTA Rulebook each require that every player must only wear apparel or use equipment on a tennis court that is produced by one of the Tours' approved "tennis equipment manufacturers"—

the companies making tennis products with which the Tours' already have partnerships or sponsorship deals.

149.    As a result, if Louis Vuitton or Gucci, for example, offered a player a lucrative endorsement deal to arrive at center court at Indian Wells carrying a racket bag bearing their logo, the player would have to reject the offer because the Tours do not recognize those luxury fashion brands as tennis equipment manufacturers.

150.    As a result, the Tours and their Tournament Co-Conspirators deprive players of opportunities to receive a separate income stream outside of the artificially capped prize money available at tournaments.

151.    The Governing Body Defendants have also orchestrated and entered into agreements with and among their Tournament Co-Conspirators, through the ATP and WTA Rulebooks, to restrict players from accepting or displaying sponsorships from companies in certain lucrative industries such as sports betting.[20]

152.    However, the Governing Body Defendants and the Tournament Co-Conspirators themselves enter into agreements with some of the very same companies that they prevent the players from endorsing. By preventing players from partnering with betting companies but doing so themselves, the Governing Body Defendants and the Tournament Co-Conspirators have diverted betting sponsorship revenue in tennis from the players to themselves, thereby artificially constraining players' income sources.

---

[20] *See* ATP Rulebook §§ 1.13(C)-(D); WTA Rulebook § VII.B.8.

153.     Not only do the Governing Body Defendants restrict the *types* of endorsements players are allowed to sell—they also restrict the *number* of endorsements as well. The Rulebooks contain highly specific regulations about the number of sponsors allowed to be displayed on a player's shirt, hat, towel, and bag, and even the size of the ad that can be displayed. This rule has forced players to reject offers for endorsement deals that would meet the Governing Body Defendants' category restrictions, but otherwise exceed their artificial limits on the number and appearance of endorsements.

154.     Upon information and belief, Defendants ATP and WTA further agree *with each other* that neither Tour will lift its respective restrictions on sponsorships and endorsements. For instance, the ATP ensures that no woman player on the WTA Tour may freely endorse a betting company so that the ATP feels no competitive pressure to permit the men's players to do the same, and vice versa.

155.     By their nature, these restrictions are *per se* anticompetitive because they are naked restraints that prevent a competitive, free market from determining how much money betting companies and tennis equipment manufacturers would allocate to players as part of their tennis marketing budgets.

156.     These restraints on professional tennis players' endorsement opportunities lack any procompetitive justification. The Governing Body Defendants impose restrictions on endorsements that are unnecessarily broad only because they face no competitive pressure from alternative tennis tournaments or events that could offer players more flexible sponsorship opportunities.

157.    Other professional sports leagues permit their athletes to ink endorsement deals with apparel and equipment companies different from the leagues' own sponsorship partners while maintaining the capital, infrastructure, and coordination necessary to organize and operate their leagues. For instance, an MLB player may wear a custom glove produced by a company that is not an official sponsor of the league or the player's team.

158.    Nor is there a procompetitive justification for preventing players from partnering with betting companies that sponsor the Tours and their Tournament Co-Conspirators. In fact, active athletes competing in other professional sports leagues freely endorse sports betting companies. Most famously, basketball player LeBron James serves as a partner for DraftKings Sportsbook, through which he provides followers his picks for NFL games, while DraftKings serves as an official sports betting partner of the NBA.

159.    The experience of MLB and the NBA illustrate that the Governing Body Defendants could enact narrower rules than those they have imposed that would still protect the Tours' own sponsorship deals and minimize the risk of match-fixing. For instance, they can do so by promulgating rules that more specifically proscribe players from appearing in any materials advertising gambling *on tennis*, just as LeBron James does not advertise or associate with betting on NBA games. The blanket bans they have put in place only due to the competitive insulation they enjoy from the barriers to market entry they have erected are of unnecessary breadth and scope to achieve Defendants' purportedly procompetitive aims.

## B. The Governing Body Defendants and Their Co-Conspirators Lock Up the Market by Agreeing to Only Recognize the Ranking Points from Each Others' Tournaments and Controlling the Professional Tennis Schedule

160.     The Governing Body Defendants have engineered and entered into horizontal agreements with and among their Tournament and Grand Slam Co-Conspirators to effectively foreclose players from competing in unsanctioned tournaments and, in turn, have instituted barriers to entry that effectively prevent unsanctioned tournaments from entering the market and competing for these players' services. Specifically, the Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators have created a Ranking Points system and strict scheduling rules that work together to dictate the terms under which players must play in order to pursue careers in professional tennis.

161.     These restraints undergird the Governing Body Defendants' agreements with their Tournament and Grand Slam Co-Conspirators to fix prize money and limit endorsement opportunities. By limiting the events at which professional tennis players can earn Ranking Points to tournaments within the cartel, which they compel players to attend at the exclusion of alternative events, the Tours and their Tournament Co-Conspirators can continue to restrict player compensation knowing that players will have no incentive, no time, and little flexibility to play at unsanctioned tournaments or on a different circuit.

162.     The Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators are only able to institute these restraints because they possess market power in the market for the services of professional tennis players. As a result of these barriers to entry, competitor events that would otherwise be drawn into the

market for the players' services by the artificially low prize money pots awarded by the Tournament and Grand Slam Co-Conspirators are shut out of the market for players, allowing the Tournament and Grand Slam Co-Conspirators to continue to maintain their dominance over professional tennis players and restrict prize money pools.

163.    These horizontal agreements constitute a *per se* illegal group boycott of professional tennis players because of the unduly restrictive terms they impose on the players for the purpose of depriving players and competitor events of the benefits of competition.

### 1. The Governing Body Defendants and Their Co-Conspirators Utilize Ranking Points to Manipulate the Market for Players' Services.

164.    The Governing Body Defendants restrain the market for the services of professional tennis players by designing and imposing a Ranking Points system that prevents players from competing in unsanctioned events and forecloses unsanctioned professional tennis tournaments from competing for these players' services.

165.    Ranking Points are units awarded to and taken from professional players based on their participation and performance at certain specified tournaments. Each tournament on the ITF World Tennis Tour, ATP Challenger Tour, WTA Challenger Tour, ATP Tour, and WTA Tour, as well as each of the Grand Slams, offers participating players an amount of Ranking Points that corresponds to the tournament's designated tier level.

166.    On both Tours, tournaments award Ranking Points on a sliding scale, with players eliminated in the first round earning the fewest Ranking Points, and tournament winners receiving the most Ranking Points.

167.    Ranking Points awards allow players to move up in the rankings and subsequently qualify for higher-tiered, higher-paying tournaments, including the prestigious Grand Slams. The more Ranking Points a player accumulates, the better his or her chances become for qualifying for these major events.

168.    The ATP Rulebook regulates the eligibility of tournaments that can award ATP Ranking Points to male professional tennis players. Specifically, the ATP, its Tournament Co-Conspirators, and its Grand Slam Co-Conspirators agree that *only* the ATP Tour and Challenger events, the Grand Slams, and certain ITF events may award Ranking Points to professional male tennis players who compete in such tournaments. The ATP will not award Ranking Points to players for participating or succeeding at tournaments that have not received sanctions to become members of the Tour.[21] The ATP Rulebook then dictates that whether players are accepted into tournaments shall be determined by (a) a formula derived from the Ranking Points and (b) any penalties they receive for missing or withdrawing from tournaments.[22]

169.    In the ATP, a player's ranking is determined by calculating his total points from a maximum of 20 events over the preceding 52-week time frame: the four Grand Slams; the eight mandatory ATP Tour Masters 1000 tournaments; the Nitto

---

[21] ATP Rulebook § 9.02(A)

[22] ATP Rulebook §§ 9.02(C), 9.03(A)-(B).

ATP Finals; and his best seven results from the United Cup, all ATP Tour 500, ATP Tour 250, ATP Challenger Tour, and ITF Men's tournaments.[23]

170.    The WTA Rulebook also regulates the eligibility of tournaments that can award WTA Ranking Points to female professional tennis players. Specifically, the WTA, its Tournament Co-Conspirators, and its Grand Slam Co-Conspirators agree that *only* certain ITF, WTA Challenger, and WTA Tour events, and the Grand Slams may award Ranking Points.[24] The WTA Rulebook then dictates that a player's ranking is determined according to a formula derived from the WTA Ranking Points.[25] The WTA will not award Ranking Points to players for their participation or success at tournaments that have not received sanctions to become members of the WTA Tour.

171.    A WTA player's ranking is also based on the preceding 52-week window, but the WTA calculates total points in 18 tournaments for singles players: the four Grand Slams; the six mandatory WTA 1000 combined tournaments;[26] one WTA 1000 mandatory tournament (WTA only); and her best seven results from all WTA 1000 Mandatory, WTA 500, WTA 250, WTA 125, and ITF events. If the player did not compete in any of the above events, they earn zero points. If the player competed in

---

[23] ATP Rulebook § 9.03(A). A doubles player's ranking does not include the Nitto ATP Finals. *See* ATP Tour, *Rankings*, (last visited March 17, 2025) https://www.atptour.com/en/rankings/rankings-faq.

[24] As a co-owner of the United Cup, Defendant ATP is a member of the WTA and agrees to Defendant WTA's Ranking Points scheme.

[25] WTA Rulebook § VIII.A.4.

[26] These tournaments operate with or de facto operate together with the ATP.

the WTA Finals, the player's results are added to her total points as a bonus tournament.[27]

172.     To that end, the Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators design the Ranking Points system primarily to compel players to participate in their tournaments at the exclusion of other competitive tennis events. Instead of a merit-based ranking system driven by how players perform relative to other players, how often they win, and the scale of their victories at matches, the Ranking Points system reward players for how frequently they play at events on the Tours irrespective of whom they beat.

173.     Success at an unsanctioned exhibition or tournament is irrelevant. A player who beats each of the top five players in the world in a single week will earn zero Ranking Points if he or she does so at an unsanctioned event that is not owned by a Tournament or Grand Slam Co-Conspirator and is not a stop on one of the Tours.

174.     Furthermore, for both Tours, a player's ranking is not determined solely by his or her on-court performance at Tour events, but also by how *often* the player agrees to play. If the player misses a tournament—for example, because the player did not qualify, was injured, or was ineligible for a visa in the country where the tournament was located—the formula subs in a corresponding one or zero Ranking Points, a devastating blow to the player's ranking and future earnings potential. Even taking parental leave for the birth of a child results in a deduction in Ranking Points for the male players on the ATP Tour.

---

[27] WTA Rulebook § VIII.A.4.

175.    The ATP and the WTA then leverage their exclusive ability to award Ranking Points in an agreement with the Grand Slam Co-Conspirators that Ranking Points will be the *only* way nearly all players qualify for the Grand Slams. If players do not participate in a sufficient number of mandatory events hosted by the Tournament Co-Conspirators to accumulate enough Ranking Points—available to them *only* at those Tour events—they cannot qualify for or participate in the Grand Slams.

176.    The system works as designed. Because the thresholds for Ranking Points required to qualify for critical events like the Grand Slams are set so high, players have no choice but to forgo alternative competitions just to continue accumulating Ranking Points. As a result, the ATP and WTA each squeeze out potential rival tournament operators, who cannot offer players coveted Ranking Points, from competing for the players' services.

### 2. The Governing Body Defendants and Their Co-Conspirators Set A Demanding, Year-Long Schedule With Restrictive Play Requirements.

177.    Aided by their Ranking Points system, the Governing Body Defendants and the Tournament and Grand Slam Co-Conspirators flex their monopsonistic market power by agreeing to compel professional tennis players to participate in a grueling, never-ending season of tournaments, effectively foreclosing players from selling their labor to unsanctioned tournaments. This unceasing calendar of mandatory events serves as a barrier to market entry for unsanctioned tournaments, which are excluded by the Governing Body Defendants' calendar rules from competing for the players' services.

178.    Insulated by their monopsony power and anticompetitive restraints from competition from rivals who might offer players less demanding schedules, the Tours have in recent years increased the season's length to 11 months and left barely any offseason for players to recover for the following season. The ATP schedules over 60 tournaments on its annual calendar; the WTA schedules over 50. Those numbers do not include the several dozen tournaments scheduled on the ATP or WTA Challenger Tours each season.

179.    The Governing Body Defendants' nearly year-long season is significantly longer than the four-month-long NFL season, six-month-long MLB season, six-month-long NBA season, six-month-long NHL season, and the eight-month-long MLS season. The Governing Body Defendants can impose these unusually long seasons not only because their market power eliminates any fear that players may play elsewhere, but because Defendants classify players as independent contractors who may not collectively bargain for work schedules in the same manner NFL, NBA, MLB, NHL, and MLS players can.

180.    In furtherance of this grueling schedule, the Governing Body Defendants have conspired with their Tournament Co-Conspirators to make each individual tournament longer. Each of the Tours has decided to lengthen several of their premier tournaments by 50%. The ATP has increased the length of Masters-1000 level tournaments from eight to 12 days. The WTA has similarly announced that multiple 1000-level tournaments will go from eight to 12 days beginning in 2025. Instead of providing professional tennis players more rest between tournaments to

endure a longer season, the ATP and WTA have given them less. Of course, these longer tournaments do not come with a proportionate increase in prize money pools.

181.    The Grand Slam Co-Conspirators have articulated their desire to extend their events as well, eventually reaching three weeks per Grand Slam. This follows the USTA's announcement that it will add a 15th day to the U.S. Open, joining the Australian Open and French Open, which recently expanded to 15 days.

182.    By agreeing to increase the length of their tournaments and extend the Tours' seasons to 11 months, the Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators have packed dozens more days of tennis into the schedules of several tournaments and left players with shorter turnaround times between events. In several instances, the ATP's and WTA's longer tournaments have required players to start playing in a tournament *the very next day* after they conclude their previous tournament—sometimes thousands of miles away. There is no respite within events, either. Tournament Co-Conspirators typically schedule late matches, often starting after midnight, leaving little time to rest before the next day.

183.    Although the Governing Body Defendants may defend these scheduling changes as moves to satiate the appetites of tennis fans, they are able to impose them unilaterally only because their monopsony power relieves them of any worry that alternative tours or tournaments may compete for the players' services by offering less demanding schedules.

184.    To further ensure professional tennis players comply with this grueling schedule rather than compete at shorter unsanctioned events, the Governing Body

Defendants have agreed with their Tournament Co-Conspirators to compel player participation in their events. Through these agreements codified in the ATP and WTA Rulebooks, the Player Plaintiffs and the members of the Classes must participate in an unsustainable number of tournaments at the risk of injury, fines, and other penalties.[28]

185.    The ATP's mandatory participation system classifies the top 30 players as "commitment players." A commitment player is required to compete in all ATP Tour Masters 1000 tournaments, the Nitto ATP Finals (if qualified), and five ATP Tour 500 tournaments.[29] If a player fails to meet his mandatory participation obligations, the ATP strips him of his eligibility for the bonus program, of his eligibility for main draw entry for the following ATP season (making it more difficult to reach his subsequent commitment player obligations), and of credits to put toward the ATP retirement program.[30]

186.    Unlike the ATP, the WTA mandatory participation rules bind *all players*.[31] Each WTA player who is accepted into the main draw of a WTA 1000-level

---

[28] Even when players comply and appear at tournaments, the Governing Body Defendants often abuse their market power by levying excessive and disproportionate fines for conduct on the court, which they impose arbitrarily and unilaterally without regard to prior fines issued for similar acts. For instance, the ATP fined Player Plaintiff Reilly Opelka $54,000 at the 2025 BNP Paribas Open—more than the total prize money he earned at the tournament—for the "unsportsmanlike" act of seeking medical treatment mid-match, a sum without precedent for any similar conduct.

[29] ATP Rulebook § 1.07(D).

[30] ATP Rulebook § 1.07(F).

[31] WTA Rulebook §§ II, XVII.E.

tournament must play. All players who are accepted in up to six WTA 500 Tournaments must play in each of those six WTA 500 tournaments.

187.     Although complying with the mandatory schedule requires constant travel, the Tours do not cover travel costs for players, inhibiting lower earning players' ability to bring along their coaching and medical staffs. Players often must secure and pay for accommodations themselves, making professional tennis an unsustainable career even for those with the necessary talent.

188.     As an illustration of the onerous schedule the Governing Body Defendants impose on players, consider the most recent full season of JP Smith, currently the 85th-ranked men's doubles player on the ATP Tour. Beginning on January 2, 2024, Smith embarked on a 45-week season in which he competed in 62 matches across 32 tournaments on the ATP Tour and ATP Challenger Tour. By January 20, before the season was even three weeks old, he had played seven different matches in three different tournaments in three different cities in Australia. After he concluded play at the Australian Open in Melbourne, he then flew directly to Western Europe, where he played seven matches in France and the Netherlands within 18 days. He then played six more matches by the end of February across one 250-level tournament in Doha and one 500-level tournament in Dubai.

189.     From Dubai, Smith then spent five weeks playing in four tournaments in the southern United States, before returning to Western Europe in mid-April to play in eight tournaments in six countries through July 8, after which he flew immediately to Newport, Rhode Island, for a second stint of tournaments in the

United States. During his second lap of American events, Smith competed in 11 matches in five tournaments in four states and Washington, D.C. over six weeks.

190.    Smith then flew to China, where in a single month he competed in one tournament in Chengdu, one in Beijing, and one in Shanghai, cities that are hundreds of miles away from one another. He then concluded his 2024 season by playing in eight matches between October 16 and November 7 across four tournaments in Sweden, Austria, Slovakia, and Serbia.

191.    For those keeping score at home, in 2024 Smith participated in 32 total tournaments in 15 countries on four different continents. As a reward for his dedication to his demanding schedule and the toll it took on his body, Smith was given a six-week offseason: the December 30, 2024 opening match of the Brisbane International signaled the start of the 2025 season, only 43 days after Smith's final match of the 2024 season.

192.    Smith himself has felt that the ATP's rules force him to comply with this daunting schedule. Several times throughout his 13-year professional career, Smith has opted to play in tournaments even though he did not feel physically capable of competing at a high level because of the negative repercussions his career would face if he passed up the opportunity to earn prize money and Ranking Points. Without any material or financial support from the ATP or its Tournament Co-Conspirators, Smith must foot the bill for thousands of miles of plane and train travel—often at exorbitant, last-minute prices—and frequently must endure harsh and discomforting travel conditions that impair his body's recovery between tournaments.

193.    Smith must pursue his career under these conditions only because the ATP and its co-conspirators have the market power to make him. Lest there be any worry that he would defect to a rival tennis circuit, they agree on a set a rules that compels his attendance at the tournaments sanctioned by the Defendants.

194.    Specifically, to enforce players' attendance during their never-ending season of tournaments and ensure all players endure what JP Smith did in 2024, the Governing Body Defendants subject players to a withdrawal rule and prohibit players from playing at unsanctioned tournaments.

195.    The Tour permits players to withdraw from tournaments only twice per season before they are fined.[32] Players receive a fine regardless of whether they are injured or if their absence was due to visa or related immigration issues (which the Tours are supposed to, but do not always, handle). While the WTA Rules contain pregnancy and maternity protections and policies, the ATP's rules lack corresponding paternity protections, meaning that if players seek to exercise their rights to parental leave under federal and certain state laws, they can nonetheless be penalized by the ATP and suffer adverse career consequences. Indeed, ATP players have been penalized for withdrawing from tournaments even when they did so for the birth of a child or other family and/or medical issues.

---

[32] *See* ATP Rulebook § 7.05(E)(3) ("The first two (2) withdrawals are excused, thereafter, each withdrawal is subject to a fine"); *see* WTA Rulebook § IV.A.5 ("[N]o more than two (2) times per Tour Year, a player may withdraw from the singles competition at a WTA Tournament without receiving a Late Withdrawal fine").

196.    Even when players seek to withdraw for medical purposes, they must physically appear at the tournament at their own expense—regardless of where the tournament may be—to be medically cleared by the Tours' own medical staff.

197.    Hubert Hurkacz made the difficult decision to withdraw from the mandatory Shanghai Open in 2024 after tearing his meniscus at Wimbledon. Although Hurkacz withdrew due to an injury he sustained playing tennis, the ATP punished him by docking his bonus by 25%.

198.    In addition to fines, the ATP and its Tournament Co-Conspirators subject male players to Ranking Points deductions for withdrawals regardless of whether they withdrew for permissible reasons. Under this system, a player who withdraws from a sanctioned tournament receives zero Ranking Points, which replaces the Ranking Points the player had received from the earlier tournament that is part of the rolling-basis calculation.[33]

199.    The Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators further agree to enforce compliance with their restrictive schedules by prohibiting professional tennis players from playing in unsanctioned tournaments or exhibitions during the Tours' season.

200.    Because the Governing Body Defendants have fit more than 50 annual tournaments on each Tour in an 11-month season, there are already few available days each year in which players might seek to compete at exhibitions or unsanctioned

---

[33] ATP Rulebook § 9.03(C). A player can also be subject to a ranking penalty for withdrawal from an ATP Masters 1000 tournament. *See* ATP Rulebook Section 8.04(D)(2).

events, and doing so would come at the cost of sacrificing some of the precious little time the Tours permit for rest and recovery. But the rules promulgated by the Governing Body Defendants ensure that the players do no such thing.

201.    Section 1.14 of the ATP Rulebook prohibits male commitment players from playing in any event other than a Grand Slam, ATP Tour tournament, or ATP Challenger Tour tournament if the tournament is scheduled (i) within the tournament weeks of any ATP Tour Masters 1000 tournament, ATP Tour 500 tournament, or the Nitto ATP Finals (single or doubles); (ii) within 30 days before or after the tournament weeks of any ATP Tour Masters 1000 tournament, ATP Tour 500 tournament, or the Nitto ATP Finals (singles of doubles), if the event is located within 100 miles of the tournament or in the same market of the tournament, as determined by the ATP CEO; or (iii) within the period of any ATP Tour 250 tournament if the event is located within 100 miles of the tournament or in the same market area of the tournament as determined by the ATP CEO.[34] In 2024, this left commitment players with only the first 12 days and the last 34 days of the year free to play in any exhibition or unsanctioned tournament of their choice.

202.    These restrictions apply to ATP tournaments for which the commitment player *has not even qualified*. Even if a commitment player is ineligible to play in an ATP tournament, he may not play in any unsanctioned tournament or exhibition that comes within the ambit of Section 1.14. A player can be subject to a $250,000 fine, suspension, or even banishment from the ATP Tour if he violates this section.

---

[34] ATP Rulebook § 1.14.

203.    The ATP also prohibits male professional players from participating in exhibitions and unsanctioned tournaments that feature even a single player ranked in the top 100 of the ATP rankings and last longer than three consecutive days.[35] A player can be stripped of his voting rights on the Player Advisory Council and on other ATP governance matters and may forfeit credits toward the ATP retirement program if he competes in such events.

204.    Section XVII.E.3 of the WTA Rulebook prohibits WTA player members from competing in any non-WTA or non-ITF event that is scheduled (i) 60 days before or 30 days after the WTA Finals, a WTA 1000 Mandatory, a WTA 500, or a WTA 250 tournament if the event is located either within 125 miles of the event or within the same geographic area of the tournament, as determined by the CEO; (ii) during the same week as the WTA Finals, a WTA 1000 Mandatory, WTA 500, or WTA 250 Tournament; or (iii) during the same week as a WTA 125 Tournament in which the player is entered.[36] Given the length of the tournament calendar, not a single day was available in 2024 for female players to compete in an exhibition or unsanctioned tournament free of any conflict and without the requisite consent of the WTA. The penalty for violating this rule is a fine depending on a player's ranking—the higher the player is ranked, the greater her fine.

---

[35] ATP Rulebook § 1.21.
[36] WTA Rulebook § XVII.E.3.

205.    To maintain their conspiracy with the Grand Slam Co-Conspirators, both the ATP and the WTA specifically exempt the Grand Slams and any events promoted by the Grand Slams from the rules on unsanctioned competitions.

206.    These restrictions bar the entry of any other professional tennis event to compete with the Tours in the market for professional tennis players' services. They limit players' opportunities to play in exhibitions that showcase their skills and offer prize money, albeit with no chance to win Ranking Points. Players find exhibitions attractive because they are shorter than the Tours' 12-day events and provide a platform to hone their skills against top players whom they otherwise may not be seeded against in a Tour tournament or a Grand Slam.[37] Exhibitions also offer additional sources of income for the players that are otherwise subject to the Governing Body Defendants' illegal price-fixing scheme.

207.    The rules restricting player participation in conflicting events also preclude players from enrolling in an exhibition or unsanctioned tournament if he or she is eliminated in the early rounds of a tournament on the Tours. For example, the rules would prohibit eliminated players from competing in an exhibition at Madison Square Garden during the second week of the U.S. Open.

---

[37] For example, Holger Rune played at the Six Kings Slam, the only player invited to the Saudi Arabian exhibition who had never won a Grand Slam, and the only player ranked outside the ATP top 10. However, Rune has "long been touted as a future rival for Sinner and Alcaraz." (B. Gray, *Nadal, prize money, Saudi Arabia: Everything you always wanted to know about the Six Kings Slam (but never had time to find out) – updated after final*, Tennis Majors (Oct. 20, 2024), https://www.tennismajors.com/others-news/nadal-prize-money-saudi-arabia-everything-you-always-wanted-to-know-about-the-six-kings-slam-but-never-had-time-to-find-out-790399.html).

208.    But for these barriers to entry, a greater number of competitors would enter the market for the services of professional tennis players. Thus, the Governing Body Defendants' restrictions on player mobility results in a reduced output of exhibitions and independent tournaments.

209.    The Tours' insulation from competitive pressure also allows them to cancel tournaments at the last minute, causing significant harm to players who have already made travel and financial arrangements. For example, in January 2025, just weeks before the tournament was set to begin, the WTA announced it would shut down the San Diego Open, a 500-level event. Because players may not compete in conflicting unsanctioned events, this decision left them without any place to play and without any earnings.

210.    The WTA similarly makes a mockery of its mandatory participation rules for 1000- and 500-level tournaments by preventing players from competing in 250-level tournaments if those players are deemed *too good*. Pursuant to Section III.B.1.iii of the WTA Rulebook, Defendant WTA and its Tournament Co-Conspirators agree to prohibit any Tournament Co-Conspirator operating a 250-level tournament from allowing more than one female player ranked in the top ten to play in the event. As a result, the WTA and its Tournament Co-Conspirators deny prominent players the opportunity to play in an event of their choice.

211.    American player Madison Keys recently fell victim to this rule: she was kicked out of the field of the 250-level ATX Open in Austin, Texas, in March 2025 because her consecutive titles at the 500-level Adelaide International and the

Australian Open in January caused her to shoot from 20th to 7th in the global rankings. Because the ATX Open already had another top-ten player scheduled to play, it followed the WTA's rule and prohibited Keys from participating. As Keys's experience illustrates, this rule arbitrarily restricts the output of tournaments where female professional tennis players may sell their labor.

212.    The Governing Body Defendants' agreements with their Tournament and Grand Slam Co-Conspirators to compel attendance at longer tournaments with impractical match times have increased the risk of physical injuries to players. Grand Slam matches are 20% longer than they were in 1999, a trend that studies show is highly correlated with the risk of injury. Despite data showing that players are 25% more likely to get injured during a night match, there has been a 100% increase in night matches at Grand Slams since 2018. In 2024, the PTPA published a report analyzing the effect of poor scheduling on players' health. Among other conclusions, the report showed that night matches have become significantly more common and demonstrated a "stronger correlation" between injuries and matches played at night, compared to those played in the day. Over the long term, the increased number of matches and tournaments in which players must compete shortens players' careers.

213.    Players have been vocal about the tolls these schedules take on them. Coco Gauff called the post-midnight finishes at the 2024 French Open "not healthy." Carlos Alcaraz criticized the Tours' schedule, saying the Governing Body Defendants "are going to kill [players] in some way." And Iga Swiatek warned that the Governing Body Defendants' current scheduling strategy is "not going to end well."

### 3. Ranking Points and Compulsory Schedules Force Players to Sell Their Labor on Restrictive Terms.

214.    The Governing Body Defendants' agreements with their Tournament and Grand Slam Co-Conspirators to control the distribution of Ranking Points and to compel player attendance at Tour tournaments—to the exclusion of competitor events—require the Player Plaintiffs and members of the Classes to offer their services only to the members of the cartel on specific, restrictive terms. By requiring players to accumulate their exclusive Ranking Points to obtain eligibility for premier tournaments like the Grand Slams, fining players on the Tours who abstain from events, and precluding players from playing for competitors, the Governing Body Defendants have agreed with their Tournament and Grand Slam Co-Conspirators to refuse to deal with players who do not abide by their terms and to exclude exhibitions and unsanctioned tournaments from competing for the players' services.

215.    These restraints not only limit players' career opportunities and increase their risk of physical injury but work nakedly to bar unsanctioned tournaments from entering the market for players' services. These restrictions lack any procompetitive justification and any benefit from the restrictions is outweighed by the anticompetitive harm or could be obtained through less restrictive means.

216.    Although the Governing Body Defendants may contend that some rules are necessary to coordinate players' appearances on a tournament circuit, the rules they actually promulgate and enforce go well beyond that. Creating an 11-month season filled with two-week tournaments players must attend with minimal rest between them surpasses the coordination necessary to maintain a viable circuit of

tournaments. The Governing Body Defendants could still satisfy fans' demand to watch matches by, at the least, limiting the season to 8 or 9 months or including adequate rest periods for players between tournaments without fear of financial or Ranking Points penalties for missing consecutive tournaments. By providing enough time between tournaments or creating a true offseason with sufficient recovery time, the Governing Body Defendants can reinvigorate players, allowing them the rest and recuperation needed to perform at the world's highest levels and improve the product on the court. Moreover, the Governing Body Defendants need not ignore players' success at exhibitions and unsanctioned tournaments. They could easily incorporate performances at such events into the Ranking Points calculation without losing player participation.

217.    In other words, the systems for scheduling tournaments and evaluating players that Governing Body Defendants have agreed to and imposed that are far inferior than what competition from rival tournaments would have yielded.

### C. The Tours Prevent New Tournaments From Entering The Market and Require Member Tournaments to Agree to Anticompetitive Non-Competes.

218.    The Governing Body Defendants have orchestrated and entered into agreements with and among their Tournament and Grand Slam Co-Conspirators to limit the number of tennis tournaments competing in the market for professional tennis players' services through illegal non-compete agreements and a rigid closed-tournament structure, each an example of a horizontal market allocation that is a *per se* violation of Section 1 of the Sherman Act.

### 1. Closed Tournament Structure

219.    Pursuant to the ATP and WTA Bylaws, the Tours grant sanctions—effectively, licenses—to tournament operators who may join the Tours and enjoy the benefits of membership. Those benefits include administering tournaments at which professional tennis players must play and may accumulate Ranking Points. This sanction is a tournament's golden ticket to participate in the Tours' anticompetitive and monopsonistic schemes; without a sanction, a tournament cannot take part in the market for the services of professional tennis enjoyed exclusively by the Tours and their co-conspirators. Moreover, upon information and belief, each sanction the Tours grant stipulates the geographic area where the tournament must operate.

220.    The agreements among the Tournament Co-Conspirators and the Grand Slam Co-Conspirators to restrict new tournaments from entering the Tours and Grand Slams, arranged and enforced by the Governing Body Defendants, have led to a structure through which unsanctioned tournaments cannot attract enough talent to sustain operations.

221.    These new tournaments, which may otherwise seek to compete for the players' services due to the artificially suppressed prize money pots and restrictive working conditions required by the Tours, are barred by the Governing Body Defendants' anticompetitive agreements from entering the market to offer professional tennis players a place to sell their services. The sanctions system artificially reduces the opportunities for professional tennis players to sell labor by preventing new tournaments from emerging to compete with the Governing Body

Defendants and their Tournament Co-conspirators through better working conditions, Ranking Points, or prize money.

222.    This result is by design. When other non-Tour tournaments sought Ranking Points recognition, which would make their events desirable to the players who would otherwise wish to participate, they were rejected outright to preserve the exclusionary market power the Tours possess.

223.    The Tours notably permit their players to compete in one select set of competitor tournaments above all others—the Grand Slams—without running afoul of their stringent unsanctioned event rules otherwise applicable to the top players. This selective exception allowing the Player Plaintiffs, ATP Class members, and WTA Class members to play in the Grand Slams demonstrates that the Grand Slam Co-Conspirators work in concert with the Tours to maintain and strengthen the Tours' respective monopsonies in the market for the services of men's and women's professional tennis players.

224.    The ATP's closed tournament structure is further enforced through Phase One of the ATP's OneVision strategic plan, which went into effect on January 1, 2023. Through OneVision, Defendant ATP and their Tournament Co-Conspirators use their market power to block new tournaments from entering the tour by implementing "category protection," which provides for 30-year category protection for ATP Masters 1000 tournaments and 10-year category protection for ATP 500-level tournaments. In practice, this means each Tournament Co-Conspirator operating a Masters 1000 tournament will continue operating a 1000-level event for 30 years and

each Tournament Co-Conspirator operating a 500-level tournament will continue operating a 500-level event for 10 years without any fear of slipping in the Tour's pecking order if they fail to produce an adequate product. While the ATP justifies this exclusivity as a means to promote long-term security, higher enterprise value, more investment, and higher standards across the tour, in reality, this component of OneVision entrenches the ATP's monopsonistic stranglehold for decades to come by outright banning new tournaments from entering the Tour, even if those tournaments wanted to offer better prize money or better working conditions.

225.    To further cement the Governing Body Defendants' exclusive market power, the ATP has publicly announced that "Phase 2" of the OneVision initiative would unify the Tours' governance systems and merge the ATP's commercial rights with the WTA's and that the Tours have already hired a management consultancy firm to advise them on the contemplated deal.[38] A merger of the ATP and the WTA would exacerbate the restrictive restraints each of them currently imposes on Player Plaintiffs and members of the classes. Should the proposed merger come closer to fruition, Plaintiffs reserve their rights to challenge the merger as a further restraint on trade and illegal under governing law.

226.    There is no procompetitive justification for this arrangement and any benefits, if they exist, are outweighed by the anticompetitive harms or could be obtained by less restrictive means. Although a degree of coordination among

---

[38] *Phase Two*, ATP One Vision, (last visited March 17, 2025), https://onevision.atptour.com/one-vision/phases-one-two#block-bb52526c-5f24-4efd-94f6-397d14a042ca

tournaments may be warranted to sustain a circuit, preventing any new market entrants goes far beyond what is required to do so. The manifest purposes of the sanctions system are to reduce the output of professional tennis tournaments and erect barriers to market entry or expansion by any new competitors that could offer the players fair market compensation for their services. The agreement's primary function is to reinforce the Governing Body Defendants' other anticompetitive restraints, not to deliver a necessary product.

## 2. Non-Compete Agreements

227. The Governing Body Defendants have entered into agreements with their Tournament Co-Conspirators and Grand Slam Co-Conspirators, codified in the ATP and WTA Bylaws, to horizontally allocate the market for professional tennis players and refrain from competing with each other within the same geographic area or time period.

228. Pursuant to Section 5.16 of the ATP Bylaws, each ATP Tournament Co-Conspirator that produces a 1000-level event (and its owners and executives individually) has agreed that it will not operate a separate men's professional tennis event within 600 miles of another ATP Tournament Co-Conspirator's event or *within the same country* in which another ATP Tournament Co-Conspirator operates an event.[39] If the ATP Tournament Co-Conspirator stops operating its 1000-level tournament, the agreement not to compete extends to prevent its owners from

---

[39] Until recently, this provision restricted *all* ATP Tournament Co-Conspirators, not only those that own 1000-level events. For years, every Tournament Co-Conspirator agreed not to operate a competing, unsanctioned men's tournament within the same country as a co-conspirator's event for at least two years.

operating a new competitor tournament in that country for *two years* after it ceased operations.

229.    Although this agreement now only explicitly restricts the producers of 1000-level events from creating unsanctioned tournaments, it protects the vast majority of ATP Tournament Co-Conspirators from the threat of any such competition. Indeed, over two-thirds of all ATP Tournament Co-Conspirators operate events within the expansive geographic radius of Section 5.16 of the ATP Bylaws.

230.    In addition, this provision restricts the ability of any operator of a 250- or 500-level event from creating unsanctioned tournaments to the extent that operator also owns a 1000-level event on the ATP Tour.

231.    Pursuant to Section 2.7 of the WTA Bylaws, each WTA Tournament Co-Conspirator, and any person or entity with an ownership interest in a WTA tournament, has similarly agreed that it will not stage, operate, or invest in a separate women's professional tennis event within the same media market or metropolitan area in which another Tournament Co-Conspirator operates and will not stage a new event for two years if it ceases operations of its event. The WTA Tournament Co-Conspirators have also agreed to grant the WTA CEO unilateral authority to determine whether a professional tennis event would occur in the same region as a fellow Tournament Co-Conspirator's tournament, thereby expanding the reach of the non-compete. Unlike the ATP's non-compete agreement, Section 2.7 of the WTA Bylaws prohibits *every* WTA Tournament Co-Conspirator, including the

ATP, from operating a competing women's professional tennis event in the same geographic region as a fellow WTA Tournament Co-Conspirator.

232.    The non-compete agreements prohibit Tournament Co-Conspirators—who have the knowledge, resources, and the facilities to start a competing tournament—from leaving the Tours to start competing events. Similarly, they completely prohibit the Tournament Co-Conspirators from offering an additional product that competes simultaneously with other Tournament Co-Conspirators for players' services. The Tournament Co-Conspirators restricted by the agreements would either have to sell their current facilities and move outside of their country or wait two years to begin operations again if they sought to leave a Tour and start a competing tournament or tour.

233.    By agreeing to limit events in proximity to each other, the Governing Body Defendants and their Tournament Co-Conspirators reduce the number of entities to which professional tennis players may sell their services in a given year. Although many players would, if given the option, compete in a tournament that is closer to home, pays higher wages, or provides better amenities than an event occurring further from family with inferior facilities, the horizontal market allocation agreement eliminates that possibility by restricting output.

234.    The non-compete agreements have also inhibited the investment in and output of new tournaments vying for the players' services by delaying for two years Tournament Co-Conspirators' efforts to create new competing events after they cease staging a previous event on the Tour, even where market forces may incentivize such

investment to take advantage of artificially low prize money awarded to players on the Tours. Any Tournament Co-Conspirator that wanted to leave a Tour and start a competing tournament or tour would either have to sell its current facilities and move hundreds of miles away or wait two years to begin operations again.

235.    Both the ATP and the WTA have engineered similar agreements with and amongst their Tournament Co-Conspirators to allocate the specific dates during which a Tournament Co-Conspirator may stage its event. For example, the Tournament Co-Conspirators that own the Madrid Open and the Italian Open— 1000-level events on both the ATP Tour and the WTA Tour—have agreed to stage their tournaments only in the consecutive 12-day windows allotted to them so that their events do not overlap and compete for players' services. Because the operator of the Italian Open is seeking to extend the tournament to two weeks so that it may market itself as the "Fifth Grand Slam," it has offered the operator of the Madrid Open over $500 million to buy the calendar dates allocated to the Madrid Open pursuant to the cartels' non-compete agreements.

236.    Absent the agreement not to compete for players' services during the Madrid Open's week, the Italian Open could freely extend its schedule to 14 days or invest capital in its facilities to achieve Grand Slam stature, rather than pay to acquire the portion of the market allocated to a fellow Tournament Co-Conspirator.

237.    And, if not for the Governing Body Defendants' agreements to divide the market and fix prize money, the Italian Open could instead invest the half-a-billion

dollars it will use to try to buy the Madrid Open's market allotment to entice players with higher prize money, better services, or higher-quality facilities.

238.    These agreements demonstrate the Tournament Co-Conspirators' agreement among themselves—engineered, agreed to, and enforced by the Governing Body Defendants—to allocate competition in the global markets for the services of men's and women's professional tennis players and limit the market only to the existing Tournament Co-Conspirators and the Grand Slam Co-Conspirators.

239.    There is no procompetitive justification for these expansive non-compete agreements. They exist only to limit any potential competition from rival tournaments or tours, including for the services of professional tennis players that the Tours' artificially low prize money awards would invite. As a result, they further depress the compensation awarded to the Player Plaintiffs and members of the Classes.

240.    Any procompetitive benefits the Governing Body Defendants may argue result from these expansive non-compete agreements are outweighed significantly by the anticompetitive harm the agreements bring and the anticompetitive restraints— such as price-fixing—which the agreements reinforce and could be obtained through less restrictive means. The specific rules the Governing Body Defendants have agreed to and enforce go well beyond what would be necessary to achieve the procompetitive aim of coordinating a circuit of tournaments or to reap the value of whatever investments they make in individual sanctioned tournaments bound by the agreements.

241.    The Governing Body Defendants' procompetitive goals, to the extent any exist, could be accomplished without rules that prevent a Tournament Co-Conspirator that stops operating its January event in San Diego from producing a new event in New York the following winter if the demand existed for it. And, given the Governing Body Defendants' willingness to schedule more tournaments than there are weeks in the tennis season, they could permit tournaments of similar rank—like the Italian Open and Madrid Open—to operate simultaneously and compete for player participation.

242.    Instead, the agreements that prevent Tournament Co-Conspirators from operating events up to thousands of miles apart, up to two years apart, only prevent proven tournament operators from providing professional tennis players with a quality place to sell their labor. But that is the result Defendants and their co-conspirators have chosen because it serves their anticompetitive goals of reducing the output of tournaments, reducing competition for players, preventing new competitors from threatening their market power, and limiting the compensation they must pay to players—all of which puts more money in Defendants' own pockets to the detriment of players, rivals, and competition.

### D. Defendants Abuse Their Dominance Through The Sham and Arbitrary Investigative Processes of the ITIA.

243.    Because Defendants are insulated from competition in the relevant markets for professional male and female tennis players' services, the Governing Body Defendants exercise substantial control over the manner and conditions of professional tennis players' work. Through this control, they require players to sign

consent forms through which the players are compelled to submit to the Governing Body Defendants' codes of conduct and the ITIA's jurisdiction over investigations.

244.     Specifically, the players are bound to the TACP and TADP. Through these mandatory programs overseen by the ITIA, Defendants subject players to abusive and arbitrary investigative processes that lack any sense of fairness or due process and often result in suspensions or fines—often unwarranted—that jeopardize their careers.

245.     For example, there is ample evidence of investigators unlawfully seizing players' cellphones, harassing players and their families at tournament hotels, bombarding players with dozens of blood and urine drug tests with no basis and at odd hours, interrogating players for hours at a time, and threatening additional punishments for failing to "cooperate" with investigative requests. The ITIA then rejects players' requests for insight into their investigative processes and reasoning for punishments.

246.     Additionally, the ITIA has recently implemented a "filing failure" rule. Under this rule, if a player changes hotel accommodations within the four- or six-week window before certain tournaments, the player has to indicate where he or she will be, as soon as he or she has entered a tournament. If players do not comply with this rule, they receive a "filing failure," which counts as a missed drug test and a "strike" on their record. The ITIA has the unilateral discretion to suspend a player for up to two years if he or she commits three "infractions" within a twelve-month period.

247.    One player, for example, was indefinitely suspended after the ITIA's investigators illegally confiscated his phone during a tournament with no probable cause, downloaded a previously deleted messaging application without the player's consent, and accused him of fixing a match on a day when the player was not even playing. Without any evidence that he engaged in match-fixing, the ITIA has ruined his career and reputation and indefinitely prevented him from earning a living.

248.    In 2020, the ITIA's predecessor organization, the TIU, interrogated another player and searched his phone regarding baseless match-fixing allegations from 2018. Although the TIU found no evidence and did not contact the player again for years, the ITIA decided to file a case against him in March 2024 for match-fixing. Since then, the ITIA has followed him, interrogated him at matches, including moments before he was set to take the court, and harassed him in trying to build a case. The ITIA then subjected the player to *23 drug tests* in 2024 alone—including three blood tests—well above the 3-5 annual tests most players typically must take. The ITIA's blood tests, which they drew right before a match, diminished the player's performance and recovery time. The player has never failed a drug test in his 21 years of playing professionally and the ITIA has not suspended him for any doping or match-fixing offenses.

249.    In December 2024, the ITIA interrupted Jakub Mensik *mid-match* at the ATP Finals and forced him to undergo a drug test, which usually occurs before or after matches. Clearly affected by the abrupt interruption, Mensik ultimately lost the match.

250.     Similarly, the day before Plaintiff JP Smith was set to compete in his opening match of the Australian Open, ITIA investigators on tournament grounds approached him and required him to take a blood test. Smith was given no reason for the sudden test. Smith was forced to draw a copious amount of his blood, draining him of energy less than 24 hours before he was to begin playing in one of the biggest tournaments of his season.

251.     Upon information and belief, the Governing Body Defendants have used the ITIA and abused the anti-corruption and anti-doping investigation processes to harass players they deem a threat to their illegal cartels. For example, the WTA set up one player who had spoken out against the Tours' illegal, unfair, and anticompetitive economic practices for failure when it sent the ITIA to test her for banned substances in Bogota, Colombia.

252.     As the Governing Body Defendants know, the meat eaten in Columbia often causes false positives in players' samples because of the way cattle is farmed there—yet it is impossible for ITIA to determine whether a positive test came from meat or a banned substance. Anytime a positive result occurs in a player's sample (regardless of the reason), ITIA automatically implements a provisional ban on the player, preventing them from playing.

253.     Despite this, the WTA sent the player to Columbia to play *without warning her of this risk*, fed her contaminated meat at the WTA's official hotel, tested her for drugs, and banned her from playing the sport for *19 months* when the sample came up positive. The player maintained her innocence as a clean athlete, and, after

enduring 19 months of expensive legal action, an independent tribunal finally cleared her of doping, finding that the false positive was caused from contaminated meat.

254.    The ITIA proved in August 2024 that its heavy-handed approach is arbitrary and selective. That month, the ITIA announced that Jannik Sinner, the top-ranked player on the ATP Tour, had twice tested positive for a banned anabolic steroid earlier that season. Unlike its dogged pursuit of other players, however, it accepted Sinner's explanation that his physical therapist had accidentally applied a banned substance to Sinner's skin during treatment. As a result of its immediate acceptance, the ITIA concluded that Sinner bore "no fault or negligence" for his positive test and permitted him to compete in the 2024 U.S. Open, which Sinner won. There was no investigation that dragged for over a year into a prominent player who had not vocalized any issues with the cartel.

255.    Even when players attempt to disclose prohibited conduct as whistleblowers, or fully cooperate with the ITIA's investigation, the ITIA fails to protect them. For example, when individuals in Argentina approached ATP player Marco Trungelliti with an offer of tens of thousands of dollars to throw matches, Trungelliti immediately rejected them and reported the incident. Over the next few years, Trungelliti sat for numerous interviews and even testified in the trial against the match-fixers and implicated players. When he initially refused to testify publicly, he was threatened and told that if he did not do so, they would come after him and revoke any cooperation privileges. Since then, Trungelliti and his family have faced death threats and fled Argentina permanently for fear of retribution from players and

coaches in the Argentinian tennis community. The ITIA's failure to protect cooperators has disincentivized players from coming forward to assist in its investigations and put players in harm's way.

256.    In light of the ITIA's many wrongs and abuses, the PTPA attempted in good faith to clarify, through correspondence with the ITIA, exactly how the ITIA processes are structured and enforced. Despite the PTPA's repeated requests, the ITIA refused to reveal how their investigative personnel are vetted, trained, and educated; what standards of evidence govern the commencement of investigations under both the TACP and TADP; what local, state, national, or international laws underpin the ITIA's abusive, at-will collection of players' personal devices; and other key concerns. Instead of meaningfully engaging with the PTPA, the ITIA merely directed the PTPA to the public TACP and TADP rules and other international guidelines that supposedly inform their sham investigative protocols.

257.    The ITIA's inability, or lack of desire, to explain the bases of their tactics is no surprise, given that it is a tool deployed by Defendants' cartel against players to instill fear and compliance. In these letters, the ITIA admits that it is "financially well supported by" the Governing Body Defendants, whose executives also comprise the ITIA's board. And, despite repeated requests, the ITIA refused to articulate any procedural guardrails that the TACP and TADP afford players subject to investigations. Most notably, the ITIA failed to enumerate any procedural safeguards surrounding provisional suspensions—banning players from working prior to any

formal findings and without due process—perhaps the ITIA's most lethal weapon in its arsenal of career-ending and humiliating punishments imposed on players.

258.    Even though the Player Plaintiffs share with Defendants the goal of eradicating doping and match-fixing from the sport, the ITIA takes measures that are far more draconian and invasive than necessary to achieve those aims because the players have no competitor tour or tournaments to turn to as another option. No legitimate regulatory body can claim that it need not explain its procedural guardrails to its subjects, no matter how worthy its aims. Other anti-doping agencies can successfully police other sports without interrupting players mid-match, as the ITIA did to Jakub Mensik. Nor is there any reason why the ITIA must have the authority to confiscate players' personal devices without explanation in order to probe match-fixing allegations. It is well within the ITIA's means to institute less invasive measures without sacrificing results.

259.    However, the Governing Body Defendants are able to unleash the ITIA's abuse on professional tennis players in these ways only because their monopsony power and their interlocking anticompetitive agreements with their Tournament and Grand Slam Co-Conspirators have removed any threat of a competitor professional tennis league that could peel players away by respecting their autonomy and following due process. Because they have acquired unchallenged power in the market for the services of professional tennis players by erecting barriers to entry for any such potential rival circuit, Defendants lack any incentive to operate a disciplinary body that polices the sport according to the same standard of conduct they demand

from the players. Freed of any competitive fear of defection from players, Defendants do not police the sport in a procompetitive or constructive way, or even in a manner that complies with applicable laws across the globe.

### E. The ATP Abuses Its Monopsony Power By Unfairly Collecting and Using Players' Data

260.    As one more illustration of the degree to which Defendants control the players and monetize the players' labor for themselves, the Governing Body Defendants have begun covertly commercializing players' personal data through various business endeavors.

261.    Upon information and belief, the ATP uses lucrative data agreements with third parties to monetize the ATP's unfettered collection of players' personal biometric data.

262.    Upon information and belief, one data-collection tool primarily used by the ATP is "Hawk-Eye," the advanced technology that will soon be used throughout matches on the ATP Tour instead of human line judges to determine where tennis balls in play land on the court. Upon information and belief, Hawk-Eye now functions as a data collection enterprise that collects match data that the ATP then sells to third parties, without any revenue flowing to the players whose data is monetized.

263.    In June 2024, the ATP proudly unveiled a new biometric data-collection technology when they approved in-competition wearables, an initiative purportedly designed to advance performance metrics. While the ATP announced that all data collected would remain confidential, recent circumstances have cast significant doubt

on the ATP's use of the players' biometric data, which is distinct and more personal in nature than the match data collected by Hawk-Eye.

264.    Players have faced numerous obstacles when attempting to access their own match data gathered by Hawk-Eye, and, in some instances, have even been asked to *pay* for *their own data*. Even more outrageous are instances in which certain Grand Slam Co-Conspirators allowed some players more data access than others based on their nationality. Upon information and belief, Grand Slam Co-Conspirators have treated players from the Grand Slam host countries more favorably with respect to accessing their own match data.

265.    Upon information and belief, the WTA similarly engages in one-sided monetization of players' data without any remuneration to the players themselves. In 2021, the WTA announced a multi-year partnership with WHOOP, a fitness wearable brand, which will reportedly incorporate live player data into broadcasts and social media feeds. The players will receive no compensation for their data.

266.    Upon information and belief, each of the Governing Body Defendants, as well as some of the Grand Slam Co-Conspirators, have likewise entered into lucrative contracts with companies in the sports gambling industry, through which agreements the Governing Body Defendants sell the match data collected on players during their matches. Consistent with their agreements with their Tournament Co-Conspirators not to permit players to endorse companies in the sports gambling industry, the Governing Body Defendants do not provide the players with any revenue it receives from such agreements.

267.    The Tours' improper data collection and resale practices are just another example of the harm they are able to inflict on players as a result of their monopsony power in the market for the services of professional tennis players. Because the Tours have abused their market dominance by agreeing to restraints with their co-conspirators that exclude rival tournaments and alternative tours from competing for players' services, the players have no choice but to comply with the ATP's and the WTA's data collection and monetization schemes if they wish to pursue their careers in tennis at all.

### F. The Governing Body Defendants Protect Their Cartel By Compelling Their Players to Sign Illegal and Unenforceable Arbitration Provisions and Waivers.

268.    In furtherance of their unlawful conspiracies and monopolies, the Governing Body Defendants have conspired to impose compulsory agreements containing illegal and non-negotiable arbitration provisions and illegal compulsory waivers upon the Player Plaintiffs and members of the Classes as a condition of participation and competition in the Tours.

269.    Section 8.07 of the ATP Rulebook purports to require ATP players to submit any dispute between himself and the ATP or any Tournament Co-Conspirator that relates to the application of the ATP Rulebook to Swiss arbitration (purportedly under Swiss law, and with no guarantee that the proceeding would even occur in English). Additionally, in order to enter into an ATP Tour or ATP Challenger Tour tournament, all players must pay ATP membership dues and must sign a Consent and Agreement Form, a contract that purports to bind players to the ATP's rules, Bylaws, resolutions, and regulations, and subjects them to the oversight of the ITIA.

270.    Section XIX.B.1 of the WTA Rulebook similarly requires WTA players to submit any dispute between herself and the WTA or any Tournament Co-Conspirator that relates to the application of the WTA Rulebook to arbitration. Additionally, in order to play in any WTA event, a player must sign the WTA Annual Player Form, in which players agree to be bound by the WTA Rulebook, the WTA Bylaws, "and the decisions, rulings, and actions of the WTA Tour, the Board of Directors . . . and the CEO with respect to all matters within their respective jurisdictions . . . ."[40]

271.    Article 30 of the ITF Constitution likewise requires players who participate at ITF events or who are members of the ITF to submit any dispute between himself or herself and the ITF—other than personal injury claims—to arbitration governed by Swiss procedural rules.

272.    Defendants and their Tournament Co-Conspirators and Grand Slam Co-Conspirators inflict similar restraints on the Player Plaintiffs' earning capacity through the illegal waiver provisions contained in the ATP Bylaws and WTA Bylaws.

273.    Section 3.2(d) of the ATP Bylaws states that each player waives any claim or demand he has against the ATP CEO, the ATP Tour, or any ATP tournament, among other entities, in connection with any decision or action such entities take with respect to membership in the ATP.

274.    Section 2.5(d) of the WTA Bylaws likewise states that each player waives any claim or demand she has against the WTA, any WTA tournament, and

---

[40] WTA Rulebook § I.C.

the ITF, among other entities, in connection with any decision or action such entities take with respect to matters within their jurisdiction under the WTA Rulebook.

275.    The purpose of imposing these mandatory arbitration and waiver provisions is to deprive professional tennis players of their rights to litigate disputes in the courts of the United States or any other forum of their choosing.

276.    The Governing Body Defendants are able to impose these mandatory arbitration and waiver provisions only because they have monopsony power in the market for professional tennis players' services. Because the Governing Body Defendants have monopsony power and have conspired to exclude competitor tournaments and tours from competing in the market for the players' services, the players have no meaningful choice to pursue their careers in their chosen profession without signing the consent forms that contain these provisions. Therefore, the Governing Body Defendants control the players' working conditions without competitive pressure to offer the players' better term of their labor. Absent this monopsony power, players would be free to negotiate with tournaments for contractual provisions that would permit them to pursue their disputes in the forum of their choice. Instead, no professional tennis player is able to sell his or her services to a tournament that will litigate the player's claim in a court of law—or provide the player the choice to litigate or arbitrate—thereby reducing the competition for the player's services.

277.    These compelled terms of pursuing a career in professional tennis are manifestly unfair. They purport to subject professional tennis players to resolve

disputes in Swiss arbitration, where the proceeding may take place in French and there is no guarantee that, as appropriate in claims under the Sherman Act, the players can seek treble the damages resulting from the players' injuries. Therefore, they not only cut against public policy as contracts of adhesion but are part-and-parcel of the Defendants' anticompetitive conspiracy. As such, they are illegal and unenforceable as a matter of law.

278.    There is no procompetitive justification for the Governing Body Defendants' compelled arbitration and waiver provisions. They impose these provisions on players only because they possess the market power to force Player Plaintiffs and members of the Classes to accept terms of employment that are less valuable than these players could otherwise obtain in a free market.

## VII.  RELEVANT MARKETS, MARKET POWER, AND HARM TO COMPETITION

279.    There are two relevant markets for the purposes of Plaintiffs' antitrust claims: the market for the services of men's professional tennis players and the market for the services of women's professional tennis players.

### A.  The Market for the Services of Men's Professional Tennis Players

280.    One relevant product market is the market for the services of men's professional tennis players. The principal sellers in this market are individual male professional tennis players, such as the male Player Plaintiffs. The principal buyers in this market are the owners and producers of men's professional tennis events, including Defendant ATP and the Tournament and Grand Slam Co-Conspirators. Men's professional tennis players are a distinct and identifiable group of professional athletes as recognized by both the sports industry and sports fans. Men's professional

tennis players are a further distinct and identifiable group of tennis players as recognized by both the sports industry and sports fans. The skills and training of men's professional tennis players provide them with peculiar characteristics and uses to the producers of men's professional tennis events. Because of the unique skills and training of men's professional tennis players, the services of entertainers, other athletes, and female professional tennis players are not reasonably substitutable for the tennis-playing services of men's professional tennis players. Because of the elite skill level and training experience of men's professional tennis players, amateur and collegiate men's tennis players are not reasonably substitutable for the tennis-playing services of men's professional tennis players.

281.    Moreover, the elite skill level and training experience of men's professional tennis players render amateur, collegiate, and "minor league" tennis tournaments not reasonably substitutable buyers of the services of men's professional tennis players. Such tournaments are instead buyers in the market for amateur, collegiate, or semi-professional men's tennis players, who possess skills and experience that are inferior to and not substitutable with the skills and experience of men's professional tennis players. Therefore, men's professional tennis players do not sell their services in the markets for amateur, collegiate, or semi-professional tennis players.

282.    To the extent Defendant ITF's World Tennis Tour and the Grand Slam Co-Conspirators also buy the services of men's professional tennis players, the ITF's and the Grand Slam Co-Conspirators' conspiracy with Defendant ATP to

monopsonize the market and agree to anticompetitive price-fixing, market allocation, group boycott, and output restriction restraints vests the ATP with market power in the market for the services of men's professional tennis players.

283.    The relevant geographic market is global. Defendants' actions in the United States are damaging markets globally.

284.    The market for the services of men's professional tennis players includes the smallest group of products in which the ATP, or a hypothetical monopsonist, can profitably impose a small but significant and non-transitory decrease in price. On information and belief, if the ATP or a hypothetical monopsonist decreased prize money in this market in the range of five percent to ten percent for an extended period of time, male players would not, as a result of that decrease, pursue playing opportunities in other markets to such a degree that the price decrease would not still be profitable for the ATP or the hypothetical monopsonist. Male professional tennis players cannot and would not pursue playing opportunities in the WTA in the event of such a price decrease because the WTA only provides such opportunities to female professional tennis players. Moreover, male professional players could not pursue playing opportunities in other sports or forms of entertainment in response to such a price decrease because their unique skills and training are not transferable to such markets.

285.    On information and belief, the ATP has implemented such price decreases in the past, and players in this market did not pursue playing opportunities in other markets to such a degree that the price decrease was not still profitable.

Further, econometric studies, which consider relevant information such as pricing and number of competitors, controlled for unrelated forces affecting pricing and demand, will demonstrate that male players—as the input providers in the market for the services of men's professional tennis players—will not switch to playing opportunities in other markets in response to a small but significant and non-transitory prize money decrease by the ATP or a hypothetical monopsonist to such a degree that the price decrease would be unprofitable. On information and belief, surveys of sports fans and the limited non-Defendant providers of professional tennis events in this market would support the same conclusion.

286. Defendant ATP possesses market power in the relevant product market. Male Player Plaintiffs, and all similarly situated players, are input providers in the market for the services of men's professional tennis players. More than 2,100 male players are ranked by the ATP. Upon information and belief, the number of male professional tennis players who do not play at ATP events or are not ranked by the ATP is non-existent to negligible. Upon information and belief, the 1,800 best men's professional tennis players in the world play at ATP events. Thus, the ATP buys the services of over 85% of the input providers in the relevant market each year.

287. The ATP, its Tournament Co-Conspirators, and its Grand Slam Co-Conspirators disbursed $325 million in prize money to male professional tennis players in 2023. The ATP and its Tournament Co-Conspirators disbursed more than 65% of that prize money while the Grand Slam Co-Conspirators disbursed the other 35%. Upon information and belief, unsanctioned tournaments and exhibitions

disbursed no more than $30 million to male professional tennis players during the same time period. Thus, the ATP alone controls more than 60% of the total prize money distributed to male professional tennis players and, when considered alongside its Grand Slam Co-Conspirators, controls more than 90% of the total prize money distributed to male professional tennis players.

288.    As described further herein, as a monopsonist for the services of male professional tennis players, the ATP has the power to control prices and exclude competition in the relevant market.

### B.  The Market for the Services of Women's Professional Tennis Players

289.    The other relevant product market is the market for the services of women's professional tennis players. The principal sellers in this market are individual female professional tennis players, such as the female Player Plaintiffs. The principal buyers in this market are the owners and producers of women's professional tennis events. Women's professional tennis players are a distinct and identifiable group of professional athletes as recognized by both the sports industry and sports fans. Women's professional tennis players are a distinct and identifiable group of tennis players as recognized by both the sports industry and sports fans. The skills and training of women's professional tennis players provide them with peculiar characteristics and uses to the producers of women's professional tennis events. Because of the unique skill and training of women's professional tennis players, the services of entertainers, other athletes, and male professional tennis players are not reasonably substitutable for the tennis-playing services of women's professional tennis players. Because of the elite skill level and training experience of women's

-98-

professional tennis players, amateur and collegiate women's tennis players are not reasonably substitutable for the tennis-playing services of women's professional tennis players.

290.    Moreover, the elite skill level and training experience of women's professional tennis players render amateur, collegiate, and "minor league" tennis tournaments not reasonably substitutable buyers of the services of women's professional tennis players. Such tournaments are instead producers of events in the market for amateur, collegiate, or semi-professional women's tennis players, who possess skills and experience that are inferior to and not substitutable with the skills and experience of women's professional tennis players. Therefore, women's professional tennis players do not sell their services in the markets for amateur, collegiate, or semi-professional tennis players.

291.    To the extent Defendant ITF's World Tennis Tour and the Grand Slam Co-Conspirators also buy the services of women's professional tennis players, the ITF's and the Grand Slam Co-Conspirators' conspiracy with Defendant WTA to monopsonize the market and agree to anticompetitive price-fixing, market allocation, group boycott, and output restriction restraints vests the WTA with market power in the market for the services of women's professional tennis players.

292.    The relevant geographic market is global. Defendants' actions in the United States are damaging markets globally.

293.    The market for the services of women's professional tennis players includes the smallest group of products in which the WTA, or a hypothetical

monopsonist, can profitably impose a small but significant and non-transitory decrease in price. On information and belief, if the WTA or a hypothetical monopsonist decreased prize money in this market in the range of five percent to ten percent for an extended period of time, female players would not, as a result of that decrease, pursue playing opportunities in other markets to such a degree that the price decrease would not still be profitable for the WTA or the hypothetical monopsonist. Female professional tennis players cannot and would not pursue playing opportunities in the ATP in the event of such a price decrease because the ATP only provides such opportunities to male professional tennis players. Moreover, female professional players could not pursue playing opportunities in other sports or forms of entertainment in response to such a price decrease because their unique skills and training are not transferable to such markets.

294.    Upon information and belief, the WTA has implemented such price decreases in the past, and players in this market did not pursue playing opportunities in other markets to such a degree that the price decrease was not still profitable. Further, econometric studies, which consider relevant information such as pricing and number of competitors, controlled for unrelated forces affecting pricing and demand, will demonstrate that female players—as the input providers in the market for the services of women's professional tennis players—will not switch to playing opportunities in other markets in response to a small but significant and non-transitory prize money decrease by the WTA or a hypothetical monopsonist to such a degree that the price decrease would be unprofitable. On information and belief,

surveys of sports fans and the limited non-Defendant providers of professional tennis events in this market would support the same conclusion.

295.     Defendant WTA possesses market power in the relevant product market. Female Player Plaintiffs, and all similarly situated players, are input providers in the market for the services of women's professional tennis players. 1,600 female professional tennis players play at WTA events, each of whom is ranked by the WTA. Upon information and belief, the number of female professional tennis players who do not play at WTA events is non-existent to negligible. Therefore, the WTA buys the services of close to 100% of the input providers in the relevant market each year.

296.     The WTA, its Tournament Co-Conspirators, and its Grand Slam Co-Conspirators disbursed over $340 million in prize money to female professional tennis players in 2024. The WTA and its Tournament Co-Conspirators disbursed more than 65% of that prize money while the Grand Slam Co-Conspirators disbursed the other 35%. Upon information and belief, unsanctioned tournaments and exhibitions disbursed no more than $30 million to female professional tennis players during the same time period. Thus, the WTA alone controls more than 60% of the total prize money distributed to female professional tennis players and, when considered alongside its Grand Slam Co-Conspirators, controls more than 90% of the total prize money distributed to female professional tennis players.

297.    As described further herein, as a monopsonist for the services of female professional tennis players, the WTA has the power to control prices and exclude competition in the relevant market.

### C. Defendants' Individual and Concerted Misconduct Have Harmed the Relevant Markets.

#### 1. Harm To the Market for the Services of Men's Professional Tennis Players.

298.    Through the agreements alleged herein, the ATP, its Tournament Co-Conspirators, the ITF, and the Grand Slam Co-Conspirators control the market for the services of men's professional tennis players, which allows them to dictate any changes to professional men's tennis tournaments, exclude alternative potential competitor tournaments from entering the relevant market, depress male players' compensation, and resist improvements to players' working conditions.

299.    By conspiring with its Tournament Co-Conspirators, its Grand Slam Co-Conspirators, and the ITF to fix male players' prize money awards and limit their endorsement opportunities, the ATP has artificially suppressed male professional tennis players' compensation below competitive levels.

300.    The ATP effectively controls the entirety of the professional men's tennis schedule by colluding with its Tournament Co-Conspirators, Grand Slam Co-Conspirators, and the ITF to manipulate the Ranking Points system and compel player participation in an 11-month schedule, preventing exhibitions and unsanctioned tournaments from competing for male professional tennis players' services. Without access to players—a critical input for any tennis match—independent tournaments are prevented from entering or expanding in the market,

reducing the number of tournaments that compete for male players' services. Therefore, the ATP has used its market power to implement these compulsory attendance rules and the Ranking Points system as barriers to entry in the market for the services of men's professional tennis players.

301.    The ATP, in collaboration with its Tournament Co-Conspirators, selectively distributes sanctions to tournament operators to determine who may participate on the ATP Tour. Because Defendants' agreements limit the number of sanctioned tournaments and effectively bar players from playing in unsanctioned tournaments, they reduce the number of events able to compete for players' services and raise entry barriers for new and existing independent tournaments by preventing them from competing for players' services.

302.    The ATP has foreclosed its Tournament Co-Conspirators from breaking off from the cartel to compete in the market for male professional tennis players through a broad-reaching and restrictive non-compete clause in the ATP Bylaws, which reinforces the ATP's market power. This agreement precludes certain existing tournaments within the ATP's cartel from competing with the ATP for the services of male professional tennis players by blocking access to those players, who are the critical inputs in the relevant market.

303.    As a result of each of the illegal agreements with its co-conspirators alleged above, the ATP has harmed the market for the services of male professional tennis players by suppressing player compensation, erecting barriers to entry that exclude competitor tournaments from competing for the players' services, reducing

competition for the players' services amongst existing tournaments, and reducing the output of tournaments competing for the players' services. The anticompetitive effects of the ATP's agreements and restraints outweigh any benefits resulting from its conduct, or those benefits could be accomplished by less restrictive means.

### 2. Harm To the Market for the Services of Women's Professional Tennis Players.

304.    Through the agreements alleged herein, the WTA, its Tournament Co-Conspirators, the ITF, and the Grand Slam Co-Conspirators control the market for the services of women's professional tennis players, which allows them to dictate any changes to professional women's tennis tournaments, exclude alternative potential competitor tournaments from entering the relevant market, depress female players' compensation, and resist improvements to players' working conditions.

305.    By conspiring with its Tournament Co-Conspirators, its Grand Slam Co-Conspirators, and the ITF to fix female players' prize money awards and limit their endorsement opportunities, the WTA has artificially suppressed female professional tennis players' compensation below competitive levels.

306.    The WTA effectively controls the entirety of the professional women's tennis schedule by colluding with its Tournament Co-Conspirators, Grand Slam Co-Conspirators, and the ITF to manipulate the Ranking Points system and compel player participation in an 11-month schedule, preventing exhibitions and unsanctioned tournaments from competing for female professional tennis players' services. Without access to players—a critical input for any tennis match—independent tournaments are prevented from entering or expanding in the market,

reducing the number of tournaments that compete for female players' services. Therefore, the WTA has used its market power to implement these compulsory attendance rules and the Ranking Points system as barriers to entry in the market for the services of women's professional tennis players.

307.    The WTA, in collaboration with its Tournament Co-Conspirators, selectively distributes sanctions to tournament operators to determine who may participate in the WTA Tour. Because Defendants' agreements limit the number of sanctioned tournaments and effectively bar players from playing in unsanctioned tournaments, they reduce the number of events able to compete for players' services and raise entry barriers for new and existing independent tournaments by preventing them from competing for female players' services.

308.    The WTA has foreclosed its Tournament Co-Conspirators from breaking off from the cartel to compete in the market for female professional tennis players through a broad-reaching and restrictive non-compete clause in the WTA Bylaws, which reinforces the WTA's market power. This agreement precludes every existing tournament within the WTA's cartel from competing with the WTA for the services of female professional tennis players by blocking access to those players, who are the critical inputs in the relevant market.

309.    As a result of each of the illegal agreements with its co-conspirators alleged above, the WTA has harmed the market for the services of female professional tennis players by suppressing player compensation, erecting barriers to entry that exclude competitor tournaments from competing for the players' services, reducing

competition for the players' services amongst existing tournaments, and reducing the output of tournaments competing for the players' services. The anticompetitive effects of WTA's agreements and restraints outweigh any benefits resulting from its conduct, or those benefits could be accomplished by less restrictive means.

## VIII.  CLASS ALLEGATIONS

### A. Classes

310.    The Player Plaintiffs bring this action against the ITF under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on their own behalf and on behalf of the following Class:

> The "ITF Class": All current, former, and future tennis players who compete in, or competed in, any ITF-sanctioned tennis tournament, including, but not limited to, the Grand Slams, between the date of this Complaint through the date of final judgment in this matter.

311.    Plaintiffs Vasek Pospisil, Nicholas Kyrgios, John-Patrick Smith, Noah Rubin, Tennys Sandgren, and Reilly Opelka bring this action against the ATP, the ITF, and the ITIA under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on their own behalf and on behalf of the following Class:

> The "ATP Class": All current, former, and future tennis players who compete in, or competed in, any ATP-sanctioned tennis tournament between the date of this Complaint through the date of final judgment in this matter.

312.    Plaintiffs Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, Aldila Sutjiadi, and Varvara Gracheva bring this action against the WTA, the ITF, and the ITIA under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on their own behalf and on behalf of the following Class:

The "WTA Class": All current, former, and future tennis players who compete in, or competed in, any WTA-sanctioned tennis tournament between the date of this Complaint through the date of final judgment in this matter.[41]

## B. Numerosity

313.    Plaintiffs do not, as of yet, know the exact size of the proposed Classes, because such information is in the exclusive control of Defendants and their Tournament Co-Conspirators and Grand Slam Co-Conspirators. Upon information and belief, based upon the nature of the trade and commerce involved, there are many thousands of members of the proposed Classes residing in various states and countries across the world. Joinder of all members of the proposed Classes, therefore, is not practicable.

## C. Commonality

314.    Numerous common questions of law and fact exist as to all members of the Classes, and these common questions predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to all members of the Classes are:

  i.    Whether the Governing Body Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to restrain trade by fixing the compensation available to members of the Classes;

---

[41] The ITF Class, the ATP Class, and the WTA Class are referred to collectively herein as the "Classes."

ii. Whether the Governing Body Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade by refusing to deal with members of the Classes except on the specific, restrictive terms they impose;

iii. Whether the Governing Body Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade by horizontally allocating among themselves the market for the services of members of the Classes;

iv. Whether Defendants ATP and WTA and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade by restricting the output of professional tennis tournaments;

v. Whether the Governing Body Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade by agreeing to impose illegal arbitration and waiver provisions upon Class members;

vi. Whether the market for the services of professional tennis players is the relevant product market in this case;

vii. Whether the relevant geographic market is global;

viii. Whether Defendants ATP and WTA possess monopoly and/or monopsony power in the relevant market;

ix.     Whether, through the conduct alleged herein, Defendants ATP and WTA willfully acquired, maintained, and enhanced monopsony power;

x.     Whether, through the conduct alleged herein, the Defendants conspired to acquire and maintain monopsony power;

xi.     Whether Defendants' conduct violates the antitrust laws;

xii.     The effect of Defendants' conduct on the compensation received by members of the Classes during the Class Period;

xiii.     Whether the conduct of Defendants and their co-conspirators has substantially affected interstate commerce;

xiv.     Whether the conduct of Defendants and their co-conspirators caused antitrust injury to the Player Plaintiffs and Class members;

xv.     Whether the Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

xvi.     The appropriate type and measure of damages sustained by the Player Plaintiffs and proposed Class members.

### D. Typicality

315.     The Player Plaintiffs' claims are typical of the claims of the other members of the Classes. Each of the Player Plaintiffs and other members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of the law as complained herein. The injuries and damages of each member of the Classes were directly caused by Defendants' wrongful conduct in violation of the law as alleged herein. Each of the Player Plaintiffs and other members of the Classes suffered injury by operation of Defendants' conspiracy in restraint of trade

and maintenance of monopsony power in violation of the federal antitrust laws, as alleged herein.

### E. Adequacy of Representation

316.    The Player Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

317.    The Player Plaintiffs are adequate representatives of the Classes and will protect the claims and interests of the Classes. The Player Plaintiffs do not have interests that conflict with those of the Classes and the Player Plaintiffs will vigorously prosecute the claims alleged herein.

### F. Superiority

318.    A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by the Player Plaintiffs and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for the Player Plaintiffs and members of the Classes to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case

management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## IX. ANTITRUST INJURY

319.    The injuries suffered by the Player Plaintiffs, the PTPA's members, and members of the Classes are of the type the antitrust laws were designed to prevent and flow from that which makes the conduct described herein unlawful.

320.    Defendants' monopsonization and agreements to restrain trade have suppressed competition for the services of professional tennis players resulting in antitrust injury to Plaintiffs and PTPA members.

321.    Defendants have entered into *per se* illegal and anticompetitive agreements, including agreements (i) to fix player compensation for both their services and for the assignment of the right to commercially exploit their names, images, and likenesses; (ii) to allocate markets geographically and temporally; (iii) to restrict output through a closed ranking system and tournament structures, (iv) to systematically refuse to deal with professional tennis players who do not abide by the carefully curated rules of their cartel; (v) not to compete; and (vi) to impose arbitration and waiver provisions on the Player Plaintiffs, the PTPA's members, and members of the Classes.

322.    Absent Defendants' violations, a competitive marketplace would have yielded, among other benefits, prize money pools and earning capabilities that are more competitive, better schedules and playing conditions for players resulting in lower injury rates, and tournaments that compete for the services of players and the demand of fans. Additionally, a competitive marketplace would have given players

the option to say no to investigative policies and procedures that violate players' due process rights or other laws, rather than be forced to sign agreements that subject them to the ITIA.

323. As a result, Player Plaintiffs Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, the PTPA's members, and members of the Classes have received and will receive compensation less than what they would have received had Defendants not conspired with each other and their Tournament Co-Conspirators and Grand Slam Co-Conspirators to impose illegal restraints and to unlawfully maintain monopsony power in the relevant market for the services of professional tennis players. Defendants and their Tournament Co-Conspirators and Grand Slam Co-Conspirators continue to conspire in restraint of trade and unlawfully maintain a cartel, in a continuing violation of Section 1 of the Sherman Act. Defendants continue to conspire with each other and with their Tournament Co-Conspirators and Grand Slam Co-Conspirators to achieve and maintain their respective monopsonies over the services of the Player Plaintiffs, the PTPA's members, and members of the Classes, in a continuing violation of Section 2 of the Sherman Act. The Player Plaintiffs, the PTPA's members, and members of the Classes thus have suffered, and will continue to suffer, antitrust injury as a result of having to compete under Defendants' anticompetitive scheme.

324.    Defendants' imposition of illegal restraints, web of anticompetitive agreements, and exercise of monopsony power have inflicted irreparable harm on Player Plaintiffs Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, the PTPA's members, and members of the Classes by depriving them and continuing to deprive them of competitive compensation—harm that flows from the ongoing anticompetitive agreements detailed herein. Those anticompetitive agreements effectively render the Player Plaintiffs and PTPA members as nothing more than pawns of the Governing Body Defendants and the Tournament Co-Conspirators and Grand Slam Co-Conspirators who conspire to dictate the grueling, nearly year-long schedule of all professional tennis players. These agreements lock out potential competitors, leaving the Player Plaintiffs, the PTPA's members, and members of the Classes with no option but to sell their labor to the Governing Body Defendants, the Tournament Co-Conspirators, and the Grand Slam Co-Conspirators.

325.    To enforce the Governing Body Defendants' cartel over professional tennis, the ITIA looms above all Player Plaintiffs, the PTPA's members, and members of the Classes as a rogue enforcer with no leash. Player Plaintiffs Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, the PTPA's members, and members of the Classes are forced into a playing environment where they have limited say and little

control over their bodies, even as their athleticism and fame continue to generate greater revenues for Defendants. None of this would happen in a competitive market, where the Player Plaintiffs, the PTPA's members, and members of the Classes, could receive competitive choices and enjoy freedom of movement.

326.    Additionally, Defendants' conspiracy to impose on players sweeping releases on their rights to relief and arbitration provisions in the ATP Rulebook and WTA Rulebook also constitutes antitrust injury to Player Plaintiffs, the PTPA's members, and members of the Classes. By conspiring with the Tournament Co-Conspirators to require players, in exchange for their professional services, to purportedly waive claims they may have against the Tours, the ITF, and Tournament Co-Conspirators and to arbitrate disputes with the same, Defendants have forced Player Plaintiffs Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, the PTPA's members, and members of the Classes to accept terms that are less valuable than they could otherwise obtain without the mandatory conditions of Tour participation.

327.    By flexing their cartel and monopsony power to unilaterally impose waivers of the right to pursue antitrust claims against Defendants and their co-conspirators for their illegal conduct and of the right to pursue such claims in the forum of Plaintiffs' choice, Defendants and their co-conspirators have deprived Player Plaintiffs Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila

Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, the PTPA's members, and members of the Classes of the freedom to play tennis professionally for tournaments or tours that would agree to resolve players' claims either in public court proceedings or in fair forums that were negotiated and agreed to among the parties. Professional tennis players are artificially left without a valuable right inherent to their labor: the option to choose what claims to bring against those who hired them and act as joint employers, and to choose the forum in which to bring such claims.

328.     Defendants' mandatory arbitration provisions also injure the Player Plaintiffs, the PTPA's members, and members of the Classes by potentially depriving them of their ability to pursue treble damages for antitrust claims, which damages would be statutorily required if they prevailed in a United States court on claims for violations of federal antitrust laws. Because the Tours' anticompetitive conditions of membership and participation purport to require professional tennis players to submit any claims to arbitration, the Player Plaintiffs and members of the Classes receive no guarantee that they would receive statutory treble damages by obtaining a favorable judgment for antitrust causes of action. As such, the arbitration provisions contained in the ATP Rulebook and WTA Rulebook purport to limit the extent of financial damages the Player Plaintiffs and members of the Classes could receive in a valid action under the federal antitrust statutes, a limitation the players never would have agreed to if given a meaningful choice.

## X. INTERSTATE TRADE, COMMERCE, AND CONDUCT

329.    Defendants' conduct, whether alone or with its Tournament Co-Conspirators and Grand Slam Co-Conspirators as set forth above, occurred in, and unreasonably restrained, interstate commerce.

330.    The tennis tournaments organized, sponsored, promoted, and overseen by Defendants and their Tournament Co-Conspirators and Grand Slam Co-Conspirators take place across the United States and generate hundreds of millions, if not billions, of dollars in interstate commerce each year through ticket sales, merchandise sales, and sponsorship deals.

331.    Defendants and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have also entered into commercial agreements and arrangements with television networks that distribute live tennis matches for hundreds of millions of dollars throughout the country and the world. These agreements generate hundreds of millions of dollars in interstate commerce.

332.    Defendants' aforementioned activities make use of the instrumentalities of interstate commerce, and payments for those activities of Defendants are made by instrumentalities of interstate commerce.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### Unreasonable Restraint of Trade – Price-Fixing

**Player Plaintiffs, ATP Class, WTA Class, and ITF Class Against Defendants ATP, WTA, and ITF (Damages, Declaratory Relief, and Injunctive Relief)**

**PTPA Against Defendants ATP, WTA, and ITF (Declaratory Relief and Injunctive Relief)**

333.     Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

334.      Defendants ATP, WTA, and ITF, the Tournament Co-Conspirators, and the Grand Slam Co-Conspirators, by and through the ATP's, the WTA's, and the ITF's and co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal contract, combination, or conspiracy in restraint of trade in the relevant markets to artificially depress, fix, maintain, and/or stabilize the compensation paid to Player Plaintiffs and members of the Classes for their tennis services, which constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

335.     Each Tournament Co-Conspirator and Grand Slam Co-Conspirator is an economic actor independent from the other Tournament Co-Conspirators and Grand Slam Co-Conspirators and from the ATP, the WTA, and the ITF.

336.     Defendant ATP has orchestrated and entered into an agreement with and among its Tournament Co-Conspirators, through the ATP Rulebook, to artificially fix and/or limit the prize money amount each Tournament Co-Conspirator on the Tour may award a male professional tennis player who competes in its

tournament. The ATP Rulebook, as agreed upon among the ATP and its Tournament Co-Conspirators, specifically prescribes the precise scales of prize money each Tournament Co-Conspirator must pay male professional tennis players who compete at its events, denies each co-conspirator the ability to offer higher prize money pots, and authorizes the ATP to withhold approval of any attempts to offer higher prize money pots to men's professional tennis players.

337.    Defendant ATP, together with its Tournament Co-Conspirators, has also agreed through the ATP Rulebook to require male professional tennis players to assign their NIL rights to the ATP and its Tournament Co-Conspirators for $0 in return.

338.    Defendant ATP, together with its Tournament Co-Conspirators, has also agreed through the ATP Rulebook to restrict the number and categories of sponsorship and endorsement deals the male Player Plaintiffs, the male PTPA members, and members of the ATP Class may sign as a condition of the players' participation on the ATP Tour.

339.    Through these agreements, Defendant ATP, together with its Tournament Co-Conspirators, has agreed to limit the compensation that each co-conspirator may pay the male Player Plaintiffs, male PTPA members, and ATP Class members for their professional services and enforce such limits.

340.    Defendant WTA has orchestrated and entered into an agreement with and among its Tournament Co-Conspirators, through the WTA Rulebook, to artificially fix and/or limit the prize money amount each Tournament Co-Conspirator

may award a women's professional tennis player who competes in its tournament. The WTA Rulebook, as agreed upon among the WTA and its Tournament Co-Conspirators, specifically prescribes the precise scales of prize money each Tournament Co-Conspirator must pay female professional tennis players who compete at its events, denies each co-conspirator the ability to offer higher prize money pots, and authorizes the WTA to withhold approval of any attempts to offer higher prize money pots to women's professional tennis players.

341.    Defendant WTA, together with its Tournament Co-Conspirators, has also agreed through the WTA Rulebook to require female professional tennis players to assign their NIL rights to the WTA and its Tournament Co-Conspirators for $0 in return.

342.    Defendant WTA, together with its Tournament Co-Conspirators, has also agreed through the WTA Rulebook to restrict the number and categories of sponsorship and endorsement deals the female Player Plaintiffs, female PTPA members, and members of the WTA Class may sign as a condition of the players' participation on the WTA Tour.

343.    Through these agreements, Defendant WTA, together with its Tournament Co-Conspirators, has agreed to limit the compensation that each co-conspirator may pay the female Player Plaintiffs, female PTPA members, and WTA Class members for their professional services and enforce such limits.

344. Upon information and belief, Defendants ATP and WTA have agreed with each other that each will not end the price-fixing restrictions that both Defendant ATP and Defendant WTA have codified in their respective Rulebooks.

345. Upon information and belief, Defendants ATP and WTA have agreed with the ITF and the Grand Slam Co-Conspirators that no Tournament Co-Conspirator on either of the Tours may offer to the Player Plaintiffs and members of the Classes prize money pots greater than what the Grand Slam Co-Conspirators offer to players who compete in the Grand Slams.

346. Upon information and belief, the Governing Body Defendants have agreed that no tournament on Defendant ITF's World Tennis Tour may offer to the Player Plaintiffs and members of the Classes prize money pots greater than what the ATP's and the WTA's Tournament Co-Conspirators offer to players on the ATP Tour, the ATP Challenger Tour, the WTA Tour, or the WTA Challenger Tour.

347. Defendants ATP, WTA, and ITF have successfully compelled the support of their Tournament Co-Conspirators and Grand Slam Co-Conspirators to agree among themselves and with Defendants to carry out the ATP's, the WTA's, and the ITF's conduct described above.

348. Because the Tournament Co-Conspirators, the Grand Slam Co-Conspirators, and the Governing Body Defendants are competitors in the market for the services of professional tennis players, the resulting agreements to act as alleged above constitute a horizontal agreement. In the alternative, and as the result of its framework as set forth above, Defendants are the instrumentalities of the

Tournaments and the Grand Slams and their conduct therefore is necessarily the result of a horizontal agreement.

349.    As a result of the agreement, combination, or conspiracy between the Governing Body Defendants on the one hand, and the Tournament Co-Conspirators and Grand Slam Co-Conspirators, on the other, the Governing Body Defendants enjoy exclusive control over, and market power in, the services of professional tennis players.

350.    The Governing Body Defendants' and their co-conspirators' price-fixing conduct is not connected to any legitimate non-commercial goal. The ATP's, the WTA's, and the ITF's actions are taken solely to enhance profits for themselves and their business partners who willingly abide by their arcane and illegal rules. The ATP's, the WTA's, and the ITF's actions directly regulate commercial markets and are therefore illegal.

351.    These unreasonable restraints on competition have directly lowered the compensation paid to professional tennis players and artificially limited the demand for their services, resulting in the Player Plaintiffs', the PTPA's members', and Class members' injuries consist of receiving lower compensation for their services than they would have received absent the ATP's, the WTA's, and the ITF's conduct (along with the conduct of the various co-conspirators). As a direct and proximate result of the ATP's, the WTA's, and the ITF's horizontal price-fixing agreements, the Player Plaintiffs, the PTPA's members, and the members of the Classes have been injured and financially damaged.

352.    Player Plaintiffs', the PTPA's members', and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes the ATP's, the WTA's, and the ITF's conduct unlawful.

353.    The Governing Body Defendants' horizontal price-fixing agreements with each other and with the Tournament Co-Conspirators and Grand Slam Co-Conspirators are *per se* unlawful.

354.    In the alternative, the Governing Body Defendants' price-fixing agreements with each other and with their Tournament Co-Conspirators and Grand Slam Co-Conspirators are unlawful under a Quick Look or Rule of Reason analysis because they have resulted in financial damage to the Player Plaintiffs, the PTPA's members, and members of the Classes with no procompetitive justification and their anticompetitive effects substantially outweigh any supposed procompetitive effects that may be offered by the ATP, the WTA, and the ITF. Moreover, reasonable and less restrictive alternatives are available to the ATP's, the WTA's, and the ITF's current anticompetitive practices.

355.    The amount of damages suffered by Player Plaintiffs and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Player Plaintiffs are entitled to recover from the ATP, the WTA, and the ITF treble the amount of actual damages, and all plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit. All Player Plaintiffs, the PTPA, and members of the Classes are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## SECOND CAUSE OF ACTION
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
#### Unreasonable Restraint of Trade – Group Boycott/Refusal to Deal Conspiracy

**Player Plaintiffs, ATP Class, WTA Class, and ITF Class Against Defendants ATP, WTA, and ITF (Damages, Declaratory Relief, and Injunctive Relief)**

**PTPA Against Defendants ATP, WTA, and ITF (Declaratory Relief and Injunctive Relief)**

356.　　Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

357.　　Defendants ATP, WTA, and ITF, the Tournament Co-Conspirators, and the Grand Slam Co-Conspirators, by and through the WTA's, the ATP's, the ITF's, and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing horizontal contract, combination, or conspiracy in restraint of trade to effectuate a horizontal group boycott of Player Plaintiffs, the PTPA's members, and members of the Classes. The WTA's, the ATP's, and the ITF's group boycott and refusal to deal encompasses the WTA's, the ATP's, and the ITF's concerted acts to prevent Player Plaintiffs, the PTPA's members, and members of the Classes from being compensated for the fair market value of their tennis services in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

358.　　Each Tournament Co-Conspirator and Grand Slam Co-Conspirator is an economic actor independent from the other tournaments and from the WTA, the ATP, and the ITF.

359.　　Defendants WTA, ATP, and ITF have orchestrated a continuing agreement, combination, or conspiracy in restraint of trade among the Tournament

Co-Conspirators and Grand Slam Co-Conspirators to carry out the WTA's, the ATP's, and the ITF's conduct described above.

360.     The WTA's, the ATP's, the ITF's, the Tournament Co-Conspirators', and the Grand Slam Co-Conspirators' group boycott and refusal to deal includes their concerted action to require all professional tennis players to abide by certain regulations that preclude them from playing at competitor tournament or exhibition events. This concerted action is in effect a refusal to deal with members of the Classes who seek to provide their services to competitor tournaments, unless they accept restrictive and anticompetitive terms, and forecloses them from full access to the marketplace.

361.     Specifically, Defendants WTA, ATP, ITF; the Tournament Co-Conspirators; and the Grand Slam Co-Conspirators have collectively agreed, through the ATP Rulebook, ATP Bylaws, WTA Rulebook, WTA Bylaws, and ITF Rules, among other written and oral agreements, not to permit the participation of any tennis player who fails to accept the restrictive conditions they impose on the player's ability to compete professionally. By so agreeing, Defendants WTA, ATP, ITF, and the co-conspirators have permitted the Player Plaintiffs, the PTPA's members, and members of the Classes to offer their professional services only on specified, coercive terms of employment.

362.     Defendants ATP, WTA, and ITF have agreed through the ATP Rulebook, ATP Bylaws, WTA Rulebook, WTA Bylaws, and ITF Rules, among other written and oral agreements, to use (a) the Ranking Points system, (b) compelled

player attendance, (c) financial penalties for withdrawing or playing elsewhere, and (d) an unreasonably long schedule to achieve their group boycott of tennis players who seek to offer their professional services to competitor tournaments and events.

363.    Through these horizontal agreements, the Governing Body Defendants have refused to deal with professional tennis players who wish to offer their services at tournaments and exhibitions other than those operated by the Tournament Co-Conspirators or Grand Slam Co-Conspirators. By agreeing to schedule over 50 annual tournaments on the Tours over 11 months and compelling professional tennis players to attend such tournaments subject to fines and suspensions, Defendants ATP, WTA, and ITF have agreed to coerce any professional tennis player to accept their restrictive terms of participation on the Tours. Defendants ATP, WTA, and ITF have further agreed to dictate the events for which a professional tennis player may qualify by conditioning such qualification on the accumulation of Ranking Points, which players may only obtain at the tournaments owned and operated by Defendants' Tournament and Grand Slam Co-Conspirators that the players must attend.

364.    By orchestrating and agreeing to a horizontal group boycott of professional tennis players who seek to offer their professional services to competitors, Defendants ATP, WTA, and ITF have committed a restraint of trade that is *per se* unlawful because it is the type that courts invalidate in almost all instances.

365.    In the alternative, the group boycott to which Defendants ATP, WTA, and ITF have agreed with their Tournament Co-Conspirators and Grand Slam Co-

Conspirators is unlawful under a Quick Look analysis or Rule of Reason analysis because it has resulted in financial damage to the Player Plaintiffs, the PTPA's members, and members of the Classes with no procompetitive justification. The anticompetitive effects of the Governing Body Defendants' group boycott substantially outweigh any supposed procompetitive purpose that may be offered by the Governing Body Defendants. Moreover, reasonable and less restrictive alternatives are available to the WTA's, the ATP's, and the ITF's current anticompetitive practices.

366.    As a result of the agreement, combination, or conspiracy between the ATP, the WTA, and the ITF, on the one hand, and the Tournament Co-Conspirators and Grand Slam Co-Conspirators, on the other, the ATP, the WTA, and the ITF enjoy exclusive control over and market power in the services of professional tennis players. The ATP, the WTA, and the ITF either host such events themselves or require entities seeking to host such competitions to obtain the ATP's, the WTA's, and the ITF's approval to participate in the market.

367.    The Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators have artificially limited the number of tournaments to which professional tennis players may sell their services and have thereby reduced the demand for the Player Plaintiffs, PTPA members, and the members of the Classes by depriving them of the opportunity to sell their services to tournament owners who might otherwise compete for their services.

368.    Accordingly, the Player Plaintiffs and the members of the Classes have received and continue to receive lower compensation than they otherwise would in a competitive marketplace, were thus damaged, and seek to recover for those damages.

369.    As a direct and proximate result of the Governing Body Defendants' group boycott, the Player Plaintiffs, the PTPA's members, and the members of the Classes have been injured and financially damaged. The Player Plaintiffs', the PTPA members', and Class members' injuries consist of denial of fair market compensation for their tennis services. The Player Plaintiffs', the PTPA members', and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

370.    The amount of damages suffered by Player Plaintiffs and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, the Player Plaintiffs and members of the Classes are entitled to recover from Defendants treble the amount of actual damages, and all Plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit. All Plaintiffs, the PTPA, and members of the Classes are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CAUSE OF ACTION
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### Unreasonable Restraint of Trade – Market Allocation

**Player Plaintiffs, ATP Class, WTA Class, and ITF Class Against Defendants
ATP, WTA, and ITF (Damages, Declaratory Relief, and Injunctive Relief)**

**PTPA Against Defendants ATP, WTA, and ITF (Declaratory Relief and
Injunctive Relief)**

371.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

372.     Defendants WTA, ATP, and ITF, the Tournament Co-Conspirators, and the Grand Slam Co-Conspirators, by and through the ATP's, the WTA's, the ITF's, the Tournament Co-Conspirators', and the Grand Slam Co-Conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal contract, combination, or conspiracy in restraint of trade in the relevant markets to horizontally allocate the markets for the services of men's and women's professional tennis players, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

373.    Each Tournament Co-Conspirator and Grand Slam Co-Conspirator is an economic actor independent from the other tournaments and from the WTA, the ATP, and the ITF.

374.    Defendants ATP, WTA, and ITF have successfully orchestrated and entered into an agreement with and among the Tournament Co-Conspirators and the Grand Slam Co-Conspirators to carry out Defendants' conduct described above. Because the Tournaments Co-Conspirators, the Grand Slam Co-Conspirators, and the Governing Body Defendants are competitors in the markets for the services of

professional tennis players, the resulting agreements to act as described above constitute a horizontal agreement. In the alternative, and as the result of its governing framework as set forth above, the Governing Body Defendants are the instrumentalities of the Tournament Co-Conspirators and Grand Slam Co-Conspirators and their conduct therefore is necessarily the result of a horizontal agreement.

375.    The ATP, through the ATP Bylaws, the ATP Rulebook, and other explicit and implicit agreements, has orchestrated and entered into a continuing agreement, combination, or conspiracy in restraint of trade with and among the ATP Tournament Co-Conspirators that such Tournament Co-Conspirators will not compete against each other for the services of men's professional tennis players.

376.    Defendant ATP and its Tournament Co-Conspirators have agreed to horizontally allocate the market among the Tournament Co-Conspirators for the services of male professional tennis players by conditioning an entity's ability to host an ATP tournament on the receipt of a sanction that stipulates the geographic market in which the entity may stage events, prohibiting Tournament Co-Conspirators from operating tournaments in the same geographic area, and prohibiting Tournament Co-Conspirators from leaving the ATP Tour to operate competing events that vie for the services of male professional tennis players.

377.    The WTA, through the WTA Bylaws, the WTA Rulebook, and other explicit and implicit agreements, has orchestrated and entered into a continuing agreement, combination, or conspiracy in restraint of trade with and among its

Tournament Co-Conspirators that such Tournament Co-Conspirators will not compete against each other for the services of women's professional tennis players.

378.    Defendant WTA and its Tournament Co-Conspirators have agreed to horizontally allocate the market among the Tournament Co-Conspirators for the services of female professional tennis players by conditioning an entity's ability to host a WTA tournament on the receipt of a sanction that stipulates the geographic market in which the sanctioned Tournament Co-Conspirator may stage events, prohibiting Tournament Co-Conspirators from operating tournaments in the same geographic area, and prohibiting Tournament Co-Conspirators from leaving the ATP Tour to operate events that vie for the services of female professional tennis players.

379.    Defendants WTA, ATP, and ITF have successfully compelled the support of the Tournament Co-Conspirators and the Grand Slam Co-Conspirators to agree among themselves and with the WTA, the ATP, and the ITF to carry out the WTA's, the ATP's, and the ITF's conduct described above.

380.    As a result of the agreements, combinations, or conspiracies alleged herein, the ATP, the WTA, and the ITF enjoy exclusive control over and market power in the services of professional tennis players.

381.    Accordingly, the Governing Body Defendants and their Tournament and Grand Slam Co-Conspirators have conspired to abuse their exclusive control of the markets for the services of professional tennis players and to unreasonably reduce the compensation a competitive market would yield for the services of the Player Plaintiffs, the PTPA's members, and members of the Classes. The Player Plaintiffs

and members of the Classes seek to recover this lost compensation in the form of damages, which must be trebled under applicable law.

382.     The horizontal agreements alleged herein are *per se* unlawful because they constitute the type of horizontal market allocation conspiracies the courts invalidate in every instance.

383.     In the alternative, the horizontal agreements to allocate the market made among Defendants ATP, WTA, ITF, and their Tournament and Grand Slam Co-Conspirators are unlawful under the Quick Look analysis or the Rule of Reason analysis because they have artificially constrained the demand for the services of professional tennis players and have resulted in financial damage to the Player Plaintiffs, the PTPA's members, and members of the Classes, with no procompetitive justification. The anticompetitive effects of the Governing Body Defendants' agreements substantially outweigh any alleged procompetitive effects that may be offered by Defendants. As alleged herein, the naked reduction in competition for players' services that directly limits players' compensation is an overbroad method to achieve any coordination necessary to maintain a circuit of tournaments. Reasonable and less restrictive alternatives are available to Defendants to achieve those goals.

384.     Defendants' actions directly regulate commercial markets and have unreasonably restrained trade, and are therefore illegal.

385.     As a direct and proximate result of Defendants' scheme, the Player Plaintiffs, the PTPA's members, and the members of the Classes have been injured and financially damaged. The Player Plaintiffs', the PTPA's members', and Class

members' injuries consist of receiving lower prices for their tennis services than they would have received absent the conduct of Defendants and their Tournament Co-Conspirators and Grand Slam Co-Conspirators. The Player Plaintiffs', the PTPA's members', and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

386.     The amount of damages suffered by the Player Plaintiffs and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Player Plaintiffs and members of the Classes are entitled to recover from Defendants treble the amount of actual damages, and all Plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit. All Plaintiffs, the PTPA, and members of the Classes are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## FOURTH CAUSE OF ACTION
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
#### Unreasonable Restraint of Trade – Output Restriction

**Player Plaintiffs, ATP Class, WTA Class, and ITF Class Against Defendants ATP, WTA, and ITF (Damages, Declaratory Relief, and Injunctive Relief)**

**PTPA Against Defendants ATP, WTA, and ITF (Declaratory Relief and Injunctive Relief)**

387.     Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

388.     Defendants WTA, ATP, and ITF have orchestrated and entered into a continuing horizontal contract, combination, or conspiracy in restraint of trade with their Tournament Co-Conspirators, by and through the ATP's, the WTA's, the ITF's, and Tournament Co-Conspirators' officers, directors, employees, agents, or other

representatives, in the relevant markets to artificially restrict the output of tennis tournaments in which the Player Plaintiffs, the PTPA's members, and the members of the Classes may offer their professional tennis services, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

389.    Each Tournament Co-Conspirator is an economic actor independent from the other tournaments and from the WTA, the ATP, and the ITF.

390.    Defendants ATP, WTA, and ITF have successfully compelled the support of the Tournament Co-Conspirators to agree among themselves and with the ATP, the WTA, and the ITF to carry out Defendants' conduct described above. Because the Tournament Co-Conspirators and the Governing Body Defendants are competitors in the market for the services of professional tennis players, the resulting agreements to act as described above constitute a horizontal agreement. In the alternative, and as the result of its governing framework as set forth above, the Governing Body Defendants are the instrumentalities of the Tournament Co-Conspirators and their conduct therefore is necessarily the result of a horizontal agreement.

391.    Defendant ATP has orchestrated and entered into a continuing agreement, combination, or conspiracy in restraint of trade with the ATP Tournament Co-Conspirators, through the ATP Bylaws, to restrict the number of entities that may own, stage, or operate tournaments in which male professional tennis players may compete. The ATP and its Tournament Co-Conspirators, through

the ATP Bylaws, have agreed that only the entities to which they grant a sanction may compete in the market for the services of male professional tennis players.

392.     Defendant WTA has orchestrated and entered into a continuing agreement, combination, or conspiracy in restraint of trade with the WTA Tournament Co-Conspirators, through the WTA Bylaws, to restrict the number and identity of entities that may own, stage, or operate tournaments in which female professional tennis players may compete. The WTA and the WTA Tournament Co-Conspirators, through the WTA Bylaws, have agreed that only the entities to which they grant a sanction may compete in the market for the services of female professional tennis players.

393.     Defendants WTA, ATP, and ITF—and their Tournament Co-Conspirators—have agreed to rules prohibiting Tournament Co-Conspirators from operating at the same time, thereby reducing the output of professional tennis events that compete for the services of professional tennis players during the given time period.

394.     Defendants WTA, ATP, and ITF have successfully compelled the support of the Tournament Co-Conspirators to agree among themselves and with the WTA, the ATP, and the ITF to carry out the WTA's, the ATP's, and the ITF's conduct described above.

395.     The Tournament Co-Conspirators, through the ATP Rulebook, ATP Bylaws, WTA Rulebook, WTA Bylaws, and ITF Rules, among other written and oral

agreements, have entered into a continuing agreement, combination, or conspiracy in restraint of trade.

396.    As a result of the agreement, combination, or conspiracy between the ATP, the WTA, and the ITF, on the one hand, and the Tournament Co-Conspirators, on the other, the ATP, the WTA, and the ITF enjoy exclusive control over and market power in the services of professional tennis players.

397.    As a result of the horizontal agreements to restrict output of tournaments at which professional tennis players may offer their services, each Tournament Co-Conspirator need not and does not compete with each other, and Defendants ATP and WTA need not and do not compete with each other, for the services of the Player Plaintiffs, the PTPA's members, and members of the Classes through greater prize money awards, superior playing conditions, or tournament amenities, among other indicia of competition.

398.    The various horizontal agreements to restrict output in the market for professional tennis players described above are *per se* unlawful because they constitute the type of conspiracies the courts invalidate in every instance.

399.    In the alternative, the horizontal agreements to restrict output made among Defendants ATP, WTA, and ITF and their Tournament Co-Conspirators are unlawful under the Quick Look analysis or the Rule of Reason analysis because their anticompetitive effects substantially outweigh any alleged procompetitive effects that may be offered by Defendants. The naked restriction on events that may compete for players' services is an overbroad method to achieve any coordination necessary to

maintain a circuit of tournaments that artificially reduces the number of entities that compete for the services of professional tennis players and directly limits players' compensation as a result. Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

400.    The Governing Body Defendants' agreements have unreasonably restrained trade and directly regulate commercial markets, and are therefore illegal.

401.    As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Classes have been injured and financially damaged. The Player Plaintiffs, the PTPA's members, and members of the Classes received and continue to receive lower compensation than they otherwise would have received for their services in a competitive marketplace absent the conduct of Defendants and their co-conspirators. The Player Plaintiffs', the PTPA's members', and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful. The Player Plaintiffs and members of the Classes seek to recover this lost compensation in the form of damages, which must be trebled under applicable law.

402.    The amount of damages suffered by the Player Plaintiffs and the members of the Classes has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Player Plaintiffs and members of the Classes are entitled to recover from Defendants treble the amount of actual damages, and all Plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit. All Plaintiffs, the PTPA, and

members of the Classes are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint. 15 U.S.C. § 15

### FIFTH CAUSE OF ACTION
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the Professional Men's Tennis Market

### Player Plaintiffs, ATP Class, and ITF Class Against Defendant ATP (Damages, Declaratory, and Injunctive Relief)

### PTPA Against Defendant ATP (Declaratory and Injunctive Relief)

403.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

404.    Defendant ATP, with its Tournament Co-Conspirators and Grand Slam Co-Conspirators as set forth above, has willfully and unlawfully acquired and maintained a monopsony in the market for the services of male professional tennis players in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

405.    Defendant ATP's possession of a monopsony is evident from the fact each of the world's top 1,800 men's professional tennis players participates on the ATP Tour and is subject to the rules and regulations imposed by the ATP, including, but not limited to, those under the ATP Rulebook and ATP Bylaws. Defendant ATP's possession of monopsony power is further evident from its sole possession of authority to award and recognize Ranking Points in the market for the services of male professional tennis players and its distribution of over 60% of the annual prize money in the market for the services of male professional tennis players.

406.    Through its monopsony, Defendant ATP possesses the power to fix compensation for male professional tennis players and exclude competition in the market for the services of male professional tennis players.

407.    Defendant ATP, with its Tournament Co-Conspirators and Grand Slam Co-Conspirators as set forth above, has engaged in a series of anticompetitive and exclusionary conduct in furtherance of its monopsonization of the global market for the services of men's professional tennis players, as alleged herein.

408.    Defendant ATP has willfully and unlawfully acquired and maintained, its monopsony power through the anticompetitive conduct set forth above, including by unilaterally and artificially fixing wages, fixing the number of tournaments in which male professional tennis players must participate, fixing the number of tournaments that are allowed to participate in the ATP's scheme with its co-conspirators, imposing illegal arbitration and waiver provisions on players, and requiring its Tournament Co-Conspirators to adhere to non-compete agreements.

409.    With the conscious objective of furthering its market dominance through anticompetitive conduct, Defendant ATP has implemented its exclusive Ranking Points system, scheduled an eleven-month season, compelled attendance at its tournaments by fining and suspending players, and enforced illegal non-compete agreements, each to acquire and unlawfully maintain monopsony power.

410.    Defendant ATP utilizes its exclusive Ranking Points system to determine which male Player Plaintiffs, PTPA members, and ATP Class members are able to compete in professional tennis and earn a living in the industry. Defendant

ATP does so by dictating the events for which male Player Plaintiffs, PTPA members, and ATP Class members may qualify by conditioning such qualification on the accumulation of Ranking Points and by restricting the events at which male Player Plaintiffs and ATP Class members can earn Rankings Points to the Grand Slams and the tournaments on the ATP Tour. Defendant ATP compounds its exclusive monopsony power over professional men's tennis players' services by compelling male Player Plaintiffs, the PTPA's members, and ATP Class members' appearances at tournaments during the ATP Tour's 11-month season to the exclusion of other tournaments and by adopting and enforcing non-compete agreements among the Tournament Co-Conspirators that preclude certain Tournament Co-Conspirators, or the owners or operators thereof, from leaving the ATP Tour to operate a competing event for over two years.

411.    Through this system, Defendant ATP excludes potential competitor tournaments and exhibitions from entering the market for the services of male Player Plaintiffs, the PTPA's members, and ATP Class members.

412.    These exclusionary actions are of a continuing nature and constitute new overt acts in furtherance of the ATP's unlawful monopsony every year, do not consist of legitimate business activities, and are an abuse of its market position. There is no procompetitive justification for this exclusionary and anticompetitive conduct.

413.    Defendant ATP abuses its monopsony power by fixing the compensation paid to male Player Plaintiffs, PTPA members, and ATP Class members at sub-

competitive prices by agreeing with their Tournament and Grand Slam Co-Conspirators to restrict the prize money awarded to male professional tennis players at those co-conspirators' tournaments and to limit the ability of male professional tennis players to pursue sponsorship deals.

414.    Defendant ATP, together with the ITIA, which the ATP controls, then abuses the ATP's monopsony power in the relevant market by subjecting male professional tennis players to harassment and due process violations to which they otherwise would not be subject if the ATP had to compete for their professional services. The ITIA's abuses have resulted in lengthy or career-ending suspensions for ATP Class members, at significant financial costs, as well as severe financial penalties and out-of-pocket expenses resisting the ITIA's investigations.

415.    Defendant ATP abuses its monopsony power over male professional tennis players by imposing illegal arbitration provisions and illegal waivers of claim upon male Player Plaintiffs and ATP Class members. Defendant ATP, along with its Tournament Co-Conspirators, has illegally conditioned the ability to pursue a career as a professional tennis player on relinquishing the right to pursue legal claims against them in the forum of the player's choice.

416.    The ATP's conduct, whether alone or with its co-conspirators as set forth above, occurred in, and unreasonably restrained, interstate commerce.

417.    The ATP's monopsonization of the relevant market occurred in and unreasonably restrained interstate commerce.

418.     The ATP's monopsonization of the relevant market has directly and proximately caused antitrust injury to all male Player Plaintiffs, male PTPA members, and ATP Class members, and damages to the business and property of the male Player Plaintiffs, male PTPA members, and ATP Class members. Further, the ATP's efforts, whether alone or with its co-conspirators as set forth above, to acquire and maintain its monopsony power has caused antitrust injury to the male Player Plaintiffs, the PTPA's members, and ATP Class members and competition in the relevant market as set forth above and will continue to do so until the ATP is enjoined from further engaging in conduct to preserve and protect its monopsony power.

419.     The amount of damages suffered by the male Player Plaintiffs and ATP Class members has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, the Player Plaintiffs are entitled to recover from the ATP treble the amount of actual damages, and all Plaintiffs are entitled to recover an award of reasonable attorneys' fees and costs of suit. 15 U.S.C. § 15.

420.     The ATP's violation of Section 2 of the Sherman Act is a continuing violation causing new injury to the male Player Plaintiffs, the PTPA's members, and the ATP Class members. The male Player Plaintiffs seek damages for their past four years of antitrust injury from Defendants' Section 2 violations, plus all damages that they will continue to suffer in the future until Defendants' Section 2 violations are enjoined. 15 U.S.C. § 2.

## SIXTH CAUSE OF ACTION
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the Professional Women's Tennis Market

**Player Plaintiffs, WTA Class, and ITF Class Against Defendant WTA (Damages, Declaratory, and Injunctive Relief)**

**PTPA Against Defendant WTA (Declaratory and Injunctive Relief)**

421.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully in this paragraph.

422.    Defendant WTA has willfully and unlawfully acquired and maintained a monopsony in the market for women's professional tennis services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

423.    Defendant WTA's possession of a monopsony is evident from the fact each of the world's top 1,600 women's professional tennis players participates in the WTA Tour and is subject to the WTA's rules and regulations, including, but not limited to, those imposed under the WTA Rulebook and WTA Bylaws. Defendant WTA's possession of monopsony power is further evident from its sole possession of authority to award and recognize Ranking Points in the market for the services of female professional tennis players and its distribution of over 60% of the annual prize money in the market for the services of female professional tennis players.

424.    Defendant WTA possesses the power to fix compensation for female professional tennis players and exclude competition in the market for the services of female professional tennis players.

425.    Defendant WTA has willfully and unlawfully acquired and maintained its monopsony power by the anticompetitive conduct set forth above, including by

unilaterally and artificially fixing wages, fixing the number of tournaments in which female professional tennis players must participate, fixing the number of tournaments that are allowed to participate in its scheme, imposing illegal arbitration and waiver provisions on players, and requiring their Tournament Co-Conspirators to adhere to non-compete agreements. The WTA, through the ITIA, which the WTA controls, then abuses the ITIA's position as the body with sole jurisdiction over professional tennis's anti-doping and anti-corruption programs to eviscerate the due process and privacy rights of players.

426.    With the conscious objective of furthering its market dominance through anticompetitive conduct, Defendant WTA has implemented its exclusive Ranking Points system, scheduled an eleven-month season, compelled attendance at its tournaments by fining and suspending players, and enforced illegal non-compete agreements, each to acquire and unlawfully maintain monopsony power.

427.    Defendant WTA utilizes its exclusive Ranking Points system to determine which female Player Plaintiffs, PTPA members, and WTA Class members are able to compete in professional tennis and earn a living in the industry. Defendant WTA does so by dictating the events for which female Player Plaintiffs, PTPA members, and WTA Class members may qualify by conditioning such qualification on the accumulation of Ranking Points and by restricting the events at which female Player Plaintiffs, PTPA members, and WTA Class members can earn Rankings Points to the Grand Slams and the tournaments on the WTA Tour. Defendant WTA compounds its exclusive monopsony power over professional women's tennis players'

services by compelling female Player Plaintiffs, the PTPA's members, and WTA Class members' appearances at tournaments during the WTA Tour's 11-month season to the exclusion of other tournaments and by adopting and enforcing non-compete agreements among the Tournament Co-Conspirators that preclude any Tournament Co-Conspirator, or any owner or operator thereof, from leaving the WTA Tour to operate a competing event for over two years.

428.    Through this system, Defendant WTA excludes potential competitor tournaments and exhibitions from entering the market for the services of female Player Plaintiffs, the PTPA's members, and WTA Class members.

429.    The WTA's conduct in furtherance of its monopsony of the relevant market is exclusionary in nature, does not consist of legitimate business activities, and is an abuse of its market position. There is no procompetitive justification for this exclusionary and anticompetitive conduct.

430.    Defendant WTA abuses its monopsony power by fixing the compensation paid to female Player Plaintiffs, PTPA members, and WTA Class members at sub-competitive prices by agreeing with their Tournament and Grand Slam Co-Conspirators to restrict the prize money awarded to female professional tennis players at those co-conspirators' tournaments and to limit the ability of female professional tennis players to pursue sponsorship deals.

431.    Defendant WTA abuses its monopsony power over women's professional tennis players by imposing compulsory illegal arbitration provisions and illegal waivers of claim upon female Player Plaintiffs, PTPA members, and WTA Class

members. Defendant WTA has illegally required female professional tennis players to relinquish the right to pursue legal claims against it in the forum of the player's choice.

432. Finally, Defendants WTA abuses its monopsony on women's professional tennis by subjecting the female Player Plaintiffs, PTPA members, and WTA Class members to the ITIA's invasive and harassing investigatory tactics. Defendant ITIA has abused the WTA's, monopsony power by subjecting the female Player Plaintiffs, PTPA members, and WTA Class members to its invasive and harassing investigatory tactics with no due process protections or option for the players to sell their professional services to alternative tennis circuits. The ITIA's abuses have resulted in several lengthy or career-ending suspensions for WTA Class members and severe financial expenses resisting the ITIA's lawless investigations.

433. The WTA's monopsonization of the relevant market, whether alone or with its co-conspirators as set forth above, occurred in, and unreasonably restrained, interstate commerce.

434. The WTA's monopsonization of the relevant market has directly and proximately caused antitrust injury to all Plaintiffs and damages to the female Player Plaintiffs and WTA Class members. Plaintiffs will continue to suffer antitrust injury and damages unless the WTA is enjoined from continuing to engage in the foregoing violations of law and competition is restored in the market.

435. Further, the WTA's efforts to acquire and maintain its monopsony power has harmed the female Player Plaintiffs and competition in the relevant market as

set forth above and will continue to do so until the WTA is enjoined from further engaging in conduct to preserve and protect its monopsony power.

436.    The amount of damages suffered by the female Player Plaintiffs has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, the female Player Plaintiffs and WTA Class members are entitled to recover from Defendants treble the amount of actual damages, and all Plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit.

437.    The WTA's violation of Section 2 of the Sherman Act is a continuing violation causing new injury to Plaintiffs, as the WTA continues to engage in new overt acts to maintain its monopsony power and then exercise that power to impose anticompetitive terms of doing business on Plaintiffs. The female Player Plaintiffs and WTA Class members seek damages for their past four years of antitrust injury from Defendants' Section 2 violations, plus all damages that they will continue to suffer in the future until Defendants' Section 2 violations are enjoined.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopsonize the Professional Men's Tennis Market**

**Player Plaintiffs and ATP Class Against Defendants ATP, ITF, and ITIA**
**(Damages, Declaratory, and Injunctive Relief)**

**PTPA Against Defendants ATP, ITF, and ITIA (Declaratory and**
**Injunctive Relief)**

438.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

439.    Defendant ATP, Defendant ITF, Defendant ITIA, and each Tournament Co-Conspirator and Grand Slam Co-Conspirator is an economic actor separate and independent from the other.

440.    Defendant ATP, Defendant ITF, Defendant ITIA, and each Tournament Co-Conspirator and Grand Slam Co-Conspirator, through the ATP Rulebook and ATP Bylaws, among other written and oral agreements, have entered into a continuing agreement, combination, or conspiracy with the specific intent of acquiring and maintaining for the ATP and its Tournament and Grand Slam Co-Conspirators a monopsony in the global market for the services of male professional tennis players, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

441.    Defendant ATP, Defendant ITF, Defendant ITIA, their Tournament Co-Conspirators, and their Grand Slam Co-Conspirators have engaged in concerted action with the specific intent of acquiring and maintaining such monopsony power for the ATP and its Tournament and Grand Slam Co-Conspirators for the specific purpose of unreasonably excluding or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

442.    Defendant ATP, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have overtly acted to acquire and maintain their monopsony power by unilaterally and artificially fixing wages, fixing the number of tournaments in which tennis players must participate, fixing the number of tournaments that are allowed to participate in their scheme, imposing

illegal arbitration and waiver provisions on players, and requiring their Tournament Co-Conspirators to adhere to non-compete agreements.

443.    Defendants ATP and ITF utilize their exclusive Ranking Points system to determine which male Player Plaintiffs, PTPA members, and ATP Class members are able to compete in professional tennis and earn a living in the industry. Defendants ATP and ITF do so by dictating the events for which male Player Plaintiffs, PTPA members, and ATP Class members may qualify by conditioning such qualification on the accumulation of Ranking Points and by restricting the events at which male Player Plaintiffs, PTPA members, and ATP Class members can earn Rankings Points to the Grand Slams, the tournaments on the ATP Tour, and the tournaments on the ITF's World Tennis Tour. Defendants ATP and ITF compound their exclusive monopsony power over professional men's tennis players' services by compelling male Player Plaintiffs', the PTPA's members', and ATP Class members' appearances at tournaments during an 11-month season to the exclusion of other tournaments.

444.    Through this system, Defendants ATP and ITF exclude potential competitor tournaments and exhibitions from entering the market for the services of male Player Plaintiffs, PTPA members, and ATP Class members.

445.    Defendants ATP and ITF then abuse their monopsony power by fixing the compensation paid to male Player Plaintiffs, PTPA members, and ATP Class members at sub-competitive prices by agreeing with their Tournament and Grand Slam Co-Conspirators to restrict the prize money awarded to male professional tennis

players at those co-conspirators' tournaments and to limit the ability of male professional tennis players to pursue sponsorship deals.

446.    Defendants ATP, ITF, and ITIA act in concert to maintain their monopsony power over the services of men's professional tennis players by imposing compulsory arbitration provisions and illegal waivers of claim upon male Player Plaintiffs, PTPA members, and ATP Class members. Defendants ATP and ITF, along with their Tournament Co-Conspirators, have illegally conditioned the ability to pursue a career as a professional tennis player on relinquishing the right to pursue legal claims against them in the forum of the player's choice.

447.    Defendants ATP, ITF, and ITIA act in concert to abuse their monopsony power over the services of men's professional tennis players by imposing compulsory rules requiring players to submit to the ITIA's abusive and arbitrary investigations into doping and match-fixing that contain inadequate procedural protections.

448.    The concerted actions Defendant ATP, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have taken are exclusionary in nature, do not constitute legitimate business activities, and are an abuse of their market position.

449.    These exclusionary actions are of a continuing nature and constitute new overt acts in furtherance of Defendants' unlawful monopsony every year with the specific intent to acquire monopsony power and unlawfully maintain their monopsony power.

450.    The conspiracy among Defendant ATP, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators to monopsonize the relevant market has directly and proximately caused antitrust injury and damages to the male Player Plaintiffs, the PTPA's members, and members of the ATP Class, who will continue to suffer antitrust injury and damages unless the ATP, the ITF, the ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators are enjoined from continuing to engage in their conspiracy.

451.    The amount of damages suffered by the male Player Plaintiffs has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, the male Player Plaintiffs are entitled to recover from Defendants treble the amount of actual damages, and all Plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit, and an order enjoining the conspiracy.

452.    The ATP's, the ITF's, and the ITIA's violation of Section 2 of the Sherman Act is a continuing violation causing new injury to the male Plaintiffs, as Defendants continue to engage in new overt acts to conspire to maintain their monopsony power and then exercise that power to impose anticompetitive terms of doing business on Plaintiffs. The male Player Plaintiffs and ATP Class members seek damages for their past four years of antitrust injury from Defendants' Section 2 violations, plus all damages that they will continue to suffer in the future until Defendants' Section 2 violations are enjoined.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Conspiracy to Monopsonize the Professional Women's Tennis Market

### Player Plaintiffs and WTA Class Against Defendants WTA, ITF, and ITIA (Damages, Declaratory and Injunctive Relief)

### PTPA Against Defendants WTA, ITF, and ITIA (Declaratory and Injunctive Relief)

453.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully herein.

454.    Defendant WTA, Defendant ITF, Defendant ITIA, and each Tournament Co-Conspirator and Grand Slam Co-Conspirator is an economic actor separate and independent from the other.

455.    Defendant WTA, Defendant ITF, Defendant ITIA, and each Tournament Co-Conspirator and Grand Slam Co-Conspirator, through the WTA Rulebook and WTA Bylaws, among other written and oral agreements, have entered into a continuing agreement, combination, or conspiracy with the specific intent of acquiring and maintaining for the WTA and its Tournament and Grand Slam Co-Conspirators a monopsony in the global market the services of female professional tennis players, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

456.    Defendant WTA, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have engaged in concerted action with the specific intent of acquiring and maintaining such monopsony power for the WTA and its Tournament and Grand Slam Co-Conspirators for the specific purpose of unreasonably excluding or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

457.    Defendants WTA and ITF and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have overtly acted to acquire and maintain their monopsony power by unilaterally and artificially fixing wages, fixing the number of tournaments in which tennis players must participate, fixing the number of tournaments that are allowed to participate in the WTA's and the ITF's scheme, imposing illegal arbitration and waiver provisions on players, and requiring their Tournament Co-Conspirators to adhere to non-compete agreements.

458.    Defendants WTA and ITF utilize their exclusive Ranking Points system to determine which female Player Plaintiffs, PTPA members, and WTA Class members are able to compete in professional tennis and earn a living in the industry. Defendants WTA and ITF do so by dictating the events for which female Player Plaintiffs, PTPA members, and WTA Class members may qualify by conditioning such qualification on the accumulation of Ranking Points and by restricting the events at which female Player Plaintiffs, PTPA members, and WTA Class members can earn Rankings Points to the Grand Slams, the tournaments on the WTA Tour, and the tournaments on the ITF's World Tennis Tour. Defendants WTA and ITF compound their exclusive monopsony power over professional women's tennis players' services by compelling female Player Plaintiffs', the PTPA's members', and WTA Class members' appearances at tournaments during an 11-month season to the exclusion of other tournaments.

459.     Through this system, Defendants WTA and ITF exclude potential competitor tournaments and exhibitions from entering the market for the services of female Player Plaintiffs, PTPA members, and WTA Class members.

460.     Defendants WTA and ITF then abuse their monopsony power by fixing the compensation paid to female Player Plaintiffs, PTPA members, and WTA Class members at sub-competitive prices by agreeing with their Tournament and Grand Slam Co-Conspirators to restrict the prize money awarded to female professional tennis players at those co-conspirators' tournaments and to limit the ability of female professional tennis players to pursue sponsorship deals.

461.     Defendants WTA, ITF, and ITIA act in concert to maintain their monopsony power over the services of women's professional tennis players by imposing compulsory arbitration provisions and illegal waivers of claim upon female Player Plaintiffs, PTPA members, and WTA Class members. Defendants WTA and ITF, along with their Tournament Co-Conspirators, have illegally conditioned the ability to pursue a career as a professional tennis player on relinquishing the right to pursue legal claims against them in the forum of the player's choice.

462.     Defendants WTA, ITF, and ITIA act in concert to abuse their monopsony power over the services of women's professional tennis players by requiring players to submit to the ITIA's abusive and arbitrary investigations into doping and match-fixing that contain inadequate procedural protections.

463.     The concerted actions Defendant WTA, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have taken

are exclusionary in nature, do not constitute legitimate business activities, and are an abuse of their market position.

464.    These exclusionary actions are of a continuing nature and constitute new overt acts in furtherance of Defendants' unlawful monopsony every year with the specific intent to acquire monopsony power and unlawfully maintain their monopsony power.

465.    The conspiracy among Defendant WTA, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators to monopsonize the relevant market has directly and proximately caused antitrust injury and damages to the female Player Plaintiffs, the PTPA's members, and members of the WTA Class, who will continue to suffer antitrust injury and damages unless the WTA, the ITF, the ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators are enjoined from continuing to engage in their conspiracy.

466.    The amount of damages suffered by the female Player Plaintiffs has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, the female Player Plaintiffs are entitled to recover from Defendants treble the amount of actual damages, and all Plaintiffs are entitled to an award of reasonable attorneys' fees and costs of suit, and an order enjoining the conspiracy.

467.    The WTA's, the ITF's, and the ITIA's violation of Section 2 of the Sherman Act is a continuing violation causing new injury to the female Plaintiffs, as Defendants continue to engage in new overt acts to conspire to maintain their

monopsony power and then exercise that power to impose anticompetitive terms of doing business on Plaintiffs. The female Player Plaintiffs and WTA Class members seek damages for their past four years of antitrust injury from Defendants' Section 2 violations, plus all damages that they will continue to suffer in the future until Defendants' Section 2 violations are enjoined.

**NINTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

**Player Plaintiffs Against Defendants ATP, WTA, and ITF (Damages and Constructive Trust)**

468.    Plaintiffs incorporate and re-allege the foregoing allegations as if set forth fully in this paragraph.

469.    Defendants ATP, WTA, and ITF have been unjustly enriched as a result of the unlawful conduct detailed herein at the expense of the Player Plaintiffs. Under common law principles of unjust enrichment, Defendants ATP, WTA, and ITF should not be permitted to retain the benefits conferred upon them via their wrongful conduct, and it would be unjust for them to be allowed to do so.

470.    Defendants ATP, WTA, and ITF and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have illegally agreed to limit the compensation they pay to Player Plaintiffs in return for their professional services, which has materially enriched the Defendants ATP, WTA, and ITF and inured to their benefit.

471.    Through the conduct described above, Defendants ATP, WTA, and ITF and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have illegally agreed to restrictive rules that preclude Player Plaintiffs from receiving

compensation for their professional services from competitors who stage professional tennis events outside of the Tours.

472.   Defendants ATP, WTA, and ITF and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have required every Player Plaintiff to assign his or her NIL rights for use in the Tours' media, advertisements, and promotions to the ATP or WTA and their Tournament Co-Conspirators in exchange for no compensation, which has materially enriched Defendants ATP, WTA, and ITF and inured to their benefit.

473.   As a result of these agreements, the Player Plaintiffs have conferred material enrichment upon Defendants ATP, WTA, and ITF, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators to the impoverishment of the Player Plaintiffs, who have received lower compensation than they otherwise would have had they been able to offer their professional services in a free market.

474.   Because the various agreements and conduct alleged above constitute unlawful restraints of trade and unlawful maintenance of a monopsony in the market for professional tennis services, equity and good conscious militate against permitting Defendants ATP, WTA, and ITF to retain the value they have received from the Player Plaintiffs' services.

475.   Plaintiffs seek disgorgement of Defendants ATP's, WTA's, and ITF's profits resulting from the wrongful conduct described herein and establishment of a constructive trust from which Player Plaintiffs may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

A.  That the unlawful contract, conspiracy, and combination alleged here, and the acts done in furtherance thereof by Defendants and non-defendant co-conspirators, be adjudged and decreed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.  That the unlawful monopsonies alleged here, and the acts done in furtherance thereof by Defendants and non-defendant co-conspirators, be adjudged and decreed a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.  That the Court enjoin Defendants from continuing to implement its unlawful agreement among themselves and with the non-defendant co-conspirators to unreasonably restrain trade in the relevant market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

D.  That the Court enjoin Defendants from continuing to operate their unlawful monopsonies over the services of professional tennis players in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

E.  That the Court award compensatory and treble damages to each Player Plaintiff and each and every member of each of the Classes resulting from the Defendants' violation of Section 1 and Section 2 of the Sherman Act in an amount to be determined at trial;

F.  That the Court order Defendants to disgorge the profits they have received from their inequitable conduct;

G. That the Court order Defendants to establish a constructive trust from which the Player Plaintiffs may seek restitution;

H. That the Court award pre-judgment and post-judgment interest at the maximum legal rate;

I. That the Court award each Plaintiff its costs, expenses, and attorneys' fees in this action pursuant to, *inter alia*, Sections 4 and 16 of the Clayton Act; and

J. That the Court award such other relief as it may deem just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: March 18, 2025        Respectfully submitted,
        New York, New York


                              By:    /s/ *James W. Quinn*_____
                                     James W. Quinn

                              James W. Quinn
                              **JW QUINN ADR LLC**
                              767 Fifth Avenue
                              Suite RP4
                              New York, NY 10153
                              Tel: (646) 465-3607
                              Fax: (646) 219-1977
                              quinn@jwquinnlaw.com

                              Luna N. Barrington
                              Zachary A. Schreiber
                              Nicholas J. Reade
                              **WEIL, GOTSHAL & MANGES LLP**
                              767 Fifth Avenue
                              New York, NY 10153
                              Tel: (212) 310-8000
                              Fax: (212) 310-8007
                              luna.barrington@weil.com
                              zach.schreiber@weil.com
                              nick.reade@weil.com

                              Andrew S. Tulumello (*pro hac vice
                              forthcoming*)
                              Meagan Bellshaw (*pro hac vice
                              forthcoming*)
                              **WEIL, GOTSHAL & MANGES LLP**
                              2001 M Street NW, Suite 600
                              Tel: (202) 682-7100
                              Fax: (202) 857-0940
                              drew.tulumello@weil.com
                              meagan.bellshaw@weil.com

                              *Counsel for Plaintiffs*

-159-