

Proskauer Rose LLP  Eleven Times Square  New York, NY 10036-8299

April 18, 2025

**BY ECF**

Bradley I. Ruskin
Member of the Firm
d +1.212.969.3465
f 212.969.2900
bruskin@proskauer.com
www.proskauer.com

The Honorable Margaret M. Garnett
United States District Judge
40 Foley Square, Room 2102
New York, NY 10007

Re: *Pospisil, et al. v. ATP Tour, Inc., et al.*, No. 1:25-cv-02207-MMG (S.D.N.Y.)
ATP Tour Inc.'s Post-Hearing Letter Brief

Dear Judge Garnett:

Hours of testimony made two things clear: (1) ATP has never retaliated against any tennis player for supporting this lawsuit or the PTPA, and (2) ATP needs and is entitled to be able to communicate with its player members about this lawsuit, including to correct confusion sowed by the PTPA and its supporters. Restricting ATP's ability to provide truthful information to its player members must be "justified by a likelihood of serious abuses," and supported by a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101, 104 (1981). Plaintiffs have come nowhere close to meeting this burden.

**I.     ATP has not misled, coerced, or retaliated against any player members**

There is no evidence that ATP has retaliated against any player member for being a plaintiff, supporting the lawsuit or the PTPA, or even criticizing ATP. Every witness confirmed that no such retaliation has occurred.

Mr. Pospisil, the lead plaintiff in the lawsuit, who has publicly criticized ATP for years, has never been subject to retaliation or even threatened by ATP. Tr. 51:4-14, 52:22-24, 59:10-15, 61:11-20, 69:6-9. Even though he is the PTPA's co-founder—an organization whose stated mission is to undermine existing ATP governance by replacing the Player Advisory Council ("PAC") and the board representatives they appoint with the PTPA (Tr. 67:22-25)—Mr. Pospisil still receives benefits from ATP and has always been allowed to compete in ATP tournaments and win prize money. Tr. 51:9-14, 68:15-23, 69:6-9. Nor is Mr. Pospisil aware of any player ever losing financial benefits because he was involved with the PTPA. Tr. 50:3-6.

Mr. Opelka, similarly, admitted that although he has "been an outspoken critic of the ATP and a supporter of the PTPA" for years, ATP has not taken away his benefits or membership, prohibited him from playing in ATP tournaments, or retaliated against him. Tr. 92:17-25, 93:14-17. Mr. Syed, who "[c]onstantly" talks with professional tennis players, also testified that he is "not aware of any tennis players who have had their benefits taken away by ATP for supporting this lawsuit." Tr. 95:21-23, 101:24-102:2. Mr. Pampoulov confirmed that a player can be a member of the ATP even if he is part of the PTPA, ATP has not retaliated against plaintiffs or supporters of the lawsuit, and has no plans to do so. *See* Tr. 116:23-117:3, 131:12-132:5.

**Proskauer**

Plaintiffs failed to present any reliable evidence that ATP made any false, misleading, or coercive statements. Rather, the evidence showed that in the days following the filing of this lawsuit, ATP, its Player Board Representatives, and the PAC did exactly what player members expect and need them to do—provide accurate and transparent information about issues that impact members.

In response to player questions during a March 18, 2025 PAC meeting, there was a discussion about the possible cost of potentially long antitrust litigation and the impact that could have on the organization's finances. Tr. 118:15-119:8. ATP also shared accurate information about the fee-shifting provision in the ATP bylaws, again in response to questions from players. Tr. 119:9-120:1; *see also* PX 2 at 95-96 (fee-shifting provision).[1] Providing accurate information about the financial impact of class action litigation is not enough to justify restrictions on communications. *See Swamy v. Title Source, Inc.*, 2017 WL 5196780, at *5 (N.D. Cal. Nov. 10, 2017) (emphasis added) ("[CEO]'s representation that, should plaintiffs lose, they could be required to pay costs, was not misleading. Moreover, *it is information that plaintiffs should consider when deciding whether or not to engage in litigation*."); *In re M.L. Stern Overtime Litig.*, 250 F.R.D. 492, 500 (S.D. Cal. 2008) ("Mr. Stern is entitled to set forth his views of the potential impact of the case on the company's financial condition . . .").

During that same meeting, members of the PAC expressed "frustration" and "disbelief" about the PTPA's statement that their lawsuit was "backed overwhelmingly by the top 250+ men's and women's players including a majority of the Top 20 players." Tr. 121:14-18; DX-7. At the direction of the PAC, ATP staff prepared a position statement (DX 40) that players had "an option" to sign in response to the PTPA statement "if they wanted to, just to express themsel[ves]"; that is, signatories could say to their fellow players that the PTPA—which had long sought to challenge the player-led governance mechanisms within the ATP and was now explicitly claiming to broadly represent the players—did not in fact speak for them. Tr. 122:1-8. The day after the PAC meeting, Mr. Pampoulov spoke to two players and one player's agent regarding a letter the players were sending to the Grand Slams and also told them that the position statement was available for players to sign at the ATP office if they wanted to do so. Tr. 123:22-124:5, 124:23-125:5 (Mr. Shelton), 126:5-25 (Mr. Zverev), 127:1-10 (Mr. Sinner's agent). The ATP did not circulate the position statement to all members (Tr. 122:9-14), only "[a] handful" of players have signed the statement (Tr. 138:6-8), and active efforts to inform players about signing the statement have stopped (Tr. 128:1-10, 141:7-12).[2]

II. **Even if it were believed, Plaintiffs' proffered second- and third-hand information would still be inadequate to enjoin communications under *Gulf Oil***

It is undisputed that Plaintiffs' evidentiary support is comprised of confused hearsay statements for which none of their witnesses have personal knowledge. *See, e.g.*, Tr. 106:15-19 ("Everyone knows that Mr. Syed

---

[1] The enforceability of this fee-shifting provision in a similar antitrust lawsuit brought by two Tournament Members against ATP was specifically litigated and upheld by the Delaware Supreme Court. *See generally ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 555 (Del. 2014).

[2] In addition to wrongly claiming that *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630 (N.D. Tex. 1994) was decided by the Southern District (Tr. 8:9-15) Plaintiffs incorrectly stated that the communications in that case were "essentially the message the ATP is giving the players." *Id.* 9:5-6. There, the defendant sent three letters over many months to all potential class members, told them "that by participating in the lawsuit they are suing themselves" and "specifically advised" them "not to participate in the lawsuit." *Id.* at 633. Here, by contrast, some player members of a membership corporation were (1) told about potential costs of litigation and relevant bylaws in the context of a broader discussion of player questions about the recent litigation, and (2) informed that they could sign a two-sentence statement, drafted at the request of player members, if they wanted do so.

2

knows everything that he knows about these interactions because of what the players told him."), 52:1-4 (Pospisil never witnessed any communications between ATP and players about the lawsuit), 88:21-89:15 (none of Opelka's testimony was based on information he learned directly from ATP). Each of Plaintiffs' witnesses gave accounts of interactions and communications that purportedly occurred between unidentified players and ATP. The Court should not give any weight to the unreliable accounts from three self-interested witnesses—each of whom has a personal stake in the lawsuit and advocates for undoing ATP. *See, e.g.*, *Solais v. Vesuvio's II Pizza & Grill, Inc.*, 2016 WL 1057038, at *3 (M.D.N.C. Mar. 14, 2016) (witness's testimony about an "unidentified" declarant's statements "cannot support the requested communication constraint"); *cf. Gulf Oil*, 452 U.S. at 103 n.18 (explaining that "unsworn allegations of misconduct" cannot justify communication ban).[3]

The lack of reliability of such alleged communications, and the prejudice to ATP, is magnified here by Plaintiffs' refusal to identify participants in the communications, particularly where there was zero evidence of retaliation. But where Plaintiffs identified a participant in a conversation, ATP showed—through a witness with personal knowledge—that Plaintiffs' account was inaccurate. For example, Mr. Syed testified that Mr. Pampoulov "approached" a player later identified as Ben Shelton "in the locker room." Tr. 98:14-23. Mr. Syed emphasized that the "locker room is a player sanctuary [...] a safe haven for players" in an attempt to cast the interaction as threatening or intimidating. Tr. 99:14-19. But Mr. Pampoulov clarified that the conversation with Mr. Shelton occurred on a "walkway" where he "and many others have access" and he "did not enter the locker room." Tr. 124:6-15. Mr. Syed also claimed that Mr. Pampoulov refused to permit Mr. Shelton to consult with an attorney regarding the position statement. Tr. 98:24-99:8. But Mr. Shelton did not ask Mr. Pampoulov if he could consult his attorney. Tr. 125:16-18. And when a different player (Mr. Zverev) asked if his attorneys could review the statement, Mr. Pampoulov sent it to him for that purpose. Tr. 141:25-142:4. Contrary to Mr. Syed's recitation, the record demonstrates that Mr. Pampoulov did not attempt to mislead the players, did not attempt to persuade them not to join the lawsuit, did not

---

[3] At the hearing, Plaintiffs relied on two cases for the proposition that hearsay was sufficient evidence of "coercive episodes." Tr. 11:18-12:9. In the first, the plaintiffs alleged that the defendant threatened that undocumented employees would be "reported to immigration authorities and possibly deported." *Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 485 (S.D.N.Y. 2012). For the second, Plaintiffs claimed at the hearing that "a declaration of an affidavit declaring that they have received a phone call from a putative class member about a defendant's pressure to drop out of the suit, that was deemed sufficient." Tr. 12:5-8. But the court's decision in *Schulman* did not mention a phone call. Rather, the evidence consisted of a letter, two emails, and an opt-out form sent by the defendant to all putative class members. *See Schulman v. Becker & Poliakoff, LLP*, 2018 WL 4961003, at *1-3 (S.D.N.Y. Oct. 15, 2018) (citations omitted). The letter and the first email "'did not contain any misleading information, were not coerceive[,] and served a legitimate purpose' in light of the media coverage of this lawsuit," and included "accurate characterizations of what would result should any client become part of the class." *Id.* at *3. Only the second email, which "insisted on 'need[ing] to know'" whether putative class members would join the suit, was "problematic." *Id.* at *4. In addition to not resembling the facts here, neither case stands for the proposition that a member corporation's communications with its members about a lawsuit are coercive. *See also Cohen v. Apache Corp.*, 1991 WL 1017, at *2 (S.D.N.Y. Jan. 2, 1991) ("[P]laintiffs do not contest that a corporation may comment on pending litigation in its reports to shareholders."); *Slavinski v. Columbia Ass'n*, 2011 WL 1310256, at *4 (D. Md. Mar. 30, 2011) (injunction not appropriate where the plaintiff provided "no evidence [the defendant] misrepresented facts about the lawsuit or discouraged participation in the suit," and "no employee who signed [an evidentiary] declaration [for the employer] has stepped forward to object to the interview as misleading or coercive").

Proskauer»

threaten players, and did not say there would be consequences for not signing the statement. Tr. 123:9-18, 125:22-24.

Similarly, Mr. Opelka claimed that Mr. Gaudenzi—a former player who was selected as a result of a concerted campaign by the PAC and their Board Representatives to unseat the former chair and install Mr. Gaudenzi in his stead[4]—instructed a PAC member in a room of 15 people to threaten Mr. Opelka (and named Plaintiff Nicholas Kyrgios) that "they could lose their pension, their benefits, and be on the hook for all legal fees if they lose" in an effort to get them to drop out of the lawsuit. Tr. 80:5-83:5, 84:20-22.

Mr. Pampoulov, who was not in the courtroom while Mr. Opelka made these new and unsubstantiated claims—but, unlike Mr. Opelka, *was* in the PAC meeting on March 18, 2025—testified unequivocally that Mr. Gaudenzi did not make these statements or direct anyone to talk to either player at all. Tr. 120:2-9. Whether it was Mr. Opelka or the PAC Member he purportedly spoke with that misstated, mischaracterized, or simply misunderstood what was actually said at the PAC meeting, Mr. Opelka's repetition of mistruths highlights the problem with second-hand information (from an unidentified source) and the reason it cannot serve as a basis to restrain ATP's speech. That Mr. Opelka's declaration said nothing about Mr. Gaudenzi further undermines Mr. Opelka's credibility and the reliability of his allegations, made in court, for the first time, regarding Mr. Gaudenzi. *See* ECF No. 37.

With respect to Jay Clarke, Mr. Pospisil testified that Mr. Clarke withdrew because of pressure from an unnamed <u>sponsor</u>, not ATP. Tr. 46:2-24. Mr. Pospisil acknowledged that in their text communications, Mr. Clarke did not say that he "fear[ed] retaliation from ATP." Tr. 48:12-22. Mr. Clarke publicly claimed that he withdrew because he did "not fully align with the way the case has been approached." Tr. 74:20-75:10. Although Mr. Pospisil "jumped to the conclusion that there could have been some foul play," he admitted that he "ha[s] no evidence" of that. Tr. 46:19-21. Mr. Pospisil gave Mr. Clarke's texts to his lawyers (Tr. 48:12-17), who could have submitted them if they corroborated this version of events.

As for the remainder of Plaintiffs' allegations, the purported speaker is not even identified, making it impossible for ATP to respond to or rebut them. Plaintiffs justify this anonymity with repeated reference to "fear of retaliation." But as described above, there is nothing in the record to support or substantiate this "fear." *See supra* Section I. Plaintiffs failed to provide a single document in support of their allegations. And this "fear" does not make sense in an organization that is 50% controlled by the players. At bottom, "it is Plaintiffs' responsibility to provide a clear record that allows the Court to make specific findings supporting the requested relief." *Crosby v. Stage Stores, Inc.*, 377 F. Supp. 3d 882, 890 (M.D. Tenn. 2019) ("vicarious accounts of these allegedly improper communications" are insufficient under *Gulf Oil*). Anonymous hearsay is not enough evidence to impose Plaintiffs' injunction.

### III.     Any restraint would interfere with ATP's ability to operate

Any need to impose a limitation on ATP's communications with its player members (and there is none) must be weighed against the potential interference with ATP's rights, which would be significant. *Gulf Oil*, 452 U.S. at 101. While PTPA's goal is to replace ATP's PAC and Player Board Representatives (Tr. 67:15-25), even Mr. Pospisil conceded the importance of honesty and transparency from the PAC and Player

---

[4] Tr. 62:15-17. The PAC's successful campaign against the former chair puts the lie to the notion that players have little power within ATP. Indeed, as ATP's CLO explains, the PAC uses its broad powers to select highly qualified Player Board Representatives (ECF No. 61-1 ¶¶ 6-10); and the Bylaws underscore that material decisions cannot be made without buy-in from the Player Board Representatives. *E.g.*, PX 2 at 76 (Bylaw requiring, for major decisions, assent by at least half of all (i) Tournament Board Representatives and (ii) Player Board Representatives).

Board Representatives. Tr. 61:25-62:1. The ATP is entitled to—and indeed needs to—communicate broadly with its members to comply with its duties under its governance structure, and, specifically, to provide accurate and truthful information to its members to rebut misstatements of PTPA. Generously construed, Plaintiffs' evidentiary record demonstrates at most that some players are confused about the ATP's Bylaw on fee-shifting, and under the mistaken impression that players could lose their benefits for participating in the lawsuit. That confusion could be best addressed by informed ATP representatives who know what the Bylaws are, and how they will (and will not) be used in the future.

Communications between player members, and Player Board Representatives and ATP staff, are essential to ATP's operations. Mr. Pampoulov explained that "communicating with the players and the [PAC] . . . getting feedback from them and understanding . . . their concerns, issues, and demands" is a "critical" part of his role as a Player Board Representative. Tr. 114:7-24, 115:18-21. The wide-ranging issues Mr. Pampoulov discusses with players include topics such as prize money, schedule, and standardizing equipment, all of which are implicated by this lawsuit. Tr. 142:5-12. Other ATP employees, including player relations staff, also need to regularly communicate with players "to help them with . . . tournament needs, and any other issues or questions the players might have." Tr. 116:8-14. Even Mr. Pospisil admitted it "was important" that Player Board Representatives be transparent with players. Tr. 62:11-14.

Since the lawsuit was filed, the PTPA (a self-anointed "advocacy" group with no members (Tr. 108:10-16), and a different vision for how ATP should be run), has flooded social and regular media with statements that, combined with the complaint, have attacked ATP's structure and created confusion among players about their role in ATP governance. *See, e.g.*, DX 28. PTPA's PR campaign paints a picture of what ATP does for its members that is very different from reality, including with respect to governance, prize money increases, and financial security. Tr. 129:3-12, 129:19-130:4, 130:20-131:6.[5] While the PTPA claims nearly universal support for its lawsuit, three of the world's top five men's tennis players publicly called that into question. Tr. 71:19-72:1 (Djokovic), 72:19-73:11 (Alcaraz), 73:12-19 (Zverev). The PTPA has even misleadingly disseminated an article calling itself a "union." Tr. 109:13-22. As Mr. Pampoulov explained, ATP and its Player Board Representatives need to be able to respond to the "many misstatements and false statements that [PTPA has] made." Tr. 128:11-19. Even Mr. Syed agreed that "it's okay for ATP to tell tennis players that the PTPA is not their union." Tr. 110:5-8.

Plaintiffs' goal in filing this motion is to restrict ATP's ability to communicate with its Player Members, so that the only source of advocacy and information for players regarding fundamental issues, including this lawsuit, is the PTPA itself. That result, unsupported by the law and evidence, would be grossly unfair and devastate the organization's ability to function. Even a relatively narrow prior restraint would chill ATP's ability to communicate meaningfully with its members.

---

[5] In requesting that Mr. Opelka testify remotely, Plaintiffs represented that Mr. Opelka had to "be in Barcelona on April 11 to compete in the Barcelona Open" and insinuated that ATP was effectively retaliating against him by forcing him to miss play, "forfeit prize money and risk losing rankings points." ECF No. 49 at 2. At the hearing, counsel doubled down, saying: "He is playing in a tournament tomorrow." Tr. 77:20-22. However, as Mr. Opelka admitted on cross, his first match was not scheduled to take place until April 14 at the earliest. Tr. 87:8-9.



                                                          Respectfully submitted,

                                                          <u>*/s/ Bradley I. Ruskin*</u>
                                                          Bradley I. Ruskin
                                                          **PROSKAUER ROSE LLP**
                                                          Eleven Times Square
                                                          New York, NY 10036
                                                          Tel: (212) 969-3000
                                                          bruskin@proskauer.com

                                                          *Counsel for Defendant ATP Tour, Inc.*

cc:      All counsel of record