**Weil, Gotshal & Manges LLP**

2001 M Street, NW Suite 600
Washington, DC 20036
+1 202 682 7000 tel
+1 202 857 0940 fax

**Andrew S. Tulumello**
+1 (202) 682-7100
drew.tulumello@weil.com

BY ECF

April 18, 2025

Hon. Margaret M. Garnett
United States District Judge
Southern District of New York
40 Foley Square, Room 2102
New York, NY 10007

Re:   *Pospisil et al. v. ATP Tour, Inc. et al.,* No. 1:25-cv-02207-MMG (S.D.N.Y.) – Plaintiffs' Post-Trial Letter Regarding Relief Under Fed. R. Civ. P. 23(d)

Dear Judge Garnett:

The April 11, 2025 hearing demonstrated the urgent need for a Rule 23(d) order. Plaintiffs and the putative class are financially dependent on ATP. ATP purports to vest itself with unfettered discretion to ban players from professional tennis, to strip any and all benefits from players if they take actions that are not, in ATP's view, in "the best interests of . . . the sport of tennis," and to saddle them each individually with ATP's legal fees in this case. *See* PX-002, ATP Bylaws, § 4.6; PX-001, 2025 ATP Rulebook § 1.21(c). Against that background, ATP has embarked on an inherently coercive and blatantly unlawful campaign to pressure class members to sign a statement disavowing this lawsuit—including dispatching ATP Board Director Luben Pampoulov into the private suite of a top-ranked player during the Miami Open to urge him to sign a loyalty oath to ATP. This pressure campaign "work[s] directly against [the] principle [of Rule 23] by attempting to reduce the class members participation in the lawsuit based on threats to their pocketbooks." *Hampton Hardware, Inc. v. Cotter & Co., Inc*., 156 F.R.D. 630, 633 (N.D. Tex. 1994). It is axiomatic that interfering with "the interests embodied in Rule 23 . . . is a sufficient finding upon which to base an order limiting contacts." *Id.*

   I.   **The Record Amply Supports Issuance of a Rule 23(d) Order.**

Courts in this District routinely grant Rule 23(d) orders where defendants threaten to exploit their status as an employer or business partner to discourage participation in the class, provide putative class members one-sided or incomplete information, and otherwise interfere with the Court's supervision and protection of absent class members. *See* ECF No. 20 at 2 (collecting cases). The ATP's bullying tactics check each of these boxes.

***Abuse of Financial Dependence:*** Vasek Pospisil and Reilly Opelka testified about the extent to which male professional tennis players depend on ATP to sustain their livelihood. Pospisil testified that players primarily earn compensation by winning prize money at tournaments on the ATP Tour, the only tour *in the world* in which men may play to pursue a career in the sport. *See* Hearing Transcript ("Tr.") at 36:7-16. In Pospisil's

April 18, 2025  
Page 2

**Weil, Gotshal & Manges LLP**

own words, "for 99 percent of tennis players, there is no other option" to earn a living playing professional tennis other than playing on the ATP Tour. *Id.* at 38:11-15. As a result, male "players [are] financially dependent on the ATP for their livelihoods," not only to earn compensation but to obtain eligibility for "pension[s] [and] insurance." *Id.* at 36:17-24; *see also* PX-001, 2025 ATP Rulebook § 1.21. Opelka also testified that players earn compensation from ATP through prize money at ATP tournaments and can qualify for a pension and health insurance only through ATP. *See* Tr. at 79:17-80:2. ATP offered no evidence to the contrary.

Pospisil, Opelka, and Wajid Mir testified to how ATP is leveraging its asymmetrical economic power to dissuade players from pursuing their class action rights. Opelka testified about what he had been told by an ATP Player Advisory Council (the "Council") member over three separate conversations: that ATP Chairman Andrea Gaudenzi instructed the Council member to "notify" Opelka and other named plaintiffs that if they did not "drop[] out of the lawsuit," they "could lose their pension[s], their benefits, and be on the hook for all legal fees." *Id.* at 82:6-83:5, 84:20-22. Because Gaudenzi instructed the Council member to deliver this message to incentivize players to withdraw from the lawsuit, *see id.* at 83:1-3, there is no question that the message was meant to dissuade, not inform. According to Opelka, players worried about these threats because they "don't know what's true about [] possibly being o[n] the hook for [their] pension and benefits." *Id.* at 84:15-19. Likewise, Pospisil testified that ATP agents tried to convince players not to support the lawsuit by telling them that the legal fees ATP would incur "would affect player pensions and prize money." *Id.* at 44:22-24, 45:10-17. Mir testified that players told him that "they were being told that they could potentially lose their pension and their benefits or the lawsuit would cost them $50 million to $100 million," and were "severely concerned about the impacts of this." *Id.* at 100:10-23. ATP's threats to player pocketbooks and pensions are clearly designed to deter players from pursuing their rights as class members. They are precisely the sort of tactics courts in this District have barred. *See Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 485 (S.D.N.Y. 2012); *Ralph Oldsmobile, Inc. v. GM Corp.*, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001).

**Coercive Communications:** Beyond the threats of severe financial consequences, multiple witnesses testified to other forms of communications that ATP is using to coerce players not to participate in this lawsuit. Pampoulov corroborated Mir's testimony that, mere hours after Plaintiffs filed the complaint, Pampoulov intercepted players in private areas of the Miami Open, where he asked them to sign a position statement *drafted by ATP staff*—not players—disclaiming support for the lawsuit. *See* Tr. at 123:19-125:13, 134:6-137:15. The record reflects that ATP had Pampoulov, its Board Director, "exert pressure" on putative class members at the Miami Open by conducting "in-person solicitation" and "provid[ing] a one-sided presentation"—in this instance, a pre-written statement. *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1206 (11th Cir. 1985). Pampoulov admitted that when he approached one of those players, Sascha Zverev, in his private suite, he asked Zverev to sign the statement then and there—even providing a pen with which Zverev could sign it—despite knowing that Zverev had not been present for the full meeting at the time this statement was discussed with Council members. *See* Tr. at 118:10-14, 135:16-137:15. According to Mir—who did not publicly disclose Zverev's name during his testimony or in his declaration, ATP did, *see id.* at 126:5-7—Pampoulov's solicitation confused Zverev whether ATP had authority to demand he disclaim this lawsuit. *See id.* at 99:9-13. Pampoulov admitted that Zverev "wanted to understand" the document better and asked to consult his counsel. *See id.* at 136:14-137:1. Pampoulov's testimony thus revealed precisely the sort of communication that courts find impermissibly coercive because it "encourage[d] speedy and [] uninformed decisionmaking" without an "opportunity for . . . counter-education," *Kleiner*, 751 F.2d at 1206, and confused

potential class members about their rights, *see Hampton Hardware, Inc.*, 156 F.R.D. at 633 (misleading information warranted relief where class members "necessarily rely upon the defendant for dissemination of [relevant] factual information"). In these coercive discussions with players, ATP is prejudging the validity of the structure and practices that this antitrust action seeks to invalidate.

Pampoulov also admitted that he confronted *a second* player—who is not a member of the Council—to ask the player to sign ATP's statement disavowing support for the lawsuit. *See* Tr. at 123:1-6, 124:19-125:5. This particular interaction, together with the Zverev incident, confirms Plaintiffs' witnesses' accounts of a widespread pressure campaign that "necessitates restraint" of further coercive communications. *Kleiner*, 751 F.2d at 1206.

***ATP Chills Participation:*** ATP's efforts to coerce and confuse players have unfortunately yielded early results. Opelka said that ATP's threats of financial reprisal gave him pause about continuing as a named plaintiff in the lawsuit because he "didn't know . . . what's true, what's allowed or not" with respect to ATP's authority to strip players of their financial benefits—another sign of the confusing nature of ATP's communications. Tr. at 84:23-85:6. Pospisil testified that Jay Clarke, a plaintiff in a companion action in the United Kingdom represented by Plaintiffs' counsel, told Pospisil that he must withdraw from that case a mere 13 days after filing—not because he does not support the mission (he does)—but because his sponsor, who provides "the only way that he could play tennis," threatened to pull financial support if he did not. *Id.* at 46:2-12.

ATP's tactics have also deterred other players from participating in this lawsuit. Opelka testified that recent conversations with several other players revealed that those players would pursue their legal rights against ATP if they "knew . . . that they weren't on the hook for [] losing their benefits and pension." *Id.* at 86:2-19. Consistent with Opelka's testimony, Pospisil testified about a conversation he had with a "top player" after Plaintiffs filed the complaint in which the player hesitated to associate with the ongoing lawsuit because of his concern about losing his pension. *See id.* at 42:5-43:8. Mir's testimony that Pampoulov's target would not publicly recount his interaction with Pampoulov because he was "scared about the retaliation" from ATP further demonstrates that ATP is interfering with the free exercise of class members' rights. *Id.* at 99:25-100:9.

It is immaterial whether ATP has acted on these threats yet. The players are not inventing their fears. What chills participation in this lawsuit—and what scares players—is the *threatened possibility* about what ATP *could* do. Bans, loss of pensions, legal costs, ostracism, private pressure—these are all tools ATP is wielding and that enable it "to exercise strong coercion in connection with [players'] decisions regarding participation in this litigation." *Urtubia*, 857 F. Supp. 2d at 485. Communications that even "pose[] the danger[] of possible chilling of the rights of the potential class members" or "create[] confusion, and threaten the essence of fairness and due process" warrant a restriction on ATP's communications. *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 602 (2d Cir. 1986) (cleaned up).

Moreover, the pressure campaign will continue absent protection from the Court.  As Pampoulov admitted, he paused soliciting signatures for ATP's position statement only *after* Plaintiffs sought emergency relief from this Court. *See* Tr. at 128:1-6. ATP would have resumed, and will resume, its inherently coercive opt-out campaign absent an order from this Court.

April 18, 2025  
Page 4

Weil, Gotshal & Manges LLP

## II. ATP's Excuses Should Be Rejected.

At the Hearing, ATP offered several rationalizations to support its pressure campaign, each of which is meritless.

***This is Purportedly Normal Player Involvement in ATP Governance:*** ATP suggests that, because the Council elects four representatives to the ATP Board, *see* PX-002, ATP Bylaws § 12.3(b), and because Council members met with ATP Chairman Gaudenzi and ATP staff about this lawsuit, ATP was only working on behalf of the players, who drove the decision to solicit signatories denouncing this lawsuit and spread the word about alleged negative financial consequences. ATP tried to argue that players are "fairly and equally represented in all of ATP's decisions" because they elect Council members who elect the four "player" directors on the ATP Board. Tr. 16:1-8.

ATP's argument is tantamount to asserting that the players themselves came up with the idea to pressure other players to sign ATP's loyalty oath. But this is impossible to square with the record testimony that ATP staff prepared the statement, that ATP Board members initiated the campaign to disavow the suit, and that players do not want to sign the statement. It also makes no sense. If player sentiment is so strong against this case, ATP leadership would not need to deputize ATP staff and Board members to traverse the grounds of the Miami Open "requesting" signatures on a pre-written statement.

And while not ripe today, ATP errs seriously in suggesting that its Board governance is the very model of Athenian democracy. Pospisil, who served on the Council, testified that it is "impossible" for players on the Council to accomplish "[a]nything significant" or "influence any matter that affected [thei]r livelihoods," largely because the ATP Board never permitted the Council to view pertinent financial information. Tr.at 35:6-36:3. Pampoulov corroborated Pospisil's account, explaining that, although Council members elect the player representatives to the ATP Board, Council members select from a slate of candidates proposed by an executive search firm *hired by ATP*. *See id.* at 113:2-114:4. ATP's search firm screens the candidates and determines the final list of candidates for consideration. Declaration of Mark V. Young ¶ 7, ECF No. 61-1. The ATP Board job posting that ATP attached to Mark Young's Declaration states clearly that Player Board Representatives owe "fiduciary duties . . . *to the ATP*," not the players. ECF No 61-2 at 1 (emphasis added). It is notable that Pampoulov—who last played professional tennis more than two decades ago, has no track record of player advocacy, and earns more from ATP on one year than he did as a player—is ostensibly the "players" choice for the Board. *See* Tr. at 138:21-139:23. ATP controls which "players" receive spots on its Board, but hires Board members like Pampoulov who have far greater allegiance to ATP than to players.

***Appropriately Tailored Prophylactic Relief:*** ATP also argues that prophylactic relief is inappropriate because it would unduly interfere with communications it must have with players in the ordinary course of business. *See id.* at 14:16-21, 116:8-14. That is wrong. Plaintiffs' proposed order does not affect ATP's ability to talk to players about the business of tennis; it only bars them from engaging in pressurized conversations about "their participation or involvement in this [a]ction." ECF No. 20 at 3. Because the two improper forms of communication that ATP has pursued—soliciting signatures for a statement denouncing the lawsuit and threatening financial harm for supporting *this* lawsuit—do not occur in the ordinary course of ATP's business, curtailing such communications would not impair ATP's operations. Therefore, Plaintiffs' requested relief

April 18, 2025  
Page 5

**Weil, Gotshal & Manges LLP**

"limits speech as little as possible" and is drawn narrowly. *Gulf Oil Co v. Bernard*, 452 U.S. 89, 102 (1981); *Kleiner*, 751 F.2d at 1204-07; *Urtubia*, 857 F. Supp. 2d at 484-85.

### III. ATP's Evidentiary Objections Should Be Rejected.

Given the inherent nature of 23(d) disputes, courts must rely on secondhand and anonymous accounts of defendants' coercive communications with putative class members. *See Urtubia*, 857 F. Supp. 2d at 484-85 (crediting a statement that an unnamed putative class member withdrew from being a named plaintiff due to defendant's threats); *Shulman v. Becker & Poliakoff, LLP*, 2018 WL 4961003, at *2, *4-5 (S.D.N.Y. Oct. 15, 2018) (limiting communications based in part on a coercive email defendant had sent to an unnamed potential class member). That is especially true following an evidentiary hearing at which the Court can assess the credibility and candor of the witnesses. ATP conceded at the hearing that this Court has discretion to consider this evidence. *See* Tr. at 21:4-22:8. And, without embarking on an extended evidentiary analysis, the testimony is at a minimum admissible under the residual hearsay exception because it is "particularly trustworthy" based on players' direct discussions with the witnesses, "bears on [the] material fact" of coercion central to the motion, and is "the most probative evidence addressing that fact." *United States v. Bryce*, 208 F.3d 346, 350 (2d Cir. 1999), *as amended on denial of reh'g*, (Jan. 19, 2000).

### IV. Conclusion

There is no question that the professional tennis players who have come forward in support of this lawsuit have done so bravely and at grave risk to their careers. Plaintiffs' witnesses testified to how, immediately after Plaintiffs filed their complaint, ATP officials mounted a targeted campaign to coerce named Plaintiffs and putative class members to disavow or withdraw from this action. These witnesses testified about how many other players support this lawsuit but have forgone the opportunity to voice their support or participate out of fear of financial reprisal by ATP. To permit these potential class members to make informed decisions about their rights and to permit this case to proceed with the integrity Rule 23 demands, the Court should issue a narrow order limiting Defendants from communicating with putative class members regarding their participation or involvement in this lawsuit until it concludes.

Respectfully submitted,

*/s/ Andrew S. Tulumello*

Andrew S. Tulumello  
*Counsel for Plaintiffs*

cc:     all counsel of record (via ECF)