UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5/7/2025_

---

VASEK POSPISIL, Individually and on Behalf of
All Others Similarly Situated, et al.,

                              Plaintiffs,

                -against-

ATP TOUR, INC., et al.,

                              Defendants.

---

25-CV-02207 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Professional tennis is big business, and its governing structures and the procedural rules that dictate division of profits between tournament providers and players determine the flow of hundreds of millions of dollars worldwide. Plaintiffs, comprised of professional tennis players and The Professional Tennis Players Association ("PTPA"), brought this putative class action on behalf of themselves and all current, former, and future professional tennis players who compete in tournaments and events operated by Defendants ATP Tour, Inc. ("ATP"); WTA Tour, Inc.; International Tennis Federation Ltd.; and International Tennis Integrity Agency Ltd., challenging Defendants' allegedly anticompetitive practices under federal antitrust laws. On March 21, 2025, Plaintiffs moved for relief under Rule 23(d) of the Federal Rules of Civil Procedure against ATP, alleging that ATP officials have engaged in improper, coercive, and/or threatening communications with putative class members, and requesting the Court issue, *inter alia*, an order restricting all Defendants from engaging in further communications with putative class members regarding their participation or involvement in this action, absent leave of court, and authorizing corrective notice. Dkt. No. 20 (the "Motion" or "Mot."). For the reasons stated herein, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiffs' motion.

## FACTS & PROCEDURAL BACKGROUND

On March 18, 2025, Plaintiffs filed this putative class action against Defendants alleging, in sum, that Defendants individually and collectively have unjustly benefitted from and artificially created and maintained monopsonies and anticompetitive restraints in the market for the services of professional tennis players in violation of federal antitrust laws. *See* Dkt. No. 1 ("Compl."). Specifically, Plaintiffs allege that Defendants and their co-conspirators have unlawfully fixed the compensation professional tennis players may earn, restricted and locked in players' exclusive participation in tours organized by Defendants, restricted other tournament operators' ability to compete with Defendants' tournaments and events, and abused various anti-doping and anti-corruption programs. *See* Compl. ¶¶ 1–19. Plaintiffs assert nine causes of action against various Defendants, including violations of Section 1 of the Sherman Act (First, Second, Third, and Fourth Causes of Action, *id.* ¶¶ 333–402); violations of Section 2 of the Sherman Act (Fifth, Sixth, Seventh, and Eighth Causes of Action, *id.* ¶¶ 403–67); and common law unjust enrichment (Ninth Cause of Action, *id.* ¶¶ 468–75). ATP is a named defendant in each cause of action. Plaintiffs seek, *inter alia*, damages, injunctive relief, and a declaratory judgment. *See id.* ¶¶ 333–467.

On March 21, 2025, Plaintiffs filed a letter-motion requesting that, pursuant to Rule 23(d), the Court enter an order (i) restricting all Defendants from engaging in future communications with putative class members; (ii) requiring all Defendants to disclose all prior communications with putative class members regarding this action; (iii) requiring all Defendants to preserve all communications relating to their efforts to approach and ask putative class members to sign paperwork condemning this action; and (iv) authorizing Plaintiffs to issue a corrective statement. *See generally* Mot. & Dkt. No. 20-1 ("Syed Decl."). Plaintiffs allege that

ATP has (i) "[t]hreatened putative class members that, if this litigation persists, ATP plans to reduce their compensation, including prize money and pensions, to offset ATP's attorneys' fees"; (ii) "[c]onfronted at least one player in a highly sensitive location within his place of work with a pen and paper seeking the player's signature on a letter opposing this lawsuit, and refused that player's request to show the letter to his attorneys"; and (iii) "[a]ttempted to pressure players to sign statements stating that they had no prior knowledge of this [a]ction, when . . . they did have prior knowledge." Mot. at 3; Syed Decl. ¶¶ 10–12.

Specifically, Plaintiffs alleged that, on March 19, 2025—the day after this lawsuit was filed—"at the ongoing[1] Miami Open tournament, Luben Pampoulov, a Player Representative member of ATP's Board of Directors, approached a player in an area designated for players only and demanded that this player sign a pre-written letter denouncing this lawsuit." Mot. at 1; Syed Decl. ¶ 12. Mr. Pampoulov allegedly "provided the player with a pre-written document that purported to state that the player was not a member of the PTPA and did not support [this] lawsuit" and "then handed the player a pen and asked the player to sign the proposed statement." Syed Decl. ¶ 12. Mr. Pampoulov allegedly refused the player's requests to consult an attorney and to take a picture of the statement. *Id.* When the player refused to sign the statement, Mr. Pampoulov purportedly stated that he would speak to ATP Chairman Andrea Gaudenzi about "this issue." *Id.* Plaintiffs further alleged that other "[s]enior ATP officials . . . have entered player-only areas at the Miami Open to demand players condemn this [a]ction and warn that ATP plans to respond by reducing their wages and their pensions." Mot. at 1; Syed Decl. ¶¶ 9–10.

---

[1] The Miami Open is a tennis tournament on both the ATP Tour and WTA Tour, which began on March 17, 2025, and concluded on March 30, 2025. Syed Decl. ¶ 6.

On March 23, 2025, ATP filed a letter-response, contesting nearly all of the allegations in the Motion, including that ATP had made any false or misleading statements, violated any putative class member's rights, or interfered in any way with the administration of this action. *See generally* Dkt. Nos. 24 ("Opp.") & 25 ("Pampoulov Decl."). On March 31, 2025, Plaintiffs filed their reply memorandum of law (Dkt. No. 36) and the Declaration of Reilly Opelka, a professional tennis player (Dkt. No. 37), in further support of their Motion.

On April 11, 2025, the Court held an evidentiary hearing, which included opening statements from Plaintiffs and ATP and testimony from Plaintiff Vasek Pospisil; Plaintiff Reilly Opelka; Wajid Mir Syed, Plaintiff PTPA's General Counsel and Executive Vice President of Player Engagement; and Luben Pampoulov.[2] On April 16, 2025, with the Court's permission, ATP filed the Declaration of Mark V. Young (Dkt. No. 61-1) in further support of their opposition to the Motion. On April 18, 2025, the parties filed post-hearing letter-briefs. Dkt. Nos. 62 ("ATP Post-Hearing Br.") & 63 ("Pl. Post-Hearing Br."); *see also* Dkt. No. 64 (letter from ATP clarifying its statements regarding *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554 (Del. 2014) and *Deutscher Tennis Bund v. ATP Tour Inc.*, 480 F. App'x 124 (3d Cir. 2012)); Dkt. No. 47 (letter-response from Plaintiffs regarding ATP's clarifying letter).

## DISCUSSION

Having carefully considered all of the parties' submissions and the evidence presented at the hearing, the Court shall issue limited relief under Rule 23(d), only as to ATP and only to the extent further detailed below.

---

[2] Citations to the transcript of the April 11 hearing shall be "Tr. [pincite]." Citations to exhibits admitted into evidence at the hearing shall be to their pre-marked identification, *e.g.*, PX-1.

## I.    LEGAL STANDARD

Underlying Rule 23(d) of the Federal Rules of Civil Procedure is "the responsibility of the court to . . . safeguard [putative class members] from unauthorized, misleading communications from the parties or their counsel." *See Erhardt v. Prudential Grp., Inc.*, 629 F.2d 843, 846 (2d Cir. 1980). "Courts use Rule 23(d) to limit communications to protect class members from misleading communications from the parties or their counsel, because misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *Dodona I, LLC v. Goldman, Sachs & Co.*, 300 F.R.D. 182, 184 (S.D.N.Y. 2014) (internal references omitted); *see also Erhardt*, 629 F.2d at 846 ("Unapproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice.").

"The Court's authority to regulate communications under Rule 23(d) also 'extends to communications that interfere with the proper administration of a class action[,] those that abuse the rights of members of the class,' and situations in which 'there is a relationship that is inherently coercive.'" *Dodona I, LLC*, 300 F.R.D. at 184 (quoting *Sorrentino v. ASN Roosevelt Ctr. LLC*, 584 F. Supp. 2d 529, 532–33 (E.D.N.Y. 2008)); *see In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) ("A court may 'limit communications with absent class members where the communications were . . . an improper attempt to undermine Rule 23 by encouraging class members not to join the suit.'" (quoting *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 644, 667 (E.D. Tex. 2003)). "A unilateral communications scheme, moreover, is rife with potential for coercion. If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be

coercive." *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985); *see, e.g.*, *Zamboni v. Pepe W. 48th St. LLC*, No. 12-cv-03157 (AJN) (JCF), 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013) (finding coercion in defendant-employers' solicitation of statements from employees that they did not have claims for unpaid wages); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 253 (finding potential coercion and impropriety in two defendant-banks' contacts with credit cardholders "who depend on defendants for their credit needs" and "ha[d] no other realistic source of information regarding [the] litigation"); *Ralph Oldsmobile Inc. v. Gen. Motors Corp.*, No. 99-cv-04567 (AGS), 2001 WL 1035132, at *4 (S.D.N.Y. Sept. 7, 2001) (finding defendant's request for releases from putative class members potentially coercive where "[t]heir continued success and, indeed, existence may depend upon [defendant's] good will"); *cf. Dodona I, LLC*, 300 F.R.D. at 186 (finding no "evident imbalance of power" or "obvious potential for coercion" between defendants and "sophisticated institutional class members," especially where communications were made through counsel).

Further, "when a defendant contacts putative class members for the purpose of altering the status of a pending litigation, such communication is improper without judicial authorization." *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 253 (citing *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994); *In re Sch. Asbestos Litig.*, 842 F.2d 671, 682 n.23 (3d Cir. 1988)); *see also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011); *but see Zamboni*, 2013 WL 9789935, at *3 ("In general, communications that are litigation-neutral[—]that do not alter the legal relationship between the defendants and members of a putative class[—]are not subject to restriction.").

In light of these concerns, Rule 23(d) authorizes a district court to, *inter alia*, (1) require that appropriate notice be given to class members at "any step in the action" in order to "protect

class members and fairly conduct the action"; (2) "impose conditions on the representative parties or on intervenors"; or (3) "deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1)(B)(i), (C), (E). The Court's supervisory authority under Rule 23(d) to limit communications exists even prior to class certification, *see Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 484 (S.D.N.Y. 2012), and "the Court's primary purpose in supervising communications is . . . to ensure that potential class members receive accurate and impartial information regarding the status, purposes and effects of the class action." *Wachovia Bank N.A.*, 790 F. Supp. 2d at 134.

"[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981) (concerning plaintiffs' communications with putative class members); *see Dodona I, LLC*, 300 F.R.D. at 185 (extending *Gulf Oil Co.*'s reasoning to defendants' communications with putative class members). The Court's discretion to enter such an order "is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules," as well as by the First Amendment. *See Gulf Oil Co.*, 452 U.S. at 100. The Court's balancing "should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102; *see also id.* at 103 ("[A]n order requiring prior judicial approval of all communications, with the exception of cases where respondents chose to assert a constitutional right . . . was an abuse of discretion.").

## II.    ATP'S CONDUCT WARRANTS RELIEF UNDER RULE 23(D)

Considering the totality of the circumstances, the parties' submissions, and the evidence presented at the hearing, the Court finds that ATP's conduct to date, regardless of intent, could

readily have been viewed by potential class members as potentially coercive, deceptive, or otherwise abusive, which warrants limited relief under Rule 23(d).

### A. Putative Class Members Are Vulnerable to Economic Coercion

"Courts are more likely to take remedial measures under Rule 23(d) when putative class members are particularly vulnerable to coercion or being misled. While there is no common definition of what makes such individuals vulnerable, courts have shown concern when, for example, putative class members . . . are susceptible to economic coercion." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 264 (S.D.N.Y. 2020), *report and recommendation adopted*, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021). Based on ATP's relationship with its members, the Court finds putative class members who are members of ATP are vulnerable to economic coercion by ATP.

As background, ATP is a non-profit membership organization of male professional tennis players and organizers of men's professional tennis tournaments. *See* Compl. ¶ 65; Opp. at 1 (quoting *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 824 (3d Cir. 2010)). Among other things, ATP's organizational purposes include owning, sanctioning, scheduling, and administering circuits of professional tennis tournaments, as well as developing, promulgating, and administering rules, regulations, and grievance procedures to ensure the fair and orderly conduct of the sport of professional tennis. *See* PX-2 ("ATP Bylaws") § 2.1. Organizational and policy decisions are made by the ATP Board, consisting of nine directors, including four player representatives, four tournament organizers, and the Board Chairman, currently Andrea Gaudenzi, who is selected by the other eight directors. *See id.* art. XII (Tour Board Representatives), § 15.1; Compl. ¶ 67; Tr. 16. The four player representatives who sit on ATP's Board are elected by the Player Advisory Council, but their fiduciary duty is solely to the ATP. *See* ATP Bylaws § 12.3(b); Tr. 16, 115; Young Decl. ¶¶ 4, 6–10 (describing the retention of an

executive search group that, since 2022, has identified and presented ATP Board candidates to the Player Advisory Council).  The Player Advisory Council consists of ten members, including active players, an alumni member, and a coach member, all of whom are elected by the "Group 1" players, consisting of the top 250-ranked singles players and the top 50-ranked doubles players.  *See* ATP Bylaws §§ 4.2, 9.2; Compl. ¶ 70; Young Decl. ¶ 5.

Male professional tennis players primarily make a living by playing in tournaments, which are nearly-exclusively organized by ATP, and winning prize money.  Tr. 36.  Players can also earn money through endorsements and sponsorships, which themselves are influenced by how successful the player is within the ATP system.  *See* Compl. ¶¶ 7, 9; *see, e.g.*, Tr. 46, 136.  On behalf of its players, ATP coordinates a worldwide annual circuit of more than 60 tournaments over the course of eleven months.[3]  *See* Compl. ¶ 72; Tr. 15, 38.  In order to participate in a tournament organized by ATP, a player must (i) be an ATP member; (ii) qualify or be eligible to compete, based in part on the "Ranking Points" system; and (iii) cover the expenses incurred, including travel costs and hiring a support team of coaches, physical therapists, and the like.  *See* Tr. 36–37.  As part of their ATP membership, players sign a "Consent and Agreement Form," which is a contract that purportedly binds players to ATP's rules, bylaws, resolutions, and regulations.  *See* Compl. ¶ 269; *see also* ATP Bylaws § 3.2 (Conditions of Membership).  The Ranking Points system, designed by ATP and the other Defendants, awards players Ranking Points based on their participation and performance at tournaments.  *See* Compl. ¶¶ 164–65.  Ranking Points are awarded on a sliding scale—the better that a player performs at a tournament, the more Ranking Points he receives, and the higher his

---

[3] The four Grand Slams are not under the purview of ATP, but organizers of the Grand Slams have an agreement with ATP regarding the Ranking Points awarded to players based on their participation and performance at the Grand Slams.  *See* Tr. 32–33.

ranking, the more opportunities he has to win greater sums of prize money associated with bigger tournaments. *See* Tr. 36–37; Compl. ¶¶ 164–65. The ATP Rulebook regulates the eligibility of tournaments that can award ATP Ranking Points. *See generally* PX-1 ("ATP Rulebook") § 9 (PIF ATP Rankings); *see also* Tr. 37 (testimony of Mr. Pospisil confirming that ATP members cannot receive ranking points from any source other than ATP).

Player-members are also eligible for other forms of compensation and benefits from ATP, such as "Platinum Benefits," which include retirement programs, bonus programs, and financial security plans, and bonus pools. *See* ATP Rulebook §§ 1.07(G)–(H) (bonus pools for ATP tours), 1.21(B) (Platinum Benefits); Tr. 36.

At the hearing, Mr. Pospisil extensively and credibly testified about the near total and exclusive control ATP has over its members, specifically over members' compensation and benefits. *See* Tr. 36 (Q: "Now, are players financially dependent on the ATP for their livelihoods?" A: "Yes, completely."); *see also* Tr. 25 (explaining players' benefits and Platinum Benefits are decided by ATP's Board), 79–80 (testimony of Mr. Opelka regarding players' compensation and benefits). As a practical matter, male professional tennis players have no other way to make a living in their field, other than by participating in the ATP tours and Grand Slam tournaments, and even then, most players are struggling to make ends meet. *See* Tr. 37–39 (testimony of Mr. Pospisil).

In light of this context, as Plaintiffs argue, "ATP is uniquely positioned to exert pressure over putative class members, all of whom are subject to ATP's governance, rules, and potential disciplinary actions." *See* Mot. at 2; Pl. Post-Hearing Br. at 1–2. Specifically, under the ATP Bylaws and ATP Rulebook, players are strongly disincentivized from acting or aligning

themselves contrary to ATP's "best interests," or else risk serious economic loss and potentially their professional careers.

For example, under the ATP Bylaws, the ATP Board has "right to take any action which it deems appropriate, including, but not limited to, the termination of such [player] member's membership in the [ATP]," if the ATP Board "determines that [the player] has <u>acted in a manner which is contrary to the best interests of the [ATP]</u>." ATP Bylaws § 4.6 (Continuance of Membership) (emphasis added). If a player were to fall out of ATP's good graces and ATP terminated his membership, that player would be barred from participating in ATP events and tournaments, which would effectively prevent him from making a living as a professional tennis player. *See* Tr. 44 (testimony of Mr. Pospisil) (Q: "Now, what's your understanding of [ATP Bylaws § 4.6]?" A: "Yeah, my understanding of the section is that if you are a plaintiff in this lawsuit, that it could be deemed as not in the best interest of the league, the ATP, and you could lose your benefits or be kicked out of the tour, lose your pension."); *but see* Tr. 59–60, 68 (Mr. Pospisil conceding that, despite his prominent criticism of ATP and well-known status as a founder of PTPA, he has not lost his benefits or his membership in ATP).

Similarly, under the ATP Rulebook, Platinum Benefits are only available for a player who is "in good standing" and "does not have any relationship or affiliation with any business, corporation, company, partnership, association, organization, person, or entity that is <u>not in the best interests of ATP</u>." *See* ATP Rulebook § 1.21(C) (Eligibility for Platinum Benefits) (emphasis added); *see also id.* § 1.07(F) (defining "good standing"). Also, under the ATP Bylaws' fee-shifting provision, any player who initiates, asserts, joins in, offers substantial assistance to, or has a direct financial interest in any legal claim brought against ATP is jointly and severally liable for "all fees, costs and expenses of every kind and description (including, but

not limited to, all reasonable attorneys' fees and other litigation expenses) . . . that the parties may incur in connection with such [c]laim," if the claimant ultimately fails to prevail. *See* ATP Bylaws § 23.3(a) (Litigation Costs).[4]

ATP's financial interest in this action and players' particular susceptibility to economic pressure by ATP underscore the potential for coercion. At the hearing, Plaintiffs analogized ATP's conduct to that of the defendant in *Hampton Hardware, Inc. v. Cotter & Co., Inc. See* Tr. 8–9. There, shortly after the lawsuit was filed, the defendant sent three letters to potential class members which contained information about the lawsuit and urged the potential class members not to participate in the lawsuit. 156 F.R.D. 630, 631 (N.D. Tex. 1994). Some of the letters specifically indicated that defendant's costs in litigating the lawsuit would be borne by potential class members. *See id.* at 631–32 ("Every member who joins the class adds to the expense and time needed to protect your Company[, the defendant,] and you. The expense will, ultimately, come out of your pocket. . . . By not participating in this suit, you will help save your Company expense in dollars and time. . . . By asking you to join the class, Hampton[, the plaintiff,] is asking you to sue yourself.").

Here, as discussed further *infra*, the Court accords little weight to Plaintiffs' allegations that certain unnamed ATP officials, in fact, warned players that ATP planned to respond to this action by reducing their wages and pensions, but does credit that some number of players believed such a response was possible or likely. *See* Syed Decl. ¶¶ 9–10; Tr. 45 (testimony of Mr. Pospisil regarding generalized locker room rumors); Tr. 103–05 (ATP establishing on cross-

---

[4] This fee-shifting provision runs both directions—ATP is likewise obligated to reimburse a player's fees, costs, and expenses if ATP essentially fails to prevail on a claim that it initiates, asserts, joins in, offers substantial assistance to, or has a direct financial interest in. *See* ATP Bylaws § 23.3(b); Tr. 25–26 (arguing the fee-shifting provision was "agreed to and adopted by the entire board" and "that the player members have been beneficiaries of [the provision] over time").

examination of Mr. Syed that his declaration and his testimony regarding conversations that players had were not based on first-hand personal knowledge); Tr. 81 (testimony of Mr. Opelka regarding an unnamed player on the Player Advisory Council "trying to look out for [him]" and expressing uncertainty over whether ATP could withhold pensions); Tr. 131 (testimony of Mr. Pampoulov denying that anyone, on behalf of ATP, indicated that ATP intends to reduce the compensation and benefits of players who are either parties to or supportive of this lawsuit); *see generally* ATP Post-Hearing Br. at 2 n.2 (distinguishing *Hampton Hardware*).  However, the clear impact of rumors or suggestions to that effect is telling, and sharply illuminates the vulnerability of putative class members to economic coercion by ATP.

At the hearing, the parties also referenced the withdrawal of Jay Clarke, a British professional tennis player, as a named plaintiff from a similar class action brought by PTPA and other players in the United Kingdom.  *See* Tr. 10–11.  While the U.K. action is not formally connected to this lawsuit, the circumstances surrounding Mr. Clarke's withdrawal exemplify players' vulnerability to the broader pressures that they face by participating in legal action against tennis governing bodies, including, *inter alia*, the potential loss of sponsorship.  *See* Tr. 46, 74–75 (testimony of Mr. Pospisil regarding a text conversation with Mr. Clarke in which Mr. Clarke described pressure from the British media and stated that his sponsor encouraged him to withdraw from the U.K. action or else lose his coach and financial support); ATP Post-Hearing Br. at 4 (arguing that Mr. Clarke's withdrawal was not caused by ATP).

Thus, putative class members' vulnerability to economic coercion by ATP weighs in favor of granting relief under Rule 23(d).

**B. ATP Unilaterally Targeted Putative Class Members to Seek to Influence Their Choice of Remedies**

The Court finds that ATP did, in at least two instances, unilaterally target putative class members, which similarly weighs in favor of granting relief under Rule 23(d), especially given putative class members' susceptibility to economic coercion.[5]  ATP does not contest that Mr. Pampoulov, in his official capacity on behalf of ATP, approached two players on separate occasions at the Miami Open, seeking to have them sign a position statement indicating, among other things, that they were "not supportive of this litigation against the ATP."  *See* Opp. at 2; Pampoulov Decl. ¶ 7.  Nonetheless, ATP counters that it was attempting to further its "mission to support [professional tennis players]," while being allegedly undermined by Plaintiff PTPA's "ero[sion] [of professional tennis players'] trust in, and the healthy functioning of, ATP Tour."[6] Opp. at 2; *see* Pampoulov Decl. ¶ 10; Tr. 13.

The events leading up to Mr. Pampoulov's interactions with two putative class members are as follows.  On March 18, 2025, the day that the Complaint was filed, Mr. Pampoulov attended two meetings at the Miami Open, one of which was with top players regarding a letter that was part of an initiative to improve player benefits from the Grand Slams (the "Grand Slams letter"), and the other of which was with the Player Advisory Council, at which this lawsuit and its potential costs were discussed.  *See* Tr. 117–18.  At this second meeting with the Player

---

[5] In addition to the two interactions between Mr. Pampoulov and players discussed *infra*, Mr. Pampoulov also approached the agent of Jannik Sinner.  Tr. 127.

[6] ATP's attempt to undermine the significance of its conduct at issue because this action has not progressed to the point of notice or class certification, *see* Tr. 23, is inapposite because it is well-established that the Court's authority and duty under Rule 23 exists prior to class certification, and that a defendant's improper communications pre-class certification can still warrant relief under Rule 23.  *See Urtubia*, 857 F. Supp. 2d at 484.  Indeed, to ensure objective and truthful information is disseminated, upon the certification of the class, the notice procedures outlined under Rule 23 are to be directed by the Court, not any party to this litigation.  *See* Fed. R. Civ. P. 23(c)(2)(A)–(B).

14

Advisory Council, Mr. Pampoulov testified that, in response to questions, ATP officials explained the effect of the fee-shifting provision of the ATP Bylaws. *See* Tr. 118–19. Following that meeting, Mr. Pampoulov testified that, per "guidance from the [P]layer [A]dvisory [C]ouncil," a position statement was prepared to counter the public statements of PTPA regarding top players' purported widespread support of this litigation. *See* Tr. 120–22; DX-7 (press release by PTPA indicating that "PTPA's legal actions [are] backed overwhelmingly by the top 250+ men's and women's players including a majority of the Top 20 players."); DX-40 (the position statement). Mr. Pampoulov did not specifically identify whose idea it was to prepare the position statement, who drafted the language, or who formulated the plan to secure signatures. *See* Tr. 122.

On March 19, 2025, Mr. Pampoulov approached Ben Shelton, a highly-ranked American professional tennis player, and had a conversation with him about the Grand Slams letter and the position statement. Tr. 124. Mr. Pampoulov maintained that this conversation occurred on a walkway in an area between the players' locker room and practice area, after Mr. Shelton had finished practice. *Id.* Mr. Pampoulov updated Mr. Shelton on what was discussed at the March 18 Player Advisory Council meeting, presented the position statement to him, and informed him that the statement was also available for signing at ATP's office. Tr. 124–25. Mr. Shelton requested to speak further after he had showered and gave Mr. Pampoulov his number, but did not respond to Mr. Pampoulov's outreach by text thereafter. Tr. 125. Mr. Pampoulov maintained that he did not ask or pressure Mr. Shelton to sign the position statement and did not tell him that there would be consequences if he did not sign the statement, *e.g.*, that he would raise the issue with Mr. Gaudenzi. Tr. 125–26. Mr. Pampoulov further testified that, during

their conversation, Mr. Shelton did not ask to consult an attorney or ask to take a picture of the statement.  Tr. 125.

Later that same day, Mr. Pampoulov also approached Alexander "Sascha" Zverev, a German professional tennis player, currently the No. 2 ranked player in the world, as Mr. Zverev was walking to his private suite, and similarly had a conversation with him about both the Grand Slams letter and the position statement.  Tr. 126, 135.  After being invited by Mr. Zverev into the private suite, Mr. Pampoulov showed him the Grand Slams letter, which Mr. Zverev signed with a pen or pencil provided by Mr. Pampoulov, and also showed him the position statement and explained that it was available at the ATP's office if he wanted to sign it.  Tr. 136–37.  Mr. Zverev asked Mr. Pampoulov to send the position statement to him, so he could consult with his lawyer about it, which Mr. Pampoulov did.  *Id.*  Ultimately, Mr. Zverev did not sign the position statement.  Tr. 137.

To date, a handful of players have apparently signed the position statement.  Tr. 138 (testimony of Mr. Pampoulov confirming there is a version of the position statement with signatures of players, but that he did not know who had the statement).  Upon the filing of the instant motion, ATP ceased its efforts to collect additional signatures for the position statement.  Tr. 128.

In response to Plaintiffs' allegations that these interactions between Mr. Pampoulov and players were coercive, ATP essentially asks the Court to trust it and its good intentions—a response that does not satisfy the Court's duty and authority under Rule 23(d) to protect the integrity of the putative class and the fair administration of justice.  *See, e.g.*, *Wachovia Bank N.A.*, 790 F. Supp. 2d at 134 (requiring judicial supervision of the notice process under Rule 23 although the defendants had proffered an alternative "pure . . . intention[]" to serve the best

16

interests of the citizens of their states).  While ATP has repeatedly claimed that any communications with players about this action were not nefarious and were well-intentioned, the Court finds that, in contrast to his precise recollections of his conversations with Mr. Shelton and Mr. Zverev, Mr. Pampoulov was inexplicably vague with respect to certain key aspects of the position statement, including how and why the position statement came about, all of which undermines his credibility regarding the non-coercive intent of the statement.  *Cf.* Tr. 26 ("Ultimately, Mr. Pampoulov will also explain in detail that statement and why it was created, at whose initiation it was created.").  For example, although Mr. Gaudenzi was present at the March 18 Player Advisory Council meeting in his capacity as Board Chairman, Mr. Pampoulov claimed that Mr. Gaudenzi did not specifically comment on this litigation, and simply "introduced the staff members that would share more information about it."  *See* Tr. 133.  Mr. Pampoulov also could not specifically recall how he came to learn that the position statement was ready the following morning on March 19, and he did not know who specifically drafted the statement, or even who first suggested creating a statement or soliciting player signatures.  *See* Tr. 134–35 (Q. "Who wrote the statement, to the best of your knowledge?" . . . A. "Staff.  I don't know who exactly wrote [it].").

However, even assuming *arguendo* that the circumstances surrounding the creation and circulation of the position statement were innocuous, and that Mr. Pampoulov did not approach anyone with the intention of threatening or influencing their decision to support, denounce, or otherwise participate in this action, the Court finds that Mr. Pampoulov's conduct, undertaken in his official capacity as a member of the ATP Board, has a <u>tendency</u> to unduly influence players and to potentially discourage them from participating in this action altogether.

In addition to the two encounters between Mr. Pampoulov and players, which ATP concedes, Mr. Opelka testified about an unnamed player on the Player Advisory Council, who "was instructed to notify [him] that by signing and being a [named] plaintiff on this lawsuit that . . . [he was] at risk of losing [his] pension, [his] benefits, and also being financially responsible for the ATP's legal fees if [plaintiffs] were to lose . . . ." Tr. 80. Mr. Opelka further testified that the player told him that he was instructed by Mr. Gaudenzi to approach him and fellow player Nicholas Kyrgios to inform them that, by supporting this litigation, they could risk losing their pension, benefits, and legal fees if they lose the lawsuit. Tr. 82. ATP contests all of this. *See* Tr. 120; *see generally* ATP Post-Hearing Br. at 3 & n.3 (arguing that the hearsay evidence presented by Plaintiffs is insufficient).

Given the hearsay nature of his testimony and the lack of corroboration elsewhere in the evidentiary record, *see* Tr. 88–89; ATP Post-Hearing Br. at 4, the Court accords little weight to the portions of Mr. Opelka's testimony regarding whether Mr. Gaudenzi in fact instructed the unnamed player to approach Mr. Opelka and others, and whether ATP officials in fact intimidated or threatened other players. *See, e.g.*, Tr. 84 (testimony of Mr. Opelka) (Q. "And was this player instructed by Mr. Gaudenzi?" A. "That's what he had told me, yes. I wasn't in the room. You know, I wasn't in that player council meeting[.]"). However, as discussed *supra*, provisions of the ATP Bylaws and ATP Rulebook, including the fee-shifting provision, <u>could</u> be applied in an economically coercive manner to players who support this litigation. And the Court does credit Mr. Opelka's testimony that (i) he was <u>told</u> that the message was directed by Mr. Gaudenzi, *see* Tr. 84; (ii) the conversation between Mr. Opelka and the unnamed player occurred in front of other players, *see* Tr. 85 ("[W]ord definitely traveled a little bit."); (iii) the unnamed Player Advisory Council member was "trying to look out for [Mr. Opelka]," *see* Tr. 84,

by keeping him informed, all while expressing uncertainty over what ATP could or could not do to players supporting the lawsuit, *see* Tr. 81 ("[P]art of the reason why [the unnamed player] didn't want to be named was because . . . [h]ow [was he] supposed to know if legally [ATP is] allowed to . . withhold [players'] pension . . . or whatnot?"); and (iv) the conversation gave Mr. Opelka "some pause" over continuing to participate in this lawsuit, *see* Tr. 85.  Mr. Opelka's credible testimony, particularly regarding how he perceived the interaction with the Player Advisory Council member, further supports the Court's finding that putative class members are particularly susceptible to economic coercion by ATP and that ATP's conduct thus far has a tendency to coerce or mislead.  *See* Tr. 86 (testimony of Mr. Opelka regarding conversations with players who expressed that they would "feel a lot better" about considering participating in this lawsuit if they knew they would not risk losing their benefits and pension).  This is true regardless of the subjective intent of ATP and its officials, given the structural economic relationship between ATP and players who are putative class members.

Ultimately, the narrowly tailored relief that the Court shall grant Plaintiffs, as described *infra*, does not undermine ATP's "crucial role" in "regularly be[ing] in contact with [its members] in order to receive player feedback and discuss measures taken or being considered by ATP."  *See* Opp. at 1, 3; *see also* Tr. 140 (testimony of Mr. Pampoulov regarding his fiduciary duty, on behalf of ATP, to act in the best interest of players).  While ATP has the right to express a contrary view about this lawsuit, it is not ATP's responsibility to advise or inform putative class members about their ability to participate in this litigation, especially where it is an interested party with a direct pecuniary interest in the outcome of this lawsuit.  *See Hampton Hardware, Inc.*, 156 F.R.D. at 633–35 (reasoning that defendant should be prohibited from

contacting potential class members up through the time of trial, in part on the defendant's conflict of interest due to its financial interest in the outcome of the case).

### C. There Is Evidence that ATP's Actions Directly or Indirectly Coerced or Misled Players

The Court further finds that ATP did in fact leverage its power over putative class members to directly or indirectly coerce or mislead putative class members into disavowing this action, thereby posing a serious threat to the fairness of the litigation process, the adequacy of representation, and the administration of justice generally.

*First*, a common sense reading of the position statement circulated by ATP suggests that ATP sought to directly or indirectly influence member participation in this litigation in a coercive and misleading manner. The position statement provides:

> We, the undersigned Player members of the ATP Tour, understand that the PTPA and certain players have brought a lawsuit against the ATP Tour and other tennis entities. We wish to make clear that we are not members of the PTPA, that the PTPA does not represent us, and that we are not supportive of this litigation against the ATP.

DX-40. Encouraging putative class members to sign this statement, even if ATP's attempts were unsuccessful, is an express act to influence those members to disavow this action, which not only discourages participation of those specific members in this litigation but also has the likely effect of chilling other potential members' participation, given the record evidence about the nature of communication within the player community. While ATP contests some of the alleged circumstances surrounding Mr. Pampoulov's interactions with players, *e.g.*, whether Mr. Pampoulov prevented Mr. Shelton from contacting counsel about the statement, *compare* Syed Decl. ¶ 12 *and* Tr. 98–99 (testimony of Mr. Syed) *with* Tr. 125 (testimony of Mr. Pampoulov), the Court need not credit Plaintiffs' assertions to find that the plain language of the position statement, the fact that ATP concedes that it unilaterally approached individual players to solicit

them to sign the statement, and the nature of the relationship between ATP and its members, *see* Section II(A) *supra*, is a sufficient evidentiary basis to warrant relief under Rule 23(d).

There is also record evidence that at least one player, Mr. Zverev, perceived the position statement as a document with some potential legal effect, *see* Tr. 136, which supports a finding that the statement and ATP's interactions directly or indirectly misled players regarding their ability to participate in this litigation and the effect of signing the statement on that issue. The second sentence of the position statement in particular has a tendency to mislead players into thinking that their affiliation with PTPA (as a member of PTPA or otherwise) has any effect on this litigation or their ability to participate in this action as a legal matter. The second sentence suggests that PTPA (despite being only one of the named plaintiffs in this action, at a stage of the litigation when no lead plaintiff has been selected by the Court) does not or could not represent the interests of a signing player, as a member of the putative class, because the player is not a member of PTPA. *Cf.* ATP Post-Hearing Br. at 2; Tr. 122 (testimony of Mr. Pampoulov explaining that the position statement was so players could rebut PTPA's claim that players overwhelmingly supported this lawsuit).

*Second*, ATP's actions are similar in nature to those of defendants who have, for example, solicited putative class members to opt out of a class or to make statements that they do not have claims relevant to the pending litigation. In *Ralph Oldsmobile, Inc.*, the court held that the defendant's solicitation of *ex parte* releases from putative class members supported findings of potential coercion. 2001 WL 1035132, at \*3. There, plaintiffs were car dealers and defendant was the only source of their lines of vehicles. *Id.* at \*4. Accordingly, the court reasoned that while "there [was] no evidence of actual coercion" because plaintiffs could refuse to sign the release, plaintiffs' "continued success and, indeed, existence may depend upon [defendant's]

good will." *Id.*  Similarly, in *Zamboni*, the court held that, in a FLSA action, defendant-employers' solicitation of statements from employees that they did not have claims for unpaid wages involved coercion.  2013 WL 978935, at *3.  While ATP's position statement is not binding on putative class members as a matter of law, a player "who signs such a statement does not necessarily understand such legal subtleties and may well believe that, having signed the statement, he is precluded from [later] opting in to this litigation." *See id.*  Indeed, Mr. Pampoulov testified that some of the top players and members of the Player Advisory Council are not Americans, are not lawyers, and are generally unfamiliar with litigation and the American legal system.  *See* Tr. 119; *see also* Tr. 136 (discussing Mr. Zverev's confusion over the potential legal effect of signing the position statement).  As in *Zamboni*, the Court similarly finds that a player "could well sign such a statement without full recognition of the extent of his rights and potential claims."  *See* 2013 WL 978935, at *3.

ATP argues that informing putative class members about the effect this litigation may have on ATP is not coercive or misleading, even if a representative or agent of ATP told a putative class member that legal fees from this litigation could decrease available funds for players, because "that is precisely the kind of information [players] ought to know because they are members of ATP."  Opp. at 3 (emphasis omitted); *see also* ATP Post-Hearing Br. at 4–5 (arguing ATP can permissibly communicate accurate and truthful information to its members about the lawsuit and rebut perceived misstatements by PTPA).  ATP's broader assertion that it has a right or duty to inform or advise its members about this litigation is, as discussed *supra*, not permitted by Rule 23 to the extent that ATP actions to "inform" or "advise" in fact leveraged players' financial dependence on ATP in service of the specific posture of this litigation, with the effect of coercing, influencing, or misleading putative class members.

The persuasiveness of ATP's position is significantly undermined by ATP's failure, at every stage of this litigation thus far, to acknowledge, engage with, or address in any way the obvious risk that its actions will tend to coerce, influence, or mislead putative class members' participation in and understanding of the impact of this litigation, given the structural and economic relationships between players and ATP.  ATP has instead focused solely on its subjective intentions, which are not determinative.  *See* ATP Post-Hearing Br. at 1–2 (arguing there is no evidence that ATP misled, coerced, or retaliated against players).  The Court finds that the undisputed circumstances of Mr. Pampoulov's interactions with Mr. Shelton and Mr. Zverev are potentially coercive in nature.  Mr. Pampoulov, pen in hand, sought out these players while they were passing by on their way to private areas (*e.g.*, the locker room and a private suite) to rest or prepare for the Miami Open, and simultaneously presented the position statement, while optional and less urgent, alongside the Grand Slams letter, a seemingly important or even required document for top players to sign related to those major tournaments. Moreover, ATP's suggestion that because they are a member organization and putative class member players are members of ATP, their communications with player-members about this litigation and its potential effects on ATP cannot be improperly coercive is specious and again ignores the overall circumstances of the relationship. *See* Tr. 15–16; ATP Post-Hearing Br. at 3–4 (contrasting ATP with PTPA, described as "a self-anointed 'advocacy' group with no members'"). The argument is akin to suggesting that because a person is a voter and a taxpayer in a given town, that person cannot, as a legal matter, be coerced or intimidated by the actions of a local elected official or a member of the taxpayer-funded police force, and is similarly absurd.

In light of the totality of the circumstances—including putative class members' susceptibility to economic coercion and the tendency of ATP's conduct to date to discourage

players from participating in this action or sow confusion about players' legal right to participate in this action—the Court finds that a narrowly tailored order restricting ATP's communications with putative class members, to the extent they involve direct or indirect efforts to retaliate or threaten retaliation against players who support or participate in this action, can balance "the need for a limitation and the potential interference with the rights of the parties." *See Gulf Oil Co.*, 452 U.S. at 101.

## III.   PLAINTIFFS' PROPOSED RELIEF IS OVERLY BROAD

While Plaintiffs have sufficiently shown that they are entitled to some relief under Rule 23(d), the Court finds that Plaintiffs' requested order is overbroad to the extent the order would enjoin <u>all</u> Defendants, as opposed to just ATP, the sole defendant about which Plaintiffs allege any facts and the witnesses at the hearing testified. *See* Mot. at 1 ("We write concerning improper communications made by, at least, Defendant ATP Tour, Inc."). Further, the Court finds a more limited prohibition on retaliation or threats of retaliation, along with a corrective notice addressing past actions, would sufficiently protect the putative class and the fair administration of this action. Plaintiffs have not established that their additional requests for relief are warranted.

*First*, the Court finds that a wholesale prohibition on ATP from communicating with its members about any aspect of their participation or involvement in this action would not be narrowly tailored to prevent the abuses alleged by Plaintiffs. The cases cited by Plaintiffs— *Kleiner* and *Urtubia*—are distinguishable. In *Kleiner*, the Eleventh Circuit upheld the district court's ban on opt-out solicitations, reasoning that the class at issue, which consisted of defendant-bank borrowers, "were dependent on the [defendant-bank] for future financing." 751 F.2d at 1202. Similarly, in *Urtubia*, the court enjoined defendants from communicating with any

24

putative class member regarding the lawsuit where there was record evidence that (i) the plaintiff and others similarly situated were forced by the defendants to sign sworn affidavits about the lawsuit; and (ii) the defendants had threatened to report a potential co-plaintiff, who was an undocumented alien, to immigration authorities for possible deportation. 857 F. Supp. 2d at 484–85.

Here, while Plaintiffs have established that putative class members, who are also members of ATP, are financially dependent on ATP in numerous ways, the position statement circulated by ATP is dissimilar in nature and effect from the opt-out solicitation in *Kleiner* and the sworn affidavits in *Urtubia*. If a putative class member signs the ATP position statement, that is not binding on that member's ability to later opt in to the class, should a class be certified, or to otherwise participate in this action should he later change his mind. In any event, a corrective notice is sufficient to address any lingering improper effects of the position statement.

Further, while there is some record evidence supporting a finding that players fear retaliation by ATP if they participate in this action, *see* Tr. 72, there is no substantiated evidence of any specific act of retaliation or threat of retaliation by Mr. Pampoulov or any ATP representative or agent. *See* Tr. 48 (ATP establishing on cross-examination of Mr. Pospisil that he does not recall receiving a written communication from a player who has explicitly said they fear retaliation by ATP, and he does not have first-hand knowledge of communications between ATP and players regarding this lawsuit); ATP Post-Hearing Br. at 1–2. Rather, the fear of retaliation appears to be a generalized concern, given players' relationship with ATP and ATP's clear opposition to this litigation. *Cf. Urtubia*, 857 F. Supp. 2d at 485 (evidence of a defendant specifically threatening to have a potential plaintiff reported to immigration authorities and possibly deported). At the hearing, Mr. Pospisil testified regarding "a long process of spreading

fear, retaliation, [and] what could happen if [a player is] even associated with PTPA, *see* Tr. 41–42, and regarding (i) a conversation with Mr. Opelka, who expressed concern over losing his pension because of his participation as a co-plaintiff in this lawsuit and (ii) conversations with other players who heard that players' pensions and prize money would be affected by the expenses ATP would incur in defending this lawsuit. *See* Tr. 45 (testimony of Mr. Pospisil), 82–83 (testimony of Mr. Opelka); *but see* Tr. 49–50 (ATP establishing on cross-examination of Mr. Pospisil that he is not aware of any player losing their benefits because they were a member of PTPA).

Plaintiffs' purported need for a wholesale limitation on communications by ATP is undercut by the lack of evidence showing actual purposeful misconduct by ATP, whereas a prohibition of all communications with players regarding this action would harm the ability of ATP's Board or ATP's Player Advisory Council to permissibly discuss and respond to this litigation in lawful ways. *See* Tr. 128–30 (testimony of Mr. Pampoulov regarding his view that certain allegations in the complaint are inaccurate, misleading, or incomplete, which he would want to express to players); ATP Post-Hearing Br. at 4–5. For example, decisions made by ATP's Board regarding the position or strategy it takes with respect to this action necessarily require communications with director-players that could be putative class members and would likely require communications with players writ large.[7] *See* Tr. 114 (testimony of Mr. Pampoulov regarding his role in soliciting feedback from players and the Player Advisory Council on ATP Board decisions). Thus, while a prohibition on all communications between

---

[7] Plaintiffs' request for a prohibition of all communications is complicated by the fact that putative class members hold various official positions at multiple levels of governance within ATP. There would not be a clear bright line between prohibited and otherwise permissible communications with a player who is also an ATP officer of some kind, such as a member of the Player Advisory Council.

ATP and putative class members is not warranted, the Court finds a prohibition on retaliation or threats of retaliation by ATP, as similarly ordered by Chief Judge Swain in *Urtubia*, would be sufficient and narrowly tailored relief.

*Second*, the Court also finds that requiring ATP to disclose all prior communications with putative class members is unwarranted and premature. Imposing these conditions on ATP would not serve to protect the putative class, and the record does not support this heightened level of judicial supervision. "There is no way to completely eliminate the potential for coercion in the relationship between [ATP] and its [members]." *See Ralph Oldsmobile, Inc.*, 2001 WL 1035132, at *6. This Court has previously declined to interpose itself in business relationships such as those between putative class members and ATP. *See, e.g.*, *id.* ("Courts cannot simply interpose themselves in the business relationship between a franchisor and its franchisees each time a franchisee files a putative class action against the franchisor."). However, the Court will direct ATP to preserve all communications related to their efforts to communicate with players about this litigation, which may already be covered by an appropriate litigation hold.

Accordingly, the Court finds that an order prohibiting retaliation or threats of retaliation (whether direct or indirect), and issuing a corrective notice to the putative class members in this action will provide a reasonable and appropriate measure of protection to putative class members and to the fairness and integrity of this litigation. *See, e.g.*, *id.*; *Urtubia*, 857 F. Supp. 2d at 485 (prohibiting defendants from retaliating, or threatening retaliation, directly or indirectly, against any potential class member for considering or asserting claims related to the lawsuit); *Zamboni*, 2013 WL 978935, at *4 ("The appropriate remedy, then, is to require notice alerting employees that they have not waived any FLSA rights, and to extend the period within which, armed with

that knowledge, employees may opt in to this lawsuit.  No broader proscription on the defendants' communications with their employees is warranted.").

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART Plaintiffs' motion to the extent that (1) Defendant ATP is hereby prohibited from retaliating, or threatening retaliation, directly or indirectly, against any putative class member who is a member of ATP, for considering participating in or ultimately deciding to participate in this action; (2) Defendant ATP is directed to distribute the Court's attached corrective notice to all putative class members who are members of ATP informing them (i) of the existence of this action; (ii) that they have not waived any right to participate in this action by virtue of signing the ATP position statement, which has no legal effect on their status as potential class members; and (iii) that ATP is prohibited from retaliating, or threatening retaliation, directly or indirectly, against any putative class member for considering participating in or ultimately deciding to participate in this action; and (3) Defendant ATP is ordered to preserve all communications related to their efforts to communicate with players about this litigation.  No later than 7 business days from the date of this Order, Defendant ATP shall file a letter confirming it has distributed the corrective notice to all putative class members who are members of ATP.

The Clerk of Court is respectfully directed to terminate Dkt. No. 20.

Dated: May 7, 2025
      New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge