# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VASEK POSPISIL, NICHOLAS KYRGIOS, ANASTASIA RODIONOVA, NICOLE MELICHAR-MARTINEZ, SAISAI ZHENG, SORANA CÎRSTEA, JOHN-PATRICK SMITH, NOAH RUBIN, ALDILA SUTJIADI, VARVARA GRACHEVA, TENNYS SANDGREN, and REILLY OPELKA, individually and on behalf of all others similarly situated,<br><br>-and-<br><br>THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION<br><br>              Plaintiffs,<br>v.<br>ATP TOUR, INC., WTA TOUR, INC., INTERNATIONAL TENNIS FEDERATION LTD., and INTERNATIONAL TENNIS INTEGRITY AGENCY LTD.,<br><br>              Defendants. | Civil Action No. 1:25-cv-02207-MMG<br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## INTERNATIONAL TENNIS INTEGRITY AGENCY'S MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

PLAINTIFFS' ALLEGATIONS ........................................................................................... 1

LEGAL STANDARD.............................................................................................................. 4

ARGUMENT .......................................................................................................................... 6

I.    Claims Based on a Shared Monopsony Theory are Not Cognizable................................... 7

II.   Plaintiffs Fail to Plausibly Allege That the ITIA Conspired with Defendants. .................. 9

    a.    Plaintiffs Fail to Plead Direct or Indirect Evidence that the ITIA Conspired to Commit an Illegal Act. ......................................................................................... 10

    b.    Plaintiffs Fail to Plead that the ITIA Was Involved In, Much Less Plead Direct or Indirect Evidence that the ITIA Conspired to Commit, Five of the Six Acts Alleged in Counts VII and VIII. .......................................................................... 11

        i.    No Involvement of the ITIA in Allegedly Fixing Wages. ......................... 11

        ii.   No Involvement of the ITIA in Allegedly Fixing the Number of Tournaments in Which Players Must Participate. ....................................... 12

        iii.  No Involvement of the ITIA in Allegedly Fixing the Number of Tournaments in the Alleged Market or Imposing Non-Competes on Tournaments. .............................................................................................. 13

        iv.   No Involvement of the ITIA in Allegedly Imposing Arbitration or Waiver Provisions on Players. ........................................................................... 13

    c.    Plaintiffs Fail to Plead Direct or Indirect Evidence that the ITIA Conspired to Conduct Allegedly Abusive and Arbitrary Investigations................................... 15

        i.    Plaintiffs Fail to Allege Direct or Indirect Evidence that the ITIA Agreed to Use Its Investigative Authority to Harass Players Deemed a Threat. ......... 16

        ii.   Plaintiffs' Complaint Reflects the Independence of the ITIA's Investigations. ........................................................................................... 19

III.  Plaintiffs Fail to Allege Anticompetitive or Exclusionary Conduct From Which the Court Can Infer Specific Intent to Monopsonize. ....................................................................... 21

IV.   Plaintiffs Fail to Plausibly Allege Antitrust Injury as to the ITIA.................................... 24

CONCLUSION....................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*AD/SAT, a Div. of Skylight Inc. v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ......................................................................... 5, 14, 18

*All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*,
  596 F. Supp. 2d 630 (E.D.N.Y. 2009) ...................................................................... 5

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ................................................................................................ 17

*Am. Tobacco Co. v. United States*,
  328 U.S. 781 (1946) .................................................................................................. 6

*Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*,
  No. 22-cv-10361 (PKC), 2024 U.S. Dist. LEXIS 198687 (S.D.N.Y. Mar. 26, 2024) .............. 24

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ................................................................................................ 24

*B&R Supermarket, Inc. v. Visa, Inc.*,
  No. 17-CV-2738 (MKB), 2024 U.S. Dist. LEXIS 170400 (E.D.N.Y. Sept. 27, 2024) .............. 9

*Bassett v. NCAA*,
  528 F.3d 426 (6th Cir. 2008) .............................................................................. 25, 26

*Bassett v. NCAA*,
  No. 5:04-425-JMH, 2005 U.S. Dist. LEXIS 17570 (E.D. Ky. May 3, 2005) ......................... 26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 5, 10, 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ...................................................................................... 6, 24, 25

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ................................................................................... 10

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
  129 F.3d 240 (2d Cir. 1997) ..................................................................................... 4

*Fort Wayne Telsat v. Ent. & Sports Programming Network*,
  753 F. Supp. 109 (S.D.N.Y. 1990) ......................................................................... 20

*Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*,
  697 F.3d 59 (2d Cir. 2012) .................................................................................... 19

*Gatt Commc'ns., Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ...................................................................................... 6

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
  58 F. Supp. 2d 228 (S.D.N.Y. 1999) ...................................................................... 25

*H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989) ................................................................................... 7

*Heart Disease Rsch. Found. v. Gen. Motors Corp.*,
  463 F.2d 98 (2d Cir. 1972) .................................................................................... 20

*IHS Dialysis v. Davita, Inc.*,
  No. 12 Civ. 2468 (ER), 2013 U.S. Dist. LEXIS 47532 (S.D.N.Y. Mar. 31, 2013) ................. 21

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014) .................................................................................. 22

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
  No. 21-cv-00351 (GHW) (VF), 2023 U.S. Dist. LEXIS 133589 (S.D.N.Y. July 31, 2023) .... 22

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) .................................................................. 17

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir.2010) ................................................................................... 15

*In re Int. Rate Swaps Antitrust Litig. (Swaps I)*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..................................................................... 10

*In re Tether & Bitfinex Crypto Asset Litig.*,
  576 F. Supp. 3d 55 (S.D.N.Y. 2021) ........................................................................ 7

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) ............................................................. 4, 6, 7, 9, 21

*Int'l Distrib. Cts., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) .................................................................................. 21

*Invamed, Inc. v. Barr Lab'ys, Inc.*,
   22 F. Supp. 2d 210 (S.D.N.Y. 1998) ............................................................................ 5, 14

*Mayor & City of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ............................................................................... 10, 15, 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ......................................................................................................... 9, 14

*Neimann v. Carlsen*,
   No. 4:22-cv-01110-AGF, 2023 U.S. Dist. LEXIS 110089 (E.D. Mo., Jan. 3, 2023) .............. 26

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ................................................................................................ 22

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
   530 F. Supp. 3d 301 (S.D.N.Y. 2021) .................................................................................. 17

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
   507 F.3d 117 (2d Cir. 2007) ................................................................................................ 22

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007) ................................................................................................ 19

*Shak v. JPMorgan Chase & Co.*,
   156 F. Supp. 3d 462 (S.D.N.Y. 2016) .................................................................................... 5

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ............................................................................................. 26

*Tera Grp., Inc. v. Citigroup, Inc.*,
   2019 U.S. Dist. LEXIS 128107 (S.D.N.Y. July 30, 2019) ..................................................... 18

*Tera Grp., Inc. v. Citigroup, Inc.*,
   2024 U.S. App. LEXIS 26029 (2d Cir. 2024) ......................................................................... 5

*Tera Grp., Inc. v. Citigroup, Inc.*,
   No. 17-cv-4302 (RJS), 2023 U.S. Dist. LEXIS 143786 (S.D.N.Y. Aug. 14, 2023) .................. 5

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .......................................................................................... 10, 15

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*,
   502 F.3d 47 (2d Cir. 2007) .................................................................................................... 5

*Twombly v. Bell Atl. Corp.*,
    425 F.3d 99 (2d Cir. 2005) ................................................................................... 10, 15

*United States v. Borelli*,
    336 F.2d 376 (2d Cir. 1964) ........................................................................................ 9

*United States v. Chas. Pfizer & Co.*,
    245 F. Supp. 737 (E.D.N.Y. 1965) ............................................................................. 9

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ..................................................................................... 22

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ..................................................................................................... 6

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ..................................................................................................... 8

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) ....................................................................................... 21

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312 (2007) ..................................................................................................... 4

**Statutes**

15 U.S.C. § 1 ...................................................................................................................... 5

15 U.S.C. § 2 ......................................................................................................... 4, 5, 7, 9

**Other Authorities**

Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their
    Applications* (1999) ................................................................................................... 18

## INTRODUCTION

Plaintiffs' Complaint fails to plausibly allege an antitrust conspiracy as to the International Tennis Integrity Agency ("ITIA"). Nowhere in their 475-paragraph Complaint do Plaintiffs allege a single fact, much less plausibly allege, that the ITIA—an entity whose mission is to safeguard the integrity of professional tennis by overseeing the anti-doping and anti-corruption rules in accordance with the World Anti-Doping Agency and International Olympic Committee requirements on all international sports—entered into an agreement to monopsonize the market for men's and women's professional tennis players. Plaintiffs' claims against the ITIA for a "shared monopsony" is contrary to well-settled precedent. Plaintiffs do not (and cannot) allege that the ITIA is part of the alleged relevant market. Plaintiffs do not (and cannot) allege that the ITIA engaged in any anticompetitive or exclusionary acts. And Plaintiffs do not (and cannot) allege antitrust injury as a result of the ITIA's anti-doping and anti-corruption investigations in professional tennis. Plaintiffs' claims as to the ITIA amount to an objection as to the means and methods by which the ITIA carries out its mission, but grievances about testing protocols and procedures do not sound in antitrust. Plaintiffs' claims against the ITIA are misconceived and incurably flawed. The Complaint as to the ITIA should be dismissed with prejudice.

## PLAINTIFFS' ALLEGATIONS

Defendant ITIA is a not-for-profit corporation that "enforce[s] anti-doping and anti-corruption measures in professional tennis." Compl. ¶ 37. The ITIA was formed in 2021 to address, among other things, its predecessor's "failure to address allegations in match-fixing." *Id.* ¶ 91. The ITIA is governed by a "nine-member board," which consists of "five attorneys and business executives," as well as four other individuals comprised of "the executive director of the

Grand Slam Board, the chair of the WTA, the chief legal officer of the ATP, [and] the president of the ITF." *Id.* ¶ 93.

Plaintiffs are twelve current and former professional tennis players on the ATP and WTA Tours who are suing on behalf of themselves and three separate classes of "current, former, and future tennis players who compete in, or competed in" ATP, WTA, or ITF-"sanctioned tennis tournament[s]."[1]  Compl. ¶¶ 310–12.  Plaintiffs also include The Professional Tennis Players Association ("PTPA"), which purports to be "an association of men and women professional tennis players . . . [that] works to support, protect, and advance players' well-being."  *Id.* ¶ 33.

Plaintiffs allege two relevant markets.  They allege a "market for the services of men's professional tennis players," which consists of sellers—"individual male professional tennis players"—and buyers—the "ATP and the Tournament and Grand Slam Co-Conspirators."  Compl. ¶ 280.  They also allege a "market for the services of women's professional tennis players," which likewise includes sellers—"individual female professional tennis players"—and buyers—"the owners and producers of women's professional tennis events."  *Id.* ¶ 289.  Plaintiffs do not allege that the ITIA is a buyer or seller in either market.

Plaintiffs' Complaint is based on an alleged "concerted and interlocking scheme to dominate the market for the service of professional tennis players."  Compl. ¶ 114.  Their claims are based on allegations that the "Governing Body Defendants," which includes Defendants ATP, WTA, and ITF*, but not* ITIA, *id.* ¶ 50, have (1) "engage[d] in horizontal price-fixing by agreeing amongst themselves and with their Tournament and Grand Slam Co-Conspirators to fix the

---

[1] Plaintiffs seek to represent three classes of players—the "ITF Class," the "ATP Class," and the "WTA Class," which are defined as:  "All current, former, and future tennis players who compete in, or competed in, any [ATP/WTA/ITF]-sanctioned tennis tournament between the date of this Complaint through the date of final judgment in this matter."  Compl. ¶¶ 310–12.  As is evident from the definitions, the classes are not defined with any reference or link to the ITIA.

compensation that professional tennis players may earn in prize money and endorsement deals," *id.* ¶ 116; (2) "entered into horizontal agreements with and among their Tournament and Grand Slam Co-Conspirators to . . . institute[] barriers to entry that effectively prevent unsanctioned tournaments from entering the market and competing for these players' services," *id.* ¶ 160, (3) entered into "horizontal market allocation" agreements in the form of allegedly "illegal non-compete agreements" with the Tournament and Grand Slam Co-Conspirators, *id.* ¶ 218, (4) "abused their market dominance" through "improper data collection and resale practices," *id.* ¶ 267, and "compulsory agreements containing illegal and non-negotiable arbitration provisions and illegal compulsory waivers," *id.* ¶ 268.

Of the nine counts in Plaintiffs' Complaint, only Counts VII and VIII are directed at the ITIA. These counts allege a conspiracy to "acquir[e] and maintain[] for the ATP [and, separately, the WTA] and its Tournament and Grand Slam Co-Conspirators a monopsony in the global market for the services of male [and female] professional tennis players." Compl. ¶¶ 440–41, 455–56. As it pertains to the ITIA, Plaintiffs allege that "the Governing Body Defendants have used the ITIA and abused anti-corruption and anti-doping investigation processes to harass players they deem a threat to their illegal cartel." *Id.* ¶ 251. Plaintiffs further allege that the Governing Body Defendants are "able to unleash the ITIA[] . . . only because [of] their monopsony power," *id.* ¶ 259, and that "the ITIA looms above all Player Plaintiffs, the PTPA's members, and members of the Classes as a rogue enforcer with no leash," *id.* ¶ 325. Though Plaintiffs state that they "share . . . the goal of eradicating doping and match-fixing from the sport," they allege that the ITIA's actions

are "far more draconian and invasive than necessary to achieve [its] aims because the players have no competitor tour or tournaments to turn to as another option." *Id.* ¶ 258.

Plaintiffs' alleged "harm to the market" is that "ATP [or WTA], its Tournament Co-Conspirators, the ITF, and the Grand Slam Co-Conspirators control the market,"—*but not* the ITIA—allowing them to "dictate any changes to professional men's [and women's] tennis tournaments," "exclude alternative potential competitor tournaments," "depress . . . players' compensation," Compl. ¶¶ 298, 304, "compel player participation in an 11-month schedule," *id.* ¶¶ 300, 306, and "preclude[] certain existing tournaments . . . from competing" through non-compete clauses, *id.* ¶¶ 302, 308 (alleging, with respect to the WTA, that it "precludes *every* existing tournament . . . from competing" through non-compete clauses) (emphasis added). The ITIA is not mentioned in Plaintiffs' "harm to the market." *Id.* ¶¶ 298–309.

## LEGAL STANDARD

To survive a motion to dismiss, plaintiffs asserting a conspiracy to monopsonize under Section 2 of the Sherman Act must allege "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monop[sonize]." *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (describing elements of conspiracy to monopolize claim); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 322 (2007)

4

(citations omitted) (explaining that courts should apply similar legal standards for claims of monopolization to claims of monopsonization).

To plead concerted action, plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007);[2] *see also Transhorn, Ltd. v. United Techs. Corp.* (*In re Elevator Antitrust Litig.*), 502 F.3d 47, 50 (2d Cir. 2007); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 491 (S.D.N.Y. 2016); *Invamed, Inc. v. Barr Lab'ys, Inc.*, 22 F. Supp. 2d 210, 221 (S.D.N.Y. 1998). That is, the Complaint must "set forth sufficient facts to establish that the defendants . . . consciously committed themselves to a common scheme designed to achieve an unlawful objective.'" *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2023 U.S. Dist. LEXIS 143786 at *15–16 (S.D.N.Y. Aug. 14, 2023) (quoting *AD/SAT, a Div. of Skylight Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)), *aff'd*, 2024 U.S. App. LEXIS 26029 (2d Cir. 2024); *see also Zinc*, 155 F. Supp. 3d 337 at 386 (explaining plaintiffs must allege evidence that "push[es] their conspiracy allegations across the line from conceivable to plausible"). At the pleading stage, "each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose." *Zinc*, 155 F. Supp. 3d at 384. For this reason, "[m]ere generalizations as to any particular defendant—or even defendants as a group—are insufficient . . . Plaintiffs must be able to separately state a claim against each and

---

[2] Although Plaintiffs bring a Section 2 conspiracy claim, the same pleading standard for a Section 1 conspiracy claim applies in this context. *See, e.g., Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.),* 502 F.3d 47, 50 (2d Cir. 2007)) ("[O]ur precedents support application of *Twombly* to the conspiracy claims asserted under both Section 1 and Section 2."); *All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund,* 596 F. Supp. 2d 630, 642 (E.D.N.Y. 2009) (finding allegations insufficient to survive motion to dismiss Section 1 claim equally insufficient to survive Section 2 claim).

every defendant joined in th[e] lawsuit." *Id.* (dismissing complaint against defendant for "lack of any allegations of conspiratorial activity").

In addition, plaintiffs must allege facts from which the Court may infer that Defendants' "specific intent" was to harm competition and "enable or maintain a monop[sony] position in the relevant market." *Zinc,* 155 F. Supp. at 383. The requisite "specific intent" is the intent to exclude competition or control prices. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (defining monopoly power as "the power to control prices or exclude competition"); *see also Am. Tobacco Co. v. United States,* 328 U.S. 781, 789 (1946) (object of a combination or conspiracy to monopolize is "to exclude actual and potential competitors").

Finally, plaintiffs must also adequately plead "antitrust injury." That is, plaintiffs must plead an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Gatt Commc'ns., Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (citation omitted).

## ARGUMENT

Counts VII and VIII, which are directed at the ITIA, allege a conspiracy to "acquir[e] and maintain[] for the ATP [and, separately, the WTA] and its Tournament and Grand Slam Co-Conspirators a monopsony in the global market for the services of male [and female] professional tennis players." Compl. ¶¶ 440–41, 455–56. Plaintiffs' Complaint as to the ITIA is fatally flawed because the Second Circuit has rejected claims based on "shared monopsonies." But even if such a theory was possible, which it is not, Plaintiffs' claims against the ITIA fail to plausibly plead sufficient factual allegations to support that (1) the ITIA conspired with the Governing Body Defendants; (2) the ITIA engaged in exclusionary conduct with the specific intent to monopsonize

6

the alleged markets; or (3) the ITIA's alleged conduct caused antitrust injury. Plaintiffs' Complaint as to the ITIA should be dismissed with prejudice.

## I.      Claims Based on a Shared Monopsony Theory are Not Cognizable.

It is well settled that a "shared monopsony" theory cannot support a Section 2 claim. *See Zinc*, 155 F. Supp. 3d at 382 (citing *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (collecting cases)); *see also In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 100 (S.D.N.Y. 2021) (citation omitted). Yet this is precisely the claim Plaintiffs bring against the ITIA in Counts VII and VIII of the Complaint.

The alleged conspiracies to monopsonize set forth in Counts VII and VIII allege that Defendants "engaged in concerted action with the specific intent of acquiring and maintaining such monopsony power *for the ATP* [*and WTA*] *and its Tournament and Grand Slam Co-Conspirators*." Compl. ¶¶ 441, 456 (emphasis added). Indeed, throughout the Complaint Plaintiffs attribute the actions of the Governing Body Defendants and the Tournament and Grand-Slam Co-Conspirators to *their* "monopsony power."

Plaintiffs allege that "Defendants and their co-conspirators have formed a cartel, *acquired monopsony power* . . . and abused *their* power to the harm of players, the sport, fans, and competition." Compl. ¶ 3 (emphasis added). They further allege that the "Governing Body Defendants and the Tournament and Grand Slam Co-Conspirators flex *their monopsonistic market power* by agreeing to compel professional tennis players to participate in a grueling, never-ending season of tournaments." *Id.* ¶ 177 (emphasis added). And Plaintiffs claim that "[a]lthough the Governing Body Defendants may defend these scheduling changes as moves to satiate the appetites of tennis fans, they are able to impose them unilaterally only because *their monopsony power* relieves them of any worry that alternative tours or tournaments may compete for the players' services by offering less demanding schedules." *Id.* ¶ 183 (emphasis added). Indeed, they claim

that "the Governing Body Defendants are able to unleash the ITIA's abuse on professional tennis players in these ways only because [of] *their monopsony power*." *Id.* ¶ 259 (emphasis added).

The Counts, themselves, further expand on Plaintiffs' allegations and assert that the ITIA, itself, has shared monopsony power. *See, e.g.*, Compl. ¶ 442 ("Defendant ATP, Defendant ITF, Defendant ITIA, and their Tournament Co-Conspirators and Grand Slam Co-Conspirators have overtly acted to acquire and maintain *their* monopsony power . . . .") (emphasis added); ¶ 446 ("Defendants ATP, ITF, and ITIA act in concert to maintain *their* monopsony power . . . .") (emphasis added); ¶ 447 ("Defendants ATP, ITF, and ITIA act in concert to abuse *their* monopsony power . . . .") (emphasis added); ¶ 449 ("*Defendants'* unlawful monopsony") (emphasis added); ¶ 452 ("Defendants continue to engage in new overt acts to conspire to maintain *their* monopsony power. . . .") (emphasis added); ¶ 461 ("Defendants WTA, ITF, and ITIA act in concert to maintain *their* monopsony power. . . .") (emphasis added); ¶ 462 (Defendants WTA, ITF, and ITIA act in concert to abuse *their* monopsony power. . . .); ¶ 467 ("Defendants continue to engage in new overt acts to conspire to maintain *their* monopsony power. . . .") (emphasis added).

It is, of course, axiomatic that the ITIA does *not* have monopsony power in the alleged global markets for men's and women's professional tennis players as Plaintiffs do not (and cannot) allege that the ITIA is a participant in the relevant market. *See* Compl. ¶¶ 279–309; *see United States v. Grinnell Corp.*, 384 U.S. 563, 570–72, 576 (1966) (holding that whether a firm has monopoly power is contingent on its participation in the relevant market). The "buyers" in the alleged markets are the Tours and the Tournament and Grand-Slam Co-Conspirators. *See* Compl. ¶¶ 280, 289.

But even if the ITIA were a participant in the alleged relevant markets, which it is not, Plaintiffs' claims of a conspiracy to create a *shared* monopsony in those markets is squarely

foreclosed.  *See Zinc*, 155 F. Supp. 3d at 382 (citing *H.L. Hayden Co.*, 879 F.2d 1005, 1018)
(collecting cases and stating that courts "have repeatedly rejected the viability of a Section 2
conspiracy claim based on a shared monopoly theory"); *see also Tether*, 576 F. Supp. 3d at 100
(citation omitted).  For this reason, alone, Plaintiffs' claims against the ITIA must be dismissed
with prejudice.

## II.    Plaintiffs Fail to Plausibly Allege That the ITIA Conspired with Defendants.

Putting aside Plaintiffs' fatally flawed claim for a "shared monopsony," Plaintiffs' claims
against the ITIA also must be dismissed because Plaintiffs have failed to plausibly allege that the
ITIA "conspired" with the Governing Body Defendants.

"The gravamen of conspiracy is an *agreement* to commit *an illegal act*."  *United States v.
Chas. Pfizer & Co.*, 245 F. Supp. 737, 739 (E.D.N.Y. 1965) (emphasis added); *see also United
States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("[T]he gist of the [conspiracy] offense remains
the agreement, and it is therefore essential to determine what kind of agreement or understanding
existed as to each defendant.").   An agreement is a "conscious commitment" to "a common
scheme."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *see also Tera Grp.*,
2023 U.S. Dist. LEXIS 143786 at *15–16 (quoting *AD/SAT*, 181 F.3d at 234) ("[A] complaint
must set forth sufficient facts to establish that the defendants . . . 'consciously committed
themselves to a common scheme designed to achieve an unlawful objective.'"); *see also Am.
Tobacco Co. v. United States*, 328 U.S. at 810 (holding that agreement requires a "unity of purpose
or a common design and understanding, or a meeting of the minds," to pursue an "unlawful
arrangement.").

A plaintiff can allege an agreement through direct or indirect evidence, *see B&R
Supermarket, Inc. v. Visa, Inc.*, No. 17-CV-2738 (MKB), 2024 U.S. Dist. LEXIS 170400, at *39–
40 (E.D.N.Y. Sept. 27, 2024).   Direct evidence of a conspiracy is defined as "evidence that is

explicit and requires no inferences to establish the proposition or conclusion being asserted." *See In re Int. Rate Swaps Antitrust Litig. (Swaps I)*, 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017) (internal quotations omitted) (quoting *Burch v. Milberg Factors, Inc*., 662 F.3d 212, 225 (3d Cir. 2011)). "[T]his type of 'smoking gun' [evidence] can be hard to come by, especially at the pleading stage." *Mayor & City of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

In the absence of direct evidence, plaintiffs may allege "circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* (emphasis in original). A horizontal agreement or conspiracy "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). That is, allegations of parallel action "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Ordinarily, allegations of a common motive to conspire, acts against economic self-interest, or a high level of interfirm communications are expected. *See Citigroup*, 709 F.3d at 136 (citing *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds*, *Twombly*, 550 U.S. 544).

Plaintiffs' Complaint fails to clear either hurdle as to the ITIA.

### a. Plaintiffs Fail to Plead Direct or Indirect Evidence that the ITIA Conspired to Commit an Illegal Act.

Counts VII and VIII allege that the ITIA conspired with co-Defendants to monopsonize the alleged relevant markets as evidenced by agreements to (1) fix tennis players' wages, (2) fix the number of tournaments in which tennis players must participate, (3) fix the number of tournaments that are allowed to participate in their scheme, (4) require the Tournament Co-Conspirators to adhere to non-compete agreements, (5) impose allegedly illegal arbitration and waiver provisions on players, *see* Compl. ¶¶ 442, 457, and (6) require players to submit to the

ITIA's allegedly abusive and arbitrary investigations into doping and match-fixing, *see id.* ¶¶ 447, 462.  But even a cursory review of the Complaint demonstrates the absence of a *single* allegation reflecting direct or indirect evidence that the ITIA made a "conscious commitment" to "a common scheme" with any Defendant to monopsonize the market, much less that the ITIA was even involved in or agreed to the majority of the alleged acts underlying Plaintiffs' claims.

> **b. Plaintiffs Fail to Plead that the ITIA Was Involved In, Much Less Plead Direct or Indirect Evidence that the ITIA Conspired to Commit, Five of the Six Acts Alleged in Counts VII and VIII.**

Notwithstanding the fact that Plaintiffs spend 136 paragraphs of their Complaint on five of the six types of conduct underlying their conspiracy to monopsonize claim, nowhere is there a single allegation against, much less mention of, the ITIA.  *See* Compl. ¶¶ 116–242, 268–78.  Rather, these allegations rest on conduct involving *only* the Governing Body Defendants and the Tournament and Grand-Slam Co-Conspirators.

### i. No Involvement of the ITIA in Allegedly Fixing Wages.

Plaintiffs' claim that Defendants "artificially fix[] wages" for men's and women's professional tennis players is based on alleged conduct involving only the WTA, ATP, ITF, and non-party co-conspirators.  Compl. ¶¶ 442, 457.  It is not based on any conduct involving the ITIA.

Plaintiffs allege that "*Governing Body Defendants* have engineered and entered into agreements with and among their *Tournament Co-Conspirators* to fix the amount of prize money that each Tournament Co-Conspirator can offer to professional tennis players."  Compl. ¶ 118 (emphasis added).  Plaintiffs also claim that wages have been "fixed" based on alleged agreements restricting Players from being able to profit from their Name, Image, and Likeness ("NIL") rights

and sponsorships. *See id.* ¶¶ 142–46. Nowhere do Plaintiffs allege that the ITIA was involved in these alleged agreements.

For example, Plaintiffs allege, *inter alia*, that: (1) the *ATP and WTA* "have . . . agreed to limit the amount of prize money offered at each level of the Tour[s] to prevent tournaments of lower tiers from competing with higher-tier tournaments," Compl. ¶¶ 123, 128; (2) the *ATP and WTA* "have agreed *with each other, their Grand Slam Co-Conspirators*, and *Defendant ITF* to limit prize money for their respective tournaments," *id.* ¶ 133; (3) "Defendants *ATP, WTA, and the ITF* have agreed *with their Grand Slam Co-Conspirators* to stratify the prize awards such that no Tournament Co-Conspirator will pay players more money than their Grand Slam counterparts," *id.* ¶ 134 (emphasis added); and (4) "Defendant *ITF agrees with Defendants ATP and WTA* that tournaments on the ITF's men's and women's World Tennis Tours will abide by similar restrictions on the prize money they award," *id.* ¶ 136 (emphasis added). Similarly, Plaintiffs allege that "the *Governing Body Defendants* orchestrated and entered into agreements with and among their *Tournament Co-Conspirators* to require every player to assign their NIL rights to the Tours and the Tournament Co-Conspirators for use in media, advertisements, and promotion in exchange for $0," *id.* ¶ 142, and that "Defendants *ATP and WTA* . . . agree with one another to maintain and enforce this anticompetitive NIL assignment," *id.* ¶ 144 (emphasis added).

### ii. No Involvement of the ITIA in Allegedly Fixing the Number of Tournaments in Which Players Must Participate.

As with the wage fixing allegations, Plaintiffs' claim that Defendants conspired to "[l]ock [u]p the [m]arket," Compl. ¶ 160, is based entirely on alleged conduct involving only the Governing Body Defendants and the Tournament and Grand-Slam Co-Conspirators. Plaintiffs allege that the "*Governing Body Defendants* and their *Tournament and Grand Slam Co-Conspirators* have created a Ranking Points system and strict scheduling rules that work together

to dictate the terms under which players must play in order to pursue careers in professional tennis."
*Id.* (emphasis added).  Plaintiffs allege that "the *Governing Body Defendants* and their Tournament and Grand Slam Co-Conspirators design the Ranking Points system primarily to compel players to participate in their tournaments at the exclusion of other competitive tennis events."  *Id.* ¶ 172. Plaintiffs further allege that the "*Governing Body Defendants* and the Tournament and Grand Slam Co-Conspirators flex their monopsonistic market power by agreeing to compel professional tennis players to participate in a grueling, never-ending season of tournaments, effectively foreclosing players from selling their labor to unsanctioned tournaments."  *Id.* ¶ 177.  Nowhere is the ITIA implicated in this alleged conduct.

### iii.  No Involvement of the ITIA in Allegedly Fixing the Number of Tournaments in the Alleged Market or Imposing Non-Competes on Tournaments.

Plaintiffs allege that the Governing Body Defendants have entered into "horizontal market allocation" agreements,  Compl. ¶ 218, by allegedly "restrict[ing] new tournaments from entering the Tours and Grand Slams," *id.* ¶ 220, and entering into alleged agreements with the Tournament and Grand Slam Co-Conspirators to "refrain from competing with each other within the same geographic area," *id.* ¶ 227.  There are no allegations that the ITIA participated in either of these alleged agreements.

### iv.  No Involvement of the ITIA in Allegedly Imposing Arbitration or Waiver Provisions on Players.

Plaintiffs allege that "the *Governing Body Defendants* have conspired to impose compulsory agreements containing illegal and non-negotiable arbitration provisions and illegal compulsory waivers upon the Player Plaintiffs and members of the Classes as a condition of participation and competition in the Tours."  Compl. ¶ 268 (emphasis added).  There are no

allegations that the ITIA is a party to these agreements, much less that they agreed with the Governing Body Defendants to "compel" players to enter into the agreements.

*    *    *

Given that Plaintiffs do not allege that the ITIA participated in *any* of the aforementioned conduct, Plaintiffs have failed to plausibly allege that the ITIA made a "conscious commitment" to a "common scheme" with the Governing Body Defendants to monoposonize the market as evidenced by that conduct. *Monsanto*, 465 U.S. at 764; *see also Tera Grp.*, 2023 U.S. Dist. LEXIS 143786 at *15–16 (internal quotations omitted) (quoting *AD/SAT v. Associated Press*, 181 F.3d at 234) (applying *Monsanto* when considering a motion to dismiss); *Invamed*, 22 F. Supp. at 221 (dismissing conspiracy claims as to particular defendants when complaint "present[ed] no facts that might establish any participation" by those defendants in the alleged agreement).

To the extent Plaintiffs attempt to salvage their claim against the ITIA by conclusory references to the ATP and WTA Rulebooks and Bylaws, that alone is insufficient. *See, e.g.*, Compl. ¶¶ 440, 455. Nowhere in the Complaint do Plaintiffs allege that the ITIA was a party to the ATP or WTA Rulebooks and Bylaws, is bound by them, or was otherwise involved in their creation. Rather, Plaintiffs allege only that the Tournament Co-Conspirators and players agree to be bound by the respective Rulebooks and Bylaws. *See* Compl. ¶¶ 72–73, 85–86. Thus, even if the Rulebooks and Bylaws were evidence of an agreement, it is clear that they are not evidence of an agreement as to the ITIA.

Nor do Plaintiffs allege any circumstantial evidence that the ITIA made a "conscious commitment" with co-Defendants to monopsonize the alleged markets. There are no allegations of parallel conduct. Nor could there be. The ITIA is not a participant in the relevant markets and has no authority over players' wages, the number and/or types of tournaments in which players

14

must compete, or any arbitration or non-compete agreements.  The ITIA's sole authority is "to investigate and discipline players for doping and corruption-related offenses."  Compl. ¶ 92.  And even if Plaintiffs had alleged parallel conduct, which they have not, Plaintiffs have failed to allege sufficient "plus factors."  *See Citigroup*, 709 F.3d at 136 (internal quotations omitted) (quoting *Todd*, 275 F.3d at 198).  There are no allegations that the ITIA has a "common motive to conspire" with the Governing Body Defendants or "acts against apparent individual economic self-interest" in conducting its investigations.  *Citigroup*, 709 F.3d at 136 (quoting *Twombly*, 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544).  Absent these allegations, Plaintiffs' have not—and cannot—allege the ITIA participated in a conspiracy to commit the acts alleged in this case.  *See id.* at 137 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)) ("[P]laintiffs relying on parallel conduct must allege facts that, if true, would establish *at least one* 'plus factor,' since plus factors are, by definition, facts that 'tend[] to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors.'" (alteration in original) (emphasis added)).

### c.  Plaintiffs Fail to Plead Direct or Indirect Evidence that the ITIA Conspired to Conduct Allegedly Abusive and Arbitrary Investigations.

The sole allegation relating to the ITIA's involvement in an alleged conspiracy to monopsonize the market for men's and women's professional tennis players relates to alleged "abusive and arbitrary investigations into doping and match-fixing." Compl. ¶ 447.  But, as with their other allegations, Plaintiffs' claim is doomed by its failure to allege any direct or indirect evidence regarding a "conscious commitment" between the ITIA and the Governing Body

Defendants concerning the use of the ITIA's investigatory authority to monopsonize the relevant markets.

      **i.** **Plaintiffs Fail to Allege Direct or Indirect Evidence that the ITIA Agreed to Use Its Investigative Authority to Harass Players Deemed a Threat.**

Plaintiffs baldly assert that "the Governing Body Defendants have used the ITIA and abused the anti-corruption and anti-doping investigation processes to harass players they deem a threat to their illegal cartels." *Compl.* ¶ 251. That is, Plaintiffs assert that the ITIA "is a tool deployed by Defendants' cartel against players to instill fear and compliance." *Id.* ¶ 257. But Plaintiffs fail to allege even a single fact supporting an agreement between the Governing Body Defendants and the ITIA to use its investigative authority into corruption and doping practices to "harass" or "instill fear and compliance" in players who allegedly threaten the cartel.

Nowhere in the Complaint do Plaintiffs allege direct evidence of an agreement between the ITIA and the Governing Body Defendants, let alone any one of the Governing Body Defendants individually, relating to the use of the ITIA's authority to enforce the Tennis Anti-Doping Program ("TADP") or the Tennis Anti-Corruption Program ("TACP"). For example, there are no allegations relating to any discussions, meetings, or calls between the ITIA and the Governing Body Defendants concerning such an agreement. *See Citigroup*, 709 F.3d at 136 (explaining that direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level"). Indeed, nowhere do Plaintiffs even assert that the ITIA entered into any "agreement," much less one concerning the use of their investigative authority to police the alleged cartel, with the Governing Body Defendants. To the contrary, Plaintiffs' Complaint underscores the independence of the ITIA and its investigations. For example, Plaintiffs allege that "the[] mandatory [TADP and TACP] programs are *overseen by the ITIA*," *Compl.* ¶ 244 (emphasis added), that "*ITIA . . . rejects players' requests* for insight into their

16

investigative process and reasoning for punishment," *id.* ¶ 245 (emphasis added), that "*ITIA . . . implemented* a 'filing failure' rule," *id.* ¶ 246 (emphasis added), that "*ITIA has unilateral discretion* to suspend a player,*" id.* (emphasis added), and that "*ITIA decided* to file a case . . . [and] . . . subjected the player* to" drug testing, *id.* ¶ 248 (emphasis added).

Nor do Plaintiffs allege facts supporting circumstantial evidence of an agreement.  While Plaintiffs point to the ITIA's board composition and the Governing Body Defendants' financial support of the ITIA, neither allegation standing alone will suffice.  First, Plaintiffs acknowledge, as they must, that the ITIA's board is dominated by five members that are *independent* of the Governing Body Defendants.  *See* Compl. ¶ 93 (describing that the ITIA's "nine-member board" consists of "five" unaffiliated "attorneys and business executives").  Thus, even if the Governing Body Defendants' membership on the ITIA's board were enough, which it is not, Plaintiffs have failed to allege how their minority representation on the Board evidences an agreement.  *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 336 (S.D.N.Y. 2021) ("'[A]llegations of overlapping board membership . . . indicate only an opportunity to conspire," and do not on their own provide plausible grounds to infer an agreement (citing *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1119 (N.D. Cal. 2012))).

Plaintiffs also categorically assert that the ITIA "operates under the control of," Compl. ¶ 93, and is "a tool deployed by," the Governing Body Defendants because the ITIA is "financially well supported by" them,[3] *id.* at ¶ 257 (internal quotations omitted).  But nowhere do Plaintiffs

---

[3] In this respect, Plaintiffs' Complaint is self-servingly inconsistent.  On the one hand, they allege—as they must to support an antitrust conspiracy claim—that the ITIA is an "economic actor separate and independent" from the Governing Body Defendants.  Compl. ¶ 439; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (explaining that concerted action, an essential element of conspiracy, consists of an agreement between separate economic actors pursing their own economic interests).  On the other hand, their claims against the ITIA are based on the notion that the ITIA "operates under the control" of the Governing Body Defendants and the Grand Slam

allege (nor could they) that the ITIA and the Governing Body Defendants agreed that financial support is provided in exchange for the ITIA's agreement to conduct "sham" investigations for the Governing Body Defendants.  That is, Plaintiffs have not, and cannot, allege that the financial relationship, itself, is evidence of a "conscious[] commitment" to achieve an unlawful objective. *See, e.g.*, *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 U.S. Dist. LEXIS 128107, at *33–45 (S.D.N.Y. July 30, 2019) (finding allegations that multiple defendants jointly owned a financial platform insufficient evidence that Defendants "consciously committed themselves to a common scheme designed to achieve an unlawful objective" (quoting *AD/SAT*, 181 F.3d at 234)).

Indeed, to find that a financial relationship between an organization and its members constitutes plausible evidence of concerted action would contradict analogous precedent regarding trade associations.  Courts in the Second Circuit have found that, despite close ties (including financial ties) among members, not every action by a trade association is concerted action by the association's members.  *AD/SAT*, 181 F.3d at 234.  In evaluating antitrust conspiracy claims, courts concern themselves with "improprieties reducing competition among the members [of trade associations] or with their competitors," not the "day-to-day operations of the organization." *Id.* at 234 (quoting 7 Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Applications* ¶ 1477, at 347 (1999)).  Here, Plaintiffs have alleged no facts that indicate the aforementioned funding does anything but support the day-to-day operations of the ITIA.

To the contrary, Plaintiffs acknowledge that the ITIA was formed as a "new organization" to address issues with prior enforcement of the TACP, Compl. ¶ 91, and later assumed responsibility for the TADP, *see id.* at ¶ 92.  And as reflected in the correspondence referenced in

---

Board, Compl. ¶ 93, and that its investigations are a "tool deployed by Defendants' cartel," *id.* ¶ 257.

the Complaint,[4] *see id.* ¶ 256, the ITIA is operationally and legally independent of its members with respect to investigations and enforcement. As discussed below, Plaintiffs' allegations confirm this.

### ii. Plaintiffs' Complaint Reflects the Independence of the ITIA's Investigations.

Plaintiffs attempt to illustrate the alleged "abusive and arbitrary investigations" by detailing incidents involving seven players. Compl. ¶ 247–55. But far from bolstering Plaintiffs' claim that the ITIA has "conspired" with the Governing Body Defendants to use its authority to "harass" or "instill fear and compliance," Plaintiffs' illustrative allegations further underscore the independence of the ITIA's investigations and undermines any notion that the ITIA acted based on a "conscious commitment" to a "common scheme" with an unlawful objective. None of the investigations involve sufficient allegations that they were conducted by the ITIA in agreement with, or at the behest of, the Governing Body Defendants, much less that they were conducted because the player was a "threat" to the alleged cartel.

- Plaintiffs allege that a player was "indefinitely suspended" based on an ITIA investigation. Compl. ¶ 247. But Plaintiffs assert no allegations that the ITIA's investigation and suspension of this player was conducted as a result of an agreement between the ITIA and the Governing Body Defendants or that the player was a "threat" to the alleged cartel.

- Plaintiffs allege that the ITIA "decided to file a case against" a player for "match-fixing" and was later "interrogated" and "subjected" to multiple blood tests by the ITIA. Compl. ¶ 248. But Plaintiffs assert no allegations that the ITIA's decision to file a case against the player or any subsequent interrogation or testing of the player was conducted at the behest of or in agreement with the Governing Body Defendants or that the player was a "threat" to the alleged cartel.

- Plaintiffs allege that Jakub Mensik was "interrupted" during a match and "forced" to undergo drug testing. Compl. ¶ 249. There are no allegations, however, that the ITIA's

---

[4] "Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 63 n.4 (2d Cir. 2012) (internal quotations omitted) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

actions were done as a result of an agreement with the Governing Body Defendants or in response to actions deemed to be a "threat" to the cartel.

- Plaintiffs allege that Plaintiff JP Smith was "required" to take a blood test at the Australian Open. Compl. ¶ 251–53. But Plaintiffs do not allege that the drug test was done at the behest of or in agreement with the Governing Body Defendants or that, at the time of the alleged testing (or even now), JP Smith was a "threat" to the cartel.

- Plaintiffs allege that the ITIA's decision to permit Jannik Sinner to compete in the 2024 U.S. Open is evidence that the ITIA's investigations are "arbitrary and selective," but nowhere do Plaintiffs allege that the ITIA's decision was because of an agreement it had with the Governing Body Defendants or that the ITIA's decision was made in consultation with the Governing Body Defendants. Compl. ¶ 254.

- Plaintiffs allege that Marco Trungelliti's case demonstrates how the ITIA "fails to protect" players, but do not explain how these allegations relate to allegedly "abusive and arbitrary investigations" to "harass players they deem a threat to their illegal cartels" or that any of the actions complained of were the result of an agreement between the ITIA and the Governing Body Defendants. Compl. ¶ 255.

- Finally, Plaintiffs allege that a WTA player was targeted for speaking out about alleged "illegal, unfair, and anticompetitive economic practices." Compl. ¶ 250–253. But Plaintiffs fail—once again—to allege that the ITIA tested this player pursuant to any agreement with the Governing Body Defendants to "harass" such players. *Id.* ¶ 251. They simply assert, without more, that the WTA "sent the ITIA to test her" after they allege the "WTA set up . . . [the] player." *Id.* This type of "bare bones statement of conspiracy" does not suffice. *Fort Wayne Telsat v. Ent. & Sports Programming Network*, 753 F. Supp. 109, 113 (S.D.N.Y. 1990) (internal quotations omitted) (quoting *Heart Disease Rsch. Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972)).

In sum, Plaintiffs' allegations relating to specific ITIA investigations serve only to underscore the ITIA's independence from the Governing Body Defendants. While Plaintiffs complain about "seizing players' cellphones" and "blood and urine drug tests," Compl. ¶ 245, their allegations merely allege conduct that is integral to the ITIA's mission, which is to manage and enforce the anti-doping and anti-corruption programs to protect the integrity of the sport. "Allegations merely consistent with unilateral action are insufficient" to support a conspiracy

claim. *Zinc*, 155 F. Supp. 3d at 366) (collecting cases). Indeed, Plaintiffs "share" ITIA's "goal of eradicating doping and match-fixing from the sport." Compl. ¶ 258.

*    *    *

Having failed to allege *any* facts supporting a "conscious commitment" by the ITIA to an illegal "common scheme" with the Governing Body Defendants to monopsonize the market for men's and women's professional tennis, much less any of the conduct underlying Plaintiffs' claims, Plaintiffs' Complaint as to the ITIA must be dismissed.

### III. Plaintiffs Fail to Allege Anticompetitive or Exclusionary Conduct From Which the Court Can Infer Specific Intent to Monopsonize.

Plaintiffs' claims against the ITIA also fail because Plaintiffs have not plausibly alleged that ITIA had the specific intent to monopsonize the alleged markets. *Zinc*, 155 F. Supp. 3d at 382 ("The specific intent to monop[sonize], rather than the power to exclude competitors, is the key element of a conspiracy to monop[sonize] claim."); *Int'l Distrib. Cts., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795–96 (2d Cir. 1987) (same). Plaintiffs must plead specific intent as to each defendant. *See IHS Dialysis v. Davita, Inc.*, No. 12 Civ. 2468 (ER), 2013 U.S. Dist. LEXIS 47532, at *28 (S.D.N.Y. Mar. 31, 2013) (granting Defendant's motion to dismiss Plaintiffs' conspiracy to monopolize claim when Plaintiffs' allegations related only to another defendant's intent to achieve a monopoly). In the absence of direct evidence of a defendant's intent to exclude competition, which can be difficult to obtain, a court may infer "specific intent" from allegations that the defendant engaged in anticompetitive or exclusionary conduct. *See, e.g.*, *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988); *In re Amazon.com, Inc. eBook*

21

*Antitrust Litig.*, No. 21-cv-00351 (GHW) (VF), 2023 U.S. Dist. LEXIS 133589, at *64 (S.D.N.Y. July 31, 2023).

Anticompetitive conduct is "conduct *without a legitimate business purpose* that makes sense only because it *eliminates competition*." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (emphasis added) (internal citations omitted) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)), *corrected*, 754 F.3d 128 (2d Cir 2014). Put another way, to constitute anticompetitive or exclusionary conduct, a challenged practice must "bar a substantial number of rivals or severely restrict the market's ambit." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).

As described above, the only conduct the ITIA allegedly engaged in is subjecting players to "abusive and arbitrary investigative processes." Compl. ¶ 244. Plaintiffs have failed to allege that this conduct is anticompetitive or exclusionary for at least two independent reasons.

First, Plaintiffs do not (and cannot) allege that the ITIA's mission lacks a legitimate business justification. Indeed, they admit that they "share with Defendants the goal of eradicating doping and match-fixing from the sport." Compl. ¶ 258. Rather, they take issue with "interrupting players mid-match" to conduct a drug test and "confiscat[ing] players' personal devices without explanation" to investigate match-fixing allegations, referring to these actions as "measures that are far more draconian and invasive than necessary," *id.* ¶ 258, and the ITIA's alleged refusal to "articulate any procedural guardrails" or "procedural safeguards," *id.* ¶ 257.

Second, Plaintiffs have not alleged that the ITIA's allegedly "abusive and arbitrary investigative process" eliminates or harms competition. Indeed, Plaintiffs do not mention the ITIA or its investigative processes at all in the 12 paragraphs in which they explain how Defendants

have allegedly harmed competition in the relevant markets. *See* Compl. ¶¶ 298–309. As alleged by Plaintiffs, the anticompetitive conduct consists of the purported agreements between the Governing Body Defendants and the Tournament and Grand Slam Co-Conspirators. For example, Plaintiffs allege, *inter alia*, that the ATP and WTA Bylaws grant "licenses" to "tournament operators" to "join the Tours," without which "a tournament cannot take part in the market for the services of professional tennis." Compl. ¶ 219. Plaintiffs allege that "[b]y agreeing to limit events in proximity to each other, the Governing Body Defendants and their Tournament Co-Conspirators reduce the number of entities to which professional tennis players may sell their services in a given year." Compl. ¶ 233. And they allege that the Governing Body Defendants and their Tournament and Grand Slam co-conspirators "agree[] amongst themselves . . . to fix the compensation that professional tennis players may earn in prize money and in endorsement deals." Compl. ¶ 116.

By contrast, Plaintiffs do not allege that the ITIA's conduct in carrying out investigations conferred monopsony power on Defendants by excluding competition or controlling prices. Rather, Plaintiffs allege that the "abusive investigations" occurred because of the Governing Body Defendants' monopsony power which resulted from anticompetitive conduct alleged only against the Governing Body Defendants and the Tournament and Grand Slam Co-Conspirators. *See, e.g.*, Compl. ¶ 259 ("[T]he Governing Body Defendants are able to unleash the ITIA's abuse on professional tennis players . . . only because their monopsony power and their interlocking anticompetitive agreements . . . have removed any threat of a competitor professional tennis league that could peel players away . . . .").

Having failed to plausibly allege that the ITIA's conduct—its administration of the TACP and TADP to eradicate doping and match-fixing in tennis—constitutes anticompetitive or

exclusionary conduct, Plaintiffs have failed to allege the requisite specific intent necessary to sustain its conspiracy to monopsonize claims as to the ITIA.

## IV.    Plaintiffs Fail to Plausibly Allege Antitrust Injury as to the ITIA.

Plaintiffs' claims as to the ITIA also fail to adequately allege "antitrust injury."  In order to allege antitrust injury, a plaintiff must allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Brunswick*, 429 U.S. at 489.  Even if a plaintiff can demonstrate that its injury is "causally related to an antitrust violation," it "will not qualify as an 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

As a preliminary matter, Plaintiffs fail to allege antitrust injury as a result of the ITIA's investigations because they have failed to allege anticompetitive conduct.  *See supra* pp. 22–24. That is, Plaintiffs have failed to allege that the so-called "abusive and arbitrary investigative processes," which allegedly include "forc[ing] [Plaintiffs] into a playing environment where they have limited say and little control over their bodies," is itself anticompetitive.  Compl. ¶ 325.[5]  *See, e.g.*, *Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*, No. 22-cv-10361 (PKC), 2024 U.S. Dist. LEXIS 198687, at \*2, 23 (S.D.N.Y. Mar. 26, 2024) (Plaintiff's allegations that Defendants showed "bias" towards Plaintiff's competitors, while "harass[ing]" and imposing "onerous conditions" on Plaintiff, failed to reveal antitrust injury because such actions did not constitute anticompetitive conduct within a broader marketplace).  It necessarily follows that any "injury"

---

[5] Plaintiffs do not allege that the PTPA suffered any harm whatsoever at the hands of ITIA.  As such, it is impossible to undergo this injury analysis with respect to the PTPA.  For further argument regarding why the PTPA is not an efficient enforcer with respect to Plaintiffs' claims, s*ee* Memorandum in Support of Defendants' Motion to Dismiss the Professional Tennis Players Association, which is being filed contemporaneously herewith.

Plaintiffs suffered as a result of the allegedly "abusive and arbitrary investigations" does not "flow from" and is not "attributable to" anticompetitive conduct.

That aside, the alleged injuries stemming from the ITIA's investigations are not injuries "of the type the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489. While Plaintiffs detail alleged examples of the ITIA suspending players, searching their phones after being accused of match-fixing, and subjecting them to drug tests before or in the middle of matches, Compl. ¶¶ 247–53, nowhere do Plaintiffs allege that these acts injured *competition*. The harm Plaintiffs allege they suffer at the hands of the ITIA—being "forced into a playing environment where they have limited say and little control over their bodies"—is entirely unrelated to the harm to competition asserted within the relevant markets: "exclud[ing] alternative potential competitor tournaments from entering the relevant market" and "depress[ing] players' compensation," for example. *Id.* ¶¶ 298–303, 304–09. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 245 (S.D.N.Y. 1999) ("[T]here is a critical disjunction between the injuries suffered by the [plaintiffs] and the injuries to the relevant market.")

At most, the "injury" players allegedly suffer as a result of the ITIA's investigations is individual, personal harm, which Courts frequently distinguish from competitive harms. The Sixth Circuit's opinion in *Bassett v. NCAA* is instructive. 528 F.3d 426 (6th Cir. 2008). Bassett, a football coach at the University of Kentucky, resigned due to alleged infractions of the National Collegiate Athletic Association's ("NCAA") rules. *Id.* at 429. He was later found guilty of the rules infractions, and the NCAA limited his ability to coach at other institutions. *See id.* Bassett filed suit against the NCAA, the Southeastern Conference ("SEC") and the University of Kentucky Athletic Association ("UKAA"), alleging that they conspired to prevent him from coaching at any NCAA member school. *See id.* Bassett further alleged that many other coaches had been "unfairly

investigated or sanctioned through NCAA's enforcement process" as well.  *Id.* at 434.  The district court dismissed Bassett's claim, finding there was no antitrust injury as Bassett alleged "only injury to Bassett," and failed to allege "any anticompetitive effect on an identifiable market, failed to allege any decrease in the supply or quality of coaching services, increase in cost of coaching services, or any harm to consumers resulting from his punishment." *Id.* at 431, 434 (citing *Bassett v. NCAA*, No. 5:04-425-JMH, 2005 U.S. Dist. LEXIS 17570, at *12 (E.D. Ky. May 3, 2005).  On appeal, the Sixth Circuit agreed.  *Bassett*, 528 F.3d at 434.  The Court found Bassett's injury did not result from "some anticompetitive purpose."  *Id.*  Rather, his Complaint "merely state[d] NCAA's actions have resulted in the unfair investigation and sanction of coaches denied due process."  *Id.  See also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1064 (9th Cir. 2001) (rejecting challenge to NCAA conference transfer rule because plaintiff "allege[d] nothing more than a personal injury to herself, not an injury to a definable market"); *Neimann v. Carlsen*, No. 4:22-cv-01110-AGF, 2023 U.S. Dist. LEXIS 110089 (E.D. Mo., Jan. 3, 2023), at *31 (finding no standing for a chess player who was expelled from a chess league following cheating, as "the injury allegedly resulting from the conspiracy is an injury to [Plaintiff] alone, not to competition within the Competitive Chess Market").

At heart, Plaintiffs allege that players are made to comply with the TADP and TACP, which the ITIA oversees and the administration of which the Named Plaintiffs do not like.  Whatever their grievance may be, it is not one redressable by the Sherman Act.  Absent allegations that Plaintiffs suffered "antitrust injury" as a result of the ITIA's investigations, Plaintiffs' claims against the ITIA fail.

**CONCLUSION**

For the foregoing reasons, the Complaint against the ITIA should be dismissed in its entirety with prejudice.

Dated: May 20, 2025                               Respectfully Submitted,


                                                  By: /s/ *Heather P. Lamberg*
                                                  **FRESHFIELDS US LLP**
                                                  Heather P. Lamberg (*pro hac vice*)
                                                  Jan Rybnicek
                                                  Constance Forkner
                                                  700 13th Street NW, 10th Floor
                                                  Washington, DC 20005
                                                  Telephone: (202) 777-4797
                                                  Fax: (202) 777-4555
                                                  Email: heather.lamberg@freshfields.com
                                                  Email: jan.rybnicek@freshfields.com
                                                  Email: constance.forkner@freshfields.com

                                                  *Counsel for International Tennis Integrity Agency Ltd.*

**WORD COUNT CERTIFICATION**

I, Heather P. Lamberg, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c) and Rule (II)(B)(2) of the Honorable Margaret M. Garnett's Individual Rules & Practices.  According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rules, there are 8378 words in the document.

/s/ *Heather P. Lamberg*
Heather P. Lamberg