## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, on behalf of themselves and all others similarly situated, | Civil Action No. 1:25-cv-02207-MMG |

-and-

The Professional Tennis Players Association,

                     Plaintiffs,

v.

ATP Tour, Inc., WTA Tour, Inc., International Tennis Federation Ltd., and International Tennis Integrity Agency Ltd.,

                     Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO COMPEL ARBITRATION
## <u>BY DEFENDANT INTERNATIONAL TENNIS FEDERATION LTD</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 2

    A.    ITF Is The Global Governing Body For Tennis............................................ 2

    B.    Plaintiffs Are An International Group Of Professional Tennis
        Players And An Associated Organization. ................................................... 3

    C.    Plaintiffs Seek To Allege That ITF Participated In A Global
        Antitrust Conspiracy Involving Players And Organizations
        Around The World. ..................................................................................... 3

    D.    To Compete For WTT Prize Money, The Player Plaintiffs Agreed
        To Be Bound By The IPIN Agreement and the ITF Constitution.............. 5

    E.    By Agreeing To The IPIN Agreement And ITF Constitution,
        Each Player Plaintiff Agreed With ITF To Refer Claims Such As
        These To CAS Arbitration, With Proceedings Conducted In English........ 9

    F.    The Rules of CAS Arbitration Delegate The Validity And Scope of
        The Arbitration Clause to the Arbitrator..................................................... 11

    G.    The Arbitration Agreements Are Governed by English Law. .................. 12

ARGUMENT ...................................................................................................... 12

    A.    The Player Plaintiffs Repeatedly Agreed To Resolve This Dispute
        By CAS Arbitration. ................................................................................. 14

    B.    This Case Falls Within The Scope Of The Agreement To Arbitrate........ 16

    C.    ITF's Arbitration Agreements Are Enforceable. ...................................... 18

    D.    The Validity And Scope Of The Arbitration Agreements Has
        Been Delegated To The Arbitrator ............................................................ 20

    E.    If PTPA Is Permitted To Bring Claims Belonging To Players,
        It Should Also Be Compelled To Arbitrate................................................ 22

    F.    Plaintiffs' Claims Against ITF Should Be Stayed In Their
        Entirety Pending Arbitration. .................................................................... 23

CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ............................................... 17

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ............................................... 16

*Contec Corp. v. Remote Sol., Co.*,
398 F.3d 205 (2d Cir. 2005)................................... 20, 21

*Davitashvili v. Grubhub Inc.*,
131 F.4th 109 (2d Cir. 2025) ............................... 18, 20

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) ...................................... 14

*Generali España de Seguros y Reaseguros, S.A. v. Speedier Shipping, Inc.*,
No. 22-1150, 2023 WL 3362839 (2d Cir. May 11, 2023) ....................................... 21

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ................................................... 20

*In re Currency Conversion Fee Antitrust Litig.*,
265 F. Supp. 2d 385 (S.D.N.Y. 2003) ..................... 19

*In re Universal Serv. Fund Tel. Billing Pracs. Litig.*,
No. 02-MD-1468, 2003 WL 21254765 (D. Kan. May 27, 2003)........................... 20

*Jung v. Ass'n of Am. Med. Colleges*,
300 F. Supp. 2d 119 (D.D.C. 2004) ..................... 19–20

*Kelly v. Kosuga*,
358 U.S. 516 (1959) ................................................. 20

*Kwik Ticket Inc. v. Spiewak*,
No. 20-cv-01201, 2022 WL 3446316 (E.D.N.Y. Aug. 17, 2022)........................... 24

*McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.,*
No. 14-CV-6633, 2015 WL 144190 (S.D.N.Y. Jan. 12, 2015) .......................... 22–23

*Merrill Lynch Inv. Managers v. Optibase, Ltd.,*
337 F.3d 125 (2d Cir. 2003) .................................................................... 22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ......................................................................... 12, 16

*Rent-A-Center, W., Inc. v. Jackson,*
561 U.S. 63 (2010) ............................................................................ 20

*Republic of Ecuador v. Chevron Corp.,*
638 F.3d 384 (2d Cir. 2011)............................................................... 12, 13

*Spinelli v. Nat'l Football League,*
96 F. Supp. 3d 81 (S.D.N.Y. 2015) ......................................................... 17

*Thomson-CSF, S.A. v. Am. Arb. Ass'n,*
64 F.3d 773 (2d Cir. 1995).................................................................. 22

## Rules and Statutes

9 U.S.C. § 1 ................................................................................... 12

9 U.S.C. § 3.............................................................................. 13, 23

9 U.S.C. § 206............................................................................ 13–14, 23

Fed. R. Civ. P. 44.1 ......................................................................... 12

## Other Authorities

English Arbitration Act 1996 ............................................................. 13, 21

*Enka Insaat Ve Sanayi AS* v *OOO Insurance Company Chubb,*
[2020] UKSC 38 (appeal taken from Eng.).............................................. 13

*Parker-Grennan v. Camelot UK Lotteries Ltd.,*
[2024] EWCA (Civ) 185 (Eng.) ............................................................ 14

The International Tennis Federation ("ITF") moves pursuant to 9 U.S.C. §§ 3 and 206 for an order staying these proceedings against ITF in light of its agreement with Plaintiffs to submit claims such as these to the Court of Arbitration for Sport ("CAS").

## PRELIMINARY STATEMENT

Plaintiffs in this case hail from eight different countries and they, and the Professional Tennis Players Association ("PTPA"), bring this case against the ITF, the London-based global governing body for the sport of Tennis. Plaintiffs are professional tennis players who participate in international competitions. They contend in this action that various activities by ITF and others violate the U.S. antitrust laws. But Plaintiffs have agreed—repeatedly, and pursuant to clear notice—that they will arbitrate such claims against ITF before the independent international body convened to resolve sports-related disputes: CAS.

That CAS is an appropriate forum for resolving their claims against ITF is confirmed by the actions Plaintiffs have taken in this case. Theirs is not purely a domestic dispute. Indeed, in addition to commencing proceedings here, Plaintiffs have filed complaints with the public competition authorities in the United Kingdom and the European Union and have served a letter before action threatening civil proceedings before the High Court of England and Wales. PTPA has publicly touted this multi-pronged international legal assault as "decisive legal action."[1]

---

[1] PTPA, *The PTPA and Tennis Players File Historic Legal Actions Against Governing Bodies Exposing Corrupt, Illegal, and Abusive System* (Mar. 18, 2025), available at https://www.ptpaplayers.com/legal-actions-filed/

Plaintiffs' Complaint in this case affirmatively acknowledges what ITF substantiates with this motion: that Plaintiffs agreed with ITF to arbitrate such claims. *See* Compl. ¶ 271. Now Plaintiffs seek to renege on their bargain by offering commonly made and often-rejected arguments. *See id.* ¶¶ 275–78. But their agreement is enforceable and should be enforced. Public policy both in this Country and in England (where ITF is based, and whose laws govern much of its relationship with Plaintiffs) favors the enforcement of international arbitration agreements. At the end of the day, it is the opposite of unconscionable for the world governing body for tennis to agree with thousands of international-level professional tennis players from around the world to arbitrate at an international forum established specifically to resolve sport-related disputes.

## **BACKGROUND**

### A.    **ITF Is The Global Governing Body For Tennis**

ITF is a Bahamas-registered, London-headquartered non-profit company that functions as tennis's global governing body and reinvests approximately 90% of its revenue into tennis development and other tennis activities. ITF works to develop and grow tennis around the globe, supporting its member national tennis associations and affiliated regional associations to help them put in place projects to develop the next generation of players. ITF also organizes six Tours, with over 3,000 events a year, across more than 60 countries, providing competitive opportunities for players of various ages and across various tennis variations: the World Tennis Tour Juniors, the Men's World Tennis Tour, the Women's World Tennis Tour, the World Tennis Masters Tour (formerly known as the ITF Seniors Tour), the UNIQLO Wheelchair

Tennis Tour, and the Beach Tennis World Tour. ITF is also responsible for the Davis, Billie Jean King, and Hopman Cups (respectively, annual international tournaments for men's, women's and mixed teams) together with other team and individual competitions; and organizes the tennis events at the Olympic and Paralympic Games on behalf of the International Olympic and Paralympic Committees.

**B.  Plaintiffs Are An International Group Of Professional Tennis Players And An Associated Organization.**

Plaintiffs are 12 current and retired professional tennis players (each player, a "Player Plaintiff") and the PTPA. Four of the 12 Player Plaintiffs hail from the United States of America, and the remaining eight collectively hail from seven foreign countries: Australia, Canada, China, France, Indonesia, Romania, and Russia. *See* Compl. ¶¶ 20–32. The PTPA, allegedly "an association of men and women professional tennis players," was cofounded by Player Plaintiff Vasek Pospisil, who currently sits on its executive committee alongside Player Plaintiff Saisai Zheng. *Id.* ¶¶ 33, 94. The Complaint suggests that other Player Plaintiffs have also served on the PTPA's executive committee. *See id.* ¶ 96.

**C.  Plaintiffs Seek To Allege That ITF Participated In A Global Antitrust Conspiracy Involving Players And Organizations Around The World.**

As described in ITF's Motion to Dismiss, which is being filed contemporaneously, plaintiffs' actual antitrust allegations against ITF are wafer thin. Most of plaintiffs' claims concern co-defendants. ITF does not organize or control the ATP Tour, WTA Tour, or any of the four Grand Slams that are the subject of Plaintiffs' allegations. Rather, the Complaint concedes that ITF's core functions include

determining the size of tennis balls and courts and organizing "the lowest-paying level of competition for both men and women aspiring to compete on the ATP and WTA Challenger Tours and eventually on the ATP and WTA Tours." Compl. ¶¶ 36, 136. This lowest-paying level of competition is called the ITF's Men's and Women's World Tennis Tour (ITF's "WTT"), which the Complaint accurately describes as "the *entryway* into a professional tennis career." *Id.* ¶ 136 (emphasis added); *see also id.* ¶ 61 (describing WTT as "a potential entry point into professional tennis tournaments"); *id.* ¶ 75 ("[M]ost players first compete in the ITF Men's World Tennis Tour before competing in the ATP Challenger Tour."); *id.* ¶ 88 ("[M]ost players first compete in the ITF Women's World Tennis Tour before competing in the WTA Challenger Tour.").

Plaintiffs allege an antitrust conspiracy centered around the ATP Tour, WTA Tour, and Grand Slams (none of which ITF controls), but the heart of plaintiffs' relationship with ITF is their participation in the WTT. *See, e.g.,* Compl. ¶¶ 61, 75, 88, 136, 165, 282, 291, 346, 443, 458 (making allegations about ITF's WTTs). For example, plaintiffs allege that "[t]o the extent Defendant ITF's World Tennis Tour . . . also buy[s] the services of women's professional tennis players, the ITF's . . . conspiracy with Defendant WTA to monopsonize the market and agree to anticompetitive price-fixing, market allocation, group boycott, and output restriction restraints vests the WTA with market power in the market for the services of women's professional tennis players." *Id.* ¶ 291; *see also id.* ¶ 282 ("To the extent Defendant ITF's World Tennis Tour . . . also buy[s] the services of men's professional tennis

4

players," parallel allegation with respect to ATP); *id.* ¶ 136 (alleging prize money conspiracy between ITF's WTT and the ATP, ATP Challenger, WTA, and WTA Challenger tours); *id.* ¶ 458 (alleging ranking points conspiracy between ITF's WTT and WTA Tour); *id.* ¶ 443 (parallel allegation against ITF's WTT and ATP Tour).

### D.  To Compete For WTT Prize Money, The Player Plaintiffs Agreed To Be Bound By The IPIN Agreement and the ITF Constitution.

Each Player Plaintiff agreed to the IPIN Agreement (also known as the Player Welfare Statement) and the ITF Constitution. Since at least 2010, ITF has required that a player has an active IPIN annual membership to enter into a WTT tournament and compete for prize money. Declaration of Nicky John Fishpool ("Fishpool Decl.") ¶ 2. To purchase an annual IPIN membership on ITF's website, the player must click a button to agree to the IPIN Agreement. Declaration of Brendan Feeney ("Feeney Decl.") ¶ 2. Each Player Plaintiff agreed to the IPIN Agreement multiple times since 2010. *Id.* ¶ 3, Ex. 1. While there have been slight variations in the language and formatting used in the documents at different times, they have remained similar in all material respects.

The IPIN Agreement starts with a section titled "Agreements of the Player," in which the player declares that he or she is "aware of and will abide by" the WTT Regulations.[2] *Id.* ¶¶ 4(i), 5(i), Exs. 2–3. The WTT Regulations, in turn, have a Related

---

[2] Prior to 2019, the ITF WTT was known as the ITF Pro Circuit.  For simplicity, the ITF Pro Circuit Regulations will hereinafter be referred to as WTT Regulations.  The Men's WTT and Women's WTT each have a separate set of Regulations, which are published annually, and which shall be cited collectively as the WTT Regulations when parallel in all relevant respects. In those instances where they are not parallel, they will be referred to separately as Men's WTT Regulations and Women's WTT Regulations.  Additionally, when a document is referred

Regulations section that states "[t]o the extent not covered herein the Constitution of ITF Limited . . . shall be applicable to all [Men's and Women's] ITF World Tennis Tour Tournaments." *See* Fishpool Decl. ¶ 3 , Exs. 10–16 (2019–25 WTT Regulations § I.D); *accord* Fishpool Decl. ¶ 3, Exs. 7–9 (2016–18 WTT Regulations §§ I.A, I.B); Fishpool Decl. ¶ 3, Exs. 4–6 (2013–15 Men's WTT Regulations §§ A, B.17); Fishpool Decl. ¶ 3, Exs. 1–3 (2010–12 Men's WTT Regulations §§ A, B.16). The WTT Regulations and ITF Constitution have always been easily accessible on ITF's website. Declaration of Nowell Bamberger ("Bamberger Decl.") ¶ 3; Exs. 4–10. At the bottom of the IPIN Agreement webpage is a button that a player clicks in order to manifest their assent to the IPIN Agreement, the WTT Regulations, and through those Regulations the ITF Constitution. Feeney Decl. ¶¶ 4(ii), 5(ii), Exs. 2–3. The player must do so to proceed to the checkout page and complete their purchase of the IPIN membership required to compete for ITF WTT prize money. *Id.* Each Player Plaintiff did so multiple times. *Id.* ¶ 3, Ex. 1.

---

to as relating to a certain year, reference is being made to the year of the applicable WTT Tour, which run for a calendar year, but documents are typically published prior to the start of the calendar year.

**Figure 1.A** below is a screenshot of the beginning of the IPIN Agreement as it existed between 2010 and 2018. *Id.* ¶ 5, Ex. 3.

**<u>Figure 1.A</u>**



**Figure 1.B** below is the ending section of the IPIN Agreement as it existed between 2010 and 2018. *Id.*

**<u>Figure 1.B</u>**



As depicted in **Figure 1.B**, to proceed to the IPIN membership checkout page, a player must have ticked the "checkbox to indicate that [they] . . . have read and accept the IPIN Player Welfare Agreement" followed by pressing the 'Confirm' button, both at the bottom of the IPIN Agreement webpage that displayed the text of a CAS arbitration agreement. *Id* ¶ 5(ii)–(iii), Ex. 3.

 **Figure 2.A** below is a screenshot of the beginning of the IPIN Agreement as it has existed since 2019. *Id.* ¶ 4, Ex. 2.

<u>**Figure 2.A**</u>



**Figure 2.B** below is the ending section of the IPIN Agreement as it has existed since 2019. *Id.*

**Figure 2.B**



**Figure 2.B** reflects the fact that, to proceed to the IPIN membership checkout page, a player must have clicked the 'Accept' button rather than the 'Decline' button at the bottom of the IPIN Agreement webpage that displayed the text of a CAS arbitration agreement. *Id* ¶ 4(ii)–(iii), Ex. 2.

### E.    By Agreeing To The IPIN Agreement And ITF Constitution, Each Player Plaintiff Agreed With ITF To Refer Claims Such As These To CAS Arbitration, With Proceedings Conducted In English.

By agreeing to the IPIN Agreement and ITF Constitution, each Player Plaintiff agreed with ITF to arbitrate claims such as these. The IPIN Agreement and ITF Constitution (collectively, the "Arbitration Agreements") each include an agreement to refer disputes to CAS arbitration. As shown in **Figures 1.B** and **2.B** above, the IPIN Agreement includes a clear and conspicuous CAS arbitration provision on its face, just above the click-wrap buttons. Since 2010, the arbitration provision read as

follows:

> Save where the Rules and Regulations provide for another court or
> tribunal to have jurisdiction, the parties agree to refer any dispute
> arising out of or in connection with this Agreement to the Court of
> Arbitration for Sport for final and binding arbitration in accordance with
> the CAS Code of Sports Related Arbitration[.]

*Id.* ¶ 4(iii), Ex. 2; *id.* ¶ 5(iii), Ex. 3; *see also supra* **Figures 1.B** and **2.B.**

In addition to the arbitration agreement on its face, the IPIN Agreement also

incorporates the ITF Constitution's agreement to arbitrate at CAS and in English. As

explained above, the IPIN Agreement incorporates the ITF Constitution. The ITF

Constitution contains, as announced in its table of contents, a clear and conspicuous

arbitration agreement that "applies to any legal dispute of any kind arising . . .

between the company and any other individual . . . [who] is involved in any of the

circuits or competitions of the company." Fishpool Decl. ¶ 4, Ex. 18 (2024 ITF

Constitution Art. 33(a)); *accord* Fishpool Decl. ¶ 4, Ex. 17 (2010 ITF Constitution

Art. 33(a)); Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 30.1). The company

is defined as ITF Limited. Fishpool Decl. ¶ 4, Exs. 17–19 (ITF Constitution,

Memorandum of Association at I). The arbitration agreement specifies that "the

parties to the dispute will be deemed to have agreed to submit the dispute to the

Court of Arbitration for Sport in Lausanne, Switzerland ("CAS"), for resolution by

arbitration in accordance with the CAS code of sports-related arbitration, they shall

not bring any action or claim that conflicts with that submission to the jurisdiction of

the CAS[,] they shall be bound by the decisions of the CAS[, and] . . . the proceedings

to resolve the dispute shall be conducted in English." Fishpool Decl. ¶ 4, Ex. 18 (2024

ITF Constitution Art. 33(c)–(d)); *accord* Fishpool Decl. ¶ 4, Ex. 17 (2010 ITF Constitution Art. 33(a)); Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 31.1).

Since a 2019 update, the IPIN Agreement has made even clearer that it incorporates additional arbitration agreements, by specifically calling out such agreements in connection with the assent button. Feeney Decl. ¶ 4(i), Ex. 2; *see supra* **Figure 2.A** ("I acknowledge that the Rules and Regulations include provisions regarding how disputes are to be dealt with . . . and I agree . . . that such dispute shall be dealt with using arbitration (if that is specified).").

### F. The Rules of CAS Arbitration Delegate The Validity And Scope of The Arbitration Clause to the Arbitrator.

Each of the Arbitration Agreements explicitly incorporates the CAS rules, which empower an arbitrator to decide the threshold issue of the validity and scope of the arbitration agreement. The IPIN Agreement specifies "arbitration in accordance with the CAS Code of Sports Related Arbitration." The ITF Constitution similarly specifies "arbitration in accordance with the CAS code of sports-related arbitration." Fishpool Decl. ¶ 4, Ex. 18 (2024 ITF Constitution Art. 33(c)); *accord* Fishpool Decl. ¶ 4, Ex. 17 (2010 ITF Constitution Art. 33(a)); Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 30.2). Rule 39 of the CAS Code states, in relevant part, that "[t]he Panel shall rule on its own jurisdiction, irrespective of any legal action already pending before a State court or another arbitral tribunal relating to the same object between the same parties, unless substantive grounds require a suspension of the proceedings." *See* Bamberger Decl ¶ 4, Exs. 11–12.

**G.**     **The Arbitration Agreements Are Governed by English law.**

The IPIN Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of England and Wales." Feeney Decl. ¶ 4(iii), Ex. 2; *id* ¶5(iii), Ex. 3; *see also supra*, **Figures 1.B** and **2.B**. The ITF Constitution states that "[w]here the company is a party to a dispute, the governing law of the dispute shall be English law . . . ." *See* Fishpool Decl. ¶ 4, Ex. 18 (2024 ITF Constitution Art. 33(d)); *accord* Fishpool Decl. ¶ 4, Ex. 17 (2010 ITF Constitution Art. 33(c)); Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 31.1). Notice is hereby given of the relevance of foreign law, *see* Fed. R. Civ. P. 44.1, and English law authorities cited herein are annexed to the accompanying Declaration of Nowell Bamberger. Bamberger Decl. ¶ 2, Exs. 1–3.

## ARGUMENT

The arbitration agreements between the 12 Player Plaintiffs cover this dispute, are enforceable, and should be enforced. Because a party to its arbitration agreement should not be entitled to avoid that clear agreement by the artifice of enlisting an entity to pursue its claims on its behalf, the Court should also enforce the agreement to arbitrate against PTPA under principles of estoppel.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "That policy 'is even stronger in the context of international business transactions' where 'arbitral agreements promote[ ] the smooth flow of international transactions by removing the

threats and uncertainty of time-consuming and expensive litigation.'" *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (quoting *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir.1991)); *see also id.* ("[F]ederal policy favoring arbitration applies with 'special force in the field of international commerce[.]'" (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). As a result, courts should resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24–25).

To the extent that English law may apply to certain issues relevant to this motion, the same pro-arbitration policies apply. *See* English Arbitration Act 1996 § 1; *Enka Insaat Ve Sanayi AS* v *OOO Insurance Company Chubb* [2020] UKSC 38, [107] (appeal taken from Eng.) ("In a substantial majority of all jurisdictions, national law provides that international arbitration agreements should be interpreted in light of a 'pro-arbitration' presumption." (quoting Gary Born, International Commercial Arbitration 1403 (2nd ed. 2014)).

Pursuant to the FAA, "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration," and "the court in which such suit is pending" is "satisfied that the issue involved in such suit or proceeding is referable to arbitration," it "shall" stay the proceeding "until such arbitration has been had." 9 U.S.C. § 3; *see*

*also* 9 U.S.C. § 206 ("A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States.").

### A. The Player Plaintiffs Repeatedly Agreed To Resolve This Dispute By CAS Arbitration.

Under the standards followed both in New York and England, it is clear that each Player Plaintiff agreed to arbitrate with ITF because they provided their "unambiguous manifestation of assent" to the "clear and conspicuous" Arbitration Agreements. *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023); *accord Parker-Grennan v. Camelot UK Lotteries Ltd.* [2024] EWCA (Civ) 185, [26], [32], [51] (Eng.).

Here, when they were seeking to compete for WTT prize money, each Plaintiff Player repeatedly accepted the CAS arbitration provision on the face of the IPIN Agreement. Between 2010 and 2018, every Player Plaintiff assented to the IPIN Agreement by affirmatively ticking the checkbox that was below the clear and conspicuous text of a CAS arbitration agreement and that was adjacent to text stating that they should "[t]ick this checkbox to indicate that [they] . . . have read and accept the IPIN Player Welfare Statement"—and then they pressed the 'Confirm' button. Feeney Decl. ¶¶ 3–4, Exs. 1–2; *see also supra* Figure 1.B (showing that adjacent to checkbox and confirm button is text stating that "the parties agree to refer any dispute arising out of or in connection with this Agreement to the Court of Arbitration for Sport for final and binding arbitration"). Since 2019, Player Plaintiffs Vasek Pospisil, Saisai Zheng, Aldila Sutjiadi, Sorana-Mihaela Cirstea, Tennys Sandgren,

Noah Rubin, and Varvara Gracheva also assented to the IPIN Agreement by clicking the 'Accept' button rather than the 'Decline' button just beneath the clear and conspicuous text of a CAS arbitration agreement. Feeney Decl. ¶¶ 3, 5, Exs. 1, 3; *see also supra* Figure 2.B (showing that adjacent to 'Accept' or 'Decline' buttons is text stating that "the parties agree to refer any dispute arising out of or in connection with this Agreement to the Court of Arbitration for Sport for final and binding arbitration").

Similarly, when they were seeking to compete for WTT prize money, every Player Plaintiff repeatedly accepted the ITF Constitution's CAS arbitration provision. Since at least 2010, the ITF Constitution has contained a clear and conspicuous CAS arbitration agreement that is announced in its table of contents. *See* Fishpool Decl. ¶ 4, Exs. 17–18 (2010 and 2024 ITF Constitution Art. 33); Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 30.1). The IPIN Agreement put Player Plaintiffs on inquiry notice of the ITF Constitution because at the very top of the IPIN Agreement is a section titled "Agreements of the Player," in which the player declares that he or she is "aware of and will abide by" the WTT Regulations, which have a Related Regulations section that states that "[t]o the extent not covered herein the Constitution of ITF Limited . . . shall be applicable to all [Men's and Women's] ITF World Tennis Tour Tournaments." *See* Figure 1.A; Figure 2.A; Fishpool Decl. ¶ 3 , Exs. 10–16 (2019–25 WTT Regulations § I.D); *accord* Fishpool Decl. ¶ 3, Exs. 7–9 (2016–18 WTT Regulations §§ I.A, I.B); Fishpool Decl. ¶ 3, Exs. 4–6 (2013–15 Men's WTT Regulations §§ A, B.17); Fishpool Decl. ¶ 3, Exs. 1–3 (2010–12 Men's WTT Regulations §§ A, B.16). The WTT Regulations and ITF Constitution have always

been easily accessible on ITF's website. *See* Bamberger Decl. ¶ 3, Exs. 4–10. And since a 2019 update, the IPIN Agreement has made even clearer that it incorporates additional arbitration agreements, by specifically calling out such agreements in connection with the assent button. Feeney Decl. ¶ 4(i), Ex. 2; *see also* Figure 2.A ("I acknowledge that the Rules and Regulations include provisions regarding how disputes are to be dealt with . . . and I agree . . . that such dispute shall be dealt with using arbitration (if that is specified)."). Every Player Plaintiff, having been shown the "Agreements of the Player" section at the very top of the IPIN Agreement, proceeded to tick the "checkbox to indicate that [they] . . . have read and accept the IPIN Player Welfare Agreement" and then press the 'Confirm' button. Feeney Decl. ¶ 3, Ex. 1. Since 2019, Player Plaintiffs Vasek Pospisil, Saisai Zheng, Aldila Sutjiadi, Sorana-Mihaela Cirstea, Tennys Sandgren, Noah Rubin, and Varvara Gracheva clicked the 'Accept' button rather than the 'Decline' button at the bottom of the IPIN Agreement. *Id.*

As a result, every Player Plaintiff repeatedly agreed to resolve this dispute by CAS arbitration.

## B.    This Case Falls Within The Scope Of The Agreement To Arbitrate.

The FAA requires a court considering the scope of an arbitration agreement to compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25.

16

Courts have found that antitrust claims relating to contractual agreements are covered by broad arbitration provisions. "The Second Circuit has held that if the allegations underlying the claims touch matters covered by the parties' contracts, those claims must be arbitrated whatever the legal labels attached to them." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 103 (S.D.N.Y. 2015) (citation omitted); *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 228–29 (2013) (antitrust claims were subject to an arbitration agreement).

Here, plaintiffs' claims against ITF fall squarely within the scope of their agreement to arbitrate. To the extent plaintiffs allege that they have been harmed by ITF, such harm seems to be premised on a connection to ITF's WTTs. *See, e.g.,* Compl. ¶¶ 61, 75, 88, 136, 165, 282, 291, 346, 443, 458 (making allegations about ITF's WTTs). To compete for ITF WTT prize money, players must have an IPIN membership and so must have agreed to the IPIN Agreement. Accordingly, plaintiffs' claims against ITF are claims "arising out of or in connection with" the IPIN Agreement. *Cf.* Feeney Decl. ¶¶ 4(iii), 5(iii) (arbitration provisions for "any dispute arising out of or in connection with this [IPIN] Agreement"). Similarly, the ITF Constitution requires that players arbitrate any dispute not covered by the WTT Regulations' intricate dispute resolution provisions. Because plaintiffs' antitrust claims are "not referred under any of the ITF Rules and Regulations to the ITF Internal Adjudication Panel or the Independent Tribunal, the parties to the dispute [are] deemed to have agreed to submit the dispute to the Court of Arbitration for Sport." Fishpool Decl. ¶ 4, Ex. 18

17

(2024 ITF Constitution Art. 33); *accord* Fishpool Decl. ¶ 4, Ex. 17 (2024 ITF Constitution Art. 33); Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 30).

To the extent that plaintiffs assert that ITF is also responsible for any alleged harm from players' competing in ATP or WTA tournaments, such claims against ITF would also fall squarely within the scope of Player Plaintiffs' agreements to arbitrate. The ITF Constitution makes clear that the parties' arbitration agreement "applies to any legal dispute of any kind." Moreover, this case is not like *Davitashvili v. Grubhub Inc.*, in which the court held that plaintiffs' "use of Grubhub" was "both too speculative and too attenuated to qualify as a 'cause' of [their] antitrust claims" concerning "their access and use of *other* platforms and restaurants." 131 F.4th 109, 119–20 (2d Cir. 2025). Here, Plaintiffs' Complaint repeatedly explains that "ITF's World Tennis Tour is the *entryway* into a professional tennis career . . . for both men and women aspiring to compete on the ATP and WTA Challenger Tours and eventually on the ATP and WTA Tours." Compl. ¶ 136 (emphasis added); *accord id.* ¶¶ 61, 75, 88. In fact, each Player Plaintiff first agreed to the Arbitration Agreements over a decade ago. *See* Feeney Decl. ¶ 3, Ex. 1. Thus, any claims against ITF for alleged harm during a players' professional tennis career is a claim "arising out of or in connection with" the "entryway" into professional tennis, the World Tennis Tour, participation in which is governed by the Arbitration Agreements.

## C.    ITF's Arbitration Agreements Are Enforceable.

Plaintiffs' attempts to plead around their Arbitration Agreements fail. Plaintiffs concede that they are subject to the ITF Constitution and would be bound by its arbitration clause. Compl. ¶ 271. But they allege that the agreement is "illegal

and unenforceable" because, among other reasons, the proceeding "may take place in French." *Id.* ¶ 277. Never mind that Player Plaintiff and PTPA cofounder Vasek Pospisil speaks French,[3] and that Player Plaintiff Varvara Gracheva is French, *see* Compl. ¶ 29, their contention is also explicitly contradicted by that very same document's plain statement: "the proceedings to resolve the dispute shall be conducted in English." Fishpool Decl. ¶ 4, Ex. 18 (2024 ITF Constitution Art. 33(c)–(d)); *accord* Fishpool Decl. ¶ 4, Ex. 19 (2025 ITF Constitution Art. 31.1).

Plaintiffs also allege that the Arbitration Agreements are "illegal and unenforceable" because "there is no guarantee that, as appropriate in claims under the Sherman Act, the players can seek treble the damages resulting from the players' injuries." Compl. ¶ 277. But "the importance of the private damages remedy in antitrust actions does not compel the conclusion that those remedies are precluded in a private arbitration." *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 408, 416 (S.D.N.Y. 2003) (citing *Mitsubishi*, 473 U.S. at 634–36) (granting motion to compel arbitration, including for horizontal price-fixing claims).

Plaintiffs' allegation that ITF's Arbitration Agreements are themselves the result of an antitrust conspiracy also fail as a matter of law. Under the FAA, "a party is not relieved from an agreement to arbitrate on the ground that the contract is allegedly void for violation of the antitrust laws unless plaintiffs demonstrate that the Court's enforcement of the arbitration provision would make the Court a party to the unlawful activity." *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 154

---

[3]     *See* Notable Life, *A Glimpse Into Vasek Pospisil's Personal Life Off The Court* (Mar. 20, 2017), available at https://www.notablelife.com/vasek-pospisil-tennis-interview/.

(D.D.C. 2004); s*ee also In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, No. 02-MD-1468, 2003 WL 21254765, at *6 (D. Kan. May 27, 2003) (rejecting "plaintiffs' argument that the arbitration clauses in this case are not enforceable because they are allegedly the product of an antitrust conspiracy"); *see generally Kelly v. Kosuga*, 358 U.S. 516, 518 (1959) ("As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court.").

## D. The Validity And Scope Of The Arbitration Agreements Has Been Delegated To The Arbitrator

Even if there were ambiguity around the validity and scope of the Arbitration Agreements, those agreements delegate those questions to the arbitrator. Such delegation clauses are routine and enforceable. *See Davitashvili*, 131 F.4th at 118; *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65, (2019); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010).

Under federal law, when parties "explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Davitashvili*, 131 F.4th at 117 (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005)). In *Contec*, the court held that parties included a delegation clause by agreeing to arbitrate "in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA')." 398 F.3d at 208. The court reasoned that the parties explicitly incorporated rules that empower an arbitrator to decide issues of arbitrability because "Rule 7 of the AAA Commercial Arbitration Rules

20

states with respect to jurisdiction that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" *Id.*

Here, the Arbitration Agreements clearly and unmistakably evidence the parties' intent to delegate issues of validity and scope to an arbitrator. The Arbitration Agreements expressly specify arbitration in accordance with the rules of the CAS Code of Sports Related Arbitration. *See supra*, at page 11. Rule 39 of the CAS Code states, in relevant part, that "[t]he Panel shall rule on its own jurisdiction, irrespective of any legal action already pending before a State court or another arbitral tribunal relating to the same object between the same parties, unless substantive grounds require a suspension of the proceedings."

The parties' choice of English law serves as further clear and unmistakable evidence of the parties' intent to delegate scope and validity issues to an arbitrator, because "English law empowers an arbitral tribunal to rule on its own 'substantive jurisdiction,' defined to include 'whether there is a valid arbitration agreement,'" *Generali España de Seguros y Reaseguros, S.A. v. Speedier Shipping, Inc.*, No. 22-1150, 2023 WL 3362839, at *2 (2d Cir. May 11, 2023) (citing English Arbitration Act 1996 § 30(1)(a)), and "what matters have been submitted to arbitration in accordance with the arbitration agreement." English Arbitration Act 1996 § 30(1)(c). Thus, the parties have agreed that it is not for this Court to decide the validity and scope of the Arbitration Agreements. But if the Court finds that it has jurisdiction to consider

those issues, then it should find that plaintiffs' claims fall within the scope of the valid Arbitration Agreements for the reasons explained above.

## E.   If PTPA Is Permitted To Bring Claims Belonging To Players, It Should Also Be Compelled To Arbitrate.

PTPA is not itself a professional tennis player, and does not allege that it participated in any tournaments or was subject to any of the conduct alleged in the complaint. Accordingly PTPA's claims should be dismissed. *See* Defendants' Motion To Dismiss The Professional Tennis Players Association. But to the extent that PTPA is permitted to participate in this litigation by asserting claims based on alleged injuries to professional tennis players, it should be bound by the same arbitration agreement that those players agreed to. *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003).

Player Plaintiffs admit that they control the PTPA. Vasek Pospisil co-founded the PTPA and currently sits on its executive committee alongside Player Plaintiff Saisai Zheng, and several other Player Plaintiffs have also served on the PTPA's executive committee. *See* Compl. ¶¶ 33, 94–96. These admissions of a "virtual abandonment of separateness" among "common officers" who "do not deal at arms length with each other" prove that the PTPA is merely the Player Plaintiffs' alter ego and should be bound by their Arbitration Agreements with ITF. *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 778 (2d Cir. 1995).

The PTPA is also equitably estopped from avoiding arbitration because it received a direct benefit from Player Plaintiffs' Arbitration Agreements. Under the doctrine of direct-benefit estoppel, a non-signatory to an arbitration agreement is

estopped from denying its obligation to arbitrate when it "admit[s] to having directly benefited from an agreement containing an arbitration clause, for example by suing as a third-party beneficiary of that agreement." *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, No. 14-CV-6633, 2015 WL 144190, at *9 (S.D.N.Y. Jan. 12, 2015). Although the basis upon which PTPA is suing ITF is shaky at best, the PTPA can be understood as suing ITF as a third-party beneficiary of the Player Plaintiffs' IPIN Agreements, which they agreed to in order to compete for ITF's WTT prize money and which contain a CAS arbitration agreement.

Compelling the PTPA to arbitrate with ITF is all the more important in light of the fact that substantially all of the absent class members are also bound by the Arbitration Agreements with ITF, because as part of purchasing an IPIN membership online to compete in an "entryway" WTT tournament, absent class members would have had to agree to the Arbitration Agreements. *See* Feeney Decl. ¶ 2. More generally, this Court should not allow Player Plaintiffs and absent class members to avoid their Arbitration Agreements by conjuring up a collective entity that purports to shed those agreements.

### F.    Plaintiffs' Claims Against ITF Should Be Stayed In Their Entirety Pending Arbitration.

Section 3 of the FAA provides that where claims are referred to arbitration, the Court "shall" stay the litigation of those claims "until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also* 9 U.S.C. § 206. This Court should find that each plaintiff is bound to arbitrate with ITF at CAS, and so should stay plaintiffs' claims against ITF pending the conclusion of

arbitration. If this Court finds that any of the plaintiffs are not bound to arbitrate with ITF at CAS, then this Court should exercise its discretion to stay the claims of any such plaintiff. "A stay is usually appropriate where arbitrable and non-arbitrable claims arise out of the same set of facts and arbitration may decide the same facts at issue in the litigation." *Kwik Ticket Inc. v. Spiewak*, No. 20-cv-01201, 2022 WL 3446316, at *4 (E.D.N.Y. Aug. 17, 2022) (citation and internal quotation marks omitted). The Court should stay any non-arbitrable claims against ITF to conserve judicial resources, avoid potential inconsistent outcomes, and allow the arbitration to inform the Court's subsequent disposition of any non-arbitrable claims. *See id.* ("Stays are particularly appropriate where they promote judicial economy [and] avoidance of confusion and possible inconsistent results.") (citation and internal quotation marks omitted).

## **CONCLUSION**

For the foregoing reasons, the Court should grant this motion, compel arbitration with respect to Plaintiffs' claims against ITF, and stay those claims pending the conclusion of the arbitration proceedings.

Dated: May 20, 2025

Respectfully Submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ Heather S. Nyong'o
Heather S. Nyong'o (admitted *pro hac vice*)
650 California Street Suite 2400
San Francisco, CA 94108
(415) 796-4400
hnyongo@cgsh.com

Joon H. Kim
One Liberty Plaza
New York, New York 10006
(212) 225-2000
jkim@cgsh.com

Nowell D. Bamberger (*pro hac vice* forthcoming)
J.P. Olinski (pro hac vice forthcoming)
Benjamin S. Fridman (*pro hac vice* forthcoming)
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
(202) 974-1500
nbamberger@cgsh.com
jolinski@cgsh.com
bfridman@cgsh.com

**Certificate of Compliance**

As required by this Court's Rule II(B)(2), I certify that this memorandum of law contains 6,099 words, excluding the caption, table of contents, table of authorities, and signature blocks.

Dated: May 20, 2025                    Respectfully submitted,

                                       */s/ Heather S. Nyong'o*