# EXHIBIT A

P4BCpos1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   Vasek Pospisil, Nicholas
     Kyrgios, Anastasia Rodionova,
 4   Nicole Melichar-Martinez,
     Saisai Zheng, Sorana Cîrstea,
 5   John-Patrick Smith, Noah
     Rubin, Aldila Sutjiadi,
 6   Varvara Gracheva, Tennys
     Sandgren, and Reilly Opelka,
 7   on behalf of themselves and
     all others similarly situated
 8   -and- The Professional Tennis
     Players Association,
 9
                     Plaintiffs,
10
              v.                          25 Civ. 2207 (MMG)
11
     ATP Tour, Inc., WTA Tour,
12   Inc., International Tennis
     Federation Ltd., and
13   International Tennis Integrity
     Agency Ltd.,
14
                     Defendants.
15
     ------------------------------x
16                                        New York, N.Y.
                                          April 11, 2025
17                                        2:00 p.m.

18   Before:

19              HON. MARGARET M. GARNETT,

20                                        District Judge

21

22

23

24

25
```

P4BCpos1

1                          APPEARANCES

2  WEIL GOTSHAL & MANGES LLP
        Attorneys for Plaintiffs
3  BY:  JAMES QUINN
        DREW TULUMELLO
4       LUNA BARRINGTON
        ZACHARY A. SCHREIBER
5
6  PROSKAUER ROSE LLP
        Attorneys for Defendants
7  BY:  BRAD RUSKIN
        KYLE CASAZZA
        LEE POPKIN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P4BCpos1

```
 1                  (Case called)

 2              MR. QUINN:  Yes, your Honor.  James Quinn for the

 3      plaintiffs, along with my colleagues Andrew Tulumello, Luna

 4      Barrington, and Zach Schreiber.

 5              THE COURT:  Good afternoon.

 6              MR. RUSKIN:  Good afternoon, your Honor.  Brad Ruskin,

 7      Proskauer, for ATP Tour, along with my colleagues Kyle Casazza

 8      and Lee Popkin.  Also with us today is Mark Young from ATP.

 9      Mr. Young is the chief legal and administrative officer.

10              THE COURT:  Welcome, everyone.

11              We're here today for a hearing on the plaintiffs'

12      23(d) motion.

13              Before we begin, I just want to make a record about

14      relationships I have with two of the lawyers in this case.

15      First, one of the lawyers for the WTA tour, Mr. Biederman, he

16      was a law school classmate of mine.  There he is.  Nice to see

17      you.  Although we were friends in law school, I don't believe I

18      have seen or spoken to Mr. Biederman, sadly, in about 20 years.

19      Our graduation from law school was some time before that, but

20      we were friends in law school and law school classmates.

21              In addition, of course, Joon Kim, who's one of the

22      lawyers for the International Tennis Federation, was my boss

23      for, I'm going to guess about five years when he was chief of

24      the criminal division, Deputy U.S. Attorney, and then

25      U.S. Attorney for the Southern District of New York.  I was an
```

1    AUSA during those years.  That would be from about 2012 until

2    2017.  I was a supervisor in the U.S. Attorney's Office during

3    those years and worked closely with Mr. Kim.  He was my boss.

4    We've maintained a professional friendship since that time,

5    although we have not worked together since 2017.

6              Again, I don't see any reason that either of these

7    relationships affect my ability to preside over this matter or

8    my impartiality, but I wanted to disclose that and to ask you,

9    Mr. Quinn, if you have any objection to me continuing to

10   preside over this matter.

11             MR. QUINN:  No, your Honor.

12             THE COURT:  And Mr. Ruskin, I assume since all of

13   those lawyers are on your side that you have no objection, but

14   just --

15             MR. RUSKIN:  Thank you for asking.  No objection.

16             THE COURT:  With that, we're here for an evidentiary

17   hearing.

18             Mr. Quinn, do you have a witness?

19             MR. QUINN:  I believe the parties had agreed to have

20   brief opening statements.

21             THE COURT:  Of course.  I'm happy to hear you.

22             MR. QUINN:  Mr. Tulumello will be doing the opening

23   for the plaintiffs.

24             MR. TULUMELLO:  Good afternoon, your Honor.  Drew

25   Tulumello of Weil Gotshal & Manges for the plaintiffs.  Thank

P4BQpos2                          Pospisil - Cross

1    right?

2    A.  Yes, I believe so.

3    Q.  Over your career, you've earned millions of dollars in

4    prize money, right?

5    A.  Yes, I'm very fortunate to be one of the few that has.

6    Q.  And just so the record is clear on this, you've never had

7    any of your benefits rescinded by the ATP Tour or anything like

8    that, have you?

9    A.  No, I have not.

10   Q.  Sir, during opening statements, do you remember your lawyer

11   making a reference to videos about a player smashing a racquet?

12   A.  Yes.

13   Q.  In the interest of time, I am not going to ask you many

14   questions about Miami 2021, but you would agree, it wasn't your

15   finest hour, was it, sir?

16   A.  No, it wasn't.  No.

17   Q.  But the ATP never took away your benefits as a result of

18   your conduct that day, did it?

19          THE WITNEDSS:  Can I ask -- can I ask you, I don't

20   know if -- can I ask you something privately?

21          THE COURT:  Well, you have to ask -- I'm sorry, we

22   can't speak privately, Mr. Pospisil.

23          THE WITNEDSS:  Sorry.  Sorry.

24          THE COURT:  No.  No.  No.  You definitely -- if you

25   need guidance about how you can answer, you can ask me a

1   question about that, but you and I can't speak privately.

2   A.  I was going to receive a large fine for that, and then we

3   came to a settlement, and I don't know the details of the

4   settlement, if I'm able to speak about it or not, so that's why

5   I hesitate.

6   Q.  I'll just move on, sir.

7          On the day the complaint was filed, you tweeted that

8   "It's important to note that we spoke to over 300 players prior

9   to filing, and everyone was extremely supportive, including the

10  top players."

11  A.  Correct.

12  Q.  You personally spoke to hundreds of players before filing

13  this lawsuit?

14  A.  Believe it or not, yes.

15  Q.  Did you actually share the complaint with hundreds of

16  people?

17  A.  No.  That -- no.  No one would -- I would outline the

18  premise of the issues and what the lawsuit is about and gave as

19  much information as I felt necessary, which was as much as

20  possible, obviously, and -- but I did not send the complaint,

21  no.

22  Q.  With how many players did you actually share the complaint?

23  A.  With those that were interested in signing on as plaintiffs

24  and that had asked to view the complaint.

25  Q.  How many players would that be, sir?

P4BQpos2                         Pospisil - Cross

1    A.  I'm the not sure.  As I mentioned previously, it was very

2    difficult to have a player -- regardless of how supportive they

3    were or not of the overall idea of the claim, it was very

4    difficult to get them to a point where they felt even

5    comfortable to put their names on it given the fear that is

6    clearly out there.

7    Q.  Sir, the players to whom you did show the complaint, did

8    they tell you they liked everything in the complaint?

9    A.  The issue was not the complaint.  Yes.  I don't recall a

10   single player mentioning anything about a specific part in the

11   complaint that was an issue for them.

12   Q.  Sir, Novak Djokovic, the co-founder of the PTPA, he didn't

13   sign his name to your lawsuit, did he?

14   A.  He did not, and he -- we spoke to him the morning that we

15   filed.  He had reviewed -- well, I can't speak for him if he

16   reviewed, but we had sent him all the way through along the way

17   all the drafts.  He was part of the early conversations, and he

18   was supportive all the way through to the end.

19   Q.  But you're surely aware that after the lawsuit was filed,

20   he publicly said there are things that I agree with in the

21   lawsuit and there are also things that I don't agree with,

22   right?

23   A.  Yes.  I was surprised to hear him say that personally, and

24   I can't speak for him.  I don't know why he said that and what

25   specifically he didn't agree with because it was not in line

P4BQpos2                          Pospisil - Cross

1   with our previous conversations with him leading up to it.

2   Q.  Most of the people with whom you spoke about the lawsuit

3   before it was filed, you did not show most of them the actual

4   complaint, did you?

5   A.  We sent the complaint to every player that is a named

6   plaintiff.

7   Q.  Beyond the named plaintiffs, how many players did you send

8   the complaint to before it was filed?

9   A.  Like I said previously, I am not sure.  The only ones that

10  I sent it to are the ones that requested to see it, and those

11  are the ones that were considering signing on as plaintiffs,

12  but the filing itself was never brought up as the issue.  It's

13  clearly, you know, the fear and the potential retaliation and

14  the outcome of putting your name on something like this.  So I

15  just think it was -- yeah, that was the reason.

16  Q.  Mr. Djokovic wasn't the only top player to make a public

17  statement in opposition to the lawsuit, was he?

18  A.  No.

19  Q.  Carlos Alcaraz, the number three player in the world, when

20  he was asked about this lawsuit, you recall that Mr. Alcaraz

21  said "It was surprising for me because no one had told me about

22  it"?

23  A.  Yes, and actually he was one of the few that in hindsight I

24  should have spoken to.  I made a judgment call given that he

25  was so young and doing so well, I felt at the time -- and in

1  hindsight I should have spoken to him, but I felt at the time

2  that I didn't want to distract him.  He's only -- I don't know

3  how old he is, 20 maybe, and actually messaged him after I saw

4  those comments, which were taken a little bit out of context as

5  well because I think he was referring mostly to the fact that

6  he just wasn't aware of the lawsuit and didn't have a strong

7  opinion on it given he was not aware.  And then when I messaged

8  him, he replied quite enthusiastically via text basically

9  saying that yes, he would love to learn more about it, and that

10  was the last interaction we had.  We tried to get in touch

11  after Miami, but we haven't been able to do so.

12  Q.  Mr. Zverev, Alexander Zverev, the number two player in the

13  world, he didn't come out and say he was extremely supportive

14  of the lawsuit, did he?

15  A.  I'm not sure what he said publicly to a T, but I've had

16  extensive conversations with him for months.

17  Q.  Do you remember that he publicly said that he thinks that

18  players in tour should unite and not fight?

19  A.  Yeah, he may have said that.  I don't recall seeing those.

20  Q.  Going back to Jay Clarke just real briefly, and I want to

21  be precise here.  Did you personally discuss the U.K. letter

22  with Jay Clarke before that letter naming him as a plaintiff

23  was filed?

24  A.  I personally spoke to -- yeah -- well, I had to recruit.  I

25  mean, I had to ask him about it, and I don't recall if -- I

P4BQpos2                         Pospisil - Cross

1   genuinely don't recall if it was via text message or

2   conversation, and then he was -- I was surprised -- because I

3   know how sensitive of an issue this is, and I was very

4   pleasantly surprised -- although he has always been very

5   supportive of us from the beginning, I was surprised he was

6   willing to put his name on the lawsuit, yes.  So, of course --

7   yes, to answer your question, I did speak to him.  I just don't

8   remember what form it was in.  He wouldn't have just put his

9   name on it without speaking to him.

10  Q.  Is it your sworn testimony today that the PTPA had

11  Mr. Clarke's permission to name him as a plaintiff?

12  A.  Yes.

13  Q.  And you did not personally witness what anyone from ATP

14  ever said to Mr. Clarke or any of his representatives, did you?

15  A.  I'm sorry, can you repeat the question?

16  Q.  You did not personally witness any statements made by

17  anyone at ATP to either Mr. Clarke or any of his

18  representatives?

19  A.  No.

20  Q.  You understand that Mr. Clarke has made public statements

21  about why he withdraw from the U.K. lawsuit, right?

22  A.  Yes, I'm aware of the statements.

23  Q.  You understand that in his public statement, Mr. Clarke

24  said, "I do not fully align with the way the case has been

25  approached," right?

P4BQpos2                        Pospisil - Redirect

1    A.  Yes, and I was very -- well, I shouldn't say -- yeah, I was

2    surprised to see that because he had texted me prior to making

3    the announcement, and he explicitly said in the text message

4    that the reason was that he had said that he still obviously

5    supports it, and he said that he was getting eaten alive in the

6    British media, and he was going to say that he wanted to focus

7    on his career, and that was what the statement was going to be,

8    so I was surprised to see that.  And he made no mention of

9    anything that he disagreed with in terms of wording of the

10   lawsuit.

11   Q.  And that's still a text message you have in your

12   possession?

13   A.  Yes, I do.

14        MR. CASAZZA:  Thank you, sir.  I have no further

15   questions for now.

16        THE COURT:  Mr. Quinn, any redirect?

17        MR. QUINN:  Very briefly, your Honor.

18   REDIRECT EXAMINATION

19   BY MR. QUINN:

20   Q.  Counsel asked you a lot about communications that you have

21   had and continue to have with players with regard to this

22   lawsuit.  Do you recall that line of question?

23   A.  Yes.

24   Q.  You or the PTPA -- neither you nor the PTPA control the

25   livelihood of tennis players.  Am I right about that?

P4BQpos2                           Pospisil - Redirect

1   A.  Yes, you're right, we don't.

2   Q.  He also showed you -- if you would put up DX-33.  Do you

3   recall counsel asked you about this email that you wrote back

4   in 2019?

5   A.  Yes.

6   Q.  In the email, you talked about replacing -- getting a new

7   player board?

8   A.  Yes.

9   Q.  And you thought back then that that was going to solve

10  everything or you hoped that it would?

11  A.  I hoped it would help.

12  Q.  How did that turn out?

13  A.  Not well at all.  And this was still during the phase in

14  which I was trying to, you know, fix the issues within the

15  structure within the council, and it was, you know, clear that

16  it was impossible, and hence why we decided to make the move to

17  start the association.

18  Q.  Now, you wrote in this email, and I will just quote it: "We

19  need a governance structure that prevents peddling by the deep

20  pocketed tournaments."

21         Then you go on to say, "We need our own legal

22  counsel."

23         You have that now, right?

24  A.  Yes.

25  Q.  And you want your own business advisors.  You have that now

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4BCpos3                       Syed - Cross

1   meeting, as well.

2   Q.  You did not personally witness a word of any of those

3   conversations, did you?

4   A.  Not personally, no.

5   Q.  You testified in your declaration, sir, that since the

6   lawsuit was filed, you've spoken with several professional

7   players about inappropriate communications between themselves

8   and representatives or agents from the ATP initiated by ATP

9   about those players' participation in the ongoing lawsuit,

10  right?

11  A.  Yes, that's correct.

12  Q.  Were the players with whom you spoke ATP members?

13  A.  Yes.

14  Q.  What did you do to document any of those conversations?

15  A.  I communicated that I have notes regarding those

16  conversations.

17  Q.  And again, you're not the attorney for any of the

18  individual players with whom you had those conversations, are

19  you?

20  A.  No.

21  Q.  You're not claiming that your communications with those

22  individual players are privileged, are you?

23  A.  No.

24  Q.  In your declaration, when you refer to representatives or

25  agents from the ATP who spoke to players, you're unwilling to

P4BCpos3                          Syed - Cross

1   name those individuals; do I have that right?

2   A.  Yeah, based on my conversation with those players

3   expressing that explicitly, yes.

4   Q.  You testified in your declaration that the communications

5   were initiated by ATP, right?

6   A.  Yes.

7   Q.  But you don't actually know whether those communications

8   were initiated by ATP, do you?

9   A.  I do because the players narrated that to me.

10  Q.  Well, sir, players might have told you that.  You don't

11  personally know who initiated any of the conversations players

12  told you they supposedly had?

13  A.  Players, yes, they told me the stories that they had, yes.

14          THE COURT:  I'll just help everyone.  Mr. Syed, you

15  weren't present for any of the conversations that players told

16  you about, correct?

17          THE WITNESS:  That's correct.

18          THE COURT:  I think that's been well established.

19  Q.  You testified about the locker room at ATP events being a

20  players sanctuary, right?

21  A.  Yes, that's correct.

22  Q.  You know, sir, that at the PTPA's request, ATP actually

23  gives credentials to the PTPA so the PTPA can go in locker

24  rooms at ATP events?

25  A.  Not in the locker rooms.

P4BCpos3                          Syed - Cross

1   Q.  But you understand that the ATP gives PTPA credentials to

2   go into players-only areas at ATP events, right?

3   A.  Specific player area only such as dining, but not a locker

4   room.  Even coaches are not technically allowed in the player

5   locker rooms.  They have specific coaches locker rooms for

6   those reasons.

7   Q.  In your declaration when you were testifying about the

8   conversation that Mr. Pampoulov supposedly had with a

9   professional tennis player, you testified that the player was

10  asked to signed a document; right?

11  A.  Yes, correct.

12  Q.  You don't know whether that document was actually about

13  this lawsuit, do you?

14  A.  I do because the player told me it was about this lawsuit.

15          THE COURT:  It's getting late.  Everyone knows that

16  Mr. Syed knows everything that he knows about these

17  interactions because of what the players told him.  There's no

18  confusion about that.  So let's not spend any more time on that

19  issue because I know it and everyone knows it.  And you only

20  have a couple more minutes, Mr. Casazza, with this witness, so

21  use it wisely.

22  Q.  Mr. Syed, if you could quickly take a look at DX 7 in the

23  binder.  This is a press release the PTPA issued regarding the

24  filing of this lawsuit, right?

25  A.  Yes, that's correct.

P4BCpos3                    Syed - Cross

1          MR. CASAZZA:  We'd like to move this into evidence.

2          MS. BARRINGTON:  No objection, your Honor.

3          THE COURT:  It's admitted.  DX 7 is admitted.

4          (Defendants' Exhibit 7 received in evidence)

5    Q.  Mr. Syed, you reviewed this press release before it was

6    published, right?

7    A.  That's correct.

8    Q.  You're a licensed attorney, at least in Minnesota, you

9    wouldn't want the PTPA to make false statements to the public,

10   would you.

11   A.  Yes, that's correct.

12   Q.  If you learn that the PTPA says something false, would you

13   try to correct that?

14   A.  Yes.

15   Q.  Can you please take a look at the last bullet point here on

16   the first page of DX 7 where it says, PTPA's legal actions

17   backed overwhelmingly by the top 250-plus men's and women's

18   players including a majority of the top 20 players.  Do you see

19   that, sir?

20   A.  Yes.

21   Q.  So it's your sworn testimony that that's 100 percent

22   accurate?

23   A.  Yes.

24   Q.  Does the PTPA know which professional tennis players

25   consider themselves to be members of the PTPA?

P4BCpos3                          Syed - Cross

1    A.  So the PTPA advocates on behalf of the top 250 men and

2    women singles players and the top 100 men and women doubles.

3    Q.  But does the PTPA actually know which individual players

4    consider themselves to be PTPA members?  Do you understand what

5    I'm asking, sir?

6    A.  Yes.  We don't have any membership criteria specifically.

7    Q.  You don't maintain a list of your members, do you?

8    A.  Where in terms of people who are players would sign

9    something?

10   Q.  However you would define "member," sir.  It's not my

11   organization.

12   A.  No.  We advocate on behalf of the top 250 men and women

13   professional players singles and the top 100 men and women

14   doubles.  That's our player advocacy focus group.

15   Q.  The PTPA does not maintain a list of its members, does it?

16   A.  No, that's correct.

17   Q.  How does someone become a member of the PTPA?

18   A.  As they move up the rankings, as the rankings in tennis,

19   once you get to be ranked in the top 250 play -- or 250 in the

20   singles, for example, you'll be eligible in terms of

21   potentially some of our services and benefits that we have.  We

22   start advocating our medical networks that we have, a lot of

23   the player health-related aspects.  They are eligible to start

24   being participants in those kind of things and utilizing those

25   services and benefits.

P4BCpos3                              Syed - Cross

1    Q.  I want to make sure that I understand your testimony

2    correctly.  You're saying that professional tennis players

3    automatically become members of the PTPA once they get

4    sufficiently highly ranked?

5    A.  We advocate for those players, yes.

6            THE COURT:  He's already said, Mr. Casazza, that it's

7    not a membership organization in the traditional sense, but the

8    mission of the organization is to advocate on behalf of that

9    set of players.

10           And I'm going to give you just one more minute, but I

11   want you to wrap up this witness so we have time for

12   Mr. Pampoulov.

13   Q.  If you could take a look at DX 32, sir.  This is a post on

14   X that you reposted from Sky Sports news, that it says,

15   breaking a tennis players' union cofounded by Novak Djokovic

16   has started legal action against the sport's governing bodies?

17   A.  Yes.

18   Q.  The PTPA is not a union, sir?

19   A.  That's correct.

20   Q.  Did you call Sky Sports news and say you need to change

21   your headline, the PTPA is not a union?

22   A.  No, I did not.

23   Q.  Weren't you concerned that spreading news on X that the

24   PTPA is a players union would confuse player members of the ATP

25   into believing the PTPA is a union?

P4BCpos3                    Syed - Cross

1    A.  No, I was not.  I was focused on the fact that it had one

2    of our cofounders, Novak Djokovic, saying that we started a

3    legal action against the sports governing bodies for the

4    accuracy.

5    Q.  Sir, while I've got you here, my last question, do you

6    think it's okay for the ATP to tell it tennis players that the

7    PTPA is not their union?

8    A.  Yes.

9            MR. CASAZZA:  Thank you, your Honor.

10           THE COURT:  Thank you.

11           Ms. Barrington, anything further questions?

12           MS. BARRINGTON:  No.  No, thank you, your Honor.

13           THE COURT:  Thank you, Mr. Syed.  You can step down.

14           (Witness excused)

15           Mr. Quinn, any additional?

16           MR. QUINN:  That completes the testimony for the

17   players.

18           THE COURT:  Thank you very much.

19           Ms. Popkin, do the defendants have a witness?

20           MS. POPKIN:  We do, your Honor.  We call Mr. Luben

21   Pampoulov.

22           THE COURT:  Mr. Pampoulov, just come here.  I know

23   you've been here for the hearing, so you know what to do.  But

24   just come to the witness stand and remain standing when you get

25   there.  Thank you.

P4BCpos3                      Pampoulov - Direct

1              MS. POPKIN:  Your Honor, to correct the record, he has

2       not been in here.  He listened to the openings and left the

3       courtroom.

4              THE COURT:  That's useful, Ms. Popkin.  Thank you.

5        LUBEN PAMPOULOV,

6           called as a witness by the Defendants,

7           having been duly sworn, testified as follows:

8       DIRECT EXAMINATION

9       BY MS. POPKIN:

10      Q.  Good afternoon, Mr. Pampoulov.

11      A.  Good afternoon.

12      Q.  We are a little tight on time, so we are going to try to

13      keep this a little tighter than expected.  But just to give the

14      Court a very brief sense of your background, when did you start

15      playing tennis?

16      A.  At a very young age.  I had a, you know, my father was a

17      good tennis player.  I played almost professionally and my mom

18      played as well, so started as soon as I was walking.

19      Q.  And have you, yourself, played professional tennis?

20      A.  I did play after juniors for about two and a half years on

21      the lower rank tournaments.

22      Q.  And do you have a career outside of tennis now?

23      A.  Yes.  After college I started investment banking and then

24      switched over to venture capital, which I've been now for

25      16 years.

P4BCpos3                     Pampoulov - Redirect

1              THE COURT:  Mr. Quinn, any objection to that?

2              MR. QUINN:  No, I don't have an objection to that.

3    That's fine.

4              THE COURT:  Sure.  That would be fine.

5              MR. RUSKIN:  Thank you.

6              THE COURT:  The only thing is that I think you should

7    file that by Wednesday so that when the plaintiffs submit their

8    letter on Friday, they know what the complete factual record is

9    for the hearing.

10             MR. RUSKIN:  Happy to do so.  Yes.

11             MR. QUINN:  Thank you, your Honor.  That would be

12   helpful.  Thank you.

13             THE COURT:  Anything you want to file on that in terms

14   of a declaration, just file it by Wednesday and then the

15   parties will file their letters by Friday.

16             MR. RUSKIN:  That makes sense.  I'm happy to do so.

17   Thank you.

18             THE COURT:  Anything further, Mr. Ruskin?

19             MR. RUSKIN:  No.  Thank you.

20             THE COURT:  Thank you, all, very much.  It was very

21   helpful.  We're adjourned.

22                              * * *

23

24

25

1                           INDEX OF EXAMINATION

2       Examination  of:                                    Page

3        VASEK POSPISIL

4       Direct By Mr. Quinn    . . . . . . . . . . . . .30
        Cross By Mr. Casazza . . . . . . . . . . . . . .47
5       Redirect By Mr. Quinn   . . . . . . . . . . . .75

6       REILLY OPELKA

7       Direct By Mr. Schreiber . . . . . . . . . . . .79
        Cross By Ms. Popkin . . . . . . . . . . . . . .87
8        WAJID MIR SYED

9       Direct By Ms. Barrington . . . . . . . . . . . .94
        Cross By Mr. Casazza . . . . . . . . . . . . . 101
10       LUBEN PAMPOULOV

11      Direct By Ms. Popkin . . . . . . . . . . . . . 111
        Cross By Mr. Tulumello . . . . . . . . . . . . 132
12      Redirect By Ms. Popkin . . . . . . . . . . . . 141

13                          PLAINTIFF EXHIBITS

14      Exhibit No.                                     Received

15       2  . . . . . . . . . . . . . . . . . . . . . . .44

16                          DEFENDANT EXHIBITS

17      Exhibit No.                                     Received

18       29   . . . . . . . . . . . . . . . . . . . . . .58

19       18   . . . . . . . . . . . . . . . . . . . . . .60

20       33   . . . . . . . . . . . . . . . . . . . . . .63

21       33   . . . . . . . . . . . . . . . . . . . . . .63

22       23   . . . . . . . . . . . . . . . . . . . . . .67

23       7  . . . . . . . . . . . . . . . . . . . . . . 107

24       40   . . . . . . . . . . . . . . . . . . . . . 122

25       28   . . . . . . . . . . . . . . . . . . . . . 131