## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, and Reilly Opelka, on behalf of themselves and all others similarly situated,<br><br>-and-<br><br>The Professional Tennis Players Association,<br><br>          Plaintiffs,<br><br>v.<br><br>ATP Tour, Inc., WTA Tour, Inc., International Tennis Federation Ltd., and International Tennis Integrity Agency Ltd.,<br><br>          Defendants. | Case No. 1:25-cv-02207-MMG<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INTERNATIONAL TENNIS FEDERATION LTD.'S MOTION TO DISMISS THE CLAIMS AGAINST IT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

PLAINTIFFS' ALLEGATIONS ............................................................................................ 4

    A.    ITF is the Non-Profit Governing Body Of Worldwide Tennis ................................... 4

    B.    Two thirds of Plaintiffs Are Foreign Tennis Players Whose Alleged
          Injuries Occurred Abroad ........................................................................................ 6

    C.    Plaintiffs Allege A Broad Antitrust Conspiracy To Limit Competition
          Among Tour Organizers. ......................................................................................... 6

    D.    Plaintiffs Do Not Allege That ITF Competes In Their Alleged Market. .................... 7

LEGAL STANDARD ............................................................................................................ 8

ARGUMENT ......................................................................................................................... 9

    I.    Plaintiffs Do Not Connect ITF to the Alleged Agreements ................................... 9

    II.    ITF Does Not Compete For Professional Tennis Services ...................................... 19

    III.    Plaintiffs' Conspiracy to Monopsonize Claims (Seventh and Eighth
           Causes of Action) Fail as to ITF ........................................................................... 21

    IV.    Plaintiffs' Unjust Enrichment Claims (Ninth Cause of Action)
           Fail as to ITF ......................................................................................................... 23

CONCLUSION ...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................. 8, 13, 15, 19

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir. 2004) .......................................................................... 23

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
  No. 12 Civ. 1667, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ........................ 8–9, 11, 12, 18

*Cooper v. Anheuser-Busch, LLC*,
  553 F. Supp. 3d 83 (S.D.N.Y. 2021) ................................................................. 23

*Corsello v. Verizon NY, Inc.*,
  18 N.Y.3d 777 (2012) ...................................................................................... 23

*Cuoco. v. Moritsugu*,
  222 F.3d 99 (2d Cir. 2000) ............................................................................. 24

*Grossman v. Simply Nourish Pet Food Co. LLC*,
  516 F. Supp. 3d 261 (E.D.N.Y. 2021) ............................................................... 23

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13MD2476 DLC, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ...................... 22

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011) ............................................................. 9, 11

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ......................................................................... 14, 17

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) ............................................................... 22

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) ........................................................................... 9, 21

*Invamed, Inc. v. Barr Lab'ys, Inc.*,
  22 F. Supp. 2d 210 (S.D.N.Y. 1998) .................................................................. 9

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)................................................................................. *passim*

*New York Times Co. v. Microsoft Corp.*,
    No. 23-CV-11195, 2025 WL 1009179 (S.D.N.Y. Apr. 4, 2025) ................................. 5, 13, 18

*Oxbow Carbon & Mins. LLC v. Union Pac. R. Co.*,
    926 F. Supp. 2d 36 (D.D.C. 2013) ............................................................................ 22

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*,
    61 F.4th 299 (2d Cir. 2023) ............................................................................... 8, 9–10

*SmileDirectClub, LLC v. Tippins*,
    31 F.4th 1110 (9th Cir. 2022) .................................................................................. 21

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010)................................................................... 13, 14, 15, 19

## <u>Other Authorities</u>

*Comm'r of Rev.* v *The Invest. Tr. Cos. (in Liquidation)*,
    [2017] UKSC 29 (UK) ............................................................................................ 24

*Croxen et al.* v *Gas and Elec. Mkts. Auth.*,
    [2022] EWHC 2826 (Ch) (Eng.) ........................................................................ 23–24

International Tennis Federation Ltd. ("ITF"), by its undersigned counsel, respectfully moves to dismiss the claims asserted against it in the Complaint ("Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiffs' Complaint paints a picture of a broad cartel among the "Governing Body Defendants"[2] and the Grand Slam and Tournament Co-Conspirators[3] to control the men's and women's professional tennis markets worldwide. Setting aside the ultimate lack of merit to their allegations, to pursue these far-reaching claims Plaintiffs must plead sufficient detail in their complaint to make out a legally viable claim against *each* defendant. Group pleading, glossing over key distinctions by pleading broadly against "Defendants" (or in this case the "Governing Body Defendants"), is not sufficient. And this is particularly true where, as here, Plaintiffs are themselves professional participants in the industry they challenge and therefore are well acquainted with the relevant facts.

As to ITF, Plaintiffs plead virtually no detail about what ITF allegedly did to violate the antitrust laws. Instead, Plaintiffs repeatedly describe how the ATP

---

[1]     ITF is concurrently moving to compel arbitration and does not, by filing this Motion to Dismiss, waive the right to resolution through arbitration.

[2]     In the Complaint, Plaintiffs refer to ATP, WTA, and ITF collectively as the "Governing Body Defendants." Compl. ¶ 50.

[3]     The Complaint defines the Grand Slam Co-Conspirators as the owners and operators of the Grand Slams (the U.S. Open, French Open, Australian Open, and Wimbledon) and the Tournament Co-Conspirators as the operators of ATP and WTA events. Compl. ¶ 50; *see also id.* ¶ 35. Though Plaintiffs allege connections between ITF and the Grand Slams, their Complaint also concedes that the Grand Slam Co-Conspirators "operate[] separately from the Defendants." *Id.* ¶ 51.

Rulebook, WTA Rulebook, ATP Bylaws, and WTA Bylaws are used to effectuate a series of allegedly anticompetitive agreements between ATP, WTA, and the Tournament and Grand Slam Co-Conspirators in the markets for men's and women's professional tennis services. But Plaintiffs do not allege (because they cannot) any ITF connection to those supposedly key documents, despite incorporating them by reference in the Complaint. Nor do Plaintiffs explain what role ITF could possibly have played in the alleged agreements, since ITF is an association of national tennis federations, not an owner of the ATP, WTA, Grand Slam, or other tennis tournaments that allegedly compete for professional tennis services. As the Complaint alleges, ITF handles roles like promulgating the Rules of Tennis (e.g. court size, scoring system, etc.). ITF also supports World Tennis Tour events, which are entry-level events for aspiring professionals who hope to one day play in ATP or WTA tournaments. The lack of connection between ITF and the alleged agreements persists despite Plaintiffs' access to the ITF Constitution and ITF Rules of Tennis ("ITF Rules"), which are also incorporated by reference in the Complaint. Plaintiffs' failure is not surprising because there is in fact no connection between the core allegations and ITF.

Most tellingly, Plaintiffs never grapple with the fact that ITF's supposed role in the alleged conspiracies is utterly implausible: ITF's funding is tied to Grand Slam prize money—as prize money increases, so too do payments to ITF.

Plaintiffs' allegations thus assume (without any basis) that ITF is a participant in a conspiracy the effect of which is directly contrary to its economic interests. These

are not plausible allegations that would sustain claims under the federal antitrust laws.

Plaintiffs assert nine causes of action, seven of which include ITF.[4] None of them are viable.

*First,* Plaintiffs' first four causes of action, which allege unlawful agreements in violation of Section 1 of the Sherman Act, all fail. Plaintiffs assert three agreements to fix the prices of professional tennis tournaments. But on the Complaint's own terms, ITF does not set the price for any of the tournaments covered by the first two alleged agreements,[5] and as to the third, its allegations that prize money for entry-level World Tennis Tour events is lower than for ATP and WTA events is unsurprising, Compl. ¶ 136, and entirely consistent with unilateral conduct. Plaintiffs also try to allege a 'refusal to deal' claim related to the award of Ranking Points, *id.* ¶ 357, but ITF does not determine which tournaments can award Ranking Points. Nor does ITF impose penalties on players for participating in competing tournaments. In short, ITF does not, in any sense, refuse to deal with players who play in such tournaments. Plaintiffs allege a scheme to allocate the markets for men's and women's professional tennis services, *id.* ¶ 372, but the scheme only includes tournaments that ITF does not control. Finally, Plaintiffs' allegations of output restriction through ATP's and

---

[4]    The Fifth and Sixth Causes of Action do not include ITF.

[5]    The first two agreements are allegedly agreements to limit the prize money awarded by the Tournament Co-Conspirators who "operate[] separately from the Defendants." Compl. ¶ 51.

WTA's tournament sanctioning process[6] are inapposite as to ITF, which neither controls the alleged sanctioning process nor has control over the award of Ranking Points that facilitate the alleged scheme.

*Second*, Plaintiffs allege two conspiracies to monopsonize based on the conduct alleged in the first four counts, discussed above. Compl. ¶¶ 440, 442, 455, 457. But the lack of allegations establishing ITF's involvement in the alleged agreements underlying the first four claims likewise dooms the conspiracy to monopsonize claims pleaded in Plaintiffs' seventh and eighth counts. Even had Plaintiffs tied ITF to the alleged conspiracy, courts in this circuit routinely reject the shared monopsony theory that Plaintiffs pleaded.

*Third*, Plaintiffs' ninth claim of unjust enrichment is based on money Defendants' allegedly were able to retain by paying artificially low prize money. But Plaintiffs' claim is duplicative of their federal claims and fails for the same reasons.

## PLAINTIFFS' ALLEGATIONS[7]

Despite its heft, Plaintiffs' complaint fails to describe conduct by ITF that, if proven, would violate the antitrust laws of this country.

### A.    ITF is the Non-Profit Governing Body of Worldwide Tennis

Tennis is among the most universally beloved sports. More than 100 million people globally play the game, and national associations sponsor tournaments in 199

---

[6]    As described in the Complaint, tournament sanctions are effectively licenses that allow tournaments to join the Tours and award Ranking Points. Compl. ¶ 219.

[7]    As required under Rule 12(b)(6), allegations are drawn from the Complaint without agreement thereto.

countries. Founded in Paris in 1913 and based in London since the outbreak of the Second World War, ITF is Tennis's global governing body. As part of its role growing the game of Tennis globally, ITF "organizes the ITF World Tennis Tours, two lower-level circuits of professional tennis events that serve as a potential entry point into professional tennis tournaments for juniors and lower-ranked players hoping to ascend to the Challenger Tours and then, eventually, the ATP Tour or the WTA Tour." Compl. ¶ 61; *see also id.* ¶¶ 75, 88. ITF also oversees the Davis Cup, the Billie Jean King Cup, and various Olympic events, which are team and international events. Compl. ¶ 61. Pursuant to its Constitution, ITF receives a funding contribution from the Grand Slams equal to 1% of the gross prize money awarded by each of the Grand Slam tournaments. Bamberger Decl., Ex. A (International Tennis Fed'n, *The Constitution of ITF Limited*, Art. 24.1 (2025)).[8]

ITF also oversees the Rules of Tennis, which standardize gameplay by determining things like the size of the court, the size and weight of the ball, and the scoring system. *See* Compl. ¶¶ 36, 59; *see also* Bamberger Decl., Ex. B (Int'l Tennis Fed'n, *ITF Rules of Tennis* (2025)). ITF is organized under the laws of the Bahamas and maintains its principal place of business in London. Compl. ¶ 36.

---

[8]    The ITF Constitution and ITF Rules of Tennis are incorporated by reference in the Complaint, Compl. ¶¶ 36 n.1, 59, and therefore properly considered on a motion to dismiss. *See, e.g.*, *New York Times Co. v. Microsoft Corp.*, No. 23-CV-11195, 2025 WL 1009179, at *5 (S.D.N.Y. Apr. 4, 2025) (When considering a Rule 12(b)(6) motion, the Court may consider "documents appended to the complaint or incorporated in the complaint by reference.").

**B.    Two thirds of Plaintiffs Are Foreign Tennis Players Whose Alleged Injuries Occurred Abroad**

Plaintiffs are 12 current and retired professional tennis players (each player, a "Player Plaintiff") and the PTPA. Four of the 12 Player Plaintiffs hail from the United States of America, and the remaining eight collectively hail from seven foreign countries: Australia, Canada, China, France, Indonesia, Romania, and Russia. *See* Compl. ¶¶ 20–32. The PTPA, allegedly "an association of men and women professional tennis players," is a creation of Player Plaintiff Vasek Pospisil, who currently sits on its executive committee alongside Player Plaintiff Saisai Zheng. Compl. ¶¶ 33, 94.[9]

**C.    Plaintiffs Allege A Broad Antitrust Conspiracy To Limit Competition Among Tour Organizers.**

Plaintiffs allege a variety of agreements to restrain trade in the markets for men's and women's professional tennis services. Specifically, Plaintiffs allege that through price fixing, market allocation, refusal to deal, output reduction, monopolization, and conspiracy to monopolize, Defendants lower the amount of prize money awarded for men's and women's professional tennis services. Plaintiffs' non-conclusory allegations regarding the agreements rely almost exclusively on the ATP and WTA Rulebooks and Bylaws.

---

[9]    ITF incorporates the arguments advanced in Defendants' Motion to Dismiss the Professional Tennis Players Association.

**D.    Plaintiffs Do Not Allege That ITF Competes In Their Alleged Market.**

ITF does not compete in the alleged markets through any of the tournaments discussed in the Complaint. Plaintiffs carefully avoid alleging that ITF competes for the services of professional tennis players through World Tennis Tour events. *See, e.g.*, Compl. ¶¶ 282, 291 (alleging what might happen if World Tennis Tour events competed for men's and women's tennis services without alleging that they do). And when listing the "principal buyers" in the markets they allege, Plaintiffs do not include ITF. *Id.* ¶¶ 280, 289. That is unsurprising given the Complaint's allegations that ITF's World Tennis Tour events offer vastly less prize money to players of a vastly lower skill level compared to ATP and WTA events. Plaintiffs do not allege, nor could they, that ITF owns or operates any of the ATP or WTA tour events. And the Complaint does not make any allegations about the significance of the Davis Cup or the Olympics, other than vaguely stating that ITF "oversees" them. *Id.* ¶ 61.

Plaintiffs vaguely allege that ITF "organizes" the Grand Slams through responsibilities such as "directing rule changes, structural changes, administrative services, officiating, and media services for the events." *Id.* ¶¶ 36, 60. But, as Plaintiffs correctly acknowledge, "each Grand Slam is independently owned," *id.* ¶ 56, and is "an independent economic entity that operates separately from the Defendants," *id.* ¶ 51. *See also id.* ¶ 40 (explaining that the United States Tennis Association is "the owner and operator of the U.S. Open Grand Slam event"). Plaintiffs do not connect the roles they do allege to the antitrust violations they assert.

Plaintiffs assert that ITF holds seats on the WTA, Grand Slam, and International Tennis Integrity Agency ("ITIA")[10] boards, *id.* ¶¶ 60, 78, 93, but there are no allegations ITF used its alleged board positions to contribute to the alleged conspiracies. And as Plaintiffs allege, ITF is but a single member on each of the boards on which it allegedly sits. *Id.* ¶ 60 (1 of 5 Grand Slam board members); *id.* ¶ 81 (1 of 8 WTA board members); *id.* ¶ 93 (1 of 9 ITIA board members).

## LEGAL STANDARD

A complaint must contain sufficient allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "first question" in a Sherman Section 1 case is "whether the challenged conduct stems from independent decision or from an agreement." *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023). Because the existence of an "agreement" in a Section 1 case "is a legal conclusion, not a factual allegation," a plaintiff must allege direct or circumstantial evidence that the agreement actually existed. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135–36 (2d Cir. 2013).[11]

It is also not enough to allege an agreement generally, without tying that agreement to each defendant. Generic group pleading is not permitted. *See Concord*

---

[10]    The ITIA enforces anti-doping and anti-corruption measures in professional tennis. Compl. ¶ 37.

[11]    Because Plaintiffs plead their antitrust claims under U.S. federal law, ITF addresses their elements under that law without agreement that U.S. law governs their claims. To the extent required, ITF hereby gives notice pursuant to Federal Rule of Civil Procedure 44.1 that it believes Plaintiffs' claims, particularly insofar as they are extraterritorial in nature, arise under foreign law.

*Assocs., L.P. v. Ent. Props. Tr.*, No. 12 Civ. 1667, 2014 WL 1396524, at *22 (S.D.N.Y. Apr. 9, 2014) (collecting cases), *aff'd*, 817 F.3d 46 (2d Cir. 2016); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) ("[G]eneric references to 'defendants' [are] insufficient."); *Invamed, Inc. v. Barr Lab'ys, Inc.*, 22 F. Supp. 2d 210, 222 (S.D.N.Y. 1998) (same for "bare-boned statement[s]").

In the absence of direct facts, such as admissions or written agreements, a horizontal agreement "may be inferred on the basis of conscious parallelism." *Citigroup*, 709 F.3d at 136 (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)). But even then the plaintiff must still adduce well-pled allegations showing that "such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.*

To state a claim for conspiracy to monopolize, the plaintiff likewise must allege that the defendant engaged in "concerted action" – that is, agreed – to the alleged conspiracy. *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987).

## **ARGUMENT**

### I.    **Plaintiffs Do Not Connect ITF to the Alleged Agreements**

Plaintiffs allege agreements to fix prices, geographically allocate the market, refuse to deal, and restrict output. The "first question" in a Sherman Section 1 case

is "whether the challenged conduct stems from independent decision or from an agreement." *Relevent Sports*, 61 F.4th at 306.

Here, ITF does not even engage in the challenged conduct.[12] It accordingly cannot be plausibly alleged to have entered into an illegal agreement with respect to that conduct. Notably absent from Plaintiffs' descriptions of the alleged agreements at issue in this case are any direct or circumstantial evidence that ITF participated in them. Plaintiffs must allege either direct evidence (e.g. an email or recorded phone call) or circumstantial evidence in the form of parallel conduct and plus factors. Plaintiffs do not allege any direct evidence as to ITF.[13] And because ITF does not engage in the underlying conduct, Plaintiffs' circumstantial case fails at the outset. Even if Plaintiffs had alleged parallel conduct, they do not plead the requisite plus factors. The alleged conspiracies hurt, rather than benefit, ITF because ITF receives a funding contribution from the Grand Slams equal to a percentage of the prize money awarded by the Grand Slam tournaments. Any allegation that ITF participated in an antitrust conspiracy that – if successful – would have harmed it (without any alleged benefit) is implausible and legally insufficient. *Citigroup*, 709 F.3d at 138–39

---

[12]    Federal antitrust law also generally applies to associations that restrain competition by adopting binding rules for their members, even if the associations themselves do not engage in the challenged conduct. *Relevant*, 61 F.4th at 307. That does not implicate ITF either. The members of ITF are national tennis federations. There are no allegations that ITF facilitates an agreement amongst the national federations.

[13]    To the extent the ATP and WTA Rulebooks and Bylaws are considered direct evidence of an agreement, they are not direct evidence of an agreement involving ITF because ITF is not obviously a party to those Rules or Bylaws.

(affirming dismissal in part because allegations did not establish a common motive to conspire).

In place of specific allegations, Plaintiffs begin nearly all of their key theories with a conclusory description of an agreement alleged amongst the Governing Body Defendants, a group that by the Complaint's definition includes ITF. *E.g.*, Compl. ¶ 118 (price limits); *id.* ¶ 142 (NIL rights); *id.* ¶ 160 (refusal to deal – Ranking Points); *id.* ¶ 164 (same); *id.* ¶ 177 (refusal to deal – schedule); *id.* ¶ 218 (output restriction); *id.* ¶ 227 (market allocation). But these allegations are conclusory. And the detailed allegations that follow each of these conclusory allegations do not mention ITF. Compl. ¶¶ 119–32 (price limits); *id.* ¶¶ 143–45 (NIL rights); *id.* ¶¶ 165–76 (refusal to deal - Ranking Points); *id.* ¶¶ 178–213 (refusal to deal – schedule); *id.* ¶¶ 219–26 (output restriction); *id.* ¶¶ 228–42 (market allocation). Plaintiffs occasionally mention the Governing Body Defendants in their descriptions (usually in a conclusory manner), but there are no specific allegations regarding ITF.

Plaintiff's approach, often referred to as group pleading, is legally insufficient. *See Concord*, 2014 WL 1396524, at *24 (complaint that "predominately attributes conduct that advanced the conspiracy to various defendants grouped together under a single name" was "simply insufficient to withstand review on a motion to dismiss"); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 417 (dismissing defendants whose alleged involvement was based on "generic references to 'defendants'"). Indeed, the court in *Concord* quoted in full and rejected allegations

nearly identical in form to those implicating ITF here. *See Concord*, 2014 WL 1396524, at *24.

**Price Fixing (First Cause of Action):** Plaintiffs allege that the Defendants fix prices pursuant to the ATP and WTA Rulebooks by limiting the amount of prize money the Tournament Co-Conspirators can distribute. These alleged agreements are described extensively without reference to ITF. *See* Compl. ¶¶ 119–28. For example, Plaintiffs allege that ATP and WTA "agreed to limit the amount of prize money offered at each level of the Tour to prevent tournaments of lower tiers from competing with higher-tier tournaments." *Id.* ¶¶ 123, 128. Plaintiffs do not allege – because they cannot – that ITF sets prize money for any of the tournaments subject to those rules or is involved in establishing the contents of those rules.

Plaintiffs also allege that ATP, WTA, and ITF have fixed prices by agreeing with the Grand Slam Co-Conspirators that no Tournament Co-Conspirator will offer more prize money than is offered by the Grand Slams. *Id.* ¶ 134. As with the first price fixing allegation, ITF does not determine prize money for any of the tournaments that are allegedly part of the alleged agreement. More importantly, despite incorporating the ITF Constitution into their Complaint, *id.* ¶¶ 59, 271, Plaintiffs never grapple with the fact that the Grand Slams pay ITF a funding contribution equal to 1% of the prize money awarded by their tournaments, meaning the alleged agreement would *reduce* ITF's funding. Bamberger Decl., Ex. A

(International Tennis Fed'n, *The Constitution of ITF Limited*, Art. 24.1 (2025)).[14] *See* Compl. ¶¶ 134, 135 (describing the agreement).

Finally, Plaintiffs allege that ITF agrees that its World Tennis Tour tournaments will not offer more prize money than is offered at ATP and WTA events; in exchange, ATP and WTA award Ranking Points for World Tennis Tour events. Compl. ¶ 136. That ITF World Tennis Tour events offer less prize money than ATP and WTA events is entirely consistent with unilateral activity. ATP and WTA events offer millions of dollars in prize money to the best men's and women's tennis players in the world. *Id.* ¶ 287 (ATP and men's Grand Slams awarded $325 million in prize money in 2023); *id.* ¶ 296 ($340 for WTA and women's Grand Slams). By contrast, World Tennis Tour events, which are two levels below Tour events, are "entryway" events for "aspiring" tennis players who hope to one day qualify for the ATP Challenger Tour (or the women's equivalent level, the WTA 125s) and then the ATP or WTA Tour (ATP and WTA 250s and up) after that. *Id.* ¶ 136; *see also id.* ¶ 88.

The fact that ITF World Tennis Tour events offer less prize money than ATP and WTA events is an entirely unremarkable consequence of ITF World Tennis Tour events being tournaments for lower level players aspiring to qualify for the higher-valued ATP and WTA tournaments, and, on its own, fails "to suggest that an agreement was made." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556). Allegations of conduct that makes "perfect

---

[14]     *Microsoft*, 2025 WL 1009179, at *5 (When considering a Rule 12(b)(6) motion, the Court may consider "documents appended to the complaint or incorporated in the complaint by reference.").

business sense," *Citigroup*, 709 F.3d at 138, or for which "there are obvious alternative explanations," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322–23 (3d Cir. 2010) (citation omitted), are not legally sufficient. Because "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. *Starr*, 592 F.3d at 321 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Plaintiffs also allege agreements amongst the Governing Body Defendants to restrict players' income by forcing players to assign their Name, Image, and Likeness rights to the Tours and Tournament Co-Conspirators, Compl. ¶ 142, and by limiting the number and types of sponsorship deals that players can have, *id.* ¶¶ 148, 151, 153. These alleged agreements are codified in the ATP and WTA Rulebooks. *Id.* ¶¶ 143, 148, 151. And the alleged agreements have nothing to do with and are defined in the Complaint without any reference to ITF. *Id.* ¶ 336 (defining agreement to fix prize money between ATP and Tournament Co-Conspirators); *id.* ¶ 337 (defining NIL agreement between ATP and Tournament Co-Conspirators); *id.* ¶ 338 (same for sponsorships); *id.* ¶ 340 (defining WTA prize money agreement with Tournament Co-Conspirators); *id.* ¶ 341 (same for NIL rights); *id.* ¶ 342 (same for sponsorships). ITF is lumped in as a Governing Body Defendant. *Id.* ¶¶ 142, 147. But there is no explanation for what role it plays in the alleged agreements.

**Market Allocation** **(Third Cause of Action):** Plaintiffs next allege an agreement to geographically allocate the market by requiring tournament operators to agree to limitations on when and where they will host tournaments in order to

receive a sanction to be part of the ATP or WTA Tour. Compl. ¶¶ 219, 372. The Complaint is clear that "the [ATP and WTA] Tours grant sanctions" to tournament operators "who may join the [ATP and WTA] Tours." *Id.* ¶ 219; *see also id.* ¶ 35 (defining the "Tours" as the ATP Tour and WTA Tour). The Complaint does not allege, nor could it, that ITF grants sanctions for ATP or WTA membership. And the Complaint does not allege, nor could it, that any of the tournaments allegedly connected to ITF seek or have those sanctions. Instead, Plaintiffs allege that ATP and WTA, through their Rulebooks and Bylaws, prevent the Tournament Co-Conspirators from competing against each other for men's and women's professional tennis services. *Id.* ¶¶ 375–78. But according to Plaintiffs, only the Tournament Co-Conspirators and players are bound by those Rulebooks and Bylaws. *Id.* ¶¶ 72, 73, 85, 86.

Plaintiffs do nothing more than implausibly tack ITF onto this alleged agreement through a number of conclusory allegations, *id.* ¶ 218 (orchestrated and entered agreements); *id.* ¶ 220 (same); *id.* ¶ 372 (enter agreements); *id.* ¶ 374 (same); *id.* ¶ 379 (compel agreements), but they never explain how or why ITF is involved. *See Twombly*, 550 U.S. at 564 ("Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations."); *see also Starr*, 592 F.3d at 319 n.2 ("The allegation that defendants agreed to this price floor is obviously conclusory, and is not accepted as true.").

**Refusal to Deal (Second Cause of Action):** Plaintiffs further allege an agreement to refuse to deal with tennis players who play in competitor tournaments or exhibition events. Compl. ¶ 357. Defendants allegedly effectuate their scheme by: (1) limiting the events that award Ranking Points, (2) using Ranking Points to determine Grand Slam qualification, (3) penalizing players for missing events, and (4) holding events 11 months of the year. *Id.* ¶¶ 160, 175, 177, 184.

But, on Plaintiffs' own allegations, ITF does not play any role in these decisions. "The ATP Rulebook regulates the eligibility of tournaments that can award ATP Ranking Points," and it is "ATP, its Tournament Co-Conspirators, and its Grand Slam Co-Conspirators" who allegedly agree on which events can award Ranking Points.[15] *Id.* ¶ 168. The WTA Rulebook does the same for the WTA, and, again, the alleged agreement determining the tournaments that can award Ranking Points does not include ITF. *Id.* ¶ 170. Plaintiffs elsewhere allege that ATP, WTA, and ITF have agreed through the ATP and WTA Rulebooks and Bylaws to the alleged scheme. *Id.* ¶¶ 361–62. But despite repeatedly citing the contents of those documents in the Complaint, Plaintiffs do not allege, nor could they, that ITF is a party to any of those documents. *See id.* ¶¶ 72, 73, 85, 86 (identifying parties bound by those documents).

The alleged requirement that Ranking Points determine Grand Slam qualification comes from an alleged agreement between ATP, WTA, and the Grand Slam Co-Conspirators. *Id.* ¶ 175. And penalties for not participating are allegedly

---

[15]    As previously explained, though Plaintiffs allege connections between ITF and the Grand Slams, the Grand Slam Co-Conspirators "operate[] separately from the Defendants." Compl. ¶ 51.

handed down by ATP, WTA, and the Tournament Co-Conspirators. *Id.* ¶¶ 185, 186, 198. Indeed, despite referencing the ITF Rules and ITF Constitution in the Complaint, Plaintiffs do not point to a single instance in which ITF prohibits players from participating in competing events. Nor could they, because ITF does not.

ATP and WTA also allegedly determine scheduling. *Id.* ¶¶ 72, 84, 178, 180, 201, 204. Though the Plaintiffs at times attribute scheduling decisions to all "Governing Body Defendants," *id.* ¶¶ 58, 182, 363, the Complaint never describes ITF's involvement in scheduling decisions, especially in light of the clear allegations that ATP and WTA set their own schedules. The alleged penalties for failure to participate likewise come from the ATP and WTA rules, *id.* ¶¶ 184–86, 195, 198, as do the prohibitions on playing in unsanctioned events, *id.* ¶¶ 201–04.

The alleged result of this scheme is that "ATP and WTA each squeeze out potential rival tournament operators." *Id.* ¶ 176. A benefit to ITF is not alleged, because there is none.

Even if Plaintiffs had adequately pleaded that ITF was in some way responsible for the length of professional tennis schedules, such participation, absent involvement in the other elements of the alleged scheme, would be insufficient to establish ITF's agreement to refuse to deal with players who participate in non-tour events. Allegations of conduct that makes "perfect business sense," *Citigroup*, 709 F.3d at 138, or for which "there are obvious alternative explanations," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 322–23, are not enough. Scheduling more tournaments, thereby generating more interest in and revenue for the game and

17

providing more opportunities for aspiring players, falls into both categories. *See Concord*, 2014 WL 1396524, at *23 (alleged conduct was "just as consistent with an alternative, lawful explanation of events").

Plaintiffs allege that ITF World Tennis Tour events award Ranking Points. Compl. ¶ 165. But awarding Ranking Points is not the same as determining who gets to award Ranking Points. And Plaintiff's allegation that ITF had to bargain with ATP and WTA in order for ATP and WTA to award Ranking Points for ITF World Tennis Tour events belies any notion that ITF has control over which tournaments can award Ranking Points. *Id.* ¶ 136.

Plaintiffs briefly list the ITF Rules as an agreement that facilitates the alleged refusal to deal. *Id.* ¶ 361. But Plaintiffs fail to explain how those Rules, incorporated by reference in the Complaint and thus reviewable by this Court, *Microsoft*, 2025 WL 1009179, at *5, plausibly facilitate market allocation. The ITF Rules are rules for how tennis is played. They specify things like the size of the court, the weight and size of the ball, and the scoring process. They have no connection to ATP's and WTA's allocation of Ranking Points or scheduling.

**Output restriction** **(Fourth Cause of Action):** Plaintiffs allege an agreement to restrict output by requiring tournament owners to receive a sanction from ATP or WTA if they want to award Ranking Points. As with the Market Allocation claim, Plaintiffs do not allege, because they cannot, that ITF grants sanctions for ATP or WTA membership or that World Tennis Tour events have those sanctions. *See supra.* Nor do Plaintiffs allege that ITF has reduced the number of

tournaments it operates or allows others to operate. Plaintiffs allege no direct or circumstantial evidence that ITF has agreed to restrict output in any way.

To the contrary, Plaintiffs allege an agreement between ATP and the tournament operators and another agreement between WTA and the tournament operators in the form of the ATP and WTA Bylaws respectively. *Id.* ¶¶ 391, 392. Despite incorporating the ATP and WTA Bylaws in their Complaint, Plaintiffs do not identify anything in the Bylaws that connects ITF to the alleged agreement. ITF is lumped in through conclusory allegations without any explanation for or specificity as to how it is involved. *Id.* ¶¶ 388, 390, 393, 394. *See Twombly*, 550 U.S. at 564 ("Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations."); *see also Starr*, 592 F.3d at 319 n.2 ("The allegation that defendants agreed to this price floor is obviously conclusory, and is not accepted as true.").

Plaintiffs again refer to the ITF Rules without explaining the significance of rules about court size and ball weight to alleged Output Restriction. Compl. ¶ 395.

## II.    ITF Does Not Compete For Professional Tennis Services

Plaintiffs' inability to connect ITF to any of the alleged agreements is unsurprising. Fundamentally, ITF does not compete horizontally with the Tournament or Grand Slam Co-Conspirators. The Tournament and Grand Slam Co-Conspirators allegedly compete for professional tennis services through the prize money that they offer. But Plaintiffs do not allege that ITF owns tournaments that compete for these services or pays players prize money for such tournaments. Instead,

19

ITF is an organization of national federations that promotes tennis globally through support for entry-level tournaments and handles roles such as standardizing rules.

The connections Plaintiffs do allege between ITF and the Grand Slams, World Tennis Tour, Davis Cup, and Olympics do not bear the weight of their claims. Plaintiffs stop short of alleging that ITF competes for professional tennis services through any of these tournaments. As to the Grand Slams, Plaintiffs acknowledge that the Grand Slams are independently owned and allege that each of the Grand Slam owners is "an independent economic entity" from ITF. Compl. ¶¶ 51, 56. Plaintiffs allege only roles that demonstrate no incentive to restrain competition for player services. *Id.* ¶ 60.

As to the World Tennis Tour, Plaintiffs do not plausibly allege that those events horizontally compete with the Tournament or Grand Slam Co-Conspirators. They only allege an agreement to cap the prize money awarded in exchange for Ranking Points. *Id.* ¶ 136. As explained above, those allegations fail to raise the likelihood of an agreement above mere possibility because it is entirely predictable that entry-level tournaments for young, aspiring tennis players offer less prize money than the most lucrative, competitive tennis tournaments in the world.

And as to the Davis Cup and Olympics, Plaintiffs make no reference to them or their significance beyond alleging that ITF "organizes and oversees" them. *Id.* ¶ 61.

Nor does ITF's alleged presence on the boards of WTA, ITIA, and the Grand Slams make them a competitor or participant in the alleged agreements. Plaintiffs do not allege that ITF's purported liability is established through its board

memberships or that ITF facilitated or joined any of the alleged agreements through its board memberships. Board membership alone is not sufficient evidence of participation, particularly where, as here, a board member lacks the incentive to conspire that the collective board has. *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119 (9th Cir. 2022).

*       *       *

Plaintiffs have failed to plausibly allege that ITF was part of the alleged agreements underlying its first four causes of action, to the extent those alleged agreements are properly alleged at all. This Court should dismiss those claims against ITF.

## III.  Plaintiffs' Conspiracy to Monopsonize Claims (Seventh and Eighth Causes of Action) Fail as to ITF

Plaintiffs allege that the Defendants conspired to acquire and maintain monopsony power for ATP and WTA. Compl. ¶¶ 440, 455. A conspiracy to monopsonize claim requires "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Int'l Distribution Centers*, 812 F.2d at 795.

As described above, Plaintiffs have failed to adequately allege that ITF participated in those alleged agreements. They have also failed to allege that ITF had the incentive, let alone the intent, to monopsonize the market for ATP or WTA. Plaintiffs' allegations regarding ITF's intent are entirely conclusory, *see* Compl.

¶¶ 441, 456, and they allege the conduct described in the first four causes of action as overt acts, i*d.* ¶¶ 442–46, 457–61.

Even if Plaintiffs had adequately connected ITF to the conspiracy, the alleged conspiracy is not legally viable. Plaintiffs allege a conspiracy to acquire and maintain monopsony power "for the ATP and its Tournament and Grand Slam Co-Conspirators." *Id.* ¶¶ 440, 455 (same for WTA); *see also id.* ¶ 442 (ATP, ITF, ITIA, and Tournament and Grand Slam Co-Conspirators "overtly acted to acquire and maintain *their* monopsony power." (emphasis added)); *id.* ¶ 457 (same for WTA).

But allegations like these amount to a "shared monopoly." *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 DLC, 2014 WL 4379112, at *13 (S.D.N.Y. Sept. 4, 2014) (characterizing plaintiff's allegations as a shared monopoly where they alleged that defendants "*collectively* sought to monopolize" the market and did not allege that defendants "sought to confer monopoly power on any single entity"). Courts "have repeatedly rejected the viability of a Section 2 conspiracy claim based on a shared monopoly theory." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) (collecting cases). As one court put it, "[t]he very phrase 'shared monopoly' is paradoxical; when a small number of large sellers dominates a market, this typically is described as an oligopoly." *Oxbow Carbon & Mins. LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013). That is why though a conspiracy amongst competitors may violate Section 1, "competitors, by conspiring to maintain or create an oligopoly, do not run afoul of the Section 2 prohibitions against monopoly." *Id.*

22

## IV.    Plaintiffs' Unjust Enrichment Claims (Ninth Cause of Action) Fail as to ITF

Plaintiffs allege that Defendants, including ITF, "ha[ve] materially enriched" themselves by agreeing to "limit the compensation they pay to Player Plaintiffs." Compl. ¶ 470. But "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon NY, Inc.*, 18 N.Y.3d 777, 790 (2012). Here Plaintiffs' unjust enrichment claim wholly duplicates their claim under the antitrust laws. Their allegations thus either make out a claim under the antitrust laws, or they should be dismissed. Plaintiffs cannot salvage defective claims by dressing them up as claims for unjust enrichment. *See, e.g.*, *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021) (dismissing duplicative unjust enrichment claim); *Grossman v. Simply Nourish Pet Food Co. LLC*, 516 F. Supp. 3d 261, 285 (E.D.N.Y. 2021) (dismissing claim where "the unjust enrichment claim duplicates the plaintiff's other claims"); *see also Corsello*, 18 N.Y.3d at 791 ("To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects.").

Plaintiffs' unjust enrichment claim would fail even if it was not duplicative. To state a claim, Plaintiffs must plead that "(1) [the] defendant was enriched, (2) at [the] plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what [the] plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).[16] Here, Plaintiffs do not

---

[16]    ITF does not concede that Plaintiffs' claims are governed by New York law. To the extent that ITF has been unjustly enriched, it has been so in England, where it

explain how the alleged conduct enriched ITF, much less unjustly. Plaintiffs' market allocation, output reduction, refusal to deal, and conspiracy to monopolize claims are directed at ATP, WTA, and Grand Slam events. The only claim that involves prize money paid by ITF is the price fixing claim. But because Plaintiffs have not adequately alleged that ITF World Tennis Tour tournaments restrict the prize money they award, they have not alleged any conduct that enriches ITF. Even if they had, they do not allege that any of the named Plaintiffs played in an ITF World Tennis Tour event within the applicable statute of limitations. *See* Compl. ¶¶ 20–32.

## CONCLUSION

For the reasons stated above, ITF respectfully asks this Court to dismiss the claims against it and that leave to replead be denied. *See, e.g.*, *Cuoco. v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("[A] futile request to replead should be denied.").

---

is based. The elements of a claim for unjust enrichment under English law are broadly the same as under New York law. *See, e.g.*, *Croxen et al.* v *Gas and Elec. Mkts. Auth.* [2022] EWHC 2826 (Ch), [117] (Eng.) ("(1) has the [defendant] been enriched by reason of the satisfaction of customer balances? (2) was the enrichment at the expense of the [claimants] (3) was the enrichment unjust? (4) does the [defendant] have a defence?"). Moreover, English law, like New York law, recognizes that "[a] claim based on unjust enrichment does not create a judicial licence to meet the perceived requirements of fairness on a case-by-case basis: legal rights arising from unjust enrichment should be determined by rules of law which are ascertainable and consistently applied." *Comm'r of Rev.* v *The Invest. Tr. Cos. (in Liquidation)* [2017] UKSC 29, [39]–[42] (UK). Plaintiffs plead no established principle under which their claim against ITF would arise.

Dated: May 20, 2025                 Respectfully Submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Heather S. Nyong'o*

Heather S. Nyong'o (admitted *pro hac vice*)
650 California Street Suite 2400
San Francisco, CA 94108
(415) 796-4480
hnyongo@cgsh,com

Joon H. Kim
One Liberty Plaza
New York, New York 10006
(212) 225-2000
jkim@cgsh.com

Nowell D. Bamberger (*pro hac vice* forthcoming)
J.P. Olinski (*pro hac vice* forthcoming)
Benjamin S. Fridman (*pro hac vice* forthcoming)
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
(202) 974-1752
nbamberger@cgsh.com
jolinski@cgsh.com
bfridman@cgsh.com

### Certificate of Compliance

As required by this Court's Rule II(B)(2), I certify that this memorandum of law contains 6,480 words, excluding the caption, table of contents, table of authorities, and signature blocks.

Dated: May 20, 2025                    Respectfully submitted,

                                       */s/ Heather S. Nyong'o*

26