# Exhibit C

# Robert Croxen, Paul Berkovi and Mark Firmin (as Joint Liquidators of Utility Point Limited), Robert Croxen and Jonathan Marston (as Joint Liquidators of Igloo Energy Supply Limited), Paul Flint, Paul Berkovi and Robert Croxen (as Joint Administrators of PFP Energy Supplies Limited), Paul Flint, Paul Berkovi and Robert Croxen (as Joint Administrators of PFP Energy Limited), Jonathan Marston, Paul Berkovi and Mark Firmin (as Joint Liquidators of Green Supplier Limited), Robert Croxen, Paul Berkovi and Mark Firmin (as Joint Administrators of Neon Reef Limited), Jonathan Marston, Paul Berkovi and Robert Croxen (as Joint Administrators of People's Energy (Supply) Limited), Michael Denny, Paul Berkovi and Mark Firmin (as Joint Liquidators of Avro Energy Limited), Matthew Cowlishaw and Daniel Smith (as Joint Administrators of Iresa Limited), Jonathan Roden and Stuart Preston (as Joint Liquidators of Economy Energy Trading Limited) v Gas and Electricity Markets Authority, Octopus Energy Limited, EDF Energy Customers Limited, British Gas Trading Limited v Contract Natural Gas Limited

 No Substantial Judicial Treatment

**Court**
Chancery Division

**Judgment Date**
11 November 2022

Case Nos: CR-2021-001735; CR-2021-001834; CR-2021-001756; CR-2021-001659; CR-2021-001803; CR-2021-002188; CR-2021-001740; CR-2021-001791; CR-2018-006300; CR-2022-000441

High Court of Justice Business and Property Courts of England and Wales Insolvency and Companies Court List (Ch)

**[2022] EWHC 2826 (Ch), 2022 WL 16902725**

Before: Mr Justice Zacaroli

11/11/2022

Hearing Dates: 4-7 October 2022

**Representation**

Mark Phillips KC , Andrew Shaw and Dr Riz Mokal (Instructed by Womble Bond Dickinson ) for the 1st to 8th Applicants.
Lance Ashworth KC and Matthew Morrison (Instructed by Shakespeare Martineau LLP and Squire Patton Boggs ) for the 9th and 10th Applicants.
Andrew de Mestre KC and Lara Hassell-Hart (Instructed by OFGEM ) for the 1st Respondent.
Matthew Abraham (Instructed by Freshfields Bruckhaus Deringer ) for the 2nd to 4th Respondents.
Matthew Weaver KC and Andrew Brown (Instructed by Addleshaw Goddard ) for the Intervener.

**Approved Judgment**

Mr Justice Zacaroli:

**Introduction**

1.  This is an application for directions by the officeholders (in five cases joint administrators, and in the other five cases, joint liquidators) of companies that were formerly licensed under the Electricity Act 1989 (" EA 1989 ") and the Gas Act 1986 (" GA 1986 ") to supply electricity and gas to domestic customers in the UK.

2.  On various dates (between 1 August 2018 and 21 November 2021) the licence of each of the companies (other than PFP Energy Limited, which did not hold a licence at the time it became insolvent) was revoked, following a determination by a court that it was unable to pay its debts. The procedure is explained in, for example, *Gas & Electricity Markets Authority v Spark Energy Supply Limited [2018] EWHC 2522 (Ch)* . I will refer generally to a licensee whose licence is revoked in these circumstances as a "Failed Supplier." Upon revocation of each licence, another supplier – known as a supplier of last resort ("SoLR") – was appointed to supply electricity and gas to the customers of the company whose licence was revoked.

3.  The issues to be determined on this application fall into two groups. The first group concerns the construction of statutory provisions relating to obligations imposed on licensed suppliers of electricity to provide certificates certifying that they have acquired electricity from renewable sources, or to make payment in lieu (the "renewables obligation"). A number of questions are raised as to the nature of the renewables obligation and the extent to which liabilities arising out of it are provable in the administration or liquidation of the Failed Supplier. I deal with these in section 1 below.

4.  The second group of issues concerns a possible claim in unjust enrichment by a SoLR against the Failed Supplier arising out of the fact that the SoLR honoured credit balances of customers with the Failed Supplier, following their appointment as SoLR. I deal with these in section 2 below.

5.  A full list of the issues (except for Issues 11 and 12 which are not dealt with in this judgment), with my brief answer to each of them insofar as relevant, appears in section 3 below.

6.  There is no material difference between the provisions of the GA 1986 and the EA 1989 , or the respective statutory instruments made under them. For the sake of simplicity, therefore, I will refer throughout this judgment to the relevant provisions of the EA 1989 and the statutory instruments made under it.

**The Parties**

7.   The first to eighth applicants are officeholders of companies whose licences were revoked after 1 September 2021 (save, as I have already noted, PFP, which did not hold a licence when it became insolvent). I will refer to these as the "Applicants". The Applicants were represented by Mr Mark Phillips KC, Mr Andrew Shaw and Dr Riz Mokal.

8.   The ninth and tenth applicants are officeholders of, respectively, Iresa Limited ("Iresa"), whose licence was revoked on 1 August 2018, and Economy Energy Trading Limited ("Economy"), whose licence was revoked on 14 January 2019. I will refer to these as the "Additional Applicants". The Additional Applicants were represented by Mr Lance Ashworth KC and Mr Matthew Morrison.

9.   The difference in the dates of revocation of their licences, as between the Applicants and the Additional Applicants, is relevant to certain of the second group of issues, because the provisions of the applicable statutory instruments changed over time.

10.   The first respondent is the Gas and Electricity Markets Authority (the "Authority"), a non-ministerial department and independent regulator of the electricity and gas markets. The Authority was represented by Mr Andrew de Mestre KC and Ms Lara Hassell-Hart.

11.   The day to day activities necessary to enable the Authority to discharge its functions are carried out by Ofgem. The principal objective of the Authority is to protect the interests of existing and future electricity and gas consumers, including their interests in the security of the supply to them: see, for example, s.3A(1) of EA 1989 .

12.   The second to fourth respondents are energy companies that were appointed as SoLRs to one or more of the Failed Suppliers. They were represented by Mr Matthew Abraham.

13.   Contract Natural Gas Limited ("CNG") was the operator of a wholesale gas supply business until it entered administration on 17 December 2021. It was a party to master supply agreements with five of the companies whose officeholders are the 1st, 2nd, 5th, 8th and 10th applicants. As such, it is a creditor of those companies, and the dividend it will receive from the insolvent estate of those companies is likely to be impacted by the answer to the issues raised on this application. By an order of the Chancellor dated 22 July 2022, CNG was given permission to intervene by providing written submissions. I permitted it to make non-duplicative oral submissions on certain of the issues. It was represented by Mr Matthew Weaver KC and Mr Andrew Brown.

14.   I am grateful to all counsel and solicitors for their excellent and comprehensive written and oral submissions.

**Section 1 : the Renewables Obligations (Issues 1 to 5)**

15.   Issues 1 to 5 are concerned with the interpretation of the Renewables Obligation Order 2015 ("ROO15") or, in Scotland, the Renewables Obligation (Scotland) Order 2009 . The provisions of each instrument are subantially the same, and I will refer for convenience to ROO15. It is made under section 32 of EA 1989 . This empowers the relevant minister to make a "renewables obligation order", being an order which imposes the "renewables obligation" on each electricity supplier falling within a designated description. The purpose is to encourage the development of electricity generating capacity using renewable sources of energy.

© 2025 Thomson Reuters.

**The relevant provisions of Roo15**

16.  The relevant provisions of ROO15 are set out in Annex 1 to this judgment. The following is a summary.

*Renewables obligation*

17.  The Authority is required to issue renewables obligation certificates ("ROCs") to operators generating electricity from renewable sources that are accredited to the Renewables Obligation Scheme: Article 18. Those ROCs are sold by the operators to suppliers who purchase electricity from them.

18.  Each "designated electricity supplier" (i.e., one that is supplying electricity in England and Wales: Article 7(1)) is subject to the "renewables obligation". That is, by Article 7(2), that "each designated electricity supplier must, by the specified day, produce to the Authority, in respect of each megawatt hour of relevant electricity that it supplies during an obligation period, the number of UK ROCs determined in accordance with articles 13 and 13B."

19.  By Article 2(1), an "obligation period" runs from 1st April in any given year until 31st March in the following year, and the "specified day" is 1st September following the relevant obligation period.

20.  Designated electricity suppliers are informed, by 1st October preceding an obligation period, of the number of ROCs they are required to produce in respect of each megawatt hour of electricity that they supply to customers during that obligation period: Articles 13, 13A and 13B. The aggregate number of ROCs to be provided each year by suppliers to the Authority is intended to be greater than the number of ROCs issued by the Authority to operators. That is so as to ensure that at least some part of the renewables obligation has to be satisfied by making a buyout payment. In turn, this ensures that there will be a buyout fund – as described below – from which the Authority's expenses of running the renewables obligation can be paid. It also helps to maintain the market price of ROCs.

*Payments to discharge the renewables obligation*

21.  Designated electricity suppliers are, however, given the option to discharge their renewables obligation (in whole or part) by making a payment (a "buyout payment") to the Authority "before the 1st September in the following obligation period": Article 67(1). The following obligation period (i.e. 1st April to 31st March following the end of the relevant obligation period) is then defined as the "settlement period".

22.  There is a potential discrepancy between the reference to making a buyout payment *before* 1st September under Article 67(1), and providing ROCs *by* 1st September under Article 7(1), but nothing turns on it for the purposes of the issues to be determined on this application.

23.  The amount to be paid under Article 67(1) is a sum equal to a fixed amount (the buyout price) for each ROC multiplied by the number of ROCs the designated electricity supplier should have, but has not, supplied to the Authority in respect of the relevant obligation period: Article 67(2).

24.  The amount held by the Authority on 1st September in the settlement period, representing the payments made under Article 67(1) and any interest thereon, is referred to as the "buyout fund". The Authority is required, before 1st November in the settlement period, to deal with the buyout fund as follows: first, to pay into the consolidated fund an amount to cover its costs of running the renewables obligation scheme; second, to pay any remaining amount to UK suppliers in proportion to the amount of ROCs that each supplier produced in the relevant obligation period compared to the total amount of ROCs produced by all UK suppliers in that period: Articles 69 and 71.

25.  Where a designated electricity supplier fails to discharge its renewables obligation before 1st September in the settlement period, it is given a further grace period, called the "late payment period": Article 68. The late payment period runs from 1st September to 31st October in the settlement period. The Authority is required to notify each designated electricity supplier of the extent of its default as soon as reasonably practicable after 1st September. The extent of its default is the same as the amount calculated under Article 67(2) (see above), less any payments already made under Article 67. Interest is payable on the amount of default, at 5% above the Bank of England base rate. By sub-paragraphs (6) and (7) of Article 68:

"(6) If, by the end of the late payment period, the designated electricity supplier has paid to the Authority under this article the amount referred to in paragraph (2) and all interest required to be paid on that amount under paragraph (3), it will be treated as having discharged its renewables obligation for the relevant period.

(7) If, by the end of the late payment period, the designated electricity supplier has not paid to the Authority the amount referred to in paragraph (2) and all interest required to be paid on that amount under paragraph (3), the supplier will not have discharged its renewables obligation for the relevant period."

26. The amount held by the Authority on 1st November in the settlement period, comprising late payments and interest, is called the "late payment fund". The Authority is required, before 1st January in the settlement period, to deal with the late payment fund in a way similar to the buyout fund: first, if the costs of the Authority of administering the renewables obligation scheme exceeded the buyout fund, by paying an amount equal to the remaining costs into the consolidated fund; and, second, provided the remaining sum is more than £50,000, by paying it to UK suppliers in proportion to the amount of ROCs that each supplier produced in the relevant obligation period compared to the total amount of ROCs produced by all UK suppliers in that period.

*Mutualisation*

27. The mutualisation provisions contained in Articles 72 to 77 are potentially triggered, as at the end of October in the settlement period, if there is a shortfall in the amounts received by the Authority by the end of the late payment period. They operate by: (1) identifying a sum to be raised (the "total mutualisation sum"); (2) calculating the amount to be paid, and from which suppliers, towards the mutualisation sum; and (3) determining to which suppliers the sum raised (the "mutualisation fund") is to be distributed.

28. Specifically, as soon as reasonably practicable after 31st October in the settlement period, the Authority is required to determine whether a shortfall has occurred between (1) the amounts held in the buyout fund as at 1st September and in the late payment fund as at 31st October, and (2) the amount that should have been in those funds had each designated electricity supplier, which had not (and is not treated as having) discharged its renewables obligation in full, paid the sum notified to it under Article 68(1).

29. A shortfall is only a "relevant shortfall" (so as to trigger the operation of the mutualisation provisions), however, if it exceeds the "mutualisation threshold" for the relevant period. Prior to 31st March 2021 the mutualisation threshold in England and Wales was £15.4 million. Since that date it varies from year to year according to the calculation set out in Article 72(4). There is also a cap on the amount of the total mutualisation sum. In 2020-2021 the mutualisation cap was £301,471,100.35. The cap has not to date been reached in any year.

30. In the simplest case, the total mutualisation sum is equal to the relevant shortfall: Article 73(1).

31. The calculation of the total mutualisation sum is adjusted according to a formula set out in Article 72(3), where any non-compliant UK supplier has nevertheless provided at least one ROC to the Authority. No party suggested that anything turns on this adjustment.

32. The amount due from suppliers in order to fund the total mutualisation sum is calculated pursuant to Article 74 as follows:

(1) It is only "relevant suppliers" that are required to make a payment. A relevant supplier is one that was a designated electricity supplier in the relevant obligation period and which, at the end of the late payment period had either discharged or was treated as having discharged its renewables obligation at least in part.
(2) That means that any supplier that was a designated electricity supplier in the relevant obligation period, but failed either to produce any ROCs or make any buyout or late payment to the Authority, has no obligation to contribute to the total mutualisation sum.

(3)  Each relevant supplier is required to contribute a fraction of the total mutualisation sum calculated as the number of ROCs that it would have had to produce (had it made no payments in lieu under Articles 67 or 68) over the total number of ROCs that all relevant suppliers would have had to produce (if they had made no such payments in lieu). Relevant suppliers must pay this sum in four equal, quarterly instalments commencing before 1st September in the "mutualisation period", which is the obligation period immediately following the settlement period (i.e. the year commencing on 1st April a year and a day after the end of the relevant obligation period).

33.  Article 75 deals with the situation where a supplier makes a payment to *other UK suppliers* which would, had it been paid to the Authority under Article 67 (buyout payment) or Article 68 (late payment) have increased the amounts that those suppliers would have received under Article 71 from the buyout and late payment funds. That will be the case where the supplier in receipt of such a payment had provided at least some ROCs (because its entitlement to receive funds out of the buyout and late payment funds is calculated by reference to the number of ROCs they provided). I will refer to these as "lateral supplier payments".

34.  In that event, the Authority is required to undertake three calculations. First, it must recalculate the total mutualisation sum, on the basis that (see Article 73(3)) the shortfall is reduced by the sum of all lateral supplier payments. Second, and as a result of the total mutualisation sum having been recalculated, it must recalculate the amount each relevant supplier is required to contribute to the mutualisation fund. Third, it must then calculate the amounts which each supplier is either still to pay to the Authority (where its recalculated supplier payment is greater than the amount already paid by it towards the total mutualisation sum), or is to receive from the Authority (where its recalculated supplier payment is less than the amount already paid by it towards the total mutualisation sum), as a result of the first two recalculations. The mechanism for this is set out in Article 76.

35.  Under Article 77, the whole of the mutualisation fund is recycled to "compliant UK suppliers" (i.e. those suppliers who, at the end of the late payment period, have either discharged, or are treated as having discharged, their renewables obligation in full in respect of the relevant obligation period). It is distributed in proportion to the number of ROCs each compliant supplier produced, compared to the ROCs produced by all compliant suppliers.

**The positions of the parties in brief**

36.  Issues 1 to 5 raise a number of questions as to certain of the obligations imposed on suppliers under ROO15, including as to the extent to which they are actual, prospective or contingent liabilities.

37.  The parties are agreed as to the answer in relation to liabilities under the mutualisation scheme (and also as to answers in relation to a separate piece of legislation known as the Feed-in Tariffs Order 2012 concerned with a "levelisation fund"). Accordingly, I do not address these issues at all in this judgment.

38.  I received written submissions on the provisions of the Insolvency (England and Wales) Rules 2016 relating to provable debts but, in the end, there was no dispute between the parties as to the interpretation of those provisions.

39.  So far as Issues 1 to 5 concern the renewables obligation (and any liability to make payment arising out of it), the parties' respective positions boiled down to a few core points, as I summarise in the following paragraphs.

40.  The Applicants contend that a supplier comes under no liability at all to make a payment in respect of its renewables obligation. Alternatively, it contends that if any liability did arise, it ceased to exist on 31st October in the settlement period. That proposition is advanced as a matter of statutory construction, on the basis that the mutualisation scheme, which gives rise to new and different payment obligations, is intended to replace any liability that had arisen in respect of the renewables obligation.

41.  On the Applicants' case the only liabilities to which a supplier is subject in relation to ROO15 for which the Authority may prove in its insolvency are: (1) the payment obligations arising under the mutualisation scheme; and (2) a penalty under s.27A EA 1989 .

42.  The Additional Applicants contend that suppliers *do* come under payment obligations arising out of the renewables obligation, but these are replaced (also as a matter of statutory construction) by the payment obligations imposed on suppliers under the mutualisation scheme. Unlike the Applicants, however, they contend that the earlier obligations are only replaced if and when the mutualisation threshold is reached, because it is only then that relevant suppliers are under an obligation to make mutualisation payments.

43.  CNG supports the analysis of the Applicants (alternatively the Additional Applicants), and advances a further, fall-back, argument that any payment obligation of a supplier arising from its renewables obligation is discharged at common law by payments made by suppliers pursuant to the mutualisation scheme.

44.  The Authority contends that a supplier who has not discharged its renewables obligation in full (and is not treated as having done so) is liable to pay the amount by which it is in default to the Authority, and that liability continues notwithstanding the existence of the mutualisation scheme, as from 31st October in the settlement period, or payment obligations imposed on suppliers under it, or payments made by suppliers pursuant to it.

**Is any liability to make payment imposed on suppliers in relation to the renewables obligation prior to 31st October in the settlement period?**

45.  As I have noted above, the Applicants' first proposition is that no payment obligation is ever imposed on a supplier in relation to the renewables obligation, other than under the mutualisation scheme (after 31st October) or by way of penalty.

46.  The starting point of Mr Phillips, for the Applicants, is that the renewables obligation is one to provide ROCs, not to make payment, by 1st September in the settlement period. Although there is an option to make a buyout payment instead of providing ROCs, that is voluntary and gives rise to no enforceable obligation.

47.  I agree that, prior to 1st September in the settlement period, the renewables obligation does not give rise to any enforceable obligation to pay money to the Authority. Indeed there is no enforceable obligation to do anything until 1st September, because designated electricity suppliers have until that date to comply with the renewables obligation.

48.  Leaving aside the potential discrepancy between an obligation to do something before, as opposed to by, 1st September, however, it is clear that immediately after that date a supplier that has been subject to a renewables obligation during the relevant obligation period is now required to make a payment to the Authority if and to the extent that it has not satisfied its renewables obligation by providing the requisite number of ROCs by 1st September. After that date, it is no longer open to it to satisfy the renewables obligation by providing ROCs.

49.  In my judgment, the proper analysis of the renewables obligation is that it comprises a primary obligation to provide ROCs, and a secondary obligation, to the extent that it does not provide ROCs, to make a buyout payment to the Authority. Mr de Mestre, for the Authority, submitted that the primary obligation is itself a provable debt, because it is a "liability to

pay money's worth" within the meaning of Rule 14.1 of the Insolvency Rules 2016 . I do not think that is correct, but nothing turns on it, because at the same time as the supplier comes under an enforceable obligation to provide ROCs, it comes under an obligation to pay money to the extent that it does not provide ROCs.

50.  The latter is clearly a provable debt. Prior to 1st September, the supplier is under a contingent liability to pay, the contingency being the negative one that it has not, by 1st September, satisfied its renewables obligation by suppling ROCs to the Authority. From 1st September, the supplier is under an actual obligation to make a payment, and to pay interest for every day it fails to pay, up until 31st October. The fact that the late payment period continues until 31st October does not mean that there is no enforceable obligation to pay until that date. The payment obligation crystallises as of 1st September.

51.  Mr Phillips contests that conclusion on the basis that, although ROO15 provides that a supplier is in default if it has not satisfied its renewables obligation in full by 1st September, and that it cannot be regarded as having satisfied that obligation if it has not made a payment in respect of that renewables obligation by 31st October, nevertheless there is no payment obligation on a supplier, because the Authority has no *entitlement* to receive payment. This is for two reasons.

52.  First, because the Authority is precluded, by Article 68(8) from imposing a penalty on a supplier, for having defaulted on its renewables obligation, during the late payment period. A substantial part of the submissions advanced by the Applicants (supported in this respect by CNG) related to the circumstances in which the Authority could, and could not, impose a penalty on a supplier, and the extent to which that possibility gave rise to a provable debt. I do not address these submissions, however, because I reject the contention that the Authority's inability to impose a penalty has any relevance to the question whether there is an enforceable obligation to make a late payment following 1st September. The Applicants' submission, in my judgment, confuses the question of enforceability with the question of punishment for non-compliance. The fact that the Authority cannot impose a penalty does not disentitle it to receive such payment as is due to it from a supplier who is in default of its renewables obligation.

53.  Mr Phillips, supported by Mr Weaver for CNG, advanced a development of this argument, to the effect that a supplier that had failed to discharge its renewables obligation and had had its licence revoked, owed no provable debt to the Authority because the loss of its licence deprived the Authority of the ability to impose a penalty on it. I reject this development of the argument for the same reason: even if it is correct that no penalty can be imposed on a supplier once its licence has been revoked, that does not relieve the supplier of the underlying obligation to discharge its renewables obligation by making the payment required by Article 68. I need not address, therefore, the submissions advanced in writing by Mr Weaver relating to the circumstances in which a liability might exist, but is not provable because it cannot be enforced.

54.  I understood Mr Phillips also to contend that where a supplier's licence had been revoked, that meant that it was no longer under a renewables obligation, because: (1) such an obligation can only be imposed on a designated electricity supplier: (2) a designated electricity supplier is one that is actually supplying electricity; and (3) once a supplier's licence is revoked it is no longer able to supply electricity.

55.  I also reject this contention. The renewables obligation is imposed on a designated electricity supplier in respect of a relevant obligation period. The critical requirement, therefore, is that the supplier was licensed during that obligation period. If it was, it incurs a liability. Without a clear provision removing that liability upon a subsequent revocation of its licence, in my view it continues.

56.  Mr Phillips pointed, by way of contrast, to the fact that the obligation to make mutualisation payments is imposed on relevant suppliers, who are expressly defined to include those that *had* a licence in the relevant obligation period. That express

provision is necessary, however, because a mutualisation payment obligation is created for the first time after 31st October in the settlement period. It needs to cater, therefore, for the possibility that a supplier has had its licence revoked since the end of the relevant obligation period. For the reasons already given, no such necessity arises in the case of the renewables obligation.

57.  The second reason is based on section 32G(6) of EA 1989 . That subsection reads, relevantly, as follows:

> "A renewables obligation order may not by virtue of subsection (5) confer an entitlement on the Authority to receive a payment in respect of the shortfall for any period—
>
> (a)  in the case of a shortfall in the amount received by the Authority, if the receipt of the payment is to be while a prohibition or restriction by virtue of subsection (4) applies, in one or more cases, to the taking of steps in relation to contraventions of renewables obligations for that period…"

58.  Mr Phillips submitted that a "prohibition or restriction by virtue of subsection (4) applies…" during the late payment period, and it follows that under s.32G(6) a renewables obligation order cannot confer any entitlement on the Authority to receive a payment, including a "late payment" during that period. He referred to this as an "imperfect obligation", by which he meant that there is a duty on the supplier to pay but no entitlement in the Authority to receive payment.

59.  I reject this submission which is based on a misinterpretation of subsection (6). That subsection merely precludes a renewables obligation order *by virtue of subsection (5)* conferring an entitlement on the Authority to receive payment during the late payment period. Subsection (5) is the provision in the statute which empowers the making of the mutualisation scheme – that is, the scheme which addresses the overall shortfall suffered by the Authority as a result of suppliers' failure to discharge their renewables obligation. It reads, relevantly, as follows:

> "A renewables obligation order may provide that, in a case in which the amount received by the Authority, or by the Northern Ireland authority, by way of discharge payments for a period falls short of the amount due in respect of that period, every person who—
>
> (a)  was subject to a renewables obligation for the relevant period or for a subsequent period specified in or determined under the order, and
>
> (b)  is of a description so specified or determined, must by the time and in the circumstances so specified or determined make a payment (or further payment) to the Authority of an amount calculated in the manner so specified or determined."

60.  Subsection (6) is accordingly to be read as precluding the renewables obligation order from entitling the Authority to receive payment *pursuant to the mutualisation scheme* during any period to which the prohibition on enforcement under subsection (4) applies, i.e. during the late payment period. ROO15 is consistent with 32G, because it provides for mutualisation payments only after 31st October. On a proper reading of section 32G , there is nothing which prevents the Authority from receiving payments from suppliers in respect of their renewables obligation during the late payment period. Any other conclusion would, in the face of clear provisions in Article 68 (expressly mandated by section 32G(1) ) permitting

© 2025 Thomson Reuters.

suppliers to make payments, in discharge of the renewables obligation, to the Authority in the late payment period, be perverse.

### What is the effect of mutualisation?

61. The Applicants' principal contention is that even if there is a payment obligation on designated electricity suppliers prior to 31st October, then as from that date it ceases to exist. As I have summarised above, that contention is advanced as a matter of statutory construction, on the basis that the bringing into effect of the mutualisation scheme as from 31st October is inconsistent with any payment liability in respect of the renewables obligation continuing thereafter.

62. The Applicants contend that this is so even if mutualisation is not in fact triggered because the shortfall is too small to constitute a relevant shortfall under Article 72(3). They contend that it is the mere fact that a different and inconsistent regime is imposed from 1st November which dictates that any earlier payment liability arising out of the renewables obligation ceases. The Additional Applicants disagree, and contend that the renewables obligation is replaced only if the threshold is reached, so as to trigger the obligation to make mutualisation payments.

63. Between them, the applicants' submissions can be viewed under three broad headings. First, if any liability to make payment pursuant to the renewables obligation continued beyond 31st October it would result in double counting, in that suppliers would have to pay twice in respect of the same underlying obligation. Second, if that liability continued beyond 31st October, it would result in the Authority making double recovery, in that the *amount* of the shortfall caused by all the suppliers who failed to discharge their renewables obligation in full would be recovered again from payments made by suppliers under the mutualisation scheme. Third, the absence of any provisions in EA 1989 or ROO15 addressing the possibility that late payments might be made after 31st October, or as to what should be done with such payments, indicates that the liability is intended to cease at that date. I will address these broad headings in turn.

*Double Counting*

64. The risk of double counting (in the sense that a supplier would be liable to pay the same amount twice, once as a continuing renewables obligation and once as an obligation under the mutualisation scheme) is overstated.

65. First, if the threshold for a relevant shortfall is not met, then there will be no payments under the mutualisation scheme and no double counting. The Additional Applicants (but not the Applicants) meet this point by contending that the renewables obligation is replaced, so as to be brought to an end, only if mutualisation payments are actually triggered. It is also the case that any shortfall over the "mutualisation cap" is ignored in calculating the total mutualisation sum (and thus the aggregate amount to be collected from relevant suppliers under the mutualisation scheme). There is accordingly no double-counting to the extent that the cap is exceeded. While the likelihood of the mutualisation cap being exceeded is low, the fact that the possibility exists is a circumstance against which the applicants' arguments need to be tested.

66. Second, and more significantly, there would also be no double counting in relation to any supplier which wholly failed to discharge its renewables obligation. That is because such a supplier is not a relevant supplier, and thus not required to make any payment under the mutualisation scheme. For the following reasons, this is not to be discounted as an outside possibility which cannot have been at the forefront of the drafter's mind.

67. The parties referred me to the Explanatory Memorandum to the Renewables Obligation Order 2005 (the "2005 EM"). All parties relied to some extent on it as an aid to construing ROO15: the provisions of the 2005 Order were materially similar to ROO15, and it was the 2005 Order that introduced the mutualisation scheme. At §7.28 of the 2005 EM, it was noted that it is "extremely likely" that the only reason a supplier would not pay the full outstanding amount of its renewables obligation was because it was insolvent and incapable of making any further payments. At §7.37, when explaining which suppliers would not be required to make mutualisation payments, it was noted that experience had so far shown that if a supplier becomes insolvent and therefore unable to comply with its renewables obligation, "it will default on the whole obligation and not

attempt to comply in part." The reason for leaving those suppliers out of the mutualisation scheme was that if their renewables obligation had been included, then part of the shortfall would not be recovered (see §7.40).

68. It is clear from the 2005 EM, therefore, that the possibility that one or more of the suppliers would wholly fail to discharge their renewables obligation was viewed as the most likely explanation for a shortfall occurring. In other words, the drafter was aware that the most likely circumstance in which mutualisation would occur is one in which there was no double counting, because those required to make mutualisation payments would constitute suppliers other than those who had caused the shortfall. Mutualisation would therefore have been envisaged as operating mostly on the basis of one group of suppliers (those who discharged their renewables obligation in full) plugging the hole left by another group (those who wholly failed to discharge their renewables obligation.)

69. That has been borne out in practice. According to Mr de Mestre, for the Authority, the experience in recent years, at least, has been that there are very few partially compliant suppliers. Suppliers have mostly either defaulted altogether – i.e. they have not discharged their renewables obligation even in part – or they have fully complied. This is borne out by the fact that the discrepancy between the total shortfall and the total amount paid out under the mutualisation scheme in each of the past few years is very small. It is to be expected that a supplier that could not make a late payment due to its insolvency would equally be unable to contribute to the mutualisation fund. The fact that the discrepancy is small is thus explained by the fact that most of the shortfall is caused by insolvent suppliers who have wholly failed, and are thus not required to contribute to the mutualisation fund.

70. Even where a relevant supplier has only partially discharged its renewables obligation, any double counting will relate to part only of its renewables obligation. That is because the obligation to contribute to the mutualisation fund is spread among *all* relevant suppliers, such that the defaulting supplier's mutualisation payment will inevitably be less than the amount of its own default. That was certainly true of each of the worked examples provided by Mr Ashworth, for the Additional Applicants.

71. Moreover, as Mr de Mestre submitted, the fact that such a supplier would be required to make a mutualisation payment *and* be under a continuing obligation to pay the amount by which it was in default of its renewables obligation, does no more than bring it into line with the *compliant* suppliers. Each of them will (by definition) have satisfied their renewables obligation in full, but are nevertheless required to make a mutualisation payment.

72. The difference (as Mr Phillips and Mr Ashworth emphasised) is that whereas the fully compliant supplier may be entitled to a distribution from the mutualisation fund, the partially compliant supplier is not. That is the consequence of the underlying policy of ROO15, namely encouraging renewable energy, in particular by ensuring that the value of ROCs is maintained. As pointed out in the 2005 EM (at §7.30), the price that suppliers will pay for ROCs takes into account not only that the supplier does not need to make a buyout payment but also that it will receive a distribution from the buyout and late payment funds. The risk of a shortfall in those funds would lead to a discount in the price of ROCs. The mutualisation scheme was introduced to counteract that risk, by trying to "mitigate the impact of any future shortfalls on the market for certificates": §7.25.

73. In any event, a fully compliant supplier is only entitled to receive any payment from the mutualisation fund if and to the extent that it satisfied its renewables obligation by providing ROCs, as opposed to making a buyout payment. That is because the amount payable to each compliant supplier is calculated by reference to the number of ROCs it provided. A supplier that satisfied its renewables obligation without providing ROCs is therefore in the same situation as the defaulting supplier who is required to satisfy its payment liability *and* contribute to the mutualisation fund; it is required to make, to some extent at least, a double payment without being entitled to share in distributions from the mutualisation fund.

74. In my judgment, the fact that the continuation of liability under the renewables obligation puts the partially defaulting suppliers in the same position as fully compliant suppliers *so far as the possibility of double payment* is concerned, is a powerful reason in support of the continuation of that liability, and that point is not diminished by reference to the fact that it is only fully compliant suppliers (to the extent they provide ROCs) that benefit from the recycling of the mutualisation fund.

75. Mr Ashworth objected that the policy would not be achieved by pursuing defaulting suppliers for payment. There would be an uncertain prospect of any recovery from insolvent suppliers, and it could take years to receive any dividend. That is true, and underlines the importance of the mutualisation scheme to raise money to be recycled to those who provided ROCs quickly and with certainty. The fact, however, that the mutualisation scheme creates an alternative fund to be recycled to those who provided ROCs, quickly, so as to maintain the value of ROCs, provides no reason for concluding that the original liability of defaulting suppliers comes to an end.

*Double Recovery*

76.  Mr Phillips referred to the fact that in relation to each of the obligation periods 2017/18, 2018/19 and 2019/20 the amount of the shortfall (created by default of suppliers in respect of their renewables obligation) was very nearly matched by the total mutualisation distribution payments. For 2017/18, for example, the total shortfall in the UK was £58.6 million, and the amount distributed to suppliers under the mutualisation scheme was £57,785,425.

77.  It is true that, as I have already noted, in the most likely scenario (i.e. where the shortfall is mostly caused by suppliers who wholly failed to discharge their renewables obligation) it is likely that the amount raised from mutualisation payments from relevant suppliers will equal, or nearly equal, the shortfall. That is because the relevant suppliers, being those that discharged their renewables obligation in full, will be solvent and thus in a position to meet their mutualisation obligations.

78.  It does not follow, however, that because a shortfall created by one group of suppliers is matched by funds raised by another group of suppliers, the liability of the first group falls away. There are many circumstances in which a person's debt is paid by another, but such payment does not ordinarily eliminate the debtor's liability to pay: for example, insurance, sureties, or payment in circumstances that give rise to the restitutionary remedy of subrogation (considered in Section 2 below) where, although the debt is "discharged", the debtor nevertheless remains subject to the same liability, albeit to the third party via subrogation.

79.  The applicants nevertheless support this conclusion by reference to the absence of any provisions in EA 1989 or ROO15 which envisage the possibility of late payments in respect of the renewables obligation being made after 31st October, to which I now turn.

*Absence of provisions addressing late payments made after 31st October*

80.  The applicants point, first, to the fact that Article 68 permits a late payment to be made only until 31st October, and for interest to accrue until that date, and to the absence of any provision in ROO15 permitting payment thereafter.

81.  I do not read much into this fact. If a statutory liability is payable by a certain date (1st September), there is no need to make express provision in order for the liability to continue after that date. That is not the purpose of Article 68 in permitting payment to be made late. Its purpose (evident from sub-paragraphs (6) and (7)) is to provide a period of grace within which suppliers who are in fact in default of the renewables obligation (which by its terms has to be discharged by 1st September) may remedy that default so that they will be *treated* as if they had discharged it. That is important principally because it is only suppliers who have actually discharged the renewables obligation or who are treated as having discharged it that are entitled to receive any payment from the mutualisation fund. Accordingly, the absence of an express provision *permitting* a payment to be made later than 31st October, or to allow for interest to accrue beyond that date, provides no support for the view that the obligation comes to an end on 31st October.

82.  In response to the Authority's contention that ROO15 says nothing about the renewables obligation ceasing, Mr Ashworth pointed to the fact that it also says nothing about it continuing. I accept that there is no express provision either way in ROO15. I consider, however, that the burden is on those asserting that a liability created by statute ceases to exist upon some other event, to explain how that result is achieved. Given that Article 68(7) expressly states that a supplier that has not paid the full amount of its late payment and interest by 31st October in the settlement period "will not have discharged its renewables obligation for the relevant period", the absence of any express provision in ROO15 to the effect that the liability thus created disappears on 31st October is a significant hurdle for the applicants and CNG to overcome.

83.  More substantively, the applicants rely on the lack of any machinery dictating what the Authority should do with any late payment received after 31st October. Mr Phillips pointed to the fact that, in relation to a *late* late payment to the Authority (in contrast to the position where a lateral supplier payment is made) there is no provision for: (a) the Authority to notify others; (b) the Authority to add the amount of such a payment into any of the buyout fund, the late payment fund or the mutualisation fund; (c) relevant suppliers to suspend paying instalments of their mutualisation payments; (d) the Authority to recalculate relevant suppliers' mutualisation payments; or (e) the Authority to notify relevant suppliers of recalculated obligations.

84.  Mr Phillips submitted that it cannot have been Parliament's intention that any post-31st October payment from a supplier to the Authority, in purported discharge of its renewables obligation, would be retained by the Authority. I agree that this is unlikely to have been Parliament's intention. The purpose of the renewables obligation regime (being to encourage renewable energy) is achieved by recycling payments received from defaulting suppliers to those who produce ROCs. It is no part of

the purpose to enable the Authority to retain sums received from suppliers, save only that it is entitled to retain part of the buyout and late payment funds to satisfy its expenses. It has no such entitlement in relation to the mutualisation fund.

85. In fact, the Authority has, to date, recognised that it ought not to retain sums paid to it by suppliers in respect of their renewables obligation after 31st October. Where that happened, until May 2020, the Authority chose to distribute such payments to UK suppliers who had presented ROCs, regardless of whether mutualisation had been triggered. In March 2020, however, it consulted suppliers and other stakeholders, presenting two options for dealing with such late payments. The first was to continue as before. The second – which, in light of responses to the consultation, it chose to adopt – was to distribute such payments to all suppliers in proportion to the total mutualisation payments they were responsible for making in the relevant period. In Ofgem's letter of 7 May 2020, informing suppliers of its decision, it said:

> "We have considered the views of respondents on the [two options] and have decided that in respect of years in which mutualisation is triggered Ofgem will distribute any late payments received after the late payment deadline of 31 October to all relevant suppliers which are still trading, as defined within the RO Orders, in proportion to the total mutualisation payments they are responsible for making (see Option 1). This is because, when mutualisation is triggered, not only suppliers who presented ROCs but also suppliers who discharged their obligations by making payments into the buyout or late payment funds are impacted by the shortfall, as all relevant suppliers have an obligation to make mutualisation payments to cover the shortfall. Ofgem therefore considers that option 1 is the most proportionate approach and the most consistent with the provisions of the RO Orders."

86. The possibility that the Authority might simply retain any late payments was not even considered to be an option. It is also notable that Ofgem referred, in that letter, to the possibility of reducing mutualisation payments by an amount equal to that recovered from defaulting suppliers, but rejected it on the basis that Article 75 provided for the specific circumstances in which the Authority is required to recalculate the total mutualisation sum and mutualisation payments, but this applied only in the case of lateral supplier payments: "As such, the RO Orders do not authorise Ofgem to recalculate mutualisation payments in circumstances where payments are received by Ofgem after the late payment deadline of 31 October."

87. The consultation, and Ofgem's response to it, is relevant to the extent that it reinforces the fact that an important piece of machinery is missing from ROO15 if liability to pay under renewables obligation continues beyond 31st October. Beyond that, however, Ofgem's response is not relevant to the interpretation of the relevant provisions of EA 1989 or ROO15.

88. Mr Phillips relied on the fact that where there is a lateral supplier payment, Article 75 does not treat it as discharging a pre-existing late payment obligation, but requires it to be fed into a recalculation of mutualisation obligations. That is true, but it is equally true to say that where a supplier makes a lateral supplier payment, that does not go to reduce the amount that *it* is required to pay towards the total mutualisation sum. That is because the payment that each supplier is required to make towards the mutualisation fund is calculated by reference to the total ROCs it *would* have produced had it made no buyout or late payments. Had the only obligation remaining upon a supplier after 31st October been the obligation to make a mutualisation payment, then it might be expected that a lateral supplier payment made by a particular supplier would be treated as reducing *its* obligation to make a mutualisation payment. That is not, however, the case.

89. Mr Ashworth compared the position under certain other mutualisation schemes, where express provision is made for late payments from defaulting suppliers to be distributed to suppliers within the mutualisation scheme. I do not find, however, the terms of other schemes to be helpful in interpreting the mutualisation scheme under ROO15. He suggested that the fact that Ofgem had to consult about what to do with late payments made by defaulting suppliers pointed against their obligations surviving. I disagree. It merely reinforces the fact that there is nothing in the rules to deal with such late payments.

90. I nevertheless accept that there is a lacuna in ROO15, in the lack of any provision dictating what the Authority should do with late payments made after 31st October, particularly when that is contrasted with the detailed machinery, in the case of lateral supplier payments, for notification to suppliers and recalculation of the total mutualisation sum and suppliers' obligations to make mutualisation payments.

91. The critical question, however, is whether that lacuna compels the conclusion that the payment liability arising out of the renewables obligation ceases to exist on 31st October, or on the mutualisation scheme being triggered. That question arises in circumstances where, for the reasons set out above: (1) ROO15 clearly creates a payment liability on suppliers who have failed to discharge their renewables obligation by 1st September; (2) Article 68 states that the renewables obligation will not have been discharged by a supplier who fails to make good its default in payment by 31st October; (3) there is no express provision terminating that liability to pay; (4) there is no appreciable risk of double-payment in the circumstances in which default giving rise to the shortfall is likely to occur; (5) any such risk replicates the position – so far as payment is concerned – of those who have fully complied with the renewables obligation; and (6) the mere fact that the gap in funds to be recycled to suppliers who provided ROCs, created by one group of suppliers' default, is filled by mutualisation payments from another group of (predominantly different) suppliers does not in itself provide a reason for the termination of the liability of the first group.

92. Added to that, I consider that the continuation of the liability better reflects the purpose of ROO15. The discontinuance of the obligation for a defaulting supplier, in circumstances where (as I have noted above) the mutualisation obligation which replaces it is inevitably in a significantly smaller amount, would, if anything, be a disincentive on suppliers complying with the renewables obligation (although I accept that this point has less weight where there are other incentives on a supplier, including the wish to retain its licence, to comply with that obligation).

93. In my judgment, in all these circumstances, the correct interpretation of ROO15 is that the payment liability arising out of the renewables obligation continues notwithstanding either the coming into effect of the mutualisation scheme, or payment obligations under it being triggered, on 31st October.

*CNG's fall-back argument*

94. Mr Weaver, on behalf of CNG, advanced a fall-back argument to the effect that actual payment of mutualisation obligations discharged any outstanding renewables obligation, as a matter of common law. He contended (citing the four requirements for payment of another's debt to result in discharge of that debt, per Lewison LJ in *Ibrahim v Barclays Bank plc [2012] EWCA Civ 640* ) that the mutualisation payments were (1) paid by a third party (relevant suppliers); (2) to the creditor (the Authority); (3) on account of the renewables obligation owed by defaulting suppliers; and (4) under compulsion.

95. It is true to say that the amount sought to be raised in aggregate through mutualisation payments from relevant suppliers is the same amount in aggregate as the shortfall in the amount due from defaulting suppliers in respect of their renewables obligation. However, as the Applicants pointed out in their position paper, no individual relevant supplier makes a payment on account of the debt owed by any defaulting supplier. More importantly, I consider that the analysis breaks down because, although payment is made to the same creditor – the Authority – that ignores the fact that the Authority merely sits in the middle of a scheme for recycling payments and has different rights and responsibilities in relation to payments made in respect of renewables obligations (I will call this stage 1) and payments under the mutualisation scheme (I will call this stage 2).

96. The first difference relates to the Authority's interest in the moneys received by it. At stage 1, the Authority has an interest in the moneys received, because it is entitled to look to those moneys to pay its costs of running the renewables obligation scheme. At stage 2, however, the Authority has no interest in the moneys received. It must distribute the whole of the mutualisation fund to suppliers. If the whole of the shortfall were needed to satisfy the Authority's expenses of running the renewables obligation scheme, then there would be no correlation at all between the use to which the buyout payments and the mutualisation payments were to be put.

97. The second difference relates to the identity of the suppliers entitled to receive distributions. At stage 1, all suppliers who have provided at least one ROC are entitled to receive a distribution from the buyout and late payment funds. At stage 2, on the other hand, only compliant suppliers (i.e. those that have discharged, or are treated as having discharged, their renewables obligation in full) are entitled to receive a distribution from the mutualisation fund.

98. In these circumstances, I do not think that it is sufficient – in order to establish that the mutualisation payment is made in respect of the renewables obligation – that the aggregate amount that all relevant suppliers are required to pay the Authority in mutualisation payments is the same as the aggregate amount due from all defaulting suppliers in respect of their renewables obligation. As Mr De Mestre submitted, the purposes of the two payment obligations (the buyout payments and the mutualisation payments) may to some extent coincide – namely to enable payments to be made to suppliers who provided ROCs so as to maintain the market value of ROCs – but that purpose is achieved via different mechanisms.

**Conclusion**

99.  For the above reasons, I conclude that: (1) a supplier that has failed to discharge its renewables obligation in full solely by provision of ROCs by 1st September is under a liability to make a buyout payment, and interest for the period between 1st September to 31st October in the settlement period; (2) that liability is, prior to 1st September, contingent on the supplier not having satisfied its renewables obligation by providing ROCs, thereafter it is an actual obligation; (3) that liability continues beyond 31st October, notwithstanding either the existence of the mutualisation scheme from that date, or payment obligations under it being triggered by reason of the mutualisation threshold being reached.

**Section 2: Unjust Enrichment**

100.  The second set of issues relates to the regime for appointing a supplier of last resort ("SoLR") upon the failure of a licensed energy supplier.

101.  At all times relevant to the parties in this case, the Standard Conditions of an energy supplier's licence permitted the Authority (by Condition 8.1) to impose a last resort supply direction ("LRSD") on a licensee. A LRSD is made if circumstances have arisen entitling the Authority to revoke the licence of a Failed Supplier, for example – as for each of the applicants in this case – on the grounds that it is insolvent, and the licensee could comply with the LRSD without significantly prejudicing its ability to continue to supply energy and to fulfil its contractual obligations for that supply.

102.  In some cases, the customers of the Failed Supplier had paid for their energy supply by direct debit and, upon the revocation of the Failed Supplier's licence, they had credit balances with it. Those credit balances have been paid by the relevant SoLR. Issue 7 asks whether a SoLR has a claim for unjust enrichment where it had confirmed to Ofgem prior to its appointment as SoLR that it would honour such customers' credit balances. Although the issue distinguishes between honouring credit balances by payment, supply of energy or in some other way, no party suggests that the result is any different depending on the manner in which the customer credit balances were honoured.

103.  Issues 6, 8, 9 and 10 raise either a sub-issue (relating to compulsion as an element in a claim for unjust enrichment) or certain variations on the central question. It is common ground that consideration of Issue 11 will be deferred, if it is relevant at all, until after judgment is delivered on the remaining issues. Accordingly, I will focus primarily on Issue 7, which arises in the circumstances I describe in more detail in the following paragraphs. I will then address briefly Issue 12, which raises the question of a proprietary claim in favour of customers from whom direct debit payments continued to be taken by a Failed Supplier after the making of a LRSD.

**Summary of the relevant facts**

104.  Ofgem operates what it terms a "safety net" for customers of Failed Suppliers, to ensure both the continuation of their supply and the protection of any credit balances they had with their Failed Supplier. On 21 October 2016, it published guidance on, among other things, the SoLR regime. In the executive summary it stated that the factors it would take into account in selecting a SoLR included "any measures offered by a potential SoLR to address the loss of consumer credit balances." It provided further detail at paragraph 2.23 of the guidance:

> "We will also seek information on the proposed steps to be taken in relation to customers who hold credit balances with the failed supplier. The loss of such balances may have particular implications for customers or specific groups of customers in certain circumstances. We will ask potential SoLRs

whether, and how, they would address the loss of this balance (e.g. through applying a credit to the customer's account) in order to ensure that customers are not unduly affected."

105.  For that purpose, the information sought by Ofgem from a failing supplier in each of the companies the subject of these applications included a description of its financial position, including details of indebtedness. The guidance indicated that high-level, aggregated portfolio information (although not specific customer details) would be shared with potential SoLRs to enable them to assess their ability to supply the additional customers. One of the assumed facts for this application is that the information provided by the failing supplier, and shared with potential SoLRs, was an estimate of the total outstanding credit balances (the amount was necessarily an estimate because it was dependent on precise energy usage as at the date of the LRSD).

106.  At paragraph 3.25 of the guidance, Ofgem stated that it would "assess the supplier's proposals in respect of consumers who have credit balances with a preference for those agreeing to honour these balances." That is in practice what Ofgem does: it has never appointed a SoLR which did not agree to honour customer credit balances, and each of the SoLRs joined to this application did agree to honour customer credit balances, although they agreed to absorb differing amounts of the costs of doing so (I deal below with the possibility that the SoLR could recoup the costs through a last resort supply payment).

107.  The process followed by Ofgem, as explained in the witness statement of its Deputy Director of the Enforcement Directorate, Rupert Charles Hargreaves, involves the following steps:

(1)  Prior to the revocation of the failing supplier's licence, Ofgem makes a public announcement, reassuring customers that their supply would continue and their credit balances with the Failed Supplier would be honoured. In the case of Iresa, Ofgem's announcement dated 27 July 2018 said: "the energy supply of Iresa customers will continue as normal, and their outstanding credit balances protected under Ofgem's safety net". Customers were advised to "sit tight" as that would "…make the process of handing Iresa's customers over to a new supplier, and paying back their outstanding credit balances, as hassle free for these customers as possible." It reiterated that "If you are an Iresa customer there is no need to worry as we will make sure your energy supplies are secure and your credit balance is protected." The announcement in respect of Economy was in materially similar terms.
(2)  The failing supplier is also asked to make a similar announcement on its website. In Iresa's case, this said: "Iresa Limited will be ceasing to trade. Ofgem, the energy regulator, is appointing a new supplier for its customers. Customers need not worry; their supplies are secure and credit balances are protected. Ofgem's advice is not to switch, but to sit tight and wait until the new supplier has been appointed. This will help make sure that the process of handing customers over to a new supplier, and honouring credit balances, is as hassle free for customers as possible." Economy's announcement on its website was in materially similar terms.
(3)  Once a SoLR was appointed, Ofgem made a further announcement to let customers know that their supply had been taken over by another licensed supplier. In the case of Iresa, Ofgem's announcement, dated 31 July 2018, stated that Octopus Energy had taken on supplying customers of Iresa and would "honour all outstanding credit balances, including money owed to both current customers and to past customers of Iresa."

108.  Following the appointment of administrators to a Failed Supplier, I am asked to assume that one or other of three scenarios ensued:

(1)  The SoLR entered into an agreement with the administrators of the Failed Supplier, under which the SoLR expressly agreed with the Failed Supplier that it would honour all or certain of the customer credit balances;
(2)  The SoLR entered into an agreement with the administrators of the Failed Supplier, under which the Failed Supplier agreed to transfer customer data, including as to credit balances, to the SoLR;
(3)  No agreement was reached between the SoLR and the Failed Supplier as to transfer of data.

109. By way of example of the second scenario, the evidence of Jonathan Roden, one of the joint liquidators (formerly joint administrators) of Economy, is that following their appointment the administrators provided the relevant SoLR with documentation to assist it in respect of customer credit balances. He also said that when the administrators sent out their proposals to creditors (on 7 March 2019) "…we did not send the proposals to the customers as we took the view (rightly or wrongly) that [the SoLR] having stated that they would honour the customers' credit balances, the customers were no longer creditors of Economy". The evidence of Matthew Cowlishaw, one of the joint administrators of Iresa, is the same.

*Last Resort Supply Payment*

110. Under Standard Condition 9 of the supply licences, a SoLR is entitled, provided it has the Authority's consent to do so, to make a claim for a Last Resort Supply Payment ("LRSP") from distributors. The cost of a LRSP is passed on by increased charges to suppliers and, in turn, to customers.

111. Condition 9.3 requires the SoLR to give to the Authority notice of its claim and the calculation of the amount claimed, with supporting information. By Conditions 9.5 and 9.6 the Authority may give its consent to the claim, or to a claim in a different amount.

112. A LRSP is intended to cover certain of the costs incurred by the SoLR, including the cost of purchasing wholesale energy at short notice, and the cost of honouring customer credit balances. Express reference has been included to the latter since January 2019, when sub-paragraph (b) (underlined below) was added to Condition 9.4, which provides that the amount claimed may not exceed the amount by which:

> "(a)  the total costs (including interest on working capital) reasonably incurred by the licensee in supplying electricity to premises under the Last Resort Supply Direction and a reasonable profit,
>
> plus
>
> (b)  any sums paid or debts assumed by the licensee to compensate any Customer in respect of any Customer Credit Balances ,
>
> are greater than:
>
> (c)  the total amounts recovered by the licensee through Charges for the Supply of Electricity to premises under the Last Resort Supply Direction (after taking all reasonable steps to recover such Charges)."

113. One of the agreed facts I am asked to assume is that, since January 2018, approval of claims by the Authority has been expressly subject to the condition that the SoLR will seek to recover the cost of honouring credit balances from the Failed Supplier's insolvency. An example of Ofgem's recent practice in this respect is its response (in a letter dated 23 June 2022) to a request for consent to a LRSP made by Octopus as SoLR upon the revocation of Avro Energy Limited's licence. This was conditional upon Octopus entering into a "True-up" agreement, whereby any reduction in costs would be offset against Octopus's subsequent claim, and upon Octopus's agreement to repay any net overpayment back to consumers. In approving that part of the claim relating to customer credit balances, Ofgem said: "…it may still be the case that Octopus is able to recover some of this claimed amount through the ongoing administration process for Avro. Where it does so, those recovered amounts should reduce the total amount of the overall levy claim and subject to timings of any recover via the administrator, be declared and set off against any future claim as part of the true up process."

*Relevant terms of Standard Conditions*

114.  At the time of the LRSD in respect of Iresa, the Standard Conditions contained, relevantly, the following terms:

(1)  Condition 0.2: "The licensee must, and must ensure that its Representatives, achieve the Standards of Conduct in a manner consistent with the Customer Objective".
(2)  By Condition 0.1, The "Customer Objective" was that "each Domestic Customer … is treated Fairly".
(3)  The Standards of Conduct included Condition 0.3(a): "behave and carry out actions in a Fair, honest, transparent, appropriate and professional manner".
(4)  By Condition 0.9, a licensee would not be regarded as treating a Domestic Customer Fairly "…if their actions or omissions give rise to a likelihood of detriment to the Domestic Customer, unless the detriment would be reasonable in all the relevant circumstances."

115.  At the time of the LRSD in respect of Economy, as well as the above terms, the Standard Conditions contained the additional sub-paragraph (b) in Condition 9.4 which I have set out above. An accompanying definition of Customer Credit Balances was provided at Condition 9.10, which included "Closed Credit Balances" (being any amount owing by the Failed Supplier to a customer on the date when the LRSD took effect, where the customer had previously transferred to another supplier, or where its contract had been terminated) and "Open Credit Balances" (being any amount owed by the Failed Supplier to a customer on the date of the LRSD).

116.  By the time of the LRSD in relation to all the other applicants, the Standard Conditions included the following further terms:

(1)  Condition 7.12(b): "The licensee must ensure that each Deemed Contract contains terms and conditions which … (b) require the licensee to honour Customer Credit Balances, provided and to the extent that the licensee committed to do so before the Authority gave it a [LRSD] and the Deemed Contract arose as a result of the [LRSD]";
(2)  Condition 8.3: "In complying with the Last Resort Supply Direction, the licensee must take all reasonable steps to honour any commitment made to the Authority before the Authority gave it a Last Resort Supply Direction".

**Unjust enrichment: the elements in the claim**

117.  The parties were in agreement as to the approach to establishing a claim in unjust enrichment (see *Banque Financiere de la Cite v parc (Battersea) Ltd [1999] 1 AC 221* , per Lord Steyn at p.227): (1) Has the Failed Supplier been enriched by reason of the satisfaction of the customer balances? (2) Was the enrichment at the expense of the SoLRs? (3) Was the enrichment unjust? (4) Does the Failed Supplier have a defence?

118.  As explained by Lord Reed JSC in *Investment Trust Companies v Revenue & Customs Comrs [2017] UKSC 29* , at §39-42, a claim based on unjust enrichment does not create a "judicial licence to meet the perceived requirements of fairness on a case-by-case basis: legal rights arising from unjust enrichment should be determined by rules of law which are ascertainable and consistently applied". Nevertheless, Lord Steyn's four questions are "no more than broad headings for ease of exposition. They are intended to ensure a structured approach to the analysis of unjust enrichment, by identifying the essential elements in broad terms." While they should be considered and answered separately, "the questions themselves are not legal tests, but are signposts towards areas of inquiry involving a number of distinct legal requirements."

119.  Lord Reed also (at §41) emphasised the continuing importance of older authorities, notwithstanding that the concept of unjust enrichment as a unifying principle is of relatively modern origin: "Although judicial reasoning based on modern theories of unjust enrichment is in some respects relatively novel, there are centuries' worth of relevant authorities, whose value should not be underestimated. The wisdom of our predecessors is a valuable resource, and the doctrine of precedent continues to apply. The courts should not be reinventing the wheel."

120.  In *Capital Insurance Co Ltd v Samsoondar [2020] UKPC 33* , the Privy Council emphasised the importance of identifying (in relation to the third of Lord Steyn's questions) the "unjust factor" relied on, whether one of the established

categories ( *examples* of which included "mistake, duress, undue influence, failure of consideration, necessity and legal compulsion"), or "some incremental development" from them: see Lord Burrows as §19-20.


121.  The parties were also in agreement that, if a claim in unjust enrichment is established in this case, the appropriate remedy is that the SoLR is subrogated to the claims of the customers of the Failed Supplier.


**The position of the parties in brief**

122.  The SoLRs (supported by the Authority) contend that they have a claim in unjust enrichment in circumstances where, having committed to doing so prior to their appointment, the SoLRs honoured the Failed Supplier's customers' credit balances, because:

(1)  Payment by a SoLR to customers of the Failed Supplier enriched the Failed Supplier by discharging its debt to its customers, either because the Failed Supplier requested, authorised or ratified the payment or because it was paid under compulsion;

(2)  That enrichment was at the expense of the SoLR because value was subtracted from it in order to honour the customer balances; and

(3)  That enrichment was unjust, for either or both of the same reasons that the Failed Supplier was enriched: request, authority or ratification; or compulsion.


123.  The Applicants do not advance a positive case against a SoLR's claim in unjust enrichment. Indeed, in one respect they go further in support of such a claim than the SoLRs, as they contend that discharge of the Failed Supplier's debt to customers is established merely by the *customers* accepting payment from the SoLR.


124.  The Additional Applicants (supported to a large extent by CNG) contend that there is no claim in unjust enrichment against them, because:

(1)  Neither Iresa nor Economy was enriched by payment by the relevant SoLR of their customers' credit balances, because payment was neither requested, authorised or ratified by the Failed Supplier nor made under compulsion (by reference to the Standard Licence Conditions that applied to Iresa or Economy);

(2)  Any enrichment was in any event not at the expense of the SoLR, because the payment of customer credit balances was "incidental and collateral" to the wider bargain entered into by a SoLR upon being appointed as such and/or because the SoLR can recoup some or all of the costs via a LRSP;

(3)  Alternatively, where a SoLR has recouped the cost of honouring credit balances via a LRSP, the Additional Applicants have a defence of "passing-on"; and

(4)  Any enrichment was not unjust for largely the same reasons that the Failed Supplier's debt was not discharged.


125.  Much of the relevant case law pre-dates the analysis of unjust enrichment through Lord Steyn's four questions, with the consequence that the elements of enrichment and unjust factors are not separately identified in many of the cases. For that reason, and because the same two factors (request, authority, or ratification; and compulsion) are relied on for both elements, I will address these elements together, before dealing with the questions of whether any enrichment was at the expense of the SoLRs and whether a defence of passing-on is available.


**(A) Enrichment and Unjust Factors: the law**

126.  It is common ground that a Failed Supplier will have been enriched by a SoLR's payment of its customer credit balances only if that payment discharged the debt owed by the Failed Supplier to its customers.

127.  As between the Additional Applicants, the Authority, CNG and the SoLRs, there was also a measure of common ground as to the circumstances in which a debt owed by a debtor (D) to its creditor (C) is discharged by a payment to C by a third party (TP). It was contended by these parties that payment by TP of D's debt to C would be effective to discharge D's debt only if (1) it was requested, authorised or ratified by D, or (2) it was paid under compulsion (or necessity, although it is not contended by any party that necessity is relevant in this case).

128.  As I have noted above, the dispute between the Additional Applicants and CNG, on the one hand, and the SoLRs and the Authority on the other, is whether (as the SoLRs and the Authority contend) either basis (whether so as to discharge the Failed Suppliers' debt to customers, or so as to give rise to an unjust factor) is established on the facts of this case.

129.  The Applicants alone contend that discharge of D's debt to C, by a payment by TP, depends solely upon C having accepted the payment in discharge of the debt. Mr Phillips did not go so far as to say that acceptance by C is the *only* way in which the debt can be discharged, but says it is sufficient. This point is of practical importance if I reject the claim in unjust enrichment, because unless the customers' claims had been discharged merely by their acceptance of payment from the SoLRs, the Applicants would then have to address the fact that all customers with outstanding credit balances at the point of the LRSD will be creditors of the insolvent estate of the Failed Supplier.

*Request, Authority, or ratification*

130.  The possibility that D's debt to C is discharged by a payment by TP that is requested, authorised or ratified by D is relatively straightforward: Goff & Jones, Unjust Enrichment, 9th ed., at para 5.55. In *Electricity Supply Nominees Ltd v Thorn EMI Records (1991) 63 P&CR 143* , Fox LJ (with whom Sir Denys Buckley agreed) said, at p.148: "If a person makes a voluntary payment intending to discharge another's debt, he will only discharge the debt if he acts with that person's authority or the latter subsequently ratifies the payment."

131.  *Simpson v Eggington (1855) 10 Exch 845* is an example of subsequent ratification. The treasurer (TP) of a corporation (D) paid their clerk (C) the amount of his year's salary. The treasurer acted without the authority of the corporation and the corporation repudiated the payment. In a subsequent action by the corporation against the clerk to recover other sums, the clerk sought to set-off his entitlement to the year's salary. The corporation subsequently ratified the payment by the treasurer. Parke B held that this subsequent ratification defeated the clerk's purported set-off, holding that:

> "The general rule as to payment or satisfaction by a third person, not himself liable as a co-contractor or otherwise, has been fully considered in the cases of *Jones v. Broadhurst (9 C. B. 193* ), *Belshaw v. Bush (11 C. B. 191* ), and *James v. Isaacs (22 L. J. C. P. 73* ); and the result appears to be, that it is not sufficient to discharge a debtor unless it is made by the third person, as agent, for and on account of the debtor and with his prior authority or subsequent ratification."

132.  Whether or not D has sufficiently requested, authorised or ratified the payment (for the purpose either of satisfying the discharge element or amounting to an unjust factor) is to be determined by reference to the intentions of the parties gleaned from all the circumstances. As noted in Chitty on Contracts, 34th ed., at §32-132, (in a section dealing with the circumstances in which a claim to reimbursement arises, not merely the question of discharge) the courts have often inferred from the circumstances an implied request by the defendant to make the payment. The principle was stated as follows in

Smith's Leading Cases, 13th ed., at p.156 (a passage cited with approval in *Re Cleadon Trust Ltd [1939] Ch 286* : see the judgment of Bennett J at first instance at *[1938] Ch 660, 665-666* , approved by Clauson LJ, with whom Scott LJ agreed, on appeal at *[1939] Ch 286, 319* ):

> "If a person knows that the consideration is being rendered for his benefit with an expectation that he will pay for it, then if he acquiesces in its being done, taking the benefit of it when done, he will be taken impliedly to have requested its being done: and that will import a promise to pay for it."

*Compulsion*

133.  A number of the older authorities in which TP was permitted to claim against D, having paid D's debt to C under compulsion, were reviewed by Lewison LJ in *Ibrahim v Barclays Bank plc [2012] EWCA Civ 640* , at §40-48, including *Exall v Partridge* (1799) 8 Durn & E 208; *Moule v Garrett (1872) LR 7 Ex 101* ; *Brook's Wharf and Bull Wharf Ltd v Goodman Bros [1937] 1 KB 534* ; and *Electricity Supply Nominees Ltd v Thorn EMI Records* (above). His conclusion (with which Rimer and McFarlane LJJ agreed) was that these authorities justified the following proposition:

> "(i)  payment by a third party to a creditor under legal compulsion on account of a debt owed by a debtor will automatically discharge the debtor's debt; (ii) that is the case even if the legal compulsion arises out of a contractual obligation voluntarily assumed by the third party."

134.  The Additional Applicants agree that this is an accurate statement of the law. They contend, however, that a payment made by TP to C pursuant to a scheme which, though legally enforceable between TP and other third parties, cannot be enforced by C, will not discharge D's liability to C.

135.  The only authority cited for that proposition was *Esso Petroleum Co Ltd v Hall Russell & Co Ltd [1989] 1 AC 643* . In that case, Esso was the owner of a vessel, *Esso Bernicia* , which was damaged in an accident alleged to have been due to the negligence of the builders (Hall Russell) of a tugboat that was, at the time of the accident, berthing *Esso Bernicia* . The accident caused *Esso Bernicia* to spill a quantity of oil, which caused damage to sheep owned by certain crofters. Esso was a party to an agreement with other shipowners, the Tanker Owners Voluntary Agreement concerning Liability for Oil Pollution ("TOVALOP"). That agreement obliged Esso to pay compensation to the crofters. In an action in negligence by Esso against, among others, Hall Russell, Esso claimed to have a direct right against Hall Russell in respect of the amount they had paid to the crofters. One of the bases upon which this was asserted was a right to be subrogated to the crofter's rights against Hall Russell.

136.  That claim was rejected by the House of Lords. At p.662H-663A, Lord Goff noted that, had there been a contract of indemnity between Esso and the Crofters, and the payment to the Crofters had been made under that contract, then Esso would have been subrogated to the crofters' claims against Hall Russell. That would not, however, have enabled Esso to proceed, without more, to enforce the crofters' claims by action in its own name against Hall Russell. That was because Esso's payment to the crofters did not have the effect of discharging Hall Russell's liability to them: "There can of course be no direct claim by Esso against Hall Russell in restitution, if only because Esso has not by its payment discharged the liability of Hall Russell, and so has not enriched Hall Russell."

137.  The reason for this conclusion does not appear from that section of Lord Goff's speech, but it is clear from reading his speech as a whole that it was because the payment by Esso to the crofters was entirely voluntary. That appears, for example, from pp.665E to 666C, where Lord Goff dealt with an application by Esso to amend its claim, to aver that it was a practical necessity for the owner of a tanker in order to trade internationally to be a participating owner in TOVALOP. That was rejected on the basis that, since *Esso* was a founder-member of TOVALOP, it must have done so voluntarily, albeit for sound commercial reasons, and it was also inconceivable that Esso should have been deterred from withdrawing from TOVALOP

(which it was open to it to do) by reason of such practical necessity. He said, at p.666B: "the amendment would provide, therefore, no answer to the point that Esso is seeking to claim from Hall Russell, as a separate head of damage, sums paid by it under a voluntary agreement whereby it undertook to indemnify persons in the position of … the crofters."

138.  Similarly, Lord Jauncey, in dismissing the possibility that payments made to the crofters constituted a direct head of damage in Esso's claim against Hall Russell, said (at p.677H to 678A): "Esso chose to enter into and remain a party to TOVALOP for what were no doubt sound policy and commercial reasons but under no compulsion of law so to do. They agreed voluntarily to indemnify persons affected by oil spillage. They were under no general duty in law to the crofters and as far as they were concerned the payments which they received were entirely gratuitous."

139.  At p.662E, Lord Goff declined to consider an argument that TOVALOP created rights enforceable by third parties such as the crofters, because it was unnecessary to do so in light of his conclusion that since *Esso* voluntarily participated in TOVALOP, its payment to the crofters did not discharge Hall Russell's liability. This reinforces the point that what precluded relief in that case was that Esso's indemnification of the crofters was voluntary, not that there was an obligation but it was owed to someone other than the crofters.

140.  Accordingly, I reject the proposition that, in order to constitute compulsion sufficient to discharge D's debt, C must be able to enforce payment against TP. I note that compulsion, as an unjust factor more broadly, includes compulsion pursuant to statute (i.e. not at the behest of any particular person): see, for example, *Gebhardt v Saunders [1892] 2 QB 452* , where a tenant, who was obliged by statute to remedy defects in the property, was entitled to recover from the owner at common law, on the grounds that he had been compelled to expend money on work for which the owner was legally responsible.

141.  Mr Ashworth submitted that while it was sufficient, in order for a payment by TP to C to discharge D's debt to C, that (per Lewison LJ in *Ibrahim* ) the payment was made under legal compulsion arising out of an obligation voluntarily assumed, that was not sufficient to amount to an unjust factor. That is how, he submitted, *Ibrahim* is to be reconciled with the earlier Court of Appeal decision in *Owen v Tate [1976] QB 402* , noting that Lewison LJ cited *Owen v Tate* (at §39 of his judgment in *Ibrahim* ) for the proposition that "even where a payment does discharge another's debts the law may still decline to recognise that any rights have accrued to the payer as the result of the payment."

142.  The Additional Applicants rely on *Owen v Tate* for the broader proposition that TP, who was compelled to make payment which discharged a liability of D to C, would not be entitled to recover where TP's obligation had been voluntarily assumed. *Owen v Tate* does not, however, support such a bald proposition. In that case, the defendants (D) had obtained a loan from the bank (C), secured by a charge by way of legal mortgage on the property of a Miss Lightfoot. The claimant (TP), who was Miss Lightfoot's employer, had deposited money with the bank and executed a guarantee in favour of the bank so as to secure the release of Miss Lightfoot's security. This was done, not only voluntarily, but without any knowledge of the defendants. The defendants protested when they learned what had happened. When, however, the bank subsequently pressed the defendants for payment, the defendants asked the bank to have recourse to the claimant's moneys.

143.  The Court of Appeal rejected the claimant's claim for reimbursement. The lead judgment was given by Scarman LJ, with which Stephenson and Ormrod LJJ agreed. He began by noting two general rules (at p.406G to p.407C): (1) if a payment is regarded by the law as voluntary, it cannot be recovered; and (2) a person who is compelled to pay another's debt is entitled to be reimbursed by the latter. Both rules, however, admitted of exceptions. Exceptions to the first rule had been "constructed by the judges through a readiness to imply from the circumstances of the case a request or an authority to make the payment": p.407D. The exceptions to the second rule include that the person compelled had officiously exposed himself to the liability: p.407G to p.408B.

144.  Scarman LJ referred to Lord Wright MR's judgment in *Brook's Wharf and Bull Wharf Ltd v Goodman Brothers [1937] 1 KB 534* , in which he rejected the notion that the obligation to reimburse a claimant was based on an implied, notional or constructive contract, and continued: "The obligation is imposed by the court simply under the circumstances of the case and on what the court decides is just and reasonable having regard to the relationship of the parties": p.408C-D.

145.  He concluded that the cases, including *Brook's Wharf* , *Exall v Partridge* and *Moule v Garrett* , supported the proposition that "a broad approach is needed to the question whether in circumstances such as these a right of indemnity arises, and that broad approach requires the court to look at all the circumstances of the case": p.409F-G. In particular, he concluded, at p.410B, that even when an obligation is voluntarily assumed, the circumstances might render the volunteer entitled at law to a right of indemnity." At p.409H to p.410A he identified the fundamental question as being "whether in the circumstances it was

reasonably necessary in the interests of the volunteer or the person for whom the payment was made, or both, that the payment should be made – whether in the circumstances it was 'just and reasonable' that a right of reimbursement should arise."

146.  The critical circumstance in that case was, not merely that the claimant assumed the liability voluntarily, but had done so behind the defendants' back (p.410C-D):

> "It is enough to refer to the judge's findings of fact to know that the plaintiff assumed the obligation of a guarantor behind the back of the defendants, against their will, and despite their protest. At that moment, he was interested, as the judge has found, not to confer a benefit on the defendants: he was interested to confer a benefit upon Miss Lightfoot. Using the language of the old common law, I would say that the plaintiff was as absolute a volunteer as one could conceivably imagine anyone to be when assuming an obligation for the debt of another."

147.  Stephenson and Ormrod LJJ agreed with the judgment of Scarman LJ.

148.  The decision in *Owen v Tate* has come under criticism, largely because it might better be viewed as a case of payment at the request of the defendants, since the defendants subsequently asked the bank to have recourse to the claimant's moneys (see, for example, Chitty on Contracts, 34th ed., at §32-115, and Virgo, The Principles of the Law of Restitution, 3rd ed., at p.245). No party sought to argue before me, however, that the legal principles set out by Scarman LJ are wrong.

**(B) Enrichment and Unjust Factors: application to the facts of this case**

149.  In my judgment, on the basis of the facts outlined at §101 to §113 above, and largely in agreement with the submissions of Mr Abraham, the payment of each of the Failed Supplier's customer credit balances by the relevant SoLR was implicitly requested or ratified by the Failed Supplier, in circumstances where the SoLR could reasonably expect to be entitled to claim reimbursement from the Failed Supplier. That is sufficient both to cause the Failed Supplier's debt to customers to be discharged and to give rise to the requisite unjust factor.

150.  If that is wrong, then I consider that the SoLRs were, following their appointment, under sufficient legal compulsion to give rise both to the discharge of the Failed Supplier's obligation to customers and to the requisite unjust factor.

*Request or ratification*

151.  By entering into a licence with the Authority, suppliers agree to participate in a system in which the Authority plays a pivotal role, acting at all times in accordance with its principal objective of protecting the interests of energy consumers. That role is of particular importance when a supplier becomes insolvent and unable to satisfy its obligations towards its customers. As I have noted above, the Authority's policy – as published in its guidance on the SoLR regime – is to ensure that customers of a Failed Supplier are protected, including by ensuring that any credit balances they had with the Failed Supplier will be satisfied by a SoLR.

152.  Moreover, in entering into a licence, at a time when it could in due course become either a Failed Supplier or a SoLR, each supplier agrees to behave in a manner which avoids detriment to Domestic Customers, unless that detriment is in all the circumstances reasonable: see Standard Conditions 0.1 and 0.3 of its licence and the definition of "Fair". In the case of Economy (whose licence was granted on 19 May 2011) and Iresa (whose licence was granted on 1 July 2014), they were subject to such obligation only from 10 October 2017, when Condition 0 first appeared in the standard licence conditions.

153.  When a supplier is facing revocation of its licence due to its insolvency, it knows that it will be unable to honour any credit balances held by customers with it. It will be incapable of making payment to the customers, but can only promise a

dividend of an uncertain amount in a future distribution from its insolvent estate. Nor could it make further supplies to offset the balance, because the making of a LRSD terminates its licence and makes it illegal to continue supplies.

154.  In those circumstances, it is clearly in the failing supplier's customers' best interests that a SoLR willing to honour their credit balances is appointed. I consider it would, equally clearly, be a breach of the failing supplier's obligation under its licence to avoid causing detriment to customers for it to do anything which frustrated the ability of the SoLR to honour its customers' credit balances.

155.  In these circumstances, even absent anything else being done by the Failed Supplier, I consider that it has sufficiently acquiesced in its customer balances being honoured by the incoming SoLR, that it is to be regarded as having requested or ratified the SoLR's actions for the purposes of giving rise to an equitable entitlement to be subrogated to the customers' claims against the Failed Supplier.

156.  In practice, as the facts summarised at §107 above show, a failing supplier is actively involved in the process by which its customer balances are honoured by the SoLR in at least two ways which reinforce its acquiescence in the SoLR honouring its customers' credit balances.

157.  First, it provides information relating to its customer balances to the Authority and, second, it makes a statement to its customers telling them that a SoLR has been appointed and that they are not to worry, but to sit tight, to ensure that the handing over of customers to the SoLR, and the SoLR's honouring of customers' credit balances, is as hassle free as possible.

158.  In many, but not all, cases the Failed Supplier, following revocation of its licence, provides further assistance by entering into an agreement with the SoLR to provide information. That is yet further evidence of acquiescence. (If a Failed Supplier expressly agrees with the SoLR that its customers' credit balances will be honoured, being one of the three possible scenarios in the agreed assumed facts, the requisite request would clearly be present. The only dispute in this respect is whether such a scenario ever occurred in practice.)

159.  Mr Ashworth objected that failing suppliers (and, after the making of the LRSD, the Failed Suppliers) have no choice, whether to object to the SoLR appointment process, or to the SoLR honouring its customers' credit balances by making supplies or payments to them. He submitted that without the freedom to make a choice there can be nothing which amounts to a request or ratification.

160.  It is true that a failing supplier has little if any practical ability to stand in the way of the Authority's appointment of a SoLR willing to honour its customers' credit balances. It is also true, as I have already noted, that a failing supplier could not, consistent with its obligations under the licence, object to its customer balances being honoured by the SoLR. To regard that as negating the conclusion that it has requested or ratified that its customer's credit balances be honoured by the incoming SoLR, however, is to ignore the wider regulatory environment to which suppliers have signed up when entering into their licence: an environment in which the Authority's objective is to protect the interests of customers. In the case of the Applicants that is fortified by the fact that they willingly assumed, on entering into their licence, an obligation to the Authority to avoid causing detriment to customers. The fact that Economy and Iresa were subject to that obligation only from October 2017 does not detract from this conclusion: the introduction of that Condition can be seen as a particular aspect of the Authority's pursuit of its objective to protect customers.

161.  I am also satisfied that the implied request or ratification takes place in a context where the Failed Supplier knows that the SoLR reasonably expects to be reimbursed by the Failed Supplier – to the extent possible given the Failed Supplier's insolvency. If nothing else, this is demonstrated by the fact that, at all material times relevant to the parties in this case, the Authority's stated policy was that approval of a claim to a LRSP would be subject to the condition that the SoLR would seek to recover the costs from the Failed Supplier's insolvency.

162.  In addition, this conclusion follows from the regulatory environment and the obligation under the licence to avoid detriment to customers. If there is any prospect of a recovery being made by the SoLR from the Failed Supplier's insolvency, then it is in the interest of all Domestic Customers that a claim to reimbursement is made. So far as the Failed Supplier's customers are concerned, there is certainly no detriment to them in recognising the SoLR's claim to reimbursement, because their claim against the Failed Supplier has been paid or otherwise satisfied by the SoLR. So far as customers generally are concerned, any loss suffered by the SoLR (i.e. the difference between the amount it has spent in honouring customers' credit balances and the amount recouped from the Failed Supplier) will inevitably be passed on to consumers, most likely via the

LRSP: see §110 above. It is in all customers' interests, therefore, that the SoLR's loss is reduced by being able to claim in the insolvency of the Failed Supplier.

*Compulsion*

163. The Applicants are all office holders of Failed Suppliers to whom Standard Condition 7.12 applies. That expressly obliges the relevant SoLR to include in every Deemed Contract a term that it would honour the credit balances of transferred customers, to the extent that it had committed to do so before appointment.

164. Mr Phillips did not contend that Condition 7.12 was insufficient to constitute compulsion in a relevant sense because it only imposed an obligation on a supplier who had committed (without being compelled to do so), prior to its appointment, to honour customer balances. In the summary of the parties' positions on the issues which was provided after the hearing, the only positive case asserted by the Applicants on Issue 7 was that acceptance by the customers was sufficient to discharge the Failed Supplier's debt to them. Mr Ashworth did not address this point, as his clients were not subject to Condition 7.12. Mr Weaver, for CNG, accepted that Condition 7.12 "plainly creates a compulsion on the part of the SoLR to honour the credit balances of its customers".

165. Condition 7.12, however, is effective only to compel payment in respect of open account balances, i.e. the credit balances of customers who were transferred to the relevant SoLR. It is irrelevant to the closed account balances.

166. The remaining dispute, therefore, relates to: (1) the payment by the relevant SoLRs of Iresa's and Economy's customers' credit balances; and (2) the payment by the relevant SoLRs in respect of closed account balances of all the applicants.

167. So far as Iresa and Economy are concerned, the only provisions in the licences applicable to them that are relied on as creating compulsion are Conditions 0.1, 0.2, 0.3 and 0.9, quoted at §114 above.

168. Mr Ashworth submitted that: (1) Condition 0 imposes amorphous standards of general conduct, which makes no reference to honouring credit balances or to any commitments to the Authority; and (2) any obligation is owed to Ofgem, and not to the customers.

169. I do not agree that Condition 0 is too vague or amorphous to amount to relevant compulsion. While it does not refer explicitly to honouring either credit balances of customers, or commitments made to the Authority, it does expressly include the obligation to avoid detriment to Domestic Customers (save only where the detriment is reasonable). Given the Authority's known preference for appointing as SoLR a supplier who was willing to give a commitment to honour customers' credit balances, a SoLR who had made that commitment and then reneged on it would directly have deprived the relevant customers of a benefit which they would otherwise have been likely to obtain. That would be an obvious and unreasonable detriment to those customers. The range of enforcement powers open to the Authority for breach by a supplier of the terms of its licence, which could ultimately mean the revocation of that licence, contain a sufficient element of compulsion to satisfy the enrichment and unjust elements of a claim in unjust enrichment.

170. For the reasons set out above at §134 to §140, the fact that Condition 0 is not enforceable by customers is not a reason to conclude it does not give rise to compulsion in the relevant sense. I note, in any event, that the Authority's powers include making a final order to "make such provision as is requisite for the purpose of securing compliance with" the requirement in the licence: s.25(1) EA 1989 . By s.27(4) and (5) EA 1989 , an obligation to comply with a final order shall be a duty owed to any person who may be affected by its contravention, and any breach is actionable at the suite of such person. It is at least possible, therefore, that customers could ultimately have a remedy directly against the SoLR.

171. I also conclude, if it was necessary to go beyond this in relation to the Applicants, that Condition 8.3 (which obliges a SoLR to take all reasonable steps to honour any commitment made to the Authority) contains a sufficient element of compulsion. The fact that the obligation is not absolute, but qualified by "all reasonable steps", does not detract from that conclusion. That qualification would excuse a SoLR which was unable, for example, for practical reasons – such as being unable to locate a particular customer's details – from honouring its commitment. Where, however, there were no such practical obstacles, then it is difficult to see why taking reasonable steps would not inevitably result in the customer's credit balance being satisfied.

172. That leaves only the question whether the compulsion is sufficient to constitute an unjust factor because the obligation was voluntarily incurred. In my judgment, it is. The actions of SoLRs are as far removed from the un-asked for and unwanted actions of the claimant in *Owen v Tate* as can be imagined. Even if the commitment given by SoLRs prior to their appointment

cannot be regarded as given at the request of the failing supplier, the circumstances that it was given at the request of the Authority, pursuant to a regulatory policy of protecting customers, and for the undoubted benefit of a Failed Supplier that was unable to satisfy the claims itself, are sufficient circumstances (adopting the approach of Staughton LJ in *Owen v Tate*) to permit the SoLR to be subrogated to the customers' claims even if their assumption of the obligation is to be regarded as voluntarily undertaken.

**(C) At the expense of the claimant/defence of passing on: the law**

173.  I take these two issues together because, as argued by Mr Morrison on behalf of the Additional Applicants, they raise essentially the same points.

174.  Where a SoLR honoured customer credit balances by supplying energy, making payments or in some other way then, subject only to two points, there can be no doubt that the enrichment of the Failed Supplier (assuming it was enriched at all) was at the expense of the relevant SoLR.

175.  The Additional Applicants contend, however, that the enrichment was not at the expense of the SoLRs for one or other of two reasons. First, the payment of customer credit balances was merely one aspect of the overall bargain which SoLRs made in order to gain their appointment as SoLR, such that the benefit conferred on the Failed Suppliers was "incidental and collateral" to the reason why the SoLR honoured the credit balances. Second, because SoLRs have a right (subject only to the Authority's discretion to refuse permission) to recoup some or all of the costs of honouring credit balances via a LRSP, that means that any enrichment of the Failed Supplier cannot have been at their expense. As an alternative to this second point, it is contended that to the extent that the SoLRs do later recoup amounts expended in satisfying customers' credit balances, then they are entitled to rely on the defence of "passing-on".

*"At the expense of"*

176.  The "at the expense of" element of a claim in unjust enrichment was considered by the Court of Appeal in *Kleinwort Benson Ltd v Birmingham City Council [1997] QB 380 (CA)*. In that case, Kleinwort Benson had paid to the Council a sum in excess of £350,000 over a five year period under an interest rate swap agreement which it later transpired was ultra vires the Council and void. The bank sought restitution of the money. The Council sought to amend its defence and counterclaim to plead that it would be inequitable to order restitution because the sum the bank paid out had been made good by the proceeds of hedging contracts in the money market. This was characterised by Evans LJ (at p.385E-G) as an attempt to plead a defence of "passing on", that is that "the bank has not in fact suffered any, or any substantial, loss as a result of these transactions".

177.  The Court of Appeal held that there was no such defence available. I consider that aspect of the decision below, at §191 to §193. In reaching that conclusion, the Court considered the meaning and scope of the words "at the expense of" the claimant.

178.  Morritt LJ (with whom Saville LJ agreed), at p.400, said:

> "the words "at the expense of the plaintiff" on which the authority placed such reliance do not appear in a statute and should not be construed or applied as if they did. In my view they require no more than point to the requirement that the immediate source of the unjust enrichment must be the plaintiff."

179.  Saville LJ agreed, holding (at p.394E-H) that whether the payer under a void contract (where the payment has unjustly enriched the payee) is out of pocket or has recouped his outlay from other sources is entirely irrelevant. At p.395A-B, he said:

© 2025 Thomson Reuters.

> "The expression "at the payer's expense" is a convenient way of describing the need for the payer to show that his money was used to pay the payee. Thus there may well be cases where this cannot be shown, but where in truth, for example, the payer was only the conduit through which the funds of others passed to the payee. What this expression does not justify is the importation of concepts of loss or damage with their attendant concepts of mitigation, for these have nothing whatever to do with the reason why our law imposes an obligation on the payee to repay to the payer what he has no right to retain."

180.  Mr Ashworth submitted that this decision must now be read in the light of the comments of Lord Reed in *Investment Trust Companies v Revenue & Customs Commissioners (above). In* that case, investment funds had been charged VAT by managers for a period of ten years in the mistaken belief that VAT was properly chargeable on the managers' services. When it was later held that the services were zero rated for VAT, the managers claimed against the revenue under s.80 of the Value Added Tax Act 1994 for the return of tax paid in error. The revenue met that claim, but only to the extent of the net amount of tax paid by the managers (being the difference between the output and input tax accounted for by the managers in each relevant VAT period). The managers (as they were obliged to do) forwarded the reimbursements to the investment managers. The investment managers then sued the revenue, including on the ground of unjust enrichment. The Supreme Court concluded, so far as relevant to the issues in this case, that the revenue had only been enriched by the VAT it had actually received from the managers (i.e. the surplus of output tax over deducted input tax) and that, since the investment funds had paid the VAT to the managers, not direct to the revenue, that transaction and the accounting by the managers to the revenue could not be collapsed into a single transfer of value from the investment funds to the revenue: accordingly, the revenue had not been enriched at the expense of the investment funds.

181.  Lord Reed, at §42-43, said that the nature of the various legal requirements indicated by the "at the expense of" element, follows from the characterisation of unjust enrichment as a principle of corrective justice, i.e. that "it is designed to correct normatively defective transfers of value, usually by restoring the parties to their pre-transfer positions." He continued:

> "They are designed to ensure that there has been a transfer of value, of a kind which may have been normatively defective; that is to say, defective in a way which is recognised by the law of unjust enrichment (for example, because of a failure of basis on which the benefit was conferred). The expression "transfer of value" is, however, also too general to serve as a legal test. More precisely, it means in the first place that the defendant has received a benefit from the claimant. But that is not enough in itself. The reversal of unjust enrichment, usually by a restitutionary remedy, is premised on the claimant's also having suffered a loss through his provision of the benefit."

182.  It is clear, however, that "loss" has a special and narrower meaning than in the law of damages. At §45 Lord Reed said:

> "It should be emphasised that there need not be a loss in the same sense as in the law of damages: restitution is not a compensatory remedy. For that reason, some commentators have preferred to use different terms, referring for example to a subtraction from, or diminution in, the claimant's wealth, or simply to a transfer of value. But the word "loss" is used in the authorities, and it is perfectly apposite, provided it is understood that it does not bear the same meaning as in the law of damages. The loss to the claimant may, for example, be incurred through the gratuitous provision of services which could otherwise have been provided for reward, where there was no intention of donation. In such a situation, the claimant has given up something of economic value through the provision of the benefit, and has in that sense incurred a loss."

© 2025 Thomson Reuters.

183.   Lord Reed then considered various circumstances where difficulties arise in satisfying the "at the expense of" requirement. First, at §46-51 he considered the position where the claimant and defendant have not dealt with each other directly. It may then be problematic to establish that the enrichment was at the expense of the claimant, unless the transaction was carried out through an intermediate agent, or where an intervening transaction is found to be a sham, or where co-ordinated transactions may be regarded as a single scheme or transaction for the purposes of the "at the expense of" enquiry. The discharge of a debt owed by the defendant does not give rise to the same problem because, although it is the third party creditor that receives payment, the defendant is enriched by having its debt discharged.

184.   Second, at §52-58, Lord Reed considered cases where the claimant has not incurred a loss (in the narrow sense he had already identified) because "the provision of the benefit was merely an incidental or collateral result of his expenditure." That might be the case where the claimant received the consideration for which he bargained as the counterpart of his own expenditure, so for that reason will not have incurred a loss or – if he has incurred a loss – it will not have arisen through his provision of something for the benefit of the defendant "since the benefit received by the defendant will have been merely collateral to the reason why the expenditure was incurred." He gave the following examples:

(1)   *The Ruabon [1900] AC 6* , where owners of a ship benefitted incidentally from insurers paying expenses of dry-docking the ship for repairs to be carried out, by taking the opportunity to have the ship surveyed. Even if the insurers might be regarded as having provided a benefit to the owners, they incurred no loss because the dry-dock expenses they were already committed to pay (for the purposes of the repairs) were not increased.

(2)   *Edinburgh and District Tramways Co Ltd v Courtenay [1909] SC 99* . In that case, advertisers who rented space on tram cars were required under their contract with a tramway company to provide the boards around the upper decks of the trams on which their adverts were displayed. The tramway company built new tram cars with boards already fitted. The advertisers obtained a benefit but, because the tramway company had acted for its own purposes in building the tram cars with boards fitted, it had not incurred any loss. Lord President Dunedin gave the example of one man heating his house, which provides a benefit to his neighbour: "It is absurd to suppose that the person who has heated his house can go to his neighbour and say – 'Give me so much for my coal bill, because you have been warmed by what I have done, and I did not intend to give you a present of it'."

(3)   *TFL Management Services Ltd v Lloyds TSB Bank plc [2013] EWCA Civ 1415* . In that case A had sued to recover a debt from C. C successfully defended the claim on the basis that the debt was due to B. B recovered the debt from C. A sued B on the basis that it had conferred a benefit on B by bringing the earlier proceedings which clarified that the debt was owed to B. The Court of Appeal refused to strike out the claim. Lord Reed considered, however, that had the court considered the "at the expense of" requirement, it would have been bound to strike out the claim, as, at best, B received only an incidental benefit as a result of A's pursuit of its own interests.

185.   Third, Lord Reed (at §59-60) rejected the suggestion that the "at the expense of" requirement could be satisfied by a connection between the parties' respective benefit and loss merely as a matter of economic or commercial reality. He first noted the practical difficulties in examining where the economic burden of an unjust enrichment had fallen (a point that is relevant to the passing on defence, considered below). He then said that a more fundamental difficulty with the approach based on economic reality arose from the fact that "the purpose of restitution is not to compensate for loss, but to reverse the defective transfer."

186.   Mr Ashworth also referred me to *Swynson Ltd v Lowick Rose LLP [2017] UKSC 32* . In that case, a Mr Hunt caused a company controlled by him, Swynson, to advance a loan to EMSL. The purpose of the loan was to enable EMSL to finance a management buyout of Evo. Prior to making the loan, Swynson and EMSL jointly instructed the defendant accountants, HMT, to carry out due diligence on Evo. Their report was negligently prepared. Subsequently, Evo (and thus its parent, EMSL) was in financial difficulty and further sums were advanced to it by Swynson. Subsequently Mr Hunt personally loaned money to EMSL on condition that it was used to repay the earlier loans from Swynson. His purpose was to clean up Swynson's balance sheet. In a claim by Mr Hunt and Swynson in negligence against HMT, one issue was whether Mr Hunt was entitled to be subrogated to Swynson's claim against HMT by reason of having provided funds to EMSL to repay Swynson.

187.   Lord Sumption (with whom Lords Neuberger, Clarke and Hodge agreed) assumed that Mr Hunt's payment to EMSL had enriched Swynson at Mr Hunt's expense, but held that there was no unjust factor. Lord Mance referred (at §67-68) noted that it was likely to be difficult to separate "at the expense of" from the unjust factor question before focusing on the latter. Lord Neuberger (with whom Lord Clarke agreed) merely said (at §115) that he was "unconvinced" that HMT was enriched

at Mr Hunt's expense, based on Lord Reed's reasoning in the *Investment Trust Companies* case. Nothing in this case takes the points made by Lord Reed any further.

188.  I do not accept that the Supreme Court in *Investment Trust Companies* implicitly overruled *Kleinwort Benson v Birmingham* so that, as Mr Ashworth suggested, the propositions of the Court of Appeal as to what is meant by "at the expense of" are no longer good law. While Lord Reed pointed to circumstances (in particular where the benefit conferred is an incidental result of the expenditure by the claimant) where the benefit was not at the expense of the claimant, I do not find anything in his judgment that is critical of the reasoning of the Court of Appeal in *Kleinwort Benson v Birmingham. I* note that the case was referred to, at §67 of Lord Reed's judgment, as "the only English authority cited in argument which contains a discussion of the "at the expense of" question in relation to taxation", and no criticism was made of it.

*Passing-on*

189.  Mr Morrison, who argued this part of the case on behalf of the Additional Applicants, characterised the passing-on defence as the mirror image of their argument on the "at the expense of" element. The difference between the two was a matter of timing: if it was enough to show that honouring customer balances was at the expense of the SoLR because, at the time, it had not recouped anything under a LRSP, then subsequently receiving a LRSP gave rise to the defence of passing-on.

190.  Mr Morrison frankly accepted that there is so far no case in this jurisdiction that has recognised a defence of passing-on to a claim in unjust enrichment. It was expressly rejected in *Kleinwort Benson v Birmingham* , to which I have referred above in the context of the "at the expense of" element of the claim. In that case the local authority's application for permission to amend to include a defence of passing on was refused.

191.  Morritt LJ (with whom Saville LJ agreed) framed the question at issue in the *Birmingham* case as being "whether the law of restitution in England and Wales recognises the defence of passing on". In concluding that it did not, his reasoning (as I have noted above) reflected his conclusions in respect of "at the expense of", in particular that restitution is not concerned with compensating for loss (see p.400D-G). He also noted the "overwhelming weight of authority against the contentions of the authority" (p.401D).

192.  The conclusions of Evans LJ (with whom Saville LJ also agreed) were by reference to the earlier decision of Hobhouse J in *Kleinwort Benson Ltd v South Tyneside BC [1994] 4 All ER 972* , in which the local authority sought to defend a claim in unjust enrichment on the basis that the claimant bank had recouped their losses pursuant to hedging contracts. At p.978a-b, Hobhouse J likened the issue to "passing on" in tax cases, where the payer of the wrongful tax has passed on the burden to its customers. He rejected the local authority's argument on two bases. The primary reason was that considerations of loss – on which the argument was based – "may be relevant to compensation but are not relevant to restitution … What contracts or other transactions or engagements the plaintiffs may have entered into with third parties have nothing to do with the principle of restitution" (see p.985c-d). The second reason was because the argument involved problems of remoteness.

193.  In *Birmingham* , Evans LJ (at p.393E) agreed with both of Hobhouse J's reasons. Although his conclusion that no "passing on" defence arose was apparently qualified by the words "in this case", his endorsement of Hobhouse J's primary reason is consistent with Morritt LJ's wider rejection of it as a defence to claims in unjust enrichment. Evans LJ noted that there was no instance outside cases of wrongfully paid tax where a defence of passing on had been raised, whether in England, Canada, Australia or the United States (p.389F). Whether it was available in taxation cases in England was uncertain (p.389B), but in any event the tax cases were of limited assistance in addressing the question of general principle raised by the *Birmingham* case (p.389G).

194.  The fact that the Court of Appeal in the *Birmingham* case rejected the defence of passing on was confirmed by the Privy Council in *Waikato Regional Airport Ltd v The Attorney General of New Zealand [2003] UKPC 50* , at §77, where its rejection in a series of cases in Australia was also noted. In that case, the defendant argued that the airport had passed on the charges to its customers. The Privy Council declined to express a definitive view on the question of principle because there was no evidence that the charges had been effectively passed on.

195.  Mr Morrison cited *Marks & Spencer plc v Customs & Excise Commissioners [2005] UKHL 53* , as the "strongest indication" that the defence exists in English law. He relied on a passage in the speech of Lord Walker, at §25: "Passing-on is recognised (although not without some controversy)". It is clear from the context, however, that Lord Walker was referring only to a possible defence to overpaid tax. In the footnote to that sentence in his judgment he cited a passage in Professor Burrows' book, *The Law of Restitution* (2nd ed., pp.591-596). As Mr Abraham pointed out, Professor Burrows was there pointing to the *rejection* in the *Birmingham* case of the defence to claims in restitution, and to the fact that the Court of

Appeal had in so doing put aside the tax cases, and was advocating that passing on should in no circumstances be a defence to restitution. Lord Walker also cited in this part of his judgment the Australian case of *Roxborough v Rothmans of Pall Mall Australia Ltd (2001) 208 CLR 516* , in which the defence had also been rejected. There is, on analysis therefore, nothing in the *Marks & Spencer* case that supports the existence of the defence in English law.

196.  In my judgment, therefore, the defence of passing-on is not part of the English law of unjust enrichment.

**(D) At the expense of and passing-on: application to the facts of this case**

197.  The Additional Applicants' principal argument is that the benefit conferred on Failed Suppliers through the discharge of customer credit balances was not at the expense of the SoLR, because it was incidental and collateral to the reason why the SoLR honoured the credit balances.

198.  As I have noted, in the *Investment Trust Companies* case, at §52, Lord Reid described the circumstances in which an incidental benefit would negate the "at the expense of" requirement as being where "the provision of the benefit was merely an incidental or collateral result of his expenditure", or where "the defendant has received a benefit merely as an incidental consequence of the claimant's pursuit of some other objective", because "the claimant may have received the consideration for which he bargained as the counterpart of his own expenditure".

199.  Mr Ashworth contends that honouring customers' credit balances was merely part of the overall bargain entered into by the SoLR with the Authority in order to gain appointment, and it therefore obtained all that it bargained for in return for honouring credit balances.

200.  The Additional Applicants' skeleton argument detailed, over ten pages, the numerous aspects to the bargain entered into between a SoLR and the Authority. In summary, the Additional Applicants rely on the following matters: suppliers typically volunteer to be appointed as SoLR in a competitive process; the desirability of an appointment is demonstrated by the fact that there were eight suppliers stating that they wished to be appointed as SoLR of Iresa; SoLRs undertake a detailed negotiation with the Authority prior to their appointment, including negotiations as to the SoLR's willingness to honour credit balances, and on what terms; such terms included (across different suppliers) taking on various percentages of the cost of honouring customer balances, with the remainder being recouped by way of LRSP; there are valuable commercial benefits to becoming a SoLR (as recognised by Ofgem in its guidance from 2016), including taking on the Failed Supplier's customers without having to incur the cost (between £60 and £120 per customer) which they would normally incur in acquiring new customers.

201.  For the SoLRs, Mr Abraham disputed that the commercial benefits to the SoLRs are as significant as the Additional Applicants suggest. He pointed to several additional costs associated with supplying new customers under the SoLR regime.

202.  It is not necessary to resolve any dispute of fact, between the Additional Applicants and the SoLRs, as to the extent to which a SoLR benefits, or loses out, by accepting an appointment. Even assuming all of the benefits indicated by Mr Ashworth, I do not accept that this leads to the conclusion that the enrichment of the Failed Suppliers was incidental or collateral in the way envisaged by Lord Reid in *Investment Trust* case, such that the honouring of customers' credit balances was not "at the expense of" the SoLR.

203.  The circumstances of this case are far removed from those in any of the cases in which the enrichment has been found not to be at the expense of the claimant because it was incidental or collateral to their reason for providing the benefit. In each of those cases, or the examples provided in them, it was the very benefit provided by the claimant, at the claimant's cost, which produced the incidental benefit to the defendant.

204.  Thus, in *The Ruabon* , the claimant paid dry-dock expenses to enable repairs to be carried out. The benefit to the owners (in being able to carry out a survey without paying dry-dock expenses) was purely incidental to the relevant benefit provided at the claimant's cost (the payment of dry-dock expenses) for which the claimant received what it bargained for (the docking of the ship).

205.  In the *Edinburgh and District Tramways* case, the benefit to the advertisers (in being relieved of the cost of providing advertising boards) was purely incidental to the relevant benefit provided at the claimant's cost (the fitting of boards to the trams) for which the claimant received what it bargained for (the fitted boards).

206.  In the *TFL Management Services* case, the benefit to B (in having C's debt to it established) was purely incidental to the relevant benefit provided at A's cost (the legal services for the purposes of pursuing a claim against C), for which A received what it bargained for (the legal services).

207.  In the example given by Lord Dunedin in the *Edinburgh and District Tramways* case of the homeowner, who heats his home, the benefit to the neighbour is purely incidental to the benefit provided at the homeowner's cost (heating his home) for which he received what he bargained for (a heated home).

208.  In this case, in contrast, the enrichment of the Failed Supplier (the discharge of its debt to customers) is the <u>essential</u> consequence of the thing done by the SoLR at its cost (the honouring of customers' credit balances). It is far from incidental to the SoLR's expenditure. Nor is it merely collateral to the reason why the SoLR incurred the expenditure.

209.  The most that could be said is that the SoLR's decision (made prior to its appointment) to commit to incurring the expenditure was an incidental factor in its decision making process when it agreed to be appointed as SoLR. That does not make, however, the enrichment of the Failed Supplier incidental to its reason for incurring the expenditure, and would be a significant extension beyond Lord Reid's analysis. It is one which I do not think as a matter of principle is warranted.

210.  I have addressed the *Swynson* case above at §186 to §187. To the extent that it considered the "at the expense of" requirement, it is again far removed from the circumstances of this case. It was not a case of payment in discharge of another's debt: Mr Hunt loaned the money to EMSL. Moreover, his reasons for doing so were to ensure a tax advantage and to remove a non-performing loan from Swynson's balance sheet. Accordingly, it was a case where he received the whole benefit that he intended to achieve in making the payment. Any benefit to HMT, in providing them with a defence to the claim in negligence subsequently brought against them, was purely incidental.

211.  The short answer to the Additional Applicants' alternative contention, that the benefit to a Failed Supplier was not at the expense of the SoLR because of its right to recoup some or all of the costs via a LRSP, is that, in accordance with the reasoning of the Court of Appeal in *Kleinwort Benson v Birmingham* (above at §176 to §179), the possibility of reimbursement pursuant to a LRSP is irrelevant to the question whether the honouring of customers' credit balances was at the expense of the SoLR for the purposes of a claim in unjust enrichment. It was not suggested that there was sufficient connection between the SoLR's honouring of credit balances and the LRSP to make them part of the same transaction, so that the credit balances were honoured at the expense of the operator paying under the LRSP. Absent that level of connection, I do not think there is a relevant distinction between recoupment under the hedging contracts in the *Birmingham* case and recoupment under a LRSP.

212.  While I would reach this conclusion in any event, it is reinforced by the fact that the Authority's public position (since before the first LRSD in this case) has been that consent to a LRSP will be subject to the proviso that the SoLR will seek to recover the cost from the insolvent estate of the Failed Supplier. In my judgment, that negates the suggestion that a LRSP prevents the honouring of credit balances being at the expense of the SoLR, since it identifies the LRSP as a backstop, paying out if and to the extent that the SoLR cannot obtain reimbursement from the Failed Supplier. That is so whether or not there is any right in the Authority to claw back any part of the LRSP in the event of later recovery by the SoLR from the insolvency of the Failed Supplier. In practice, the SoLR will rarely if ever obtain full reimbursement from an insolvent Failed Supplier, so will always look to some extent to the LRSP to make it whole.

213.  For completeness, had I concluded that there is a defence of passing-on to a claim in unjust enrichment, I would also have concluded (for the same reason that I have rejected the contention that the honouring of customers' credit balances was not at the expense of the SoLR) that a SoLR that honoured customers' credit balances and subsequently recouped the expense of doing so via a LRSP had not passed-on the expense so as to disentitle itself from pursuing a claim in unjust enrichment against the Failed Supplier.

**(E) Is acceptance by the customers sufficient in itself to result in discharge of the Failed Supplier's debt?**

214.  In light of my conclusion that the SoLRs are entitled to be subrogated to the claims of the Failed Suppliers' customers, it is unnecessary to consider whether, in the alternative, the Failed Suppliers' debt to customers was discharged by reason only of the customers' acceptance of their credit balances being honoured by the SoLRs. I will therefore deal with it only briefly by saying that had I been required to address it, I would have concluded that I am bound by Court of Appeal authority to decide that the customers' acceptance was not in itself sufficient to lead to a discharge of the Failed Suppliers' debt.

215.  That was the clear conclusion of the Court of Appeal in *Electricity Supply Nominees Ltd v Thorn (1991) 63 P & CR 143* , per Fox LJ at p.148. I do not accept, as Mr Phillips submitted, that Fox LJ was there merely reciting Counsel's submissions. He was stating the principles established by the authorities relating to payments under compulsion, on which Counsel relied.

216.  It was also the clear conclusion of the Court of Appeal in *Cantrave Ltd v Lloyds Bank plc [2000] QB 917* , per Pill LJ at p.923F-G. Although Pill LJ said in the following paragraph that it was unnecessary to decide "general questions as to the circumstances in which another's debt may be discharged", that did not undermine his specific conclusion that, in the absence of authorisation or ratification, "the payment to the creditor will not of itself discharge the company's liability to the creditor."

217.  Moreover, decisions such as that of the Court of Appeal in *Ibrahim* , which considered the circumstances in which payment under compulsion might discharge a debt, would have been unnecessary if acceptance by the creditor was sufficient.

218.  The Applicants' proposition adopts an argument advanced by Lord Burrows in his book, the Law of Restitution, 3rd ed., at pp 460-468. That argument was, principally, however, as to what the law should be, and not what it was. As to the latter, Lord Burrows merely noted that one can read some of the authorities supporting what he acknowledged to be the traditional approach (no automatic discharge except where there is legal compulsion or necessity) as "not being as supportive as may at first sight appear", and that some authorities go the other way (see p.467).

219.  In contrast to the clear statements that there will be no discharge absent ratification or compulsion in the recent Court of Appeal cases referred to above, in none of the cases relied on by Mr Phillips is there an express conclusion that discharge of a debt may occur merely because the creditor accepts the payment. In most of them ( *Exall v Partridge* ; *Moule v Garrett* ;

Croxen v Gas and Electric Markets Authority, 2022 WL 16902725 (2022)

*Gebhardt v Saunders; B Liggett (Liverpool) Ltd v Barclays Bank Ltd* ; and *Owen v Tate)* there was no separate consideration given to the question of discharge.

220.  The question of whether or not Lord Burrows' view is, as a matter of principle, to be preferred, is one, in my view, for a higher court.

## Issue 12: A proprietary claim?

221.  Issue 12 arises in circumstances where customers' direct debit arrangements were left in place following the making of a LRSD in respect of the relevant Failed Supplier, and payments were made pursuant to that direct debit arrangement thereafter, before the transfer of direct debit mandates to the SoLR could be effected. It was common ground that the transfer of money from the customer to the Failed Supplier, pursuant to the direct debit mandate, required positive action by the Failed Supplier.

222.  The SoLRs contend that, in those circumstances, the relevant customers have a proprietary claim in constructive trust to the amounts received by the Failed Supplier. The response to this argument was presented by Mr Weaver on behalf of CNG.

223.  There are a number of difficulties in resolving this issue. First, the claim was principally put on the basis of mistaken payment, but the relevant mistake would have been made by customers. The customers are not parties to the application and there is no evidence from any of them. What *is* known (as I have noted above in relation to the unjust enrichment claim) is that customers were told by the Authority to "sit tight", and that their credit balances would be honoured. The nature of the mistake made by any particular customer in light of that information is unclear. Indeed if, as I note below, the relevant credit balance was honoured by the SoLR, then it is difficult to see what mistake the customer made.

224.  The second problem is that it was common ground that in order to give rise to a constructive trust by reason of a mistaken payment, it is essential to establish sufficient knowledge on the part of the recipient (i.e. each of the Failed Suppliers) to render their taking of, or retention of the mistaken payment unconscionable. That knowledge needs to be established either at the point of receipt or potentially at some later date when the identifiable proceeds of the payment are still in the recipient's hands. There is no evidence, however, from any supplier as to the knowledge of its directors or other relevant employees at the time of receipt of direct debit payments made after the relevant LRSD, or any later stage.

225.  The third problem is that it emerged during the hearing that in some cases it is certain that the SoLR had reimbursed the relevant customer the amount that had been paid to the Failed Supplier after the LRSD, and that may well have been the case in relation to all SoLRs. It is common ground that to the extent that a SoLR has honoured such credit balances, then the question of whether it has a personal claim in unjust enrichment against the Failed Supplier is answered by the answer to Issue 7. That means that the real question is not whether a customer had a proprietary claim, but whether the SoLR is able to assert a proprietary claim in circumstances where it has honoured the relevant customer's credit balance. It was agreed that that question gives rise to additional issues which were not debated and which I am not asked to resolve.

226.  In these circumstances, I consider that there are simply too many unknown variables to make it a worthwhile exercise to answer any part of Issue 12. It is certainly not the Court's function to identify the range of facts which, if established, would give rise to a claim in constructive trust. Moreover, there was in the end little between Mr Abraham and Mr Weaver on the central legal issue: if it could be established that a customer made a mistake, which caused the direct debit payments to continue to be taken by the Failed Supplier, and the Failed Supplier knew of that mistake at the time it took the payment, then a constructive trust could be established.

© 2025 Thomson Reuters.

### Section 3: Conclusion in respect of each of the issues

*Issue 1: What are the obligations of a designated electricity supplier (as defined in Roo15 and Roo9): (a) to make payments to the Authority in relation to its renewables obligations (as defined in the 1989 Act , Roo15 and Roo9); (b) to make payments to the Authority towards the total mutualisation sum (as defined in Roo15 and Roo9); and (c) to make payments to the levelisation fund maintained by the Authority (as defined in Fit12)?*

227.  Each designated electricity supplier is under an obligation to make a payment to the Authority if and to the extent that it has not, by 1st September in the settlement period, satisfied in full its renewables obligation by providing ROCs.

228.  I have not addressed sub-paragraphs (b) and (c) because the parties were agreed as to the outcome.

*Issue 2: in relation to each payment obligation within Issue 1: (a) under which statutory provision is it imposed; and (b) what is the nature of the debt or liability (i.e. present, prospective or contingent) of the designated electricity supplier it gives rise to?*

229.  The liability to make a payment arises under a combination of Articles 7(1) & (2) and 67(1) of ROO15. Prior to 1st September in the settlement period it is a contingent liability (the contingency being that the supplier has not produced the requisite number of ROCs to satisfy its renewables obligation). From 1st September it is an actual liability. The liability to pay interest is also a contingent liability prior to 1st September, and becomes an actual liability day to day thereafter as it accrues.

*Issue 3: If any debt or liability within Issue 2 is present or prospective, at what time did it, or does it, arise?*

230.  See the answer to Issue 2: the liability to make a payment is a present liability as from 1st September in the settlement period.

*Issue 4: If any debt or liability within Issue 2 is contingent upon the fulfilment of certain conditions: (a) what conditions must be fulfilled before such debt or liability becomes due and payable; (b) would the revocation of a designated electricity supplier's licence prevent any of those conditions from ever being fulfilled; and (c) if so, what is the effect of that?*

231.  See the answer to Issue 2: the condition that must be fulfilled before the liability to make a payment becomes due and payable is that the supplier has not produced to the Authority the requisite number of ROCs by 1st September in the settlement period. The condition that must be fulfilled before the liability to pay interest becomes due and payable is that the supplier fails to make payment of the amount that it is in default in respect of its liability to make a payment from day to day as interest accrues between 1st September and 31st October.

232.  The revocation of a designated electricity supplier's licence, after the end of the obligation period, does not prevent those conditions from being fulfilled.

*Issue 5: What is the effect (if any) on any such debt or liability of payments made or required to be made (by way of supplier payments, mutualisation or otherwise) to the Authority by relevant suppliers/licensees by reason of the failure of the designated electricity supplier to discharge that debt or liability?*

233.  None of the existence of the mutualisation regime, nor the triggering of the obligation to make payments pursuant to it by reason of the shortfall being a relevant shortfall, nor the payment of any sums due from suppliers pursuant to it, has any effect on the liability of suppliers identified in answer to Issues 1 to 4.

*Issue 6: If a Solr confirms to Ofgem or its customers that it will assume, pay or otherwise honour the credit balances of customers whom it is taking over from Failed Suppliers, does this create any obligations on the part of the Solr to: (a) Ofgem and/or the Authority; and/or (b) the customers the Solr is taking over, and, if so, what is the nature of any such obligations?*

234.  The obligation under Standard Condition 0.2 (to be read with 0.1, 0.3(a) and 0.9) includes an obligation on a SoLR, who has given the confirmation referred to in Issue 6, to honour the relevant credit balances.

235.  Where Standard Condition 8.3 applies to a SoLR (who has given the relevant commitment), the SoLR is under an obligation to take all reasonable steps to honour the credit balances.

236.  Where Standard Condition 7.12 applies to a SoLR (who has given the relevant commitment), the SoLR is under an obligation to include a term in its Deemed Contract with customers obliging it to honour credit balances.

237.  In each case, the obligation is sufficient to render the honouring of the credit balances being done under compulsion so as to satisfy the "enrichment" and "unjust factor" elements of a cause of action in unjust enrichment.

*Issue 7: What claim (if any) does a Solr have against a Failed Supplier whose customers it has taken responsibility for supplying where it has confirmed to Ofgem that it will honour such customer's credit balances owed by the Failed Supplier prior to the date on which the Solr took over those customers (the "Solr date"): (a) without the Solr supplying electricity or gas exhausting some or all of the credit balances or making any payment to the customer in respect of such credit balances? (b) in circumstances where the Solr has supplied electricity or gas exhausting some or all of the credit balances? (c) in circumstances where the Solr has made payments to customers exhausting some or all of the credit balances? (d) in circumstances where the Solr has otherwise honoured such credit balances?*

238.  Where a SoLR, that has given such confirmation prior to the SoLR date, has honoured the Failed Supplier's customers' credit balances through any of the means referred to in Issue 7, it has a claim in unjust enrichment against the Failed Supplier (satisfied by an equitable right of subrogation to the customers' claims against the Failed Supplier).

239.  A SoLR that has made that commitment but has not honoured a Failed Supplier's customers' credit balances has no claim against the Failed Supplier.

*Issue 8: What claim (if any) does a Solr have against a Failed Supplier whose customers it has taken responsibility for supplying where it has not confirmed to Ofgem that it will honour such customers' credit balances owed by the Failed Supplier, but nevertheless honours such credit balances: (a) by supplying electricity or gas against such credit balances? (b) by making payments to customers in respect of such credit balances? (c) by otherwise honouring such credit balances?*

240.  This situation does not arise in practice in any of the applications, and the possible fact patterns that might arise were not explored in the hearing. In the absence of any request, authority or ratification by the Failed Supplier, it would be necessary to establish that the SoLR was legally compelled to honour customers' credit balances in order to establish a claim in unjust enrichment. I leave open (because the point was not sufficiently addressed in argument) whether a confirmation given by the SoLR to the customers might give rise to an obligation under the terms of the Standard Conditions of the SoLR's licence sufficient to amount to compulsion for the purposes of a claim in unjust enrichment.

*Issue 8A: What claim (if any) does a Solr have against a Failed Supplier in respect of 'closed balances', namely the credit balances of customers for whom the responsibility for supply had been transferred away from the Failed Supplier before the date of the Lrsd (as defined in ¶9.10 of the Standard Conditions), where the Solr has confirmed to Ofgem prior to the Solr date that it will honour such customer's credit balances: (a) without the Solr making any payment to the customer in respect of such credit balances? (b) in circumstances where the Solr has made payments to customers exhausting some or all of the credit balances? (c) in circumstances where the Solr has otherwise honoured such credit balances?*

241.  Save only that Standard Condition 7.12 is irrelevant in these circumstances, the answer is the same as that given to Issue 7.

*Issue 9: Does it make a difference to the answer to the questions in Issues 7, 8 and 8A if: (a) (in respect of Issues 7 and 8A only) the Solr has made a public statement confirming that it will honour the credit balances of customers it is taking over from Failed Suppliers, and/or of customers for whom the responsibility for supply had been transferred away from the Failed Supplier before the date of the Lrsd; (b) the Solr has waived its right to receive a Last Resort Supply Payment pursuant to condition 9 of the Standard Conditions; and/or (c) the Solr has exercised its right to make a claim for a Last Resort Supply Payment and: (i) has received payment in full in respect of the customer balances it committed to honour as a result of a Last Resort Supply Payment; and/or (ii) has received payment in full in respect of the customer balances it has actually honoured as a result of a Last Resort Supply Payment; and/or (iii) has received a partial payment towards the customer balances it has committed to honour as a result of a Last Resort Supply Payment; and/or (iv) has received a partial payment towards the customer balances it has actually honoured as a result of a Last Resort Supply Payment*

242.  No.

*Issue 10: in the circumstances set out in Issues 6 to 9, does the assumption, payment or honouring by a Solr of a credit balance owed to a customer discharge the obligation of the Failed Supplier to the customer in respect of that credit balance?*

243.  Where a SoLR has honoured the credit balances of a Failed Supplier's customers in the circumstances described in Issue 7 above, this has the consequence of discharging the Failed Supplier's debt to its customers.


**Annex 1: Extracts from the Renewables Obligation Order 2015**

**Article 7.— the renewables obligation**

(1)  The renewables obligation is imposed on each electricity supplier supplying electricity in England and Wales (a "designated electricity supplier").

(2)  The renewables obligation is that, subject to articles 67 and 68, each designated electricity supplier must, by the specified day, produce to the Authority, in respect of each megawatt hour of relevant electricity that it supplies during an obligation period, the number of UK ROCs determined in accordance with articles 13 to 13B.

(3)  To enable the number referred to in paragraph (2) to be determined, the Secretary of State must first determine, for the obligation period in question, calculations A and B and the total number of UK ROCs required to be produced by designated electricity suppliers in accordance with articles 8 to 12.

(4)  Where the number of UK ROCs that a designated electricity supplier is required to produce by virtue of paragraph (2) is not a whole number, it is to be rounded to the nearest whole number (one-half being rounded upwards).

(5)  In this Part, "relevant electricity" means—

(a)  in respect of—

(i)  any obligation period beginning on or after 1st April 2019; or

(ii)  any month of an obligation period in respect of which a revised obligation level applies in accordance with article 13B(7)(a) (ii), (b)(ii), (8)(a) or (b)(ii), any electricity supplied to customers in England and Wales other than EII excluded electricity; and

(b)  in respect of any other period, any electricity supplied to customers in England and Wales.


**Article 12: Determining the total number of UK Rocs to be produced in an obligation period**

(1)  Having determined calculations A and B for an obligation period, the Secretary of State is to determine the total number of UK ROCs required to be produced by designated electricity suppliers ("the total obligation") for that period in accordance with paragraphs (2) to (4).

(2)  Where calculation A is equal to or greater than calculation B for an obligation period, the total obligation for that period is calculation A.

(3)  Where calculation B is greater than calculation A for an obligation period, the total obligation for that period is calculation B.

(4)  References to the total obligation in this Part 1 are to be construed accordingly.


**Article 13, 13A and 13B:**

© 2025 Thomson Reuters.

: contain provisions to enable Sec of State to calculate the number of ROCs that a designated supplier is obliged to produce to discharge its renewables obligation. Each of them contains the following, or similar:

> "The Secretary of State must publish, by the 1st October preceding an obligation period, the number of UK ROCs that a designated electricity supplier is required to produce in respect of each megawatt hour of electricity that it supplies to customers in England and Wales during that period in order to discharge its renewables obligation for that period."

### Article 18.— Issue of Rocs to generators and suppliers

(1)  The Authority is to issue ROCs.

(2)  Subject to paragraphs (3) to (5) and article 19, the Authority is to issue a ROC to the operator of the generating station by which the electricity to which the ROC relates was generated.

(3)  Where electricity—

(a)  is required to be generated by a generating station from renewable sources under a NFFO arrangement, or

(b)  in compliance with such an arrangement, is required to be made available to the nominated person, ROCs are to be issued as set out in paragraphs (4) and (5).

(4)  Where by virtue of the NFFO arrangement the nominated person is entitled to the electricity ROCs are to be issued to electricity suppliers notified to the Authority by the nominated person as being purchasers of the electricity and to each in such numbers as are appropriate to the amount of the electricity which the nominated person notifies the Authority each has purchased (subject to the total number of ROCs available to be issued in respect of the electricity).

(5)  Where electricity suppliers are entitled to electricity under a NFFO arrangement, ROCs are to be issued to those electricity suppliers, each in proportion to its entitlement.

(6)  In this article, "nominated person" has the same meaning as it has in the Electricity from Non-Fossil Fuel Sources Saving Arrangements Order 2000 .

### Article 66.— Interpretation

(1)  In this Part—

"buy-out fund" means the fund held by the Authority on the 1st September in the settlement period, being the aggregate of—

(a)  amounts received by the Authority under article 67 relating to the renewables obligation for the relevant period,

(b)  amounts held by the Authority by virtue of articles 70(4)(b), 71(4), 76(5) and 77(6)(b), and

(c)  any interest earned on those amounts;

"compliant UK supplier" means a UK supplier which, at the end of the late payment period, has discharged or is treated as if it had discharged in full every UK renewables obligation imposed on it in respect of the relevant period;

"GBRO costs" means the costs which have been or are expected to be incurred by the Authority in connection with the performance of any of its functions conferred by or under sections 32 to 32M of the Act during the settlement period;

"instalment payment" is to be construed in accordance with article 74(5);

"late payment fund" is the fund held by the Authority on the 1st November of the settlement period, being the aggregate of—

(a) amounts received by the Authority during that period under article 68 relating to the renewables obligation for the relevant period, and

(b) any interest earned on those amounts;

"late payment period" means the period beginning with the 1st September and ending with the 31st October in the settlement period;

"mutualisation fund" means the aggregate at any given time of the amounts (excluding any amounts repaid under article 76(2)) received by the Authority under articles 74 and 76 (together with any interest earned on those amounts) in relation to the relevant period;

"mutualisation period" means the obligation period immediately following the settlement period;

"NIRO costs" means the costs which have been or are expected to be incurred by the Northern Ireland authority in connection with the performance of any of its functions conferred by or under Articles 52 to 55F of the Energy (Northern Ireland) Order 2003 during a period which, in any order made under those Articles, corresponds to the settlement period;

"non-compliant UK supplier" means a UK supplier which, at the end of the late payment period, has not discharged or is not treated as if it had discharged in full every UK renewables obligation imposed on it in respect of the relevant period;

"recalculated supplier payment" is to be construed in accordance with article 75(5) ;

"the relevant period" is to be construed in accordance with article 67(1) ;

"relevant shortfall" is to be construed in accordance with article 72(3) ;

"relevant supplier" means an electricity supplier which was a designated electricity supplier in the relevant period and which at the end of the late payment period had discharged or is treated as if it had discharged the whole or part of its renewables obligation for the relevant period;

"retail prices index" means—

(a) the general index of retail prices (for all items) published by the Office of National Statistics, or

(b) where the index is not published for a month, any substituted index or figures published by the Office of National Statistics;

"settlement period" is to be construed in accordance with article 67(1);

"shortfall" is to be construed in accordance with article 72(2);

"supplier payment" is to be construed in accordance with article 74(3);

"total mutualisation sum" is to be construed in accordance with article 73;

"total UK buy-out fund" means the fund existing on the 1st September of the settlement period, being the aggregate of—

(a) the buy-out fund held on that date,

© 2025 Thomson Reuters.

(b)  any fund provided for in a renewables obligation order made by the Scottish Ministers which corresponds to the buy-out fund held on that date, and

(c)  any fund provided for in an order made under Articles 52 to 55F of the Energy (Northern Ireland) Order 2003 which corresponds to the buy-out fund held on that date;

"UK renewables obligation" means—

(a)  the renewables obligation imposed by article 7 of this Order,

(b)  a renewables obligation imposed by a renewables obligation order made by the Scottish Ministers, or

(c)  a renewables obligation imposed on Northern Ireland suppliers in an order made under Articles 52 to 55F of the Energy (Northern Ireland) Order 2003 ;

"UK supplier" means—

(a)  a designated electricity supplier,

(b)  any electricity supplier on which a UK renewables obligation is imposed under a renewables obligation order made by the Scottish Ministers, and

(c)  any designated electricity supplier within the meaning of Article 52(2) of the Energy (Northern Ireland) Order 2003 .

(2)  In this Part, references to the late payment period, the mutualisation period, the relevant period and the settlement period, when used in the context of a UK supplier subject to a UK renewables obligation, are to be construed (where the UK supplier is not a designated electricity supplier)—

(a)  in the case of an electricity supplier on which a UK renewables obligation is imposed under a renewables obligation order made by the Scottish Ministers, as references to the period which corresponds to the late payment, mutualisation, relevant or (as the case may be) settlement period in that order;

(b)  in the case of an electricity supplier on which a UK renewables obligation is imposed under an order made under Articles 52 to 55F of the Energy (Northern Ireland) Order 2003 , as references to the period which corresponds to the late payment, mutualisation, relevant or (as the case may be) settlement period in the order under which that UK renewables obligation is imposed.

(3)  Any sum payable by suppliers under articles 67(1) , 68(6) , 74 or 76(1) is to be rounded to the nearest penny, with any half of a penny being rounded upwards.

## Article 67 .— Payments to discharge the renewables obligation

(1)  A designated electricity supplier may (in whole or in part) discharge its renewables obligation for an obligation period ("the relevant period") by making a payment to the Authority before the 1st September in the following obligation period ("the settlement period").

(2)  The payment referred to in paragraph (1) is an amount equal to £X (Y-Z) where—

(a)  X is the sum which corresponds to a UK ROC by virtue of paragraph (4);

(b)  Y is the number of UK ROCs that the designated electricity supplier, if it makes no payment under paragraph (1), would have to produce to the Authority in order for it to discharge its renewables obligation for the relevant period in full; and

(c)  Z is the number of UK ROCs that it has produced to the Authority for that period (or, where it has not produced any, zero).

(3)  Where a designated electricity supplier makes a payment to the Authority which is less than the amount calculated under paragraph (2), its renewables obligation for the relevant period will be discharged by that payment to the extent of the appropriate number of UK ROCs, which is the quotient obtained by dividing the payment made by the sum which corresponds to a UK ROC by virtue of paragraph (4).

(4)  The sum which corresponds to a UK ROC ("the buy-out price") is—

(a)  for the relevant period commencing with 1st April 2016, £44.33 increased or, as the case may be, decreased by the percentage increase or decrease in the retail prices index over the 12 month period ending with 31st December 2015 (the resulting figure being rounded to the nearest penny, with any half of a penny being rounded upwards), and

(b)  for each obligation period thereafter, the buy-out price for the previous obligation period increased or, as the case may be, decreased by the percentage increase or decrease in the retail prices index over the 12 month period ending with the 31st December in the previous obligation period (the resulting figure being rounded to the nearest penny, with any half of a penny being rounded upwards).

### Article 68.— Late payments to discharge the renewables obligation

(1)  Where a designated electricity supplier fails (in whole or in part) to discharge its renewables obligation for the relevant period before the 1st September in the settlement period, the Authority must notify it of the extent of its default as soon as is reasonably practicable on or after that date.

(2)  The extent of the designated electricity supplier's default is an amount equal to the amount calculated under article 67(2) less any amount that the designated electricity supplier has paid to the Authority under article 67.

(3)  Interest is payable on that amount (or, where all or part of it is paid to the Authority before the end of the late payment period, such part of that amount as remains unpaid) during the late payment period.

(4)  That interest is to be calculated on a daily basis at 5 percentage points above the base rate charged by the Bank of England on the first day of the late payment period.

(5)  Any payment made by a designated electricity supplier towards discharging its default under paragraph (2) will be applied first to any interest that is payable under paragraph (3).

(6)  If, by the end of the late payment period, the designated electricity supplier has paid to the Authority under this article the amount referred to in paragraph (2) and all interest required to be paid on that amount under paragraph (3), it will be treated as having discharged its renewables obligation for the relevant period.

(7)  If, by the end of the late payment period, the designated electricity supplier has not paid to the Authority the amount referred to in paragraph (2) and all interest required to be paid on that amount under paragraph (3), the supplier will not have discharged its renewables obligation for the relevant period.

(8)  The Authority must not, during the late payment period, impose a penalty under section 27A(1) of the Act on any supplier in respect of that supplier's failure to discharge its renewables obligation in full before the 1st September in the settlement period.

(9)  In paragraph (4) "base rate" means the rate announced from time to time by the Monetary Policy Committee of the Bank of England as the official dealing rate.

### Article 70. — Dealing with the late payment fund: payments into the Consolidated Fund and to the Northern Ireland authority

(1)  Subject to paragraph (2), where the buy-out fund has been paid into the Consolidated Fund and to the Northern Ireland authority under article 69(2), before the 1st January in the settlement period the Authority must pay from the late payment fund—

(a)  into the Consolidated Fund an amount which is equal to the difference between the amount that was paid into the Consolidated Fund under article 69(2) and the amount that would have been paid into it under article 69(1) had the aggregate of the amounts to be paid by the Authority under article 69(1) not exceeded the buy-out fund; and

(b)  to the Northern Ireland authority an amount which is equal to the difference between the amount that was paid to it under article 69(2) and the amount that would have been paid to it under article 69(1) had the aggregate of the amounts to be paid by the Authority under article 69(1) not exceeded the buy-out fund.

(2)  Where the aggregate of the amounts to be paid by the Authority under paragraph (1) would exceed the late payment fund, before the 1st January of the settlement period the Authority must pay the late payment fund into the Consolidated Fund and to the Northern Ireland authority in the same ratio as the GBRO costs bear to the NIRO costs.

(3)  Where any amount to be paid under paragraph (1) or (2) is not a whole number when expressed in terms of pounds sterling, it is to be rounded down to the nearest pound sterling.

(4)  Where, after any payments required to be made during the settlement period under paragraph (1) or (2) have been made, the Authority —

(a)  holds more than £50,000 in the late payment fund, the Authority must pay the late payment fund to UK suppliers under and in accordance with article 71 by the 1st January in the settlement period;

(b)  holds £50,000 or less in the late payment fund, the Authority must retain that money, which is to constitute part of the buy-out fund held in the obligation period immediately following the settlement period.


**Article 71.— Dealing with the buy-out and late payment funds: payments to Uk suppliers**

(1)  Each UK supplier must be paid a proportion of the amount (if any) that the Authority is required to pay to UK suppliers by virtue of article 69(4) or 70(4)(a) by the dates in the settlement period specified in those articles.

(2)  The proportion referred to in paragraph (1) is A v B where —

(a)  A is the number of UK ROCs produced by the UK supplier to the Authority or Northern Ireland authority in order to discharge (in whole or in part) any UK renewables obligation to which it was subject in the relevant period; and

(b)  B is the total number of UK ROCs produced by UK suppliers to the Authority or to the Northern Ireland authority in order to discharge (in whole or in part) any UK renewables obligations to which they were subject in that period.

(3)  Where any amount to be paid under this article is not a whole number when expressed in terms of pounds sterling, it is to be rounded down to the nearest pound sterling.

(4)  Where by virtue of the operation of paragraph (3) the Authority continues to hold any sum which otherwise would have been paid out under this article that sum is to be retained by the Authority and is to constitute part of the buy-out fund held in the obligation period immediately following the settlement period.


**Article 72.— Determining whether a relevant shortfall has occurred**

(1)  As soon as reasonably practicable after the 31st October in the settlement period, the Authority must—

(a)  determine whether a shortfall has occurred (within the meaning of paragraph (2)); and

(b) where such a shortfall has occurred and is a relevant shortfall (within the meaning of paragraph (3)), calculate the total sum to be recovered from relevant suppliers ("the total mutualisation sum").

(2) A shortfall occurs in relation to the relevant period where the amount referred to in sub-paragraph (a) is less than the amount referred to in sub-paragraph (b) and is the difference between the two—

(a) the amount referred to in this sub-paragraph is the sum of—

(i) the amount held in the buy-out fund on the 1st September in the settlement period, and

(ii) the amount held in the late payment fund on 31st October in that period (excluding from that amount any interest paid pursuant to article 68(3)); and

(b) the amount referred to in this sub-paragraph is what the amount referred to in sub-paragraph (a) would have been if, on 31st October in the settlement period, each designated electricity supplier which, at the end of the late payment period, has not (and is not treated as having) discharged its renewables obligation in full were to pay to the Authority the amount notified to it by the Authority under article 68(1).

(3) A shortfall in relation to a relevant period is a relevant shortfall if it is equal to, or in excess of, the mutualisation threshold for that period.

(4) The mutualisation threshold for a relevant period is determined as 1% of A x B, rounded to the nearest £100,000 with £50,000 being rounded upwards, where—

(i) A is the total obligation for the relevant period determined under article 12;

(ii) B is the buy-out price for the relevant period referred to in article 67(4).


**Article 73.— Calculating the total mutualisation sum in the case of a relevant shortfall**

(1) Subject to paragraphs (2) to (4), where a relevant shortfall has occurred in relation to the relevant period, the total mutualisation sum for that period is the amount of that shortfall.

(2) Where any non-compliant UK supplier has produced UK ROCs to the Authority or the Northern Ireland authority in order to discharge, in part, any UK renewables obligation to which it was subject in the relevant period, the total mutualisation sum for that period is equal to S - (S x C/D)

where —

(a) S, subject to paragraphs (3) and (4), is the amount of the shortfall;

(b) C is the number of UK ROCs produced by non-compliant UK suppliers to the Authority or the Northern Ireland authority in order to discharge, in part, any UK renewables obligation to which they were subject in the relevant period; and

(c) D is the total number of UK ROCs produced by UK suppliers to the Authority or to the Northern Ireland authority in order to discharge, in whole or in part, any UK renewables obligation to which they were subject in the relevant period.

(3) If the total mutualisation sum for the relevant period has to be recalculated by virtue of article 75(5), for the purposes of that recalculation (whether under paragraph (1) or (2)) the amount of the shortfall is to be reduced by the sum of all payments mentioned in article 75(1)(b) received by UK suppliers.

(4) For the purposes of calculating or recalculating the total mutualisation sum for the relevant period, the amount (if any) by which the shortfall in relation to that period exceeds the mutualisation cap for that period is to be disregarded.

(5)  The mutualisation cap for the relevant period depends on which obligation period constitutes the relevant period and is—

(a)  for the relevant period commencing with 1st April 2016, the 2015/16 mutualisation cap increased or, as the case may be, decreased by the percentage increase or decrease in the retail prices index over the 12 month period ending on 31st December 2015 (the resulting figure being rounded to the nearest penny, with any half of a penny being rounded upwards); and

(b)  for each obligation period thereafter, the mutualisation cap for the previous obligation period increased or, as the case may be, decreased by the percentage increase or decrease in the retail prices index over the 12 month period ending with the 31st December in the previous obligation period (the resulting figure being rounded to the nearest penny, with any half of a penny being rounded upwards).

(6)  In paragraph (5), the "2015/16 mutualisation cap" is £267,035,558.91.


**Article 74.— Payments to be made by suppliers towards the total mutualisation sum**

(1)  Where a relevant shortfall has occurred in relation to the relevant period, as soon as reasonably practicable after the 31st October in the settlement period the Authority must notify each relevant supplier of—

(a)  the amount of the shortfall,

(b)  the total mutualisation sum, and

(c)  the payment which that supplier is required to make under paragraph (3).

(2)  Where the Authority notifies relevant suppliers under paragraph (1) it must publish a notice stating the amount of the shortfall in relation to the relevant period and the total mutualisation sum.

(3)  Where a relevant shortfall has occurred in relation to the relevant period, each relevant supplier must make a payment to the Authority (a "supplier payment").

(4)  The supplier payment for each relevant supplier is equal to T x E/F where—

(a)  T is the total mutualisation sum,

(b)  E is the number of UK ROCs that the supplier, if it had made no payments under article 67 or 68, would have had to produce to the Authority in order for it to have discharged its renewables obligation for the relevant period in full, and

(c)  F is the total number of UK ROCs that all relevant suppliers, if none of them had made payments under articles 67 or 68 would have had to produce in order for each of them to discharge their renewables obligation for the relevant period in full.

(5)  Subject to article 75, each relevant supplier must make its supplier payment in the following instalments ("instalment payments")—

(a)  25% of the supplier payment required must be paid to the Authority before 1st September in the mutualisation period;

(b)  25% of the supplier payment must be paid to the Authority before 1st December in that period;

(c)  25% of the supplier payment must be paid to the Authority before 1st March in that period; and

(d)  25% of the supplier payment must be paid to the Authority before 1st June immediately following that period.

(6)  Where a person required to make a supplier payment—

(a)  fails to make payment in full, and

(b)  at any time during or after the end of the relevant period ceases to hold a licence to supply electricity under section 6(1) of the Act , sections 25 to 28 of the Act are to apply in respect of that person in respect of the obligations imposed by this article, as if that person still held a licence to supply electricity.

**Article 75.— Circumstances in which payments towards the total mutualisation sum are to be re-calculated**

(1)  This article and article 76 apply where —

(a)  a relevant shortfall has occurred in relation to the relevant period, and

(b)  a designated electricity supplier which failed to discharge its renewables obligation for the relevant period makes a payment to other UK suppliers which, if it had been made to the Authority under article 67 or 68, would have increased the amounts that those suppliers would have received under article 7 1 from the buy-out and late payment funds, that payment being designed to compensate those suppliers for that loss.

(2)  A designated electricity supplier which makes a payment mentioned in paragraph (1)(b) must, immediately after making the payment, notify the Authority —

(a)  of the names of the UK suppliers to which the payment was made,

(b)  how much each UK supplier received, and

(c)  to which obligation period the payment relates.

(3)  Any designated electricity supplier which receives a payment mentioned in paragraph (1)(b) must notify the Authority, immediately after receiving the payment, of the amount it received.

(4)  Where a designated electricity supplier receives a payment from an electricity supplier supplying electricity in Scotland in relation to the electricity supplier's failure to discharge in full any UK renewables obligation imposed on it by a renewables obligation order made by the Scottish Ministers, the designated electricity supplier must notify the Authority, immediately after receiving the payment, of the amount it received.

(5)  Where, before 1st August in the obligation period immediately following the mutualisation period, the Authority receives a notification under paragraph (2) or (3), relevant suppliers shall cease to be required to make instalment payments in respect of dates specified in article 74(5) which have not yet passed and the Authority must, as soon as is reasonably practicable—

(a)  recalculate the total mutualisation sum (in relation to the relevant period),

(b)  recalculate the supplier payment (in relation to the relevant period) which each relevant supplier is required to make (to take account of the recalculated total mutualisation sum),

(c)  calculate, in accordance with article 76, the payments (if any) suppliers are required to make under that article, and

(d)  notify each relevant supplier of —

(i)  the recalculated total mutualisation sum,

(ii)  its recalculated supplier payment, and

(iii)  the payments (if any) the supplier is required to make under article 76.

**Article 77.— Payments to be made to suppliers out of the mutualisation fund**

(1) The Authority must pay out the mutualisation fund to compliant UK suppliers in accordance with paragraphs (2) to (6).

(2) When there is money in it, the mutualisation fund is to be paid out by—

(a) 1st November in the mutualisation period;

(b) 1st February in that period;

(c) 1st May immediately following that period; and

(d) 1st August immediately following that period.

(3) On each occasion the mutualisation fund is paid out, each compliant UK supplier must be paid a proportion of the mutualisation fund.

(4) The proportion referred to in paragraph (3) is where—

(a) A is the number of UK ROCs produced by the compliant UK supplier to the Authority or Northern Ireland authority in order to discharge (in whole or in part) any UK renewables obligation to which it was subject in the relevant period, and

(b) K is the total number of UK ROCs produced by all compliant UK suppliers to the Authority or Northern Ireland authority in order to discharge (in whole or in part) any UK renewables obligation to which they were subject in that period.

(5) Where any amount to be paid under this article is not a whole number when expressed in terms of pounds sterling, it is to be rounded down to the nearest pound sterling.

(6) Where following the making of a payment to compliant UK suppliers the Authority continues, by virtue of the operation of paragraph (5), to hold any sum which otherwise would have been paid out under this article—

(a) the Authority must pay out that sum along with the next payment to be made under this article in respect of the relevant period; or

(b) where there are no further payments to be made under this article in respect of the relevant period that sum is to be retained by the Authority and is to constitute part of the buy-out fund held in the obligation period immediately following the mutualisation period.

Crown copyright

© 2025 Thomson Reuters.