# Exhibit D

# The Commissioners for Her Majesty's Revenue and Customs (Appellants) v The Investment Trust Companies (in liquidation) (Respondents)
# The Commissioners for Her Majesty's Revenue and Customs (Respondents) v The Investment Trust Companies (in liquidation) (Appellants)

 **Positive/Neutral Judicial Consideration**

**Court**
Supreme Court

**Judgment Date**
11 April 2017

**[2017] UKSC 29, 2017 WL 01291423**

before Lord Neuberger, President Lord Mance Lord Reed Lord Carnwath Lord Hodge

Judgment given on 11 April 2017

Hilary Term

On appeal from: [2015] EWCA Civ 82

Heard on 17, 18 and 19 May 2016

**Representation**

> Appellants/Respondents (HMRC) Stephen Moriarty QC Andrew Macnab (Instructed by the General Counsel and Solicitor to Her Majesty's Revenue and Customs ).
> Respondents/Appellants (Investment Trust Companies) Laurence Rabinowitz QC Andrew Hitchmough QC Michael Jones (Instructed by PricewaterhouseCoopers Legal LLP ).

**Judgment**

Lord Reed: (With Whom Lord Neuberger, Lord Mance, Lord Carnwath and Lord Hodge Agree)

> 1. This appeal arises out of the payment of value added tax which was not due, because the supplies in question were exempt from VAT under the relevant EU directive. At the time of the payment, however, the supplies were treated as taxable by the UK's VAT legislation, which had incorrectly transposed the directive, and were mistakenly believed to be taxable by the customer who paid an amount charged in respect of the tax, the supplier who received that amount, and the Commissioners to whom the supplier accounted for the tax. As the corollary of the supplies being believed to be taxable, the supplier and the Commissioners also believed that the supplier was entitled to deduct from the tax chargeable on its supplies to customers the tax which it had itself paid on taxable supplies received for the purposes of its business. It therefore accounted to the

© 2025 Thomson Reuters.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 3 of 24

Investment Trust Companies (in Liquidation) v Revenue..., 2017 WL 01291423...

Commissioners for the tax chargeable on its supplies during each accounting period on the basis that it could deduct and retain the amount of the tax which it had paid to its own suppliers, and it paid the Commissioners only the remaining surplus, if any.

2. In that situation, does the customer have a common law claim against the Commissioners for restitution, or is he confined to a claim against the supplier? If he has a claim against the Commissioners, is it for the entire amount which he paid to the supplier, or only for the amount, if any, which the Commissioners received from the supplier? Does it make a difference if any claim for restitution by the supplier against the Commissioners is time-barred? Does it make a difference if there is a statutory scheme under which the customer can obtain reimbursement of the amount which the supplier paid to the Commissioners, but not of any amount which was retained by the supplier? Furthermore, if the statutory scheme has the effect of excluding a common law claim by the customer against the Commissioners, is that compatible with EU law? These are the principal issues which the court has to decide.

**The factual background**

3. The claimants are investment trust companies ("ITCs"). They are "closed-ended" investment funds constituted as limited companies: that is to say, the companies were established with a fixed number of issued shares and a term date when the company would be wound up and the assets distributed to the shareholders. They have now reached their term dates and are in winding up. The claims of three of the ITCs ("the Lead Claimants") have been taken forward as lead claims while the others are stayed to await the outcome of these proceedings. The Lead Claimants are Kleinwort Overseas Investment Trust plc, F&C Income Growth Investment Trust plc, and M&G Recovery Investment Trust plc. They will be referred to respectively as the Kleinwort Trust, the F&C Trust and the M&G Trust.

4. Between 1992 and 2002 the Lead Claimants received supplies of investment management services from their investment managers ("the Managers"). Those were respectively Kleinwort Benson Investment Management Ltd, F&C Asset Management Ltd and M&G Investment Management Ltd. Their services were rendered under contracts which provided for the Managers to be paid fees plus VAT "if applicable" (or words to similar effect). Under the provisions of the UK VAT legislation then in force, those services, unlike the other investment management services provided by the Managers, did not qualify for exemption. The Managers therefore charged VAT on the supplies of their services. The VAT charges were separately identified on the VAT invoices issued to the Lead Claimants, and the Lead Claimants paid the amounts charged.

5. The Managers were obliged to account to the Commissioners for the VAT due in respect of their chargeable supplies during each accounting period. It is relevant to note that the obligation to account for tax arises whether or not tax is charged on the supply or paid by the customer: it is the supplier, rather than the customer, who is under a liability to the Commissioners, and it is the supply, rather than payment by the customer, which triggers the supplier's liability. The customer's liability to pay an amount in respect of the tax rests upon contract. The Managers' obligation to account for the tax due did not, however, mean that they were obliged to pay the Commissioners the whole of, or indeed any part of, the sums they received from the Lead Claimants. Under general principles of VAT law, they were entitled to deduct from the tax chargeable in respect of any taxable supplies they had made, known as output tax, the tax chargeable in respect of any taxable supplies which they had received for the purpose of their business of making taxable supplies, known as input tax.

6. It therefore followed from the legislative treatment of the services supplied to the Lead Claimants as taxable, that the Managers were understood to be entitled to pay to the Commissioners only the surplus of their output tax over their input tax, and to retain the balance of the output tax in their own hands. If the input tax exceeded the output tax, they were entitled to a credit, which could be paid by the Commissioners or carried forward to later accounting periods. Thus, for example, if a Manager made taxable supplies to an ITC, and the VAT chargeable on those supplies was £100, then the Manager was bound to account to the Commissioners for £100. If the Manager had purchased taxable supplies during the relevant period on which the VAT was £25, the Manager was entitled to credit for that £25, and was required to pay the Commissioners only the balance of £75.

© 2025 Thomson Reuters.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 4 of 24

Investment Trust Companies (in Liquidation) v Revenue..., 2017 WL 01291423...

7.  It was also possible for an ITC to be registered for VAT (if it invested in securities outside the EU), and in that event to recover, as input tax, some of the VAT which it had paid to its Manager. The F&C Trust and the M&G Trust made no such supplies, but the Kleinwort Trust did, and recovered 58.4% of the VAT charged by its Manager (that being the percentage of its portfolio which was invested outside the EU). Its claim against the Commissioners has therefore been adjusted to take account of the sums which it has already recovered as input tax: rather than claiming every £100 which it paid to its Manager in respect of VAT, it claims £41.60, being the difference between the £100 and the £58.40 which it recovered as input tax.

8.  The essential pattern was therefore as follows:

> 1.  The Managers supplied investment management services to the Lead Claimants under contracts providing for the payment of fees plus VAT if applicable.
>
> 2.  The Managers charged the Lead Claimants VAT on the supply of those services, and included the VAT charges on the invoices which they issued to the Lead Claimants.
>
> 3.  The Lead Claimants paid the invoices. They might or might not be able to recover some of the VAT as input tax.
>
> 4.  The Managers made periodic VAT returns in which they:
>
> (i)  accounted for the VAT chargeable on their supplies of investment management services as output tax;
>
> (ii)  deducted as input tax the VAT which they had paid to third parties for supplies received in the course of their business; and
>
> (iii)  paid the difference between their output tax and input tax to the Commissioners.

9.  It transpired that the supplies of the investment management services were exempt from VAT under article 13B(d)(6) of the Sixth VAT Directive (77/388/EEC) . That was established by the European Court of Justice in JP Morgan Fleming Claverhouse Investment Trust plc v Revenue and Customs Comrs (Case C-363/05) [2007] ECR 1-5517 . Although the UK failed to transpose article 13B(d)(6) correctly into national legislation until 1 October 2008, it had direct effect at all material times. It is therefore common ground between the parties that the Lead Claimants paid the Managers the amounts they did in respect of VAT, and that the Managers accounted for VAT to the Commissioners, under a mistake of law.

**The Managers' claims against the Commissioners**

10.  In early 2004, when the Claverhouse litigation began and was publicised, the Managers of the F&C Trust and the M&G Trust made claims to the Commissioners under section 80 of the Value Added Tax Act 1994 for refunds in respect of VAT accounting periods from 2001 to 2004. It will be necessary to return to section 80 , the material provisions of which are set out in para 75 below. Claims were not made in relation to earlier accounting periods because of the three year limitation period imposed by section 80(4) . For the same reason, no claim was made by the Managers of the Kleinwort Trust, which had gone into winding up in 1998. Following the Claverhouse judgment, the Commissioners allowed the claims and repaid the relevant amounts (as will be explained shortly) to the Managers, with interest. In accordance with section 80 , and regulations made pursuant to section 80A , the Commissioners required the Managers to enter into approved "reimbursement arrangements" with the Lead Claimants, so that the refunded VAT and interest were passed on by the Managers to them.

Case 1:25-cv-02207-MMG     Document 87-4     Filed 05/20/25     Page 5 of 24

Investment Trust Companies (in Liquidation) v Revenue..., 2017 WL 01291423...

11. Subsequently, the decision of the House of Lords in *Fleming (trading as Bodycraft) v Revenue and Customs Comrs [2008] UKHL 2; [2008] 1 WLR 195* established that the retrospective manner in which the three year limitation period had been introduced (by an amendment to the 1994 Act, effected by the Finance Act 1997 , which reduced the previous period) was incompatible with EU law, and that the time bar had to be disapplied in respect of rights which had accrued before it came into effect on 4 December 1996. The Managers then made further claims in respect of accounting periods ending before that date. These claims were again allowed, with interest, and the appropriate repayments were made to the Managers, who in turn passed them on to the Lead Claimants.

12. As a result of these arrangements, the Lead Claimants were refunded the VAT which they had paid to the Managers, subject to two exceptions. First, the Managers were unable to make claims in respect of accounting periods ending on or after 4 December 1996 which were time barred under section 80(4) . In practice, that meant that claims could not be made by the Managers of the Kleinwort Trust in relation to accounting periods ending between 4 December 1996 and 20 March 1998, when the Kleinwort Trust went into liquidation. The corresponding periods in relation to the F&C Trust and the M&G Trust ended on 6 and 1 April 2001 respectively. Those periods have been referred to in these proceedings as the "dead periods". It is common ground that the limitation period section 80(4) is compatible with EU law.

13. Secondly, the amounts repaid to the Managers were calculated on the basis that, under section 80(2A) , it was necessary to set against the output tax for which they had accounted, the amount of the input tax which they had deducted. It is a matter of agreement that that was the correct approach to the application of section 80 . In the illustrative example given in para 6 above, that means that the Managers were entitled to repayment of the £75 which they had paid to the Commissioners, but not of the £25 which they had retained in their own hands.

14. It is a matter of agreement that, although the Managers were only entitled under section 80 to reimbursement of the notional £75, the Commissioners could have made the refunds conditional on the Managers' undertaking to repay to the Lead Claimants the full amount which they had been mistakenly charged (ie, the notional £100). It is agreed that the Commissioners did not do so because they accepted the Managers' assertion that, if they had known that the input tax was non-deductible, they would have passed on that cost to the Lead Claimants by charging a higher price for their services. In the present proceedings, however, it is accepted that that assertion was erroneous: had the true position been known, the Managers would not have sought to increase the price of their services to the Lead Claimants. Instead, as Henderson J found after trial, they would have absorbed the input tax as a business expense. In the event, the notional £25 was later refunded to the Kleinwort Trust and the F&C Trust by their respective Managers, but it was not refunded to the M&G Trust.

**The proceedings below**

15. The ITCs brought proceedings against the Commissioners in which they sought payment of the amounts which had been paid by them to their managers, to the extent that they had not been recovered under the statutory scheme established by section 80 or otherwise: in other words, the amounts which the managers could not claim because any claim would be time-barred, and the amounts which the managers had not paid to the Commissioners but had retained and set against input tax (unless those amounts had been refunded to the ITC in question by its manager). The ITCs' claims were based on unjust enrichment, or alternatively on EU law.

16. The claims of the Lead Claimants proceeded to a trial on liability. After trial, the judge held [2012] EWHC 458 (Ch):

  1. That, using the notional figures referred to above, the Commissioners had been enriched in the full amount of £100, even if only £75 was paid to them by a Manager after deducting £25 in respect

of input tax paid to its own suppliers. In the judge's view, although the £25 was not paid to the Commissioners, it was nevertheless used by the Commissioners to give the Managers a credit for that input tax.

2. That the Commissioners were enriched at the expense of the Lead Claimants because, in economic terms, the person at whose expense the VAT was paid was the customer. The enrichment was also unjust.

3. That a cause of action in unjust enrichment was, however, excluded under domestic law by *section 80(7)* of the 1994 Act, which protects the Commissioners from liability other than as provided in that section.

4. That the Lead Claimants had a directly effective right to repayment against the Commissioners under EU law, which required a remedy to be made available in respect of the full notional £100, not merely the £75.

5. That EU law did not, on the other hand, require national law to give the Lead Claimants any remedy in respect of amounts falling within the scope of the time-bar imposed by *section 80(4)* . Any EU-based claims would be subject (in effect) to the same limitation period.

17.  In a subsequent judgment [2013] EWHC 665 (Ch), which had been deferred pending the decision of this court in *Test Claimants in the FII Group Litigation v Revenue and Customs Comrs [2012] UKSC 19; [2012] 2 AC 337* , and the judgment of the Court of Justice in *Littlewoods Retail Ltd v Revenue and Customs Comrs (Case C-591/10) [2012] STC 1714* , the judge further held that the Lead Claimants had no *Woolwich* claim under English law for unlawfully levied tax (ie a claim based on the principle established in *Woolwich Equitable Building Society v Inland Revenue Comrs [1993] AC 70* ), and that EU law required *section 80(7)* to be disapplied, so as to permit a mistake-based restitutionary claim. It is unnecessary to consider the *Woolwich* issue further, as the point has not been pursued in the present appeal.

18.  In the light of these conclusions, the judge gave judgment for the M&G Trust in respect of the notional £25 (defined as the difference between the amounts paid by the M&G Trust to its Manager as VAT and the amount of the refunds it received from its Manager, and also as equalling the input tax brought into account by its Manager) for periods outside the dead period, and dismissed the claims in relation to the dead periods (the dead period in relation to each claimant being the period for which its Manager was unable, for reasons of limitation, to make a claim under *section 80* ).

19.  The Lead Claimants appealed against the first judgment on the grounds that the judge was wrong to conclude (i) that a cause of action in unjust enrichment against the Commissioners was excluded by *section 80(7)* of the 1994 Act, and (ii) that the Lead Claimants had no claim under EU law to VAT paid in respect of the dead periods. The Commissioners also appealed against the first judgment on the ground that the judge was wrong to conclude that the M&G Trust had a directly effective EU law right to recover from the Commissioners the £25 element of its claim for accounting periods outside the dead period, and they appealed against the second judgment on the ground that the judge had erred in holding that *section 80(7)* was to be disapplied.

20.  The Court of Appeal (Moore-Bick, Patten and Beatson LJJ) [2015] EWCA Civ 82 allowed both parties' appeals. It held:

1. That the judge had been right to conclude that the Lead Claimants had a direct cause of action in unjust enrichment against the Commissioners for VAT paid under a mistake of law.

© 2025 Thomson Reuters.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 7 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

2.  That he had been wrong to treat this cause of action as excluded by section 80(7) .

3.  That he had been wrong to conclude that the notional £25 retained by the Managers represented the discharge of any subsisting obligation to refund that amount on the part of the Commissioners, and that, accordingly, the Commissioners could not have been enriched by more than the notional £75 for any of the accounting periods in question. Any domestic claim in unjust enrichment for the notional £25 lay against the Managers alone.

4.  That the Lead Claimants had no direct claim against the Commissioners for the notional £25 under EU law, given the claim they had in that amount against the Managers.

21.  The Court of Appeal therefore allowed the Lead Claimants' appeal, to the extent of the notional £75 paid in respect of dead periods, and allowed the Commissioners' appeal in respect of the notional £25.

22.  In this appeal by the Commissioners against the decision of the Court of Appeal (in respect of the notional £75 paid in respect of dead periods), and cross-appeal by the Lead Claimants (in respect of the notional £25), there are three key questions. First, did the Lead Claimants have a common law claim against the Commissioners in principle, subject to any statutory exclusion of such a claim? Secondly, if so, did section 80 of the 1994 Act bar such a claim? Thirdly, if the Lead Claimants have no claim against the Commissioners, either because no such claim is recognised at common law or because a common law claim is barred by section 80 , is that compatible with EU law?

**The common law claim**

23.  The Lead Claimants argue that customers who pay undue VAT charged by their supplier have a claim against the Commissioners based on unjust enrichment, unless such a claim is excluded by statute. The first question is whether that is correct. If not, that in itself provides an answer to the claims made in these proceedings, subject to any issue arising under EU law.

24.  In answering the question, both parties followed the approach adopted by Lord Steyn in Banque Financière de la Cité v Parc (Battersea) Ltd [1999] 1 AC 221, 227, and asked:

(a)  Has the defendant been benefited, in the sense of being enriched?

(b)  Was the enrichment at the claimant's expense?

(c)  Was the enrichment unjust?

(d)  Are there any defences?

**Were the Commissioners enriched?**

25.  There is no dispute that the Commissioners were enriched to the extent of the notional £75. What is in dispute is whether they were also enriched to the extent of the notional £25 which they did not receive. The judge held that they were. Although

the £25 was not paid to the Commissioners by the Managers, it enriched the Commissioners, in his view, by being set against the input tax which the Commissioners would otherwise have been obliged to pay or credit to the Managers: that is to say, the tax which the Managers had paid on the goods and services supplied to them for the purposes of their business of supplying investment services.

26.  The Court of Appeal considered this reasoning to be fallacious on the basis that if the supply of services by the Managers was not taxable, then the Managers had no right to deduct as input tax the VAT which they had paid to their own suppliers. The Managers retained the notional £25 in satisfaction of what the court regarded as a purported obligation, on the part of the Commissioners, which never existed. The Commissioners did not, therefore, benefit from the Lead Claimants' payment of the notional £25. An order compelling them to pay that amount to the Lead Claimants would not reverse an enrichment but leave them worse off, having received £75 and made "restitution" of £100. Any claim to restitution of the £25 should therefore have been directed against the Managers.

27.  In this appeal, counsel for the Lead Claimants argued that when the £25 was paid to the Managers, the position under the applicable UK legislation was that the Managers were entitled to deduct their input tax in satisfaction of an obligation owed to them by the Commissioners. They continued to be entitled to account to the Commissioners for VAT, notwithstanding that it was not lawfully due under EU law, and therefore remained entitled to claim reimbursement in respect of input tax, until the position under UK law was changed: *Becker v Finanzamt Münster-Innenstadt (Case C-8/81) [1982] ECR 53* ; *VDP Dental Laboratory NV v Staatsecretaris van Financiën (Joined Cases C-144/13, C-154/13 and C-160/13) [2015] STC 1133* . The Court of Justice had rejected the argument that a domestic levy which was incompatible with EU law was to be treated as having never existed: *Ministero delle Finanze v IN CO GE'90 Srl (Joined Cases C-10/97 to C-22/97) [1998] ECR I-6307* .

28.  I am unable to accept this argument. The case of *Ministero delle Finanze v IN CO GE'90 Srl* merely establishes that national legislation which is incompatible with EU law, although inapplicable in so far as it is incompatible, is not a nullity for all purposes. The case concerned claims for the repayment of a charge which had been levied under Italian legislation which was inconsistent with EU law. A preliminary issue before the national court was whether the claims fell within its jurisdiction: an issue which turned on whether they were of a fiscal or a civil nature. The question which troubled the national court was whether, in deciding that issue, it should treat the national legislation as set aside in its entirety, or whether it could have regard to the legislation for the purpose of characterising the nature of the relationship between the parties at the time when the contested amounts were paid. The Court of Justice held that, subject to compliance with the principles of non-discrimination and effectiveness, the detailed rules which applied for the repayment of a charge, and the classification for that purpose of the legal relationship established when the charge was levied, were matters to be determined under national law (para 26).

29.  The cases of *Becker* and *VDP Dental Laboratory* are more directly in point. In the former case, VAT had been levied under domestic law in respect of services which were exempt under the relevant directive, and an issue was raised as to the consequences of granting the exemption retrospectively after the mistake was discovered. In the course of its judgment, the Court of Justice stated that, by availing themselves of an exemption from VAT, persons entitled to the exemption necessarily waived the right to claim a deduction in respect of input tax (para 44). An analogous conclusion was reached in the *VDP Dental Laboratory* case, where an exemption provided for under national law was incompatible with the relevant VAT directive. The court held that the taxable person was not entitled both to benefit from the exemption and to exercise the right to deduct input tax (para 40). It follows from these authorities that the Managers could not both claim reimbursement of the output tax which they had paid to the Commissioners, under section 80 of the 1994 Act, on the basis that their supplies were exempt from VAT, and simultaneously assert an entitlement to retain the amounts which they had deducted as input tax, on the basis that their supplies were taxable.

30.  The Commissioners were not, therefore, enriched by the Managers' retention of the notional £25, and the Managers have, in principle, no defence to a claim by the Lead Claimants for the restitution of that amount. That conclusion is as one would expect. The Lead Claimants' claim to restitution against the Commissioners proceeds on the basis that the supplies which

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 9 of 24

Investment Trust Companies (in Liquidation) v Revenue..., 2017 WL 01291423...

they received from the Managers were exempt from VAT. That being so, it would be surprising if they could present that claim, in relation to the measure of restitution, on a basis which was predicated on the supplies being taxable.

31.  It follows that the Commissioners' enrichment was only to the extent of the notional £75.

**Was the enrichment at the Lead Claimants' expense?**

32.  There is no doubt that, in economic terms, the Commissioners were enriched at the expense of the Lead Claimants. On the mistaken premise that the supplies were taxable, the Lead Claimants were charged tax by the Managers, and paid it to them in accordance with their contract. On the same premise, the Managers were obliged to account to the Commissioners for the tax chargeable on their supplies, and to pay them the output tax in respect of each accounting period, after deducting their input tax. The net result of the mistake was that the Lead Claimants were worse off by the amount of the Managers' output tax, and the Commissioners were better off to the extent that that amount exceeded the Managers' input tax.

33.  As the judge noted, however, no payment was made by the Lead Claimants to the Commissioners. Nor were the Managers simply a conduit or, in legal terms, an agent for payment by the Lead Claimants to the Commissioners. The Lead Claimants owed no money to the Commissioners. Furthermore, the payment of the tax element of the invoices submitted by the Managers to the Lead Claimants was not the cause of the payment of tax by the Managers to the Commissioners: as explained earlier, the Managers were liable to account for tax to the Commissioners once they had supplied the relevant services. As the judge found, it could not be said that the tax would not have been paid but for the payments by the Lead Claimants to the Managers. In these circumstances, it was argued, the Lead Claimants' remedy lay against the Managers, as the recipients of the mistaken payments which they had made, leaving it to the Managers to recover from the Commissioners any amount which they had mistakenly paid to them in accordance with the legislation.

34.  After considering the limited guidance provided by the modern English authorities, and English academic opinion, the judge concluded that, as a general rule, a defendant was legally enriched at the expense of the person from whom the benefit in question was directly received. There were, however, exceptions to that general rule. Without attempting to be exhaustive, he listed a number of relevant criteria for identifying such exceptions, which he derived from the authorities: put shortly, the need for a close causal connection between the payment (or other provision of a benefit) by the claimant and the enrichment of the defendant, the need to avoid the risk of double recovery, the need to avoid conflict with contracts between the parties, and the need to distinguish between unjust enrichment and compensation or damages.

35.  Applying that approach, he regarded the present case as exceptional. First, to allow the Lead Claimants to recover from the Commissioners would not, in his view, involve any risk of double recovery, as any claim against the Managers would face a cast iron defence of change of position, since they had accounted to the Commissioners for the entirety of the tax and retained no benefit for themselves (this reasoning mistakenly presumed that the Managers were entitled to retain the notional £25, as deductible input tax, and that the notional £75 was irrecoverable by the Managers from the Commissioners). Secondly, it would not undermine or conflict with the contract between the Lead Claimants and the Managers, which had provided for the payment of VAT "if applicable". Thirdly, notwithstanding the absence of a strict causal connection between the payments by the Lead Claimants and the enrichment of the Commissioners, the nexus created by the VAT system between the consumer and the Commissioners could, in his view, hardly be closer or stronger as a matter of commercial reality. In that regard, the judge referred at para 49 to the statements of the Court of Justice in *Elida Gibbs Ltd v Customs and Excise Comrs (Case C-317/94) [1996] ECR I-5339; [1997] QB 499* , that "the basic principle of the VAT system is that it is intended to tax only the final consumer" (para 19), and that the taxable persons "collect the tax on behalf of the tax authorities and account for it to them" (para 22). In his view, cases concerned with subrogation showed that the "at the expense of" requirement could be satisfied by reference to "the underlying commercial reality of a transaction" (para 72).

36.  By the time this case came before the Court of Appeal, the approach adopted by the judge had already been approved by that court in three decisions: *Menelaou v Bank of Cyprus UK Ltd [2013] EWCA Civ 1960, [2014] 1 WLR 854* ; *TFL Management Services Ltd v Lloyds TSB Bank plc [2013] EWCA Civ 1415, [2014] 1 WLR 2006* ; and *Relfo Ltd v Varsani (No 2) [2014] EWCA Civ 360; [2015] BCLC 14* . It was also endorsed by the Court of Appeal in the present case. The court noted that the judge had been mistaken in thinking that the Managers would have a defence to a direct claim by the Lead Claimants, so far as the notional £25 was concerned. It nevertheless agreed with his conclusion that, in the context of VAT, the final consumer who paid the tax had a sufficient economic connection with the Commissioners to be able to say that they had been enriched at his expense when the tax ought never to have been imposed on the services which were supplied.

**General discussion**

37.  Decisions concerning the question whether an enrichment was "at the expense of" the claimant demonstrate uncertainty as to the approach which should be adopted. Such tests as have been suggested have been too vague to provide clarity. For example, in *Menelaou v Bank of Cyprus UK Ltd [2015] UKSC 66; [2016] AC 176* , Lord Clarke of Stone-cum-Ebony said at para 27, with the agreement of Lord Neuberger of Abbotsbury, Lord Kerr of Tonaghmore and Lord Wilson, that "the question in each case is whether there is a sufficient causal connection, in the sense of a sufficient nexus or link, between the loss to the bank and the benefit received by the defendant". This leaves unanswered the critical question, namely, what connection, nexus or link is required? The same can be said of Arden LJ's statement in *Relfo* that there must be a "sufficient link" (para 95), Floyd LJ's reference in the same case to "proximity" (para 110), and the Court of Appeal's finding in the present case that there was "a sufficient economic connection" (para 67).

38.  It would be unwise to attempt in this appeal to arrive at a definitive statement of the circumstances in which the enrichment of a defendant can be said to be at the expense of the claimant. Nevertheless, in view of the uncertainty which has resulted from the use of vague and generalised language, this court has a responsibility to establish more precise criteria. Some observations of a general nature should therefore be made, before turning to the specific context in which the issue arises in the present case. It should be said at the outset that these observations are concerned only with personal claims, and not with proprietary claims.

39.  First, it is important, when dealing with personal claims based on unjust enrichment, to bear in mind what was said by Lord Goff of Chieveley in Lipkin Gorman v Karpnale Ltd [1991] 2 AC 548, 578 , when rejecting a submission that, when dealing with a claim to restitution based on unjust enrichment, it was for the court to consider the question of injustice or unfairness on broad grounds, and that it should deny recovery if it thought that it would be unjust or unfair to hold the defendant liable:

> "The recovery of money in restitution is not, as a general rule, a matter of discretion for the court. A claim to recover money at common law is made as a matter of right; and even though the underlying principle of recovery is the principle of unjust enrichment, nevertheless, where recovery is denied, it is denied on the basis of legal principle."

As Lord Steyn remarked in Banque Financière , unjust enrichment ranks next to contract and tort as part of the law of obligations (p 227). A claim based on unjust enrichment does not create a judicial licence to meet the perceived requirements of fairness on a case-by-case basis: legal rights arising from unjust enrichment should be determined by rules of law which are ascertainable and consistently applied. Without going as far as Scrutton LJ, who described the legacy of *Moses v Macferlan (1760) 2 Burr 1005* as "a history of well-meaning sloppiness of thought" ( Holt v Markham [1923] 1 KB 504, 513 ), McLachlin J rightly cautioned against the "tendency … to view the action for unjust enrichment as a device for doing whatever may seem fair between the parties": Peter v Beblow (1993) 1 SCR 980, 988 .

40.  Secondly, the adoption of the concept of unjust enrichment in the modern law, as a unifying principle underlying a number of different types of claim, does not provide the courts with a tabula rasa, entitling them to disregard or distinguish all authorities pre-dating Lipkin Gorman . The point is illustrated by the judgment of Floyd LJ in *TFL* , where the decision in *Ruabon Steamship Co Ltd v London Assurance [1900] AC 6* was put to one side on the basis that "the House of Lords … was not looking at the case through the eyes of the modern law of unjust enrichment" (para 39). Although judicial reasoning based on modern theories of unjust enrichment is in some respects relatively novel, there are centuries' worth of relevant authorities, whose value should not be underestimated. The wisdom of our predecessors is a valuable resource, and the doctrine of precedent continues to apply. The courts should not be reinventing the wheel.

41.  Thirdly, as the judge observed in the present case, in remarks with which Lord Clarke expressed agreement in *Menelaou* (para 19), Lord Steyn's four questions are no more than broad headings for ease of exposition. They are intended to ensure a structured approach to the analysis of unjust enrichment, by identifying the essential elements in broad terms. If they are not separately considered and answered, there is a risk that courts will resort to an unstructured approach driven by perceptions of fairness, with consequent uncertainty and unpredictability. At the same time, the questions are not themselves legal tests, but are signposts towards areas of inquiry involving a number of distinct legal requirements. In particular, the words "at the expense of" do not express a legal test; and a test cannot be derived by exegesis of those words, as if they were the words of a statute.

42.  The structured approach provided by the four questions does not, therefore, dispense with the necessity for a careful legal analysis of individual cases. In carrying out that analysis, it is important to have at the forefront of one's mind the purpose of the law of unjust enrichment. As was recognised in *Menelaou* (para 23), it is designed to correct normatively defective transfers of value, usually by restoring the parties to their pre-transfer positions. It reflects an Aristotelian conception of justice as the restoration of a balance or equilibrium which has been disrupted. That is why restitution is usually the appropriate remedy.

43.  The nature of the various legal requirements indicated by the "at the expense of" question follows from that principle of corrective justice. They are designed to ensure that there has been a transfer of value, of a kind which may have been normatively defective: that is to say, defective in a way which is recognised by the law of unjust enrichment (for example, because of a failure of the basis on which the benefit was conferred). The expression "transfer of value" is, however, also too general to serve as a legal test. More precisely, it means in the first place that the defendant has received a benefit from the claimant. But that is not in itself enough. The reversal of unjust enrichment, usually by a restitutionary remedy, is premised on the claimant's also having suffered a loss through his provision of the benefit.

44.  This was recognised in *Menelaou* , as was noted in para 37 above. It was explained more fully by Lord Clyde in Banque Financière , citing a maxim of Pomponius:

> "My Lords, the basis for the appellants' claim is to be found in the principle of unjust enrichment, a principle more fully expressed in the Latin formulation, nemo debet locupletari aliena jactura [no-one should be enriched by another's loss] …Without attempting any comprehensive analysis, it seems to me that the principle requires at least that the plaintiff should have sustained a loss through the provision of something for the benefit of some other person with no intention of making a gift, that the defendant should have received some form of enrichment, and that the enrichment has come about because of the loss." (p 237)

© 2025 Thomson Reuters.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 12 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

45.  It should be emphasised that there need not be a loss in the same sense as in the law of damages: restitution is not a compensatory remedy. For that reason, some commentators have preferred to use different terms, referring for example to a subtraction from, or diminution in, the claimant's wealth, or simply to a transfer of value. But the word "loss" is used in the authorities, and it is perfectly apposite, provided it is understood that it does not bear the same meaning as in the law of damages. The loss to the claimant may, for example, be incurred through the gratuitous provision of services which could otherwise have been provided for reward, where there was no intention of donation. In such a situation, the claimant has given up something of economic value through the provision of the benefit, and has in that sense incurred a loss.

**Direct and indirect provision of a benefit**

46.  Situations in which the defendant has received a benefit from the claimant, and the claimant has incurred a loss through the provision of that benefit, usually arise where the parties have dealt directly with one another, or with one another's property. Common examples are the gratuitous payment of money, or provision of goods or services, by the claimant to the defendant, where there was no intention of donation. In such a situation, if the enrichment of the defendant is unjust - if, in other words, the transfer of value is defective in a sense recognised by the law of unjust enrichment - then the claimant is prima facie entitled to have the enrichment reversed.

47.  There are, however, situations in which the parties have not dealt directly with one another, or with one another's property, but in which the defendant has nevertheless received a benefit from the claimant, and the claimant has incurred a loss through the provision of that benefit. These are generally situations in which the difference from the direct provision of a benefit by the claimant to the defendant is more apparent than real.

48.  One such situation is where the agent of one of the parties is interposed between them. In that situation, the agent is the proxy of his principal, by virtue of the law of agency. The series of transactions between the claimant and the agent, and between the agent and the defendant, is therefore legally equivalent to a transaction directly between the claimant and the defendant. Similarly, where the right to restitution is assigned, as in Equuscorp Pty Ltd v Haxton [2012] HCA 7; 246 CLR 498; 86 AJLR 296 , the claimant stands in the shoes of the assignor, and is therefore treated as if he had been a party to the relevant transaction, and the defendant's enrichment had been directly at his expense. Another situation is where, as in *Relfo* , an intervening transaction is found to be a sham (para 121). Since the sham is created precisely in order to conceal the connection between the claimant and the defendant, it is disregarded when deciding whether the latter was enriched at the former's expense. So, in *Relfo* , Gloster and Floyd LJJ described the arrangements in question as being "equivalent to a direct payment" (paras 103 and 115). There have also been cases, discussed below, in which a set of co-ordinated transactions has been treated as forming a single scheme or transaction for the purpose of the "at the expense of" inquiry, on the basis that to consider each individual transaction separately would be unrealistic. There are also situations where the defendant receives property from a third party into which the claimant can trace an interest. Since the property is, in law, the equivalent of the claimant's property, the defendant is therefore treated as if he had received the claimant's property.

49.  A different type of situation is typified by the case where the claimant discharges a debt owed by the defendant to a third party. Although it is the third party creditor who receives the payment from the claimant, the defendant is directly enriched, since the payment discharges his debt: the enrichment is not the payment which the third party receives, but the discharge which the defendant receives. Where the transfer of value is defective, and the enrichment is consequently unjust, the law reverses it, as far as possible, by subrogating the claimant to the rights formerly held by the third party (as was explained, for example, by Walton J in Burston Finance Ltd v Speirway Ltd [1974] 1 WLR 1648, 1652 ). There are many variations on the type of situation where equitable subrogation is an appropriate remedy to reverse or prevent unjust enrichment. The remedy differs from restitution, in that it does not have the effect of restoring the parties to their pre-transfer positions, but it is the most practicable means of reversing or preventing unjust enrichment in the types of situation where it is appropriate.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 13 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

50.  It has often been suggested that there is a general rule, possibly subject to exceptions, that the claimant must have directly provided a benefit to the defendant. The situations discussed in the two preceding paragraphs can be reconciled with such a rule, if it is understood as encompassing a number of situations which, for the purposes of the rule, the law treats as equivalent to a direct transfer, in the sense that there is no substantive or real difference. So understood, the suggested rule is helpful. It may nevertheless require refinement to accommodate other apparent exceptions, and it would be unwise at this stage of the law's development to exclude the possibility of genuine exceptions, or to rule out other possible approaches.

51.  Where, on the other hand, the defendant has not received a benefit directly from the claimant, no question of agency arises, and the benefit does not consist of property in which the claimant has or can trace an interest, it is generally difficult to maintain that the defendant has been enriched at the claimant's expense. The point is illustrated by the case of *MacDonald Dickens & Macklin v Costello [2011] EWCA Civ 930; [2012] QB 244* , where the provision of services to a company was held not to enrich its directors and shareholders. It is also illustrated by the example, discussed in *Relfo* , of a claimant who makes a mistaken payment to a third party, who in consequence makes a gift to the defendant out of property in which the claimant has no interest, and into which he is unable to trace. As Arden and Floyd LJJ recognised (paras 78 and 114), the claimant does not have a claim in unjust enrichment against the defendant. The claimant suffers a loss through making the payment to the third party, who is unjustly enriched at his expense. A claim in unjust enrichment therefore lies against the third party (subject to any defences available). But no claim of a personal nature lies at the instance of the claimant against the defendant: the claimant has not incurred any loss through the making of the gift.

**Incidental benefits**

52.  As explained earlier, the "at the expense of" requirement is not satisfied merely by the direct receipt of a benefit. The claimant must also incur a loss through the provision of the benefit. As Lord Clyde put it in Banque Financière , in the passage cited at para 44 above, "the plaintiff should have sustained a loss through the provision of something for the benefit of some other person". That requirement will not normally be satisfied where the provision of the benefit was merely an incidental or collateral result of his expenditure. (In practice, situations where the defendant has received a benefit merely as an incidental consequence of the claimant's pursuit of some other objective are also often situations in which the enrichment of the defendant is not in any event unjust.) In such a situation, the claimant may have received the consideration for which he bargained as the counterpart of his own expenditure, and in that event will not usually have suffered any loss. Even if he has incurred a loss, it will not normally have arisen through his provision of something for the benefit of the defendant, since the benefit received by the defendant will have been merely incidental or collateral to the reason why the expenditure was incurred. A "but for" causal connection between the claimant's being worse off and the defendant's being better off is not, therefore, sufficient in itself to constitute a transfer of value.

53.  The need for the claimant to suffer a loss through the provision of something for the benefit of the defendant is illustrated by the *Ruabon* case, which concerned a ship which had been damaged during a voyage covered by a policy of marine insurance. She was put into dry dock for repairs at the expense of the insurers. The owners took advantage of her being in dry dock to have her surveyed for the purpose of renewing her Lloyds classification. There was no consequent increase in dock expenses. Even if the insurers might be regarded as having provided a benefit to the owners (by enabling them to have the vessel surveyed without themselves incurring the expense of putting her into dry dock), the insurers incurred no loss through the provision of that benefit: their expenses were not increased, and they received the consideration for which they had paid. The insurers' claim for a contribution towards their expenses, on the basis that the owners had benefited from it, was rejected. Lord Macnaghten put the point in a nutshell: "there is no principle of law which requires that a person should contribute to an outlay merely because he has derived a material benefit from it" (p 15).

54.  The Earl of Halsbury LC, in a speech with which the other members of the Committee agreed, emphasised the fact that the owners were strangers to the exercise undertaken by the insurers, and the absence in those circumstances of any reason why, in justice, they should contribute towards its cost:

> "[T]his is the first time in which it has been sought to advance that principle [of contribution] where there is nothing in common between the two persons, except that one person has taken advantage of something that another person has done, there being no contract between them, there being no obligation by which each of them is bound, and the duty to contribute is alleged to arise only on some general principle of justice, that a man ought not to get an advantage unless he pays for it. So that if a man were to cut down a wood which obscured his neighbour's prospect and gave him a better view, he ought upon this principle to be compelled to contribute to cutting down the wood." (p 12)

The Lord Chancellor's example did not involve anything which might have been argued to be an unjust factor, but the position would scarcely be different if it had: if, for example, the man had cut down the wood in the mistaken belief that the trees were diseased.

55.  Another illustration of the need for a loss to be incurred through the provision of the benefit, also cited to the Court of Appeal in the *TFL* case, is the case of *Edinburgh and District Tramways Co Ltd v Courtenay 1909 SC 99* . It concerned a contract between a tramway company and an advertising firm, under which the firm paid a rental for the right to display advertising on the tramcars. It was up to the firm to provide the boards around the upper deck of the tramcars, on which the advertisements were displayed. The tramway company subsequently constructed new tramcars with "decency boards" already supplied, saving the advertising firm the expense of fitting its own. The tramway company's claim against the advertising firm for the cost of fitting the decency boards was rejected, on the ground that the tramway company had not incurred any loss through the provision of the benefit. Lord President Dunedin observed that "there are certain marks or notes of the situation in which recompense is due, and I think that one mark or note is that the person who claims recompense must have lost something" (pp 105-106). The Lord President also emphasised that the company had been acting for its own purposes. Referring to earlier authorities, he remarked that in the case at hand "you have the same element that went to the decision of some of these cases, that the thing done was as much for the benefit of the man who did it as for that of the other person" (p 106). The Lord President illustrated his opinion with an illuminating example:

> "One man heats his house, and his neighbour gets a great deal of benefit. It is absurd to suppose that the person who has heated his house can go to his neighbour and say - 'Give me so much for my coal bill, because you have been warmed by what I have done, and I did not intend to give you a present of it.'" (p 105)

56.  The importance of identifying a loss arising through the provision of a benefit is also illustrated by the case of *TFL* , where a claim based on unjust enrichment was brought by a company, A, against a defendant, B, in order to recover the costs which A had incurred in earlier legal proceedings. Those proceedings had been brought by A in order to recover a debt from a third party, C, and had been successfully defended on the ground that the debt was due, not to A, but to B. After B recovered the debt, A brought proceedings against B on the basis that A had conferred a benefit on it by bringing the earlier proceedings and thereby clarifying B's right to recover the debt. Since A had done so under an erroneous understanding of its rights, it argued that B had therefore been unjustly enriched at its expense. The Court of Appeal, by a majority (Sir Stanley Burnton dissenting), held that the claim could not be summarily dismissed. The court had understandable difficulty in identifying the benefit which had supposedly been conferred by A on B (para 50), and accepted that the benefit, "whatever it consists of", had not been directly provided by A to B (para 54). It appears to have considered that a causal link between A's payment of the costs of the proceedings and an indirect benefit to B was nevertheless arguably sufficient (para 64). The fact that A had been acting in its own interests was considered to be no answer (para 67).

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 15 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

57.  The court could hardly have reached the same conclusion if, when considering the "at the expense of" question, it had focused on the need to identify a transfer of value from the claimant to the defendant. A had not provided any benefit directly to B. At best, B had received an incidental benefit as the result of A's pursuit of its own interests. The facts of the case, so far as the "at the expense of" question is concerned, were not materially distinguishable from those of Lord Dunedin's example of the householder whose heating warms his neighbour's house. Furthermore, A's erroneous understanding of its legal rights did not in any event bear on the justice of B's incidentally benefiting from the clarification of the legal position: one might cite Pollock CB's rhetorical question in Taylor v Laird (1856) 25 LJ Ex 329, 332 , "One cleans another's shoes; what can the other do but put them on?" A had received the legal services it had bargained for when it incurred the expense (and, if it also had to meet its opponent's costs, that was a risk inherent in litigation, which it voluntarily assumed). Even bearing in mind that the Court of Appeal was dealing with a strike-out application, the majority of the court were wrong in not summarily dismissing the claim.


58.  It is interesting to note that similar claims were rejected long ago in Scotland, on the basis that the litigant had been pursuing his own interests. More, in his Notes to Stair's Institutions (1832), states:

> "a person who, for his own benefit, carries on an expensive law-suit, which, in the result, establishes some point as beneficial to other neighbouring proprietors as to himself, can make no claim against them for any part of the expense incurred by him. And Lord Stair, in the text, states the case of a person who reduces [sets aside] a right as void, and thereby lets in the claims of third parties, which are ultimately preferred to his own, yet he says, that 'as he was doing his own business, not theirs, he can claim no share from them of his expenses.'" (p liv)


Hume's *Lectures* (1786-1822) are to the same effect, stating in relation to the person who brings an action:

> "Now, though it should so happen, (as very often it must,) that he settles some point of law, in the decision of this lawsuit of his, and thus does a service to a number of other persons, whose property, or concerns, are in the like situation; yet still the cost of this lawsuit is his peculiar and exclusive concern. He can recover no part of it from his neighbours, or any of them, for whose benefit he probably never would have stirred in the matter." (Vol III, p 167, citing the unreported case of Ferguson v Smyth , 18 November 1802, SC Old Sess Pap, vol 437, No 30.)



**Economic reality**

59.  Nor is the "at the expense of" requirement satisfied by a connection between the parties' respective benefit and loss merely as a matter of economic or commercial reality. Economic reality is not only a "somewhat fuzzy concept", as Moses LJ described it in *Menelaou [2014] 1 WLR 854* , para 62, but one which is difficult to apply with any rigour or certainty in this context, or consistently with the purpose of restitution on the ground of unjust enrichment. An inquiry into where the economic burden of an unjust enrichment has fallen is liable to be a very complex undertaking, especially where there is a chain of suppliers and consumers. The supplier who passes on a tax or other charge by increasing the price of his goods or services might be thought to have shifted the economic burden, but his increased prices may have an adverse impact upon his sales, and accordingly upon the profitability of his operations. Furthermore, in a situation where numerous factors affect the prices which he charges, it may be far from easy to decide to what extent the economic burden of the tax has been reflected in the price charged. Deciding whether the economic burden of an unjust enrichment has been passed on has been described as virtually unascertainable ( Hanover Shoe Inc v United Shoe Machinery Corpn (1968) 392 US 481, 493 ) and a near impossibility ( British Columbia v Canadian Forest Products Ltd [2004] 2 SCR 74 , para 205). These points have been made repeatedly in other jurisdictions, when considering a defence of passing on: that is to say, a defence based on

the proposition that the economic burden of an unjustified enrichment was borne not by the claimant but by a third party: see, for example, Commissioner of State Revenue (Victoria) v Royal Insurance Australia Ltd (1994) 182 CLR 51; 126 ALR 1 ; Kingstreet Investments Ltd v New Brunswick (Finance) Ltd [2007] 1 SCR 3 ; and the Opinions of Advocate-General Mancini in *Amministrazione delle Finanze dello Stato v SpA San Giorgio (Case 199/82) [1983] ECR 3595* (" *San Giorgio* ") and of Advocate-General Geelhoed in *Commission of the European Communities v Italian Republic (Case C-129/00) [2003] ECR I-14637* .

60.   A more fundamental difficulty with an approach based on economic reality arises from the fact that the purpose of restitution is not to compensate for loss, but to reverse the defective transfer. Looking to see who has suffered an economic loss is therefore not, in principle, the correct way of identifying the appropriate claimant. Indeed, even in tort law, which *is* concerned with compensation for loss, the court is not concerned with where the economic burden of the tort may ultimately have fallen as a matter of economic reality.

### Co-ordinated transactions

61.   There are, on the other hand, cases in which the court has referred to "reality" in a different sense. These are cases in which, for the purpose of answering the "at the expense of" question, the court has treated a set of related transactions, operating in a co-ordinated way, as forming a single scheme or transaction, on the basis that to answer the question by considering each of the individual transactions separately would be unrealistic. The case of Banque Financière , as explained in some of the judgments, is an example. The claimant had entered into a refinancing arrangement involving the loan of a sum of money to the manager of a holding company, which he in turn lent to a subsidiary of that company so that it could discharge a debt secured by a first-ranking security. The purpose of interposing the manager between the claimant and the first subsidiary was to avoid a requirement to make a public disclosure of the loan, which would have applied if the claimant had lent the money directly to the first subsidiary. The claimant paid the money directly to the subsidiary's creditor, so discharging the debt. It was conceded that this enriched the defendant, which was another subsidiary of the holding company, since it promoted the ranking of its own security, with the consequence that it was the only creditor of the first subsidiary which was likely to be repaid. This was contrary to the understanding on which the claimant had advanced the loan, namely that it would be repaid in priority to all intra-group debts. The House of Lords held that this would unjustly enrich the defendant, and therefore subrogated the claimant to the discharged security, as against the defendant, so as to prevent the unjust enrichment.

62.   One of the questions considered by the House of Lords was whether the enrichment was at the expense of the claimant, when the claimant had made the loan to the manager of the holding company, who had then made a further loan to the first subsidiary, rather than the claimant lending directly to the first subsidiary. Two different analyses were put forward. Lord Steyn proceeded on the basis that the interposition of the loan to the manager was "no more than a formal act designed to allow the transaction to proceed …To allow [it] to alter the substance of the transaction would be pure formalism" (p 227). Lord Clyde similarly stated that the arrangement with the manager did not "prevent recognition of the reality of the granting of the funds by [the claimant] to [the holder of the first-ranking security]" (p 238). That was also the view of Lord Hutton ("the reality was that the [defendant] was enriched at the expense of [the claimant]": p 239). Lord Hoffmann, with whom Lord Steyn, Lord Griffiths and Lord Clyde agreed, put forward another analysis, namely that the claimant's money could be traced into the discharge of the debt secured by the first-ranking security (p 235). On both analyses, the House of Lords treated the situation as one where the defendant had directly received a benefit from the claimant, since on one analysis it was in reality the claimant which had discharged the first-ranking security and thereby promoted the defendant's security, and on the other analysis it was the claimant's money which had done so.

63.   The case of *Menelaou* provides another illustration. The case concerned the sale of a property owned by the defendant's parents, and the use of part of the proceeds to purchase another property in her name, as a gift. The claimant bank held a charge over the first property to secure the parents' borrowings, and agreed to the discharge of the security in return for a fresh charge over the second property. It instructed solicitors to deal with the discharge of the security over the first property and to obtain a charge over the second property. The solicitors sent the bank a charge over the second property, purportedly executed by the defendant, and the bank authorised the discharge of the security over the first property. In the event, the second charge

was defective, as a result of the solicitors' negligence. The defendant had agreed to the purchase of the second property in her name, but was unaware of her parents' agreement with the bank that there should be a charge. The solicitors admitted liability to the bank for its losses, subject to credit being given for any sums which the bank might recover from the defendant.

64.  Lord Carnwath analysed the case in terms of the law of equity rather than unjust enrichment. He considered that the moneys held by the solicitors following the sale of the first property, and used to purchase the second property, were held on a *Quistclose-type* trust for the bank ( *Quistclose Investments Ltd v Rolls Razor Ltd [1970] AC 567* ). On that footing, it followed that the bank was subrogated to the lien of the unpaid vendor of the second property, so as to give it an equitable interest in the property. In other words, the vendor had a lien over the property, to secure his right to payment of the purchase price, as long as he remained unpaid. The bank, on discharging the parents' obligation to pay the vendor, became entitled in equity to the benefit of that lien (or, strictly analysed, to a new lien to secure its own right to repayment) by subrogation.

65.  The other members of the court held that the bank should be subrogated to the unpaid vendor's lien on the basis of unjust enrichment, since it had mistakenly authorised the use of the proceeds of sale of the first property (which it could otherwise have required to be applied to discharge the debt owed to itself) to purchase the second property, thereby providing the defendant with a benefit at its expense. Lord Clarke proceeded on the basis that "the two arrangements, namely the sale of [the first property] and the purchase of [the second property], were not separate but part of one scheme, which involved the bank throughout" (para 25). Lord Neuberger agreed, observing that "it is appropriate not merely to consider the purchase of, and charge over, [the second property] as a single composite transaction", applying the approach to property purchases involving a charge which was adopted in *Abbey National Building Society v Cann [1991] 1 AC 56* , but that it was "also appropriate in the present case to treat the sale of [the first property] and the purchase of [the second property] as one scheme, at least for present purposes" (para 67). Lord Kerr and Lord Wilson agreed with both judgments in relation to this issue.

66.  On that basis, Lord Clarke considered that the conclusion that there had been a transfer of value between the bank and the defendant gave effect to "the reality of the transaction", notwithstanding the absence of a direct payment by the former to the latter (para 33). Lord Neuberger agreed, stating:

> "[T]here was in reality a single transaction, and it was from that transaction that [the defendant] directly benefitted, even though the benefit was effected at the direction of the Menelaou parents. The benefit to [the defendant] was direct because it arose as the immediate and inevitable result of the very transaction to which she was party and which gave rise to the unjust enrichment." (para 73)

**"At the expense of" in the present case**

67.  Turning to the issue raised in the present case, the only English authority cited in argument which contains a discussion of the "at the expense of" question in relation to taxation is the decision of the Court of Appeal in *Kleinwort Benson Ltd v Birmingham City Council [1997] QB 380* . The case concerned a claim by a bank for restitution of money which it had paid to a local authority under a void swap transaction. The bank had also entered into hedging arrangements with a third party which protected it against loss. In considering whether English law recognised a defence of passing on, the Court of Appeal discussed the requirement that the defendant's enrichment should be at the expense of the claimant. Evans LJ, delivering the leading judgment with which Saville LJ agreed, referred to a range of authority and academic writing from other jurisdictions, including two authorities concerned with taxes paid under a mistake: the decision of the United States Federal Court of Appeals for the Second Circuit in 123 East Fifty-Fourth Street Inc v United States (1946) 157 F 2d 68 , and the decision of the High Court of Australia in Commissioner of State Revenue (Victoria) v Royal Insurance Australia Ltd . He noted that the cases raised a "question, akin to agency, which is whether the taxpayer should be regarded as having collected tax from his customers on behalf of the taxing authority", and that it had been said by Learned Hand J in the *123 East Fifty-Fourth Street* case that any tax recovered by the taxpayer would be held by him as a fiduciary for his customers. Similarly, in the

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 18 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

Royal Insurance case it had been said that if it was established that the plaintiff had charged its policy-holders the tax as a separate item, it would be entitled to recover the money from the tax authority but would then hold it as a constructive trustee. In the event, however, Evans LJ found the taxation cases of little assistance, since on the facts of the case no question of a constructive trust or of any obligation to account to customers could arise (p 391). Morritt LJ, with whose judgment Saville LJ also agreed, emphasised that the plaintiff was legally and beneficially entitled to the money it paid to the authority, and that the case was not one in which the claimant held the money claimed as a bare trustee or tax collector such as, arguably, in the *123 East Fifty-Fourth Street* case (p 400).

68.  It has not been argued in the present appeal that the Managers held the amounts paid to them by the Lead Claimants in respect of VAT as agents or trustees or in any other fiduciary capacity. In the circumstances, it is unnecessary to consider the American and Australian authorities in any detail. The dissenting opinion of Learned Hand J in the *123 East Fifty-Fourth Street* case was concerned with a simpler situation than the present case, where the supplier of services collected sales tax from his customers, as a separately identifiable amount paid for the purpose of meeting the tax, and then remitted the whole of that amount to the tax authority. The same was true in the case of Wayne County Produce Co v Duffy-Mott Co (1927) 244 NY 351 , where Cardozo CJ adopted a similar approach. The reasoning in these cases was approved by Mason CJ in the Royal Insurance case, in an opinion in which the other members of the court did not join, but he distinguished the case before him on the basis that the amount collected was not paid separately from the price of the services supplied.

69.  In considering these authorities, it is necessary not only to bear in mind the differences from the facts of the present case, but also to remember that American and Australian law adopt a broader approach to constructive trusts than English law. In particular, one of the essential requisites for a trust in English law is that there must be identifiable trust property (or its traceable proceeds) in the hands of the recipient which is not available to him as part of his general assets: see Westdeutsche Landesbank Girozentrale v Islington London Borough Council [1996] AC 669, 705 .

70.  In the present case, the contracts between the Managers and the Lead Claimants provided for the Managers to be paid fees plus VAT "if applicable" (or words to similar effect). The contractual obligation of the Lead Claimants was therefore to pay the fees plus whatever sum, if any, was necessary in order to meet the VAT chargeable on the supply in question. This was reflected in the invoices issued by the Managers, which drew a distinction between their fees, on the one hand, and the VAT due on their fees, on the other hand. There is, however, no indication that the Managers were expected to keep the amounts paid to them by the Lead Claimants in respect of VAT separate from their other funds: on the face of things, they were entitled to treat them as part of their general assets. It follows that in paying those amounts to the Managers, the Lead Claimants must be taken to have intended to part with any interest in the money, rather than to have impressed it with a special purpose trust. Furthermore, since the Managers were not aware of any mistake prior to making payment to the Commissioners, their conscience cannot have been affected so as to render them trustees: see Westdeutsche at p 709. In these circumstances, the right to the restitution of money paid under the contract as the result of a mistake gives rise, like the contract itself, to purely personal obligations.

71.  Returning, then, to the question whether the unjust enrichment of the Commissioners was at the expense of the Lead Claimants, and focusing on whether there was a transfer of value from the Lead Claimants to the Commissioners, the answer is in the negative. There was a transfer of value, comprising the notional £100, from the Lead Claimants to the Managers, under the contract between them. It was defective, because it was made in performance of a contractual obligation which was mistakenly believed to be owed. There was a subsequent transfer of value, comprising the notional £75, from the Managers to the Commissioners. It was also defective, because it was made in compliance with a statutory obligation which was inapplicable because it was incompatible with EU law. These two transfers cannot be collapsed into a single transfer of value from the Lead Claimants to the Commissioners.

72.  That follows from a number of considerations. First, the Lead Claimants do not challenge the judge's rejection of a connection between the payments made by the Lead Claimants and the payments received by the Commissioners based on

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 19 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

agency. The intervention of the Managers cannot therefore be disregarded on the basis that they were in law the proxy of one of the other parties. Secondly, since the payments made by the Lead Claimants formed part of the Managers' general assets, to do with as they pleased, it is impossible to trace those payments into the payments subsequently made by the Managers to the Commissioners, and so to regard the Commissioners as having benefited from the receipt of property in which the Lead Claimants had an interest. Thirdly, the fact that there were two separate transactions - first, between the Claimants and the Managers, and secondly between the Managers and the Commissioners - is not in this context something which can be disregarded. In particular, there is no question of the transactions being a sham or involving an artificial step, or of their comprising a single scheme. The first transfer did not even bring about the second transfer as a matter of causation: the judge's rejection of a "but for" causal connection between the two transfers is not challenged. The Lead Claimants rely on a connection established by commercial or economic reality. But, for the reasons already explained, the fact that, as a matter of economic or commercial reality, the Lead Claimants bore the cost of the undue tax paid by the Managers to the Commissioners does not in itself entitle them to restitution from the Commissioners.

73.  It follows that the Lead Claimants did not in principle have any right to restitution against the Commissioners. They did, on the other hand, have a right to restitution against the Managers. That right was to restitution of the entire amount paid in respect of VAT, ie the notional £100. The Managers did not in principle have a change of position defence in respect of the notional £75 which they paid to the Commissioners, since that change of position was reversible under section 80 of the 1994 Act, as I shall shortly explain. Nor did they have a change of position defence in respect of the notional £25 which they retained.

74.  In the circumstances, it is unnecessary to consider the remainder of Lord Steyn's questions.

## Section 80 of the 1994 Act

75.  In order to determine the issues arising in relation to EU law, it is necessary next to consider the effect of section 80 of the 1994 Act. The section has undergone amendment on a number of occasions. The version in force at the time when the Managers made their claims, and also applicable at the time when the present actions were brought by the Lead Claimants, was in the following terms, so far as material:

"Credit for, or repayment of, overstated or overpaid VAT

(1)  Where a person -

(a)  has accounted to the Commissioners for VAT for a prescribed accounting period (whenever ended), and

(b)  in doing so, has brought into account as output tax an amount that was not output tax due,

the Commissioners shall be liable to credit the person with that amount.

(lA)  Where the Commissioners -

(a)  have assessed a person to VAT for a prescribed accounting period (whenever ended), and

(b)  in doing so, have brought into account as output tax an amount that was not output tax due,

they shall be liable to credit the person with that amount.

© 2025 Thomson Reuters.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 20 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

(lB)   Where a person has for a prescribed accounting period (whenever ended) paid to the Commissioners an amount by way of VAT that was not VAT due to them, otherwise than as a result of -

(a)  an amount that was not output tax due being brought into account as output tax, or

(b)  an amount of input tax allowable under section 26 not being brought into account,

the Commissioners shall be liable to repay to that person the amount so paid.

(2)  The Commissioners shall only be liable to credit or repay an amount under this section on a claim being made for the purpose.

(2A)  Where -

(a)  as a result of a claim under this section by virtue of subsection (1) or (lA) above an amount falls to be credited to a person, and

(b)  after setting any sums against it under or by virtue of this Act, some or all of that amount remains to his credit,

the Commissioners shall be liable to pay (or repay) to him so much of that amount as so remains.

(3)  It shall be a defence, in relation to a claim under this section by virtue of subsection (1) or (lA) above, that the crediting of an amount would unjustly enrich the claimant.

(4)  The Commissioners shall not be liable on a claim under this section -

(a)  to credit an amount to a person under subsection (1) or (1A) above, or

(b)  to repay an amount to a person under subsection (1B) above,

if the claim is made more than three years after the relevant date [ie the end of the prescribed accounting period].

…(7)  Except as provided by this section, the Commissioners shall not be liable to credit or repay any amount accounted for or paid to them by way of VAT that was not VAT due to them."


76.  Section 80 is supplemented by section 80A , introduced by section 46(2) of the Finance Act 1997 and subsequently amended, which enables the Commissioners to make regulations providing for reimbursement arrangements to be disregarded for the purposes of section 80(3) except where they contain such provision, and are supported by such undertakings, as may be required by the regulations. The relevant regulations are contained in Part VA of the Value Added Tax Regulations 1995 (SI 1995/2518), as amended. They provide for "reimbursement arrangements", defined by regulation 43A as arrangements for the purposes of a claim under section 80 which "(a) are made by a claimant for the purpose of securing that he is not unjustly enriched by the crediting of any amount in pursuance of the claim, and (b) provide for the reimbursement of persons (consumers) who have, for practical purposes, borne the whole or any part of the original amount brought into account as output tax that was not output tax due". The regulations go on to require the claimant under section 80 to give undertakings to the Commissioners that he will apply the whole of the amount credited, and any interest on that amount, to the reimbursement of identified consumers whom he has reimbursed or intends to reimburse.


77.  It is common ground that, for persons who have accounted to the Commissioners for VAT that was not due, section 80 and the associated regulations provide a code for the recovery of VAT which is exhaustive and excludes other remedies such

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 21 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

as a common law claim based on unjust enrichment. It is also common ground that the ITCs could never have made a claim under section 80 , since they did not pay or account for any of the VAT in question to the Commissioners. The first issue in dispute is whether the effect of section 80 is to exclude a common law claim by the ITCs, assuming, contrary to my earlier conclusion, that such a claim might otherwise be brought.

78.  The argument for the Lead Claimants is based primarily on the structure and wording of section 80 . They point out that subsections (1) to (6) are concerned with the crediting or repayment of undue VAT to the supplier, not the consumer. In subsection (7), the words "credit or repay" echo the language of earlier subsections, where they can plainly refer only to the repayment or crediting of the supplier. They submit that subsection (7) is similarly concerned with the supplier. Only a supplier of goods or services can "account" for an amount to the Commissioners, and only a supplier can be "credited" with an amount by them. Similarly, only a supplier can be "repaid" by the Commissioners, since only he has paid them in the first place. Section 80(7) is thus designed only to exclude claims, otherwise than under the section, by persons who have a claim under the section. That argument was accepted by the Court of Appeal.

79.  On behalf of the Commissioners, it is argued that the word "repay" is capable of applying to any payment back by the Commissioners of VAT which they have received. From their perspective, there is a repayment if the VAT is refunded, whether to the supplier or to someone else. Furthermore, it is argued, it would be strange if section 80(7) barred a restitutionary claim by the supplier, but left the supplier's customer in a better position. Moreover, it is argued, section 80 establishes a statutory scheme for the restitution of VAT which was not due, which by necessary implication excludes non-statutory restitutionary claims. The argument seeks to draw support from the decision of the Court of Appeal in *Monro v Revenue and Customs Comrs [2008] EWCA Civ 306; [2009] Ch 69* , where a common law claim was held to be excluded by a statutory scheme for the recovery of tax, since it would be inconsistent with the purpose of the scheme.

80.  In agreement with the judge, I find the textual arguments inconclusive, when considered by themselves. The word "repay" is capable of bearing a wider meaning than the one for which the claimants contend, but could also be construed more narrowly. A purposive construction of the provision points more clearly to the correct conclusion. In that regard, section 80(3) and (4) are particularly important.

81.  Under section 80(3) , the Commissioners have a statutory defence to a claim under section 80 - a claim which, it is agreed, can only be made by a supplier - where crediting the supplier would unjustly enrich him. The possibility of unjust enrichment (in a non-technical sense) arises because the supplier normally recovers from his customers the output tax for which he accounts to the Commissioners. The subsection therefore creates a statutory defence of passing on. Section 80A , and the 1995 Regulations, then create a scheme under which the defence is disapplied where "reimbursement arrangements" are made with the purpose of ensuring that the payment to the supplier is used to reimburse the consumers who have borne the economic burden of the tax. Sections 80 and 80A , together with the 1995 Regulations, thus create a scheme which enables consumers who have been wrongly charged VAT to obtain reimbursement. The consumers are able to recover the VAT which they were wrongly charged, to the extent that it was remitted by the supplier to the Commissioners, through the medium of the supplier's claim under section 80 .

82.  Although the consumers' remedy is indirect, it can generally be expected to be effective: if the supplier is otherwise reluctant to make a claim, the consumers have a direct claim against him, as explained below. Subject to the question of time bar, these arrangements therefore remove any need there might otherwise be, in most circumstances, for the consumer to have a direct remedy against the Commissioners. It will be necessary at a later point to return to the question whether there may nevertheless be some circumstances in which a direct remedy is required by EU law.

83.  Section 80(4) lays down a limitation period for claims under the section which is shorter than the period of six years, with extensions in the event of mistake, which would apply to a common law claim in unjust enrichment under section 32(1)(c) of the Limitation Act 1980 (and which also applied under section 80(4) until its amendment by the Finance Act 1997 ). A statutory claim by the supplier must therefore be brought within a shorter and more certain period of time. The evident aim is to protect public finances against the risk of a liability to repay tax emerging more than three years after the tax was received. It would be inconsistent with that intention for there to be a potentially far longer period within which non-statutory claims might be brought against the Commissioners by the supplier's customers.

84.  In the light, therefore, of section 80(3) and (4) in particular, Parliament cannot sensibly be taken to have intended, when it created this scheme for the reimbursement of suppliers (with provision for them in turn to reimburse their customers), subject to strict time limits, that it should exist concurrently with non-statutory liabilities towards suppliers and their customers which were potentially wider in scope and were subject to a longer and less certain limitation period. Such an intention would be inconsistent with the rationale of the statutory scheme. In these circumstances, on the hypothesis that non-statutory claims by consumers might otherwise lie against the Commissioners in circumstances falling within the scope of section 80 , subsection (7) must be construed as excluding such claims.

85.  The Court of Appeal considered that that approach, which the judge accepted, presupposed that Parliament had in mind that restitutionary claims might be brought by consumers, and legislated with the intention of excluding such claims. As they pointed out, however, *Kleinwort Benson Ltd v Lincoln City Council [1999] 2 AC 349* , which established that money paid under a mistake of law might be recoverable, had not been decided when the 1994 Act was enacted. In their view, that background pointed away from a legislative intent to restrict claims for the recovery of overpaid VAT to the machinery provided by section 80 .

86.  I find this reasoning unpersuasive. The fact that Parliament will not have had in mind a particular common law right to payment when enacting a legislative scheme for recovery does not preclude the common law right being excluded by that scheme: *R (Child Poverty Action Group) v Secretary of State for Work and Pensions [2010] UKSC 54; [2011] 2 AC 15* . The absence of a recognised right to recover money paid under a mistake of law, at the time when section 80 was enacted, did not exclude the possibility of restitutionary claims by consumers, since there were other established grounds on which restitution might be sought, including payment under a mistake of fact. Moreover, the Lead Claimants' argument proves too much: if section 80(7) was not intended to exclude common law claims based on mistake of law, because no such cause of action was recognised when the legislation was enacted, then a common law claim by the Managers would not be excluded either; but it is common ground that section 80(7) is effective to exclude any common law claim by the Managers.

87.  More fundamentally, the determining factor in the present case is that the scheme created by section 80 is inconsistent with the existence of a concurrent non-statutory liability on the part of the Commissioners to make restitution to consumers. In the absence of an express exclusion in section 80(7) , one would therefore conclude that section 80 impliedly excluded such liability (assuming that it might otherwise exist). Given the existence of an express exclusion in section 80(7) which is capable of covering such liability, it is unnecessary to rely on implication: one can construe section 80(7) as having the same exclusionary effect.

88.  It follows that section 80 bars claims by the consumers who ultimately bear the burden of VAT. It nevertheless enables them to be reimbursed, subject to a limitation period designed to avoid the disruption of public finances.

**Compatibility with EU law**

89.  Section 80 must have been intended to be compliant with EU law, since it is concerned with the recovery of VAT, which is a tax imposed by EU law. Indeed, a report by the Law Commission indicates that section 80 was framed to accord closely

with European Community law: Restitution: Mistakes of Law and Ultra Vires Public Authority Receipts and Payments, Law Com No 227 (1994) para 14.19. The present case raises the question whether the system of reimbursement established by section 80 has achieved that objective.

90.   There is a well-established principle of EU law that a member state is in principle required to repay taxes levied in breach of EU law, and an equally well-established exception whereby repayment can be refused where it would entail unjust enrichment of the taxable person because the burden of the tax has been passed on: see *San Giorgio* , paras 12-13. In the latter situation, however, the Court of Justice has held that the person to whom the tax was passed on should have a right to recover the sums unduly paid, so as to offset the consequences of the tax's incompatibility with EU law by neutralising the economic burden which the tax has imposed on the operator who has actually borne it: *Danfoss A/S v Skatteministeriet (Case C-94/10) [2011] ECR I-9963* , paras 23 and 25. It is for the domestic legal system of each member state to lay down the conditions under which claims may be made, subject to observance of the principles of equivalence and effectiveness: *Danfoss* , para 24. These general principles apply to the reimbursement of improperly invoiced VAT: *Reemtsa Cigarettenfabriken GmbH v Ministero delle Finanze (Case C-35/05) [2007] ECR I-2425* . Reasonable limitation periods are compatible with the principle of effectiveness, and the limitation period applicable to claims under section 80 of the 1994 Act has specifically been held to be reasonable: *Marks & Spencer plc v Customs and Excise Comrs (Case C-62/00) [2003] QB 866* , para 35.

91.   The court has accepted that, in principle, a system under which only the supplier is entitled to seek reimbursement of VAT from the tax authorities, and the consumer can seek restitution from the supplier, meets the requirements of EU law: *Reemtsma* , para 39. The court added one caveat:

> "[I]f reimbursement of the VAT becomes impossible or excessively difficult, in particular in the case of the insolvency of the supplier, those principles may require that the recipient of the services to be able to address his application for reimbursement to the tax authorities directly."

( *Reemtsma* , para 41).

92.   This approach has been applied and restated in later cases. In the *Danfoss* case, the Court of Justice put the matter in this way:

> "27.   It follows that a member state may, in principle, oppose a claim for the reimbursement of a duty unduly paid made by the final consumer to whom that duty has been passed on, on the ground that it is not that consumer who has paid the duty to the tax authorities, provided that the consumer - who, in the final analysis, bears the burden of that duty - is able, on the basis of national law, to bring a civil action against the taxable person for recovery of the sums unduly paid.
>
> 28.   However, if reimbursement by the taxable person were to prove impossible or excessively difficult - in particular, in the case of the insolvency of that person - the principle of effectiveness requires that the purchaser be able to bring his claim for reimbursement against the tax authorities directly and that, to that end, the member state must provide the necessary instruments and detailed procedural rules."

In these passages, the insolvency of the taxable person is given as an example of circumstances where reimbursement by that person might prove impossible or excessively difficult, and where the principle of effectiveness would therefore be infringed. It is the most likely example to arise in practice, but it cannot be treated as necessarily exhaustive. The governing

© 2025 Thomson Reuters.

Case 1:25-cv-02207-MMG    Document 87-4    Filed 05/20/25    Page 24 of 24

Investment Trust Companies (In Liquidation) v Revenue..., 2017 WL 01291423...

principle of effectiveness means that the purchaser must, in principle (and subject to procedural rules which are compatible with the principle of effectiveness, such as reasonable limitation periods), be able to recover from the member state where reimbursement by the taxable person would be impossible or excessively difficult.

93.   In the present case, the Lead Claimants had a common law right to restitution of the amounts mistakenly paid to the Managers, whose enforcement was neither impossible nor excessively difficult. The Managers had a statutory right to recover the notional £75 from the Commissioners, under arrangements which ensured that it was passed on to the Lead Claimants. The Managers retained the remaining £25 and were not insolvent. They were therefore in a position to refund it to the Lead Claimants. The only amounts which the Lead Claimants could not recover were the amounts which they had paid during the "dead periods", to the extent that those amounts had been paid by the Managers to the Commissioners: that is to say, the notional £75 whose recovery from the Commissioners was time-barred under section 80(4) of the 1994 Act. Although a claim by the Lead Claimants against the Managers in respect of the dead periods would not have been time-barred, because of the more generous limitation period allowed by section 32(1)(c) of the Limitation Act 1980 , the Managers would have a defence of change of position, since the amounts which they paid to the Commissioners during those periods were irrecoverable. The inability of the Lead Claimants to recover those sums is not, however, incompatible with EU law: as explained earlier, it is conceded that the three year limitation period imposed by section 80(4) of the 1994 Act is compatible with EU law.

94.   In these circumstances, the inability of the Lead Claimants to pursue a direct claim for restitution against the Commissioners is not incompatible with EU law. That follows from the application of well-established principles of EU law. There is therefore no need for any reference to the Court of Justice. Nor is it necessary or appropriate to consider what the position would be in a hypothetical case where the supplier was insolvent: the court has heard no submissions, and has no information before it, as to how reimbursement arrangements under section 80 might operate in that situation.

**Conclusion**

95.   For these reasons I would allow the Commissioners' appeal and dismiss the Lead Claimants' cross-appeal.

Crown copyright

© 2025 Thomson Reuters.