**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VASEK POSPISIL, NICHOLAS KYRGIOS, ANASTASIA RODIONOVA, NICOLE MELICHAR-MARTINEZ, SAISAI ZHENG, SORANA CÎRSTEA, JOHN-PATRICK SMITH, NOAH RUBIN, ALDILA SUTJIADI, VARVARA GRACHEVA, TENNYS SANDGREN, SACHIA VICKERY, NICOLAS ZANELLATO, and REILLY OPELKA, on behalf of themselves and all others similarly situated,
-and-

THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION,

Plaintiffs,

v.

ATP TOUR, INC. and WTA TOUR, INC.,

Defendants.

Case No. 1:25-cv-02207-MMG-SDA

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WTA TOUR, INC.'S MOTION TO COMPEL ARBITRATION, MOTION TO DISMISS, AND MOTION TO STAY PROCEEDINGS**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PROCEDURAL AND FACTUAL BACKGROUND ..... 2

A. The Initial Complaint ..... 2
B. The Claims In The Amended Complaint ..... 3
C. WTA Arbitration Terms ..... 3

III. LEGAL FRAMEWORK ..... 4

A. Arbitration Of WTA Plaintiff Claims ..... 4
B. Dismissal Of ATP Plaintiff Claims ..... 6

IV. ARGUMENT ..... 6

A. The WTA Plaintiffs Are Bound By The WTA Rulebook, So Their Claims Belong In Arbitration ..... 7
1. The WTA Plaintiffs Agreed To Arbitrate Their Disputes With The WTA ..... 7
2. The Arbitrability Of WTA Disputes Is Determined By The Arbitrator ..... 9
3. The WTA Plaintiffs' Claims Qualify As "Any Dispute" ..... 10
B. The Court Should Stay Proceedings ..... 11
C. The ATP Plaintiffs Cannot State A Claim Against The WTA ..... 11

V. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Lab'ys v. Adelphia Supply USA*,
2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)....6

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), *aff'd on other grounds*, 833 F.3d 151 (2d Cir. 2016)....6, 12

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)....7

*In re Am. Express Fin. Advisors Secs. Litig.*,
672 F.3d 113 (2d Cir. 2011)....5

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006)....12

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)....2

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987)....14

*Arista Recs. LLC v. Lime Grp., LLC*,
532 F. Supp. 2d 556 (S.D.N.Y 2007)....12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....6, 12, 13, 14

*Contec Corp. v. Remote Sol. Co.*,
398 F.3d 205 (2d Cir. 2005)....9

*In re Currency Conversion Fee Antitrust Litig.*,
265 F. Supp. 2d 385 (S.D.N.Y. 2003)....10

*Daly v. Citigroup Inc.*,
939 F.3d 415 (2d Cir. 2019)....10

*Desarrolladora La Ribera v. Anderson*,
2024 WL 5186600 (S.D.N.Y. Dec. 20, 2024) ....................15

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) ....................5, 7

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)....................2, 6, 13

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....................7

*Genesco, Inc. v. T. Kakiuchi & Co.*,
815 F.2d 840 (2d Cir. 1987), *abrogated on other grounds* by *Rodriguez-Depena v. Parts Auth., Inc.*, 877 F.3d 122 (2d Cir. 2017) ....................5

*Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*,
246 F.3d 219 (2d Cir. 2001)....................1

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)....................10

*Hines v. Overstock.com, Inc.*,
380 F. App'x 22 (2d Cir. 2010) ....................5

*Jessup v. Am. Kennel Club*,
862 F. Supp. 1122 (S.D.N.Y. 1994)....................6, 12

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
387 F.3d 163 (2d Cir. 2004), *abrogated on other grounds* by *Loc. Union 97, Int'l Brotherhood of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107 (2d Cir. 2023) ....................5

*JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*,
167 F. App'x 266 (2d Cir. 2006) ....................9

*Katz v. Cellco P'ship*,
794 F.3d 341 (2d Cir. 2015)....................11

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....................7

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)....................6

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d Cir. 1996)....................5

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019)....................7

**STATUTES**

9 U.S.C.
§ 2....................4
§ 3....................11

## I. INTRODUCTION

The WTA Player Plaintiffs ("WTA Plaintiffs") and the ATP Player Plaintiffs ("ATP Plaintiffs") (together, the "Player Plaintiffs") brought this putative class action against WTA Tour, Inc. ("WTA") for violation of the antitrust laws and unjust enrichment. Am. Compl. ¶¶ 138, 583-590, ECF No. 109 ("Am. Compl.").[1] None of the WTA Plaintiffs' claims should have been brought in this court—and the ATP Plaintiffs do not state a claim against the WTA.

The WTA Plaintiffs' claims must be heard in arbitration, pursuant to a binding agreement between the parties. A dispute must be sent to arbitration if there is a valid arbitration agreement, and the dispute falls within the scope of the agreement. *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001). Before the WTA Plaintiffs brought this suit in federal court, they agreed to abide by the WTA Rulebook. The 2025 WTA Rulebook (like its predecessors) states that "Any Dispute" between a WTA player and the WTA shall be "submitted exclusively" to the American Arbitration Association ("AAA") for a single arbitrator proceeding. Ex. 1 at 403.[2] WTA Plaintiffs in the Amended Complaint repeatedly cite the WTA Rulebook to attempt to support their claims against the WTA. *See, e.g.*, Am. Compl. ¶¶ 81, 86, 87, 149, 151, 153, 172, 187, 190, 220, 259, 274, 368. They also acknowledge that players sign an Annual Player Form agreeing to be bound by the WTA Rulebook. *Id.* ¶ 87. By agreeing to arbitrate "Any Dispute" with the WTA as provided by the WTA Rulebook, the WTA Plaintiffs

---

[1] The WTA Plaintiffs are Sorana Cîrstea, Varvara Gracheva, Nicole Melichar-Martinez, Anastasia Rodionova, Aldila Sutjiadi, Sachia Vickery, and Saisai Zheng; the ATP Plaintiffs are Nicholas Kyrgios, Reilly Opelka, Vasek Pospisil, Noah Rubin, Tennys Sandgren, John-Patrick Smith, and Nicolas Zanellato. Am. Compl. ¶¶ 24-37.

[2] All exhibits referenced herein are to the concurrently filed July 31, 2025, Declaration of Lawrence E. Buterman in Support of Defendant WTA Tour, Inc.'s Motion to Compel Arbitration, Motion to Dismiss, and Motion to Stay Proceeding.

agreed to arbitrate the claims in this case. The Court should compel arbitration and stay this litigation until such arbitrations conclude.

The ATP Plaintiffs' claims should be dismissed, as they cannot state an antitrust claim against the WTA. The WTA pointed out the incongruity of male tennis players purporting to bring claims against the WTA in its initial motion to dismiss; indeed, membership in the WTA is expressly limited to women by the WTA Rulebook and subject to the WTA Women's Eligibility Policy. Ex. 1 at 6, 193. But facing the mandatory arbitration of disputes between the WTA and WTA players, the Player Plaintiffs added nonsensical conspiracy claims to their Amended Complaint to try to keep the WTA as a defendant in this Court. Plaintiffs' eleventh-hour conclusory allegations of conspiracy omit all necessary particulars of an anticompetitive scheme and cannot survive a motion to dismiss. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012). No facts alleged support any conspiracy between the ATP Tour, Inc. ("ATP") and the WTA. Without alleging an unlawful agreement, the Amended Complaint does not state a Sherman Act Section 1 claim. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (per curiam). The Court should dismiss the ATP Plaintiffs' case against the WTA.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. The Initial Complaint

After the Plaintiffs filed their initial Complaint, ECF No. 1, the WTA moved to compel arbitration of the WTA Plaintiffs' claims, and to dismiss the claims brought by the ATP Plaintiffs. The original motion to dismiss explained the controlling arbitration terms. ECF No. 76, at 2-3. The original motion to dismiss also explained that the initial Complaint contained no allegations of participation by the WTA in men's professional tennis, or participation by the ATP in women's professional tennis. *Id.* at 5-6. Instead of opposing the WTA's motion, the Plaintiffs filed an Amended Complaint on June 24, 2025.

### B. The Claims In The Amended Complaint

In the Amended Complaint, the Player Plaintiffs once again allege that the WTA has engaged in anticompetitive conduct in violation of the antitrust laws. Specifically, the WTA is alleged to have entered unlawful agreements in violation of Section 1 of the Sherman Act and also to have violated Section 2 of the Sherman Act.

The Amended Complaint continues to define two separate relevant markets: "the market for the services of women's professional tennis players" and "the market for the services of men's professional tennis players." Am. Compl. ¶ 377. There are also two separate Plaintiff classes alleged, with a separate class for players in WTA-sanctioned tournaments and another class for players in ATP-sanctioned tournaments. *Id.* ¶¶ 24-38, 414-415.

### C. WTA Arbitration Terms

As noted in the Amended Complaint, the WTA Rulebook is among the "the rules by which female professional tennis players on the Tour are bound." *Id.* ¶ 81. And as provided by the "Final Dispute Resolution" chapter of the WTA Rulebook, "Any Dispute between or among the WTA, WTA Tournaments or WTA Players . . . arising out of the application of any provision of this Rulebook" that "is not finally resolved by applicable provisions of this Rulebook, shall be submitted exclusively to the American Arbitration Association ("AAA") for final and binding arbitration . . . ." Ex. 1 at 403. The WTA Rulebook only provides an exception for "any Dispute relating to or arising out of a change in Tournament Class Membership status." *Id.*

The WTA Rulebook also states that the laws of the State of New York apply to any dispute arising out of the application of any provision of the WTA Rulebook, and that any request for arbitration shall be filed with the AAA. *Id.*

The "Amended and Restated By-Laws of WTA Tour, Inc." ("By-Laws") include conditions of membership that include a waiver of all claims against the WTA. Ex. 2 at 3. And

the By-Laws reiterate that "[n]o current or prior Member" can commence, assert, or cause any claim or counterclaim against the WTA "without first exhausting . . . any and all available appeals expressly provided for in the WTA Tour Rules." *Id.* at 42-43.

Every year, players reaffirm their assent to be bound by the Rules and By-Laws by signing the "WTA Annual Player Form" (the "Player Form"). Ex. 3; *see also* Am. Compl. ¶¶ 87, 368. WTA Plaintiffs Cirstea, Gracheva, Melichar, Rodionova, Sutjiadi, Vickery, and Zheng, affirmatively and individually agreed to the WTA Rules and By-Laws by signing their Annual Player Forms. *See, e.g.*, Exs. 4-30. Additionally, the WTA Rulebook states that by "enter[ing] or participat[ing] in any WTA Tournament," a player "consents and agrees to . . . comply with and [be] bound by all the provisions of the Rulebook and the WTA By-laws." Ex. 1 at 15. The affirmation is a condition of entry and participation in a WTA tournament. *Id*. at 16 ("A player must complete the Annual Player Form prior to playing her first match in each Tour Year . . . ."). WTA Plaintiffs entered and participated in various WTA Tournaments during the relevant time. *See* Am. Compl. ¶¶ 137, 414.

## III. LEGAL FRAMEWORK

### A. Arbitration Of WTA Plaintiff Claims

Under the Federal Arbitration Act ("FAA"), an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress enacted the FAA to replace "widespread judicial hostility to arbitration agreements" with a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted).

A motion to compel arbitration turns on only two questions: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within

the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

For step one, the test is whether "(1) a '"reasonably prudent" person would be on *inquiry* notice' of the terms . . . and (2) [Plaintiff] unambiguously manifest[ed] assent 'through . . . conduct that a reasonable person would understand to constitute assent.'" *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (citations omitted). Once the defendant demonstrates that the plaintiff entered into an agreement to arbitrate, the burden is on the plaintiff to attempt to demonstrate the invalidity of that agreement. *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).

For step two, the factual allegations in the complaint dictate whether a claim falls under the arbitration agreement. *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 173 (2d Cir. 2004), *abrogated on other grounds* by *Loc. Union 97, Int'l Brotherhood of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107 (2d Cir. 2023). Not all motions to compel arbitration require this second step. "[T]he arbitrability of a given issue is a question for the court," except where "there is 'clear and unmistakable' evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198-99 (2d Cir. 1996) (citation omitted). Where there is clear and unmistakable intent to delegate questions of arbitrability to the arbitrator, step one alone compels arbitration.

To the extent a court must determine arbitrability, where allegations underlying the claims "touch matters" covered by the parties' agreements, then those claims must be arbitrated. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) (citation omitted), *abrogated on other grounds* by *Rodriguez-Depena v. Parts Auth., Inc.*, 877 F.3d 122 (2d Cir. 2017). Antitrust claims

are no exception, as the Supreme Court has held that antitrust claims are arbitrable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 636-37 (1985).

### B. Dismissal Of ATP Plaintiff Claims

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Dismissal of conspiracy claims under the Sherman Act is appropriate when claims are alleged in "entirely general terms without any specification of any particular activities by any particular defendant." *In re Elevator Antitrust Litig.*, 502 F.3d at 50 (citation omitted). A claim cannot survive a motion to dismiss when "the pleadings mention[] no specific time, place, or person involved in the alleged conspiracies." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007); *see, e.g.*, *Jessup v. Am. Kennel Club*, 862 F. Supp. 1122, 1129 (S.D.N.Y. 1994) (plaintiff did not "identify or refer to specific acts or activities suggesting any illegal agreement or concerted action").

When evaluating whether a plaintiff has pleaded sufficient facts to state a claim under Section 1 of the Sherman Act, a court should consider "common economic experience" and "obvious alternative explanation[s]." *Twombly*, 550 U.S. at 557, 565, 567. In addition, the plausibility of an antitrust claim is determined by applying basic economic principles. *See, e.g.*, *Abbott Lab'ys v. Adelphia Supply USA*, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017); *see also In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *29 (S.D.N.Y. Aug. 29, 2014) (dismissing antitrust claims that "[did] not make economic sense"), *aff'd on other grounds*, 833 F.3d 151 (2d Cir. 2016).

## IV. ARGUMENT

The WTA respectfully submits that this Court should compel arbitration of the WTA Plaintiffs' claims in accordance with the arbitration provision in the WTA Rulebook, stay the

claims as to the WTA Plaintiffs, and dismiss the ATP Plaintiffs' claims against the WTA for failure to state a claim.

### A. The WTA Plaintiffs Are Bound By The WTA Rulebook, So Their Claims Belong In Arbitration

The WTA Rulebook requires any disputes arising under the WTA Rules to be "submitted exclusively" to the AAA for "final and binding arbitration." Ex. 1 at 403. Courts must "'rigorously enforce' arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citation omitted); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018) (recognizing the FAA requirement to enforce arbitration agreements). "Not only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures." *Epic*, 584 U.S. at 506. By agreeing to the WTA Rulebook, the WTA Plaintiffs are bound by the entire set of rules, including the agreement to arbitrate.

#### 1. The WTA Plaintiffs Agreed To Arbitrate Their Disputes With The WTA

To assess whether a party agreed to arbitrate, this Court must ask whether a reasonably prudent person would be on inquiry notice of the terms, and whether the party unambiguously manifested assent through conduct that a reasonable person would understand to constitute assent. *See Edmundson*, 85 F.4th at 703. Courts apply state-law principles of contract formation for this analysis. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017). Under controlling New York law, in order to be binding, a contract requires a "meeting of the minds" and a "manifestation of mutual assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citation omitted). Even without actual notice, inquiry notice is sufficient. *Id.* at 289. The key question is whether the term was called to attention, which usually turns on whether the terms were presented in a "clear and conspicuous way." *Id.*

The WTA Plaintiffs had ample notice of the WTA's Rules, including the arbitration provision, and unambiguously manifested assent to them. The WTA Rulebook presents the arbitration provision unambiguously and conspicuously. Specifically, the WTA Rulebook has a chapter titled "Final Dispute Resolution" that clearly states that "[a]ny dispute . . . which is not finally resolved by applicable provisions of this Rulebook, shall be submitted exclusively to the American Arbitration Association ("AAA") for final and binding arbitration before a single arbitrator in accordance with the Expedited Procedures of the AAA's Commercial Arbitration Rules." Ex. 1 at 403.

The WTA Plaintiffs recognize the operative arbitration clause in the Amended Complaint. *See* Am. Compl. ¶¶ 366, 368. And they cite the WTA Rulebook to attempt to support their claims against the WTA. *Id.* ¶¶ 81, 86, 87, 149, 151, 153, 172, 187, 190, 220, 259, 274, 368. The WTA Plaintiffs may not pick and choose the provisions of the WTA Rulebook that do and do not apply to them. The WTA Rulebook *in its entirety* exists for the benefit of all WTA participants.

The Amended Complaint also concedes that players additionally manifested assent to be bound by the WTA Rulebook by signing the Player Form. Signing the Player Form includes an acknowledgement of the agreement to abide by the WTA Rulebook, and thus unambiguously manifests assent to be bound by the WTA Rulebook and its provision requiring arbitration. The WTA Plaintiffs unquestionably affirmed their assent to be bound by the Rules and By-Laws by signing Annual Player Forms. *See, e.g.*, Exs. 4-30; *see also* Am. Compl. ¶¶ 87, 368.

Additionally, the WTA Rulebook states that by "enter[ing] or participat[ing] in any WTA Tournament," a player "consents and agrees to . . . comply with and [be] bound by all the provisions of the Rulebook and the WTA By-Laws." Ex. 1 at 15. The affirmation is a condition of entry and participation in a WTA tournament. *Id.* at 16 ("A player must complete the Annual

Player Form prior to playing her first match in each Tour Year . . . ."). The WTA Plaintiffs entered and participated in various WTA Tournaments during the relevant time. *See* Am. Compl. ¶¶ 137, 414.

For all of these reasons, the WTA Plaintiffs had sufficient notice of the Rules requiring arbitration, and unambiguously manifested assent to be bound by the Rules. The WTA respectfully submits that this Court should find that the arbitration provision is binding on the WTA Plaintiffs.

2. The Arbitrability Of WTA Disputes Is Determined By The Arbitrator

The WTA Plaintiffs' agreement to AAA arbitration also puts the arbitrability decision in the hands of the arbitrator. The WTA Rulebook expressly incorporates the AAA rules, requiring arbitration "in accordance with the Expedited Procedures of the AAA's Commercial Arbitration Rules." Ex. 1 at 403. Rule 7(a) of the AAA Commercial Arbitration Rules states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim . . . ." Ex. 31 at 14. Further, Rule 7(b) states that the arbitrator "shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." *Id.* at 15. Courts in the Second Circuit hold that an arbitration agreement incorporating the AAA's commercial arbitration rules demonstrates the parties' clear and unmistakable intent to refer arbitrability to the arbitrator. *See Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 210 (2d Cir. 2005) (ruling that arbitrability is "within the jurisdiction of the arbitrator pursuant to AAA Rule R-7(a) as incorporated into [the agreement]"); *JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 167 F. App'x 266, 268 (2d Cir. 2006). Agreeing to arbitrate in accordance with AAA rules clearly and unmistakably evidences an agreement for the arbitrator to decide arbitrability.

Therefore, once the Court finds that the WTA Plaintiffs agreed to AAA arbitration, the Court's inquiry should end, and arbitration should be compelled. To the extent the WTA Plaintiffs intend to challenge whether their claims fall within the scope of the arbitration agreement, those issues should be decided by an arbitrator as opposed to the Court. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68, 71-72 (2019) (holding that where there is "clear and unmistakable evidence" that the "contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract," "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless" (citation omitted)).

3. <u>The WTA Plaintiffs' Claims Qualify As "Any Dispute"</u>

Even if the contract term was not clear and unmistakable, the Court should still enforce the parties' arbitration agreement covering "Any Dispute." The provision plainly encompasses the WTA Plaintiffs' claims. *See In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 405-06 (S.D.N.Y. 2003) (collecting cases). Consistent with the "strong federal policy favoring arbitration," courts must compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (citation omitted).

The WTA Rulebook states that a "dispute" is subject to arbitration if it "aris[es] out of the application of any provision of this Rulebook." Ex. 1. at 403. All of the WTA Plaintiffs' claims fall squarely within the broad scope of the arbitration provision. Specifically, the Amended Complaint focuses on the WTA Plaintiffs' grievances regarding player earnings, prize money, the Ranking Points system, player schedules, and player requirements, among other topics. Am. Compl. ¶¶ 1, 5, 12, 18. The WTA Rulebook addresses all of these topics, with chapters dedicated to tournament schedules, player responsibilities, the WTA ranking system, prize money, prize

money formula, tournament membership, and code of conduct, as examples. *See, e.g.*, Ex. 1 at 61, 101, 135, 163, 241, 269, 277. The WTA Plaintiffs' claims are undoubtedly related to matter covered by the WTA Rulebook and are therefore encompassed by the arbitration provision.

**B. The Court Should Stay Proceedings**

Under the FAA, a court must grant a motion to stay judicial proceedings once it has determined that the dispute is subject to a valid arbitration agreement. 9 U.S.C. § 3 ("If any suit or proceeding" has been brought in any court for "any issue referable to arbitration," the court shall "stay the trial of the action until such arbitration has been had."); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."). Because the WTA and WTA Plaintiffs formed a valid agreement to arbitrate, the WTA respectfully submits that this Court should compel arbitration and grant the mandatory stay until any arbitrations conclude.

**C. The ATP Plaintiffs Cannot State A Claim Against The WTA**

The male player claims against the women's tour were an afterthought in the initial Complaint, because none of the alleged WTA conduct could have possibly harmed the male players. Accordingly, the WTA's memorandum in support of its motion to dismiss the initial Complaint explained that the ATP Plaintiffs could not state a claim against the WTA. *See* ECF No. 76, at 5-6. Had the WTA Plaintiffs' claims not been subject to mandatory arbitration, one expects the ATP Plaintiff claims against the WTA very likely would have fallen by the wayside where they belong.

The ATP Plaintiffs new claims rest on an implausible conspiracy allegation against the ATP and WTA. It is implausible because there are still separate product markets for men's and women's professional tennis in the Amended Complaint. Am. Compl. ¶¶ 378, 386. The bottom

line is that Plaintiffs are really stuck between a rock and a hard place: abandon their separate market definitions or concede that each tour cannot possibly harm players on the other tour. But facing mandatory arbitration, the Plaintiffs conjured a 27-year-long male-female market allocation agreement in an eleventh-hour attempt to keep at least some claims against the WTA in this Court.

Plaintiffs now allege that WTA and ATP are each "the potential competitor most prepared and best equipped to cross into the other's market," and thus they must have agreed "not to compete for the services of the professional tennis players on the other's Tour." *Id.* ¶¶ 323-332. Why a tour devoted, since its formation in 1973, to advancing the interests of women's tennis players would change course now is never explained. *See* WTA Tour, https://www.wtatennis.com/about (last visited July 31, 2025) ("Founded in 1973 by the visionary Billie Jean King, the WTA was created to build equal opportunities for women in tennis, and we've been breaking boundaries ever since."). The bottom line is that Plaintiffs fail to plausibly plead any factual allegations supporting any supposedly unlawful agreement. Dismissal is appropriate when the pleadings do not mention a "specific time, place, or person involved in the alleged conspiracies." *Twombly*, 550 U.S. at 565 n.10. Like the complaint in *In re Elevator Antitrust Litigation*, the Amended Complaint contains conclusory allegations of conspiracy that are "entirely general terms without any specification of any particular activities." 502 F.3d at 50 (citation omitted); *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) ("bald assertions and conclusions of law will not suffice" (citation omitted)). It is telling that the ATP Plaintiffs also fail to plausibly allege a "meeting of the minds." *Arista Recs. LLC v. Lime Grp., LLC*, 532 F. Supp. 2d 556, 579 (S.D.N.Y 2007) (citation omitted); *see also Jessup*, 862 F. Supp. at 1129 (noting that plaintiff did not "identify or refer to specific acts or activities suggesting any illegal agreement or concerted action" and thus "no concerted action is identified that would support a finding of illegal action").

Any alleged agreement not to compete between WTA and ATP also contradicts "common economic experience" and "obvious alternative explanation[s]," such as the long history of separate men's and women's professional tours. *Twombly*, 550 U.S. at 557, 565, 567; *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *29 (dismissing antitrust claims that "[did] not make economic sense"). The allegation that each tour would enter the other market defies the "common economic experience" reflected in the Plaintiffs' separate market definitions and the fact that men and women do not ordinarily compete against each other in professional tennis matches. Am. Compl. ¶¶ 377-378, 386; indeed, eligibility for WTA membership is expressly limited to women by the WTA Rulebook and subject to the WTA Women's Eligibility Policy. Ex. 1 at 6, 193. Because there is an "obvious alternative explanation" for separate tours for men's and women's professional tennis, the Plaintiffs' allegations of an unlawful agreement is not sufficiently plausible as a matter of law.

Plaintiffs' desperate attempt to avoid arbitration is also laid bare by the paucity of factual allegations. The Amended Complaint adds a decades-old allegation about the ATP discontinuing the "Grand Slam Cup," and a WTA agreement with a promoter to put on the United Cup, a country-level competition. Am. Compl. ¶¶ 326-332, 335-345. Neither new allegation saves the ATP Plaintiffs' claims against the WTA. The Amended Complaint contains no details relating to how or whether the alleged agreement between the ATP and WTA was formed—or even how the WTA in any way restrained competition for men's professional tennis. The Amended Complaint does not identify any details of the alleged agreement to allocate markets or otherwise harm competition for men's professional tennis players. Instead, there are obvious alternative explanations for both tours having similar ranking points systems or country-level competitions. Indeed, the ATP

published rankings in the early 1970s, and the WTA followed suit when it was founded in 1973.[3] Country-level competitions have existed since the Olympics began—and it does not take an unlawful agreement for a men's professional tour and a women's professional tour to both decide that country-level tournaments outside of the Olympics make sense. There are no plausible allegations, circumstantial or otherwise, of an anticompetitive agreement between the WTA and ATP.

In a last-ditch effort to save their cross-market claims, Plaintiffs attempt to blur all distinctions between the men's and women's tours by alleging the WTA and ATP are Tournament Members of each other. Am. Compl. ¶¶ 326-332. But Plaintiffs do not plausibly allege *how* WTA and ATP are Tournament Members of each other. Plaintiffs' United Cup allegations do not sufficiently plead that membership. There are no allegations the ATP and WTA are Tournament Members of each other pursuant to the other's rulebooks and by-laws—even though Tournament Members are defined terms in all of those documents (which are incorporated by reference into the Amended Complaint).

Plaintiffs do not allege WTA and ATP are Tournament Members under the respective by-laws and rulebooks because they cannot. ATP does not satisfy the actual requirements of being a WTA Tournament Member pursuant to WTA Rules. The WTA Rulebook lays out a specific process for gaining Tournament Class Membership in the WTA, which requires submitting an application and fee, receiving provisional WTA approval, and paying a membership fee. *See* Ex. 1

---

[3] At best, this is parallel conduct. But *Twombly* teaches that "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57. Nor do Plaintiffs plausibly allege any plus factors. *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("Since mere parallel behavior can be consistent with independent conduct . . . plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors.").

at 203-05. ATP has never taken any of these steps, and the WTA has therefore never granted Tournament Membership to ATP. *See* Mem. of Law in Supp. of ATP's Mot. to Dismiss or, Sever Claims, § III.A.ii, July 31, 2025 ("ATP's Mot."). Similarly, the WTA does not satisfy the requirements of being an ATP Tournament Class Member pursuant to ATP rules. The ATP By-Laws state that ATP Tournament Class Members are organized into two divisions: the Championship Division, which consists of Masters 1000 and 500 category tournaments, and the World Series Division, which consists of 250 category tournaments. *See* Decl. of B. Ruskin in Supp. of ATP's Mot. Ex. A, at 15-16, July 31, 2025. The United Cup is not a category tournament in either of those two ATP divisions.[4] Without an allegation that the WTA and ATP satisfy the necessary requirements of actual Tournament Class Membership, the Amended Complaint fails to join the WTA and ATP in any way that could save the ATP Plaintiffs' claims.

Because they fail to plead a relevant unlawful agreement between the WTA and ATP, the ATP Plaintiffs' claims against the WTA should be dismissed.[5]

## V. CONCLUSION

The WTA Plaintiffs and the WTA agreed to arbitrate any disputes, including the claims at issue, and their claims should be compelled to arbitration.

The ATP Plaintiffs do not state any claim against the WTA, nor can they without any unlawful agreement between the ATP and WTA. Their claims should be dismissed.

---

[4] The United Cup is a country-level competition that takes place in Australia.

[5] Should the ATP Plaintiffs' claims not be dismissed now, they should be stayed pending any arbitrations. Because ATP Plaintiffs' claims overlap significantly with the claims that must be arbitrated, a failure to extend a stay as to the ATP Plaintiffs' claims would result in duplicative discovery. *Desarrolladora La Ribera v. Anderson*, 2024 WL 5186600, at *25 (S.D.N.Y. Dec. 20, 2024) ("[A] stay will preserve both judicial and party resources, guard against duplicative discovery . . . .").

Dated: July 31, 2025

Respectfully submitted,

By: /s/ Lawrence E. Buterman

Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Amanda P. Reeves (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com

Christopher S. Yates (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8157
chris.yates@lw.com

*Counsel for Defendant WTA Tour, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Lawrence E. Buterman, certify that the foregoing Memorandum of Law in Support of Defendant WTA Tour Inc.'s Motion to Compel Arbitration, Motion to Dismiss, and Motion to Stay Proceedings complies with the word-count limitation in Section II.B.2 of Judge Garnett's Individual Rules and Practices. According to the word processing software used to prepare this document, the memorandum contains 4,899 words, excluding the parts of the document exempted in Section II.B.2.

Dated: July 31, 2025

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman