**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VASEK POSPISIL, NICHOLAS KYRGIOS, ANASTASIA RODIONOVA, NICOLE MELICHAR-MARTINEZ, SAISAI ZHENG, SORANA CÎRSTEA, JOHN-PATRICK SMITH, NOAH RUBIN, ALDILA SUTJIADI, VARVARA GRACHEVA, TENNYS SANDGREN, SACHIA VICKERY, NICOLAS ZANELLATO, and REILLY OPELKA, on behalf of themselves and all others similarly situated, | Case No. 1:25-cv-02207-MMG-SDA |
| -and- | **ORAL ARGUMENT REQUESTED** |
| THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION, | |
| Plaintiffs, | |
| v. | |
| ATP TOUR, INC. and WTA TOUR, INC., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 2

STANDARD ........ 5

ARGUMENT ........ 5

I. The PTPA lacks associational standing ........ 6

A. The PTPA fails to allege it has a member who can sue on his or her own ........ 7

B. The PTPA's claims would require substantial individual participation, are duplicative of the Tennis Player Plaintiffs' claims, and threaten circumvention of the class-action treatment the Tennis Player Plaintiffs seek ........ 9

II. The PTPA lacks organizational standing ........ 13

A. The PTPA lacks constitutional standing ........ 13

B. The PTPA lacks antitrust standing ........ 18

1. The PTPA did not suffer antitrust injury ........ 18

2. The PTPA is not an efficient enforcer of the antitrust laws ........ 20

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Access 4 All, Inc. v. G & T Consulting Co., LLC*,
2008 WL 851918 (S.D.N.Y. Mar. 28, 2008) ....12

*Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*,
458 F. Supp. 2d 160 (S.D.N.Y. 2006) ....12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....5

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*,
459 U.S. 519 (1983) ....21

*Bano v. Union Carbide Corp.*,
361 F.3d 696 (2d Cir. 2004) ....6, 10

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) ....11

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016) ....5

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....13, 16

*Conn. Citizens Def. League v. Lamont*,
6 F.4th 439 (2d Cir. 2021) ....16

*Conn. Citizens Def. League, Inc. v. Thody*,
2024 WL 177707 (2d Cir. Jan. 17, 2024) ....7

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) ....14, 15

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*,
790 F.3d 411 (2d Cir. 2015) ....5, 8

*Ctr. for Food Safety v. Price*,
2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ....14

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 1996) ....20

*Dentsply Int'l Inc. v. Dental Brands for Less, LLC*,
2016 WL 6310777 (S.D.N.Y. Oct. 27, 2016) ....................19

*Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012) ....................8, 9

*Fac. v. N.Y. Univ.*,
11 F.4th 68 (2d Cir. 2021) ....................7

*Farrakhan v. Anti-Defamation League*,
2025 WL 24066 (2d Cir. Jan. 3, 2025) ....................16

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................12, 13, 14

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013) .................... *passim*

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ....................6

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ....................14

*Hunt v. Wash. St. Apple Advert. Comm'n*,
432 U.S. 333 (1977) ....................6, 8, 9, 12

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) ....................19

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
19 F.4th 127 (2d Cir. 2021) ....................21

*In re Platinum & Palladium Antitrust Litig.*,
2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ....................22

*In re S. African Apartheid Litig.*,
617 F. Supp. 2d 228 (S.D.N.Y. 2009) ....................15

*Informed Consent Action Network v. Becerra*,
595 F. Supp. 3d 70 (S.D.N.Y. 2022) ....................15, 16

*IP Invs. Grp. LLC v. Sedicii Innovations, Ltd.*,
2024 WL 729207 (S.D.N.Y. Feb. 22, 2024) ....................14

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019) ....................18

*Kent v. PoolTogether, Inc.*,
676 F. Supp. 3d 144 (E.D.N.Y. 2023) ....................17

*Lowell v. Lyft, Inc.*,
352 F. Supp. 3d 248 (S.D.N.Y. 2018)....................10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................6

*Massone v. Washington*,
2022 WL 2657168 (S.D.N.Y. July 8, 2022) ....................10

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)....................9

*New York Civ. Liberties Union v. N.Y.C. Transit Auth.*,
684 F.3d 286 (2d Cir. 2011)....................13

*Pen Am. Ctr., Inc. v. Trump*,
448 F. Supp. 3d 309 (S.D.N.Y. 2020)....................15

*Port Dock & Stone Corp. v. Oldcastle Ne.*,
507 F.3d 117 (2d Cir. 2007)....................18, 20

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
784 F. App'x. 4 (2d Cir. 2019) ....................19, 20

*Rent Stabilization Ass'n of N.Y. v. Dinkins*,
5 F.3d 591 (2d Cir. 1993) ....................5

*Rodriguez v. Winski*,
444 F. Supp. 3d 488 (S.D.N.Y. 2020)....................5

*Sell It Soc., LLC v. Acumen Brands, Inc.*,
2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015) ....................19

*Sikhs for Justice, Inc. v. Gandhi*,
2014 WL 2573487 (E.D.N.Y. June 9, 2014), *aff'd*, 614 F. App'x 29 (2d Cir. 2015) ....................7

*Sikhs for Justice, Inc. v. Gandhi*,
614 F. App'x 29 (2d Cir. 2015) ....................8

*Soule by Stanescu v. Conn. Ass'n of Schs.*,
57 F.4th 43 (2d Cir. 2022) ....................17

*Tanner-Brown v. Haaland*,
105 F.4th 437 (D.C. Cir. 2024)....................11

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017)....................................................................................................17

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996)................................................................................................9, 12

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982)......................................................................................................6

*Warth v. Seldin*,
422 U.S. 490 (1975)......................................................................................................8

## RULES

Fed. R. Civ. P. 12(b)(1)........................................................................................1, 5, 8

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 5

Fed. R. Civ. P. 23 ..................................................................................................6, 12

## CONSTITUTIONAL PROVISIONS

U.S. Constitution Article III, § 2....................................................................................5

Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), Defendants WTA Tour, Inc. and ATP Tour, Inc. (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff the Professional Tennis Players Association (the "PTPA") from this lawsuit.

## INTRODUCTION

The PTPA has no legally cognizable stake in this action. It is a self-proclaimed advocacy group that competes neither on the tennis court nor in the alleged relevant markets. It has never earned a dollar of prize money, a single ranking point, or any other benefit allegedly suppressed by the alleged anticompetitive conduct. Yet, through this litigation, it seeks to dismantle the architecture of organized professional tennis without alleging it has a single member, much less a member who fully understands and supports the relief it seeks. The PTPA is using this lawsuit as part of its quest for relevance since it failed to attract the support of any significant number of current players, but it does not have standing to seek any relief through this litigation.

If tennis players believe professional tours "harmed the markets for the services of men's and women's professional tennis players," the Federal Rules give them a clear path: seek certification of a representative class. Indeed, this very action is also brought by fourteen men's and women's professional tennis players who claim that they will "fairly and adequately" protect the interests of such a putative class. But an organization with involuntary constituents cannot bypass those procedural safeguards and manufacture standing on the mere subjective belief that the organization has a better "vision" for the "structure of tennis globally."

The PTPA stumbles at every federal antitrust standing threshold. First, the PTPA lacks associational standing under Article III because it has not identified a single member who has allegedly been injured, or even that it *has* members. Nor does it allege any sufficient "indicia of membership," such as would explain how any (evidently non-member, involuntary) constituents

direct, control, finance, influence, or otherwise affiliate with the organization. And even if it did, the participation of individual tennis players is critical to this lawsuit. Tennis players must prosecute this case and seek to represent the putative classes. The PTPA's attempt to circumvent the class action mechanism is redundant and improper.

Second, the PTPA also lacks organizational standing. The Supreme Court has clarified that a plaintiff cannot manufacture Article III standing by purporting to be "injured" by virtue of using resources to advocate against its litigation adversary. And even if the PTPA could identify some cognizable injury, the PTPA does not (and cannot) satisfy Article III's causation or redressability requirements because there is a fatal mismatch between the PTPA's alleged injuries (harms to the PTPA) and the relief requested in the Amended Complaint (redress for tennis players for alleged price-fixing and alleged anticompetitive agreements).

Third, the PTPA lacks antitrust standing because its alleged non-economic institutional harms are neither of a type the antitrust laws were designed to prevent nor attributable to the alleged anticompetitive conduct. Rather, those are self-described institutional setbacks to one organization—not harm to competition or harm in the alleged relevant markets. For those reasons, and because the PTPA's alleged injuries are indirect, speculative, and, at best, derivative of the players' alleged injuries, the PTPA cannot show that it suffered "antitrust injury" or that it is an "efficient enforcer" of the antitrust laws.

## BACKGROUND

Fourteen individuals who play or have played professional tennis (the "Tennis Player Plaintiffs" and, together with the PTPA, "Plaintiffs") brought this action individually and as representatives of putative classes of other tennis players. (Am. Compl. ¶¶ 414-15.) In each of their causes of action asserting antitrust violations, the Tennis Player Plaintiffs are joined by the PTPA (Am. Compl. Causes of Action First through Eighth). The Amended Complaint describes

the PTPA as "an association of men and women professional tennis players founded to advocate" for players and "the leading advocate for professional tennis players worldwide," which "works to support, protect, and advance players' well-being." (*Id.* ¶ 39.)

The Amended Complaint alleges that the PTPA was started in 2019 "as a grassroots movement" by two professional men's tennis players. (*Id.* ¶ 108.) Those two men's players purportedly believed that professional tennis players' interests were not sufficiently advanced by the structures of the women's and men's Tours (*id.*), even though those structures ensure those players have equal governance rights to the Tours' tournament members. The PTPA describes itself as an "advocacy body" that also "offers a wide range of services" (*id.* ¶¶ 120-22), such as "help[ing] players generate incremental off-court revenue opportunities through the PTPA's various licensing and marketing programs." (*Id.* ¶ 122.)

Notably, the PTPA does not claim to have any legal or other formal status as a representative of players. It does not have the fundamental characteristics of a players' association (such as dues or collective-bargaining powers), nor does it have any defined role or responsibilities within the operation of the Tours, Tour events, the Grand Slams, or any other tennis events operated by anyone else. And while the Amended Complaint lists persons who are on the PTPA's executive committee (*id.* ¶ 117) and sometimes refers to the "PTPA's members" (*see, e.g.*, *id.* ¶¶ 425-27, 429-32), the Amended Complaint does not identify any person who is actually a member of the PTPA (*see id.* ¶¶ 24-39) or describe whether there is any process by which individual players could either affirmatively associate themselves with the PTPA or disclaim such an association.

This is particularly notable given that Defendants' May 20, 2025 motion to dismiss the PTPA from this action for lack of standing raised this exact issue. (ECF Nos. 82-84.) The Amended Complaint makes two changes apparently aimed at curing the PTPA's lack of standing.

First, whereas the initial Complaint alleged injury only to the PTPA's (unidentified) "members," the Amended Complaint, in a single paragraph, purports also to allege injury to the PTPA itself. (Am. Compl. ¶ 433.) The new paragraph says in conclusory fashion that "Defendants' conspiracy" has "weakened the PTPA's ability to attract membership and advocate for players" and forced the PTPA to "divert its resources away from recruiting membership, retaining player membership, and advocating for players . . . ." (*Id.*) But that claimed injury is disconnected from the alleged harm to competition in the relevant markets alleged by Plaintiffs and has nothing to do with player ranking points, prize money, or playing conditions. *Second*, the Amended Complaint provides more background on the PTPA, including on its corporate form, articles of incorporation, and bylaws. (*See id.* ¶¶ 108-26.) But tellingly, the Amended Complaint (like the initial complaint) still does not claim that any identifiable person is an actual member of the PTPA; instead, the Amended Complaint acknowledges that the PTPA "does not actively maintain a formal roster of its members" (*id.* ¶ 119), a concession consistent with the evidence—including testimony of the PTPA's general counsel—that Defendants provided in support of their prior motion to dismiss the PTPA as a plaintiff.[1]

[1] The PTPA's general counsel, Wajid Mir Syed, also testified at the April 11, 2025 hearing in this case that the PTPA has no membership criteria and does not maintain a list of members (*see* ECF No. 84-1 at 108:3-21); in light of the testimony, the Court observed that the PTPA is "not a membership organization in the traditional sense, but the mission of the organization is to advocate on behalf of that set of players." (*Id.* at 109:1-9.) Similarly, the PTPA's website states that the PTPA does not "maintain a formal membership list or require membership dues" (ECF No. 84-2), a point that has been repeated publicly by the PTPA's executive director. *See* Inside the PTPA Lawsuit to Upend Tennis, https://www.benrothenberg.com/p/ptpa-lawsuit-tennis-atp-wta-itf-itia-novak-djokovic-class-action-jannik-sinner-ahmad-nassar-professional-tennis-players-association-bill-ackman (last visited July 31, 2025) (Quoting Nassar: "No, legally, that's not how it works, man . . . we have plaintiffs, we have the PTPA, we have 250-plus players whom we've briefed and spoken to—about this and more broadly about what we're trying to do with the PTPA overall. We have hundreds of players who have participated in our programs and services and benefits. That's all we need, man. It's not going be a defense for the tours to say, Oooh, well, there's no membership roll.").

## STANDARD

A motion to dismiss for lack of Article III standing may be made under Rule 12(b)(6), to the extent based on the complaint alone, or under Rule 12(b)(1), to the extent based on facts outside the complaint. *See Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993). To the extent the allegations in the complaint are facially sufficient but controverted by facts outside the complaint, "the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). Such a motion is properly granted if the court determines it "lacks the statutory or constitutional power to adjudicate" the plaintiff's claims. *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) (citation omitted).

A motion to dismiss for lack of antitrust standing is made under Rule 12(b)(6) and is properly granted where, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiffs' favor, the complaint lacks factual content sufficient for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 74-75 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

To prosecute a "Case[]" within the meaning of Article III, Section 2 of the U.S. Constitution, an organization must have organizational standing or associational standing. "Under the organizational standing theory, an association may have standing in its own right to seek judicial relief to itself and to vindicate whatever rights and immunities the association itself may enjoy. In contrast, under the associational standing theory, an association has standing to bring suit on behalf of its members." *Rodriguez v. Winski*, 444 F. Supp. 3d 488, 492 (S.D.N.Y. 2020) (internal quotations and citations omitted). In addition, in an antitrust case, a plaintiff must also

have "antitrust standing" because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) (citation omitted); *Gatt*, 711 F.3d at 75.

Here, the PTPA does not have associational standing, organizational standing, or antitrust standing, and must be dismissed from this action.

## I. The PTPA lacks associational standing.

The PTPA must be dismissed from this action to the extent it purports to sue on behalf of its "members." Bringing such claims requires "associational standing," which "carves only a narrow exception from the ordinary rule that a litigant 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)). The PTPA bears the burden of pleading it has associational standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and must show (i) it has at least one member who would have standing to sue in his or her own right; (ii) the interests it seeks to protect are germane to its purpose; and (iii) neither the PTPA's claims nor the relief requested requires the participation of individual members of the PTPA. *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The PTPA lacks the first and third elements.

Even after amendment, the PTPA fails to allege injury to any member, or even allege that it *has* members. Further, the PTPA's claims—which rely on unsupported speculation that individual players would be better off or earn more in the absence of the challenged conduct—would require the participation of individual PTPA "members." Also, those claims are entirely duplicative of the Tennis Player Plaintiffs' claims and would unfairly circumvent Rule 23's requirements for class-action treatment.

**A. The PTPA fails to allege it has a member who can sue on his or her own.**

The PTPA still does not allege that it has any member who has suffered an injury. *Fac. v. N.Y. Univ.*, 11 F.4th 68, 75-76 (2d Cir. 2021) (affirming dismissal of association that failed to allege an injury to an actual member); *Sikhs for Justice, Inc. v. Gandhi*, 2014 WL 2573487, at *2-3 (E.D.N.Y. June 9, 2014), *aff'd*, 614 F. App'x 29, 31 (2d Cir. 2015) (same). The PTPA claims to be "an association of men and women professional tennis players" (Am. Compl. ¶ 39), but it does not actually allege that it has members who are professional tennis players—much less identify any of its members who were allegedly injured by Defendants' conduct, or what conduct specifically harmed any actual PTPA member. The Amended Complaint does not claim, for example, that any of the Tennis Player Plaintiffs are members of the PTPA or otherwise identify any injured tennis players who are actually PTPA members. (*See id.* ¶¶ 24-39.) To the contrary, the Amended Complaint expressly alleges that the PTPA does not maintain a list or roster of members. (*See id.* ¶¶ 118-19.) Thus, although the Amended Complaint repeatedly claims, vaguely, injury to the "PTPA's members"—without identifying them—it "contains not a single factual allegation regarding those . . . members or their circumstances," which is "insufficient to confer standing on behalf of members." *Conn. Citizens Def. League, Inc. v. Thody*, 2024 WL 177707, at *3 (2d Cir. Jan. 17, 2024).

The PTPA claims to advocate "for all of the male and female singles players ranked in the top 250 of the global rankings and all of the male and female doubles players ranked in the top 100 of the global rankings," (Am. Compl. ¶ 119), but allowing standing on that basis would improperly conflate "membership" with the population of top players on whose behalf the PTPA purportedly advocates. The Amended Complaint does not actually allege that these top players (or anyone) are PTPA members or that any appreciable number of the top 250 men's or women's players support the PTPA and its litigation goals. The PTPA's position is particularly problematic

because professional tennis players are involuntarily included in the PTPA's claimed group upon achieving those rankings, and players within the PTPA's claimed constituency have already publicly disagreed with the PTPA's advocacy. (ECF No. 84-1 at 71:19-72:1; 72:19-73:11; 73:12-19.) *Cf. Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 159 (2d Cir. 2012) (no indicia of membership in part because organization never "notified its 'constituents' or any of their legal guardians that it was filing this suit purportedly on their behalf").

The PTPA similarly fails to allege sufficient "indicia of membership" to explain how these non-member "constituents" direct, control, finance, influence, or otherwise affiliate with the organization. *See, e.g.*, *Hunt*, 432 U.S. at 343-45; *Disability Advocs.*, *Inc.*, 675 F.3d at 159. "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). Here, the PTPA has not alleged any such facts. *Sikhs for Justice, Inc. v. Gandhi*, 614 F. App'x 29, 31 (2d Cir. 2015) ("[T]he District Court correctly held that plaintiff . . . does not have associational standing because it failed to adequately allege that it has any members who are eligible to bring a . . . claim or that it possesses sufficient 'indicia of membership' to sue on behalf of such persons." (citation omitted)). Nor could it, because the PTPA does not impose any obligations on the players it claims to represent. *See* ECF No. 84-2 ("Will I have any required obligations if I engage with the PTPA? No. We encourage you to take advantage of our services, benefits and resources, but there are no required obligations.").[2] And while the Amended Complaint alleges that the PTPA's "members" are "entitled" to elect the representatives on the PTPA's executive committee (Am. Compl. ¶ 115), the Amended Complaint

[2] *Cortlandt St. Recovery Corp.*, 790 F.3d at 417 ("In deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint.").

does not allege that the PTPA's "members" actually do or ever did elect representatives, or that the PTPA otherwise "function[s] effectively as a membership organization." *Disability Advocs., Inc.*, 675 F.3d at 157 (citation omitted). Deliberately using the passive voice and oblique allegations, the Amended Complaint describes only what the PTPA's articles of incorporation "provide," what the bylaws "create," and what the PTPA's executive committee was "to consist of" upon the PTPA's founding. (Am. Compl. ¶¶ 109-19.) That is a far cry from Article III's requirements that the PTPA actually possess "indicia of membership" or that its members "have a sufficiently active affiliation with the organization." *Hunt*, 532 U.S. at 344; *Disability Advocs., Inc.*, 675 F.3d at 158-59.

In the absence of an alleged injury to any actual PTPA member, and because the PTPA has failed to allege that these players are actually its members or that the PTPA functions as a membership organization, the PTPA lacks associational standing.

### B. The PTPA's claims would require substantial individual participation, are duplicative of the Tennis Player Plaintiffs' claims, and threaten circumvention of the class-action treatment the Tennis Player Plaintiffs seek.

The PTPA also lacks associational standing to sue on behalf of its "members"—or those it claims to represent—for additional, prudential reasons "focus[ed] on . . . matters of administrative convenience and efficiency," including that the PTPA cannot reasonably prosecute this case without its individual "members'" participation. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996).

*First*, the PTPA's claims would require the substantial participation of the PTPA's individual "members." *Hunt*, 432 U.S. at 343. Consider how the parties' competing claims of anti- and pro-competitive conduct will be litigated in practice. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96-97 (2021) (describing rule of reason framework). Plaintiffs contend that Defendants' alleged conduct "has harmed the market[s] for the services of male [and female]

professional tennis players" by depressing player compensation, depressing competition among tournaments that buy (or might buy) players' services, and reducing the tournaments' output. (Am. Compl. ¶¶ 399, 409.) In evaluating whether the challenged conduct has anticompetitive effects on those markets, the rule of reason inquiry will likely require detailed analysis of what individual players actually earn (from, *e.g.*, sanctioned tournaments' purses; appearance fees; non-sanctioned tournaments; exhibition events; sponsorships and endorsements; and pension distributions from the Tours), the benefits to players and increases in compensation that players have earned as a result of the Tour formats, and what those players would earn in Plaintiffs' but-for world.

Particularly because each professional tennis player has a highly individualized earning capacity and market value—dependent on, among other things, the player's tennis ability, events played, and nationality—individual players will need to substantially participate in this lawsuit to give evidence on what they earn (particularly from parties other than Defendants) and what they could earn.[3] Thus, notwithstanding that the PTPA seeks equitable relief only, its claims turn on injury questions about whether individual players would be better off in Plaintiffs' but-for world. Answering these questions requires a degree of individual participation that forecloses associational standing. *Bano*, 361 F.3d at 714 (no associational standing where claim for injunctive relief required inquiry into individual members' injuries); *see also, e.g.*, *Massone v. Washington*, 2022 WL 2657168, at *7 (S.D.N.Y. July 8, 2022) (no associational standing where "Plaintiff raises claims for injunctive relief that fundamentally concern individual Union members' health, medical conditions, and medical records"); *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 256-

[3] For example, the earnings potential for a top-10 ranked women's singles player from a major European country is very different from a low-ranked men's doubles player from a small country—and each of these players' pay would be very differently affected by the restructuring (or dismantling) of organized professional tennis that Plaintiffs seek.

57 (S.D.N.Y. 2018) (no associational standing for organization seeking declaratory relief that requires individual participation).[4]

*Second*, the PTPA serves no independent function in this lawsuit. While the PTPA has no identifiable members, there are fourteen Tennis Player Plaintiffs asserting claims. For both of Plaintiffs' alleged relevant markets, each of the PTPA's claims are also asserted, identically, by a set of Tennis Player Plaintiffs.[5] Even if it alleged it had members, the PTPA's "participation in the suit" is thus "redundant." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (it would not further "administrative convenience and efficiency" to "permit the association to litigate on behalf of its members 'when those members are already parties to the lawsuit in their own right'") (citations omitted); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 290 (3d Cir. 2014) (no associational standing because "[p]ermitting the [association] to litigate this case on behalf of

---

4 Indeed, in addition to the injury questions, the Amended Complaint is rife with allegations that, to be proved or defended against, require meaningful participation by individual players. These include allegations that: players who do not advance to at least the quarterfinals of a tournament "typically face a net financial loss from their participation" (Am. Compl. ¶ 168); players have been "forced . . . to reject offers for endorsement deals" (*id.* ¶ 192); players have been given fines that are "excessive and disproportionate" relative to their on-court conduct (*id.* ¶ 243 n. 26); investigators have "harass[ed] players . . . and threaten[ed] additional punishments for failing to 'cooperate' with investigative requests" (*id.* ¶ 348); and players "have faced numerous obstacles when attempting to access their own match data" (*id.* ¶ 362). The Amended Complaint also implicates core sporting rules that necessarily impact each player differently. Those include whether an alternative "merit-based ranking system" of a type described in paragraphs 223 through 225 of the Amended Complaint might be preferable to the existing system that has served thousands of players for decades; whether shortening the 11-month season—apparently regarded by some as "demanding" and "restrictive" (*id.* ¶¶ 236-39)—would deprive other players of legitimate earning opportunities; and whether alleged anti-doping and anti-corruption programs—characterized by some as "abusive and arbitrary" (*id.* ¶¶ 346-64)—ought to be weakened notwithstanding the interests of those players who favor even stricter measures to preserve competitive integrity. These are questions that cannot be resolved without meaningful participation of individual players.

5 The PTPA's claims are identical to claims asserted by the Tennis Player Plaintiffs and would be redundant (and not viable) in any forum, including in arbitration (as WTA contends is the appropriate forum) or in the District of Delaware (as ATP contends).

its members, when those members are already parties to the lawsuit in their own right, does not fulfill the Supreme Court's guidance to focus on 'administrative convenience and efficiency'" under *Hunt*) (citation omitted); *see also, e.g.*, *Access 4 All, Inc. v. G & T Consulting Co., LLC*, 2008 WL 851918, at *9 (S.D.N.Y. Mar. 28, 2008) ("[W]here [association's] claims are identical to those of the individual plaintiffs in the case . . . dismissal of [its] claims for prudential reasons is appropriate."); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 173 (S.D.N.Y. 2006) ("[C]ourts have declined to recognize the standing of associational ADA plaintiffs when the claims they assert are identical to the individual plaintiffs in the case."). Associational standing is an exception that gives "absent third parties" the ability to participate in a suit. *United Food & Com. Workers Union Local*, 517 U.S. at 556-57; *see also Hunt*, 432 U.S. at 343 (associational standing premised on claims members "*would otherwise*" be entitled to bring) (emphasis added). But associational standing serves no purpose here, where (i) the PTPA's lawyers are simultaneously claiming that the same interests are already represented by the allegedly *actually* injured parties, the Tennis Player Plaintiffs, and (ii) the Tennis Player Plaintiffs *themselves* are simultaneously claiming that they can "fairly and adequately" protect the interests of a class of all other men's and women's professional tennis players. (Am. Compl. ¶¶ 422-23.)

*Third*, the participation of the PTPA as a plaintiff would threaten unfair circumvention of Rule 23's requirements, particularly where, as here, the Tennis Player Plaintiffs are seeking to proceed as classes and do not claim to need the PTPA to represent its "members." "[A]ssociational standing subverts the class-action mechanism" because it "allows a party to effectively bring a class action without satisfying any of the ordinary requirements" of Rule 23. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 402 (2024) (Thomas, J., concurring). Plaintiffs blur the distinction between the PTPA's would-be "members" and those that the PTPA merely aspires to

represent. If Plaintiffs wish to broadly represent professional tennis players, they should be required to do so in accordance with the proper class-action mechanism, not through a self-proclaimed advocacy group that demonstrably does not speak for the putative classes.[6]

## II. The PTPA lacks organizational standing.

The PTPA also lacks organizational standing, for two independent reasons: it fails to allege it suffered particularized, redressable injury traceable to Defendants' conduct, as is required under Article III; and it fails to allege it suffered a "special kind of antitrust injury" or that it is an "efficient enforcer," and thus lacks standing under the antitrust laws. Accordingly, the PTPA's claims based on alleged "direct" injuries give them no basis to prosecute this action.

### A. The PTPA lacks constitutional standing.

Under the concept of organizational standing, an organizational plaintiff is "just another person" who must "meet the same standing test that applies to individuals." *New York Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011) (citation omitted). As such, an organization may not establish standing "simply based on the 'intensity of [its] interest'" or "strong opposition" to the challenged conduct. *FDA*, 602 U.S. at 394 (citation omitted). Rather, the organization must itself satisfy "the usual" standards and show (i) injury in fact, (ii) caused by the defendant, and (iii) redressable by the requested judicial relief. *Id.* Here, the PTPA cannot satisfy any of these requirements, let alone each of them.

*First*, the PTPA does not (and cannot) satisfy the injury in fact requirement because its alleged injuries are both manufactured and self-inflicted and thus non-justiciable under settled precedent. *See, e.g.*, *id.* ("An organization cannot manufacture its own standing . . ."); *Clapper v.*

---

[6] Circumvention of the class-action mechanism would also raise serious issues about preclusion. PTPA "members" could strategically choose not to join this suit; assuming an adverse judgment against the PTPA would not bind such non-joining "members," they might then be able to sue in their own names, even after such an adverse judgment.

*Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (same). Here, the PTPA purports to allege a weakened ability to attract members and advocate for them, and a diversion of resources away from recruiting and retaining members and advocating for them. (Am. Compl. ¶ 433.) These allegations are insufficient.

The Supreme Court has now squarely rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions." *FDA*, 602 U.S. at 395. Were that proposition accepted, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.*; *see also Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021) ("CTPU maintains that its work was perceptibly impaired because it expended resources to counteract illegal activity touching on its core mission and in so doing diverted resources away from other activities. [W]e reject such an expansive concept of organizational injury for standing purposes.") (internal quotations and citations omitted). Accordingly, the PTPA's alleged "diversion of resources" theory is foreclosed.[7]

More fundamentally, to establish injury in fact, the PTPA must allege "a perceptible impairment to an activity the organization had regularly or historically pursued prior to the challenged act." *IP Invs. Grp. LLC v. Sedicii Innovations, Ltd.*, 2024 WL 729207, at *2 (S.D.N.Y. Feb. 22, 2024); *see also Conn. Parents Union*, 8 F.4th at 174-75 ("Our analysis in *Centro* demonstrates that the injury-in-fact inquiry should focus on the *involuntary* and *material* impacts

---

[7] Following the Supreme Court's earlier decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), courts in the Second Circuit recognized that an organization might, under certain circumstances, establish injury in fact by showing a "drain on the organization's resources." *See Ctr. for Food Safety v. Price*, 2018 WL 4356730, at *4-5 (S.D.N.Y. Sept. 12, 2018) (explaining "diversion of resources" theory). But in *FDA*, the Supreme Court expressly limited *Havens* to that case's unique facts. *FDA*, 602 U.S. at 395-96 (describing *Havens* as an unusual case that should not be extended).

on *core activities* by which the organizational mission has historically been carried out.") (emphasis in original). But here, as the Amended Complaint makes clear, the PTPA did not "regularly or historically" pursue any activities "prior to the challenged conduct." Rather, according to the PTPA, it was formed *because of* the challenged conduct[8] and then it spent years "repeatedly [trying] to negotiate and facilitate change directly with the Defendants [about] *the issues present in this lawsuit*." (Am. Compl. ¶ 125) (emphasis added). That is, the PTPA set itself up to be "harmed" by Defendants to the extent it did not get what it wanted. An organization that manufactures standing in this manner—by committing itself to a mission to challenge certain conduct—cannot claim that the same conduct constitutes cognizable constitutional harm. *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 295-96 (S.D.N.Y. 2009) (organization formed in response to underlying events of case lacked constitutional standing); *Conn. Parents Union*, 8 F.4th at 174 ("[A]n organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes . . . ."); *see also Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 325-26 (S.D.N.Y. 2020) ("Its increased domestic expenditures are not a diversion of money away from its core activities, but *actually constitute* the core activities.") (emphasis added). The PTPA's manufactured, bootstrapped "injury" is not a constitutionally cognizable injury in fact.

*Second*, the PTPA lacks organizational standing for the independent reason that it does not (and cannot) allege that its alleged injuries were caused by Defendants' alleged anticompetitive conduct. "The causation component of the Article III standing test insures that the injury alleged by a plaintiff is attributable to the defendant." *Informed Consent Action Network v. Becerra*, 595

[8] (Am. Compl. ¶ 108) ("The PTPA started as a grassroots movement . . . *because the tennis organizations . . . had descended into anti-competitive organizations eroding players' rights.*") (emphasis added).

F. Supp. 3d 70, 81 (S.D.N.Y. 2022) (citation omitted). But that requirement is not met at the pleading stage where, as here, the "causation theory is purely speculative and conjectural" or "rest[s] on speculation about the decisions of independent actors." *Id.*; *see also Clapper*, 568 U.S. at 413-14; *Farrakhan v. Anti-Defamation League*, 2025 WL 24066, at *1 (2d Cir. Jan. 3, 2025). Here, in two sentences in paragraph 433 of the Amended Complaint, the PTPA hypothesizes that "Defendants' conspiracy" has weakened its ability to attract membership and advocate for players and forced it to divert its resources away from those activities. (Am. Compl. ¶ 433.) But other than the PTPA's conclusory "say so," the Amended Complaint alleges no *facts* to show that those alleged injuries are attributable to "Defendants' conspiracy" (*id.*) rather than any number of other factors, including, for example, the independent choices of tennis players who may *or may not* wish to affiliate with the PTPA. *Farrakhan*, 2025 WL 24066 at *1 ("Plaintiffs' allegations that ADL's general advocacy caused the third parties' decisions are unsupported by particularized factual assertions and, instead, rely on mere 'speculative inferences.'") (citation omitted). Nor does the PTPA identify the nature of its alleged "resources," explain how or why they were "diverted," or otherwise explain how or why such diversion was caused by "Defendants' conspiracy." *Id.*; *Conn. Citizens Def. League v. Lamont*, 6 F.4th 439, 448 (2d Cir. 2021) ("The sole indication that CCDL might suffer future injury is Sullivan's statement that 'CCDL has [expended and diverted] and continues[] to expend and divert its resources' . . . Such a conclusory assertion cannot support standing.") (citation omitted). Absent well-pleaded, non-speculative facts that connect the PTPA's alleged injuries to "Defendants' conspiracy," the PTPA fails to satisfy the causation requirement. *Farrakhan*, 2025 WL 24066 at *1; *Conn. Citizens Def. League*, 6 F.4th at 448.

*Third*, the PTPA does not (and cannot) satisfy the redressability requirement because there is a fatal mismatch between the PTPA's alleged injuries and the relief requested in the Amended Complaint. *Soule by Stanescu v. Conn. Ass'n of Schs.*, 57 F.4th 43, 51 (2d Cir. 2022) ("This mismatch between Plaintiffs' alleged injury and requested relief is fatal to establishing redressability."). To satisfy the redressability requirement, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 50 (citation omitted). For that reason, "[t]he injury that a plaintiff claims to have suffered *must be the same injury* he hopes to remedy by bringing suit in federal court." *Kent v. PoolTogether, Inc.*, 676 F. Supp. 3d 144, 152 (E.D.N.Y. 2023) (emphasis added); *Soule*, 57 F.4th at 47 (the requested relief must remedy *the plaintiff's alleged injury in fact*). But here, as discussed, the PTPA's alleged injuries—a weakened ability to attract membership and advocate for players and a diversion of resources away from those activities (Am. Compl. ¶ 433)—are detached from the Amended Complaint's requested relief, which purports to seek redress for alleged "price fixing arrangements," "restrictive scheduling and ranking mandates," "restrictive non-competes," and "abusive investigations and discipline imposed on players." (*See, e.g.,* Am. Compl. ¶¶ 4-5, 11, 18, 427, 439-590 (Causes of Action)).[9] Thus, even if the PTPA could identify some cognizable injury conceivably linked to "Defendants' conspiracy," the PTPA does not (and cannot) allege that the requested relief would address those alleged injuries. *Soule*, 57 F.4th at 47; *Kent*, 676 F. Supp. 3d at 152; *see also Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing . . . *for each form of*

---

[9] (Am. Compl. ¶ 428) ("Absent Defendants' violations, a competitive marketplace would have yielded, among other benefits, prize money pools and earning capabilities that are more competitive, better schedules and playing conditions for players resulting in lower injury rates, and tournaments that compete for the services of players and the demand of fans.").

*relief* that is sought.") (internal quotations and citation omitted) (emphasis added). Accordingly, the PTPA cannot satisfy the redressability requirement either.

For each of these reasons, the PTPA lacks organizational standing.

**B. The PTPA lacks antitrust standing.**

Independent of the PTPA's lack of Article III standing, the PTPA's claims should also be dismissed because the PTPA lacks antitrust standing. Antitrust standing is a "threshold, pleading-stage inquiry" designed to "reflect[] the judgment that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Gatt*, 711 F.3d at 75-76; *see also IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019). To satisfy this requirement at the pleading stage, a plaintiff must plausibly allege both a "special kind of antitrust injury" and that it is an "efficient enforcer" of the antitrust laws. *Gatt*, 711 F.3d at 76 (citation omitted). Here, the PTPA does neither.

**1. The PTPA did not suffer antitrust injury.**

In the Second Circuit, courts employ a three-step process to determine whether a plaintiff has plausibly alleged antitrust injury. *Id.* First, "the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive." *Id.* (internal quotations and citation omitted). Second, the court must assess "the actual injury the plaintiff alleges." *Id.* (citation omitted). Third, the court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Id.* (internal quotations and citation omitted). And where, as here, the claimed injuries are neither "of the type the antitrust laws were intended to prevent" nor "attributable to the anticompetitive aspect of the practice[s] under scrutiny," courts must dismiss such claims for lack of antitrust injury. *Id.*; *Port Dock & Stone Corp. v. Oldcastle Ne.*, 507 F.3d

117, 122 (2d Cir. 2007); *Dentsply Int'l Inc. v. Dental Brands for Less, LLC*, 2016 WL 6310777, at *3 (S.D.N.Y. Oct. 27, 2016).

Applying *Gatt*'s first step, the anticompetitive practices of which Plaintiffs complain are alleged agreements affecting tennis players, including alleged agreements to "fix player compensation," "allocate markets," "restrict output through a closed ranking system," "refuse to deal with professional tennis players who do not abide" by the rules, "not to compete," and "impose arbitration and waiver provisions . . . ." (Am. Compl. ¶ 427) (describing alleged antitrust injuries). And according to Plaintiffs, those practices are anticompetitive because they "harmed the market[s] for the services of male [and female] professional tennis players." (*Id.* ¶¶ 394-413.[10]) But under *Gatt*'s second step, the PTPA's alleged injuries—a weakened ability to attract and advocate for its "members" and a diversion of resources away from those activities (*id.* ¶ 433)—are not market injuries at all. Rather, those are supposed setbacks to an advocacy organization that is not a participant in the relevant markets. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("The upshot is that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained."); *see also Sell It Soc., LLC v. Acumen Brands, Inc.*, 2015 WL 1345927, at *4-5 (S.D.N.Y. Mar. 20, 2015) ("Plaintiff alleges 'loss of business from existing and potential vendors,' not from market-wide anticompetitive effects.") (citation omitted).

Were that not enough, *Gatt*'s third step independently dooms the PTPA's claims. To the extent the PTPA's alleged institutional injuries were cognizable injuries at all, those injuries flow

---

10 *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x. 4, 7-8 (2d Cir. 2019) ("[T]he Court must first determine the 'relevant market' for purposes of assessing antitrust injury. As a general matter, the 'relevant market' is the market that is 'directly restrained' by Defendants' alleged anticompetitive activity.") (citations omitted).

from neither the alleged anticompetitive agreements (*e.g.*, alleged "price fixing" agreements) nor the alleged anticompetitive effects of those agreements (*e.g.*, alleged harm to the relevant tennis player markets). *Gatt*, 711 F.3d at 77 ("Gatt's lost revenue resulting from the Vertex termination, however, is not an injury that flows from that which makes bid-rigging unlawful."); *see also Prime Int'l Trading,* 784 F. App'x at 8 ("[W]e affirm the district court's dismissal of Plaintiffs' Sherman Act claims on the ground that they have not adequately pleaded an antitrust injury in the markets that Defendants allegedly directly restrained."). Thus, the PTPA fails to allege an injury "of the type the antitrust laws were intended to prevent" or "attributable to the anticompetitive aspect of the practice[s] under scrutiny." *Gatt*, 711 F.3d at 76 (citation omitted); *Port Dock & Stone Corp.*, 507 F.3d at 122.

**2. The PTPA is not an efficient enforcer of the antitrust laws.**

The PTPA also cannot establish antitrust standing because it is not "a suitable plaintiff to pursue the alleged antitrust violations" as an "efficient enforcer" of the antitrust laws. *Gatt*, 711 F.3d at 76 (citation omitted). To determine whether a plaintiff is an "efficient enforcer," courts assess four factors: (i) "the directness or indirectness of the asserted injury," (ii) "the existence of more direct victims" or the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," (iii) the extent to which the claim is "highly speculative," and (iv) "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Id.*; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443-45 (2d Cir. 1996) (affirming dismissal where plaintiff was not efficient enforcer) (citation omitted). While the relative importance of each factor will "necessarily vary with the circumstances of particular cases," each of these factors here favors dismissal.

*First*, directness is based on "familiar principles of proximate causation." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139 (2d Cir. 2021) (quotation omitted). "[P]roximate cause generally follows the first-step rule," where injuries that happen "at the first step following the harmful behavior are considered proximately caused by that behavior." *Id.* at 139-40. Here, there is no *direct* relationship between Defendants' alleged anticompetitive conduct and the PTPA, because it is tennis players themselves who *directly* engage with (and indeed are members in) Defendants, compete in the alleged relevant markets, and have allegedly been directly injured. The PTPA's claims are derivative, not direct.

*Second*, there are more direct alleged "victims" than the PTPA. If Plaintiffs' theory were correct (and it is not), those direct "victims" would include, at a minimum, players. And those direct victims would also include would-be operators of professional tennis events, exhibitions, and unsanctioned tournaments that are allegedly prevented from entering the market. (*See* Am. Compl. ¶¶ 205, 235, 276-78.) Those parties would all have a more direct injury than the PTPA and their "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement . . . ." *See Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

*Third*, the PTPA's alleged injuries—an alleged weakened ability to attract membership and advocate for players and a diversion of resources away from those activities (Am. Compl. ¶ 433)—are, to the extent they even exist, highly speculative because, as discussed *supra*, they "rest[] on speculation about the decisions of independent actors" and are not attributable to the anticompetitive practices under scrutiny. *See supra* at 15-17.

*Fourth*, courts seek to avoid the risk of duplicate recovery and "complex apportionment" of damages. Here, this factor is at best neutral for the PTPA because the PTPA is not seeking

damages. But the presence of multiple parties exacerbates a broader concern about which party was injured by the alleged conduct, a concern that courts "may well dissipate—at least to some extent—if the plaintiff group is limited to those who transacted directly with Defendants." *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *25 (S.D.N.Y. Mar. 28, 2017). Here, the Tennis Player Plaintiffs (and the putative classes) directly engage with Defendants and compete in the alleged relevant markets. There is no reason to have the PTPA serve as an "enforcer of the antitrust laws" when other plaintiffs, who the PTPA and the players themselves claim to have been injured, are parties to this lawsuit or can become parties via the class-action mechanism.

For these reasons, the PTPA lacks antitrust standing.

## CONCLUSION

The PTPA is not a proper plaintiff in this lawsuit. It lacks associational standing, organizational standing, and antitrust standing, and its presence in this case is both redundant and an improper attempt to circumvent class-action requirements. The PTPA should be dismissed as a plaintiff.

Dated: July 31, 2025

Respectfully Submitted,

*<u>/s/ Lawrence E. Buterman</u>*
Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Amanda P. Reeves (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com

*<u>/s/ Bradley I. Ruskin*</u>*
Bradley I. Ruskin
Lee M. Popkin
Jordan B. Leader
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3465
Facsimile: (212) 969-2900
bruskin@proskauer.com
lpopkin@proskauer.com
jleader@proskauer.com

Kyle A. Casazza
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400

Christopher S. Yates (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8157
chris.yates@lw.com

*Counsel for Defendant WTA Tour, Inc.*

Los Angeles, CA 90067
Telephone: (310) 284-5677
Facsimile: (310) 557-2193
kcasazza@proskauer.com

*Counsel for Defendant ATP Tour, Inc.*

* /s/ signature used with consent in accordance with ECF Rule 8.5(b)

CC: All Counsel of Record (via ECF)

**CERTIFICATE OF COMPLIANCE**

I, Lawrence E. Buterman, certify that the foregoing Memorandum in Support of Defendants' Motion to Dismiss The Professional Tennis Players Association complies with the word-count limitation in Section II.B.2 of Judge Garnett's Individual Rules and Practices. According to the word processing software used to prepare this document, the memorandum contains 7,318 words, excluding the parts of the document exempted in Section II.B.2.

Dated: July 31, 2025

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman