**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VASEK POSPISIL, NICHOLAS KYRGIOS, ANASTASIA RODIONOVA, NICOLE MELICHAR-MARTINEZ, SAISAI ZHENG, SORANA CÎRSTEA, JOHN-PATRICK SMITH, NOAH RUBIN, ALDILA SUTJIADI, VARVARA GRACHEVA, TENNYS SANDGREN, SACHIA VICKERY, NICOLAS ZANELLATO, and REILLY OPELKA, on behalf of themselves and all others similarly situated,<br>-and-<br>THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION,<br>Plaintiffs,<br>v.<br>ATP TOUR, INC. and WTA TOUR, INC.,<br>Defendants. | Case No. 1:25-cv-00207-MMG<br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF ATP TOUR, INC.'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER CLAIMS AGAINST ATP UNDER F.R.C.P. 21, AND TRANSFER PURSUANT TO 28 U.S.C. § 1404(A)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

ARGUMENT ........ 5

I. The Forum Selection Clause Requires Dismissal of All Claims Against ATP ........ 5

A. The ATP Forum Selection Clause Was Reasonably Communicated ........ 7

B. The ATP Forum Selection Clause Is Mandatory Rather Than Permissive ........ 8

C. The ATP Forum Selection Clause Encompasses The ATP Plaintiffs' Claims ........ 8

D. The ATP Forum Selection Clause Is Not Unreasonable, Unjust, or Invalid ........ 10

II. In the Alternative, Claims Against ATP Should Be Severed and Transferred to Delaware ........ 14

III. The WTA Player Plaintiffs' Claims Against ATP Should be Dismissed as Legally Insufficient ........ 18

A. The Amended Complaint Fails to Plausibly Allege Any Unlawful Agreement Between ATP and WTA ........ 19

i. It is Not Plausible that ATP and WTA Agreed to Allocate Markets ........ 20

ii. The Amended Complaint Fails to Plead Any Agreement between ATP and WTA with the Requisite Specificity ........ 23

CONCLUSION ........ 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aguas Lenders Recovery Grp. v. Suez, S.A.*,
585 F.3d 696 (2d Cir. 2009)....................10

*Allianz Glob. Corp. & Specialty v. Chiswick Bridge*,
2014 WL 6469027 (S.D.N.Y. Nov. 17, 2014)....................12

*Amyndas Pharms., S.A. v. Zealand Pharma A/S*,
48 F.4th 18 (1st Cir. 2022)....................12

*Anwar v. Fairfield Greenwich Ltd.*,
742 F. Supp. 2d 367 (S.D.N.Y. 2010)....................7

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*,
571 U.S. 49 (2013).................... *passim*

*ATP Tour, Inc. v. Deutscher Tennis Bund*,
91 A.3d 554 (Del. 2014)....................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................... *passim*

*Bense v. Interstate Battery Sys. of Am., Inc.*,
683 F.2d 718 (2d Cir. 1982)....................9

*Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*,
73 A.3d 934 (Del. Ch. 2013)....................11

*Cal. Crane Sch., Inc. v. Google LLC*,
722 F. Supp. 3d 1026 (N.D. Cal. 2024)....................23

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....................2

*Crede CG III, Ltd. v. 22nd Century Grp., Inc.*,
2017 WL 280818 (S.D.N.Y. Jan. 20, 2017).................... *passim*

*Cuhadar v. Savoya, LLC*,
766 F. Supp. 3d 434 (E.D.N.Y. 2025)....................5, 6, 8

*Deutscher Tennis Bund, et al. v. ATP, et al.*,
No. 07-cv-00178-GMS (D. Del. Mar. 28, 2007)....................11

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ....................22

*FuboTV Inc., et al., v. The Walt Disney Company, et al.*,
No. 1:24-cv-01363-MMG (S.D.N.Y. Jan. 14, 2025) ....................17

*HC&D, LLC v. Precision NDT & Consulting, LLC*,
698 F. Supp. 3d 180 (D. Mass. 2023) ....................14

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) ....................18

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ....................19, 23, 24

*In re Howmedica Osteonics Corp.*,
867 F.3d 390 (3d Cir. 2017) ....................12, 16

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ....................19

*In re Rolls Royce Corp.*,
775 F.3d 671 (5th Cir. 2014) ....................16, 17

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ....................22

*JM Smith Corp. v. AstraZeneca Pharms. L.P.*,
2020 WL 4605241 (S.D.N.Y. Aug. 11, 2020) ....................16

*Jones v. Ponant USA LLC*,
2020 WL 2489076 (S.D.N.Y. May 14, 2020) ....................9

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) ....................5

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
714 F.3d 714 (2d Cir. 2013) ....................6, 9

*Magi XXI, Inc. v. Stato Della Citta Del Vaticano*,
818 F. Supp. 2d 597 (E.D.N.Y. 2011), *aff'd*, 714 F.3d 714 (2d Cir. 2013) ....................7, 8

*Martinez v. Bloomberg LP*,
740 F.3d 211 (2d Cir. 2014) ....................10

*Mayor and City Council of Balt., Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) ....................19, 24

*Midamines SPRL Ltd. v. KBC Bank NV*,
2014 WL 1116875 (S.D.N.Y. Mar. 18, 2014), *aff'd*, 601 F. App'x 42 (2d Cir. 2015) ....7

*New Moon Shipping Co. v. MAN B & W Diesel AG*,
121 F.3d 24 (2d Cir. 1997)....7

*Ortho-Clinical Diagnostics, Inc. v. Mazuma Cap. Corp.*,
2019 WL 1082987 (W.D.N.Y. Mar. 7, 2019)....13

*Paduano v. Express Scripts, Inc.*,
55 F. Supp. 3d 400 (E.D.N.Y. 2014) ....14, 15, 17, 18

*Perma-liner Indus., LLC v. D'Hulster*,
2021 WL 951185 (D. Del. Mar. 12, 2021) ....8

*Person v. Google Inc.*,
456 F. Supp. 2d 488 (S.D.N.Y. 2006)....11

*Phillips v. Audio Active Ltd.*,
494 F.3d 378 (2d Cir. 2007)....6, 12, 14, 15

*Press v. Primavera*,
685 F. Supp. 3d 216 (S.D.N.Y. 2023)....11

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
784 F. App'x 4 (2d Cir. 2019) ....18

*RedHawk Holdings Corp. v. Craig Invs., LLC*,
2016 WL 6143355 (S.D.N.Y. Oct. 19, 2016) .... 9-10

*Reed Int'l, Inc. v. Afg Int'l Bank*,
657 F. Supp. 3d 287 (S.D.N.Y. 2023)....8

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974)....10

*SSAB Ala., Inc. v. Kem-bonds, Inc.*,
2017 WL 6345809 (S.D. Ala. Dec. 12, 2017) ....7

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)....11

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
782 F. Supp. 2d 1059 (E.D. Cal. 2011)....23, 24

*Tianhai Lace USA Inc. v. Forever 21, Inc.*,
2017 WL 4712632 (S.D.N.Y. Sept. 27, 2017)....3, 15

*TradeComet.com LLC v. Google, Inc.*,
647 F.3d 472 (2d Cir. 2011)....................................................5

*TradeComet.com LLC v. Google, Inc.*,
693 F. Supp. 2d 370 (S.D.N.Y. 2010), *aff'd in part*, 647 F.3d 472 (2d Cir. 2011) ....................................................9

*U.S. ex rel. D.D.S. Indus., Inc. v. Nauset Constr. Corp.*,
2018 WL 5303036 (D. Mass. Oct. 25, 2018)....................................................14, 15

*Valspar Corp. v. E.I. DuPont de Nemours and Co.*,
15 F. Supp. 3d 928 (D. Minn. 2014)....................................................14, 15, 18

*Wyndham Assocs. v. Bintliff*,
398 F.2d 614 (2d Cir. 1968)....................................................14

*Zinc Antitrust Litigation,*
155 F. Supp. 3d 337 (S.D.N.Y. 2016)....................................................22

*Zurich Ins. Co. v. Prime, Inc.*,
419 F. Supp. 2d 384 (S.D.N.Y. 2005)....................................................5

**STATUTES**

15 U.S.C. § 15b....................................................20. 26

28 U.S.C. § 1404(a) ....................................................1, 13, 14, 15, 19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6)....................................................1, 5, 14, 23

Fed. R. Civ. P. 21 ....................................................1, 14

Defendant ATP Tour, Inc. ("ATP") respectfully submits this memorandum in support of its motion to dismiss pursuant to F.R.C.P. 12(b)(6), or, in the alternative, to sever pursuant to F.R.C.P. 21 and transfer to the District of Delaware pursuant to 28 U.S.C. § 1404(a), all claims against ATP, as required under the mandatory forum selection clause of the ATP Bylaws, and to dismiss any claims brought by women's professional tennis players, pursuant to F.R.C.P. 12(b)(6).

## INTRODUCTION

The ATP Bylaws contain a forum selection clause designating Delaware Courts as the exclusive jurisdiction for "any dispute or controversy" between ATP and its members or anyone making a claim on their behalf. There is a strong federal policy, repeatedly reaffirmed in the Second Circuit, of enforcing such clauses. In contravention of the ATP clause, seven ATP player members (the "ATP Named Plaintiffs") and the Professional Tennis Players Association ("PTPA"), an organization purporting to represent the interests of ATP player members (together with ATP Named Plaintiffs and the putative "ATP Damages Class" and "ATP Injunctive Relief Class," the "ATP Plaintiffs"), filed their claims against ATP in the wrong court. They should not be permitted to maintain those claims here.

The mandatory forum selection clause was reasonably communicated to the ATP Named Plaintiffs, it unambiguously covers their antitrust claims, and it is valid, enforceable, and binding on both the ATP Named Plaintiffs and on the PTPA, which claims to represent those same players. Despite knowing ATP's position and arguments in support of enforcing the forum-selection clause, Plaintiffs' Amended Complaint did not add any allegations asserting that the clause is invalid or unenforceable. Moreover, Plaintiffs continue to rely on the WTA Bylaws' forum selection clause as their basis for jurisdiction and venue over Defendants. Am. Compl. ¶¶ 48, 51. Having recognized the enforceability and validity of that provision, the ATP Named Plaintiffs and the PTPA cannot circumvent ATP's materially indistinguishable forum provision. Those parties'

claims against ATP should be dismissed and refiled in Delaware if those parties want to pursue them.

The only remaining Plaintiffs (women's professional tennis players) fail to articulate an actionable antitrust claim against ATP. The Amended Complaint's scattered and conclusory references to implausible agreements between ATP and WTA, without any clarity as to the basic who, when, or where of those agreements, cannot sustain any claims here or defeat dismissal or transfer of any viable claims to Delaware.

In short, forcing ATP to litigate in this forum would contravene the Supreme Court's mandate to enforce forum selection clauses except under only the most "exceptional" circumstances. There are no exceptional circumstances here, and any claims against ATP should not be litigated in this forum.

## FACTUAL BACKGROUND

ATP operates a men's professional tennis tour. It is a Delaware non-profit corporation with two groups of members: men's professional tennis players ("Player Members") and organizers of men's professional tennis tournaments ("Tournament Members"). Ex. A,[1] ATP Bylaws, § 3.1.[2] ATP is governed by a nine-member Board of Directors—four are elected by Player Members, like the ATP Player Plaintiffs, four are elected by Tournament Members, and the ninth

---

1 Exhibits A-E are attached to the Declaration of Bradley I. Ruskin and Exhibits 1-2 are attached to the Declaration of Mark V. Young ("M. Young Decl.") filed in support of this motion.

2 On a motion to dismiss, the Court may consider any "statements or documents incorporated in [the complaint] by reference," and "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citation omitted). The September 24, 2024 ATP Bylaws (Ex. A) and the 2025 ATP Rulebook (Ex. B) are incorporated by reference and integral to the Amended Complaint (*see, e.g.*, Am. Compl. at p. 21, nn.2 & 3), and therefore properly considered in connection with this motion.

director is ATP's Chairman. Ex. C, Certificate of Incorporation EIGHTH: (a)-(d);[3] Am. Compl. ¶ 65. Amending the ATP Bylaws requires an affirmative vote by at least two of the Player Members' elected representatives. Ex. A, ATP Bylaws, § 12.9(a)(vi).

**Players' Express Consent to ATP Rules**

Each year, players who wish to participate in ATP Tour Tournaments sign a Consent and Agreement Form, agreeing to "comply with and be bound by all of the provisions of [that year's] ATP Official Rulebook and ATP By-Laws (the 'ATP Rules')" and verifying that they "had an opportunity to review the ATP Rules[.]" Ex. B, ATP Rulebook, §1.07(A)(1) & (5) (Player Entry and Commitment to Rules); *id.* at pp. 349-351 (Consent and Agreement Form), *see also* Am. Compl. ¶ 367. For the 2022 season, ATP began facilitating the execution of the Consent and Agreement Form electronically, by requiring players to sign the form through PlayerZone (an internal website for ATP players) before using that platform to enter ATP events. *See* M. Young Decl., ¶¶ 3-6, and Ex. 1. Alternatively, players could still sign a hard copy on-site if they did not use PlayerZone to enter that event. *Id.* at ¶ 5. Each of the ATP Named Plaintiffs who played in the last season where hard copies were required (2021) signed a hard copy Consent and Agreement Form for that season, and thereafter signed either electronically or on-site for each of the years in which he entered ATP events. *Id.* at ¶¶ 7-9, and Ex. 2. New Plaintiff Nicolas Zanellato signed electronically for each season he has been active. *Id.* at ¶ 9.

As a Condition of Membership under the Bylaws, "[e]ach member of the League,[4] by accepting and maintaining his, her or its membership therein: … agrees to abide by all of the terms

---

[3] On a "motion for transfer, the Court assumes allegations in the Complaint to be true, but may also look to evidence outside of the Complaint[.]" *Tianhai Lace USA Inc. v. Forever 21, Inc.*, 2017 WL 4712632, at *2 (S.D.N.Y. Sept. 27, 2017).

[4] "League" is defined as ATP. Ex. A, Art. 1.

and provisions of the Certificate of Incorporation of the League, the ATP Tour Rules and these Bylaws, as the same may be in effect from time to time." Ex. A, ATP Bylaws, § 3.2(f). Additionally, the ATP Rulebook provides that "[a]ny player who is included in the PIF ATP Rankings for singles … or the PIF ATP Doubles Rankings and/or commits to enter or participates in any ATP Tour or ATP Challenger Tour tournament consents and agrees … [t]o comply with and be bound by all of the provisions of the 2025 ATP Official Rulebook and ATP By-Laws[.]" Ex. B, ATP Rulebook, § 1.07A.

**ATP Forum Selection Clause**

The ATP Bylaws include a straightforward forum selection clause, providing that "the Delaware Courts shall have exclusive jurisdiction over *any* dispute or controversy between any Claiming Party[5] and the League or any member[.]" Ex. A, ATP Bylaws, § 23.1(c) (emphasis added).

**Plaintiffs' Claims**

The Amended Complaint asserts claims on behalf of male and female professional tennis players. The ATP Named Plaintiffs are each "male professional tennis player[s]" who currently or formerly played on the ATP Tour. *See* Am. Compl. ¶¶ 24-25, 30-31, 34, 36-37. The Amended Complaint further defines a putative "ATP Damages Class" to include "[a]ll male tennis players who compete in, have competed in, or will compete in any ATP-sanctioned tennis tournament or any of the four Grand Slams between March 18, 2021, through the date of final judgment in this matter" and "ATP Injunctive Relief Class" to include "[a]ll male tennis players who compete in, competed in, or will compete in any ATP-sanctioned tennis tournament or any of the four Grand

---

[5] "Claiming Party" is defined to include any "current or prior member or Owners or anyone on their behalf[.]" Ex. A, ATP Bylaws, § 23.1(b).

Slams between March 18, 2025, through the date of final judgment in this matter." Am. Compl. ¶ 414 (together with the ATP Named Plaintiffs, the "ATP Player Plaintiffs").

The WTA Named Plaintiffs are each "female professional tennis player[s]" who currently or formerly played on the WTA Tour, not the ATP Tour. *See* Am. Compl. ¶¶ 26-29, 32-33, 35. The Amended Complaint also defines a putative "WTA Damages Class" and "WTA Injunctive Relief Class" to include women's professional tennis players who participated in WTA on the same terms as the ATP Classes participated in ATP. Am. Compl. ¶ 415 (together with the WTA Named Plaintiffs, the "WTA Player Plaintiffs").

## ARGUMENT

### I. The Forum Selection Clause Requires Dismissal of All Claims Against ATP

The Supreme Court has made clear that "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (citation omitted). Consistent with that pronouncement, courts in the Second Circuit have "construed *Atlantic Marine* to permit Rule 12(b)(6) to be used to seek dismissal based on a forum selection clause." *Cuhadar v. Savoya, LLC*, 766 F. Supp. 3d 434, 442 (E.D.N.Y. 2025) (collecting cases). "[T]he Court of Appeals for the Second Circuit has developed a policy of honoring forum selection clauses." *Zurich Ins. Co. v. Prime, Inc.*, 419 F. Supp. 2d 384, 387 (S.D.N.Y. 2005).

A forum selection clause within a contract is "prima facie valid and should be enforced[.]" *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011) (quoting *M/S Bremen v. Zapata Off-Shore Co*., 407 U.S. 1, 10 (1972)). As a preliminary matter, the ATP Bylaws are binding on its members, and the forum selection clause is therefore within a valid and enforceable contract. Under Delaware law, bylaws "apply to all members of a non-stock corporation regardless

of whether the bylaw was adopted before or after the member in question became a member." *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 555, 557 n.10 (Del. 2014).[6]

The Second Circuit employs a four-part test in determining whether to dismiss a claim based on a forum selection clause. *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383-84, 386-87 (2d Cir. 2007) (affirming dismissal pursuant to enforceable forum selection clause); *Cuhadar*, 766 F. Supp. 3d at 443, 451 (granting 12(b)(6) motion to enforce forum selection clause). "To determine whether there is an enforceable forum selection clause, courts in this Circuit consider the following factors: (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, for example, whether the parties are required to bring any dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause." *Id.* (citation omitted). "If these factors are satisfied, the forum selection clause is deemed 'presumptively enforceable' and can be overcome only by a 'sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* (citation omitted); *accord Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 720-21 (2d Cir. 2013) (enforcing forum selection clause).

Where there is a valid forum selection clause, "plaintiff's choice of forum merits no weight." *Atl. Marine*, 571 U.S. at 63. Indeed, courts "routinely [find] that *Atlantic Marine* calls for enforcement of the forum-selection clause, notwithstanding objections grounded in fears of

---

6 Plaintiffs' argument that ATP consented to the exclusive jurisdiction in New York through the WTA Bylaws is based on an errant claim that ATP is a WTA member. ATP *is not* a WTA member and never consented to the WTA Bylaws. *See infra*, Section III.A.ii. Nor do the WTA Bylaws govern claims brought by the ATP Player Plaintiffs, who, as male tennis players, cannot be WTA player members. *See* Declaration of Lawrence E. Buterman in Support of Defendant WTA Tour, Inc.'s Motion to Compel Arbitration, Motion to Dismiss, and Motion to Stay Proceedings, ECF No. 117, Ex. 2, 2024 WTA Bylaws, § 10.12(b)-(c).

duplicative litigation or judicial economy." *SSAB Ala., Inc. v. Kem-bonds, Inc.*, 2017 WL 6345809, at *6 (S.D. Ala. Dec. 12, 2017) (collecting cases). The "burden [is] on the plaintiff[s], who brought suit in a forum other than the one designated by the forum selection clause, to make a 'strong showing' in order to overcome the presumption of enforceability." *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 28-29 (2d Cir. 1997) (explaining standard on motion to dismiss); *accord Atl. Marine*, 571 U.S. at 63 ("[A]s the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted.").

That heavy burden has not been met.

A. The ATP Forum Selection Clause Was Reasonably Communicated

"A clause is reasonably communicated to a party where the party signs an agreement that explicitly directs the party to the clause." *Midamines SPRL Ltd. v. KBC Bank NV*, 2014 WL 1116875, at *3-4 (S.D.N.Y. Mar. 18, 2014), *aff'd*, 601 F. App'x 43, 45-6 (2d Cir. 2015) (plaintiff bound by forum-selection clause in general terms and conditions by signing application that referenced them); *see also Anwar v. Fairfield Greenwich Ltd.*, 742 F. Supp. 2d 367, 372-73 (S.D.N.Y. 2010) (plaintiffs bound by forum-selection clause in banking agreement because they signed account applications specifically referring to agreement).

Here, that standard is met, and Plaintiffs' Amended Complaint does not allege otherwise. By signing the Consent and Agreement Form, the ATP Player Plaintiffs acknowledged that they had the opportunity to review the ATP Bylaws and ATP Rulebook, and agreed to be bound by them. Ex. B, ATP Rulebook, pp. 349-351; Am. Compl. ¶ 74. The forum selection clause is as prominent as all other sections in the ATP Bylaws, and the heading "Jurisdiction and Venue" is easily found in the Table of Contents. Ex. A, ATP Bylaws, p. 6; *see also Magi XXI, Inc. v. Stato Della Citta Del Vaticano*, 818 F. Supp. 2d 597, 605 (E.D.N.Y. 2011), *aff'd*, 714 F.3d at 722-25

(finding forum selection clauses in agreements reasonably communicated because they were "clearly and unambiguously phrased, and appear[ed] in standard font in the main body of each contact"). The ATP Rulebook separately provides that any player included in the ATP rankings agrees to be bound by the ATP Bylaws. Ex. B, ATP Rulebook, § 1.07. Those manners of notice, coupled with members' express acknowledgements, exceed what the case law requires.

Having filed litigation specifically citing and challenging the ATP Bylaws,[7] the ATP Plaintiffs have no good grounds to claim that the forum selection clause, "contained in the main body of the agreement in standard font and in formatting conventions consistent with the rest of the contract," was not reasonably communicated to them. *See Cuhadar*, 766 F. Supp. 3d at 444 (collecting cases); *Reed Int'l, Inc. v. Afg. Int'l Bank*, 657 F. Supp. 3d 287, 306-07 (S.D.N.Y. 2023) (forum selection clause was reasonably communicated where "pleadings acknowledge an awareness of the operative clauses and [plaintiff] relies on those documents in its complaint").

B. The ATP Forum Selection Clause Is Mandatory Rather Than Permissive

The forum selection clause in the ATP Bylaws states, "the Delaware Courts shall have exclusive jurisdiction over any dispute or controversy between any Claiming Party and the League or any member[.]" Ex. A, ATP Bylaws, § 23.1. It is mandatory, not permissive. *E.g.*, *Perma-liner Indus., LLC v. D'Hulster*, 2021 WL 951185, at *4 (D. Del. Mar. 12, 2021) (forum selection clauses providing for "*exclusive* jurisdiction" are mandatory) (emphasis added).

C. The ATP Forum Selection Clause Encompasses The ATP Plaintiffs' Claims

For this factor, "the Court must analyze 'the breadth and specificity' of the provision's language." *Cuhadar*, 766 F. Supp. 3d at 446. ATP's forum selection clause gives Delaware Courts

---

7 *See, e.g.*, Am. Compl. ¶ 172, n.17 (citing ATP Bylaws § 3.2(e)); *id.* ¶ 306 (citing ATP Bylaws § 5.16).

"exclusive jurisdiction over any dispute or controversy between any Claiming Party and the League or any member[.]" Ex. A, ATP Bylaws, § 23.1. It has no limitations that would exclude the ATP Plaintiffs' claims. *See, e.g.*, *Jones v. Ponant USA LLC*, 2020 WL 2489076, at *1, 6-7 (S.D.N.Y. May 14, 2020) (forum selection clause granting exclusive jurisdiction over "any proceedings initiated against [defendant]" was "not limited to proceedings based on specific types of claims"); *see also Bense v. Interstate Battery Sys. of Am., Inc.*, 683 F.2d 718, 720-22 (2d Cir. 1982) (holding that a forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered federal antitrust claims); *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 380 (S.D.N.Y. 2010), *aff'd in part*, 647 F.3d 472 (2d Cir. 2011) (same); *Magi XXI*, 714 F.3d at 720, 724 (forum selection clauses applying to "any 'disagreements' between [the parties]" encompassed unjust enrichment claims).

The forum selection clause would also apply to the PTPA. To the extent the PTPA purports to bring claims on behalf of ATP's player members, the definition of "Claiming Party" in the ATP Bylaws includes the PTPA. Ex. A, ATP Bylaws, § 23.1(b) (defining "Claiming Party" to include any "current or prior member or Owners or anyone on their behalf[.]"). The Amended Complaint's efforts to manufacture standing for the PTPA to bring claims for supposed harm to the organization are improper and inadequate. *See* Am. Compl. ¶ 433 (alleging difficulty attracting membership); Defendants' Motion to Dismiss the PTPA, ECF No. 119.

To the extent it remains a party, and distinct from any standing analysis, the PTPA's claims against ATP are so closely related to the men's players' claims that it is foreseeable that the PTPA would be bound by the forum-selection clause. In the Second Circuit, "forum selection clauses may bind non-signatories; the argument that 'a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause.'" *RedHawk*

*Holdings Corp. v. Craig Invs., LLC*, 2016 WL 6143355, at *4 (S.D.N.Y. Oct. 19, 2016) (finding non-signatory defendant bound by forum selection clause) (quoting *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009)). "In determining whether a non-signatory is bound, courts look to whether the non-signatory is so closely related to the dispute that it becomes foreseeable that it will be bound." *Id.* (cleaned up). "[A] non-signatory is closely related to a dispute if his interests are completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct." *Id.* (internal quotation marks omitted). Naming the PTPA as a separate plaintiff should not defeat the valid forum selection clause that binds the ATP Player Plaintiffs.

D. The ATP Forum Selection Clause Is Not Unreasonable, Unjust, or Invalid

In this Circuit, courts decline to enforce a forum selection clause only where: "'(1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum' in which suit is brought; 'or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court.'" *Martinez v. Bloomberg LP*, 740 F.3d 211, 227-28 (2d Cir. 2014) (citation omitted). "[T]he Supreme Court has made clear that a plaintiff's burden at this step is a heavy one." *Crede CG III, Ltd. v. 22nd Century Grp., Inc.*, 2017 WL 280818, at *10, 16 (S.D.N.Y. Jan. 20, 2017) (citation omitted) (granting motion to sever and transfer based on forum selection clause). "In all but the most unusual cases … 'the interest of justice' is served by holding parties to their bargain." *Atl. Marine*, 571 U.S. at 66.

First, even after amending their complaint in response to Defendants' motions to dismiss, Plaintiffs still do not allege that the forum selection clause itself was the product of fraud or overreaching. That alone is fatal for this exception. *See Crede*, 2017 WL 280818 at *9, 13 n.12

(where forum selection clause itself was not alleged to be the product of fraud, this prong was not met); *Scherk v. Alberto-Culver Co*., 417 U.S. 506, 519 n.14 (1974) (same).

Further, Plaintiffs continue to rely on the forum selection clause contained in *WTA's* Bylaws as a basis for jurisdiction and venue over both WTA *and ATP*. Am. Compl. ¶ 48. Plaintiffs can hardly claim that a substantially similar clause in ATP's Bylaws requiring disputes to be heard in Delaware Courts is fundamentally unfair.

In any event, the ATP forum selection clause is not fundamentally unfair. "[A] forum selection clause adopted by a board with the authority to adopt bylaws is valid and enforceable under Delaware law to the same extent as other contractual forum selection clauses." *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp*., 73 A.3d 934, 940 (Del. Ch. 2013). ATP and its worldwide constituency of player and tournament members have a valid shared interest in limiting any disputes to a single, convenient forum. *See Person v. Google Inc.*, 456 F. Supp. 2d 488, 496 (S.D.N.Y. 2006) (crediting defendant's interest in forum selection clause "in order to locate the myriad suits inevitably brought against … such a sizeable company in a single, convenient forum"). Indeed, members benefit from the fact that other members cannot force their organization to face litigation in myriad fora.[8]

[8] A foreign tournament class member previously recognized the validity of the ATP forum selection clause when initiating suit against ATP in Delaware. *Deutscher Tennis Bund, et al., v. ATP et al*., No. 07-cv-00178-GMS (D. Del. Mar. 28, 2007), ECF No. 1. ATP respectfully requests that the Court take judicial notice of this complaint. *See Press v. Primavera*, 685 F. Supp. 3d 216, 224 (S.D.N.Y. 2023) (permitting "judicial notice of publicly filed documents, not 'offered for the truth of the matter asserted,' but instead offered for other relevant reasons, such as 'to show … that assertions were made in lawsuits'") (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

As to the second and third factors, there can be no claim that a federal court in Delaware would be fundamentally unfair, or that enforcement of the forum selection clause contravenes any public policy of this Court. Federal law applies in both fora.

Finally, enforcing the forum selection clause through dismissal of ATP will not result in related claims proceeding simultaneously in different fora. The PTPA's claims against ATP should be dismissed for lack of standing, *see* Defendants' Motion to Dismiss the PTPA, ECF No. 119, and even if the PTPA were a proper plaintiff (which it is not), any claims by the PTPA against ATP would be subject to the forum selection clause. *See infra*, Section II.C. WTA has moved to compel the arbitration of all claims against it. *See* WTA's Motion to Compel Arbitration, Motion to Dismiss, and Motion to Stay Proceedings ("WTA's Motion"), ECF No. 116. Any claims by the WTA Player Plaintiffs against ATP are implausible and should be dismissed (*see infra*, Section III). So there should be no remaining claims against ATP here.

To the extent any claims by women's professional tennis players against WTA or ATP somehow remain both viable and in this Court, that is not enough to keep the ATP Plaintiffs' claims here. "These circumstances … do not rise to the level of those contemplated by [the Second Circuit in] *Phillips*—*i.e.* that trial in the selected forum would be 'so difficult and inconvenient' that [plaintiffs] would 'effectively be denied [their] day in court.'" *Allianz Glob. Corp. & Specialty v. Chiswick Bridge*, 2014 WL 6469027, at *3 (S.D.N.Y. Nov. 17, 2014) (rejecting plaintiff's argument that having to litigate "closely intertwined" cases against different defendants in different fora would be "unduly costly and prejudicial"); *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 33-36, 42 (1st Cir. 2022) (forum selection clause required dismissal of claims against one defendant despite claims against others continuing in that court).

In fact, the Supreme Court resolved that "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. at 64.[9] This Court "accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum" and "may consider arguments about public-interest factors only." *Id.* Permissible "public interest factors" include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (citation omitted). None of these factors trump the interest in enforcing a valid forum selection clause here.

First, there is no indication that courts in the District of Delaware are meaningfully more congested than this Court. Second, the current forum does not represent an interest in having localized controversies decided at home—ATP is at home in Delaware. Am. Compl. ¶ 40. The ATP Bylaws and ATP Rulebook have no connection to New York. And finally, any "interest in having the trial of a diversity case in a forum that is at home with the law" leans *against* this Court's retention of the claims against ATP, as the applicable state law under the ATP Bylaws is Delaware law. Ex. A, ATP Bylaws, § 23.2. Any risk of duplicative litigation is thus outweighed by the strong federal policy favoring enforcement of forum selection clauses.

---

9 Even if it were to be considered, any potential hindrance to judicial economy could easily be alleviated through pretrial management and coordination. *See In re Howmedica Osteonics Corp.*, 867 F.3d 390, 409-10 (3d Cir. 2017) ("risk of duplicative litigation" resulting from severance could "be reduced or eliminated with procedural mechanisms") (citation omitted); *see also Crede*, 2017 WL 280818 at *15 (any hindrance to judicial economy "could be lessened by … careful pretrial management" including coordination of discovery and motions practice).

## II. In the Alternative, Claims Against ATP Should Be Severed and Transferred to Delaware

Although ATP "is not required to move, pursuant to 28 U.S.C. § 1404, to have the action transferred to the forum specified in the forum-selection clause, but may instead seek dismissal of the action," *Ortho-Clinical Diagnostics, Inc. v. Mazuma Cap. Corp.*, 2019 WL 1082987, at *4 (W.D.N.Y. Mar. 7, 2019), a valid forum-section clause may also "be enforced by a motion to transfer under § 1404(a)," which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." *Atl. Marine*, 571 U.S. at 59 (quoting 28 U.S.C.A. § 1404(a)). Courts enforcing a forum selection clause pursuant to § 1404(a) conduct the same analysis as under a Rule 12(b)(6) motion. *See, e.g.*, *Crede*, 2017 WL 280818 at *9 (applying four-factor test articulated in *Phillips* to motion to transfer). Thus, for the same reasons that dismissal is appropriate under Rule 12(b)(6), transfer is also appropriate.

If claims against WTA remain in New York, to transfer under § 1404(a), the Court would first need to sever the claims against ATP. "[W]here the administration of justice would be materially advanced by severance and transfer, a district court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against the other defendants[.]" *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968); F.R.C.P. 21 (courts may "sever any claim against a party"). Courts considering the impact of *Atlantic Marine* "in matters where some, but not all, parties have entered into an agreement governed by a forum selection clause[,]" have engaged in slightly differing inquiries. *HC&D, LLC v. Precision NDT & Consulting, LLC*, 698 F. Supp. 3d 180, 200–01 (D. Mass. 2023) (collecting cases). Either approach would favor severance and transfer here.

Across the country, including in the Second Circuit, "[i]n exercising [the discretion to sever a case], courts typically consider the same general factors elucidating the § 1404(a) analysis" and find that so long as transfer is appropriate, "then severance, too, would be proper." *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 431-32 (E.D.N.Y. 2014); *see also Valspar Corp. v. E.I. DuPont de Nemours and Co.*, 15 F. Supp. 3d 928, 931-32 (D. Minn. 2014) (same); *U.S. ex rel. D.D.S. Indus., Inc. v. Nauset Constr. Corp.*, 2018 WL 5303036, at *4 (D. Mass. Oct. 25, 2018) ("where, as here, a motion to transfer under § 1404(a) is warranted, there is no need for a separate severance analysis"). Using this framework, courts regularly sever claims against one of multiple defendants to give effect to a valid and enforceable forum selection clause. *See, e.g.*, *Paduano*, 55 F. Supp. 3d at 435 (severing and transferring claims against one defendant pursuant to the forum selection clause between plaintiff and that defendant); *Valspar*, 15 F. Supp. 3d at 935 (same).

That result is only further supported by consideration of evidence outside the Amended Complaint, as is permitted on a motion to transfer. *See Tianhai Lace USA*, 2017 WL 4712632 at *2. Each of the ATP Named Plaintiffs has agreed, each year they were active, to be bound by the ATP Bylaws, including its forum selection clause. M. Young Decl., ¶¶ 8-9, and Ex. 2. And the PTPA has publicly acknowledged that it is paying for this lawsuit for both itself and the named plaintiffs. *See* Ex. D, p. 27. Having financed this whole case, the PTPA cannot credibly resist transfer of claims against ATP to Delaware by inserting itself as a party.[10]

Some courts, even following *Atlantic Marine*, have required an additional step for severance and transfer. *See, e.g.*, *Crede*, 2017 WL 280818 at *10-11 (analyzing counts of the complaint using the *Phillips* factors and severance factors, which include "[i] whether the claims

[10] Nor should Plaintiffs be able to resist transfer to Delaware based on the errant assertion that ATP is a member of WTA. It is not. M. Young Decl., ¶¶ 10-12.

arise out of the same transaction or occurrence; [ii] whether the claims present some common questions of law or fact; [iii] whether settlement of the claims or judicial economy would be facilitated; [iv] whether prejudice would be avoided if severance were granted; and [v] whether different witnesses and documentary proof are required for the separate claims"). These courts suggest that parties moving for severance and transfer must also "overcome" the "strong policy favoring the litigation of related claims in the same tribunal" by showing "that 'severance is required to avoid prejudice or confusion and to promote the ends of justice.'" *Id.* (citation omitted).[11]

Even with this additional step, courts regularly sever claims against one defendant even where claims against other defendants, or even some claims against the same defendant, would then proceed in multiple fora. *See Howmedica*, 867 F.3d at 411; *In re Rolls Royce Corp.*, 775 F.3d 671, 681-83 (5th Cir. 2014); *JM Smith Corp. v. AstraZeneca Pharms. L.P.*, 2020 WL 4605241, at *8 (S.D.N.Y. Aug. 11, 2020) ("argument is wrong" that "multi-party and/or multi-claim cases present the 'extraordinary circumstances' to set aside a forum selection clause under *Atlantic Marine*"); *Crede*, 2017 WL 280818 at *14-15 (even a "neutral conclusion" under § 1404 balancing "cannot trump … the Supreme Court's mandate that forum selection clauses be enforced in all but the most 'exceptional' circumstances").

The severance factors favor that result here. First, the thrust of the male tennis players' claims against ATP do not arise out of the same transaction or occurrence as the claims against WTA. The Amended Complaint's new allegations of a decades-long conspiracy between ATP and WTA to supposedly divide the markets for men's and women's players (which fail for the

---

[11] These courts do, however, modify the analysis of "private interest factor[s]" where there is a forum selection clause because "private unfairness must be presumed to have been accounted for in the parties' bargain." *Id.* at *15.

reasons stated in Section III, *infra*) do not change that the gravamen of Plaintiffs' complaint against ATP is an alleged monopsony by ATP of the market for men's players' services, and the alleged horizontal conspiracy with its own Tournament Co-Conspirators and the Grand Slams, both allegedly effectuated through ATP's own rules and Bylaws. *See, e.g.*, Am. Compl. ¶ 442. Claims that ATP's rules and Bylaws are anticompetitive do not involve the same transaction or occurrence as the operation of WTA's rules and bylaws, and the tennis players impacted by those rules cannot overlap. There will thus be critical differences in documentary proof and witnesses, and the gravamen of Plaintiffs' claims does not present common questions. The "strong public interest in the enforceability of contracts" therefore trumps the consideration of limited judicial economy considerations. *Crede*, 2017 WL 280818 at *15.[12]

Indeed, to allow consideration of private interests to supersede the players' agreement to a forum selection clause because the Amended Complaint includes conclusory claims of conspiracy with WTA is precisely the type of gamesmanship multiple courts have warned against. Such a "view sacrifices the clarity of *Atlantic Marine* to easy manipulation, because, if it is correct, any clever party to a lawsuit can readily join another party or individual in an attempt to avoid the forum selection clause." *Rolls Royce*, 775 F.3d at 685 (concurring opinion); *id.* at 683 (majority opinion) ("Nor do we suggest that merely joining a party to the suit will defeat a severance motion pursuant to a valid forum contract—certainly not when joined in a transparent effort to defeat the transfer."); *see also Crede*, 2017 WL 280818 at *16 ("the Court is concerned that limiting *Atlantic*

---

[12] The Court's ruling in *FuboTV Inc., et al., v. The Walt Disney Co., et al.*, No. 1:24-cv-01363-MMG (S.D.N.Y. Jan. 14, 2025), ECF No. 381, does not detract from this analysis because (1) the forum selection clause in the ATP Bylaws is far broader than in *FuboTV*, encompassing all claims against ATP, (2) no claims against ATP should persist in this Court, and (3) ATP consistently reserved its right to challenge venue and moved at the first available opportunity. *See* ECF No. 24, p. 1, and Apr. 11, 2025 Rule 23(d) Motion Hearing Tr. 12:21-13:7.

*Marine* to its precise facts, to govern only in two-party cases to which only one forum selection clause applies, would allow 'any clever party to a lawsuit' to plead around a valid forum selection clause") (citation omitted). That is precisely what Plaintiffs would be doing here.

In short, under the severance-and-transfer framework, the potential overlap of a narrow subset of the allegations, and "the efficiency and economy achieved by trying interrelated claims in one forum[,] should not trump the forum-selection clauses agreed to by [the parties]." *Paduano*, 55 F. Supp. 3d at 434-35; *Crede*, 2017 WL 280818 at *15; *see also Valspar*, 15 F. Supp. 3d at 934-35 ("allowing efficiency and economy to rule the day would effectively swallow *Atlantic Marine*'s holding in every case with multiple defendants").

## III. The WTA Player Plaintiffs' Claims Against ATP Should be Dismissed as Legally Insufficient

In an effort to keep some fragment of their lawsuit against ATP in this Court, Plaintiffs added allegations about a conspiracy between men's and women's professional tennis that the PTPA has not raised anywhere else in its worldwide litigation campaign. But women's professional tennis players do not play in ATP events and are not for that reason subject to ATP's rules or bylaws. Plaintiffs seek to circumvent this hurdle by summarily claiming that ATP formed "illegal agreements" with WTA, the Grand Slam Co-Conspirators, and their Tournament Co-Conspirators which "directly harm the market for the services of *female* players in the United States." Am. Compl. ¶ 411 (emphasis added).[13] Lacking actual evidence of any such agreements

[13] Because "only those that are participants in the defendants' market can be said to have suffered antitrust injury[,]" and women's professional tennis players, by definition, are not participants in the market for the services of men's professional tennis players, the only way any claim by women's players could possibly survive is by alleging ATP participated in a conspiracy to harm the women's market. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158-61 (2d Cir. 2016) ("[T]he putative plaintiff must be a participant in the very market that is directly restrained."); *see also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 7 (2d Cir. 2019).

or even allegations about how they were made or would work, Plaintiffs try to make a circumstantial showing based on (1) the errant claim that ATP and WTA are each tournament members of the other tour, and (2) the economically implausible claim that the men's and women's professional tennis tours are distinct only because ATP and WTA made a secret cost-saving agreement to keep them that way. Am. Compl. ¶¶ 323-32. However, Plaintiffs' new allegations still fail to allege a plausible conspiracy between ATP and WTA. And whether or not these newly minted allegations were enough for women's claims to survive this motion,[14] the forum selection clause still requires the men's claims to go to Delaware.

### A. The Amended Complaint Fails to Plausibly Allege Any Unlawful Agreement Between ATP and WTA

"To survive a motion to dismiss under *Twombly*, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement[.]" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Instead, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "[A] bare allegation of parallel conduct is not enough to survive a motion to dismiss. Something more must be alleged." *Mayor and City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).

"Put differently, allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 567). "A corollary of this proposition is that plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one

[14] If the Court dismisses or transfers the ATP Player Plaintiffs' claims but any claims by the PTPA or WTA Player Plaintiffs against ATP remain, ATP intends to file a motion to transfer those claims to the District of Delaware under § 1404(a).

'plus factor,' since plus factors are, by definition, facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Id.* at 323 (cleaned up). "[E]ven if a plaintiff alleges additional facts or circumstances—what we have previously called 'plus factors'—these facts must still lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137.

The Amended Complaint does not meet this heightened burden.

i. *It is Not Plausible that ATP and WTA Agreed to Allocate Markets*

In response to ATP's initial motion, Plaintiffs added a new and nonsensical theory to the Amended Complaint that has never been a part of the PTPA's years of public criticism of ATP, the public relations blitz for this litigation, or any of the PTPA's other worldwide complaints. Plaintiffs speculate that because WTA and ATP are each purportedly "the potential competitor most prepared and best equipped to cross into the other's market," men's and women's professional tennis organizations are separate because ATP and WTA must have agreed "not to compete for the services of the professional tennis players on the other's Tour." Am. Compl. ¶¶ 323-332. These conclusory allegations about this purported decades-long agreement—for which Plaintiffs have not alleged any of the who, when, where, or how—to "stay on their respective turfs" are not legally sufficient.[15]

[15] Were Plaintiffs to allege any foundational facts, any claims arising out of such an agreement would likely be time-barred. From their inceptions in 1987 and 1994, ATP and WTA have openly operated solely with men's and women's players, respectively, without any suggestion prior to the Amended Complaint that doing so was the result of an illegal agreement. Any claim that those decades of rational business practices were actually the result of an anticompetitive agreement would be barred by the statute of limitations for anyone who is not very new to professional tennis. *See* 15 U.S.C. § 15b (four-year statute of limitations for antitrust claims).

There is an "obvious alternative explanation" for the separateness of men's and women's professional tennis requiring dismissal here. *Twombly*, 550 U.S. at 567. Plaintiffs concede that men's and women's professional tennis players are each "a distinct and identifiable group of professional athletes as recognized by both the sports industry and sports fans." Am. Compl. ¶¶ 377-78 (acknowledging the "peculiar characteristics" and "unique skills and training of men's professional tennis players"); *id.* ¶ 386 (conceding the same for women's professional tennis players).

The Amended Complaint still claims that there are two distinct, relevant markets—"the market for the services of *men's* professional tennis players and the market for the services of *women's* professional tennis players." *Id.* ¶ 377 (emphasis added). ATP's not having entered the market for women's professional tennis players was wholly consistent with its own rational economic self-interest, namely for ATP to not make massive expenditures to enter a new and distinct market, and instead continue to focus its efforts on an existing market that includes its player members. Plaintiffs' creative allegations to keep ATP in this Court give no plausible reason to believe otherwise.

A far more sophisticated market allocation claim was rejected on a motion to dismiss in *Twombly*. Those plaintiffs failed to plausibly allege that defendants "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Twombly*, 550 U.S. at 551. Like Plaintiffs here, the plaintiffs in *Twombly* relied on the "common failure meaningfully to pursue attractive business opportunities in contiguous markets where they possessed substantial competitive advantages." *Id.* at 551 (cleaned up). In holding that the complaint failed to establish

that the challenged anticompetitive conduct stemmed "from an agreement, tacit or express" rather than simply from an "independent decision" made by each of the defendants, the Supreme Court reasoned that the allegations, while "consistent with conspiracy, [were] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 553-54. So too here.

Even at the motion to dismiss stage, without compelling direct evidence of an express agreement to not compete, businesses cannot be subject to antitrust liability for not expanding into distinct markets. Otherwise, an antitrust claim against any professional sports league could get past the pleading stage based on the naked observation that because owners or other constituents may own the same type of facilities, other sports leagues are "best equipped to cross into the other's market." Am. Compl. ¶ 323. Potential plaintiffs cannot credibly claim that the structure of professional golf is the result of a secret conspiracy between the PGA and the LPGA, or that the NFL anticompetitively sticks to football because owners have fields that could be suitable for professional lacrosse. As the Supreme Court has noted, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable[.]" *Twombly*, 550 U.S. at 569 (citation omitted). The law does not require that ATP *must* compete with WTA for the services of women's professional tennis players to avoid antitrust liability. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874 (7th Cir. 2015) ("It is one thing to prohibit competitors from agreeing not to compete; it is another to order them to compete.").

This is why courts have consistently dismissed less far-fetched claims, predicated on similarly conclusory allegations that defendants agreed not to enter the other's market. For instance, in *Zinc Antitrust Litigation*, the Southern District of New York rejected a claim that defendants entered into an anticompetitive agreement in which defendants would allocate the zinc

and aluminum markets. 155 F. Supp. 3d 337, 374 (S.D.N.Y. 2016). The court found that the allegations were "equally consistent with the inference—supported by other allegations in the [complaint]—that [defendants'] alleged conduct [was] indicative of no more than a natural and independent desire to avoid a turf war and preserve the profits guaranteed by regional dominance." *Id*. at 375 (internal quotation marks omitted); *see also Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 871 (6th Cir. 2012) (holding that defendants' "fail[ure] to grab allegedly plum business opportunities" and keep to "their own turf" "is no more than an independent, self-interested failure to compete, [and] does not violate Section One").

More than just avoiding a turf war, the investment to create a new men's or women's professional tennis league would be massive. Neither ATP nor WTA violates the antitrust laws by not doing it. *See Cal. Crane Sch., Inc. v. Google LLC*, 722 F. Supp. 3d 1026, 1038-39 (N.D. Cal. 2024) (dismissing claims alleging anticompetitive agreement between Google and Apple to allocate search engine market to Google because "vague and conclusory" allegations that "agreements were formed, confirmed, reconfirmed, and negotiated from time to time in private, secret, and clandestine personal meetings between the Chief Executive Offices and Chairmen" were "plainly insufficient to meet Rule 12(b)(6)'s pleading standards") (internal quotation marks omitted). As in *California Crane,* ATP's decision not to operate a women's tour "could just as easily be attributed to business factors, such as the actual and opportunity costs of" launching a women's tour, or "the difficulty of competing" with WTA. *Cal. Crane*, 722 F. Supp. 3d at 1039.

ii. *The Amended Complaint Fails to Plead Any Agreement between ATP and WTA with the Requisite Specificity*

As to the purported agreement between the remaining two Defendants, the Amended Complaint fails to "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1073, 1081

(E.D. Cal. 2011) (dismissing claim that defendants entered into an illegal agreement to allocate the relevant market to co-conspirator). A list of "general terms without any specification of any particular activities by any particular defendant … is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." *Elevator Antitrust Litig.*, 502 F.3d at 50–51. And yet that is all Plaintiffs have done with regard to a conspiracy between WTA and ATP.

The Amended Complaint does not name a single executive at either WTA or ATP who purportedly entered into the alleged agreement to allocate markets or otherwise reduce compensation for women's professional tennis players, let alone name any of what would need to be dozens of individuals in the last three decades who would have carried out the alleged conspiracy. The Amended Complaint does not describe any specifics relating to when or where the alleged agreement was formed, the specifics of its terms, whether it is one agreement or many, or any other details that are required to survive a motion to dismiss. *See*, *e.g.*, Am. Compl. ¶¶ 181, 196 (alleging only, on information and belief, that WTA and ATP generally "agree *with each other*" not to lift purported restrictions in their respective rules). Allegations that amount to "[a]ll defendants agreed to all agreements, notwithstanding their different corporate roles in and between themselves" are not pled with sufficient specificity and should be dismissed. *Stanislaus Food,* 782 F. Supp. 2d at 1075.[16]

---

[16] Even if the ATP and WTA rulebooks and bylaws contain similar rules regarding NIL and endorsements, that fact does not make this inartfully pled conspiracy plausible. *See Citigroup*, 709 F.3d at 137 ("If [courts] permit antitrust plaintiffs to overcome a motion to dismiss simply by alleging parallel conduct, we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy.") (citations omitted). Nor does any similarity in agreements between each of WTA and ATP and their respective tournament members. *See Elevator Antitrust Litig.*, 502 F.3d at 51 (dismissing § 1 conspiracy claim as "[s]imilar contract terms can reflect similar bargaining power and commercial goals").

As the only piece of purported circumstantial "evidence" for this alleged decades-long conspiracy between ATP and WTA, Plaintiffs allege that through the United Cup—a joint venture to own a unique team event formed in 2022—ATP is a member of WTA, and agreed to its Bylaws. Am. Compl. ¶¶ 326-332. From that premise (that ATP is a WTA Tournament Class Member), Plaintiffs argue that ATP is "party to the WTA's illegal agreement not to compete for female players' NIL rights" and "to restrict female players' endorsement opportunities." Am. Compl. ¶¶ 180, 194. But this predicate assumption is false. Neither ATP nor WTA is a member of the other, through the United Cup or otherwise.

The WTA Rulebook lays out a specific multi-step process for gaining Tournament Class Membership in the WTA. *See* Ex. E, WTA Rulebook, § XII.B.1-7 (including submission of an application and fee, provisional approval by WTA, and payment of membership fee). ATP has never taken any of these steps, and Plaintiffs do not and cannot allege otherwise. Nor is the WTA a member of the ATP. *See* WTA's Motion, ECF No. 116, at 14-15. Because ATP and WTA are not tournament members subject to the other's rulebooks and bylaws, the premise that their membership in the other's Tours is circumstantial evidence of an agreement not to compete with one another is fatally flawed.

Finally, Plaintiffs reach back to an agreement between the ATP and the Grand Slams, made 27 years ago (the "1998 Ranking Points Agreement"). Plaintiffs argue that because the Grand Slams agreed to discontinue the Grand Slam Cup, this 1998 Agreement constitutes an agreement to reduce the number of men's professional tennis tournaments. Am. Compl. ¶¶ 335-45.

Plaintiffs' claim is internally inconsistent. Plaintiffs claim that ATP, the Grand Slams, and WTA agreed to "end operations of the Grand Slam Cup and to merge its operations with the operations of the ATP/WTA Finals to form a new event called the Tennis Masters Cup, which is

now known as the ATP Finals." Am. Compl. ¶ 340. But the ATP Finals is, by definition, an ATP-only event (*i.e.*, a men's-only event). The idea that WTA would be part of an agreement somehow "merging" its WTA Finals event into a men's-only tournament makes no sense. The WTA Finals and ATP Finals are not merged—they are separate events. Pointing vaguely to a 27-year-old agreement that does not even implicate the WTA cannot possibly satisfy *Twombly*'s requirement that Plaintiffs specifically allege the who (*i.e.*, the corporate players), when, where, how, and why of the purported antitrust conspiracy that they claim is ongoing.[17]

## CONCLUSION

The ATP Bylaws' mandatory forum selection clause is clear, was reasonably communicated, encompasses all claims in this action, and is not unreasonable or unfair. There are no "exceptional" circumstances that outweigh the strong federal policy favoring its enforcement. And because any claims brought by women's players against ATP should be dismissed for failing to plead a plausible conspiracy between WTA and ATP, there are no claims against ATP which are properly brought in this forum. This is the wrong venue for Plaintiffs' claims against ATP. Those claims should accordingly be dismissed or, in the alternative, severed and transferred to Delaware.

---

[17] To the extent that Plaintiffs allege that it is this 1998 Agreement that constitutes the purported anticompetitive agreement between Defendants, that claim would be time-barred for all but the newest players—and even then, only if any such player could plausibly allege they were ever harmed at all by a 27-year-old agreement to stop holding a tournament in which only the top 12 men's players in the world (based on their performance in the four Grand Slams) were invited to compete. *See* 15 U.S.C. § 15b (four-year statute of limitations for antitrust claims).

Dated: July 31, 2025

Respectfully submitted,

By: _/s/ Bradley I. Ruskin_

Bradley I. Ruskin
Lee M. Popkin
Jordan B. Leader
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3465
Facsimile: (212) 969-2900
bruskin@proskauer.com
lpopkin@proskauer.com
jleader@proskauer.com

Kyle A. Casazza
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 284-5677
Facsimile: (310) 557-2193
kcasazza@proskauer.com

*Counsel for Defendant ATP Tour, Inc.*

## Certificate of Compliance

I, Bradley I. Ruskin, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c) and Rule (II)(B)(2) of the Honorable Margaret M. Garnett's Individual Rules & Practices. According to the word count of the word processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rules, there are 8,712 words in the document.

Dated: July 31, 2025

Respectfully submitted,

/s/ *Bradley I. Ruskin*