UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VASEK POSPISIL, NICHOLAS KYRGIOS, ANASTASIA RODIONOVA, NICOLE MELICHAR-MARTINEZ, SAISAI ZHENG, SORANA CÎRSTEA, JOHN-PATRICK SMITH, NOAH RUBIN, ALDILA SUTJIADI, VARVARA GRACHEVA, TENNYS SANDGREN, SACHIA VICKERY, NICOLAS ZANELLATO, and REILLY OPELKA, on behalf of themselves and all others similarly situated,<br><br>-and-<br><br>THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION,<br><br>   Plaintiffs,<br><br>  v.<br><br>ATP TOUR, INC. and WTA TOUR, INC.,<br><br>   Defendants. | Case No. 1:25-cv-02207-MMG<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE PROFESSIONAL TENNIS PLAYERS ASSOCIATION**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---:|
| ARGUMENT | | 1 |
| I. | PTPA lacks associational standing. | 1 |
| | A. PTPA fails to adequately allege it has a member who can sue. | 1 |
| | B. PTPA's duplicative claims require substantial individual participation and threaten circumvention of class-action requirements. | 4 |
| II. | PTPA lacks organizational standing. | 7 |
| | A. PTPA lacks constitutional standing. | 7 |
| | B. PTPA lacks antitrust standing. | 9 |
| |     1. PTPA did not suffer antitrust injury. | 9 |
| |     2. PTPA is not an efficient enforcer of antitrust laws. | 10 |
| CONCLUSION | | 11 |

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.,*
 651 F.3d 218 (2d Cir. 2011) ................................................................................... 5

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.,*
 777 F. Supp. 3d 253 (S.D.N.Y. 2025) ..................................................................... 9

*Am. Needle Inc. v. NFL,*
 560 U.S. 183 (2010) ................................................................................................ 6

*Bano v. Union Carbide Corp.,*
 361 F.3d 696 (2d Cir. 2004) ................................................................................... 5

*Bronx Indep. Living Servs. v. Metro. Transp. Auth.,*
 2021 WL 1177740 (S.D.N.Y. Mar. 29, 2021) ........................................................ 4

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,*
 290 F.R.D. 409 (S.D.N.Y. 2012) ............................................................................ 4

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
 429 U.S. 477 (1977) ................................................................................................ 9

*Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.,*
 448 F.3d 138 (2d Cir. 2006) ................................................................................... 6

*Cal. Dental Ass'n v. FTC,*
 526 U.S. 756 (1999) ................................................................................................ 5

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
 868 F.3d 104 (2d Cir. 2017) ................................................................................... 7

*Conn. Parents Union v. Russell-Tucker,*
 8 F.4th 167 (2d Cir. 2021) ................................................................................. 2, 8

*Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.,*
 675 F.3d (2d Cir. 2012) .......................................................................................... 3

*FDA v. All. for Hippocratic Med.,*
 602 U.S. 367 (2024) ............................................................................................ 7, 8

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
 711 F.3d 68 (2d Cir. 2013) ................................................................................... 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977)..................................................................................................2, 4

*In re Aluminum Warehousing Antitrust Litig.*,
 833 F.3d 151 (2d Cir. 2016)............................................................................................10

*In re DDAVP Direct Purchaser Antitrust Litig.*,
 585 F.3d 677 (2d Cir. 2009).......................................................................................10, 11

*In re NFL "Sunday Ticket" Antitrust Litig.*,
 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024).....................................................................5

*Informed Consent Action Network v. Becerra*,
 595 F. Supp. 3d 70 (S.D.N.Y. 2022).................................................................................9

*IP Invs. Grp. LLC v. Sedicii Innovations, Ltd.*,
 2024 WL 729207 (S.D.N.Y. Feb. 22, 2024)......................................................................8

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
 924 F.3d 57 (2d Cir. 2019)...............................................................................................11

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)..........................................................................................................9

*N. Am. Soccer League, LLC v. U. S. Soccer Fed'n, Inc.*,
 883 F.3d 32 (2d Cir. 2018)................................................................................................5

*Olsen v. Stark Homes, Inc.*,
 759 F.3d 140 (2d Cir. 2014).............................................................................................7

*Rent Stabilization Ass'n v. Dinkins*,
 5 F.3d 591 (2d Cir. 1993).................................................................................................5

*Singh v. Am. Racing-Tioga Downs, Inc.*,
 2021 WL 6125432 (N.D.N.Y. Dec. 28, 2021)..................................................................5

*Spinelli v. NFL*,
 96 F. Supp. 3d 81 (S.D.N.Y. 2015) ................................................................................10

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
 600 U.S. 181 (2023)..........................................................................................................3

*Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*,
 331 F.R.D. 279 (S.D.N.Y. 2019) .....................................................................................4

PTPA tries to solve its associational standing issues through carefully crafted declarations that raise more questions than they answer. Even if the Court were to credit the latest declarations, they come up short and provide no answer for the fact that PTPA expressly seeks the same relief as the player plaintiffs, which makes PTPA's claims redundant and nothing more than an effort to circumvent Rule 23. Nor does PTPA have organizational standing. What is clear is that any claims should be brought, if by anyone, by the players themselves, not by an organization choosing to describe itself as their representative.

## ARGUMENT

### I.  PTPA lacks associational standing.

#### A.  PTPA fails to adequately allege it has a member who can sue.

Recognizing that its Amended Complaint—like the initial one—fails to satisfy the legal requirements for PTPA to remain in this case, PTPA supplies a declaration of its Executive Director (Ahmad Nassar) and a single player (Saisai Zheng). But those declarations only underscore that PTPA fails to allege facts sufficient to establish it has members. The declarants admit PTPA has no list of members (ECF No. 126 ("Nassar Decl.") ¶6; ECF No. 127 ("Zheng Decl.") ¶4) and fail to explain how PTPA purports to ascertain who, if anyone, are its members. Defendants observed that PTPA improperly conflated "membership" with the population of top players on whose behalf PTPA purportedly advocates. ECF No. 119 ("MTD") at 7. In response, the new declarations double down on the confusion, variously hinting that PTPA considers any tennis player who has ever used its services to be a member or perhaps that *all* professional tennis players—wittingly or unwittingly—are PTPA members. *See* Nassar Decl. ¶¶14-15; Zheng Decl. ¶6 ("any professional tennis player" is eligible to be on executive committee); ECF No. 109 ("Am. Compl.") ¶113 (executive committee "was to consist of" people who were members of PTPA). In short, PTPA

1

cannot and does not consistently describe any membership, something that should be easy to do if PTPA actually were a membership organization.

Nor do PTPA's bylaws resolve this question. After Defendants pointed out the inadequacy of allegations that PTPA's bylaws create categories of membership and that the executive committee "was to consist of" people who are members of PTPA, the new declarants continue to carefully avoid claiming PTPA actually adheres to these provisions of the bylaws; they do not say, for example, that those on the "executive committee" are in fact members. Am. Compl. ¶¶ 111, 113.

Even Ms. Zheng, the one person who says she is a PTPA member—an allegation conspicuously absent from both the Amended Complaint and Mr. Nassar's declaration (despite common legal representation)—does not claim to be on any PTPA membership roster. Ms. Zheng admits that "PTPA does not maintain a formal membership roster," but instead, "*functions as* a representative membership organization." Zheng Decl. ¶4 (emphasis added). In evaluating standing, the Court "need not credit [the] complaint's conclusory statements without reference to its factual context." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). Here—where the organization has no membership list and does not purport to have criteria to ascertain who its members are—Ms. Zheng's apparent belief of her "membership" cannot reasonably be understood as a claim to being an *actual* member (again, PTPA has none), but, instead, a claim to being a *functional* member of an indicia-of-membership organization under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 344 (1977).[1] PTPA seems

---

[1] Notably, Plaintiffs submitted only one declaration from a player purporting to be a PTPA member. Conspicuously absent is anything in the Complaint or a similar declaration from a male professional tennis player, others on PTPA's executive committee, or the other thirteen male and female Plaintiffs.

2

to know this: If it understood Ms. Zheng to be an "identifiable member[]" within the meaning of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*—or if PTPA had *any* aggrieved, identifiable members—it could have much more easily satisfied the associational standing test. 600 U.S. 181, 201 (2023). But it didn't, and now relies on dubious testimony about how PTPA purportedly *functions* as a membership organization.

The new declarations fall short here, too. There is no serious description of how PTPA's purported constituents—whoever they are supposed to be—direct, control, finance, influence, or otherwise affiliate with the organization. According to Ms. Zheng, when PTPA makes "important decisions," it "seeks input ... from executive committee members as well as from the broader player community." Zheng Decl. ¶6. How this input is sought, and what input is given, the declarants do not say. They do say that PTPA holds an "election" that cannot in any reasonable sense be described as constituent-responsive governance: "PTPA does not conduct a formal on-paper election process for the executive committee. Instead, executive committee members are chosen through a process that involves solicitation of nominations by [Mr. Nassar] and the executive committee from the broader professional player group." Nassar Decl. ¶9. In other words, anyone who wants to be on the executive committee simply asks someone to "nominate" her—and that person is then deemed "elected," maybe subject to further vetting by Mr. Nassar. Such an "election" is inadequate for associational standing. *See Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 158-59 (2d Cir. 2012) (noting "scant evidence" that individuals "whom DAI purports to represent have the power to elect its directors, make budget decisions, or influence DAI's activities or litigation strategies").

With no constituency to whom its executive committee supposedly answers, PTPA relies on disability rights cases, where the organization's board *and its staff* are made up predominantly

of individuals who are disabled. *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416-17 (S.D.N.Y. 2012) (over seventy percent of staff have a disability); *Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 297 (S.D.N.Y. 2019) (sixty-five percent of staff have a disability); *Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, 2021 WL 1177740, at *12 (S.D.N.Y. Mar. 29, 2021) (more than half of leadership and staff have a disability). To stretch those cases to the present context would mean that an executive committee—that is, a standard board of directors (Am. Compl. ¶112) that meets quarterly and discharges standard responsibilities (Nassar Decl. ¶¶11, 17)—can sidestep the *membership* requirement and confer on its organization standing simply by meeting the separate, independent requirement of *protecting an "interest[] ... germane to the organization's purpose"* (allegedly, tennis-player rights). *Hunt*, 432 U.S. at 343 (emphasis added). In the absence of a staff (or anyone else) who comprises its constituency, PTPA fails to allege it has members. *See* Nassar Decl. ¶5.

PTPA attempts to excuse its failure to have members by conclusorily claiming it made "the strategic business decision" not to maintain a membership roster to avoid "retribution" by the Tours. Nassar Decl. ¶¶6, 8. But, even if true, there is no carve-out in the case law for anything like this, and no allegation that anyone associated with PTPA has ever been subject to retribution. No "business decision," however allegedly well-founded, excuses a litigant's failure to be a membership organization—actually or functionally—for associational standing.

     **B.    PTPA's duplicative claims require substantial individual participation and threaten circumvention of class-action requirements.**

In response to the argument that PTPA cannot meet *Hunt's* third prong because its claims cannot be litigated without substantial participation from professional tennis players, PTPA insists that the "legal question" in this case is just whether "Defendants' conduct has violated the Sherman Act." ECF No. 124 ("Opp.") at 16. But whether Defendants' conduct "violated the Sherman Act"

is not a binary "yes" or "no." It depends on individualized antitrust injury questions and a three-step, burden-shifting framework that requires weighing the circumstances of the case and assessing whether the challenged restraints had anti- or pro-competitive effects in the markets for men's and women's tennis players' services—an inquiry far more rigorous and complex than PTPA suggests. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779-81 (1999); *Singh v. Am. Racing-Tioga Downs, Inc.*, 2021 WL 6125432, at *3, *5-8 (N.D.N.Y. Dec. 28, 2021).

The Second Circuit has squarely rejected PTPA's effort to avoid *Hunt's* third prong. "[A]n association [does not] automatically satisf[y] the third prong of the *Hunt* test simply by requesting equitable relief rather than damages." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004). Rather, where "*the fact and extent of the injury*" require individualized proof—or where *the claims asserted* require participation from individual members—an organization lacks standing to seek *injunctive relief*. *Id.* (emphasis added) (citation omitted); *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993). Both are present here—a challenge to an "expansive scheme" whose anticompetitive effects on players cannot be presumed and must be tested through a full rule of reason antitrust analysis. *N. Am. Soccer League, LLC v. U. S. Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018) ("Regulation of league sports is a textbook example of when the rule of reason applies."). Thus, whether "Defendants' conduct has violated the Sherman Act"—and whether Plaintiffs have been *injured at all*—depends, at its core, on whether the challenged, antitrust-law-violative conduct renders individual players worse off. *Singh*, 2021 WL 6125432, at *7; *In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *8 (C.D. Cal. Aug. 1, 2024).[2]

---

[2] Plaintiffs' cases (Opp. at 15) confirm this. *Alliance for Open Society International, Inc.* involved a challenge to the government's compelled-speech policy—a question that could be resolved primarily by looking at the policy, with limited individualized evidence. 651 F.3d 218, 229 (2d Cir. 2011). *Building & Construction Trades Council of Buffalo v. Downtown Development., Inc.* involved a challenge to two federal statutes—an inquiry that focused on various activities "*the*

5

PTPA's attempt to reframe this case as turning on "the existence and extent of an antitrust conspiracy" (Opp. at 15) mischaracterizes its own claims. To be sure, in many antitrust cases (*e.g.*, price-fixing cases) whether there was "concerted action" is a threshold, dispositive question because any Section 1 claim fails without it. *Am. Needle Inc. v. NFL*, 560 U.S. 183, 190-91 (2010). But here, Plaintiffs hardly allege a series of secret agreements. Rather, they attack written rules contained primarily within the Tours' rulebooks and claim that *those rules* constitute concerted action. *See, e.g.*, Opp. at 6 (describing alleged anticompetitive restraints). It is thus incorrect for PTPA to say that the "existence and extent" of an "antitrust conspiracy" is the "predominant" issue, when that is plainly not the case PTPA brought.[3] Opp. at 14-15. Because PTPA cannot prosecute this case without *many* tennis players, it cannot satisfy *Hunt's* third prong.

And there is an additional prudential reason that PTPA fails the third prong: PTPA admits it "seeks the same injunctive relief the Player Plaintiffs seek," making its presence redundant and evasive of the safeguards of Rule 23. Opp. at 26. The constitutional leeway that PTPA is seeking here—associational standing, for an organization with no members—should not be extended where its presence accomplishes nothing (and later on, would raise conflicts questions for class counsel). That an association can, in some circumstances, proceed alongside a class does not mean that here PTPA *should*, where it is seeking a court's imprimatur to portray itself as representing tennis players that outside of the courtroom it does not actually represent.

---

*defendants* allegedly undertook in connection with the redevelopment of a 113-acre parcel of land." 448 F.3d 138, 142 (2d Cir. 2006) (emphasis added).

[3] PTPA's citation to three class certification cases (Opp. at 16 & n.9) are inapposite because the issue here is not whether a putative class of tennis players can satisfy Rule 23, but whether an advocacy group can challenge whether core sporting rules caused *injury* to tennis players or harmed the markets for professional tennis players' services.

**II.     PTPA lacks organizational standing.**

    **A.     PTPA lacks constitutional standing.**

Nothing in PTPA's opposition cures its failure to identify a cognizable injury in fact. Last year, the Supreme Court clarified its decision in *Havens Realty*, declined to extend that "unique" case beyond its facts, and expressly rejected the theory that "standing exists when an organization diverts its resources in response to a defendant's actions." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 370 (2024). Yet PTPA presses ahead, citing Second Circuit decisions that pre-date *FDA* and themselves rest on *Havens Realty*, while avoiding citing *Havens Realty* directly. Opp. at 17-18 (citing *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017); *Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014)). But *FDA* was clear: "*Havens* was an unusual case" that the "Court has been careful not to extend" beyond its context. 602 U.S. at 370.

PTPA nevertheless insists that its "diversion of resources" theory survives *FDA*, seizing on a line in which the Court explained that *Havens Realty* involved conduct that "directly affected and interfered with [the organization's] core business activities." Opp. at 18. But even if *Havens Realty* were not limited to its facts, PTPA misstates the import of that sentence. The Court was clarifying that *Havens Realty* was an "unusual" case because the plaintiff was *not only* an advocacy group but also provided housing counseling services. *FDA*, 602 U.S. at 395-96. Thus, when Havens Realty supplied false information to *the organization's employees*, the organization had standing because that deception "perceptibly impaired [its] ability" to provide counseling services—*i.e.*, its "core business activities." *Id.* at 395 (analogizing to a retailer who sues a manufacturer for selling defective goods *to the retailer*).

PTPA's "diversion of resources" theory does not allege that Defendants interacted with PTPA at all. Instead, PTPA alleges that Defendants engaged in various forms of anticompetitive

7

conduct towards professional tennis players, which, in turn, caused PTPA—an advocacy organization—to devote "time, money, and other resources" to opposing that conduct. Opp. at 18-19. That is a far cry from *Havens Realty*, and the kind of attenuated injury theory the Supreme Court rejected because it would give "all the organizations in America" "standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *FDA*, 602 U.S. at 396.[4,5]

Recognizing those insurmountable hurdles, PTPA pivots to a new theory of injury—one missing from the Amended Complaint. PTPA claims Defendants' alleged agreements restricting players' commercial opportunities have artificially depressed the value that *players* can extract from those opportunities. Opp. 19-20. Under the new theory, because PTPA "develop[s] a robust group licensing and sponsorship market in which *players* can capitalize on their NIL rights," PTPA argues it has been "directly injured" because the "value of commercial opportunities PTPA can secure on behalf of *players* is artificially suppressed." *Id.* (emphasis added). This theory also fails. For one thing, the alleged NIL restrictions are not new. PTPA was formed with full knowledge of them and for, it says, the purpose of challenging them (Am. Compl. ¶108), making these injuries self-inflicted, manufactured, and non-justiciable. *See* MTD at 14-15 (citing cases).

Moreover, this newly-asserted theory fails to adequately allege causation and redressability. Article III requires an injury "fairly traceable to the challenged action of the

---

[4] Even if PTPA's alleged "diversion of resources" theory survives *FDA*, PTPA still cannot demonstrate an Article III injury in fact because PTPA cannot allege "*involuntary* and *material* impacts on core activities by which the organizational mission *has historically been carried out*." MTD at 14-15 (citing *Conn. Parents Union v. Russell Tucker*, 8 F.4th at 174-75; *IP Invs. Grp. LLC v. Sedicii Innovations, Ltd.*, 2024 WL 729207, at *2 (S.D.N.Y. Feb. 22, 2024)).

[5] Likewise, PTPA's alleged "[in]ability to attract members" is not a well-pleaded injury because PTPA has no membership. Opp. at 19. Moreover, PTPA alleges no non-conclusory facts showing its lack of "members" is caused by Defendants' conduct, rather than independent choices of players.

defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Where, as here, a plaintiff's asserted injury arises from the "regulation (or lack of regulation) of *someone else*," causation and redressability are "substantially more difficult to establish." *Id.* at 562 (cleaned up). PTPA's theory is that "Defendants have entered into agreements to restrict players' commercial opportunities ...." Opp. at 19. And because "PTPA has sought to help professional tennis *players* by engaging *third parties* to help professional tennis *players* maximize their commercial value" (Nassar Decl. ¶18 (emphasis added)), PTPA contends that it has suffered a "direct injury." Opp. at 19-20. But that theory depends entirely on harm to "someone else," and a speculative chain of causation involving market responses by players, sponsors, partners, and other third parties. *Lujan*, 504 U.S. at 560. Article III does not permit standing to hinge on how third parties might behave in a hypothetical marketplace. *Id.* at 560, 568-71; *Informed Consent Action Network v. Becerra*, 595 F. Supp. 3d 70, 81-82 (S.D.N.Y. 2022).[6]

**B.    PTPA lacks antitrust standing.**

**1.    PTPA did not suffer antitrust injury.**

None of the injuries now alleged by PTPA are the type of injuries the Sherman Act was designed to protect. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Injuries such as resource diversion, difficulty attracting members, and decreased group licensing

---

[6] Nor do the eight conclusory sentences PTPA devotes to causation or redressability change the conclusion on PTPA's "diversion of resources" theory. Opp. at 20-21. PTPA's sole authority, *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 777 F. Supp. 3d 253 (S.D.N.Y. 2025), is inapposite. That case involved unauthorized disclosure of personal data, where the disclosure *itself* was the injury and an injunction halting it (and ordering destruction of the data) would have addressed that injury—unlike here, where "the requested injunction" would not redress PTPA's purported injuries but would instead allegedly yield "prize money pools and earning capabilities that are more competitive [*etc.*]." Am. Compl. ¶428.

revenues are not competitive harms in Plaintiffs' relevant markets. PTPA does not even compete in the markets allegedly restrained by ATP or WTA, so its asserted harms cannot be attributable to any anticompetitive effect on those markets. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161-63 (2d Cir. 2016) (no antitrust injury where plaintiff was not a participant in the restrained market); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76-77 (2d Cir. 2013) (same).

### 2. PTPA is not an efficient enforcer of antitrust laws.

PTPA effectively concedes that its alleged non-economic, institutional harms are neither direct nor market-based, acknowledging that "the players themselves" suffered direct harm. Opp. at 23. Nevertheless, PTPA tries to salvage its theory of antitrust standing by rebranding its derivative injuries as "*sufficiently* direct" and insisting that the players' "*more* direct" injuries do not "detract" from PTPA's alleged "natural[] motivate[ions] to enforce the antitrust laws." *Id.* at 23-24 (emphasis added). PTPA is wrong.

Courts in this district are clear: "in order to limit the class of plaintiffs with antitrust standing to the *most* efficient enforcers of the antitrust laws," antitrust plaintiffs are generally limited to "direct competitors or consumers." *Spinelli v. NFL*, 96 F. Supp. 3d 81, 107-08 (S.D.N.Y. 2015) (emphasis added) ("[A] plaintiff that is neither a consumer nor a competitor in the market in which trade was restrained does not have standing to allege an antitrust injury to that market.") (citations omitted). But here, PTPA is neither. Rather, it is a self-proclaimed advocacy group advancing institutional grievances—not harm to competition or in the alleged relevant markets.

Far from supporting its theory, PTPA's sole authority undermines it. There, plaintiffs *were consumers in the alleged relevant market and forced to pay supra-competitive prices*. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("[P]laintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive

10

prices."). Thus, although their injuries were "derivative" of harm suffered by defendants' competitors—who suffered their own standalone antitrust injuries—plaintiffs were "efficient enforcers" because "harming competitors was simply a means for the defendants to charge *the plaintiffs* higher prices." *Id.* (emphasis added). Here, by contrast, PTPA does not (and cannot) allege that it suffered any standalone antitrust injury, or that it was the intended target of any alleged anticompetitive restraints. Rather, it sues based on injuries *to tennis players*—parties who have already "alleged these same antitrust violations" and are thus capable of enforcing the antitrust laws. *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66 (2d Cir. 2019) ("Given that IQ is further removed from the harm caused by the Defendants than the parties directly affected by the boycott *that have already sued the Defendants*, [this] factor weighs against IQ's antitrust standing") (emphasis added).

## CONCLUSION

PTPA should be dismissed as a plaintiff.

Dated: September 18, 2025

Respectfully Submitted,

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
lawrence.buterman@lw.com

Amanda P. Reeves (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com

Christopher S. Yates (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8157
chris.yates@lw.com

*Counsel for Defendant WTA Tour, Inc.*


\* /s/ signature used with consent in
accordance with ECF Rule 8.5(b)

*/s/ Bradley I. Ruskin\**
Bradley I. Ruskin
Lee M. Popkin
Jordan B. Leader
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3465
Facsimile: (212) 969-2900
bruskin@proskauer.com
lpopkin@proskauer.com
jleader@proskauer.com

Kyle A. Casazza
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 284-5677
Facsimile: (310) 557-2193
kcasazza@proskauer.com

*Counsel for Defendant ATP Tour, Inc.*

# CERTIFICATE OF COMPLIANCE

I, Lawrence E. Buterman, certify that the foregoing Reply Memorandum in Further Support of Defendants' Motion to Dismiss The Professional Tennis Players Association complies with the word-count limitation in Section II.B.2 of Judge Garnett's Individual Rules and Practices. According to the word processing software used to prepare this document, the memorandum contains 3,494 words, excluding the parts of the document exempted in Section II.B.2.

Dated: September 18, 2025

*/s/ Lawrence E. Buterman*
Lawrence E. Buterman