UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cîrstea, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, Sachia Vickery, Nicolas Zanellato, and Reilly Opelka, on behalf of themselves and all others similarly situated,<br><br>-and-<br><br>The Professional Tennis Players Association,<br><br>          Plaintiffs,<br><br>    vs.<br><br>ATP Tour, Inc., WTA Tour, Inc., Tennis Australia Limited, Fédération Française de Tennis, All England Lawn Tennis Club (Championships) Limited, and United States Tennis Association Incorporated,<br><br>          Defendants. | Case No. 25-cv-2207 (MMG)<br><br>**ORAL ARGUMENT REQUESTED** |

**GRAND SLAM DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................ 4

    A.    The Grand Slam Defendants ................................................................... 4

    B.    The Alleged Conspiracy ......................................................................... 6

    C.    The Claims ............................................................................................. 8

ARGUMENT .................................................................................................................... 8

I.    Plaintiffs Fail to Allege that the Grand Slam Defendants Conspired with the Tours. ....................................................................................................... 9

    A.    Plaintiffs do not plausibly allege that the Grand Slam Defendants joined an overarching conspiracy. ..................................................................... 9

        1.    Plaintiffs fail to allege direct evidence of an overarching conspiracy. ................................................................................ 9

        2.    Plaintiffs fail to allege indirect evidence of an overarching conspiracy. ................................................................................ 11

    B.    Plaintiffs do not allege viable antitrust claims against the Grand Slam Defendants based on any specific agreement. ...................................... 15

        1.    Plaintiffs fail to allege that the Grand Slam Defendants agreed with the Tours to fix prices. ............................................................ 16

        2.    Plaintiffs fail to allege that the Grand Slam Defendants entered into a "Ranking Points Agreement" with the Tours. ....................... 19

        3.    Plaintiffs fail to allege that the Grand Slam Defendants conspired with the Tours to exclude competitors. ....................................... 22

    C.    Plaintiffs' group pleading fails to connect the individual Grand Slam Defendants to any alleged conspiracy. ............................................... 23

II.    Plaintiffs Fail to Allege that the Grand Slam Rulebook Restrains Trade. ....................... 26

    A.    Any challenge to the Grand Slam Rulebook would be subject to the rule of reason. ................................................................................................. 26

    B.    Plaintiffs do not plausibly allege that the Grand Slam Defendants have the market power that would be necessary to cause anticompetitive effects .............. 28

C.    Plaintiffs' claims also fail because the Grand Slam Defendants are not competitors and the Grand Slam Rulebook does not restrain trade....................... 29

D.    Plaintiffs do not plausibly allege antitrust injury or standing relating to the Grand Slam Rulebook or that the PTPA has Article III standing......................... 32

III.    Plaintiffs Fail to Allege that the Grand Slam Defendants Restrained Trade by Operating Non-Grand Slam Tournaments. ....................................................................... 34

CONCLUSION................................................................................................................................. 35

# TABLE OF AUTHORITIES

**CASES**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
683 F.3d 328 (7th Cir. 2012) ................................................................................28

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
19 F.4th 127 (2d Cir. 2021) ............................................................................32, 33

*Anderson News, L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)..................................................................................8

*Anderson News, L.L.C. v. Am. Media, Inc.,*
899 F.3d 87 (2d Cir. 2018)...........................................................................11, 19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..........................................................................4, 8, 23, 34

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,*
459 U.S. 519 (1983)...........................................................................................32

*Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.,*
667 F. Supp. 3d 83 (S.D.N.Y. 2023)....................................................................3

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).................................................................................. *passim*

*Bilinski v. Keith Haring Found., Inc.,*
96 F. Supp. 3d 35 (S.D.N.Y. 2015) .....................................................................13

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
485 U.S. 717 (1988)............................................................................................27

*Cancall PCS v. Omnipoint Corp.,*
2000 WL 272309 (S.D.N.Y. 2000)......................................................................14

*Cenedella v. Metro. Museum of Art,*
348 F. Supp. 3d 346 (S.D.N.Y. 2018)............................................................10, 19

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
996 F.2d 537 (2d Cir. 1993)...............................................................................15

*Cha-Char, Inc. v. Calder Race Course, Inc.,*
752 F.2d 609 (11th Cir. 1985) ............................................................................14

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.,*
92 F.4th 381 (2d Cir. 2024) ...................................................................... *passim*

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
328 F. Supp. 3d 217 (S.D.N.Y. 2018)......................................................................12

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
2014 WL 1396524 (S.D.N.Y. 2014),
*aff'd* 817 F.3d 46 (2d Cir. 2016)...........................................................................24

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
610 F.3d 820 (3d Cir. 2010).............................................................................2, 27

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010)..................................................................................6

*Doyle v. UBS Fin. Servs., Inc.*,
144 F.4th 122 (2d Cir. 2025) .................................................................................3

*Electronics Comms. Corp. v. Toshiba America Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1997)................................................................................32

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)..................................................................................11

*Evergreen E. Coop. v. Whole Foods Mkt., Inc.*,
2023 WL 545075 (2d Cir. 2023)..........................................................................15

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986)............................................................................................26

*In re Interest Rate Swaps Antitrust Litig.*,
2018 WL 2332069 (S.D.N.Y. 2018)................................................................24, 26

*Iowa Public Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018)...................................................................24

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .............................................................................11

*LaFlamme v. Societe Air France*,
702 F. Supp. 2d 136 (E.D.N.Y. 2010) ..................................................................15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)............................................................................................27

*Litovich v. Bank of Am. Corp.*,
2025 WL 2521039 (S.D.N.Y. 2025)............................................................23, 24, 25

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013).......................................................................... *passim*

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ............................................................................................. *passim*

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021) ............................................................................................................28

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
468 U.S. 85 (1984) ............................................................................................................27

*Nat'l Soc. of Pro. Eng'rs v. U.S.*,
435 U.S. 679 (1978) ..........................................................................................................27

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .....................................................................................................27, 28

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
776 F.2d 185 (7th Cir. 1985) ...........................................................................................28

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
917 F.3d 1249 (11th Cir. 2019) .......................................................................................12

*Revitalizing Auto Cmtys Env't Response Tr. v. Nat'l Grid USA*,
92 F.4th 415 (2d Cir. 2024) .............................................................................................18

*Ross v. Am. Express Co.*,
35 F. Supp. 3d 407 (S.D.N.Y. 2014),
*aff'd* 630 F. App'x 79 (2d Cir. 2015) ..........................................................................11, 13

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021) ..........................................................................................32, 33

*Tera Grp., Inc. v. Citigroup, Inc.*,
2024 WL 4501967 (2d Cir. 2024) ....................................................................................15

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...........................................................................................16

*In re Treasury Sec. Auction Antitrust Litig.*,
595 F. Supp. 3d 22 (S.D.N.Y. 2022),
*aff'd sub nom Treasuries*, 92 F.4th 381 (2d Cir. 2024) ...............................................26, 35

*U.S. Horticultural Supply v. Scotts Co.*,
367 F. App'x 305 (3d Cir. 2010) ......................................................................................13

*U.S. v. Bestfoods*,
524 U.S. 51 (1998) ............................................................................................................35

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016)......................................................................................11, 12

**STATUTES**

9 U.S.C. § 16(a) ..............................................................................................................................3

**OTHER AUTHORITIES**

ROLEX PARIS MASTERS: NEWS (Oct. 14, 2025),
https://news.rolexparismasters.com/en/news/article/2025-edition-entertainment-paris-la-
defense-arena-urban-tennis-photo-shoots-music-basket..................................................................5

Defendants Fédération Française de Tennis ("FFT"), The All England Lawn Tennis Club (Championships) Limited ("AELTC"), and United States Tennis Association Incorporated ("USTA") (collectively, the "Grand Slam Defendants") respectfully submit this memorandum in support of their joint motion to dismiss the Second Amended Complaint ("SAC") for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

The central assertion of Plaintiffs' case is that the rules imposed by the ATP and the WTA (the "Tours") create a "cartel" that imposes anticompetitive restraints on tennis players. In their Second Amended Complaint, Plaintiffs attempt to expand their claims to encompass the Grand Slam Defendants, which operate three of the four "Grand Slam" tennis tournaments that are not part of either the ATP or WTA tours. This attempt runs headlong into two fundamental obstacles.

First, Plaintiffs cannot overcome the basic fact that the Grand Slam tournaments are not governed by the ATP and WTA rulebooks at the heart of the SAC. Second, Plaintiffs' theory defies common sense because it presupposes a conspiracy among entities that are not competitors. The Grand Slam Defendants are not alleged to compete with each other. Nor could they be, as the SAC acknowledges that the Grand Slam tournaments take place in four different countries, at different times of the year, and on three different surfaces. ECF No. 139 ("SAC") ¶¶ 42–48. Similarly, the Grand Slam Defendants are not alleged to compete with the Tours, which schedule non-Grand Slam tournaments in which professional players compete, in part, as a way *to qualify* for the Grand Slam tournaments. *See id.* ¶¶ 80, 92. The lack of competition among the Grand Slam Defendants, or between them and the Tours, is fatal to the plausibility of any alleged "cartel."

In an attempt to overcome these obstacles, Plaintiffs appear to advance three primary theories of liability, none of which plausibly connects the Grand Slam Defendants to a viable antitrust claim.

*First*, Plaintiffs assert in group-pleaded and conclusory terms that the Grand Slam Defendants entered into an overarching conspiracy with the ATP and WTA to govern the hiring of the services of professional tennis players. SAC ¶ 3. But the SAC fails to allege either direct or circumstantial evidence to support the existence of any anticompetitive agreement. Plaintiffs instead rely almost entirely on conclusory assertions that an agreement exists, and a mere assertion of an agreement "is a legal conclusion, not a factual allegation" entitled to the presumption of truth at the Rule 12 stage. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). To the extent the Plaintiffs seek to advance claims based on more specific, secret anticompetitive agreements, their allegations identify only conduct that is consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market" and thus insufficient to give rise to any inference of conspiracy. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024) ("*Treasuries*").

*Second*, as an alternative basis to allege an agreement in restraint of trade, Plaintiffs invoke the Grand Slam Rulebook, which is a common set of rules applicable to the Grand Slam tournaments (but not to ATP or WTA tournaments). Any claims arising from the Grand Slam Rulebook, however, are subject to the rule of reason because they relate to the governance of sports competitions, and "the *per se* rule does not apply" to the rules of a sports governance body, including a "tennis tour." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 831 (3d Cir. 2010). Plaintiffs fail to plead a viable rule of reason claim concerning the Grand Slam Rulebook for multiple reasons, including that (i) the Grand Slam Defendants lack market power even under Plaintiffs' own alleged market definitions, (ii) Plaintiffs fail to allege plausibly that any provision of the Grand Slam Rulebook has anticompetitive effects, and (iii) Plaintiffs fail to allege any non-speculative injury arising from the Grand Slam Rulebook.

**Finally**, Plaintiffs appear to seek to connect two of the Grand Slam Defendants to the challenged ATP or WTA rules not through the Grand Slam tournaments at all, but rather in their capacities as purported "operators" of tournaments on the ATP or WTA tours. This allegation is not made against AELTC. Any challenge as to the WTA rules also does not apply to FFT, which is alleged to operate a tournament only on the ATP Tour. Nor is it plausibly alleged to apply to USTA—which at one time owned a majority share in a separate entity that operated an ATP/WTA event—because Plaintiffs do not allege any basis on which to pierce the corporate veil between USTA and its former, partially-owned subsidiary. And in all events, any allegation of a conspiracy based upon the hosting of non-Grand Slam tournaments is implausible given the lack of competition between the Grand Slam tournaments, the Tours, and non-Grand Slam tournaments.

For all these reasons, as more fully set forth below, the claims in the SAC against the Grand Slam Defendants should be dismissed with prejudice.[1]

---

[1]    AELTC and FFT have concurrently filed a joint motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Accordingly, this motion to dismiss applies only as to the claims asserted against AELTC and FFT if the Court denies that Rule 12(b)(2) motion. *See Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667 F. Supp. 3d 83, 117 (S.D.N.Y. 2023) (when defendants move to dismiss under Rule 12(b)(2), "the Court must first address the preliminary question of personal jurisdiction before considering the legal sufficiency of the allegations in the amended complaint" (citation modified)). By joining this motion to dismiss, AELTC and FFT are not waiving their personal jurisdiction defense.

The USTA has concurrently moved to compel arbitration of the claims of seven of the Plaintiffs against it. As to the USTA, this motion to dismiss therefore applies only conditionally to the claims of those Plaintiffs—John-Patrick Smith, Reilly Opelka, Aldila Sutjiadi, Nicole Melichar-Martinez, Saisai Zheng, Sorana Cirstea, and Varvara Gracheva. Specifically, the USTA moves to dismiss those Plaintiffs' claims against it only as to any portion of those claims that are determined to be non-arbitrable following the exhaustion of the USTA's right to appeal any decision by this Court that denies, in whole or in part, USTA's motion to compel arbitration. *See* 9 U.S.C. § 16(a). Accordingly, by joining this motion to dismiss, the USTA is not acting "inconsistent[ly] with the right to arbitrate" under the US Open Agreements. *Doyle v. UBS Fin. Servs., Inc.*, 144 F.4th 122, 131 (2d Cir. 2025).

## BACKGROUND

The Grand Slam Defendants, along with Tennis Australia, own and operate the four prestigious tennis tournaments known as the "Grand Slams": the Australian Open, the French Open (officially known as Roland-Garros), Wimbledon, and the US Open Tennis Championships ("US Open"). SAC ¶¶ 3, 42–47. On the eve of the Tour Defendants' filing of their reply briefs in support of their motions to dismiss the First Amended Complaint, Plaintiffs sought leave to amend once again to name the Grand Slam owners as defendants. ECF No. 135. The Court granted Plaintiffs' motion, ECF No. 138, and Plaintiffs filed the SAC, which predominantly revised the complaint only to (i) collectively sweep the Grand Slam Defendants within Plaintiffs' broadly pleaded allegations of what "Defendants" purportedly did and (ii) revise the complaint to label the Grand Slams Defendants as "Defendants" rather than "co-conspirators." *See* ECF No. 137-2.

### A.    The Grand Slam Defendants

The SAC alleges that professional tennis has developed on two separate tracks since the sport "accept[ed] that attracting the sport's top talent to the most prestigious tournaments required permitting professionals to compete for prize money" beginning in the late 1960s. SAC ¶ 66.[2]

On the one hand, the SAC alleges that the ATP and later the WTA have developed annual "slate[s]" of tournaments. SAC ¶¶ 80, 88. Each ATP and WTA tournament is "authorized" by the respective Tour, and each allegedly is governed by common ATP or WTA rulebooks. *Id.* The Grand Slam tournaments, by contrast, are not part of those annual tournament "slates," and they are not governed by the ATP or WTA or their rulebooks or bylaws. *See id.* ¶¶ 80, 83, 93, 96, 105, 106. Rather, each of the Grand Slam tournaments is independently owned and operated. To ensure

---

[2]    The Grand Slam Defendants assume, without conceding, that the facts alleged in the SAC are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Unless otherwise stated, all emphasis is added, and internal citations and quotes are omitted.

the efficient and consistent functioning of Grand Slam tennis, the Grand Slam tournaments are coordinated through a separate governance structure, known as Grand Slam Tennis ("GST"). *See id.* ¶¶ 105–108. The Grand Slam Defendants and Tennis Australia are voting participants in GST, *id.* ¶ 106—neither the ATP nor the WTA has any role. The three Grand Slam Defendants operate three of the Grand Slam tournaments.

AELTC owns, operates, and organizes Wimbledon. SAC ¶ 46. Wimbledon is a grass court tennis tournament hosted annually in London, England, typically around July. *Id.*

FFT owns, operates, and organizes the French Open. SAC ¶ 44. The French Open is a clay court tennis tournament hosted annually in Paris, France, typically in May. *Id.* ¶ 44. FFT also owns, operates, and organizes the Paris Masters, which is a 1000-level tournament on the ATP Tour hosted annually in Paris, France, typically in late October or early November.[3]

USTA owns, operates, and organizes the US Open. SAC ¶ 47. The US Open is a hardcourt tennis tournament hosted annually in New York, U.S., typically in late August and early September. *Id.* The SAC also alleges that, until 2022, USTA "owned" the "Cincinnati Open," *id.* ¶¶ 48, 104, but what that vague assertion means is that USTA maintained a controlling interest in a separate corporate entity, Cincinnati Tennis, LLC, which in turn operated what was at the time known as the Western & Southern Open, a combined tournament on the ATP and WTA Tours. Cincinnati Tennis, LLC acquired the ATP Tournament Sanction from its prior owner in March

---

[3]     *Id.* ¶ 45; *see also, e.g.*, Romain Vinot, *2025 Edition: Tennis Plus A Whole Host of Entertainment!*, ROLEX PARIS MASTERS: NEWS (Oct. 14, 2025), https://news.rolexparismasters.com/en/news/article/2025-edition-entertainment-paris-la-defense-arena-urban-tennis-photo-shoots-music-basket.

2009. Ex. 1.[4] Under the terms of the acquisition, *Cincinnati Tennis, LLC* committed to comply with the ATP By-Laws and the ATP Rulebook. *Id.* § 1. Cincinnati Tennis, LLC separately leased the rights to the WTA Tournament Sanction to operate the WTA tournament. *See* Ex. 2. Pursuant to the lease, *Cincinnati Tennis, LLC* agreed to be bound by the WTA By-Laws and the WTA Rulebook. *Id.* § 2. USTA sold its interest in Cincinnati Tennis, LLC in 2022, and the tournament has since been renamed the "Cincinnati Open." *See* SAC ¶¶ 48, 104.

### B.   The Alleged Conspiracy

The SAC's wide-ranging allegations broadly seek to connect the three Grand Slam Defendants to Plaintiffs' existing challenge to certain rules of the ATP and WTA. Specifically, Plaintiffs allege that the Grand Slam Defendants engaged in a conspiracy across various professional tennis tours and tournaments that stifled competition in markets for the services of men's and women's professional tennis players by preventing the entry of new tournaments, locking in players to certain ATP and WTA events, and suppressing compensation for professional tennis players. *See, e.g.*, SAC ¶¶ 3–4, 22, 391, 399. Because Plaintiffs cannot allege that the Grand Slam tournaments are governed by the ATP or WTA rulebooks or bylaws, they appear generally to rely on three theories to try to connect the Grand Slam Defendants to this purported scheme.

*First*, Plaintiffs' primary contention appears to be that there is a single, "concerted and interlocking scheme to dominate the market for the services of professional tennis players." SAC

---

[4]   All citations to "Ex." are to the exhibits to the declaration of Stacey Allaster, filed concurrently with this motion. Plaintiffs do not allege that the USTA in fact entered into any agreements with the ATP or WTA in connection with its ownership of Cincinnati Tennis, LLC, instead asserting only the legal conclusion that the USTA "was subject to" the ATP and WTA bylaws and rules. SAC ¶ 48; *see also id.* ¶ 104. But to the extent Plaintiffs seek to rely on the contractual relationships among the USTA, Cincinnati Tennis, LLC, the ATP, and the WTA, the Court may consider the governing agreements as both "incorporated by reference in the complaint" and "integral" to any such reliance. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

¶ 145. The terms of this purported overarching conspiracy are not well defined, and the SAC does not detail which facts it believes support the formation or existence of any such broad conspiracy.

Plaintiffs appear alternatively to suggest that the Grand Slam Defendants entered into certain more specific agreements with the Tours: (i) a purported agreement to "fix the compensation that professional tennis players may earn in prize money and in endorsement deals," SAC ¶ 147; (ii) a purported "Ranking Points Agreement" that is alleged to include a variety of terms relating to "Ranking Points, scheduling matters, and noncompete agreements," *id.* ¶ 216; and (iii) a vaguely defined agreement "to limit the number of tennis tournaments competing in the market," *id.* ¶ 299. Conspicuously absent from the SAC, however, are any factual allegations purporting to demonstrate the existence of these more specific agreements: There are no allegations, for example, of what prizes the Grand Slam Defendants award, much less any allegations of any form of improper parallelism in those prize. *See id.* ¶¶ 147–213. Similarly, each element of the purported "Ranking Points Agreement" is alleged only upon information and belief, in conclusory terms, and without the supporting factual allegations that would be necessary to support any assertion of a multi-decade antitrust conspiracy. *See id.* ¶¶ 216, 235–236, 238–239, 347–348, 353, 355. And Plaintiffs' allegations regarding the purported agreement to limit the number of tennis tournaments barely mention the Grand Slam Defendants at all, instead relying almost entirely on assertions regarding the provisions and purported effects of the ATP and WTA rulebooks to which the Grand Slam tournaments are not bound. *See id.* ¶¶ 299–358.

***Second***, Plaintiffs appear to suggest that certain provisions of the Grand Slam Rulebook— which apply to each of the four Grand Slam tournaments—themselves are anticompetitive. *E.g.*, SAC ¶¶ 180, 204, 271, 466–467. Plaintiffs do not, however, allege that there is any relevant market limited to the four Grand Slam tournaments. Nor do they allege that the Grand Slam Defendants

have market power in the two relevant markets alleged in the SAC, alleging instead that the ATP and WTA alone have such market power. *See id.* ¶¶ 390–406.

*Third*, Plaintiffs suggest that two of the Grand Slam Defendants—FFT and USTA—are connected to their broader allegations of a conspiracy through relationships with non-Grand Slam tournaments. *See* SAC ¶¶ 45, 48, 101, 104. But Plaintiffs never plead that the Grand Slams compete with the Tours or non-Grand Slam tournaments, and as noted above, the USTA sold its shares in the separate corporate entity that operated the Cincinnati Open in 2022.

### C.    The Claims

Plaintiffs assert nine causes of action, seven of which are alleged against the Grand Slam Defendants. Their first four claims are for alleged violations of Section 1 of the Sherman Act: price-fixing, group boycott and refusal to deal, market allocation, and output restriction. The fifth and sixth claims are only alleged against ATP and WTA. The seventh and eighth claims are for alleged violations of Section 2 of the Sherman Act for conspiracy to monopsonize. And the final claim is for alleged unjust enrichment.

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege enough facts to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. In applying that standard, courts do not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," *id.*, nor do they give effect to "legal conclusions couched as factual allegations," *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). In antitrust cases in particular, given the expense of antitrust discovery, courts "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

I.      **Plaintiffs Fail to Allege that the Grand Slam Defendants Conspired with the Tours.**

Plaintiffs fail to allege plausibly that the Grand Slam Defendants have entered into a secret, multi-decade conspiracy with the Tours to restrain competition. *See* SAC ¶ 4. Nor does the SAC plausibly allege that the Grand Slam Defendants have entered into any secretive agreement with the Tours to fix prices, to engage in the purported "Ranking Points Agreement," or to "avoid competition" with non-Tour tournaments. *See, e.g.*, *id.* ¶¶ 5, 12–14, 464, 485, 508, 522. Finally, all of Plaintiffs' claims of agreement between the Grand Slam Defendants and the Tours suffer from the independent, fatal flaw that they rely on impermissible group pleading. For all these reasons, Plaintiffs cannot plead that the Grand Slam Defendants have entered into any agreement with the Tours affecting their respective operations of the Grand Slam tournaments.

A.      **Plaintiffs do not plausibly allege that the Grand Slam Defendants joined an overarching conspiracy.**

Plaintiffs allege that AELTC, FFT, and USTA have joined an overarching "cartel" with the ATP and WTA that operates as an "unlawful scheme" with the purported effect of preventing new tournaments, locking in the players, and paying professional tennis players less than they otherwise would have been paid. *See, e.g.*, SAC ¶¶ 3–4, 22. When addressing such a conspiracy claim, "the first question" is "whether there is an agreement to conspire." *Treasuries*, 92 F.4th at 391. "Plaintiffs can allege such an agreement in two ways: by direct evidence, and by indirect or circumstantial evidence." *Id.* Here, Plaintiffs have done neither.

1.      **Plaintiffs fail to allege direct evidence of an overarching conspiracy.**

Plaintiffs allege no direct evidence of an overarching conspiracy between the Grand Slam Defendants and the Tours. "Direct evidence of a conspiracy is 'explicit' and can show [a conspiracy] exists without any inferences." *Treasuries*, 92 F.4th at 391. The Second Circuit has provided examples of such direct evidence: For example, it could be "a recorded phone call in

which two competitors agree to fix prices at a certain level." *Citigroup*, 709 F.3d at 136. Or it could be "an admission by an employee of one of the conspirators that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *Treasuries*, 92 F.4th at 391. Plaintiffs allege no such "smoking gun" admissions of any grand conspiracy here.

Indeed, the SAC contains no plausible allegation that the Grand Slam Defendants entered into any overarching conspiracy. Nowhere do Plaintiffs allege when and where the cartel was formed, let alone which employees of each of the Grand Slam Defendants were involved or any other details surrounding that cartel's alleged formation. As the court found in *Cenedella v. Metro. Museum of Art*, if "[t]he plaintiff does not allege during what time period the conspiracy was formed, or who among the defendants' employees created the conspiracy . . . [and it] is completely devoid of facts indicating who agreed with whom, to what, and when" then it "provides nothing more than conclusory allegations." 348 F. Supp. 3d 346, 358–59 (S.D.N.Y. 2018); *see also Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Although Plaintiffs allege the existence of certain specific rulebooks or bylaws, including the Grand Slam Rulebook and the ATP and WTA Rulebooks and Bylaws, *e.g.*, SAC ¶ 485, those documents cannot be evidence of any overarching conspiracy—or indeed of any agreement among the Grand Slam Defendants and the Tours that relates to the Grand Slam tournaments. There are no allegations that the Tours are governed by the Grand Slam Rulebook, and as detailed below in Section II, any antitrust challenge to the Grand Slam Rulebook itself fails to state a viable claim. Similarly, there are no allegations that the ATP or WTA Rulebooks or Bylaws govern the conduct of the Grand Slam tournaments, and Plaintiffs' more limited assertions that those rulebooks or bylaws apply to non-Grand Slam tournaments are addressed below in Section III.

In all events, moreover, courts routinely reject assertions that narrow, lawful agreements can be the basis to infer a broad and unlawful conspiracy. *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (declining to infer conspiracy from participation in a lawful joint venture); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369–70 (S.D.N.Y. 2016) (allegations that defendants participated in a narrow and lawful agreement "cannot support the broad [antitrust conspiracy] alleged"); *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (refusing "to read evidence of [a] benign agreement as evidence of a separate, illegal agreement"), *aff'd* 630 F. App'x 79 (2d Cir. 2015). Plaintiffs accordingly cannot bootstrap their allegations of specific rulebooks with specific provisions into a conclusion that the Grand Slam Defendants agreed to join any broader, unlawful cartel.

### 2. Plaintiffs fail to allege indirect evidence of an overarching conspiracy.

Because they lack any allegations of direct evidence, Plaintiffs must plausibly allege circumstantial evidence to survive a motion to dismiss. *Citigroup*, 709 F.3d at 136. This means facts showing both (i) "parallel conduct" by each Defendant and (ii) "plus factors" to support those allegations. *See Treasuries*, 92 F.4th at 391. The SAC fails on both counts.

***No parallel conduct.*** Parallel conduct consists of allegations that "defendants took identical actions within a time period suggestive of prearrangement." *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018). Not all "parallelism" raises such a suggestion of prearrangement: As the Supreme Court explained in *Twombly*, no inference of conspiracy should be drawn from "parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Courts thus decline to infer an antitrust conspiracy where the alleged parallel behavior "made perfect business sense," *Citigroup*, 709 F.3d at 138, where the allegations "suggest competition at least as plausibly" as "conspiracy," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007), or where "there are obvious alternative explanation[s]" for the parallel conduct,

11

*Twombly*, 550 U.S. at 567. Courts instead look for the kind of "uniformity that would be unexpected or idiosyncratic" in the absence of a preceding agreement. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1272 (11th Cir. 2019).

Plaintiffs allege no parallelism to support any inference that the Grand Slam Defendants agreed to join an "expansive" agreement with the Tours amounting to a "cartel" allegedly stretching back nearly three decades. *See* SAC ¶¶ 3, 216; *see also Treasuries*, 92 F.4th at 403 (refusing to "connect dots far flung among isolated episodes involving different subsets of defendants over two decades"); *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 230–31 (S.D.N.Y. 2018) (declining to infer "ambitious multi-year conspiracy" from allegations that two individuals "episodically coordinated positions"); *In re Zinc*, 155 F. Supp. 3d at 375 (declining to infer broad conspiracy where there were "simply not enough dots to connect to draw a plausible picture of an agreement"). Indeed, as detailed below, none of the SAC's attempts to identify parallelism is indicative even of any of the more specific agreements asserted by the SAC; to the contrary, whatever limited parallelism the SAC alleges is wholly consistent with "rational business behavior" and thus raises no inference of agreement. *Citigroup*, 709 F.3d at 137.

***No plus factors.*** Because Plaintiffs "fail to allege parallel conduct," they "cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors." *Treasuries*, 92 F.4th at 401. Even if the Court were nevertheless to consider Plaintiffs' attempts to demonstrate plus factors, those "facts must still lead to an inference of conspiracy" for the complaint to survive dismissal. *Citigroup*, 709 F.3d at 137. Relevant plus factors can include "[i] a common motive to conspire, [ii] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and [iii] evidence of a high level of

interfirm communications." *Id.* at 136. No such plus factor in support of an overarching conspiracy between the Grand Slam Defendants and the Tours is plausibly alleged here.

As an initial matter, Plaintiffs do not identify any motive for the Grand Slam Defendants to conspire with each other or with the Tours. This failure is dispositive as "[c]ourts may not infer a conspiracy where the defendants have no rational economic motive to conspire." *Ross*, 35 F. Supp. 3d at 442. Rather than articulate any motive for each of the Grand Slam Defendants to conspire, the SAC contains only bald assertions that Defendants conspired to avoid competing with each other. *See, e.g.*, SAC ¶¶ 16, 64, 185. Such conclusory allegations are insufficient to plead a viable motive. *See Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 44 (S.D.N.Y. 2015) (conspiracy implausible where "the plaintiffs have not stated in a non-conclusory fashion any facts indicating what benefit [defendants] derive" from alleged conspiracy).

The lack of factual support for this theory is also unsurprising because Plaintiffs do not and cannot allege that the Grand Slam Defendants are competitors either with each other or with the Tours. There is no allegation that players substitute between playing in the Grand Slams and Tour tournaments or that players substitute between playing in different Grand Slams (*e.g.*, that players choose to play in the French Open instead of playing in Wimbledon). To the contrary, the SAC alleges that the Tours schedule tournaments in which players compete *in order to qualify* for the Grand Slam tournaments, indicating that competing in Tour events is a complement—not a substitute—for entering the Grand Slam tournaments. *See* SAC ¶¶ 12, 80, 92; *see also U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 310 (3d Cir. 2010) (where "products are complements, rather than substitutes" a "distinct market exists for each"). Nor can Plaintiffs argue that the Grand Slam tournaments compete with each other because there are no allegations that players cannot play in *all* the Grand Slam tournaments or that players would choose not to play in

all of the Grand Slam tournaments based on relative prize money. Indeed, Plaintiffs' allegations suggest the opposite: the SAC recognizes that each of the Grand Slam tournaments takes place in different countries, at different times, and on different surfaces. SAC ¶¶ 42–48; *see also Cha-Char, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 614 (11th Cir. 1985) (finding "defendant race tracks are *not* competitors [because one] operates its races during the summer and [the other] operates its races in the winter: although the two enterprises operate on the same market level within the same geographic area, they never compete for customers or for horses").

Plaintiffs' failure to allege sufficiently that the Grand Slam Defendants compete with each other or with the Tours fatally undermines any theory that the Grand Slam Defendants would be motivated by any desire not to compete. Plaintiffs thus fail to plausibly allege any rational economic incentive to conspire. *See Cancall PCS v. Omnipoint Corp.*, 2000 WL 272309, at *7 n.4 (S.D.N.Y. 2000) (dismissing antitrust claim where "such a claim would make no economic sense on the facts pleaded by plaintiffs").

Plaintiffs similarly fail to allege any facts indicating that any of the Grand Slam Defendants engaged in parallel action against their "apparent individual economic self-interest." *Citigroup*, 709 F.3d at 136. Indeed, the SAC's contentions regarding self-interest are both internally inconsistent and implausible. On the one hand, the SAC alleges that in the absence of the conspiracy, the Grand Slam Defendants would "follow their own economic self-interest and optimize their respective tournaments by scheduling them at dates and times most attractive to players, fans, and other business partners," SAC ¶ 15, suggesting that the Grand Slam tournaments are not currently scheduled in a way that benefits them each individually. But in direct contrast, the SAC on the other hand alleges that "the Grand Slam Defendants secure prime unchallenged placement in the annual schedule of professional tennis tournaments," *id* ¶ 241, confirming that

the dates and times of the Grand Slam tournaments are, in fact, economically rational. Plaintiffs'
claims are thus implausible as they otherwise do not even attempt to identify any actions by the
Grand Slam Defendants that would be against their economic self-interest in the absence of a
purported overarching "cartel" agreement with the ATP and WTA. *See LaFlamme v. Societe Air
France*, 702 F. Supp. 2d 136, 153 (E.D.N.Y. 2010) (finding the complaint failed to "create the
factual context necessary to give rise to an inference of unlawful agreement" where "independent
and individualized rational response to common external stimuli" was present).

Finally, Plaintiffs do not allege a high level of interfirm communications with the kind of
specificity that could support an inference of conspiracy. Rather, the SAC asserts only that "upon
information and belief, Defendants . . . have regularly met . . . to agree to the illegal and
anticompetitive restraints in furtherance of the conspiracies." SAC ¶ 54. The Second Circuit has
been clear that "a plaintiff cannot merely plop 'upon information and belief' in front of a
conclusory allegation and thereby render it non-conclusory." *Evergreen E. Coop. v. Whole Foods
Mkt., Inc.*, 2023 WL 545075, at *2 (2d Cir. 2023). There are no allegations as to when these
meetings occurred, where, how often, or who from each Defendant attended. Courts routinely
reject such conclusory allegations that defendants "*could* have coordinated" because they
"communicate regularly with each other." *Tera Grp., Inc. v. Citigroup, Inc.*, 2024 WL 4501967,
at *4 (2d Cir. 2024) (emphasis in original); *see also Cap. Imaging Assocs., P.C. v. Mohawk Valley
Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) ("The mere opportunity to conspire does not
by itself support the inference that such an illegal combination actually occurred.").

**B.    Plaintiffs do not allege viable antitrust claims against the Grand Slam
Defendants based on any specific agreement.**

Alternatively, Plaintiffs suggest that the Grand Slam Defendants entered into three specific
agreements with the Tours: (i) a "price-fixing" agreement relating to payments to players, (ii) a

"Ranking Points Agreement" purportedly limiting competition among the Grand Slam Defendants and the Tours, and (iii) an agreement purportedly to exclude other competitors. For the reasons detailed below, as well as the general implausibility of any conspiracy between these non-competitors, *see supra* at 13–14, none of these agreements is plausibly alleged under *Twombly*.

### 1. Plaintiffs fail to allege that the Grand Slam Defendants agreed with the Tours to fix prices.

Plaintiffs first suggest that Defendants have entered into an illicit conspiracy to "artificially depress, fix, maintain, and/or stabilize the compensation paid to Player Plaintiffs and members of the Classes for their tennis services," in violation of Section 1 of the Sherman Act. SAC ¶ 453. In particular, Plaintiffs contend that the Grand Slam Defendants conspired with the ATP and WTA to fix the prize money pots available to players, *id.* ¶¶ 454–465, 150–177, and agreed to limit players' ability to profit from their own name, image, and likeness ("NIL") licenses and sponsorship deals at tournaments, *id.* ¶¶ 466–467, 178–212. However, each of Plaintiffs' allegations fails to plausibly allege that AELTC, FFT, or USTA engaged in any price fixing conspiracy with ATP or WTA with respect to either prize money or NIL.

***Prize money.*** Plaintiffs' prize money allegations fail because they plead no *facts* plausibly suggesting the Grand Slam Defendants' involvement in any purported agreement with the ATP, WTA, or their tournaments to limit prize money amounts. For example, there are no allegations that any of AELTC, FFT, or USTA took any unexpected or idiosyncratic actions regarding prize money in close proximity to parallel action by either the ATP or the WTA suggestive of their participation in any conspiracy. *Cf. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (citing "allegation that all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third").

Instead, Plaintiffs' rely on specific provisions in the ATP and WTA rulebooks that allegedly restrict the prize money amounts *the non-Grand Slam* tournaments can offer. *See* SAC ¶ 150 ("Section 3.08(B)(1)(a) of the ATP Rulebook states that each ATP Tournament Co-Conspirator must pay the specific prize money as established and promulgated by the ATP."); *id.* ¶ 156 ("Section IX.E and Section XII.D of the WTA Rulebook specify that each Tournament Co-Conspirator must pay the specific prize money established by the WTA's prize money 'breakdowns' published on the WTA's website."). Plaintiffs do not identify any similar restrictions that govern the Grand Slam tournaments—nor could they, as neither the ATP/WTA rules nor the Grand Slam Rulebook restrain AELTC, FFT, or USTA from setting prize pools as they see fit.

The SAC also fails to allege any nonconclusory facts about the Grand Slam Defendants' involvement in any effort to "stratify" prize money amounts. SAC ¶¶ 464–465, 167–171. Plaintiffs instead rely on "the *ATP's* and the *WTA's* decision" allegedly to deny a 2012 request by the BNP Paribas Open to increase its prize pool. *Id.* ¶ 171. Plaintiffs conspicuously do not identify any role that the Grand Slam Defendants purportedly played in influencing the ATP and WTA in making this alleged "decision." *Id.*

***NIL and sponsorship rules.*** Plaintiffs separately claim that the ATP, WTA, and the Grand Slam Defendants have all agreed, through provisions in their respective rulebooks, to license the players' NIL rights related to the tournaments, without specifically allocated compensation (*i.e.*, compensation beyond what players earn through their participation in the event). SAC ¶¶ 178–194. Plaintiffs also claim that various restrictions on the display of sponsorships contained in the ATP, WTA, and Grand Slam rulebooks are likewise the result of a conspiracy. *Id.* ¶¶ 195–212.

These allegations fail to suggest any agreement between the Grand Slam Defendants, on the one hand, and the Tours, on the other. As an initial matter, just as the Grand Slam Defendants

17

do not compete with each other or with the Tours for players' participation in tournaments, they do not compete for players' NIL rights, rendering any alleged conspiracy on such rights implausible. *See supra* at 13–14.

Moreover, Plaintiffs offer no non-conclusory allegations to support any agreement among the Tours and the Grand Slam Defendants to require players to permit the tournaments to use their NIL in broadcasts and promotional materials. Nor do they offer any explanation for why it would be unexpected for players to permit tournaments to use their NIL as a condition of entry to play, rather than as part of a hypothetical separate transaction. That each of the ATP, WTA, and the Grand Slam Defendants obtain player NIL in their rulebooks is at best an example of the general principle that "[t]he mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion." *Treasuries*, 92 F.4th at 401 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307d3 (4th & 5th eds., 2018–23)).

Likewise, Plaintiffs allege no non-conclusory facts that the various ATP, WTA, and Grand Slam rulebook restrictions that regulate player sponsorships, *see* SAC ¶ 199, are the result of any collusive agreement. As an initial matter, Plaintiffs misstate the scope of the restrictions imposed by the Grand Slam Rulebook. Unlike the alleged provisions of the ATP and WTA rulebooks, the cited provisions of the Grand Slam Rulebook impose only limited restrictions on the size and placement of "manufacturer's identifications" that appear on players' equipment *while participating in a Grand Slam tournament*, including while "on court before, during and after a match or at any press conference or tournament ceremony." *See* Ex. 3 (Code of Conduct) Art. III.C.2[5]; *see also* SAC ¶ 199 n.20. The Grand Slam Rulebook contains no restrictions that

---

[5]    This Court may consider the Rulebook itself on a motion to dismiss because the Rulebook is "integral to the complaint." *E.g.*, *Revitalizing Auto Cmtys Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 436 (2d Cir. 2024).

would prevent a player from "ink[ing] endorsement deals with apparel and equipment companies different from the league['s] own sponsorship partners." SAC ¶ 211. Nor does it prevent a player from entering into off-court sponsorship or other commercial agreements. *See id.* ¶ 212. In these respects, the Grand Slam Rulebook critically diverges from the alleged rules of the ATP and WTA, and no inference of conspiracy can arise when Defendants' conduct "was not, in fact, parallel." *Anderson News*, 899 F.3d at 105.

But even if Plaintiffs had accurately characterized the Grand Slam Rulebook, nothing in the SAC plausibly alleges that these provisions are indicative of collusion with the Tours. To the contrary, the cited restrictions make economic sense and reflect reasonable measures that any rational professional sports organization could rationally and unilaterally impose. It is, for instance, not surprising that tournaments would limit the size and placement of manufacturer identifications on equipment to preserve their branding and protect the tournaments' own sponsors. Likewise, it is rational for a professional sports league to exercise oversight over relationships between its players and gambling entities to protect the competitive integrity of the sport. That multiple sports organizations reach common answers in the face of common questions is not indicative of any collusive agreement. *See Twombly*, 550 U.S. at 554; *see also Cenedella*, 348 F. Supp. 3d at 358 ("[A] plaintiff's complaint can be dismissed when there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants.").

### 2. Plaintiffs fail to allege that the Grand Slam Defendants entered into a "Ranking Points Agreement" with the Tours.

Plaintiffs next allege that the Grand Slam Defendants, along with the ATP and WTA, coordinate a "group boycott" of players who seek to participate in alternative tournaments that could hypothetically compete with Defendants' events. *See* SAC ¶¶ 479–494, 214–298. The SAC identifies a purported "Ranking Points Agreement" as the primary instrument through which

Defendants effectuated this purported boycott, although they also refer to the professional tennis schedule and certain provisions in the ATP, WTA, and Grand Slam rulebooks to attempt to support their claims. Plaintiffs allege that, "aided by their Ranking Points System," Defendants have forced players into long seasons and grueling schedules at the expense of their physical and mental well-being so that they can accumulate more points and achieve a higher ranking. *See id.* ¶¶ 245–270.

These "boycott" assertions are supported almost entirely by allegations regarding rules and regulations promulgated by the ATP and WTA through their respective rulebooks—not by any alleged conduct by the Grand Slam Defendants. As to the Grand Slam Defendants in particular, Plaintiffs allege only three categories of conduct in support of their claims: (i) the Grand Slam Defendants' use of ranking points, *id.* ¶¶ 239–240; (ii) the Grand Slam Defendants' purported "desire" to extend their events to three weeks, *id.* ¶ 249; and (iii) certain provisions in the Grand Slam Rulebook that penalize late withdrawals and prevent entrants from playing in competing tournaments, *id.* ¶¶ 271–272. However, none of these categories of conduct plausibly supports any conclusion that the Grand Slam Defendants have joined a boycott conspiracy with the Tours.

***Ranking points.*** The ATP and WTA have developed a ranking system that rewards players for winning higher-rated, more competitive tournaments. SAC ¶¶ 223–224. The Grand Slam Defendants offer the highest-level tournaments, and they unsurprisingly rely on the ranking points system as one criterion for entry, although players may also gain entry through wild cards or by winning qualifying rounds. *Id.* ¶¶ 108, 239–240. The SAC nevertheless asserts that the Grand Slam Defendants' conduct is the result of a hidden, sinister motive. Relying solely on "information and belief," Plaintiffs assert the conclusion that the Grand Slam Defendants agreed to use ranking points not to identify the best players, but instead as a means to "ensure that professional tennis players must participate in tournaments only on the ATP and WTA Tours." *Id.* ¶ 240, 348–351.

20

These conclusory allegations come nowhere close to alleging the kinds of facts that might support the inference of a group boycott. In fact, the SAC's vague allegation that ranking points are "the *only* way nearly all players qualify for the Grand Slams," SAC ¶ 239 (emphasis in original), is inconsistent with the SAC's recognition in other allegations that 24 of the 128 players competing in each Grand Slam tournament are selected as "wild cards" or through tournament "qualifiers," rather than "based on their world ranking," *id.* ¶ 108. As a result, the Grand Slam Defendants are not alleged to "boycott" anyone—and certainly are not alleged to have boycotted any of the named Plaintiffs—based solely on their world rankings.

Nor is it indicative of any boycott conspiracy that the Grand Slam Defendants use a player's world ranking as one qualification avenue. That practice is fully consistent with a completely lawful explanation: the Grand Slam Defendants use the ATP and WTA's existing ranking points system to identify and offer admission to top-tier talent. Plaintiffs do not even allege that there are any alternate or more effective means available to the Grand Slam Defendants to identify top-level players. The use of world rankings as one criterion for qualification thus reflects nothing more than unilateral conduct "in line with a wide swath of rational and competitive business strategy." *Twombly*, 550 U.S. at 554.

**Schedule extension.** Plaintiffs next assert that Defendants rely on the "never-ending" season of tournaments to prevent players from participating in competitor tournaments. *See* SAC ¶¶ 245–281. Here again, the SAC's allegations rely almost exclusively on conduct wholly within the control of the ATP and WTA, not the Grand Slam Defendants. While the ATP allegedly schedules over 60 tournaments a year and the WTA over 50, *id.* ¶¶ 80, 92, the Grand Slam Defendants (and Tennis Australia) are alleged collectively to operate only four Grand Slam tournaments in any given year. The sole allegations concerning the Grand Slam Defendants is that

they have "articulated a desire to extend their events" and that two Grand Slam Defendants recently extended their tournaments from 14 to 15 days. *Id.* ¶ 249. This is hardly indicative of a conspiracy with the Tours to crowd out new entrants, particularly where each individual Grand Slam's decision is equally consistent with its own unilateral business interests, including being able to license additional broadcasts and to increase fan attendance.

***Grand Slam Rulebook provisions.*** Finally, Plaintiffs point to two provisions in the Grand Slam Rulebooks—one that penalizes untimely withdrawals and another that prohibits players from entering a Grand Slam while attempting to play in an "alternative tennis event taking place at the same time." SAC ¶¶ 271–272. Plaintiffs suggest these provisions are "similar" to those in the ATP and WTA rulebooks and therefore evidence of a conspiracy to boycott players. But yet again, discouraging untimely withdrawals is "only natural" because of the disruptions to tournaments that would inevitably result from such withdrawals. *Twombly*, 550 U.S. at 566. And to the extent that the Grand Slam Defendants seek to prevent players from supporting "alternative tennis events" that Plaintiffs might characterize as potential competitors to the Grand Slam tournaments, the Supreme Court has recognized that efforts to "resist[] competition"—to the extent that these provisions could even be characterized as such—are "routine market conduct" that does not give rise to an inference that market participants *agreed* to any such resistance. *Id.*

### 3. Plaintiffs fail to allege that the Grand Slam Defendants conspired with the Tours to exclude competitors.

Plaintiffs also assert that certain other rules of the ATP or WTA reflect an agreement to prevent new tournaments from competing for the services of professional tennis players. *See* SAC ¶¶ 299–358.

Most of these allegations are directed solely at the ATP and WTA and do not implicate the Grand Slam Defendants. For example, the allegations as to the "closed tournament structure," SAC

¶¶ 300–315, supposed "non-compete agreements," *id.* ¶¶ 317 & 321, and an alleged ATP and WTA agreement to "stay on their respective turfs," *id.* ¶¶ 336–345, rely entirely on the conduct of the ATP and WTA and primarily cite provisions in their respective rulebooks. *See, e.g.*, *id.* ¶¶ 317 & 321 (identifying specific sections of the ATP and WTA bylaws that allegedly prevent tournament owners from creating competing events). Plaintiffs do not allege any facts showing that the Grand Slam Defendants agreed to, participated in, or enforced these "agreements" to exclude hypothetical competitor tournaments. Such allegations cannot support a claim against AELTC, FFT, or USTA.

The only allegation even arguably involving the Grand Slam Defendants is Plaintiffs' assertion, pleaded solely "upon information and belief," that the Grand Slam Defendants agreed with the ATP and WTA to discontinue the Grand Slam Cup in the 1990s in order to "form a new event." SAC ¶¶ 346–358. This allegation is entirely conclusory: Plaintiffs plead no facts beyond the unremarkable observation that, over 25 years ago, the Grand Slam Defendants once operated a tournament and at some point ceased doing so. Plaintiffs' rank speculation as to why the Grand Slam Defendants discontinued the Grand Slam Cup is thus precisely the kind of "naked assertions devoid of further factual enhancement" that the Supreme Court has held to be insufficient to state a claim. *Iqbal*, 556 U.S. at 678.

### C.    Plaintiffs' group pleading fails to connect the individual Grand Slam Defendants to any alleged conspiracy.

Plaintiffs' claims against any individual Grand Slam Defendant also fail for the independent reason that the SAC does not allege facts that would be sufficient to connect any specific Defendant to any alleged agreement. To state a viable antitrust claim against any of the individual defendants, Plaintiffs "must separately identify how each particular defendant contributed to the alleged conspiracy." *Litovich v. Bank of Am. Corp.*, 2025 WL 2521039, at *15

(S.D.N.Y. 2025) (quoting *Treasuries*, 92 F.4th at 407 n.12). Allegations asserted against a group of defendants as a "general collective bloc" must be "set aside . . . as impermissible group pleading." *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *15 (S.D.N.Y. 2018); *see also Concord Assocs., L.P. v. Ent. Props. Tr.*, 2014 WL 1396524 at *24 (S.D.N.Y. 2014), *aff'd* 817 F.3d 46 (2d Cir. 2016) ("Group pleading . . . is simply insufficient to withstand review on a motion to dismiss."), *aff'd* 817 F.3d 46 (2d Cir. 2016). Where, as here, an antitrust complaint fails "to identify the involvement of particular defendants in the alleged conspiracy," that is "a basic pleading defect" that "dooms [its] allegations." *Treasuries*, 92 F.4th at 396.

Two recent S.D.N.Y. decisions illustrate the point. In *Iowa Public Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the court found that there was no impermissible group pleading because "the Amended Complaint allege[d] each Defendant's participation separately." 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018). For example, that complaint "identifie[d] specific employees by name," *id.*, and contained dozens of paragraphs of allegations as to each defendant's specific conduct, *id.* at 317 n.11. By contrast, in *Litovich*, the court dismissed the complaint for failure to "state an antitrust claim" because it "relie[d] on vague allegations that refer[red] to Defendants collectively as a group [and was] largely devoid of allegations about the individual Defendants." 2025 WL 2521039, at *15. Among the insufficient allegations that were "mostly generic and undifferentiated" were that "Defendants have colluded," "Defendants refused to transact business with any market participant that threatened the operation of their conspiracy" and "Defendants' efforts to discipline and punish those who threaten [their scheme] continue to this day." *Id.*

The SAC falls on the impermissible group pleading side of this divide. It predominantly refers to AELTC, FFT, and USTA jointly—as members of the "Grand Slam Defendants" or the

"Defendants," or, with regard to FFT and USTA, as the members of the "Tournament Co-Conspirators." The few allegations that refer individually to AELTC, FFT, or the USTA, moreover, fail to "separately identify how each particular defendant contributed to the alleged [] conspiracy." *Litovich*, 2025 WL 2521039, at *16.

As to AELTC, remarkably, there is not a single reference to it individually in the SAC's Factual Allegations. *See* SAC ¶¶ 145–389. The only AELTC-specific allegations are in the SAC's Description of the Parties and Background. But those allegations relate to AELTC's corporate organization, governance, operation of Wimbledon, television rights deal with ESPN, and annual revenue, *not* to what AELTC allegedly did that violated the antitrust laws. *Id.* ¶¶ 46, 102, 113, 114.

Plaintiffs fare no better with respect to USTA or FFT. Even where FFT and USTA are mentioned in the SAC's Factual Allegations' subsections, those allegations generally fall into one of two formulaic recitations, both of which relate to non-Grand Slam tournaments: (i) "[a]s ATP Tournament Class Members, . . . USTA, and FFT [are party to/agree to a purported restraint]," SAC ¶¶ 155, 188, 202, 254, 306, 329; and (ii) "[a]s [a] WTA Tournament Class Member[], . . . USTA [is party to/agree to a purported restraint]," *id.* ¶¶ 161, 189, 203, 256, 307, 330. The specific inadequacies of Plaintiffs' allegations regarding those non-Grand Slam tournaments are addressed below in Section III. But those allegations do not even attempt to suggest that the operations of the *Grand Slam tournaments* themselves are the subject of any agreement between USTA or FFT on the one hand, and ATP or the WTA on the other. And in all events, such allegations are nothing more than bald assertions that an agreement exists, which are insufficient to state a claim because "[t]he ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation," and courts "give no effect at all to legal conclusions couched as factual allegations." *Citigroup*, 709 F.3d at 135–36.

Because the SAC lacks any specific allegations about conspiratorial actions taken by each of AELTC, FFT, or USTA, its collective allegations against these entities must be "set aside" as impermissible group pleading, and the claims against the Grand Slam Defendants should be dismissed. *In re IRS*, 2018 WL 2332069, at *15; *see also In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 42 (S.D.N.Y. 2022) (dismissing the antitrust complaint even though the individual defendants are identified "by name" because the allegations fail to "link any specific Defendant to any specific conversation"), *aff'd sub nom Treasuries*, 92 F.4th 381 (2d Cir. 2024).

## II.    Plaintiffs Fail to Allege that the Grand Slam Rulebook Restrains Trade.

As with their attempt to allege an agreement among the Grand Slam Defendants and the Tours, any attempt by the SAC to allege an unlawful agreement among the Grand Slam Defendants to implement the Grand Slam Rulebook does not support a viable claim. Any challenge to the Grand Slam Rulebook would be governed by the rule of reason, and Plaintiffs fail to allege that the Grand Slam Defendants have market power, that the Grand Slam Rulebook's provisions have anticompetitive effects, or that those provisions have injured the Plaintiffs—each of which is an indispensable element of a rule of reason claim.

### A.    Any challenge to the Grand Slam Rulebook would be subject to the rule of reason.

"Only unreasonable restraints on competition violate § 1 of the Sherman Act." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018). "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" *Id.* (quoting *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457–58 (1986)).

The Grand Slam Rulebook's challenged provisions do not fall within the narrow category of restraints subject to *per se* condemnation. *Per se* treatment "is confined to restraints . . . that

would always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack . . . any redeeming value." *Id.* "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'— qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)). Professional sports coordination—even when between horizontal competitors—is generally "essential if the product is to be available at all." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101 (1984). Thus, as the Second Circuit has explained, "[r]egulation of league sports is a textbook example of when the rule of reason applies." *N. Am. Soccer League*, 883 F.3d at 41; *accord, e.g.*, *Deutscher Tennis Bund*, 610 F.3d at 831 (finding *per se* rule not applicable to rules of a "tennis tour").

The coordination efforts reflected in the Grand Slam Rulebook and highlighted by Plaintiffs are textbook examples of sports regulation subject to the rule of reason.[6] The essence of those allegations, as discussed below, is that four marquee tournaments in tennis—which are not horizontal competitors with one another, *see supra* at 13–14—each signed on to standardized rules to promote the efficient and consistent administration of Grand Slam tennis. The rule of reason therefore governs, and the "test of legality" is whether the restraints "merely regulate[] and perhaps thereby promote[] competition or whether [they] . . . suppress or even destroy competition." *N. Am. Soccer League*, 883 F.3d at 42 (quoting *Nat'l Soc. of Pro. Eng'rs v. U.S.*, 435 U.S. 679, 691 (1978)).

---

[6]    For the same reasons, if Plaintiffs were able to allege any agreement between the Grand Slam Defendants and the Tours, that agreement would likewise be subject to the rule of reason.

**B.      Plaintiffs do not plausibly allege that the Grand Slam Defendants have the market power that would be necessary to cause anticompetitive effects.**

To plead a viable Section 1 rule of reason claim based on the Grand Slam Rulebook, Plaintiffs must plausibly allege that various provisions in that Rulebook "ha[ve] an adverse effect on competition." *N. Am. Soccer League*, 883 F.3d at 42. They have not done so.

The rule of reason demands "'[a] fact-specific assessment of market power and market structure' aimed at assessing the challenged restraint's 'actual effect on competition.'" *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88 (2021) (quoting *Am. Express Co.*, 585 U.S. at 541). "If 'the exercise of market power is not plausible, the challenged practice is legal'" under that assessment. *Alston*, 594 U.S. at 89 (quoting 7 Philip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2011b, p. 134 (4th ed. 2019)); *see also, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). That is especially so with respect to joint ventures like the collaboration between the Grand Slam Defendants, which "are incapable of impairing competition" unless they collectively enjoy market power. *Alston*, 594 U.S. at 89. It instead "makes sense to understand" such ventures "as benign or beneficial" because the participants lack an incentive to coordinate to reap anticompetitive benefits. *Id.* (quoting *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985)).

Plaintiffs have not alleged, plausibly or otherwise, that the Grand Slam Defendants and Tennis Australia collectively enjoy market power independent of the Tours. Instead, Plaintiffs' only market power allegations concern the ATP and WTA. *See* SAC ¶¶ 395–397, 403–405. That is unsurprising, as the SAC indicates that the buyer side of their alleged markets for the services of professional tennis players consists of "dozens of tournaments spread across six continents." *Id.* ¶ 11; *see also id.* ¶¶ 80, 92, 391, 399. Any suggestion that the four Grand Slam tournaments alone enjoy market power would be fanciful, especially considering Plaintiffs' allegations that both

relevant markets are each dominated by purported third-party monopsonists (the ATP and WTA) that dictate market-wide terms of dealing. *See id.* ¶¶ 395–397, 403–405.

Plaintiffs' failure to allege market power dooms their Section 1 claims based on the Grand Slam Rulebook. *See N. Am. Soccer League*, 883 F.3d at 42 (absent direct evidence of anticompetitive effects, plaintiff in rule of reason case "must demonstrate both the defendant's market power and other grounds for believing the challenged restraint harms competition").

### C. Plaintiffs' claims also fail because the Grand Slam Defendants are not competitors and the Grand Slam Rulebook does not restrain trade.

Any attempt to state a rule of reason claim also fails because the Grand Slam Rulebook provisions that Plaintiffs allege do not plausibly limit competition in Plaintiffs' alleged markets. The most fundamental reason for that is, as discussed above, the Grand Slam Defendants do not compete with each other or the Tours. *See supra* at 13–14. Beyond that threshold failing, the provisions of the Grand Slam Rulebook about which Plaintiffs complain do not restrain trade.

*NIL licensing.* Plaintiffs first allege that "[t]he Grand Slam Rulebook requires every player to assign his or her NIL rights to the Grand Slam Defendants for their use in media, marketing materials, and advertisements to promote the Grand Slams." SAC ¶ 180. But that is not what the Rulebook itself—which is part of the pleadings—says. It provides instead that each player assigns "*to the events that he enters*" rights to make, use, and show "motion pictures, still pictures, and live, taped or filmed television and other reproductions of [the player] *during said events and in connection with the promotion of said events*." Ex. 3, Rules Art. I.E. In other words, the Rulebook merely provides that as a condition of entry into *each individual* Grand Slam tournament, players must assign, non-exclusively, to that Grand Slam Defendant NIL rights relating to their participation at that Grand Slam tournament.

Those limited assignments limit no competition. Rather, as detailed above, the Grand Slam Defendants do not compete with each other for the licensing of NIL rights. *Supra* at 13–14, 18. It is not plausible, nor is it alleged, that a player could pit Grand Slam Defendants against each other for who would get their NIL rights, given that the Grand Slam tournaments do not overlap temporally. Accordingly, the fact that the Rulebook memorializes the Grand Slam Defendants' independently rational decisions that players must assign their NIL rights as a condition of entry into their respective tournaments cannot plausibly be an unreasonable restraint of trade. Indeed, Plaintiffs fail to allege any examples of the hypothetical type of "competition" they allege, in which a sports tournament or sanctioning body negotiates individually for NIL rights as opposed to requiring assignment of those rights as a condition of participation.

*Endorsements.* Plaintiffs next allege that "the Grand Slam Defendants . . . restrict the number and extent of the endorsements players can wear *when they appear at the Grand Slams*." *Id.* ¶ 204; *see also* Ex. 3, Code of Conduct Art. III.C.2. But it is unremarkable that a professional sports tournament would, as a condition of participation, limit what individual participants may promote on the court and how those individuals may promote it. Without such common-sense restrictions, Grand Slam Defendants would struggle to fund their tournaments with advertising sales to tournament sponsors (who may bristle at players at the tournament they sponsor promoting their competitors on-court) and to control the branding and appearance of their own tournaments. And again, it is not a "restriction on competition" for this provision to be memorialized in the Grand Slam Rulebook; nothing in Plaintiffs' SAC suggests that the Grand Slam Defendants would not independently impose the same rules absent the Rulebook provisions.

*Withdrawals and conflicting tournaments.* Plaintiffs also allege that the Grand Slam Defendants financially penalize players who either belatedly withdraw from Grand Slam

tournaments or, relatedly, enter into and are accepted into a Grand Slam tournament but also or instead play in an alternative tennis event taking place at the same time. *See* SAC ¶¶ 271–272; *see also* Ex. 3, Code of Conduct Art. II.A.1–2. But these provisions, like those governing NIL licensing and endorsements, do not restrain competition for players' services between the Grand Slam Defendants; they instead are necessary to "[e]liminat[e] free riders." *N. Am. Soccer League*, 883 F.3d at 43. Without these restrictions or others like them, players could freely commit to play in Grand Slam tournaments—prompting the tournaments to plan around those commitments—only to throw the tournaments into disarray by pulling out after draws are set or skipping scheduled or rescheduled Grand Slam matches for alternative tournaments. And players could reap the benefits of the unparalleled exposure that playing in the most "prestigious[] and well-known tennis tournaments in the world" brings, SAC ¶ 3, while simultaneously undermining those tournaments by playing in alternative events. Again, nothing in the SAC suggests the Grand Slam Defendants would not each adopt materially similar restrictions but for the Rulebook, and Plaintiffs accordingly fail to allege plausibly that these rules "restrict competition."

***Ranking points.*** Finally, Plaintiffs challenge the Grand Slam Rulebook's provisions governing the selection of players for Grand Slam draws from the many who wish to participate. *See id.* ¶¶ 108, 239–240, 484; Ex. 3. But there are no allegations that suggest that the Grand Slam Defendants compete with each other for players, nor could there be, given that the tournaments take place at different times and players seek to play, and do play, in *all* of the Grand Slam tournaments, not to choose among them. *Supra* at 13–14. In the absence of potential substitution by players among the Grand Slam tournaments, there are no plausible arguments that common policies harm *competition*, as "an agreement will not violate the antitrust laws unless it can be shown that it will have an actual adverse effect on competition in the relevant market." *Electronics*

*Comms. Corp. v. Toshiba America Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997). And as detailed above, it is perfectly natural that in making those decisions, the Grand Slam Defendants—operators of tournaments that exist to foster high-stakes competition between the best players in the world—have chosen to allocate the bulk of their available berths to the highest-ranked players in the world, as determined by a common, objective, and widely used metric. *Supra* at 20–21. Those decisions in no way restrain competition between the Grand Slam Defendants, and the fact that they are reflected in the Grand Slam Rulebook does not somehow transform them into antitrust violations.

> **D.    Plaintiffs do not plausibly allege antitrust injury or standing relating to the Grand Slam Rulebook or that the PTPA has Article III standing.**

Finally, even if Plaintiffs could allege that any particular provision of the Grand Slam Rulebook was anticompetitive—and they cannot—they still have failed to allege the elements of antitrust injury and standing as to any such provision.

"To establish antitrust standing, a plaintiff must show (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021). A plaintiff cannot meet these requirements absent non-conclusory, factual allegations of antitrust injury, and allegations of highly speculative harms typically are insufficient because "[h]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 141 (2d Cir. 2021); *see also, e.g.*, *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545 n.52 (1983) ("[R]emote and obviously speculative character of [plaintiffs' alleged] harm is plainly sufficient to place it beyond the reach of § 4").

The SAC contains no allegations that any of the named Plaintiffs—or indeed that any individual tennis player—suffered specific harm from any of the challenged provisions of the Grand Slam Rulebook. Plaintiffs offer nothing but speculation to claim that any Grand Slam tournament would have had a different NIL licensing policy in the absence of the Grand Slam Rulebook, *see* SAC ¶ 185, and there are no factual allegations to suggest that any Grand Slam Defendant would have chosen to license the NIL rights of any of the named Plaintiffs in particular even if their policies did somehow differ. Similarly, there are no allegations as to how the Grand Slam Defendants would have regulated endorsements in the absence of the Grand Slam Rulebook, *see id.* ¶ 204, and no allegations of any proposed endorsement that any named Plaintiff was required to forego. There are likewise no allegations that any named Plaintiff ever suffered a financial penalty from a late withdrawal from a Grand Slam tournament, and no allegation that any Plaintiff chose not to participate in any tournament concurrent with a Grand Slam tournament. *See id.* ¶¶ 271–272. And there are no allegations of how the Grand Slam Defendants would have determined eligibility for their tournaments absent the Grand Slam Rulebook, much less any allegation that any such change would have benefitted any named Plaintiff.

Plaintiffs thus lack the factual allegations of non-speculative harm necessary to sustain a viable antitrust claim. *See Schwab*, 22 F.4th at 115; *In re Am. Express*, 19 F.4th at 141.

Moreover, Plaintiff the Professional Tennis Players Association ("PTPA") separately lacks Article III standing to bring any of its asserted claims against the Grand Slam Defendants. The Grand Slam Defendants incorporate by reference the arguments regarding standing asserted by the Tour Defendants, which provide an independent basis on which to dismiss PTPA's claims. *See* ECF Nos. 119, 131.

III.    **Plaintiffs Fail to Allege that the Grand Slam Defendants Restrained Trade by Operating Non-Grand Slam Tournaments.**

Plaintiffs' only remaining allegations are that two of the Grand Slam Defendants—FFT and USTA—are "Tournament Co-Conspirators" because they currently or formerly operated non-Grand Slam tournaments subject to the ATP or WTA Rulebooks. These allegations fail to state a viable claim as to either FFT or USTA.

*FFT.* There are no allegations that FFT is subject to the WTA Rulebook. To the extent that Plaintiffs challenge any particular provision within the ATP Rulebook, they cannot plausibly do so as to FFT. Just as with the Grand Slam Rulebook's provisions, the rule of reason would apply. *See supra* at 27–28 & n.6. There is no theory pleaded, let alone a plausible one, as to how FFT's operation of the Paris Masters, one of the literally dozens of tournaments on the ATP tour, pursuant to the rulebook of an entity it does not compete with, unreasonably restrained competition.

*USTA.* In addition to the lack of unreasonable restraint ground asserted by FFT, Plaintiffs' claim that *USTA* entered into an agreement with the ATP and WTA through its purported ownership of the Cincinnati Open should also be dismissed because it lacks a plausible factual predicate. The SAC relies only on conclusory allegations that USTA was subject to, or a signatory of, "the ATP Bylaws, the ATP Rulebook, the WTA Bylaws, and the WTA Rulebook" as it allegedly "owned and operated the Cincinnati Open." SAC ¶¶ 48, 104. But these are legal assertions, not factual allegations, and courts "give no effect at all to legal conclusions couched as factual allegations." *Citigroup*, 709 F.3d at 135. Plaintiffs did not, and cannot, allege any nonconclusory *facts* establishing that USTA ever agreed to the ATP and WTA rulebooks and bylaws. *See Iqbal*, 556 U.S. at 681 ("conclusory" assertions are "not entitled to be assumed true").

Plaintiffs' pleading failure is unsurprising as Cincinnati Tennis, LLC—not USTA—is the entity that held the ATP and WTA tournament sanctions and agreed to comply with their respective

bylaws and rulebooks. *Supra* at 5–6. Although USTA maintained an ownership interest in Cincinnati Tennis, LLC until 2022, Plaintiffs allege no facts that could establish that USTA is liable for the actions of its former, partially owned subsidiary. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998). USTA's ownership interest in Cincinnati Tennis, LLC, without more, cannot overcome this "bedrock principle," and Plaintiffs cannot impute to the USTA any agreement or conduct by Cincinnati Tennis, LLC.

#      #      #      #      #

For all these reasons, Plaintiffs fail to allege plausibly that the Grand Slam Defendants entered into any conspiracy or other agreement in restraint of trade. This failure is fatal to their Sherman Act claims, each of which relies on the existence of such a conspiracy or other anticompetitive agreement. *See* SAC ¶¶ 464–470 (Claim 1), 482–486 (Claim 2), 504–508 (Claim 3), 522–526 (Claim 4), 570–581 (Claim 7), 585–596 (Claim 8). Plaintiffs' inability to state a viable antitrust claim likewise leaves them unable to state a viable unjust enrichment claim premised on the same underlying conduct. *See id.* ¶¶ 599–602 (Claim 9); *In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d at 70 ("Since Plaintiffs' unjust enrichment claims against [defendants] are premised on their antitrust claim, Plaintiffs' unjust enrichment claim against [defendants] will likewise be dismissed.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against the Grand Slam Defendants should be dismissed with prejudice.

December 22, 2025                    Respectfully submitted,

                                     _/s/ Derek Ludwin_____
                                     COVINGTON & BURLING LLP
                                     Derek Ludwin
                                     John S. Playforth (*pro hac vice* forthcoming)
                                     850 Tenth Street, N.W.
                                     Washington, D.C. 20001
                                     Telephone: (202) 662-6000
                                     dludwin@cov.com
                                     jplayforth@cov.com

                                     Neema Sahni (*pro hac vice*)
                                     1999 Avenue of the Stars
                                     Los Angeles, CA 90067
                                     Telephone: (424) 332-4757
                                     nsahni@cov.com

                                     Kyle W. Chow
                                     30 Hudson Yards
                                     New York, NY 10001-2170
                                     Telephone: (212) 841-1245
                                     kchow@cov.com

                                     *Attorneys for Defendant United States Tennis*
                                     *Association Incorporated*

/s/ Michael Schaper (on consent)
Michael Schaper
Jacob Hochberger
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001
Telephone: (212) 909-6000
mschaper@debevoise.com

Tim Cornell
Leah S. Martin (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 383-8000

*Attorneys for Defendant Fédération Française de Tennis*

/s/ Bradley Justus (on consent)
Bradley Justus (*pro hac vice*)
Jeny M. Maier
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L St NW
Washington, DC 20036
Telephone: (202) 912-4700
bjustus@axinn.com
jmaier@axinn.com
avissichelli@axinn.com

*Attorneys for Defendant The All England Lawn Tennis Club (Championships) Limited*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Derek Ludwin, certify that the foregoing Memorandum in Support of Grand Slam Defendants' Joint Motion To Dismiss The Second Amended Complaint complies with the word-count limitation in Section II.B.2 of Judge Garnett's Individual Rules and Practices as modified by the Court's order granting Grand Slam Defendants' request to reallocate the word-count limitations (ECF-177). According to the word processing software used to prepare this document, the memorandum contains 11,192 words, excluding the parts of the document exempted in Section II.B.2.

Dated: December 22, 2025

                                        */s/ Derek Ludwin*        
                                        Derek Ludwin

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Ludwin, certify that on December 22, 2025, I caused the Grand Slam Defendants'
Joint Motion to Dismiss the Second Amended Complaint, the Memorandum in Support, and the
Declaration of Stacey Allaster, along with all accompanying exhibits, including those filed under
seal, to be served upon all counsel of record. I further certify that service on all parties will be
accomplished electronically by email for those who have consented, and by overnight mail for all
others.

Dated: December 22, 2025

/s/ *Derek Ludwin*
Derek Ludwin