USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/30/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Vasek Pospisil, Nicholas Kyrgios, Anastasia Rodionova, Nicole Melichar-Martinez, Saisai Zheng, John-Patrick Smith, Noah Rubin, Aldila Sutjiadi, Varvara Gracheva, Tennys Sandgren, Sachia Vickery, Nicolas Zanellato, Christian Harrison, Ingrid Neel, and Marco Trungelliti, on behalf of themselves and all others similarly situated,

-and-

The Professional Tennis Players Association,

Plaintiffs,

-against-

ATP Tour, Inc., WTA Tour, Inc., Fédération Française de Tennis, All England Lawn Tennis Club (Championships) Limited, and United States Tennis Association Incorporated,

Defendants.

25-CV-02207 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs—fifteen current and former professional tennis players and the Professional Tennis Players Association—bring this action against the ATP Tour and the WTA Tour, which control the premier men's and women's professional tennis tours, respectively, and three of the four Grand Slam entities—the All England Lawn Tennis Club, Fédération Française de Tennis, and the United States Tennis Association—which own and operate the most prestigious and well-known tennis tournaments in the world. Plaintiffs allege that Defendants have engaged in a broad, decades-long anticompetitive scheme in violation of Sections 1 and 2 of the Sherman Act by coordinating rules governing player compensation, rankings, scheduling, commercial rights, tournament participation, and player discipline in order to suppress competition in the markets

for the services of professional tennis players, all to the detriment of the players and other participants in the business of professional tennis.

## BACKGROUND

### I. RELEVANT FACTS[1]

#### A. The Parties and Professional Tennis' Governing Structure

Plaintiffs are fifteen current or former professional tennis players (the "Player Plaintiffs") and the Professional Tennis Players Association ("PTPA"), an organization that advocates for professional tennis players. Compl. ¶¶ 24–40. The eight male Player Plaintiffs (the "ATP Player Plaintiffs") compete or have competed on the men's professional tour; the seven female Player Plaintiffs (the "WTA Player Plaintiffs") compete or have competed on the women's professional tour. *Id.* ¶¶ 24–39.

Defendants ATP Tour, Inc. ("ATP") and WTA Tour, Inc. ("WTA") (collectively, the "Tour Defendants") oversee and control the principal men's and women's professional tennis tours, respectively. *Id.* ¶¶ 41–42. Each Tour schedules tournaments and operates through bylaws, rulebooks, and agreements with tournament operators and players. *Id.* ¶¶ 71–84 (ATP), 88–97 (WTA). Tournament operators participate in the Tours' governance; while players are deemed "members" and have some representation in governance, they are generally required to accept the applicable rules to compete in Tour events. *Id.*

The remaining Defendants organize three of the four Grand Slam tournaments. Fédération Française de Tennis ("FFT") operates the French Open; All England Lawn Tennis

---

[1] Unless otherwise indicated, the following facts are drawn from the operative Third Amended Complaint ("Complaint"), Dkt. No. 210 ("Compl."). For purposes of the motions to dismiss, the Court accepts its well-pled factual allegations as true. The agreements submitted in connection with the motions to compel arbitration and ATP's forum-selection motion are described separately where relevant to those motions.

Club (Championships) Limited ("AELTC") operates Wimbledon; and United States Tennis Association Incorporated ("USTA") operates the U.S. Open (collectively, the "Grand Slam Defendants"). *Id.* ¶¶ 45–48. Some Grand Slam Defendants have also operated Tour tournaments: FFT operates the Paris Masters on the ATP Tour, and until 2022, USTA operated the Cincinnati Open on both Tours. *Id.* ¶¶ 46, 49.

According to the Complaint, the Grand Slam Defendants coordinate certain tournament rules and operations through a shared governance structure called Grand Slam Tennis. *Id.* ¶¶ 106–08. That structure promulgates a common Grand Slam Rulebook. *Id.* ¶ 108. Plaintiffs also allege coordination between the Grand Slam Defendants and the Tour Defendants concerning player entry into the Grand Slam tournaments, ranking points, and other important aspects of professional tennis. *Id.* ¶¶ 109, 216–45, 239–42.

**B. The Alleged Restraints**

Plaintiffs allege that Defendants and other tournament operators have entered into interlocking agreements that suppress competition for professional tennis players' services. Plaintiffs identify two relevant markets: the global market for the services of men's professional tennis players and the global market for the services of women's professional tennis players. *Id.* ¶¶ 391–407. In those interrelated markets, players supply their services to the entities that organize professional tennis tournaments. Plaintiffs contend that the challenged arrangements operate to reduce players' compensation and professional opportunities, and materially affect the terms and conditions of their work, while also protecting Defendants from competition by existing and prospective tournaments. *Id.* ¶¶ 408–27, 439–44.

First, Plaintiffs allege agreements restricting player compensation. According to the Complaint, the Tour Defendants and their respective tournament operators limit the prize money offered at Tour events, while coordination between the Tour Defendants and the Grand Slam

Defendants preserves the Grand Slams' position at the top of the prize-money structure. *Id.* ¶¶ 5–8, 148–74. Plaintiffs cite, among other examples, ATP's and WTA's rejection of an attempted prize-money increase at the BNP Paribas Open. *Id.* ¶¶ 7, 170–74. They further allege that Defendants' tournament rules require players to grant rights to use their names, images, and likenesses without separate compensation and restrict certain player endorsements. *Id.* ¶¶ 9–10, 179–205.

Second, Plaintiffs challenge the operation of the ranking system and professional tennis calendar. They allege that ATP and WTA award ranking points for results only at their sanctioned events and at the Grand Slams, and that a player's ranking affects entry into valuable tournaments and thus, access to prize money and other compensation. *Id.* ¶¶ 11–13, 215–18, 233–42. According to Plaintiffs, ranking rules, participation requirements, and the sanctioned tournament schedule collectively induce players to compete solely or primarily within Defendants' system and limit their ability to play in alternative events. *Id.* ¶¶ 11–13, 221–300.

Third, Plaintiffs allege restraints on competition among tournaments. They contend that the Tour Defendants control which tournaments may join their circuits and assign places on the calendar to sanctioned tournaments. *Id.* ¶¶ 14–17. They also challenge provisions of the Tour bylaws that allegedly restrict tournament operators from competing against one another and outside the Tours, as well as alleged agreements between ATP and WTA not to compete for the services of players on the other's Tour and among the Grand Slam Defendants concerning competition between their events. *Id.* ¶¶ 16–17, 301–59.

**C. Agreements Relevant to the Threshold Motions**

Three sets of agreements bear directly on motions addressed in this Opinion. WTA invokes the arbitration provision in its Rulebook, to which it contends female players assent through the annual player form and participation in WTA-sanctioned tournaments. *See id.*

¶¶ 89, 94–95. That provision submits any "Dispute" to arbitration before the American Arbitration Association ("AAA"). Dkt. No. 117-1 ("WTA Rulebook") at 403. The WTA Rulebook defines a "Dispute" as:

> Any dispute between or among the WTA, WTA Tournaments, or WTA players (including, but not limited to, matters concerning the arbitrability of disputes) arising out of the application of any provision of this Rulebook.

*Id.*

USTA invokes agreements executed by seven Player Plaintiffs as a condition of participating in the 2024 or 2025 U.S. Open. The Legal Consent Waiver agreement requires arbitration of:

> any dispute, claim, or cause of action in any way related or incidental to [the player's] presence at, travel to and from, or participation in the [2024 or 2025] US Open, and any activity associated therewith.

Dkt. No. 185-4 at 6; *see also* Dkt. No. 185-3 at 7.[2]

ATP invokes a provision of its corporate bylaws designating the courts of Delaware for certain disputes between ATP and a "claiming party."[3] The ATP forum-selection clause provides, in relevant part, that "the Delaware Courts shall have exclusive jurisdiction over any dispute or controversy between any Claiming Party and the League or any member." Dkt. No. 123-1 ("ATP Bylaws") at 87.

---

[2] The arbitration provision in the Player & Player Entourage Terms and Conditions requires arbitration of "any dispute, claim, or cause of action in any way related or incidental to the credential, the terms and conditions[,] or [the credential bearer's] presence at, travel to and from, or *provision of services at*, the [2024 or 2025] US Open, and any activity associated therewith." Dkt. No. 185-3 at 7 (emphasis added).

[3] "Claiming Party" is defined to include any "current or prior member or Owners or anyone on their behalf." Dkt. No. 123-1 ("ATP Bylaws") at 87.

## II. PROCEDURAL HISTORY

Plaintiffs filed this action on March 18, 2025 against ATP, WTA, the International Tennis Federation ("ITF"), and the International Tennis Integrity Agency ("ITIA"). Dkt. No. 1. Following the filing of various motions by those Defendants to, *inter alia*, dismiss Plaintiffs' claims, dismiss PTPA as a plaintiff, compel arbitration, and sever-and-transfer, Plaintiffs filed an amended complaint on June 24, 2025, dismissing ITF and ITIA. Dkt. No. 109. WTA filed a renewed motion to compel arbitration and to dismiss the ATP Player Plaintiffs' claims, Dkt. No. 115; ATP filed a renewed motion to dismiss or, in the alternative, to sever-and-transfer, Dkt. No. 120; and the Tour Defendants filed a renewed motion to dismiss PTPA for lack of standing, Dkt. No. 118.

Plaintiffs subsequently amended their pleading to add the Grand Slam Defendants and Tennis Australia Limited ("Tennis Australia").[4] *See* Dkt. Nos. 139, 210.[5] The Complaint asserts federal antitrust claims arising from the alleged restraints—four Section 1 claims against all Defendants for price-fixing, refusal to deal, market allocation, and output restriction, two Section 2 claims against ATP and WTA for monopsonization of the professional men's tennis market and professional women's tennis market, respectively, and two Section 2 claims against all Defendants for conspiracy to monopsonize the professional men's and women's tennis markets—and a common-law claim for unjust enrichment. Compl. ¶¶ 453–606. The Player Plaintiffs seek damages and equitable relief on behalf of themselves and proposed classes of

---

[4] Plaintiffs and Tennis Australia reached a settlement, *see* Dkt. No. 182, and all deadlines with respect to Tennis Australia have been stayed, *see* Dkt. No. 194.

[5] The parties entered a stipulation permitting Plaintiffs to file a Third Amended Complaint, which "make[s] no material changes" and leaves Defendants' motions "operative as if they were made in response to the Third Amended Complaint." Dkt. No. 209 ¶ 2(a).

men's and women's professional tennis players; PTPA seeks injunctive and declaratory relief only. *Id.* at 180–81; *see also id.* ¶¶ 428–29.

In response to the operative Complaint, USTA moved to compel arbitration, Dkt. No. 183; AELTC and FFT moved to dismiss for lack of personal jurisdiction, Dkt. No. 186; and the Grand Slam Defendants moved to dismiss for failure to state a claim, Dkt. No. 189.

All six of Defendants' motions are now fully briefed and before the Court for decision.

## DISCUSSION[6]

### I. WTA'S AND USTA'S MOTIONS TO COMPEL ARBITRATION ARE DENIED

WTA moves to compel arbitration of the claims asserted against it by the WTA Player Plaintiffs pursuant to the arbitration provision contained in the WTA Rulebook. USTA separately moves to compel arbitration of the claims asserted by seven of the Player Plaintiffs who executed agreements containing an arbitration provision as a condition of entering the 2024 or 2025 U.S. Opens. Both Defendants seek corresponding stays of any litigation of the affected claims pending arbitration. The Court finds that no named Plaintiff agreed to arbitrate the antitrust claims asserted in this action. Accordingly, both motions to compel arbitration are denied.

[6] The Court refers to the parties' memoranda in support of and in opposition to the pending motions as follows: (i) **WTA's motion to compel arbitration**: Dkt. No. 116 as "WTA Mot."; Dkt. No. 128 as "Pls. Opp."; and Dkt. No. 130 as "WTA Reply"; (ii) **ATP's motion to dismiss or, in the alternative, to sever-and-transfer**: Dkt. No. 121 as "ATP Mot."; Dkt. No. 128 as "Pls. Opp."; and Dkt. No. 130 as "ATP Reply"); (iii) **the Tour Defendants' motion to dismiss PTPA for lack of standing**: Dkt. No. 119 as "Tour Defs. Mot."; Dkt. No. 124 as "Tour Defs. Opp."; and Dkt. No. 131 as "Tour Defs. Reply"; (iv) **USTA's motion to compel arbitration**: Dkt. No. 184 as "USTA Mot."; Dkt. No. 205 as "GS Opp."; and Dkt. No. 212 as "GS Reply"; (v) **AELTC's and FFT's motion to dismiss for lack of personal jurisdiction**: Dkt. No. 186 as "PJ Mot."; and (vi) **the Grand Slam Defendants' motion to dismiss for failure to state a claim**: Dkt. No. 190 as "GS Mot."

**A. Legal Standard on a Motion to Compel Arbitration**

Under Section 2 of the FAA, arbitration agreements are generally "valid, irrevocable, and enforceable." 9 U.S.C. § 2. "Where a party to an arbitration agreement refuses to comply with that agreement, and instead attempts to proceed in litigation, the other party may move to stay the litigation . . . and compel arbitration." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 240 (S.D.N.Y. 2020) (citing 9 U.S.C. §§ 3–4).[7] The FAA establishes "a liberal federal policy favoring arbitration agreements." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120 (2019) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). And it "leaves no place for the exercise of discretion by a district court," instead mandating "arbitration on issues as to which an arbitration agreement has been signed." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

The FAA requires courts to enforce arbitration agreements "according to their terms." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019). Any ambiguities as to the scope of the arbitration clause must be "resolved in favor of arbitration." *Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda.*, 638 F.3d 150, 154 (2d Cir. 2011) (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25).

In resolving a motion to compel arbitration, a court must determine (1) "whether the parties have entered into a valid agreement to arbitrate," and (2) "whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "[I]n evaluating whether the parties have entered into a valid

[7] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

arbitration agreement, the court must look to state law principles." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003). Under New York law, a contract exists where there is a "meeting of the minds" and a "manifestation of mutual assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019).[8] "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* at 289. Even if an offeree lacks "*actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Id.* (emphases in original).

If the court concludes that an agreement to arbitrate exists, "it should then consider whether the dispute falls within the scope of the arbitration agreement." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002). Though there are "various rules governing whether factual allegations subject a matter to arbitration," the "main concern in deciding the scope of arbitration agreements is to faithfully reflect the reasonable expectations of those who commit themselves to be bound by them." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995).

"Before addressing [this] inquiry, the court must also determine who—the court or the arbitrator—properly decides the issue." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128. "The question of whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144,

---

[8] Plaintiffs and WTA agree that New York law governs the validity and enforceability of the arbitration clause at issue. *See* WTA Rulebook at 403 ("Any dispute . . . shall be governed by the laws of the State of New York without reference to New York conflict of laws principles.").

153 (2d Cir. 2021). Thus, "courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 72 (2019). The party seeking to compel arbitration bears the burden of establishing "clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).

The standard of review for a motion to compel arbitration is "similar to that applicable for a motion for summary judgment." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022). As with a motion for summary judgment, the Court "considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).

**B. WTA's Motion to Compel Arbitration Is Denied**

The WTA Rulebook provides that "[a]ny Dispute between or among the WTA, WTA Tournaments or WTA Players . . . arising out of the application of any provision of [the WTA] Rulebook" that "is not finally resolved by applicable provisions of this Rulebook, shall be submitted exclusively to the American Arbitration Association ('AAA') for final and binding arbitration." WTA Rulebook at 403. WTA argues that the WTA Player Plaintiffs' claims against WTA must be heard in arbitration because (i) the WTA Player Plaintiffs are bound by the WTA Rulebook which submits any dispute arising thereunder to the AAA for final and binding arbitration, WTA Mot. at 7–9; (ii) the WTA Rulebook clearly and unmistakably delegates arbitrability to the arbitrator, *id.* at 9–10; and (iii) the WTA Player Plaintiffs' claims fall squarely within the scope of the WTA Rulebook's arbitration provision, *id.* at 10–11. The Court assumes,

without deciding, that the WTA Player Plaintiffs and WTA have entered into a binding agreement to arbitrate and that the agreement is valid and enforceable.[9] Because the WTA Player Plaintiffs' claims do not arise out of any application of the WTA Rulebook, WTA's motion to compel arbitration is denied.

### 1. The WTA Rulebook Does Not "Clearly and Unmistakably" Delegate Arbitrability

The first question is whether arbitrability is to be decided by the arbitrator or this Court. WTA argues that the WTA Rulebook's incorporation of the AAA rules evinces the parties' clear and unmistakable agreement to submit questions of arbitrability to the arbitrator. WTA Mot. at 9. The Court disagrees.

"In general, what is determinative for deciding whether the arbitrability of a dispute is to be resolved by the court or by the arbitrator is the arbitration agreement." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189 (2d Cir. 2019). Although parties may contract to arbitrate gateway questions concerning the scope or applicability of an arbitration clause, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

As an initial matter, WTA's contention that "[a]greeing to arbitrate in accordance with AAA rules clearly and unmistakably evidences an agreement for the arbitrator to decide arbitrability," WTA Mot. at 9, misstates the law. The Second Circuit has expressly held that

[9] WTA argues that because the WTA Player Plaintiffs had "sufficient notice of the [WTA's] Rules requiring arbitration, and unambiguously manifested assent to be bound by the Rules," the WTA Rulebook's arbitration provision is binding on them. WTA Mot. at 9. Plaintiffs contend that the arbitration clause is unenforceable as a matter of law because it furthers WTA's anticompetitive scheme and prospectively waives the WTA Player Plaintiffs' rights under the federal antitrust laws. Pls. Opp. at 36–39; *see also* Compl. ¶¶ 382, 387–89. Because WTA's motion to compel arbitration is denied on other grounds, the Court assumes the arbitration provision in the WTA Rulebook is valid and enforceable solely for purposes of resolving the motion and does not reach whether the provision is unconscionable or otherwise unenforceable.

while "explicit[] . . . incorporation" of procedural rules that "empower an arbitrator to decide issues of arbitrability . . . *may* serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator," "[i]ncorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) (first emphasis added). Rather, "where the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes . . . coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability," it could constitute "clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 318–19.

The WTA Rulebook expressly incorporates the AAA rules, *see* WTA Rulebook at 403, so the Court turns to the breadth of the agreement. WTA argues that the arbitration provision at issue is broad. WTA Mot. at 10–11; *see also* WTA Reply at 4, 6. Plaintiffs argue that the relevant clause is narrow because it "encompasses only disputes arising out of the application of the WTA Rulebook." Pls. Opp. at 34. Plaintiffs are right.

The WTA Rulebook expressly limits the arbitration agreement to "[a]ny dispute . . . arising out of *the application of any provision* of this Rulebook." WTA Rulebook at 403 (emphasis added). This is "not the sort of broad clause in which parties agree to submit to arbitration disputes 'of any nature or character,' or simply 'any and all disputes.'" *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988) (quoting *Rochdale Vill., Inc. v. Pub. Serv. Emp. Union, Loc. No. 80*, 605 F.2d 1290, 1295 (2d Cir. 1979)). Rather, the parties have agreed to "limit arbitration to specific types of disputes," namely, those arising out of the application of the Rulebook's provisions. *Id.*; *see also PrecisionWorks MFG, LLC v. Union Funding Source, Inc.*, No. 22-CV-08290 (LGS), 2022 WL

16857360, at *2 (S.D.N.Y. Oct. 25, 2022) (under New York law, "a reading of the [arbitration agreement] should not render any portion meaningless"). The language, "application of any provision," indicates that the parties "consented to arbitrate only a limited subset of disputes," and in such cases, "incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *DDK Hotels*, 6 F.4th at 319; *see also Ji Dong Cheng v. HSBC Bank USA, N.A.*, 467 F. Supp. 3d 46, 51 (E.D.N.Y. 2020) ("[W]hen the language of the clause itself is specific to disputes concerning a definite subject matter, and is not a clause intended to cover all disputes that might arise between the parties, it may properly be characterized as narrow.").

Accordingly, the Court cannot identify a "clear and unmistakable" expression of the parties' intent to delegate the issue of arbitrability to the arbitrator and concludes that it—not the arbitrator—must determine whether the WTA Player Plaintiffs' claims fall within the scope of the arbitration provision.

### 2. The WTA Player Plaintiffs' Claims Cannot Fairly Be Said to Arise Out of the Application of Any Rulebook Provision

WTA asserts that the arbitration clause encompasses the WTA Player Plaintiffs' claims because "the Amended Complaint focuses on the WTA Plaintiffs' grievances regarding player earnings, prize money, the Ranking Points system, player schedules, and player requirements, among other topics"—all of which are addressed by the WTA Rulebook. WTA Mot. at 10–11. The WTA Player Plaintiffs, meanwhile, contend that none of their claims are "based on, nor can they be resolved through, a simple application of a provision of the WTA Rulebook." Pls. Opp. at 32. Once again, Plaintiffs have the stronger argument.

The Court begins, as it must, with the language of the agreement: a "dispute" is subject to arbitration if it "aris[es] out of the application of any provision of this Rulebook." WTA Rulebook at 403. The ordinary meaning of "application" concerns the implementation, enforcement, interpretation, or operation of a rule in a particular context. *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/application (defining "application" as, *inter alia*, "an act of applying"); Merriam-Webster, http://www.merriam-webster.com/dictionary/apply (defining "apply" as, *inter alia*, "put into operation or effect"). A dispute over whether, for example, a player properly incurred a disciplinary sanction, qualified for tournament entry, received the correct ranking points, or complied with an eligibility requirement would naturally arise from the "application" of a Rulebook provision because resolution of the dispute would require interpreting or enforcing that provision.

The WTA Player Plaintiffs do not challenge the application of any provision in the WTA Rulebook, much less to any particular player. They do not allege that WTA improperly assessed ranking points, misapplied an eligibility requirement, erroneously imposed discipline, or otherwise failed to administer the Rulebook according to its terms. Indeed, the WTA Player Plaintiffs largely assume the opposite—that WTA applied its rules exactly as written. *See, e.g.*, Compl. ¶¶ 94, 157, 159, 180, 197, 202, 230, 253, 269, 286. Nor do the WTA Player Plaintiffs dispute the interpretation of any Rulebook provision. Rather, all Plaintiffs allege a far-reaching conspiracy among Defendants to restrain competition throughout professional tennis by which Defendants collectively suppressed prize money, restricted commercial opportunities, coordinated tournament schedules, controlled player rankings, limited competition among tournaments, and imposed numerous other restraints through a network of agreements and governing documents. *See id.* ¶¶ 146–379. Whether Plaintiffs ultimately can establish such a

conspiracy will depend upon evidence concerning Defendants' alleged agreements, market structure, competitive effects, and business justifications—not on whether WTA correctly interpreted or fairly enforced any of the Rulebook's provisions.

WTA's arguments miss the point. First, WTA contends that Plaintiffs' claims are "undoubtedly related to matter[s] covered by the WTA Rulebook and are therefore encompassed by the arbitration provision." WTA Mot. at 10–11. But references to the Rulebook's provisions, or claims that may share a subject matter with portions of the Rulebook, do not transform the WTA Player Plaintiffs' claims into disputes arising out of the application of those provisions. Second, WTA argues that the phrase, "any dispute," is "clear and unmistakable evidence of an agreement to arbitrate." WTA Reply at 2. But the parties did not agree to arbitrate "any dispute" or even "any dispute" touching upon a subject addressed in the Rulebook or professional tennis generally; they agreed to arbitrate any dispute "arising out of the application of any provision of [the WTA] Rulebook." WTA Rulebook at 403. WTA's failure to "give meaning to every . . . word" is fatal. *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 116 (2d Cir. 2010); *see also Tech. Ins. Co., Inc. v. Philadelphia Indem. Ins. Co.*, 642 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) ("a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect"); *Ji Dong Cheng*, 467 F. Supp. 3d at 51 (when "[t]he language of the clause itself is specific to disputes concerning [a definite subject matter]," it "is not a clause intended to cover all disputes that might arise between the parties").

Because the WTA Player Plaintiffs' claims do not fall within the scope of WTA's arbitration clause, WTA's motion to compel arbitration is denied.

### C. USTA's Motion to Compel Arbitration Is Denied

USTA's Legal Consent Waiver agreement requires arbitration of "any dispute, claim, or cause of action in any way related or incidental to [the player's] presence at, travel to and from, or participation in the [2024 or 2025] US Open, and any activity associated therewith." Dkt. No. 185-4 at 6; *see also* Dkt. No. 185-3 at 7.[10] According to USTA, the claims of seven Player Plaintiffs are necessarily "related" to their presence at or participation in the 2024 or 2025 U.S. Opens. USTA Mot. at 12–13. USTA further contends that incorporation of the AAA Rules constitutes clear and unmistakable evidence that the parties delegated questions of arbitrability to the arbitrator. *Id.* at 9. The Court finds otherwise on both points.[11]

#### 1. The Participation Agreements Do Not "Clearly and Unmistakably" Delegate Arbitrability

As with WTA's motion to compel arbitration, the threshold issue is whether USTA's arbitration provision delegates the question of arbitrability to the arbitrator. USTA argues that the arbitration provisions in the participation agreements are "broad and express[] the intent to arbitrate all aspects of all disputes," which, coupled with the incorporation of the AAA rules, "constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability to the arbitrator." USTA Mot. at 9 (citing *DDK Hotels*, 6 F.4th at 318–19).

---

[10] As noted *supra* n.2, the arbitration provision in the Legal Consent Waiver agreement, Dkt. No. 185 at 6, differs slightly from that in the Player & Player Entourage Terms and Conditions, Dkt. No. 185-3 at 7 (omitting "participation in" and adding "provision of services at"). This difference in language is not material and does not alter the Court's analysis or its ultimate conclusion that the arbitration provisions contained in the U.S. Open participation agreements do not encompass the relevant Player Plaintiffs' claims.

[11] USTA argues that the relevant Player Plaintiffs entered into valid agreements to arbitrate with the USTA. USTA Mot. at 7–9. Plaintiffs contend in turn that the arbitration clauses are "unenforceable as prospective waivers of [Plaintiffs'] rights and remedies under the federal antitrust laws." GS Opp. at 77–78. Because USTA's motion to compel arbitration is denied on other grounds, the Court assumes the arbitration clause in USTA's participation agreements is valid and enforceable solely for purposes of resolving the present motion and does not reach whether the provision is unconscionable or otherwise unenforceable.

Plaintiffs argue in response that the arbitration clause is "expressly narrowed by a qualifying provision," that is, the dispute must relate to a player's "presence or provision of services 'at' or 'in' the 2024 or 2025 US Opens." GS Opp. at 77. According to Plaintiffs, "[a]ny delegation thus covers only disputes regarding players' conduct during those two particular events, and not an antitrust conspiracy entered decades earlier." *Id.*

The Court agrees with Plaintiffs. Like the arbitration clause at issue in WTA's motion, the language of USTA's arbitration provision does not extend to disputes of "any nature or character" or simply, to "any and all disputes," *Rochdale*, 605 F.2d at 1295, because the provision's scope is expressly limited to "[the signatory's] presence at, travel to and from, or participation in the [2024 or 2025] US Open." Thus, the parties "consented to arbitrate only a limited subset of disputes." *DDK Hotels*, 6 F.4th at 319; *see also Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 398 (2d Cir. 2015) ("the presumption of arbitrability is overcome because we find positive assurance that the arbitration clause's scope . . . is temporally limited").[12] Because here, "there is a qualifying provision . . . that arguably excludes the present dispute from the scope of the arbitration agreement," USTA's arbitration provision "creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator." *DDK Hotels*, 6 F.4th at 322; *see also Bucsek*, 919 F.3d at 191 ("[V]ague provisions as to whether the dispute is arbitrable are unlikely to provide the needed clear and unmistakable inference of intent to arbitrate its arbitrability."). Absent an express statement that delegates arbitrability to the arbitrator, an agreement to delegate cannot be inferred under these circumstances merely from the reference to the AAA rules. Accordingly, this Court must resolve arbitrability.

[12] USTA's arbitration clause is constrained with respect to its geographic scope, its temporal scope, and its subject matter, and is thus, distinguishable from the "categorical, unconditional, and unlimited" clauses at issue in the cases cited in USTA's motion. *See* USTA Mot. at 10.

**2. The Participation Agreements' Arbitration Provisions Do Not Encompass the Relevant Player Plaintiffs' Claims**

Having determined that this Court should resolve whether the relevant Player Plaintiffs' claims are arbitrable, the next question is whether USTA's arbitration clause encompasses those claims. Without propounding any limiting principle on its interpretation of the arbitration clause, USTA makes a blanket assertion that the relevant Player Plaintiffs' claims are plainly related to their "presence, participation, provision of services, and activity at the 2024 and 2025 US Opens." USTA Mot. at 13. The Court finds otherwise.

As an initial matter, while the phrase "relating to" is "broad language" of "expansive" reach, its reach is "not unlimited." *Fasano v. Li*, 47 F.4th 91, 102 (2d Cir. 2022). Indeed, the applicability of USTA's arbitration clause is expressly limited to any dispute "related or incidental to [Plaintiffs'] presence at, participation in, provision of services at, or activity at [the 2024 or 2025 U.S. Opens]." USTA Mot. at 1. That language cannot reasonably be interpreted to extend to "any dispute between the parties." *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 561 (S.D.N.Y. 2018); *see also Ji Dong Cheng*, 467 F. Supp. 3d at 51 (when "the language of the clause itself is specific to disputes concerning a definite subject matter," such as the 2024 and 2025 U.S. Opens, it "is not a clause intended to cover all disputes that might arise between the parties"). Further, the reasonableness of a party's interpretation of a contractual provision must be examined "in the context of the entire agreement." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1990). "Ultimately, the court must interpret a contract's language in a way that most accurately reflects what the parties intended when they entered into the contract." *T.C. Swartz v. Grand Expeditions, Inc.*, No. 03-CV-06012 (DAB), 2003 WL 23021961, at *5 (S.D.N.Y. Dec. 24, 2003) (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 426 (2d Cir. 1992)).

USTA's participation agreements are not akin to general agreements governing an ongoing commercial relationship. To the contrary, the arbitration clause at issue is included in annual entry forms that are executed as a condition of participating in a particular edition of a single tournament. *See* Dkt. Nos. 185-3, 185-4. The agreements address matters naturally attendant to participation in that event, including tournament operations, media rights, player conduct, releases, and dispute resolution. *Id.* Accordingly, when "read as a whole," *W.W.W. Assocs.*, 77 N.Y.2d at 162, the participation agreements clearly govern the kinds of disputes arising out of participation in the 2024 or 2025 U.S. Opens, such as who is responsible for injuries incurred during practice or matches at the U.S. Open facilities, or the consequences of a player using footage of themselves playing at the U.S. Open for some personal business venture. *See, e.g.*, Dkt. No. 185-3 at 3–5; Dkt. No. 185-4 at 4–5.

The claims asserted by Plaintiffs are fundamentally different. The Complaint does not challenge conduct unique to either the 2024 or 2025 U.S. Opens, nor allege that USTA breached obligations arising from the participation agreements themselves. Rather, Plaintiffs allege a long-running overarching conspiracy among the Grand Slam Defendants, the Tour Defendants, and their tournament co-conspirators to restrain competition throughout professional tennis. That conspiracy predates the execution of the 2024 and 2025 U.S. Open participation agreements, extends far beyond those tournaments, and affects professional tennis at-large.

USTA's contrary interpretation would substantially expand the agreements beyond their evident subject matter. Nothing in the agreements suggests that the parties intended it to operate as a comprehensive dispute-resolution mechanism governing every possible legal claim that might later be asserted concerning the organization of professional tennis generally, and the Court declines to adopt such an expansive construction. *See Leadertex, Inc. v. Morganton*

*Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995) ("As with any contractual matter our main concern in deciding the scope of arbitration agreements is to faithfully reflect the reasonable expectations of those who commit themselves to be bound by them."); *Khowala v. Vivint Smart Home, Inc.*, No. 23-CV-01068 (AT), 2024 WL 3638265, at *4 (S.D.N.Y. Aug. 1, 2024) (finding that an arbitration clause did not govern "the parties' dispute . . . which occurred prior to the execution of [an agreement signed in 2022]" because the clause "limit[s] the scope of the clause to disputes 'arising out of, relating to, or in connection with' [that agreement]").

Critically for USTA, none of Plaintiffs' claims rise or fall on any putative class member's "presence at, participation in, provision of services at, or activity at" the 2024 or 2025 U.S. Opens. USTA Mot. at 1. Put differently, the relevant Player Plaintiffs' "presence at, participation in, provision of services at, or activity at" the 2024 or 2025 U.S. Opens is entirely irrelevant to Plaintiffs' ability to assert their claims. *Davitashvili v. Grubhub Inc.*, 131 F.4th 109 (2d Cir. 2025), provides a helpful analogy. There, the Second Circuit considered whether app-based food-delivery companies could compel restaurant customers to arbitrate their class-action antitrust claims that Grubhub, Uber Eats, and Postmates "fixed restaurant meal prices by entering into [no-price competition clauses] in which the restaurants agreed not to charge lower prices off-platform," allegedly causing the restaurants' non-app-ordering customers "to pay artificially high prices" for their meals. *Id.* at 114. The platforms moved to compel arbitration, arguing that the plaintiffs had accounts with them, and the terms of use for those accounts contained broad arbitration provisions. *Id.* The Second Circuit affirmed the district court's denial of the motion as to Grubhub, reasoning that "Plaintiffs who never used Grubhub are just as much class members as those who have." *Id.* at 120. So too here. Plaintiffs who have never competed in the 2024 or 2025 U.S. Opens are "just as much [putative] class members as those who have." *Id.*

Under binding Supreme Court and Second Circuit precedent, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Local Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 112–13 (2d Cir. 2023) (emphasis in original) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)). Even giving proper weight to the general legal preference for enforcing arbitration agreements, the Court is not convinced that the parties intended to arbitrate Plaintiffs' claims. Accordingly, USTA's motion to compel arbitration is denied.

## II. ATP'S AND WTA'S MOTIONS TO DISMISS THE WTA PLAYER PLAINTIFFS AND ATP PLAYER PLAINTIFFS, RESPECTIVELY, ARE DENIED

ATP moves to dismiss the WTA Player Plaintiffs' claims against ATP, and WTA moves to dismiss the ATP Player Plaintiffs' claims against WTA. WTA argues that the ATP Player Plaintiffs cannot state a claim against it because Plaintiffs fail to allege a plausible conspiracy between WTA and ATP. WTA Mot. at 13–15. WTA presses the purported "paucity of factual allegations" in the Complaint, as well as the "obvious alternative explanation[s]" for the separateness of men's and women's professional tennis. *Id.* at 13. ATP raises similar arguments. *See* ATP Mot. at 18–26. Plaintiffs contend that both motions must be denied because Plaintiffs plausibly allege direct and circumstantial evidence of Defendants' anticompetitive agreements. *See* Pls. Opp. at 43–51. At this stage of the case, both motions must be denied.

### A. Legal Standard on a Motion to Dismiss

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This

requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether a claim has "facial plausibility," that is, whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"There is no heightened pleading standard in antitrust cases." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017) (citing *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016)). "[A]t the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

### B. Plaintiffs Have Plausibly Alleged That ATP and WTA Are Engaged in an Antitrust Conspiracy that Injures Players on the Other Tour

Accepting ATP's and WTA's arguments requires a pinched and narrow reading of both the Complaint and antitrust law—neither of which is appropriate on a motion to dismiss. The

Court, of course, is required to accept the Complaint's well-pled allegations as true, and draw every inference in favor of Plaintiffs, without giving credence to Defendants' arguments about what they believe the facts will ultimately show. As discussed above, the Complaint alleges, in great detail, a wide-ranging conspiracy among *all* Defendants to control player earnings, box out potential competitors, and control the terms and conditions of players' work, *across professional tennis as a whole*, to serve their own economic interests to the detriment of players. But even dividing the allegations of the Complaint into discrete and separate antitrust theories, Plaintiffs have sufficiently alleged claims that can be brought by male players against WTA and female players against ATP. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

#### 1. Plaintiffs Have Plausibly Alleged That ATP and WTA Conspired to Allocate Markets

ATP and WTA contend that *Twombly* requires this Court to reject Plaintiffs' claims regarding any market-allocation conspiracy because there are "obvious alternative explanation[s]" for the separateness of men's and women's professional tennis, including (i) the long history of separate men's and women's tours, WTA Mot. at 13; (ii) the fact that men and women do not ordinarily compete against each other in professional tennis matches, *id.*; (iii) the fact that men's and women's professional tennis players are each a "distinct and identifiable group of professional athletes as recognized by both the sports industry and sports fans," ATP Mot. at 21 (quoting Compl. ¶¶ 377–78); and (iv) "business factors, such as the actual and opportunity costs of launching a women's tour, or the difficulty of competing with WTA," *id.* at 23.

As an initial matter, the Tour Defendants misread *Twombly* as standing for the proposition that the mere existence of alternative explanations serves to destroy the plausibility of Plaintiffs' conspiracy claims. Read in context, it is clear that *Twombly*'s point regarding alternative explanations was that they nearly always exist for parallel conduct, such that an allegation of parallel conduct alone cannot plausibly allege a conspiracy. 550 U.S. at 567; *see also id.* at 564–65 ("[T]he complaint leaves no doubt that plaintiffs rest their [conspiracy] claim on descriptions of parallel conduct and not any independent allegation of actual agreement.").

Contrary to the Tour Defendants' argument, the Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's well-pled conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct. That would be equivalent to "impos[ing] a probability requirement at the pleading stage," which *Twombly* expressly does not do. 550 U.S. at 556; *see also Gelboim*, 823 F.3d at 782 ("[A]t the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. . . . A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."). By asking the Court to choose their ostensibly innocent explanations over Plaintiffs' allegations of an unlawful conspiracy, the Tour Defendants are asking the Court to undertake a weighing of evidence that is not appropriate at the pleading stage. *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 688 (S.D.N.Y. 2012) ("The examination of a complaint for its purported failure to state a claim under the law is not the occasion for a court to

judge the merits of the parties' competing claims, including claims about the motivations of critical actors in an alleged price-fixing conspiracy.").

Here, Plaintiffs have alleged "sufficient factual matter to plausibly suggest an inference of conspiracy." *Gelboim*, 823 F.3d at 782. For example, Plaintiffs allege that the Tours' respective bylaws restrict operators of sanctioned tournaments from staging certain competing events: the WTA Bylaws restrict competing women's events, while the ATP Bylaws restrict certain competing men's events. Compl. ¶¶ 318–24. According to the Complaint, ATP and WTA agreed to those restrictions through their interests in the United Cup. *Id.* ¶¶ 330–31, 341–46. Together with the allegation that each Tour has agreed not to organize events competing for players on the other Tour, *id.* ¶¶ 337–39, those allegations provide more than the mere observation that ATP and WTA have historically operated separate circuits, and the Complaint as a whole is sufficient to allege a market-allocation agreement (accepting for present purposes that men's professional tennis and women's professional tennis are separate markets for antitrust purposes).[13]

[13] The fact that "there are still separate product markets for men's and women's professional tennis," WTA Mot. at 11; *see also* ATP Mot. at 21 ("The Amended Complaint still claims that there are two distinct, relevant markets"), does not render Plaintiffs' market-allocation conspiracy implausible as a matter of law. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50 (1990) (market allocation agreements are "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other"); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 363 (S.D.N.Y. 2016) ("Section 1 . . . allows for the flexibility to allege a result (e.g. higher prices) derived from conspiratorial behavior between two or more actors, who need not be within the same market, to achieve that end"); *accord Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) (opining, in the context of standing, that "different injuries in distinct markets may be inflicted by a single antitrust conspiracy," and thus, "differently situated plaintiffs might be able to raise claims").

### 2. Plaintiffs Plausibly Allege that the Tour Defendants Participate in One Another's Markets Through the United Cup

In addition to a market allocation conspiracy, Plaintiffs also identify a specific arrangement that supports an inference of participation in both markets, namely ATP's and WTA's joint ownership and operation of the United Cup, a mixed men's and women's tournament sanctioned by both Tours. Compl. ¶ 340.

The Tour Defendants contest a necessary link in Plaintiffs' theory, arguing that Plaintiffs' United Cup allegations do not sufficiently plead that WTA and ATP are Tournament Class Members of each other under the governing documents. WTA Mot. at 14–15; ATP Mot. at 25–26. But the Court need not decide on these motions whether ownership alone establishes either entity's formal membership or binds it to every provision Plaintiffs identify. Plaintiffs allege joint ownership and operation of a tournament sanctioned by both Tours, as well as restrictions on tournament operators that, according to Plaintiffs, constrain the Tours themselves. Compl. ¶¶ 318–24, 330–31, 340–46. Those allegations plausibly connect each Tour to the asserted restraints, and are not so "clearly baseless" nor "fanciful" as to warrant dismissal. *Tessema v. Env't Prot. Agency*, No. 20-CV-09700 (MKV), 2021 WL 2666855, at *4 (S.D.N.Y. June 29, 2021). Whether the governing documents in fact bind ATP and WTA in the manner Plaintiffs claim should be tested against a developed record, and at this stage, the Court finds that Plaintiffs' allegations concerning the United Cup sufficiently plead an agreement.

### 3. Plaintiffs Plausibly Allege Other Unlawful Coordination in Support of the Broader Conspiracy

Finally, the Complaint is replete with allegations of intentional parallel conduct and coordination in furtherance of the alleged conspiracy, including that ATP and WTA adopted restrictions on tournament prize money and player commercial opportunities, Compl. ¶¶ 150–214; coordinate aspects of their calendars and ranking systems, *id.* ¶¶ 215–99; and participate in

arrangements limiting entry by competing tournaments, *id.* ¶¶ 300–36. Specifically, Plaintiffs identify a particular instance in which both Tours rejected proposed increases in prize money at the BNP Paribas Open, which, according to Plaintiffs, is "further evidence of the agreements among the Defendants to stratify the prize money awards." *Id.* ¶¶ 7, 172.[14] As further examples, the Complaint also alleges that the Tour Defendants together conspire with the Grand Slam Defendants (whose tournaments include both male and female players) to ensure that no sanctioned tournament on either Tour will offer prize money greater than that offered by the Grand Slams, *id.* ¶ 465, and that the Tour Defendants have agreed with each other to maintain the price-fixing restrictions in their respective rulebooks, *id.* ¶ 464. It is not difficult to see how participants in two separate but related markets could agree to use their respective monopsony power to reinforce the monopsony power of the other—it is more than plausible, for example, that if WTA lifted its restrictions on the prize money sanctioned tournaments could pay to female tennis players, that would dramatically increase the market pressure on ATP to lift its corresponding restrictions on prize money for male players. Thus, both actors benefit from the

[14] ATP argues that Plaintiffs fail to establish parallel conduct because they do not allege WTA and ATP are horizontal competitors. ATP Reply at 10. The Court disagrees. As an initial matter, Plaintiffs do allege that WTA and ATP "are competitors in the markets for the services of professional tennis players." Compl. ¶ 499. Plaintiffs further allege that "the other [Tour] is the potential competitor most prepared and best equipped to cross into the other's market and vie for the services of its players." *Id.* ¶ 337; *see Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 310 (2d Cir. 2023) (rejecting defendants' arguments that they "are not competitors" because that argument "runs headlong into [plaintiff's] allegations, which [the court] must accept as true"); *see also Cnty. of Orange v. Sullivan Highway Prods., Inc.*, No. 88-CV-08583 (JFK), 1989 WL 124213, at *5 (S.D.N.Y. Oct. 12, 1989) (rejecting defendants' argument that they were not liable because they were not "competitors" because "defendants had control over and in fact determined with their co-conspirators the dimensions of the market" such that "[t]he conspiracy was able to function through each conspirator's agreement to maintain uniform price levels"). In any event, "parties can be horizontal competitors regardless of whether they are actual competitors (i.e., currently competing in the same market) or potential competitors." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 239 (E.D.N.Y. 2003); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 243 (S.D.N.Y. 2019) (citing *Palmer*, 498 U.S. at 46–48).

agreement to continue certain anticompetitive practices within their respective markets. The allegations of coordinated anticompetitive conduct in the Complaint are more than sufficient at this stage to allege a conspiracy in which actions of WTA injure male tennis players and actions of ATP injure female tennis players.

In contrast to *Twombly*, where the plaintiffs' complaints were dismissed because the plaintiffs "essentially pleaded only parallel conduct, with little more," *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013), Plaintiffs here set forth several plus factors that move their allegations across the line to at least "plausible." *See id.* at 136 (examples of plus factors include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications"). Plaintiffs allege a common motive to suppress players' wages and prevent new entry. *See* Compl. ¶¶ 148–214, 300–46; *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018) (opining that there was "little difficulty finding a common motive to conspire" where plaintiffs pled that defendants "feared . . . use [of] competition to reduce [their] outsized . . . profits"). Plaintiffs also contend that each Tour had an economic interest in preserving the existing tournament structure and limiting competition for players' services. *Id.* ¶¶ 168–70, 337–40.[15]

While the Tour Defendants are correct that both Tours could have, for example, rejected the prize-money proposal for separate reasons under their respective rules, when the allegations

[15] WTA argues that the ATP Player Plaintiffs fail to allege antitrust injury caused by WTA. WTA Reply at 11–12. Not so. The Complaint alleges that "[t]he illegal agreements among the Tour Defendants" including WTA "directly harm the market for the services of male players in the United States," Compl. ¶ 415, so Plaintiffs have sufficiently pled antitrust injury.

in the Complaint are considered as a whole, including allegations that the Tours agreed not to organize competing events for players on the other Tour and participated in identified common arrangements, Compl. ¶¶ 337–46, along with the other examples cited above, Plaintiffs' allegations of concerted action readily clear the bar of plausibility. *See Gelboim*, 823 F.3d at 781–82.

Accordingly, WTA's motion to dismiss the ATP Player Plaintiffs' claims and ATP's motion to dismiss the WTA Player Plaintiffs' claims are both denied.

## III. AELTC'S AND FFT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION IS DENIED

AELTC and FFT move to dismiss for lack of personal jurisdiction. They contend that Plaintiffs have failed to establish (i) a statutory basis for jurisdiction, and (ii) that the exercise of jurisdiction would comport with constitutional due process. PJ Mot. at 3, 14. The Court finds otherwise on both points.

### A. Legal Standard on a Motion to Dismiss for Lack of Personal Jurisdiction

"To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff must make a *prima facie* showing that the Court has personal jurisdiction over the defendant." *Kamal v. Pressler, Felt & Warshaw, LLP*, No. 23-CV-10487 (MKV), 2025 WL 919505, at *4 (S.D.N.Y. Mar. 25, 2025). A plaintiff makes such a showing by "pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). The Court may consider materials outside the pleadings when making this assessment. *See Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 276 (2d Cir. 2024). However, the Court cannot "draw argumentative inferences in the plaintiff's favor" and need not accept conclusory legal statements. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). In assessing whether a

plaintiff has made a sufficient *prima facie* showing, the Court must "construe the pleadings and any supporting materials in the light most favorable" to the plaintiff, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013), and resolve all doubts in the plaintiff's favor, *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022).

**B. The Court May Exercise Personal Jurisdiction Over AELTC and FFT**

"Determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires a two-step inquiry." *Licci*, 732 F.3d at 168. The Court examines first whether there is "a statutory basis for personal jurisdiction." *Pharmacy-Checker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 321 (S.D.N.Y. 2021). If such basis exists, the Court must satisfy itself that the "exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Licci*, 732 F.3d at 168. The Court addresses each step of the analysis.

**1. There Is a Statutory Basis for Jurisdiction Over AELTC and FFT**

The statutory basis of personal jurisdiction is "determined by the law of the state in which the court is located," which in this case is New York. *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010). Plaintiffs state that the Court has personal jurisdiction over AELTC and FFT under all three prongs of New York Civil Practice Law & Rules ("C.P.L.R.") Section 302(a), and under Federal Rule of Civil Procedure 4(k)(2). GS Opp. at 45–55, 61–62. Because jurisdiction exists under C.P.L.R. § 302(a)(2), the Court does not address the other asserted bases of jurisdiction.[16]

[16] Plaintiffs' argument that this Court has jurisdiction over AELTC and FFT under Rule 4(k)(2), *see* GS Opp. at 61–62, fails because, "to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state," *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) (citing cases), and no such certification has been made. The Court takes no position on whether such a certification could be made.

C.P.L.R. § 302(a)(2) "confers long-arm jurisdiction over a non-domiciliary who commits a tort in New York State through an agent." *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 605 (1st Dep't 1998), *aff'd on other grounds*, 94 N.Y.2d 43 (N.Y. 1999). "As New York courts have long recognized, allegations of a conspiracy can satisfy the statute and a co-conspirator can be considered an agent so that '[t]he acts of a co-conspirator may, in an appropriate case, be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant.'" *Berkshire Bank v. Lloyds Banking Grp. plc*, No. 20-CV-01987, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (quoting *Reeves v. Phillips*, 388 N.Y.S.2d 294, 296 (1st Dep't 1976)). "To assert a conspiracy theory of personal jurisdiction, a plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant[s] participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021). "Courts then consider whether 'a defendant's membership in the conspiracy' should confer jurisdiction based on whether; '(1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators.'" *Black v. Dain*, No. 16-CV-01238 (CBA) (ST), 2016 WL 11794335, at *3 (E.D.N.Y. Dec. 29, 2016) (quoting *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 170 (S.D.N.Y. 2014)).

Plaintiffs have plausibly alleged sufficient facts to satisfy *Schwab*'s three elements. The first two elements are plainly met. First, Plaintiffs have plausibly alleged the existence of a conspiracy involving AELTC and FFT. *See infra* § IV; *see, e.g.*, Compl. ¶¶ 148–49 (price

fixing), 215–242 (Ranking Points Agreement), 300 (output restriction), 467–68 (Grand Slam Rulebook). Second, Plaintiffs have alleged that AELTC and FFT participated in the conspiracy. *See infra* § IV; *see, e.g.*, Compl. ¶¶ 3, 5–6, 65, 108–110, 148–72. As to the third *Schwab* element, AELTC and FFT argue that Plaintiffs fail to allege any overt acts by USTA (an alleged co-conspirator) in furtherance of the conspiracy. PJ Reply at 21. Specifically, AELTC and FFT contend that the "staging of the US Open in New York does not constitute an overt act in furtherance of the alleged conspiracy," and that Plaintiffs altogether fail to explain how the U.S. Open can be an overt act in furtherance of the alleged conspiracy. *Id.* at 22. The Court finds that Plaintiffs have sufficiently pled that USTA performed at least one overt act in furtherance of the conspiracy in New York.

"An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011). This "is not a difficult requirement to meet." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 271 (2d Cir. 2023); *see also Tzolov*, 642 F.3d at 320 ("The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy."). AELTC and FFT argue that USTA's operation of the U.S. Open in New York cannot establish an overt act in furtherance of the alleged conspiracy. PJ Mot. at 12. But it is not merely the staging of the U.S. Open in New York that, Plaintiffs argue, furthers the conspiracy. Rather, Plaintiffs allege that, at the U.S. Open, USTA selects entrants under the ranking-based criteria agreed upon by the Grand Slam Defendants and the Tours, Compl. ¶¶ 109, 236–40; requires players to grant commercial rights without separate compensation and comply with the Grand Slam Rulebook's endorsement restrictions, *id.* ¶¶ 181–86, 197–205; and pays prize money allegedly constrained by Defendants' compensation arrangements and their unlawful agreements

to restrain player earnings, *id.* ¶¶ 168–74. On Plaintiffs' theory, these are the means by which USTA implements the conspiratorial agreement in New York and obtains players' services on the allegedly restrictive terms. Accepting the well-pled allegations for present purposes, USTA's actions can satisfy *Schwab*'s third prong.

Plaintiffs have also satisfied the three additional requirements to establish personal jurisdiction over a co-conspirator under New York law, namely, "awareness, benefit, and direction or control." *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 127 (2d Cir. 2023). First, the allegations support the inference that both AELTC and FFT were aware of the effects of their activity in New York. Plaintiffs allege that AELTC and FFT participate in the shared Grand Slam governance structure that adopts rules for all four tournaments, including the U.S. Open held in New York. Compl. ¶¶ 48, 106–09. They further allege that those rules govern player entry, commercial rights, and other conditions of competition at the U.S. Open. *Id.* ¶¶ 108–09, 181–205. Further, there can be no contention that the existence and operation of the U.S. Open (including those aspects discussed above with respect to *Schwab*'s third element) were somehow unknown to or hidden from AELTC and FFT. The allegations in the Complaint easily support an inference that AELTC and FFT were aware of the effects in New York of the challenged arrangements.

Second, the Complaint plausibly alleges that the New York-based co-conspirators acted to benefit AELTC and FFT. Plaintiffs allege that the arrangements preserve the Grand Slams' position relative to other tournaments, limit competition for players' services, and enable the Grand Slam Defendants to obtain player participation and player rights on restrictive terms. *Id.* ¶¶ 5–9, 170–74, 317–36, 347–59. On Plaintiffs' theory, implementation of those arrangements

at the U.S. Open directly benefits AELTC and FFT by sustaining the common system under which they operate Wimbledon and the French Open, respectively.

"The third requirement—that the New York-based co-conspirators acted at the direction or under the control of the out-of-state defendant—may be satisfied by an allegation that the out-of-state defendant was 'aware of the torts being committed by' co-conspirators in New York." *Fat Brands*, 75 F.4th at 127 (quoting *Berkshire Bank*, 2022 WL 569819, at *3); *see also Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 8 (1st Dep't 2013) (noting that this requirement is satisfied where a plaintiff alleges "that the out-of-state co-conspirator has knowledge of the tortious acts being perpetrated in New York"). Here, Plaintiffs allege "more than knowledge." *Fat Brands*, 75 F.4th at 127. They allege AELTC and FFT "participated directly in the scheme being executed by, among others, New York-based co-conspirators," *id.*, including USTA. *See* Compl. ¶¶ 106–09. Accordingly, the Court may "easily infer that they were aware of the torts being committed in New York." *Fat Brands*, 75 F.4th at 127.

In sum, Plaintiffs allege far more than USTA's independent operation of a tournament that happens to take place in New York—they allege its implementation there of rules adopted with the participation of, and for the benefit of, alleged co-conspirators AELTC and FFT. At this stage, those factual allegations plausibly support an inference that USTA acted on their behalf in carrying out the alleged anticompetitive scheme, which establishes conspiracy-based personal jurisdiction pursuant to New York's long-arm statute.

**2. The Exercise of Personal Jurisdiction Over AELTC and FFT Comports With Due Process**

Next, the Court must determine whether the exercise of personal jurisdiction over AELTC and FFT is consistent with due process. "Due process considerations require that the defendant 'have certain minimum contacts [with the forum state] such that the maintenance of

the suit does not offend traditional notions of fair play and substantial justice.'" *Licci*, 732 F.3d at 169 (quoting *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945)). Minimum contacts "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* at 170. A defendant can purposefully avail itself of the forum by creating the requisite minimum contacts through actions of a third party such as a co-conspirator because "[m]uch like an agent who operates on behalf of, and for the benefit of, its principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy." *Schwab*, 22 F.4th at 122. The Second Circuit has noted that the due process and long-arm analyses regarding personal jurisdiction are related because "the New York requirements [for conspiracy jurisdiction] (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have purposefully availed itself of the privilege of doing business in the forum." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018); *accord Licci*, 732 F.3d at 170 ("despite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare"). Nevertheless, the Court undertakes a separate constitutional analysis.

**i. AELTC and FFT Possess Minimum Contacts With New York**

AELTC and FFT argue that Plaintiffs fail to establish a sufficient nexus with New York because they do not allege any facts demonstrating specific jurisdiction under a conspiracy-jurisdiction theory. PJ Mot. at 17.[17] The Court expressly holds otherwise. *See supra* § III(B)(1).

---

[17] AELTC and FFT cite to *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), for the constitutional due process analysis. PJ Mot. at 14–15. *Fuld*, however, is inapposite because the question

"[B]y joining the conspiracy with the knowledge that overt acts in furtherance of the conspiracy had taken place in New York," AELTC and FFT "purposely availed themselves 'of the privilege of conducting activities within [New York].'" *Berkshire Bank*, 2022 WL 569819, at *4 (quoting *Lawati*, 961 N.Y.S.2d at 8). Accordingly, the minimum contacts component of the due process inquiry is satisfied.

**ii. The Exercise of Personal Jurisdiction Comports with Traditional Notions of Fair Play and Substantial Justice**

The Court next considers "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012). The Second Circuit has recited a five factor test for this "reasonableness" analysis: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) (citing *Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 113–14 (1987)).

---

presented in *Fuld* was whether the personal jurisdiction provision in the Promoting Security and Justice for Victims of Terrorism Act violates the Due Process Clause of the Fifth Amendment. 606 U.S. at 6; *see also id.* at 16 ("declin[ing] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment" and holding that "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority"). In contrast to *Fuld*, the Court's exercise of personal jurisdiction over AELTC and FFT is pursuant to New York's long-arm statute and Rule 4(k)(1)(A), and not a federal statute. Therefore, the proper analysis is the traditional "minimum contacts" test under the Due Process Clause of the Fourteenth Amendment.

AELTC and FFT argue that the exercise of jurisdiction would offend notions of fair play and substantial justice, because, *inter alia*, "defending a case in New York would be very burdensome" for these foreign defendants, relevant "documents, witnesses, and evidence are likely to be overwhelmingly" in London and Paris, and the Complaint "contains only conclusory allegations that the purported improper conduct giving rise to Plaintiffs' claims took place in New York." PJ Mot. at 17–19. None of these arguments are persuasive.

First, while there will be some burden on AELTC and FFT if they were ultimately required to travel from the United Kingdom and France, respectively, to New York for trial, "that fact provides only weak support in light of the conveniences of modern communication and transportation." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-02481 (KBF), 2015 WL 6472656, at *13 (S.D.N.Y. Oct. 23, 2015). Second, "the United States plainly has an interest in adjudicating alleged violations of its antitrust laws that affect U.S. entities such as" USTA, ATP, and WTA. *Enhanced US LLC v. World Aquatics*, No. 25-CV-07096 (JMF), 2025 WL 3206662, at *8 (S.D.N.Y. Nov. 17, 2025). As to the third and fourth factors, the most efficient resolution of the controversy would be in the United States, where Plaintiffs' claims against AELTC, FFT, and their alleged co-conspirators are ongoing in this forum and before this Court. The final factor does not tip in either direction. Having determined that Plaintiffs have made a *prima facie* showing that AELTC and FFT possessed relevant minimum contacts with New York through USTA, and upon consideration of the reasonableness factors, AELTC and FFT fail to make a compelling case that the exercise of jurisdiction is unreasonable or antithetical to due process. Accordingly, AELTC's and FFT's motion to dismiss for lack of personal jurisdiction is denied.

## IV. THE GRAND SLAM DEFENDANTS' MOTION TO DISMISS IS DENIED

The Grand Slam Defendants—AELTC, FFT, and USTA—move under Rule 12(b)(6) to dismiss the claims against them. They principally argue that Plaintiffs have not plausibly alleged their participation in a conspiracy with the Tour Defendants, and that the rules governing the Grand Slam tournaments do not independently support an antitrust claim. At this stage of the case, the Court disagrees. The Complaint alleges agreements and conduct that, considered together and with all reasonable inferences drawn in Plaintiffs' favor, plausibly connect each Grand Slam Defendant to the challenged restraints. Accordingly, the Grand Slam Defendants' motion to dismiss is denied.

### A. Applicable Law[18]

"Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a 'contract, combination . . . or conspiracy, in restraint of trade or commerce.'" *Twombly*, 550 U.S. at 548 (quoting 15 U.S.C. § 1). "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id.* at 553. "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. This standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

"The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation." *Citigroup*, 709 F.3d at 135–36. "[A] plaintiff may . . .

[18] The applicable law governing a motion to dismiss under Rule 12(b)(6) is set forth above. *See supra* § II(A).

assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.* at 136. However, "plaintiffs [are] not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). "[A] complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136 (emphasis in original). "[A] horizontal agreement, such as the one alleged in the case before us, may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* As discussed *supra* § II(B), "[t]hese 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.*

Generally, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556–57. The allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. "[A]t the motion-to-dismiss stage, [a plaintiff] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." *Gelboim*, 823 F.3d at 782. "Skepticism of a conspiracy's existence is insufficient to warrant dismissal; 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* at 781 (quoting *Twombly*, 550 U.S. at 556).

### B. Plaintiffs Plausibly Allege Both Direct and Circumstantial Evidence of the Grand Slam Defendants' Participation in an Alleged Conspiracy

#### 1. Plaintiffs Plausibly Allege the Grand Slam Defendants' Participation in the Challenged Agreements

The Grand Slam Defendants argue that "Plaintiffs do not allege viable antitrust claims against the Grand Slam Defendants based on any specific agreement." GS Mot. at 15. Plaintiffs contend otherwise, arguing "direct evidence of horizontal agreements (i) among the Grand Slam Defendants, which are memorialized in the GSR; (ii) among the Grand Slam Defendants USTA and FFT and the Tour Defendants, which are memorialized in the Tour Rulebooks and Bylaws; and (iii) among all the Defendants, memorialized in the Ranking Point[s] Agreement." GS Opp. at 16. "[A]ccepting all factual allegations . . . as true and drawing all reasonable inferences in [Plaintiffs'] favor," *Sacerdote v. New York Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021), the Court finds that Plaintiffs have plausibly alleged viable antitrust claims against the Grand Slam Defendants based on the Ranking Points Agreement, Grand Slam Rulebook, and the ATP and WTA Bylaws.[19]

##### i. Plaintiffs Plausibly Allege the Grand Slam Defendants Entered Into a Ranking Points Agreement With the Tour Defendants

Plaintiffs allege that the Ranking Points Agreement, dating to approximately 1998 and continuing today, "governs Defendants' coordination with each other regarding Ranking Points, scheduling matters, and non-compete agreements." Compl. ¶ 217. Plaintiffs detail the relationship between Grand Slam results and Tour rankings, including the points ATP and WTA award for performance at Grand Slam tournaments. *Id.* ¶¶ 234, 238–39. According to Plaintiffs,

[19] As discussed elsewhere in this Opinion, the Complaint describes a wide-ranging and long-running antitrust conspiracy to control professional tennis. Nothing in this section is meant to suggest that these are the *only* bases on which Plaintiffs allege the Grand Slam Defendants participated in the charged conspiracy. The Court need not address every allegation to conclude that the Complaint states a claim against the Grand Slam Defendants and thus, their motion to dismiss must be denied.

"[b]y limiting the events at which professional tennis players can earn Ranking Points to tournaments within the cartel, which they compel players to attend at the exclusion of alternative events, Defendants and their co-conspirators can continue to restrict player compensation knowing that players will have no incentive, no time, and little flexibility to play at unsanctioned tournaments or on a different circuit." *Id.* ¶ 218.

The Grand Slam Defendants respond that Plaintiffs allege only three categories of conduct as to the Grand Slam Defendants in particular—(i) "the Grand Slam Defendants' use of ranking points," (ii) "the Grand Slam Defendants' purported 'desire' to extend their events to three weeks," and (iii) "certain provisions in the Grand Slam Rulebook that penalize late withdrawals and prevent entrants from playing in competing tournaments," GS Mot. at 20—none of which, they claim, plausibly supports the conclusion that the Grand Slam Defendants joined an antitrust conspiracy with the Tour Defendants. But Plaintiffs' allegations that the Ranking Points Agreement "ensures that players are compelled to participate in the Grand Slams and the tournaments on the ATP and WTA Tours, and penalizes players who seek to offer their services outside of the Defendants' closed system," GS Opp. at 24; *see* Compl. ¶¶ 347–57, 485–86, sufficiently plead direct evidence of an agreement that supports the inference that Defendants conspired to boycott players seeking to participate in alternative tournaments, even if, as the Grand Slam Defendants argue, "th[ose] facts are susceptible to an equally likely interpretation" consistent with lawful conduct. *Gelboim*, 823 F.3d at 782; *see also Anderson News*, 680 F.3d at 185 ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.").

While Defendants may ultimately establish that the ranking points system reflects independent decisions serving legitimate purposes, Plaintiffs, at this stage, have plausibly alleged "enough factual matter . . . to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

**ii. Plaintiffs Plausibly Allege That the Grand Slam Rulebook Is Direct Evidence of a Conspiracy**

Plaintiffs allege that the four Grand Slam Defendants jointly promulgate the Grand Slam Rulebook through their shared governance structure and apply it at each Grand Slam tournament. Compl. ¶¶ 106–08. They challenge provisions that use ATP and WTA rankings to determine most tournament entrants; require players to grant the Grand Slam Defendants rights to use their names, images, and likenesses without separate compensation; and restrict the endorsements players may display. *Id.* ¶¶ 109, 181–86, 197, 200, 205.

The Grand Slam Defendants acknowledge that the Grand Slam tournaments operate under a "common set of rules," GS Mot. at 2, but argue that those rules cannot sustain a claim under the rule of reason. Even assuming *arguendo* that the challenged restraints are subject to the rule of reason,[20] the Court finds that Plaintiffs have pled a viable rule of reason claim concerning the Grand Slam Rulebook.

[20] Both sides invite the Court to decide whether the challenged provisions are subject to *per se* or rule of reason analysis. *Compare* GS Opp. at 36 ("the anticompetitive restraints codified in the [Grand Slam Rulebook] are direct evidence of *per se* unlawful agreements among the Grand Slam Defendants"), *with* GS Mot. at 27 ("The coordination efforts reflected in the Grand Slam Rulebook and highlighted by Plaintiffs are textbook examples of sports regulation subject to the rule of reason."). The Grand Slam Defendants may prove correct that the rule of reason applies to the restraints at issue, *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018) ("Regulation of league sports is a textbook example of when the rule of reason applies.") (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984))), although the Grand Slams are not in a "league" with each other akin to the NCAA or a professional sports league that exists to organize teams to play against one another with some level of competitive parity. But the Court declines to decide at this stage whether each challenged provision is subject to *per se* treatment or the rule of reason. *See, e.g.*, *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039–40 (N.D. Cal. 2013) (declining in ruling on a motion to dismiss to determine as a matter of law that per se treatment would be inappropriate because the parties lack "sufficient factual evidence to support their contentions" and "[a]t this stage in th[e] action, the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of

The Grand Slam Defendants argue that Plaintiffs have not plausibly alleged that the Grand Slam Defendants have the market power necessary to cause anticompetitive effects. GS Mot. at 28–29. This argument fails for the simple reason that Plaintiffs have sufficiently pled direct anticompetitive effects, which is all that is required at this stage of the case. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("[P]roof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.").

Under the rule of reason, the "plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). A plaintiff can satisfy its initial burden either by "offering 'proof of actual detrimental effects'" on competition, such as reduced output or actual control over prices, or by showing that defendants "possess the requisite market power so that their 'arrangement has the potential for genuine adverse effects on competition.'" *Id.* at 546 (quoting *Indiana Fed'n of Dentists*, 476 U.S. at 460–61); *see also United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016). "Examples of actual anticompetitive effects include reduced output, decreased quality, and supracompetitive pricing." *Am. Express Co.*, 838 F.3d at 194.[21]

---

analysis to apply"); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("[T]he Court need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment."). In any event, Plaintiffs have alleged plausible restraints even under the rule of reason, so the choice between standards does not warrant dismissal at this stage.

[21] The Grand Slam Defendants argue that Plaintiffs' opposition "identif[ies] no non-conclusory, 'actual effect' traceable *to the [Grand Slam] Rulebook*." GS Reply at 14 (emphasis in original). In light of the well-pled allegations, the Court disagrees. *See, e.g.*, Compl. ¶¶ 21, 148–78, 215–82, 312, 392–406, 467–68, 485–86.

Here, Plaintiffs allege all three. Specifically, Plaintiffs allege that the relevant provisions of the Grand Slam Rulebook (i) suppress player compensation by, *inter alia*, "requir[ing] professional tennis players to assign their NIL rights to the Grand Slam Defendants . . . for $0 in return," Compl. ¶¶ 467–68; (ii) reduce output by, *inter alia*, not "permit[ting] the participation of any tennis player who fails to accept the restrictive conditions [that the Grand Slam Rulebook, among other agreements] impose[s] on the player's ability to compete professionally," *id.* ¶¶ 485–86; and (iii) decrease quality by, *inter alia*, "compell[ing] player attendance" and imposing "an unreasonably long schedule to achieve their group boycott," *id.* ¶ 486. Thus, the Court finds that Plaintiffs have stated facts sufficient to support an inference of direct anticompetitive effects.[22]

The Grand Slam Defendants also assert that the challenged provisions of the Grand Slam Rulebook do not restrain trade. GS Mot. at 29–32. But the Grand Slam Defendants' proffered business and purportedly pro-competitive justifications for the Grand Slam Rulebook, *e.g.*, that the challenged provisions are necessary to "fund their tournaments," "control the branding and appearance of their own tournaments," and "eliminate free riders," *id.* at 30–31, are not appropriately weighed on a motion to dismiss. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (finding a plausible Sherman Act claim because the boundary between competitive and exclusionary conduct "is a highly contextual analysis"); *see also Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-CV-02680 (AJN),

---

[22] The Grand Slam Defendants also argue that Plaintiffs' claims fail as a matter of law because "the Grand Slam Defendants do not compete with each other or the Tours." GS Mot. at 29; *see also id.* at 13–14. That argument fails for the same reasons that the Court rejected the Tour Defendants' analogous contention. *See supra* n.14; *Relevent Sports*, 61 F.4th at 310 (rejecting defendants' arguments that they "are not competitors" because that argument "runs headlong into [plaintiff's] allegations, which [the court] must accept as true"); *In re Ciprofloxacin Hydrochloride*, 261 F. Supp. 2d at 239 ("parties can be horizontal competitors regardless of whether they are actual competitors (i.e., currently competing in the same market) or potential competitors").

2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014) ("[T]o survive a motion to dismiss [plaintiffs] must plead plausible allegations that, if true, would show such an adverse effect."). As discussed above in connection with ATP's and WTA's motions to dismiss, the Court need not—and indeed should not—credit Defendants' alternative explanations of what they believe the facts will show when deciding a motion to dismiss for failure to state a claim.[23]

Accordingly, Plaintiffs have plausibly alleged that the Grand Slam Rulebook is direct evidence of the Grand Slam Defendants' participation in the conspiracy.

#### iii. Plaintiffs Plausibly Allege That USTA and FFT Are Bound by Relevant ATP and WTA Agreements

Plaintiffs identify a third set of written agreements: the ATP and WTA Rulebooks and Bylaws. According to the Complaint, FFT is subject to the ATP Rulebook and Bylaws through its ownership and operation of the Paris Masters, an ATP 1000 tournament, while USTA is subject to both Tours' Rulebooks and Bylaws through its ownership and operation (until 2022) of the Cincinnati Open, an ATP and WTA 1000 tournament. Compl. ¶¶ 46, 49. Plaintiffs identify provisions that restrict operators of sanctioned tournaments from staging certain competing events, regulate tournament prize-money awards, require the assignment of players' name, image, and likeness rights, and limit sponsorship opportunities. *Id.* ¶¶ 150–62, 180, 189–90, 197–204, 317–32. At the pleading stage, the alleged adoption and application of these rules to USTA and FFT supply evidence of concerted action. *See Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307–09 (2d Cir. 2023) ("[T]he adoption of the policy,

[23] To quickly dispose of several remaining arguments raised by the Grand Slam Defendants: Their antitrust-standing argument does not withstand scrutiny. GS Mot. at 32–33. Plaintiffs have sufficiently alleged specific harms emanating from the enforcement of the Grand Slam Rulebook's provisions in the form of, *inter alia*, alleged suppression of compensation and restriction of commercial opportunities. *See, e.g.*, Compl. ¶¶ 181–84, 205, 273, 467–68, 485–86. The Grand Slam Defendants' demand for a specific lost endorsement or other transaction attributable to an individual Grand Slam rule addresses the allegations too narrowly. Finally, PTPA possesses associational standing. *See infra* § V.

combined with the member leagues' prior agreement . . . to adhere to its policies, constitutes an agreement on the part of all . . . to adhere to the announced restriction on competition.").

The Grand Slam Defendants respond that the Tour rules do not govern the Grand Slam tournaments and that AELTC is not alleged to be subject to either Tour's rules. Neither point invalidates Plaintiffs' theory. Plaintiffs do not contend that the ATP Rulebook governs the French Open or that the ATP and WTA Rulebooks govern the U.S. Open. Rather, they contend that FFT and USTA, as operators of separate Tour tournaments (*i.e.*, other than the French or U.S. Opens), joined the challenged Tour arrangements and thereby participated in part of the broader alleged course of conduct. *See, e.g.*, Compl. ¶¶ 105, 156, 162, 189–90, 203–04, 255, 257, 302, 307–08, 330–31. The fact that each entity also operates a Grand Slam tournament does not erase its alleged obligations in its capacity as a Tour tournament operator. At the motion-to-dismiss stage, Plaintiffs' plausible allegations that FFT and USTA agreed to be bound by the terms of the ATP and WTA Rulebooks and Bylaws in their capacities as ATP and WTA tournament operators must be accepted as true. *See Sacerdote*, 9 F.4th at 106–07. Nor must this third theory independently connect AELTC to the Tour rules since Plaintiffs rely on the alleged Ranking Points Agreement and the Grand Slam Rulebook, as well as other allegations about concerted action, for AELTC's participation in the alleged conspiracy.

Accordingly, Plaintiffs have plausibly alleged direct evidence of a purportedly unlawful agreement regarding FFT's and USTA's participation in the identified Tour restraints.[24]

[24] The Grand Slam Defendants also contend that the Complaint impermissibly employs group pleading and thus, fails to connect the individual Grand Slam Defendants to any alleged conspiracy. GS Mot. at 23–26. Each Grand Slam Defendant, however, is alleged to operate an identified Grand Slam tournament and to participate in the common Grand Slam governance structure through which the challenged Grand Slam rules were adopted and are implemented today. *See* Compl. ¶¶ 43–49, 98–109. The alleged participation of AELTC, FFT, and USTA in that structure provides a factual basis for assessing each Defendant's connection to the rules. At this stage, the allegations give each Grand Slam Defendant notice of the conduct attributed to it and plausibly connect it to at least part of the challenged

### 2. Plaintiffs Plausibly Allege Indirect Evidence of the Grand Slam Defendants' Participation in an Alleged Conspiracy

Plaintiffs alternatively rely on circumstantial evidence to connect the Grand Slam Defendants to the alleged broader conspiracy. *See* GS Opp. at 24–34. Plaintiffs identify several examples of parallel conduct among the Tour Defendants and Grand Slam Defendants. The Grand Slam Rulebook and the Tour Rulebooks each require players to grant rights to use their names, images, and likenesses for tournament promotion without separate compensation. Compl. ¶¶ 180–87. Each also restricts the sponsorships or endorsements players may display during competition. *Id.* ¶¶ 197–205. The Grand Slam Defendants use ATP and WTA rankings to determine entry into their tournaments, while the Tours award ranking points for Grand Slam results. *Id.* ¶¶ 109, 216–45. Plaintiffs further allege that the Grand Slam tournaments occupy protected places on the tournament calendar and that Tour events generally are not scheduled to compete with them. *Id.* ¶¶ 242, 347–48.

The Grand Slam Defendants argue that Plaintiffs' allegations of parallelism fail to support any inference that the Grand Slam Defendants "agreed to join an 'expansive' agreement with the Tours amounting to a 'cartel' allegedly stretching back nearly three decades." GS Mot. at 12. But "antitrust plaintiffs need not plead the exact same conduct within a tight timeline to state a claim under Section 1 of the Sherman Act. Rather, plaintiffs must state facts consistent with defendants' having engaged in conduct that contributes to an inference of concerted action."

---

course of conduct. *See Kashef v. BNP Paribas SA*, No. 16-CV-03228 (AJN), 2021 WL 1614406, at *2 (S.D.N.Y. Apr. 26, 2021) ("Though 'lumping' defendants together may in many instances be improper, the Second Circuit has also made clear that Plaintiffs do not always need to 'separate out claims against individual defendants' as long as those defendants have 'notice of the substance of plaintiff's claims' against them." (quoting *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004))); *accord Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 171 n.210 (S.D.N.Y. 2018) (rejecting defendants' group pleading argument on the grounds that "dismissing plaintiffs' claims for failing to include specific conspiracy allegations as to each defendant in the amended complaint would be premature at this early stage of litigation" (citing *Gelboim*, 823 F.3d at 771)).

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 82 (2d Cir. 2025). Plaintiffs have pled "general similarities in substance, timing, or effect," which is sufficient to demonstrate parallel conduct. *Id.* at 81; *see also id.* ("[T]he Supreme Court and our binding authority that followed rejects setting a high bar for what constitutes parallel conduct.").

The Court also finds that Plaintiffs have sufficiently pled plus factors that support the plausibility of a Section 1 conspiracy. *See Citigroup*, 709 F.3d at 136 (plus factors include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications"); *see also In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-CV-02601 (VM), 2022 WL 768680, at *20 (S.D.N.Y. Mar. 14, 2022) (listing "high barriers to entry" as a plus factor). Plaintiffs allege that the Grand Slam Defendants and Tour Defendants share an interest in maintaining a system in which players must participate in sanctioned events to obtain ranking points and access the Grand Slams, while tournament operators (and the Grand Slams in particular) face less pressure to compete for those players' services. Compl. ¶¶ 168–70, 217–19, 236–44. Plaintiffs further allege an ongoing institutional relationship: the Grand Slam Defendants coordinate operations through a shared governance structure known as Grand Slam Tennis which, *inter alia*, manages the Grand Slam Defendants' relationships with the Tour Defendants, and the Grand Slam Defendants and the Tour Defendants coordinate player-entry criteria and ranking points. *Id.* ¶¶ 106–10, 217, 236–40. Plaintiffs also allege that Defendants use these systems to set a demanding, year-long schedule with restrictive play requirements, which "serves as a barrier to market entry for unsanctioned tournaments." *Id.* ¶¶ 246, 287–90.

At this stage, all that is required of Plaintiffs is that they "allege *a* plausible theory based on circumstantial evidence, not *the only* or even *the most* plausible one." *See Mosaic Health*, 156 F.4th at 84 (emphases in original). Plaintiffs have done so for the Grand Slam Defendants.

## V. THE TOUR DEFENDANTS' MOTION TO DISMISS PTPA FOR LACK OF STANDING IS DENIED

The Tour Defendants move to dismiss PTPA for lack of standing. They argue that PTPA lacks associational standing, organizational standing, and antitrust standing, and must, therefore, be dismissed from this action. Tour Defs. Mot. at 6. Because the Court finds that PTPA has associational standing, the Tour Defendants' motion to dismiss PTPA for lack of standing is denied.

### A. Legal Standard on a Motion to Dismiss for Lack of Standing

A court must dismiss a claim, or a particular plaintiff, for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.

2011). On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

**B. PTPA Possesses Associational Standing**

Generally, an organization "may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). Associational standing is established on behalf of a membership organization when: "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Tour Defendants contend that PTPA lacks the first and third elements, *i.e.*, PTPA fails to allege it has any member who has suffered an injury from the alleged conduct, and PTPA's claims would require the participation of individual members. Tour Defs. Mot. at 6. The Court disagrees.

**1. PTPA Has Sufficiently Pled That It Has at Least One Member With Standing**

The Tour Defendants argue that PTPA "does not actually allege that it has members who are professional tennis players—much less identify any of its members who were allegedly injured by Defendants' conduct, or what conduct specifically harmed any actual PTPA member." *Id.* at 7. This is incorrect.

First, PTPA submitted the declaration of Saisai Zheng, a professional tennis player on the WTA Tour. Dkt. No. 127 ("Zheng Decl.") ¶ 1. Ms. Zheng avers that she is a member of PTPA

and its executive committee. *Id.* ¶ 3. Contrary to the Tour Defendants' assertion that PTPA "does not actually allege that it has members who are professional tennis players," Tour Defs. Mot. at 7, PTPA has established that "at least one identified member ha[s] suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also* Compl. ¶¶ 119 (PTPA has "four categories of membership," with a player's "eligibility for a particular category . . . to be determined by his or her global rank in the ATP or WTA world rankings"), 124–25 (naming various present and former members of PTPA's executive committee, which is exclusively comprised of and elected by PTPA's membership at-large).

Second, PTPA sufficiently alleges that its members who are current or former professional tennis players were injured by Defendants' conduct and details the specific anticompetitive conduct that harmed its members. *See, e.g.*, Compl. ¶¶ 441 (alleging that Defendants have entered into agreements to "fix player compensation for both their services and for the assignment of the right to commercially exploit their names, images, and likenesses," "restrict output through a closed ranking system and tournament structures," and "refuse to deal with professional tennis players who do not abide by the . . . rules of their cartel"), 443 (alleging that as a result of Defendants' antitrust violations, "PTPA's members . . . have received and will receive compensation less than what they would have received had Defendants not conspired with each other . . . to impose illegal restraints and to unlawfully maintain monopsony power").

To the extent the Tour Defendants argue that associational standing demands a formal membership list and identification of all PTPA members, *see* Tour Defs. Mot. at 7; Tour Defs. Reply at 1–2, that is not a requirement at this stage. *See Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 122 n.7 (2d Cir. 2025) ("an organizational plaintiff need not identify specific injured members by name at the pleading stage" (citing *Bldg. & Const. Trades Council of Buffalo &*

*Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144–45 (2d Cir. 2006))); *Nat'l Org. for Women-New York City v. United States Dep't of Def.*, 755 F. Supp. 3d 350, 362 (S.D.N.Y. 2024) ("an organization need not include the names of its injured members at the pleading stage").

Accordingly, the Complaint contains adequate factual allegations to clear the low bar required to establish the first prong of the associational standing test at this stage of the case.[25]

**2. PTPA's Claims Do Not Require Substantial Participation of Its Individual Members**

The Tour Defendants argue that PTPA lacks associational standing for "additional, prudential reasons" related to the third prong of the *Hunt* test, namely, (i) PTPA's claims would require the "substantial participation" of the PTPA's individual members, Tour Defs. Mot. at 9; (ii) PTPA serves no independent function in this lawsuit, *id.* at 11; and (iii) PTPA's participation as a plaintiff would circumvent Rule 23's requirements, *id.* at 12. These arguments do not pose a barrier to associational standing, at least at this stage of the case.

First, the Tour Defendants assert that because PTPA's claims "turn on injury questions about whether individual players would be better off in Plaintiffs' but-for world," "substantial participation" of PTPA's members is necessary to litigate PTPA's claims. Tour Defs. Mot. at 9–10. At this early point in the litigation, the Court is not convinced, as a prudential matter, that

[25] Even assuming *arguendo* that PTPA is "an organization without 'members' in a traditional sense," PTPA has sufficiently demonstrated that it "function[s] effectively as a membership organization," *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 196 (2d Cir. 2000), by alleging sufficient "indicia of membership," *Hunt*, 432 U.S. at 344. PTPA has "four categories of membership," and members exclusively comprise and elect the PTPA's executive committee. Compl. ¶¶ 119, 121–23; *see Hunt*, 432 U.S. at 344 (recognizing that the apple growers and dealers "alone elect the members of the Commission; they alone may serve on the Commission"); *Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 158–59 (2d Cir. 2012) (rejecting associational standing because of the "scant evidence in the record" that the purported represented parties "have the power to elect [the organization's] directors, make budget decisions, or influence [the organization's] activities or litigation strategies"). PTPA has adequately pled that it represents at least a substantial subset of men's and women's professional tennis players and "provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345; Compl. ¶¶ 128–31.

determining PTPA's claims and its right to injunctive and declaratory relief will involve the fact-intensive and individualized participation of each member that the third prong of *Hunt* was intended to avoid. *See M.O.C.H.A. Soc., Inc. v. City of Buffalo*, 199 F. Supp. 2d 40, 48–50 (W.D.N.Y. 2002) ("*Hunt*'s third prong is prudential rather than constitutional in nature. Judgments as to prudential standing are vested in the trial court's sound discretion since they involve 'judicially self-imposed limit[s] on the exercise of federal jurisdiction, not a constitutional mandate.'" (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557–58 (1996))).

PTPA seeks only declaratory and injunctive relief, which satisfies the "relief requested" component of *Hunt*'s third prong. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (when an association seeks equitable relief, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"). The Tour Defendants correctly assert that this prong is not "automatically satisfie[d]" whenever an association "request[s] equitable relief rather than damages." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004). Courts "also must examine the claims asserted to determine whether they require individual participation." *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993); *see Bano*, 361 F.3d at 714.

PTPA asserts that "Defendants' agreements to restrain trade, Defendants' conspiracy to monopsonize, and the Tours' monopsonization have suppressed competition for the services of professional tennis players resulting in antitrust injury to Plaintiffs and PTPA members," in violation of the Sherman Act. Compl. ¶ 440. Thus, the legal questions before the Court will include whether Defendants entered into a conspiracy to, *inter alia*, fix player compensation, allocate markets, restrict output through a closed ranking system and tournament structures, and

refuse to deal with professional tennis players who do not abide by the rules of Defendants' cartel; whether the Tour Defendants willfully acquired monopsony power; and whether, "[a]bsent Defendants' violations, a competitive marketplace would have yielded . . . prize money pools and earning capabilities that are more competitive, better schedules and playing conditions for players resulting in lower injury rates, and tournaments that compete for the services of players and the demand of fans." *Id.* ¶ 442. In answering these principal liability questions, the "primary subject of inquiry" will be "the conduct of Defendants," *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 229 (2d Cir. 2011), and "individualized inquiry [will not be] required to resolve the broader legal question[s]" at issue, *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 672 (S.D.N.Y. 2009); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996) ("the existence of a conspiracy is the predominant issue in price fixing cases . . . even where significant individual issues are present" (citing cases)).

Moreover, while some individualized showing of facts may be necessary to answer these questions, "[t]he fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 249–50 (S.D.N.Y. 1997); *see All. for Open Soc'y Int'l*, 651 F.3d at 230 (noting that *Hunt* "held that an association of apple growers had standing to challenge a statute, notwithstanding the varied nature and extent of the burdens suffered by the association's members in complying with the statute"). To enjoin Defendants' purportedly anticompetitive conduct, PTPA would not have to show redundant evidence of each separate impact of the conspiracy on every one of its members. *See Am. Booksellers Ass'n v. Houghton Mifflin Co.*, No. 94-CV-08566 (JFK), 1995 WL 92270, at *5 (S.D.N.Y. Mar. 3, 1995). Rather, "[i]t [will be]

enough that [PTPA] prove the [antitrust] violations and the impact those violations have had on at least some [members]." *Id.*[26]

The Tour Defendants separately argue that PTPA "serves no independent function in this lawsuit" because the Player Plaintiffs seek to represent classes of professional tennis players asserting identical claims. Tour Defs. Mot. at 11. As the Tour Defendants correctly note, "many courts have declined to recognize the standing of associational ADA plaintiffs when the claims they assert are identical to the individual plaintiffs in the case." *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 173 (S.D.N.Y. 2006) (citing cases). But the Court does not read those decisions as establishing a *per se* rule that an association lacks standing whenever a member joins the same lawsuit.[27] Moreover, the named players' proposed classes

---

[26] The cases cited by the Tour Defendants are inapposite because they either concern highly individuated proof or seek damages as a remedy. *See, e.g.*, *Bano*, 361 F.3d at 714–15 (2d Cir. 2004) (finding no associational standing where members "suffered bodily harm and damage to real property they own" so "each of those individuals would have to be involved in the proof of his or her claims"); *Massone v. Washington*, No. 20-CV-07906 (LJL), 2022 WL 2657168, at *7 (S.D.N.Y. July 8, 2022) ("This case concerns the medical records and diagnoses of each individual Union member allegedly impacted by Defendants' actions."); *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 257 (S.D.N.Y. 2018) (finding no associational standing because "Plaintiffs request compensatory damages").

Adopting the Tour Defendants' position on associational standing would also mean that any organization bringing an antitrust claim on behalf of its members would lack associational standing. *See* Tour Defs. Mot. at 9–10 ("[N]otwithstanding that the PTPA seeks equitable relief only, its claims turn on injury questions about whether individual players would be better off in Plaintiffs' but-for world."). But "[i]n the Second Circuit there is no persuasive authority that . . . associational standing is precluded in the antitrust context," and "[e]very other circuit that has considered the issue since *Hunt* has held that associational standing is proper under Section 16 [of the Sherman Act]." *Barr v. Dramatists Guild, Inc.*, 573 F. Supp. 555, 563 (S.D.N.Y. 1983).

[27] First, these decisions arise exclusively in the ADA context. *See Access 4 All*, 458 F. Supp. 2d at 166 ("[M]any courts have declined to recognize the standing of associational ADA plaintiffs when the claims they assert are identical to the individual plaintiffs in the case."). Second, these decisions adjudicated motions for summary judgment, not traditional motions to dismiss. *See, e.g.*, *Access 4 All*, 458 F. Supp. 2d at 166 (converting the defendant's motion to dismiss into a motion for summary judgment); *Access 123, Inc. v. Markey's Lobster Pool, Inc.*, No. 00-CV-00382 (JD), 2001 WL 920051, at *1 (D.N.H. Aug. 14, 2001) (same); *see also Do No Harm*, 126 F.4th at 113–14 (threshold for standing is different at different stages of the litigation).

have not been certified. Their presence therefore does not make PTPA's representation of its members wholly duplicative, at least at this stage.

Lastly, the Tour Defendants contend that PTPA's participation in this action would "threaten unfair circumvention of Rule 23's requirements." Tour Defs. Mot. at 12–13. As an initial matter, "the Supreme Court has made it clear that associational standing may be appropriate even when class certification is not." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 249 (S.D.N.Y. 1997) (citing *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 228 (1986)). To the extent the Tour Defendants argue that Rule 23 is a superior vehicle for bringing Plaintiffs' claims, the Supreme Court's pronouncement in *International Union* suggests otherwise. *See* 477 U.S. at 289 ("While a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital."). In any event, these are questions properly raised at the class certification stage, not at the pleading stage, and do not foreclose the present finding that PTPA has associational standing.

Because Court finds PTPA has associational standing, the Court need not and does not address whether PTPA has organizational standing.[28] The Tour Defendants' motion to dismiss PTPA is denied.

---

[28] In the context of associational standing, the association's standing is "coterminous" with that of its injured members. *See Access 4 All*, 458 F. Supp. 2d at 174–75. Because the Player Plaintiffs have antitrust standing and Defendants do not dispute otherwise, the Court need not and does not address whether PTPA independently has antitrust standing as an organization. *See Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 166 F. Supp. 2d 1155, 1168 n.8 (E.D. Mich. 2001) (concluding that an organization had "associational standing to enjoin the continued antitrust injury to its membership even when the [organization] ha[d] not, itself, suffered an injury").

## VI. ATP'S MOTION TO DISMISS PURSUANT TO ITS FORUM-SELECTION CLAUSE IS DENIED

ATP moves to dismiss all claims against it based on the forum-selection clause in its Bylaws. For the reasons that follow, the motion is denied.

### A. Legal Standard on a *Forum Non Conveniens* Motion

Although ATP brings its motion pursuant to Rule 12(b)(6), the Second Circuit has affirmatively stated that the "proper procedural mechanism for dismissing a claim based on a forum selection clause" is "through the doctrine of *forum non conveniens*, rather than Rule 12(b)." *Rabinowitz v. Kelman*, 75 F.4th 73, 79–80 (2d. Cir. 2023) (quoting *Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014)). "Section 1404(a) therefore provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013); *see also id.* at 60 ("for the subset of cases in which the transferee forum is within the federal court system . . . Congress has replaced the traditional remedy of outright dismissal with transfer.").

While courts ordinarily have broad discretion to transfer cases on an individualized, case-by-case basis, *see D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006), the Section 1404(a) calculus changes in cases involving forum-selection clauses, *see Atl. Marine*, 571 U.S. at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)); *see also Fasano v. Yu Yu*, 921 F.3d 333, 335 (2d Cir. 2019) ("Where the parties have contractually selected a forum, however, the forum selection clause substantially modifies the *forum non conveniens* doctrine."). The "usual tilt in favor of the plaintiff's choice of forum gives way to a presumption in favor of the contractually selected forum." *Martinez*, 740 F.3d at 218 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 6 (1972)). In other words, "[w]here the parties have formed a contract containing a valid mandatory forum selection clause, the discretionary

language of Section 1404(a) becomes nearly mandatory, and the district court should transfer the case to the forum specified in the clause except 'under extraordinary circumstances unrelated to the convenience of the parties.'" *Miller Fam. Indus., Inc. v. Ives*, No. 25-CV-02923 (LJL), 2025 WL 2205937, at *4 (S.D.N.Y. Aug. 4, 2025) (quoting *Atl. Marine*, 571 U.S. at 62).

### B. This Case Presents "Extraordinary Circumstances" that Justify Overriding Even a Valid and Enforceable Forum-Selection Clause

The parties dispute whether the forum-selection clause in ATP's Bylaws applies to Plaintiffs' antitrust claims under Delaware law. *Compare* Pls. Opp. at 15–16 (arguing that the forum-selection clause does not encompass Plaintiffs' claims because Plaintiffs "are not suing in their capacity as 'members' under the ATP Bylaws," and that Plaintiffs' claims are "squarely 'external claims' that are beyond the reach of what bylaws may regulate under" Delaware law), *with* ATP Reply at 3–4 (arguing that ATP's forum-selection bylaw is valid, enforceable, and covers Plaintiffs' antitrust claims). The Court need not resolve this difficult issue of Delaware state corporate law, because even assuming ATP's view is correct, this case satisfies the "extraordinary circumstances" contemplated by *Atlantic Marine* that permit a transfer even in the face of a valid forum-selection clause. 571 U.S. at 52.

Where there is a valid forum-selection clause, *Atlantic Marine* requires district courts to adjust the Section 1404(a) analysis in three ways, two of which are relevant here. First, "the [contractually-bound] plaintiff's choice of forum merits no weight," *Atl. Marine*, 571 U.S. at 63, and "the plaintiff must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed," *id.* at 64. Second, a court "must deem the private-interest factors to weigh entirely in favor of the preselected forum," and "may consider arguments about public-interest factors only." *Id.* at 64; *see also id.* at 64 n.6 (listing public-interest factors).

"[T]he practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64.

Defendants' various other motions have been denied, and so the Court turns to the *Atlantic Marine* analysis with all Defendants and all claims presently in the Southern District of New York. Because Section 1404(a) "authorizes the transfer only of an entire action and not of individual claims," and the forum-selection clause binds at most ATP and the ATP Player Plaintiffs, the Court would first need to sever the claims against ATP by the ATP Player Plaintiffs to transfer them to Delaware. *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968); *see also* ATP Mot. at 14. A district court may sever the claims against one or more defendants for the purpose of transfer "where the administration of justice would be materially advanced by severance and transfer." *Bintliff*, 398 F.2d at 618.[29]

While *Atlantic Marine* made clear that, "in most cases, district courts must enforce valid forum-selection clauses when adjudicating § 1404(a) transfer motions," the Supreme Court "did not have occasion to address how that general rule should apply where non-contracting parties are present, much less how it should apply where . . . there are other complications such as competing forum-selection clauses." *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 401 (3d Cir. 2017); *see also In re Rolls Royce Corp.*, 775 F.3d 671, 681 (5th Cir. 2014) ("*Atlantic Marine*

[29] In considering a motion to sever, the Court must weigh several factors, including "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *Bent v. Zounds Hearing Franchising, LLC*, No. 15-CV-06555 (PAE), 2016 WL 153092, at *9 (S.D.N.Y. Jan. 12, 2016). "The decision whether to grant a severance motion is committed to the sound discretion of the trial court." *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1082 (2d Cir. 1988). Most of these factors are encompassed within the transfer analysis in the balance of this section, and so the Court does not separately analyze them here. For the reasons discussed, these factors would weigh decisively against severance if they were analyzed outside the context of a forum-selection clause.

does not speak directly to the issue of severance."). Nor has the Second Circuit opined on how the severance-and-transfer analysis is to proceed in the face of a forum-selection clause where non-contracting parties or claims that fall outside the relevant contract are present. *See Crede CG III, Ltd. v. 22nd Century Grp., Inc.*, No. 16-CV-03103 (KPF), 2017 WL 280818, at *11 (S.D.N.Y. Jan. 20, 2017).

Even so, the Court is not without persuasive guidance. The Fifth Circuit has explained that "*Atlantic Marine* was premised on the fact that the parties had agreed in advance where their private litigation interests lie, and the reviewing court had no cause to disturb those expectations," but the transfer analysis is "more complicated" when "not all parties to the lawsuit have entered into a forum selection agreement." *Rolls Royce*, 775 F.3d at 679. In the latter context, the Fifth Circuit concluded that "[a] litigant not party to such a contract did not, of course, make any such advance agreements and *their* private interests must still be considered by the district court." *Id.* (emphasis in original). This highlighted for the Fifth Circuit the tension between "*Atlantic Marine* not[ing] that public factors, standing alone, were unlikely to defeat a transfer motion" and "that section 1404 was designed to minimize the waste of judicial resources of parallel litigation of a dispute." *Id.* Accordingly, the Fifth Circuit held that "where some but not all parties have entered into a forum selection clause," the severance-and-transfer inquiry should proceed as follows:

> First, pursuant to *Atlantic Marine*, the private factors of the parties who have signed a forum agreement must, as matter of law, cut in favor of severance and transfer to the contracted for forum. Second, the district court must consider the private factors of the parties who have *not* signed a forum selection agreement as it would under a Rule 21 severance and section 1404 transfer analysis. Finally, it must ask whether this preliminary weighing is outweighed by the judicial economy considerations of having all claims determined in a single lawsuit. In so determining, the district court should consider whether there are procedural mechanisms that can

> reduce the costs of severance, such as common pre-trial procedures, video depositions, stipulations, etc.

*Id.* at 681 (emphasis in original). The Fifth Circuit further opined that "[t]his is necessarily a fact-sensitive analysis," and that while *Atlantic Marine* "informs the analysis," it does not "categorically require[] severance-and-transfer in all situations." *Id.*; *see also id.* at 680 ("when considering a severance-and-transfer motion, the inquiry collapse[s] into an inquiry into the relative merits of convenience versus judicial economy").

The Third Circuit has adopted a substantially similar framework. *See Howmedica*, 867 F.3d at 403–04 ("Building on *Rolls Royce*, we prescribe a four-step inquiry in which the reviewing court . . . will consider in sequence: (1) the forum-selection clause[], (2) the private and public interests relevant to non-contracting parties, (3) threshold issues related to severance, and (4) which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private interests.").

Here, however, it is not necessary to thoroughly assess the weight that should be assigned to competing private interests, because the Court is persuaded that "public interest factors favoring all members of an alleged conspiracy to restrain trade be judged in one lawsuit weigh strongly against severance and, consequently, against the transfer of" the ATP Player Plaintiffs' claims against ATP. *Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 964 (W.D. Wis. 2017).[30] "Like the Fifth Circuit, the court does 'not read *Atlantic Marine* to

[30] Even if the Court did assess competing private interests, it would find that the analysis weighs heavily in favor of retaining all Plaintiffs' claims against WTA and the Grand Slam Defendants in this District rather than transfer to Delaware. Among other reasons, WTA and USTA are both incorporated in New York and therefore have a local stake in the outcome of this dispute, Compl. ¶¶ 42, 48; the claims against WTA and USTA arise from their alleged actions in New York, including the operation and organization of the U.S. Open and the execution of relevant agreements, *id.* ¶ 48; *see also supra* § III(B); WTA and USTA executives who may serve as witnesses are likely to be located in New York, *see* Compl. ¶ 55; and, as further evidence of WTA's desire to litigate its disputes in New York, the WTA Rulebook provides that any arbitration or action to confirm an arbitration award involving WTA may

mandate severance and transfer of a party bearing a forum selection clause in all multiparty cases, regardless of countervailing considerations of judicial economy.'" *Id.* (citing *Rolls Royce*, 775 F.3d at 677). Indeed, "the need—rooted in the valued public interest in judicial economy—to pursue the same claims in a single action in a single court can trump a forum-selection clause." *Rolls Royce*, 775 F.3d at 679; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 13-CV-03349 (SI), 2014 WL 1477748, at *2 (N.D. Cal. Apr. 14, 2014) (denying transfer motion because "enforcing the forum selection clause" would "require that [plaintiff's] claims against [one defendant] be tried separately from its substantially similar claims against the other defendants"); *Aquila v. Fleetwood, R.V., Inc.*, No. 12-CV-03281 (LDW) (GRB), 2014 WL 1379648, at *4–5 (E.D.N.Y. Mar. 27, 2014) (denying transfer motion based on a forum-selection clause in "a case involving overlapping claims against multiple defendants" because of "the public interests in avoiding duplicative proceedings and potentially inconsistent results").

Permissible public-interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine*, 571 U.S. at 62 n.6. ATP argues that none of these factors trump the interest in enforcing a valid forum-selection clause, but "[t]hese factors do not comprise an exclusive list." *Albert Fadem Tr. v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002). "[R]elevant public interest[] factors for the purposes of this case include the avoidance of the potential for inconsistent judgments and the promotion of judicial economy." *Pergo, Inc. v. Alloc, Inc.*, 262

---

only be brought before a New York federal or state court, WTA Rulebook at 412. In addition, because of the denial of the other motions, other Plaintiffs not bound by the forum-selection clause (PTPA and the WTA Player Plaintiffs) continue to have claims against ATP that they have filed in this District, and their private interests in continuing to litigate their case in the forum of their choosing, and in not litigating claims against some Defendants here and some Defendants in Delaware, would also counsel against transfer.

F. Supp. 2d 122, 131 (S.D.N.Y. 2003); *see also Bintliff*, 398 F.2d at 619 (explaining that relevant considerations for a transfer analysis include whether "duplic[ative] litigation . . . and inconsistent results can be avoided"); *Cont'l Cas. Co. v. Staffing Concepts, Inc.*, No. 06-CV-05473, 2009 WL 3055374, at *7 (N.D. Ill. Sept. 18, 2009) ("outside of the traditional public interest factors, a district court has an interest in efficiency and avoiding the possibility of multiplicity of litigation").

The interests of judicial economy, the avoidance of duplicative litigation, and the avoidance of the potential for inconsistent judgments clearly favor denying ATP's motion, especially in this sprawling antitrust case involving numerous Defendants and numerous interrelated claims. Transferring the ATP Player Plaintiffs' claims against ATP to Delaware would mean litigating those claims separately, while the ATP Player Plaintiffs would be simultaneously litigating nearly identical claims against all of the other Defendants, who are alleged to be co-conspirators with ATP, and ATP would be simultaneously defending those nearly identical claims as to PTPA and the WTA Player Plaintiffs, all in the Southern District of New York.[31] *See Ashley Furniture*, 275 F. Supp. 3d at 965. Compelling the ATP Player Plaintiffs "to litigate the same issues in a different jurisdiction . . . when this Court is adjudicating those very same issues" in this District would be "needlessly inconvenient and burdensome," and "plainly contrary to the policy of the federal judiciary of promoting the consistent and complete adjudication of disputes." *Frigate Ltd. v. Damia*, No. 06-CV-04734

[31] ATP also argues that PTPA should be bound by the forum-selection clause, even though it is not a signatory, to the extent their claims are derivative of the claims of the ATP Player Plaintiffs. ATP Mot. at 9–10. This argument has numerous legal and factual flaws (not least that PTPA also represents the interests of female players, who remain in this lawsuit with live claims against ATP), but the Court need not resolve it because even if ATP were successful in binding PTPA to the forum-selection clause for the claims of male tennis players against ATP, it would not materially change the analysis or the Court's conclusion.

(CRB), 2007 WL 127996, at *3 (N.D. Cal. Jan. 12, 2007); *Aquila*, 2014 WL 1379648, at *4 ("The public-interest factors weigh against 'the bisecting of what is essentially a single controversy.'" (quoting *Caldwell Mfg. Co. v. Unique Balance Co.*, 18 F.R.D. 258, 267 (S.D.N.Y. 1955))); *accord Grp. Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 497 (2d Cir. 1986) ("[T]o force [plaintiff] to litigate its claims against [defendants] separately when the claims and factual issues are 'but a single controversy' results in an inefficient use of judicial resources."). "Given the commonality (if not nearly identical nature) of the facts and the law applicable to [the ATP Player Plaintiffs'] claims against [ATP] and the other alleged co-conspirators, the judicial inefficiencies for which [ATP's] motion calls is not justified here by any countervailing public interest in enforcing the forum selection clause." *Ashley Furniture*, 275 F. Supp. 3d at 965 (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990)).[32] Denial of ATP's motion would also prevent potentially inconsistent adjudication. *See Aquila*, 2014 WL 1379648, at *4 ("It is in the public interest to avoid 'possible conflicts between' two different courts by not splitting an action involving similarly situated defendants." (quoting *F.T.C. v. MacArthur*, 532 F.2d 1135, 1143 (7th Cir. 1976))).[33]

---

[32] Much of ATP's argument presupposes that relevant motions would be adjudicated in its favor. *See* ATP Mot. at 12 (arguing that granting the motion to sever-and-transfer "will not result in related claims proceeding simultaneously in different fora" because "PTPA's claims against ATP should be dismissed for lack of standing," "WTA has moved to compel the arbitration of all claims," and "[a]ny claims by the WTA Player Plaintiffs against ATP are implausible and should be dismissed"). The Court has denied Defendants' motions, so ATP's arguments that depend on its success elsewhere are unavailing and the motion to dismiss or transfer must be decided in a world where PTPA's and the WTA Player Plaintiffs' claims against ATP, as well as the ATP Player Plaintiffs' claims against WTA and the Grand Slam Defendants, will proceed here in the Southern District of New York.

[33] ATP's remaining arguments as to why judicial economy concerns should not override its forum-selection clause miss the mark. First, *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400 (E.D.N.Y. 2014), is easily distinguishable. *See* ATP Mot. at 15. In that case, the district court noted that "the decision whether to grant or deny the motion to sever and transfer, by itself, will have a marginal impact on judicial economy," because it was "duty-bound to refer [the plaintiff's] claims [against the remaining defendants] to arbitration." *Paduano*, 55 F. Supp. 3d at 435. Not so here.

The Court is mindful of the Supreme Court's caution that "[o]nly under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion [to enforce a forum-selection clause] be denied." *Atl. Marine*, 571 U.S. at 62; *see also id.* at 64 ("Although it is 'conceivable in a particular case' that the district court 'would refuse to transfer a case notwithstanding the counterweight of a forum-selection clause,' such cases will not be common." (quoting *Stewart*, 487 U.S. at 30–31)). But in light of the current posture, where all Defendants and all claims have survived the motion-to-dismiss stage, and judicial economy weighs overwhelmingly in favor of litigating all claims in a single forum, the Court is satisfied that the case at bar present "extraordinary circumstances" where the interests of justice do not support severance and transfer. 571 U.S. at 62; *see also Howmedica*, 867 F.3d at 405 ("Only if it determines that the strong public interest in upholding the contracting parties' settled expectations is 'overwhelmingly' outweighed by the countervailing interests can the court, at this fourth step, decline to enforce a valid forum-selection clause." (citing *Atl. Marine*, 571 U.S. at 67)); *Crede*, 2017 WL 280818, at *11 ("[W]hile the Second Circuit has not yet addressed this exact question following *Atlantic Marine*, it has long affirmed its 'strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted

---

Second, ATP's talismanic invocation of "pretrial management and coordination" fails to convince the Court that careful management of discovery could eliminate most of the judicial inefficiencies created by severance and transfer to a new judge in Delaware. ATP Mot. at 13 n.9. Any benefit generated by pretrial management and coordination in an antitrust case of this scope and complexity is likely to be marginal at best, and does nothing to address the risk of inconsistent legal rulings and the burden on the courts of addressing the same complex antitrust issues in multiple places by multiple judges.

Third, ATP argues that "to allow consideration of private interests to supersede the players' agreement to a forum selection clause because the Amended Complaint includes conclusory claims of conspiracy with WTA is precisely the type of gamesmanship multiple courts have warned against." ATP Mot. at 17. That point is well-taken, but there is no evidence to support ATP's accusation, and this is plainly not a case where the alleged co-conspirators were "joined in a transparent effort to defeat the transfer." *Rolls Royce*, 775 F.3d at 683. The Court has "prudently exercise[d] [its] judgment in determining how the business of the federal courts is to be allocated, giving the contracted-for choice of forum its due," *id.*, and finds, for the reasons stated, that ATP's motion should be denied.

more efficiently[;] duplic[ative] litigation can be avoided, thereby saving time and expense for both parties and witnesses[;] and inconsistent results can be avoided.'" (quoting *Bintliff*, 398 F.2d at 619)).

Accordingly, ATP's motion is denied.

## CONCLUSION

For all of the foregoing reasons, Defendants' motions are DENIED. USTA's motion to seal at Dkt. No. 188 is GRANTED. The Clerk of Court is respectfully directed to terminate the motions at Dkt. Nos. 115, 118, 120, 183, 186, 188, and 189.

The parties shall appear for a conference on **October 29, 2026**, at **2:30 p.m.**, in Courtroom 110 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007. In advance of that conference, the parties should confer on next steps in this case, and submit a joint letter of no more than five pages summarizing their proposal(s), no later than three business days before the conference.

Dated: September 30, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge